# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____


ARTHUR LEE ALFRED II; EZEQUIEL MARTINEZ, JR.; and TOVA LAITER,


     Plaintiffs,


v.


     THE WALT DISNEY COMPNAY, a Delaware Corporation; DISNEY ENTERPRISES, INC., a Delaware Corporation; WALT DISNEY MOTION PICTURES GROUP, INC, a California Corporation; DISNEY CONSUMER PRODUCTIONS, INC., a California Corporation; DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., a California Corporation; DISNEY BOOK GROUP, LLC, a Delaware Limited Liability Company; DISNEY INTERACTIVE STUDIOS, INC., a California Corporation; DISNEY STORE USA, LLC, a Delaware Corporation; WALT DISNEY ATTRACTIONS TECHNOLOGY, LLC, a Delaware Limited Liability Company; WALT DISNEY THEATRICAL RECORDINGS, a California Corporation; WALT DISNEY PARKS AND RESORTS WORLDWIDE, a Florida Corporation; ABC, INC., a New York Corporation; BUENA VISTA HOME ENTERTAINMENT, INC., a California Corporation; BUENA VISTA MEDIA, a California Corporation; BUENA VISTA PRODUCTIONS; a California Corporation; BUENA VISTA THEATRES, INC.;  a California Corporation; BUENA VISTA THEATRICAL GROUP LTD., New York Corporation; BUENA VISTA VIDEO ON DEMAND, a California Corporation; BUENA VISTA BOOKS, INC., a California Corporation; BUENA VISTA CATALOGUE CO., a California Corporation; BUENA VISTA NON-THEATRICAL, INC., a California Corporation; JOHN and JANE DOES 1-10, inclusive.


     Defendants,

---

## COMPLAINT AND JURY DEMAND

---

     ARTHUR LEE ALFRED II, EZEQUIEL MARTINEZ, JR., and TOVA LAITER ("Plaintiffs"), by and through counsel, Maceau Law files this its Complaint against Defendants,

THE WALT DISNEY COMPANY, a Delaware Corporation; DISNEY ENTERPRISES, INC., a Delaware Corporation; WALT DISNEY MOTION PICTURES GROUP, INC, a California Corporation; DISNEY CONSUMER PRODUCTIONS, INC., a California Corporation; DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., a California Corporation; DISNEY BOOK GROUP, LLC, a Delaware Limited Liability Company; DISNEY INTERACTIVE STUDIOS, INC., a California Corporation; DISNEY STORE USA, LLC, a Delaware Corporation; WALT DISNEY ATTRACTIONS TECHNOLOGY, LLC, a Delaware Limited Liability Company; WALT DISNEY THEATRICAL RECORDINGS, a California Corporation; WALT DISNEY PARKS AND RESORTS WORLDWIDE, a Florida Corporation; ABC, INC., a New York Corporation; BUENA VISTA HOME ENTERTAINMENT, INC., a California Corporation; BUENA VISTA MEDIA, a California Corporation; BUENA VISTA PRODUCTIONS; a California Corporation; BUENA VISTA THEATRES, INC.;  a California Corporation; BUENA VISTA THEATRICAL GROUP LTD.,  New York Corporation; BUENA VISTA VIDEO ON DEMAND, a California Corporation;  BUENA VISTA BOOKS, INC., a California Corporation; BUENA VISTA CATALOGUE CO., a California Corporation; BUENA VISTA NON-THEATRICAL, INC., a California Corporation; JOHN and JANE DOES 1-10, inclusive. ("Defendants") and for its claims and causes of action states as follows:

## INTRODUCTION

This case is about The Walt Disney Company's ("TWDC") willful infringement of Plaintiff's original copyrighted expression of themes, settings, dialogue, characters, plot, mood, sequence of events contained in an original spec screenplay entitled "*Pirates of the Caribbean*"

and The Walt Disney Company's creation of a "*Pirates of the Caribbean*" franchise to include films, video games, theme park attractions, merchandising, casino games, literature and other related items.

## JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over this action and the claims asserted herein, pursuant to 28. U.S.C. § 1331 ("federal question jurisdiction") and § 1338(a) (actions arising under any Act of Congress relating to copyright claims), in that this action arises under the laws of the United States and, more specifically, Acts of Congress relating to copyrights. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

2.     Defendants are subject to personal jurisdiction of the Court because they reside and/or conduct business in the State of Colorado.

3.     Venue is properly laid in this district pursuant to 28 U.S. C. 1400(a) and (b).   This Court is a proper venue for this copyright infringement case because (a) the agent for Plaintiff's may be found in the State of Colorado and/or (b) each Defendant does business in the State of Colorado, or has otherwise engaged in tortious conduct injuring the Plaintiff in the State of Colorado.

## THE PARTIES

4.     This litigation arises from, inter alia, defendant's wrongful and unjustified theft of intellectual property, namely an original spec screenplay entitled: "*Pirates of the Caribbean*" (hereafter known as *"The Screenplay"*).

5.     Plaintiff A. Lee Alfred, II is a citizen of the United States and resides in California. Plaintiff Ezequiel Martinez, Jr. is a citizen of the United States and resides in California. Plaintiff Tova Laiter is a citizen of the United States and resides in California.

6.     On information and belief, defendant The Walt Disney Company (hereinafter known as "*Defendants"* or "*TWDC*"*)* is incorporated in Delaware, with its principal place of business in California, and it is duly qualified to transact business in the state of Colorado.

7.     There are persons and/or entities who or which do or may have liability upon one or more of the claims asserted or to be asserted in this action and who or which are identified in this Complaint only as John and/or Jane Does and/or Doe Entities, whose true name is unknown. Either their identities are not yet known to Plaintiffs or the facts concerning their liability and/or their amenability or capacity to be joined as defendants in this case are not yet sufficiently known to Plaintiffs to allow their joinder in this pleading.  As additional facts concerning such matters are learned, Plaintiffs will move promptly to amend this Complaint accordingly.

## HISTORY AND LORE OF PIRATES IN
## MYTH, LITERATURE, FILM AND SONG

8.     Throughout history there has been the lore and myth of pirates that have pervaded literature, song and film.  With works like, "*A General History of the Pyrates*" (1724), by Captain

Charles Johnson.  Additionally, there is literature such as "*Robinson Crusoe*," "*Treasure Island*," "*Peter Pan*," "*Captain Singleton*," "*The Pirate*," "*The Gold-Bug*," "*The Coral Island*," "*The Red Rover*," among many others.

9.    These traditional expressions of pirates include looking for treasure, are feared by all and are not shown to be good men with a sense of humor.

10.    Films have covered swashbuckling pirates, many adaptations from literature, such as "*Treasure Island*," "*Peter Pan*," "*Savage Island*," "*The Buccaneer*," "*The Pirate*," "*The Island*," "*Captain Blood*," "*Blackbeard the Pirate*," and "*Yellowbeard*," among many others.  While the majority of these pirates films have a love story/triangle, the pirates themselves are brutal and not historically portrayed as humorous and good men.

11.    Pirates are traditionally (and historically) evil, loathsome, feared and enemies of mankind.  These works typically describe pirates as bearded, eye patched, peg legged with a hook in place of their hand.

12.    Pirates have not been expressed as "humorous" or "good men", but as fearsome men who terrorize all that are in their path of destruction.

## CAPTAIN JACK AS AN EXPRESSION OF A UNIQUELY NEW "PIRATE"

13.    Pirates in film, while handsome or good looking, have not been depicted as having a sense of humor, until "Captain Jack Sparrow" in the *Pirates* franchise.  This "new" pirate, who is funny, not feared, and repeatedly referred to as a "good man" has not only created a new pirate character, but created a Pirates franchise that has been wholly centered on this new pirate character. This "Captain Jack Sparrow" character is widely recognizable and consistently differs from the traditional character of pirates.  The "Captain Jack Sparrow" in character is substantially similar

to the character "Davy Jones" in *"The Screenplay"*. (see *Exhibits 1 & 5*)

## FACTUAL BACKGROUND

14.     Every young screenwriter dreams of writing that fresh and creative script that can catch the attention of a major film studio.  The opportunity to have a major film studio, such as Defendants, take a screenwriter's original spec screenplay and turn the work into a major motion picture is the ultimate dream.

15.     A. Lee Alfred, II and Ezequiel Martinez, Jr. almost realized that dream, but they this dream quickly turned into a nightmare, when their original work, *"The Screenplay"*, was intentionally copied and commercially exploited by Defendant's, creating a billion-dollar franchise, with no credit or compensation to Alfred or Martinez.

16.     A. Lee Alfred II and Ezequiel Martinez, Jr, through their Producer, Tova Laiter, submitted their original screen play *Pirates of the Caribbean* (*"The Screenplay"*) in August 2000 to Defendants. (see *Exhibit 2.)*

17.     Both Alfred and Martinez had previously submitted an original spec screenplay "*Red Hood*" to Defendants in October 1999, through their same producer Tova Laiter.

18.     Defendants elected to produce "*Red Hood*" and invited both Alfred and Martinez to work with Brigham Taylor, Josh Harmon, Michael Haynes, (et al) on the development of the "*Red Hood*" project.

19.     In fact, Defendants paid for Alfred and Martinez to join the Writers Guild, as is required for all screenwriters at *TWDC*.

20.     Alfred and Martinez began to make several trips monthly to *TWDC* to work on this

project, without a contract completed and without compensation.

21.     These young writers, fresh out of film school, were ecstatic to work with Defendants and felt as if their dreams were coming true.

22.     From October 1999 through October 2000, both Alfred and Martinez worked with the Defendant's creative team on "*Red Hood*."

23.     The contract for the purchase of this screenplay was being reviewed by attorneys and without compensation or a properly executed contract, they continued to "trust" that Defendants would compensate them for their original spec screenplay.

24.     While working on the creative team for "*Red Hood*", both Alfred and Martinez developed an idea for an original spec screenplay entitled "*Pirates of the Spanish Main.*"

25.     Due to their relationship with Defendants at the time, Alfred and Martinez retitled the original spec screenplay "*Pirates of the Caribbean.*"

26.     This name change was when both writers realized that the ride had "no story" and they began to envision their screenplay incorporating the basic elements of the *Pirates of the Caribbean* ride while creating a new story focused upon a supernatural element.

27.     Alfred and Martinez wrote *"The Screenplay"* and the final draft was completed on July 19th, 2000.  (see *Exhibit 2.)*

28.     Tova Laiter reviewed several drafts of *"The Screenplay"* and after July 19th, 2000, received the final draft entitled "*Pirates of the Caribbean*" and began to "shop" the original spec screenplay to several different producers, studios and directors.

29.     Laiter discussed *"The Screenplay"* with Brigham Taylor, at *TWDC*, and upon Taylor's encouragement and desire to consider *"The Screenplay"* submitted *"The Screenplay"* to Taylor on August 9th, 2000.

30.     With the original spec screenplay, the writers also submitted a Sizzle Reel (created by Martinez) and original artwork (created for Alfred and Martinez.)

31.     Taylor suggested that the idea of a film based on the *Pirates of the Caribbean* ride had been suggested over the years and that the Defendants had considered making a film based on the *Pirates of the Caribbean* ride recently.

32.     However, Taylor, expressly stated to Laiter that the Defendants "had no treatment or script."  (see *Exhibit 3.)*

33.     After the submission of *"The Screenplay",* Sizzle Reel and original artwork, Laiter, Alfred and Martinez waited to hear from Taylor as to whether Defendants would be interested in producing *"The Screenplay".*

34.     They heard nothing from Taylor for many weeks.  (This was odd because it is the industry standard to pass on or accept a project within 1-2 weeks.)

35.     Laiter made numerous phone calls to follow up with Taylor.

36.     Alfred and Martinez also mentioned *"The Screenplay"* to Taylor and Harmon, when at *TWDC* to discuss "*Red Hood*."

37.     Specifically, Alfred and Martinez attended a meeting with Taylor and Harmon, where upon arriving early, they noticed their script and artwork on a coffee table in Taylor's office.

38.     After mentioning *"The Screenplay"* and asking whether they would be discussing this project, they were quickly ushered out of the office to wait for Taylor.

39.     When they returned to the office, a short time later, all materials that had been on the coffee table had been moved and the meeting ended abruptly.

40.     Within a week, both Alfred and Martinez had their contract and compensation for *"Red Hood"* and were not invited back to TWDC.

41.     Shortly thereafter, Laiter was informed by Taylor that the Defendants were going to pass on the project due to children being in *"The Screenplay."* Alfred and Martinez were both on the phone (listening on silent) when Laiter was informed that Defendants were passing on the original spec screenplay and passing on the project.

42.     At no point during the conversation did the Defendants state that they had another screenplay already and were moving forward with a *"Pirates of the Caribbean"* film project.

43.     Traditionally, in the film industry, when a studio passes on a project, the original works are returned immediately to the submitters.  This is an industry accepted standard designed to prevent the "unintentional" copying of any original spec screenplay submitted to the studios.

44.      At the time that Defendants passed on Alfred and Martinez's original spec screenplay, it was not returned.

45.     In fact, *"The Screenplay"* was never returned to Laiter or Alfred.

46.     Just over two years later, on November 26th, 2002, *"The Screenplay"* was returned to Martinez, via U.S.P.S. Priority Mail, with the return address of "B. Taylor" at TWDC. (see *Exhibit 4.)*

47.     It is highly unusual that Defendants returned the original spec screenplay to Martinez and not Laiter, who originally submitted the original spec screenplay as the Producer of the project.

48.      It is also highly unusual to return a script over two years later.  At the time, the original spec screenplay was returned to Martinez, Defendants were already in production on the first "*Pirates of the Caribbean"* film.

49.     The first "*Pirates of the Caribbean"* film, "*Pirates of the Caribbean: The Curse of the Black Pearl"* premiered just over seven months later, on July 9th, 2003.

50.    It was upon viewing the first film that Alfred, Martinez and Laiter realized the many similarities between their original spec screenplay and *"Pirates of the Caribbean: The Curse of the Black Pearl"*.

51.    The similarities have continued throughout the entire *"Pirates of the Caribbean"* franchise.

52.    The Defendants intentionally, blatantly, and without authorization copied the work of Alfred and Martinez.   Themes, settings, plot, several characters, and dialogues from *"The Screenplay"*, some practically verbatim, have been copied by the Defendants into *"Pirates of the Caribbean: The Curse of the Black Pearl"*, and in every subsequent sequel, including the 2017 release of *"Pirates of the Caribbean: Dead Men Tell No Tales,"* (2017).

53.    Defendant's unauthorized copying and appropriation of *"The Screenplay"* is just another misappropriation of intellectual property of others in their longstanding history of copying other's original material.   From allegedly *Lion King* to *Toy Story, Monsters, Inc. to Up,* and in more recent years, *Frozen, Inside Out*, to *Zootopia* and many others, Defendants have a long history of disregarding Copyright law and making tremendous profit without compensating the very individuals that created these original expressions.

54.    Alfred, Martinez and Laiter seek to hold Defendants responsible for their theft of intellectual property and the unauthorized copying of their original spec screenplay.   They also seek to hold Defendants responsible for their future loss of reputation, income and the emotional and physical distress caused by their intentional acts.

## COPYRIGHTABLE ELEMENTS

55.    Copyright law was enacted in 1790 under the United States Copyright Law Act (and further covering Motion Pictures in 1912) for the very purpose of protecting original works of authorship from any unauthorized copying by individuals or corporations.  The law itself was most certainly enacted to protect the inexperienced and naïve individuals from being taken advantage of by those who would benefit from the unauthorized copying of these individuals work.

56.    In *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984); the Courts held: "To prove copyright infringement, the Plaintiff must show (1) ownership of the copyright, (2) access to the copyrighted work, and (3) substantial similarity between the copyrighted work and the defendant's work."

*57.*    Ownership of *"The Screenplay"* vested on July 19th, 2000, when the Plaintiffs affixed their original expression in a tangible medium.  17 U.S.C. § 102(a).  (see *Exhibit 3*.)

58.    Defendants had access to the copyrighted work on August 9th, 2000, when Tova Laiter sent *"The Screenplay",* original artwork and Sizzle Reel, to Brigham Taylor. (see *Exhibit 2*.)

59.    Defendants returned a copy of *"The Screenplay",* via U.S.P.S. Priority Mail, to the Plaintiff, Ezequiel Martinez, Jr. on November 26th, 2002, therefore; Defendants had access to *"The Screenplay"*, at the very minimum, for the period of August 9th, 2000 until November 26th, 2002. (see *Exhibits 3&4*.)

60.    "To prove infringement, a Plaintiff must show that the works are substantially similar in both *ideas* and *expression." **Sid & Marty Krofft**,* 562 F.2d at 1164 (9th Cir. 1977). Similarity of ideas may be shown by an extrinsic test which focuses on alleged similarities in the

objective details of the works. *Id.* The extrinsic test requires a comparison of plot, theme, dialogue, mood, setting, pace and sequence. *Jason v. Fonda*, 698 F.2d 966 (9th Cir. 1982), *incorporating by reference*, 526 F. Supp. 774, 777 (C.D.Cal.1981)."

## DEFINTIONS OF ELEMENTS IN EXTRINSIC TEST

61.     Plot: refers to a series of dramatic events or actions that make up a film's narrative. A plot point is a key turning point or moment in a film's story that significantly advances the action. Plot points either set the story further into motion, or disrupt and complicate the plot; also known as beat or A story; contrast to a subplot (aka B story or C story) - a secondary plot in a film; a plot plant is the technique of 'planting' an apparently trivial piece of information early in a story - that becomes more important later on;

62.     Theme:  the central characteristic, idea, concern or motif in a film;

63.     Dialogue: any spoken lines in a film by an actor/actress. It may be considered overlapping if two or more characters speak simultaneously. In film-making, it is recording dialogue to match lip movements on previously-recorded film.

64.     Mood:  emotional tone; atmosphere or pervading tone;

65.     Setting:  the time (time period) and place in which the film's story occurs, including all of the other additional factors, including climate (season), landscape, people, social structures and economic factors, customs, moral attitudes, and codes of behavior, also known as locale;

66.     Pace:  the speed/tempo of the dramatic action, which is usually enhanced by the soundtrack and the speed of the dialogue, the type of editing, etc.;

67.     Sequence:  a scene, or connected series of related scenes that are edited together and comprise a single, unified event, setting, or story within a film's narrative; it also refers to

scenes that structurally fit together in the plots; sequence usually refers to a longer segment of film than a scene and sequences are often grouped into acts (like a three-act play). A sequence shot refers to a long, normally complicated shot with complex camera movements and actions;

68.    "To constitute infringement of expression, the total concept and feel of the works must be substantially similar. *Sid & Marty Krofft*,  562 F.2d at 1164."

69.    *"The Screenplay"* is substantially similar in total concept and feel of the works of the *Pirates* franchise through the plot, theme, dialogue, mood, setting, pace, sequence.  (*Exhibit 5.*)

## CHARACTER

70.    "Characters that have received copyright protection have displayed consistent, widely identifiable traits."  *Rice v. Fox Broadcasting Company*, 330 F.3d 1170, 1175 (9th Cir. 2003).   To show that characters are eligible for copyright protection Plaintiffs must show that character is sufficiently delineated through showing consistent and widely identifiable traits.

71.    The overall character of *"The Screenplay"* and the key characters in "The Screenplay" are delineated and consistent, widely identifiable with several of the character and characters of the *Pirates* franchise.  (*Exhibit 5.*)

## FIRST CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
## (REPRODUCTION OF COPYRIGHTED WORK)

72.     "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

73.     *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

74.     "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] reproduc[tion] the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1).

75.     Plaintiffs' exclusive rights to *"The Screenplay",* Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

76.     Plaintiffs, have the right and standing to enforce their exclusive rights to *"The Screenplay",* Sizzle Reel, and original artwork and its copyrightable elements.

47.     Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

48.     Defendants had access to "*The Screenplay*", Sizzle Reel, and original artwork.

49.     Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', reproduced the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

50.     Specifically, Defendants prepared reproductions of the Plaintiffs' original works of

authorship, with the following works: "*The Pirates of the Caribbean: The Curse of the Black Pearl*" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "*Pirates of the Caribbean: On Stranger Tides*" (2011); and "*Pirates of the Caribbean: Dead Men Tell No Tales*" (2017).

51.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

52.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiff's exclusive rights. Defendants are currently preparing reproductions of Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to prepare reproductions of Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to reproduce Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

53.     Defendants' infringing conduct has caused Plaintiff to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

54.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

## SECOND CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
## (PREPARATION OF DERIVATIVE WORKS)

55.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

56.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

57.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] prepar[ation] of derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).

58.    Plaintiffs' exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

59.    Plaintiffs, have the right and standing to enforce their exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork and its copyrightable elements.

60.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

61.    Defendants had access to "*The Screenplay*", Sizzle Reel, and original artwork.

62.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', prepared derivative works based on the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

63.     Specifically, Defendants prepared the following derivative works of the Plaintiffs' original works of authorship: "*The Pirates of the Caribbean: The Curse of the Black Pearl*" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "*Pirates of the Caribbean: On Stranger Tides*" (2011); and "*Pirates of the Caribbean: Dead Men Tell No Tales*" (2017).

64.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

65.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently preparing derivative works based on Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs' to prepare reproductions of Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to prepare derivative works based on Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs' are instituting an action for willful infringement by Defendants.

66.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

67.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

## THIRD CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
## (DISTRIBUTION OF COPYRIGHTED WORK)

69.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

70.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

71.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] distribut[ion] copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3).

72.    Plaintiffs' exclusive rights to "The Screenplay", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

73.    Plaintiffs, have the right and standing to enforce their exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork and its copyrightable elements.

74.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

75.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

76.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', distributed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork by producing and distributing the various works that comprise the *Pirates* franchise.

77.    Specifically, Defendants distributed the Plaintiffs' original works of authorship,

with the following works: "*The Pirates of the Caribbean: The Curse of the Black Pearl*" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "*Pirates of the Caribbean: On Stranger Tides*" (2011); and "*Pirates of the Caribbean: Dead Men Tell No Tales*" (2017).

78.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

79.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently distributing Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to distribute Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to distribute Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

80.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

81.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

**FOURTH CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT**
**(PUBLIC PERFORMANCE OF COPYRIGHTED WORK)**

83.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

84.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

85.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, t[he] perform[ance of] the copyrighted work publicly." 17 U.S.C. § 106(4).

86.    Plaintiffs' exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

87.    Plaintiffs, have the right and standing to enforce their exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork and its copyrightable elements.

88.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

89.    Defendants had access to "*The Screenplay*", Sizzle Reel, and original artwork.

90.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', publicly performed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "*The Screenplay*", Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean

franchise.

91.     Specifically, Defendants publicly performed the Plaintiffs' original works of authorship, with the following works: "*The Pirates of the Caribbean: The Curse of the Black Pearl*" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "*Pirates of the Caribbean: On Stranger Tides*" (2011); and "*Pirates of the Caribbean: Dead Men Tell No Tales*" (2017).

92.     "Anyone who violates any of the exclusive rights of the copyright owner . . .  is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

93.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently publicly performing Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to publicly perform Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights publicly perform Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

94.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

95.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

**FIFTH CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT**
**(PUBLIC DISPLAY OF COPYRIGHTED WORK)**

97.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

98.    "*The Screenplay*", Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

99.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly." 17 U.S.C. § 106(5).

100.   Plaintiffs' exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "*The Screenplay*", Sizzle Reel, and original artwork.

101.   Plaintiffs, have the right and standing to enforce their exclusive rights to "*The Screenplay*", Sizzle Reel, and original artwork and its copyrightable elements.

102.   Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

103.   Defendants had access to "*The Screenplay*", Sizzle Reel, and original artwork.

104.   Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', publicly displayed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "*The Screenplay*", Sizzle Reel, and original

artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

105.   Specifically, Defendants publicly displayed the Plaintiffs' original works of authorship, with the following works: "*The Pirates of the Caribbean: The Curse of the Black Pearl*" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "*Pirates of the Caribbean: On Stranger Tides*" (2011); and "*Pirates of the Caribbean: Dead Men Tell No Tales*" (2017).

106.   "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

107.   Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiff's exclusive rights. Defendants are currently publicly displaying Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to publicly display Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to publicly perform Plaintiffs' original works of authorship and are willfully infringing on the Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

108.   Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

109.   Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. §

504.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, respectfully prays for judgment against each and all of the Defendants upon each and all of the claims for relief asserted herein above, including and without limitation:

(1)    on the FIRST FIVE Claims for relief, the copyright owners' actual damages and any additional profits of the infringer as provided by 17 U.S.C. § 504(b).

(2)    on the FIRST FIVE Claims for relief, temporary and final injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright" as provided by 17 U.S.C. § 502(a) to restrain any further acts of infringement.

(3)     prejudgment or moratory interest in accordance with law; and

(4)    such other and further relief as the Court deems just and proper under the circumstances.

**PLAINTIFFS REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 14th day of November, 2017.

**MACEAU LAW:**

*/S/ Elizabeth M. Thomas*

Elizabeth M. Thomas
Ryan C. Gillman
Gregory A. Maceau
1465 North Union Blvd., Suite #100
Colorado Springs, CO 80909
Telephone: 719-633-2222
Email: elizabeth@maceaulaw.com

Plaintiffs' Address:
C/O Maceau Law
1465 North Union Blvd., Suite #100
Colorado Springs, CO 80909