GLENN D. POMERANTZ (State Bar No. 112503)
glenn.pomerantz@mto.com
MELINDA E. LEMOINE (State Bar No. 235670)
melinda.lemoine@mto.com
JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

J. MAX ROSEN (State Bar No. 310789)
max.rosen@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street
Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone:  (415) 512-4000
Facsimile:   (415) 512-4077

*Attorneys for Defendants The Walt Disney Company, et al.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED II, et al.,<br><br>      Plaintiffs,<br><br>     vs.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>      Defendants. | Case No. 2:18-cv-08074-CBM-AS<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFFS' COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Judge:  Hon. Consuelo B. Marshall<br>Date:    January 2, 2019<br>Time:    10:00 a.m.<br>Ctrm:   8B |

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on January 2, 2019, at 10:00 a.m., before the Honorable Consuelo B. Marshall, in Courtroom 8B of the above-captioned Court, located at 350 W 1st Street, Suite 4311, Los Angeles, CA 90012-4565, defendants The Walt Disney Company; Disney Enterprises, Inc.; Walt Disney Motion Pictures Group, Inc.; Disney Consumer Products, Inc.; Disney Consumer Products and Interactive Media, Inc.; Disney Book Group, LLC; Disney Interactive Studios, Inc.; Disney Store USA, LLC; Walt Disney Attractions Technology LLC; Walt Disney Theatrical Recordings; Walt Disney Parks and Resorts U.S., Inc.; ABC, Inc.; Buena Vista Home Entertainment, Inc.; Buena Vista Media; Buena Vista Productions; Buena Vista Theatres, Inc.; Buena Vista Theatrical Group Ltd.; Buena Vista Video On Demand; Buena Vista Books, Inc.; Buena Vista Catalogue Co. and Buena Vista Non-Theatrical, Inc.[1] (collectively, "Disney" or "Defendants") will and hereby do move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss with prejudice Plaintiffs' Complaint filed on November 14, 2017.[2]

The Complaint alleges that Disney's five *Pirates of the Caribbean* motion pictures, released between 2003 and 2017, infringe Plaintiffs' copyright in a screenplay from 2000.  The Complaint fails to state a claim of copyright infringement because the works at issue are not substantially similar as a matter of law:  after filtering out generic, unprotectable elements of the pirate genre, no

---

[1] The Complaint originally named as defendants "Disney Consumer Productions, Inc." and "Disney Consumer Productions and Interactive Media, Inc." These entities do not exist.  For purposes of this Motion, Defendants assume that Plaintiffs intended to name "Disney Consumer Products Inc." and "Disney Consumer Products and Interactive Media Inc."  Further, in April 2018 "Walt Disney Parks and Resorts Worldwide" changed its name to "Disney Parks, Experiences and Consumer Products."

[2] The Complaint was filed in the District of Colorado (No. 1:17-cv-02729-PAB-KMT, ECF No. 1).  On September 14, 2018 Judge Philip A. Brimmer of the District of Colorado entered an order granting Defendants' motion to transfer venue to the Central District of California.  (ECF No. 56.)

1  reasonable observer could find the works are substantially similar.  This defect

2  cannot be cured by amendment and requires that the Complaint be dismissed with

3  prejudice.

4      This Motion is based on this Notice of Motion and Motion, the accompanying

5  Memorandum of Points and Authorities, Request for Judicial Notice, and

6  Declarations of J. Max Rosen and Diego Parras, all pleadings and papers of record

7  and on file in this case, and such additional authority and argument as may be

8  presented at or before the time this Motion is submitted.

9      This Motion is made following the conference of counsel pursuant to L.R. 7-

10  3, which took place on November 9, 2018.

11

12  DATED:  November 16, 2018          MUNGER, TOLLES & OLSON LLP

13                                          GLENN D. POMERANTZ
                                            MELINDA E. LEMOINE
14                                          JORDAN D. SEGALL
                                            J. MAX ROSEN
15

16                                    By:      /s/ Melinda E. LeMoine

17                                          MELINDA E. LEMOINE
                                      Attorneys for Defendants The Walt Disney
18                                    Company et al.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ..............................1

II.    BACKGROUND .......................................................................................1

    A.   Factual and Legal Allegations ........................................................1

    B.   Plot of the Screenplay ....................................................................3

    C.   Plot of the Disney *Pirates of the Caribbean* Motion Pictures ................5

        1.   *The Curse of the Black Pearl* ........................................................5

        2.   *Pirates of the Caribbean* Vols. 2–5 ............................................8

III.   ARGUMENT ..........................................................................................10

    A.   Applicable Legal Standards ..................................................................10

    B.   The Screenplay and the *Pirates of the Caribbean* Pictures Are Not Substantially Similar as a Matter of Law........................................11

        1.   Most of the Alleged Similarities Identified by Plaintiffs Are Unprotectable and Must Be Filtered Out............................12

        2.   After Filtering Out the Unprotectable Elements, the Works Are Not Remotely Similar ...........................................................14

            (a)   Plot and Sequence of Events ...........................................14

            (b)   Characters .......................................................................17

            (c)   Themes ............................................................................20

            (d)   Dialogue .........................................................................21

            (e)   Mood and Pace ...............................................................22

            (f)   Setting .............................................................................23

IV.    CONCLUSION .......................................................................................23

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Allen v. Scholastic, Inc.,*
    739 F. Supp. 2d 642 (S.D.N.Y. 2011) ............................................. 11

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) .................................................................. 10

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................. 10

*Benay v. Warner Bros. Entm't, Inc.,*
    607 F.3d 620 (9th Cir. 2010) ................................................ 14, 19

*Berkic v. Crichton,*
    761 F.2d 1289 (9th Cir. 1985) ............................................... 13, 18

*Brown v. Elec. Arts, Inc.,*
    724 F.3d 1235 (9th Cir. 2013) .................................................... 10

*Campbell v. The Walt Disney Co.,*
    718 F. Supp. 2d 1108 (N.D. Cal. 2010) ...................................... 23

*Cavalier v. Random House, Inc.,*
    297 F.3d 815 (9th Cir. 2002) ..................................................... 23

*Christianson v. W. Pub. Co.,*
    149 F.2d 202 (9th Cir. 1945) ..................................................... 11

*Feist Pubs., Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991) .............................................................. 10, 14

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.,*
    462 F.3d 1072 (9th Cir. 2006) .............................................. passim

*Gable v. NBC*, 727 F. Supp. 2d 815 (C.D. Cal. 2010) ......................... 12

*Harper & Row Publishers, Inc. v. Nation Enters.,*
    471 U.S. 539 (1985) .................................................................. 13

*Ileto v. Glock Inc.,*
    349 F.3d 1191 (9th Cir. 2003) .................................................... 10

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*Knievel v. ESPN,*
    393 F.3d 1068 (9th Cir. 2005) ............................................................ 3

5
6

*Kouf v. Walt Disney Pictures & Television,*
    16 F.3d 1042 (9th Cir. 1994) ........................................................... 11

7
8

*Litchfield v. Springfield,*
    36 F.2d 1352 (9th Cir. 1984) ........................................................... 12

9

*Mattel, Inc. v. MGA Entm't, Inc.,*
    616 F.3d 904 (9th Cir. 2010) ........................................... 11, 12, 14, 17

10
11

*Murray Hill Pubs., Inc. v. Twentieth Cent. Fox Film Corp.,*
    361 F.3d 312 (6th Cir. 2004) ........................................................... 12

12
13

*Narell v. Freeman,*
    872 F.2d 907 (9th Cir. 1989) ........................................................... 22

14
15

*Newt v. Twentieth Century Fox Film Corp.,*
    2016 WL 4059691 (C.D. Cal. July 27, 2016) ................................... 10

16
17

*Pasillas v. McDonald's Corp.,*
    927 F.2d 440 (9th Cir. 1991) ............................................................. 1

18
19

*Rentmeester v. Nike, Inc.,*
    2015 WL 3766546 (D. Or. June 15, 2015) ...................................... 10

20

*Rice v. Fox Broad. Co.,*
    330 F.3d 1170 (9th Cir. 2003) ......................................................... 12

21
22

*Shame on You Prods., Inc. v. Elizabeth Banks,*
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) ........................................... 21

23
24

*Williams v. Crichton,*
    84 F.3d 581 (2d Cir. 1996) .............................................................. 12

25

*Zella v. E.W. Scripps Co.,* 529 F. Supp. 2d 1124 (C.D. Cal. 2007) .......................... 12

26

**RULES**

27

Rule 12(b)(6) ................................................................................... 3, 10

28

-v-

1

**TABLE OF AUTHORITIES**
(continued)

2                                                                                    **Page**

3   OTHER AUTHORITIES

4   https://en.wikipedia.org/wiki/Cutthroat_Island ........................................................ 16

5   https://en.wikipedia.org/wiki/Flying_Dutchman ..................................................... 8

6

7   https://en.wikipedia.org/wiki/Kraken .......................................................................... 8

8   https://en.wikipedia.org/wiki/The_Goonies .............................................................. 2

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-vi-

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.  INTRODUCTION AND SUMMARY OF ARGUMENT

The Complaint should be dismissed with prejudice because it does not plausibly plead that the works at issue—Plaintiffs' *Pirates of the Caribbean* spec screenplay (the "Screenplay"), on the one hand, and Disney's five *Pirates of the Caribbean* motion pictures, on the other—share substantially similar copyrightable elements.  *Pasillas v. McDonald's Corp.*, 927 F.2d 440, 442 (9th Cir. 1991).  No amendments to the pleadings can change this.

The Screenplay and the Disney pictures share only some generic elements commonplace in stories about pirates:  ship captains, mutinies, swordfights, rum, ghosts, and the like.  Copyright protects only concrete expression, not such generic elements.  Further, Plaintiffs concede that many of these elements appear in the Screenplay because they "incorporat[ed] the basic elements" from Disney's *own* Pirates of the Caribbean theme park ride.  (Compl. ¶ 26.)  Plaintiffs' attempt to claim copyright ownership of elements inspired by Disney's own ride is frivolous.

Beyond the generic, the works tell fundamentally different stories with different characters, plots and themes.  The Screenplay tells the story of a band of orphan children on a pirate adventure.  The Disney pictures, which do not feature children, instead tell the story of a dissolute, charismatic pirate captain—Captain Jack Sparrow—who does battle against a series of foes.  No amount of pleading can make these works substantially similar as a matter of law, and because no pleading amendments can change this, the Court should dismiss the Complaint with prejudice.

## II.  BACKGROUND

### A.  Factual and Legal Allegations

Plaintiffs allege that between October 1999 and October 2000, while they were working with Disney on an unrelated project, Arthur Lee Alfred II and Ezequiel Martinez, Jr. developed an idea for an original "spec" screenplay called

*Pirates of the Spanish Main*.  (Compl. ¶¶ 22, 24.)  Plaintiffs allege they were aware that Disney had recently considered producing a motion picture based on the well-known Pirates of the Caribbean rides at Disney theme parks.  (*Id.* ¶ 31.)  For that reason, their screenplay was retitled *Pirates of the Caribbean*, and Plaintiffs "incorporate[d] the basic elements" of Disney's ride into the Screenplay.  (*Id.* ¶¶ 25–26.)  The Complaint alleges Alfred and Martinez completed a final draft of the Screenplay on July 19, 2000, and a few weeks later mailed it to Disney with a cover letter, "Sizzle Reel" and original artwork.[3]  (*Id.* ¶¶ 28, 30.)  The cover letter described the script as "a swashbuckling fun adventure, 'Goonies'[4] meets 'Pirates of the Caribbean.'"  (*Id.* Ex. 2.)  Plaintiffs allege that Disney responded that it was going to pass on the project in part "due to children being in [the Screenplay]."  (*Id.* ¶ 41.)

Three years later, Disney released the first *Pirates of the Caribbean* motion picture, subtitled *The Curse of the Black Pearl*.  (*Id.* ¶ 49.)  Disney subsequently released four sequels:  *Dead Man's Chest* (2006); *At World's End* (2007); *On Stranger Tides* (2011); and *Dead Men Tell No Tales* (2017).  Plaintiffs allege that many similarities exist between the Screenplay and *The Curse of the Black Pearl*, and that those "similarities have continued throughout the entire 'Pirates of the Caribbean' franchise."  (*Id.* ¶¶ 50–51.)

Plaintiffs filed their Complaint on November 14, 2017 (ECF No. 1), purporting to state five different counts—violations of their rights to reproduction, preparation of derivative works, distribution, public performance, and public display—but only alleging one theory:  the *Pirates of the Caribbean* pictures

---

[3] This "original artwork"—a sample poster from the Screenplay—is attached as Exhibit 5 to the Complaint.  A cursory review of the poster makes clear, however, that it is simply a mash-up of posters from two well-known pirate pictures that most obviously inspired the Screenplay:  *The Goonies* and *Cutthroat Island*.

[4] *The Goonies* was a 1985 motion picture about a group of children who discover an old Spanish map that leads them on an adventure to find the treasure of a legendary pirate named One-Eyed Willy.  *See* https://en.wikipedia.org/wiki/The_Goonies.

1  infringe the Screenplay.  (Compl. ¶¶ 72–109.)

2      As explained in the concurrently-filed Request for Judicial Notice ("RJN"),

3  the Complaint incorporates the Screenplay, the *Pirates of the Caribbean* pictures,

4  and Disney's Pirates of the Caribbean theme park rides as they existed when the

5  Screenplay was drafted.  The Court, therefore, should review and consider the

6  contents of these works.  *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir.

7  2005) (incorporation by reference doctrine permits the court to consider documents

8  whose contents are alleged in a complaint and whose authenticity no party

9  questions, but which are not physically attached to the pleading).

10     **B.     Plot of the Screenplay[5]**

11     The Screenplay opens with a prologue, in which a privateer ship and a pirate

12 ship exchange cannon fire.  (Compl. Ex. 1, ECF No. 1-1 ("Screenplay") at 1.)  The

13 privateers win, but their captain, the "sinister" Captain Jack Nefarious, reveals

14 himself to be in league with Davey[6] Jones, a "dashing young rogue" who was once a

15 privateer.  (*Id.* at 2.[7])  When Jones refuses to give Nefarious his half of a treasure

16 map, Nefarious takes hostage Jones's love interest, Jane, and offers to trade her for

17 the map.  (*Id.* at 10.)  Jones hesitates, and Nefarious drops Jane into the sea.  (*Id.* at

18 11.)  A sea monster appears and drags Nefarious under the waves as Jones escapes.

19     Ten years later, in the streets of a shipping port, the protagonists are

20 introduced:  a band of six orphans who call themselves the Rascal Scoundrels.  (*Id.*

21 at 13.)  They range from ages 7 to 15, each with a nickname (Stink is plump and

22 flatulent, Clumsy is uncoordinated and prone to stuttering, Littles is the youngest,

---

[5] Defendants apologize for the length of the following plot summaries, but believe they are required for the record in light of the breadth of Plaintiffs' claims, which allege infringement with respect to dozens of elements in the five motion pictures.

[6] Although the figure from nautical folklore is spelled "Davy" Jones, Plaintiffs' character is named "Davey" Jones.

[7] Page number references to the Screenplay refer to the script's original page numbers in the upper-right corner of the page.

and so on). (*Id.* at 13–14.) They want one thing: to become pirates.

At an "auction of wenches"—a plot element taken from Disney's ride (*see* RJN at 5)—the children claim to be the "crew of the dreaded pirate, Davey Jones." (*Id.* at 15.) They are overheard by a mysterious "Woman in Red" (who is also depicted in the ride). (*Id.*) The children come across a group of "six drunk Midgets" in pirate garb and steal their clothes. (*Id.* at 21–22.) Dressed as pirates, the Rascals return to Jones's ship, revealing him to be their caretaker. (*Id.* at 23.) He is passed-out drunk. The Rascals search his cabin and find his half of the treasure map. (*Id.* at 26.)

As Jones wakes up and heads to the pub, a ship rolls into port and a crew of pirates emerges. (*Id.* at 30.) In the bar, the Woman in Red appears and Jones recognizes her: it is Jane. (*Id.* at 34–35.) Meanwhile, the Rascals concoct a plan to steal Nefarious's treasure map. (*Id.* at 36.) They board the pirate ship, unlock secret rooms, encounter skeletons and ultimately obtain a scroll. (*Id.* at 37, 41–44.)

Back at the pub, Nefarious and his crew arrive (including Stitch and Dagger). Stitch and Dagger are not ghosts, but pirates with their faces painted to look like skulls. (*Id.* at 46.) Jane betrays Jones, delivering him to Nefarious. (*Id.* at 52.) Nefarious, not realizing the Rascals have the map, orders Jane to search Jones's pockets, but privateer boats open fire on the city, and Jones escapes. (*Id.* at 53.)

Jones joins the Rascals aboard Nefarious's ship. (*Id.* at 56–57.) Nefarious hijacks one of the privateer ships and sets sail after them. (*Id.* at 58–59.) On Nefarious's ship, the Rascals tell Jones they have a scroll indicating where Nefarious has hidden his half of the treasure map and implore Jones to act like the great Davey Jones of yore and help. (*Id.* at 60–61.) Jones refuses, noting he lost everything "all for the evil of men's greed for treasure." (*Id.* at 61.) The Rascals knock him out and set sail for Calavera Island, where Nefarious's map is located. (*Id.* at 62.) On the island, they recover the treasure map but run straight into Nefarious and his crew. (*Id.* at 65–75.)

Dragged back to Nefarious's boat, the Rascals see no sign of Jones.  When Nefarious orders the Rascals to walk the plank, Jones appears and challenges Nefarious.  (*Id.* at 79.)  In the ensuing chaos, one of the Rascals grabs the map and escapes over the deck with the others into a rowboat.  Jones fights and defeats Stitch and Dagger, then escapes the ship with Jane as it explodes.  (*Id.* at 86.)  The Rascals begin to cry, thinking Jones is dead.  (*Id.* at 88.)  Now recognizing the evils of piracy, they throw their pirate hats overboard and rip up the map.  (*Id.* at 89.)  A current seizes the rowboat and they drift into a cove, where they plunge into a cavern ("like the Disneyland ride," as the script notes).  (*Id.* at 91.)  Finally they come to a jewel-studded room; they have found the treasure.  (*Id.* at 92.)

Nefarious appears with his crew and Jones reveals he is still alive.  Jones tells Nefarious that if he takes the jewels, the room will fill with water, killing them all.  (*Id.* at 93.)  Nefarious orders his men to take the treasure anyway, and a fight ensues.  Jones stabs Nefarious and escapes with Jane and the Rascals.  (*Id.* at 97.)  The sea monster returns and eats Nefarious.  In the epilogue, Jones becomes a privateer again, accompanied by Jane and the Rascals as his crew.  (*Id.* at 103–04.)

## C.  Plot of the Disney *Pirates of the Caribbean* Motion Pictures

Disney's five *Pirates* pictures total 12 hours over five feature-length stories, telling an epic and morally ambiguous tale of piracy and supernatural monsters.

### 1.  *The Curse of the Black Pearl*

The first in the series, *The Curse of the Black Pearl*, begins with a young Elizabeth Swann encountering Will Turner floating on a plank with a medallion around his neck.  Realizing that the medallion marks him as a pirate, Elizabeth steals it to protect Will from being found out and arrested.

A few years later, Elizabeth is a young woman, her father is the colonial governor on Jamaica, and Will is a blacksmith.  Jack Sparrow—the central character

in all five pictures—arrives at the same port.  (*Curse of the Black Pearl* at 9:09.[8])
At a ceremony making him Commodore, James Norrington asks Elizabeth to marry
him.  Unable to breathe in her corset, she falls over a cliff into the water.  Sparrow
reluctantly jumps in to save her.  Norrington recognizes Sparrow from a tattoo and
attempts to arrest him for piracy.  (*Id.* at 17:44.)  Sparrow hides in Will's workshop,
but Will recognizes and captures him.  (*Id.* at 22:44.)

A dark ship, the *Black Pearl*, appears at the port and lays siege to the town.
(*Id.* at 29:15.)  Two pirates from the crew find Elizabeth and she demands to see
their captain.  (*Id.* at 34:34.)  Crewmembers also visit Sparrow in his jail cell.  As
one pirate reaches through the bars of Sparrow's cell, his arm becomes a skeleton in
the moonlight.  (*Id.* at 37:30.)

On the *Black Pearl*, Elizabeth meets captain Hector Barbossa.  He agrees to
leave the port, but brings Elizabeth with him.  On shore Norrington, the Governor
and Will debate how to save her.  Will asks Sparrow for help.  After first stating he
sees no profit in doing so, Sparrow agrees, and he and Will set off for Tortuga to
assemble a crew.  In Tortuga, they find Gibbs, a man who once served under
Norrington's command and is now Sparrow's friend.  (*Id.* at 53:55.)  As they pursue
the *Black Pearl*, Gibbs tells Will that Sparrow used to be the *Black Pearl*'s captain,
but Barbossa mutinied and marooned him on an island.  Gibbs claims Sparrow
escaped by riding a pair of sea turtles to safety.

Back on the *Black Pearl*, Elizabeth dines with Barbossa.  He explains that his
men found the gold of Cortes, but realized too late it bore the curse of the "heathen
gods," transforming the men into unkillable skeletons in the moonlight.  (*Id* .at
1:00:26-1:00:31.)  The *Black Pearl* reaches Isla de la Muerta, the resting place of
Cortes's gold.  Barbossa explains to his crew that, to break the curse, they must
return the gold medallions, as well as blood from every person who took the coins or

---

[8] All timestamps refer to the DVD versions of the *Pirates of the Caribbean* motion
pictures submitted concurrently with this Motion.  (*See* RJN.)

1   one of his or her descendants.  (*Id.* at 1:10:37.)  Barbossa is only missing a

2   medallion and blood from a single crewmember—Bill Turner, Will's father.

3   Believing Elizabeth to be Turner's child, Barbossa cuts her hand and drops a bloody

4   medallion into the chest, but the curse is not broken.  Will, hiding in the corner,

5   knocks Sparrow out and saves Elizabeth.  Barbossa's men capture Sparrow and

6   chase after Will, Turner's true heir.

7          Later the *Black Pearl* catches Sparrow's ship, and the ships battle.  Will

8   appears on the *Black Pearl* and threatens to take his own life (making the curse

9   unbreakable).  Barbossa agrees to release Elizabeth and Sparrow, and maroons them

10  on the same island where he previously marooned Sparrow.  (*Id.* at 1:33:00–

11  1:34:00.)

12         On the island, Elizabeth asks Sparrow how he escaped.  He admits the turtle

13  story was a lie:  he encountered rum runners, who have long since left the island.

14  (*Id.* at 1:36:21.)  Sparrow and Elizabeth drink rum, and Sparrow tells her the *Black*

15  *Pearl* represents freedom to him.  (*Id.* at 1:37:49).  He collapses, drunk, and

16  Elizabeth uses the rum to build a fire.  The Navy sees the plumes.  (*Id.* at 1:38:51–

17  1:39:54.)

18         On board Norrington's ship, Elizabeth pleads with her father to rescue Will,

19  to no avail.  Seeing no alternative, she promises to marry Norrington, and asks him

20  to save Will "as a wedding gift."  (*Id.* at 1:40:51.)  He agrees, and sets off in pursuit

21  of the *Black Pearl*.

22         Back on the island, Barbossa again prepares to enact the curse-breaking ritual,

23  this time with Will's blood.  Sparrow shows up, tells Barbossa the Navy is outside,

24  and suggests he wait to break the curse until after they have defeated the Navy.

25  Sparrow proposes an alliance, under which he will captain the *Black Pearl* under

26  Barbossa's colors.  Barbossa agrees.  (*Id.* at 1:47:50.)  Barbossa's skeleton crew

27  then ambushes Norrington's ship.

28         At the same time, Elizabeth boards the *Black Pearl* and frees Sparrow's crew,

-7-

but they refuse to assist.  (*Id.* at 1:58:10.)  Back on the island, Barbossa stabs Sparrow, but Sparrow survives—he has taken a piece of Cortes's treasure and is also cursed with immortality.  (*Id.* at 1:55:33.)  Elizabeth arrives on the island to save Will.  Sparrow and Will break the curse just as Sparrow shoots Barbossa dead.  (*Id.* at 2:02:04.)  No longer immortal, the rest of Barbossa's crew surrender.

Days later, the Navy prepares to hang Sparrow for piracy.  Elizabeth declares her love for Will, and the two help Sparrow escape to the *Black Pearl*.

## 2.    *Pirates of the Caribbean* Vols. 2–5

The next four Disney motion pictures in the franchise expand on the world, themes and characters established by *Curse of the Black Pearl*.

In **Dead Man's Chest**, Sparrow is visited by the ghost of Will's father, a crewman of the *Flying Dutchman* (a ship manned by half-crustacean, half-human ghost pirates and captained by Davy Jones).  Sparrow owes Jones a debt, and the *Dutchman* is coming to collect it, along with Jones's personal sea monster, the Kraken.[9]  The characters (including Will, Elizabeth, Sparrow and Norrington), pursue the heart of Davy Jones, an object locked within the "Dead Man's Chest" that will allow its possessor to control Jones.  Ultimately Norrington runs off with the heart, and the Kraken attacks the *Black Pearl*, dragging Sparrow to Davy Jones's Locker.  Norrington delivers the heart to Lord Beckett of the East Indian Trading Company.  The *Black Pearl's* crew members hatch a plan to rescue Sparrow, and it is revealed that Barbossa has been resurrected and will lead the rescue mission.

In **At World's End**, Beckett, using Jones and the *Flying Dutchman*, is exterminating the world's pirates.  To stop him, the pirate lords (the "Brethren")

---

[9] The motion pictures make frequent use of pirate mythology.  The *Flying Dutchman* was a famous ship from 17th-century mythology:  it was said to have a crew of ghosts, often portrayed as pirates.  *See* https://en.wikipedia.org/wiki/Flying_Dutchman.  The Kraken was a mythological, tentacled sea monster.  *See* https://en.wikipedia.org/wiki/Kraken.  The pictures also portray some of the most famous figures from pirate stories that also pre-date Plaintiffs' work, such as Blackbeard and Davy Jones.

must convene and use magical coins to call forth "Calypso," a sea goddess with limitless power.  They need Sparrow, who has the ninth coin.  Elizabeth and Barbossa travel to Davy Jones's Locker to retrieve him.  When they return, Elizabeth is elected "pirate king."  The Brethren then summon Calypso, who was once Davy Jones's lover but was betrayed by him.  Angry, she creates a maelstrom.  Sparrow discovers that whoever stabs the heart of Jones will become captain of the *Dutchman* and he seeks out the role.  When Jones mortally wounds Will, however, Sparrow allows Will to take his place.  Will, captain of the *Dutchman*, fights alongside the *Black Pearl*, and defeats Beckett.

In ***On Stranger Tides***, the story pivots to Sparrow and Barbossa.  Sparrow is called before the king to help Barbossa find the Fountain of Youth.  Sparrow refuses, but ends up captured by Blackbeard, a ruthless pirate who seeks the Fountain.  Blackbeard has a daughter, Angelica, who is a pirate herself and Sparrow's former lover.  Blackbeard, Barbossa and a Spanish armada travel to the Fountain.  Sparrow learns that its water must be drunk from two chalices at once: one drinker will gain life, and the other will lose it.  Ultimately, the Fountain is destroyed, but with its last drops, Sparrow gives two chalices to Angelica and Blackbeard, who both believe Angelica is sacrificing herself for her father.  Instead, Blackbeard dies.  Sparrow and Angelica admit their love for one another, but Sparrow maroons her on an island, afraid she will seek revenge.

In ***Dead Men Tell No Tales***, the story shifts back to the Turners.  Henry Turner, Will and Elizabeth's son, seeks the Trident of Poseidon, believing it can break the curse of the *Flying Dutchman* and free his father.  He is accompanied by Carina Smyth, an astronomer whose father's diary appears to hold the key to finding the Trident.  They are pursued by a new villain, Captain Salazar, a cursed pirate-hunter who seeks revenge on Sparrow for burning him and his crew to death.  Barbossa, Sparrow, Henry and Carina sail for the Trident, and Salazar follows.  Ultimately, Henry manages to get the Trident.  Barbossa, in turn, admits he is

secretly Carina's father, and sacrifices himself to save her from Salazar.  Will, saved from the *Flying Dutchman*, reunites with Elizabeth, as Sparrow sails off into the distance, choosing the freedom of piracy over the confines of family and virtue.

## III.   ARGUMENT

### A.   Applicable Legal Standards

To survive a Rule 12(b)(6) motion for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The court need not "accept any unreasonable inferences or assume the truth of legal conclusions cast in the form of factual allegations." *Brown v. Elec. Arts, Inc.*, 724 F.3d 1235, 1248 (9th Cir. 2013) (quoting *Ileto v. Glock Inc.*, 349 F.3d 1191, 1200 (9th Cir. 2003)).  Rather, the complaint must contain sufficient concrete facts to elevate a plaintiff's right to relief from merely "speculative" to "plausible." *Twombly*, 550 U.S. at 555, 570.

To state a copyright infringement claim a plaintiff must allege "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films*, 462 F.3d at 1076 (quoting *Feist Pubs., Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, (1991)).  To satisfy the second element, Plaintiffs must plausibly allege that "the defendant had access to the plaintiff's work and that the two works are substantially similar." *Id.* (internal quotation marks omitted).  For purposes of this Motion, Disney does not dispute that Plaintiffs have sufficiently alleged access.  But, because the two works are not substantially similar as a matter of law, the Complaint must be dismissed with prejudice.

"Whether there is sufficient objective similarity … is a question that may be decided by the court as a matter of law on a motion to dismiss[.]" *Rentmeester v. Nike, Inc.*, No. 3:15-cv-00113-MO, 2015 WL 3766546, at *2 (D. Or. June 15, 2015); *see also Newt v. Twentieth Century Fox Film Corp.*, No. 15-CV-02778-CBM-JPRX, 2016 WL 4059691 (C.D. Cal. July 27, 2016) (Marshall, J.) (dismissing

-10-

copyright complaint at pleadings stage for lack of substantial similarity).  Where, as here, the works at issue are incorporated into the pleadings and are "both before the court, capable of examination and comparison," the court can properly conclude that the plaintiff's complaint does not state a claim for infringement.  *Christianson v. W. Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945).  Non-infringement should be decided as a matter of law when "the similarity between two works concerns only non-copyrightable elements of the plaintiff's work" or when "no reasonable jury, properly instructed, could find that the two works are substantially similar."  *Allen v. Scholastic, Inc.*, 739 F. Supp. 2d 642, 655 (S.D.N.Y. 2011).

**B.    The Screenplay and the *Pirates of the Caribbean* Pictures Are Not Substantially Similar as a Matter of Law**

Courts in the Ninth Circuit determine whether two works are substantially similar using a two-part test.  The "intrinsic test" "examines an ordinary person's subjective impressions," while the "extrinsic test" is "objective in nature" and focuses on key similarities in elements of the works.  *Funky Films*, 462 F.3d at 1077.  Only the extrinsic test is assessed on a motion to dismiss, and a plaintiff who cannot satisfy the extrinsic test "necessarily loses" because "a jury may not find substantial similarity without evidence on both the extrinsic and intrinsic tests."  *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1133 n.8 (C.D. Cal. 2007) (citation omitted).

The extrinsic test focuses on "articulable similarities" between eight elements in the two works:  "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."  *Funky Films*, 462 F.3d at 1077 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)).  "The key question always is:  Are the works substantially similar beyond the fact that they depict the same idea?"  *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 917 (9th Cir. 2010) (citation omitted).  "In applying the extrinsic test, th[e] court compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total

1  sequence of events and the relationships between the major characters." *Funky*

2  *Films,* 462 F.3d at 1077 (internal quotation marks and citation omitted).

3      Before evaluating the works' similarities, the court must "filter out"

4  unprotectable elements, such as general plot ideas and "unoriginal components" not

5  independently created by the inventor. *Mattel*, 616 F.3d at 913–16. Also filtered

6  out are *scenes a faire*, or "expressions indispensable and naturally associated with

7  the treatment of a given idea." *Gable v. NBC*, 727 F. Supp. 2d 815, 832 (C.D. Cal.

8  2010) (quoting *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003)).

### 1. Most of the Alleged Similarities Identified by Plaintiffs Are Unprotectable and Must Be Filtered Out

10      The principal similarity allegations in the Complaint are contained in Exhibit

11  5, which purports to list a number of protectable similarities between the Screenplay

12  and the *Pirates of the Caribbean* pictures. (*See* ECF No. 1-5 (hereafter

13  "Appendix").) But it is well-established that a list of random similarities scattered

14  throughout two works cannot establish substantial similarity. And in any case,

15  nearly all of the purported similarities Plaintiffs identify are generic or unoriginal

16  elements that the Court must filter out.

17      A plaintiff cannot satisfy its burden to plead substantial similarity by listing

18  similar elements at random because such lists are "inherently subjective and

19  unreliable" and no substitute for a holistic examination of the works. *Litchfield v.*

20  *Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984); *see also Murray Hill Publ'ns, Inc.*

21  *v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 320 (6th Cir. 2004) ("'random

22  similarities scattered throughout the works' can be discounted"); *Williams v.*

23  *Crichton*, 84 F.3d 581, 589–90 (2d Cir. 1996) (awarding judgment as a matter of

24  law to defendants for lack of substantial similarity between the film *Jurassic Park*

25  and plaintiff's book about a dinosaur theme-park, and rejecting the relevance of a

26  list of similarities as "[s]uch a scattershot approach cannot support a finding of

27

28

-12-

substantial similarity because it fails to address the underlying issue:  whether a lay observer would consider the works as a whole substantially similar to one another").

For this reason, the Court should disregard the Appendix in determining whether the works are substantially similar.  But even considering the Appendix would not save the Complaint, because essentially all of the purported similarities it enumerates involve unprotectable elements that must be filtered out under the extrinsic test.  The Appendix repeatedly lists generic elements that appear in virtually all pirate stories:  treasure maps, ghost pirates, ships flying black sails, skeletons, privateers, naval attacks, dark fog, the "pirate code," and supernatural elements such as ghosts and sea monsters.  These have appeared and will continue to appear in countless works, and many are grounded in the history of piracy itself. No author can monopolize these generic narrative building blocks.  *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) ("General plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind."). Copyright protects only "those aspects of the work—termed 'expression'—that display the stamp of the author's originality."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).  Because Plaintiffs have no protectable copyright interest in these elements, they are irrelevant to the similarity analysis.

Indeed, it is especially unsurprising that elements such as these appear in both works at issue because both the Screenplay and Disney's pictures were inspired by the same source material:  Disney's Pirates of the Caribbean theme park ride.[10]  (*See* Compl. ¶ 26 (alleging that Plaintiffs based the Screenplay on the ride).)  Disney's ride incorporated many of the elements Plaintiffs now characterize as similarities:

---

[10] That Plaintiffs took many elements from Disney's theme park ride underscores the frivolousness of their claim.  (*See* RJN.)  Should the Court determine it cannot consider the elements of the ride, however, Defendants' motion should nevertheless be granted because the cited elements are not copyrightable, and the works are not substantially similar in protectable expression.

ships appearing in dark weather and storms; numerous pirate skeletons (two pierced with swords); cursed treasure; a battle between a pirate ship and a fort; pirates and sailors drunk on rum; skeleton pirates wearing black hats; skeletons intoning, "dead men tell no tales" and the theme song ("*Yo ho, Yo ho, a Pirate's life for me*").[11] Because "copyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original," *Feist*, 499 U.S. at 350 (citation omitted), the Court must filter these elements out before applying the extrinsic test, *see Mattel*, 616 F.3d at 915–16.

### 2.   After Filtering Out the Unprotectable Elements, the Works Are Not Remotely Similar

After unprotectable elements are filtered out, the extrinsic test requires the Court to appraise the similarity of expression in the "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the works. *Funky Films*, 462 F.3d at 1077. As demonstrated below, there is no similarity of protectable expression between the two works, much less substantial similarity.

### (a)   Plot and Sequence of Events

The Ninth Circuit has refused to find substantial similarity when two works proceed from a common premise but execute their plotlines in substantially different ways. *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010) (concluding that two works told "very different stories" despite the fact both "share[d] the historically unfounded premise of an American war veteran going to Japan to help the Imperial Army by training it in the methods of modern Western warfare for its fight against a samurai uprising"); *Funky Films*, 462 F.3d at 1077–78 (rejecting a claim of substantial similarity between two works that both involved the patriarch of a family that runs a funeral home dying and leaving the business in the

---

[11] There are also numerous elements in the ride that Plaintiffs incorporated into the Screenplay that do not have analogues in the Disney motion pictures, such as a sign reading "Take a Wench Fer Yer Bride," a mysterious redhead hiding among the "wenches" at the auction, and a Spanish townsperson named Carlos. (*See* Screenplay at 12, 14, 18.)

-14-

hands of an estranged son).  When two works have plots that develop "quite differently," there is no substantial similarity and no infringement.  *Funky Films*, 462 F.3d at 1078.

That is precisely the case here.  The Screenplay and the *Pirates of the Caribbean* pictures start from the same generic premise—a conflict between a pirate captain and his first mate.  In *Pirates of the Caribbean*, Sparrow's first mate Barbossa mutinies and strands Sparrow on an island.  In the Screenplay, Nefarious and his first mate Davey Jones are thrust into conflict when Jones refuses to give Nefarious the second half of a treasure map.

Beyond that premise, the two plots have essentially nothing in common.  The Screenplay's plot centers on a ragtag group of orphans, the Rascals, who dream of becoming pirates.  They have heard the legends of Nefarious and Jones, but the Jones they know is a drunk, disillusioned with piracy and full of regret for having caused Jane's death.  The principal action in the plot revolves around two ongoing searches for two halves of a single treasure map:  Nefarious is searching for Jones, believing that he has the other half of the map, while the Rascals, who have Jones's half of the map, are searching for Nefarious's.[12]  Ultimately, those two searches collide on Calavera Island, where the Rascals finally find the second half of the map and Nefarious finds Jones, who shakes out of his malaise and saves the children as the brave privateer he once was.  At the end of the Screenplay, the Rascals learn, from Jones, that piracy does not pay:  the treasure they had hunted turns out to be impossible to collect, and in the course of seeking it, their mentor Jones appears to die.  Only once they renounce piracy are they finally able to defeat Nefarious and reunite with their surrogate parents, Jane and Jones.

---

[12] This "hunt for pieces of a map" plot is common in the pirate genre.  For example, the 1995 motion picture *Cutthroat Island*—which clearly inspired the "original artwork" Plaintiffs prepared in connection with the Screenplay—tells the story of a pirate, played by Geena Davis, who possesses one piece of a treasure map to a mysterious island and goes in search of the other two pieces.  *See* Renny Harlin, *Cutthroat Island* (1995); https://en.wikipedia.org/wiki/Cutthroat_Island.

*Pirates of the Caribbean*'s plot is fundamentally different.  It does not involve any children, much less a large group of them.  None of the plot elements involving the Rascals that form the majority of the action in the Screenplay has any analogue in Disney's pictures:  there is no group of orphans, no children who dream of becoming pirates, and no plot dynamic in which an adult pirate serves as a surrogate father to the children.

In this respect, Plaintiffs' claims suffer from the same problem as those identified in *Funky Films*.  There, both works told the story of a small funeral home operated by two brothers after the sudden death of their father.  472 F.3d at 1077.  The Ninth Circuit observed that the works shared numerous similarities—including ones far more striking than those Plaintiffs identify here.  For example, in both works, the older brother moved home from a faraway city, clashed with his conservative younger brother, and initially refused to participate in the family business.  *Id.* at 1077–78.  But the Ninth Circuit held that, upon close examination, the plots were dissimilar:  one was "a murder mystery," while the other was a drama about the character struggling to deal with "the cataclysmic death of the father."  *Id.* at 1078.  So too here:  whatever plot similarities the works may share (and they are far fewer than the similarities between the works in *Funky Films*), the plots unfold very differently because the Screenplay is about a band of children and the *Pirates of the Caribbean* pictures are not.

But even when the elements of the children are disregarded, the plots have little in common.  Unlike the Screenplay, *Curse of the Black Pearl* does not involve a search for lost treasure.  Rather, it is a rescue story:  Barbossa kidnaps Elizabeth, believing her to be the person he needs to break the curse afflicting his crew, and much of the rest of the picture centers on the efforts of Will, Sparrow, and Norrington to recover her.  Indeed, Barbossa and his crew are not trying to *find* lost treasure, like Nefarious and the Rascals, but trying to *return* it, and in so doing to break the curse that has made them inhuman.

Plaintiffs make no effort to plead any similarity in the plots of the two works. The Complaint does not identify any plot elements that are substantially similar, and the list of elements attached as Exhibit 5 identifies just *one single* "plot" element that supposedly overlaps: "Supernatural 'cursed' pirates or 'skull faced' pirates." (Compl. Ex. 5 at 1.) Plaintiffs are wrong that this is a protectable similarity. First, supernatural pirates are an "unoriginal component[]," not created by Plaintiffs, that must be filtered out in applying the extrinsic test. *Mattel*, 616 F.3d at 913–14. Countless works have borrowed the idea of supernatural pirates, from William Hope Hodgson's 1909 *The Ghost Pirates* to Richard Wagner's 1843 opera *The Flying Dutchman*. In any event, the idea of a "curse," and of skeletal pirates who speak, is in Disney's ride (on which the Disney pictures are based). Second, the idea of supernatural pirates is expressed differently in the works. In the Screenplay the pirates are "skull faced," but they are not actually skeletons: Nefarious's crew paint their faces to *look like* skulls. (*See* Screenplay at 46 (describing Stitch and Daggers as "faces … painted into TRIBAL SKULLS").) In *Curse of the Black Pearl*, Barbossa's crew are cursed men who become skeletons in the moonlight.[13]

**(b)    Characters**

Plaintiffs allege that Sparrow is substantially similar to the Screenplay's Jones character. (Compl. ¶ 13.) Plaintiffs further allege that the key similarity between Sparrow and Jones is that they are both "good m[e]n," as opposed to the "evil, loathsome, [and] feared" pirates depicted in most pirate works. (*Id.* ¶¶ 11, 13.)

As an initial matter the idea of a "good pirate" is not copyrightable; it is a "[g]eneral plot idea[]" that cannot be monopolized by any one author. *Berkic*, 761 F.2d at 1293. Jones and Sparrow also have little in common. Jones is

---

[13] The Appendix adds nothing to this analysis, as the plot similarities it points to are trivial. For example, in *Dead Man's Chest*, Davy Jones can set foot on land once every ten years. Plaintiffs compare this to the fact that in the Screenplay, ten years elapse between the prologue and the subsequent action. (Appendix at 8.) It goes without saying that Plaintiffs cannot monopolize the number 10.

unambiguously the hero of the Screenplay, and he follows a conventional hero's tale. He begins by making a terrible mistake: he prioritizes his greed for treasure over the love of his life, Jane, which leads to (what he believes is) her death. Ten years later, he has renounced his life of piracy—"No more maps. No more treasure," he tells the Rascals early in the script (Screenplay at 28)—but is a shell of the man he used to be, spending his days alone drinking rum. When he reunites with Jane, and is presented with an opportunity to save the Rascals, he is redeemed. At a crucial moment, when the Rascals believe Jones has abandoned them again, he emerges heroically: "DAVEY JONES is back! Face clean-shaven, hair pinned back in a tail, dressed like the young rogue he once was, dashing and brave." (*Id.* at 79.)

From that point Jones serves as the moral center of Plaintiffs' story. After he bravely fights on behalf of the Rascals, he reminds Jane that he is doing so for love: "[I]f you think I'm doing this for that damned treasure, you're wrong! Those kids and you are all I have, and I'm not losing them." (*Id.* at 86.) At the end of the Screenplay, Jones, having rid the Caribbean of the evil Nefarious, is dressed neatly as a privateer, with his "family"—Jane and the Rascals—at his side.

Sparrow, by contrast, is a morally ambiguous antihero who repeatedly *refuses* to renounce piracy. Unlike Jones, who regrets his pirate days, Sparrow loves the pirate life, so much so that when anyone calls him "Jack" or "Sparrow," he corrects them with the full honorific: "*Captain Jack Sparrow.*" (*Curse of the Black Pearl*, at 17:44.) Sparrow has many flaws. He lies constantly, particularly to embellish his reputation. He tells everyone he escaped from the island where Barbossa marooned him by strapping two sea turtles together, but later, when he is marooned a second time, he admits that he actually escaped by trading with rum runners. Sparrow is also portrayed as deeply self-interested. At a key moment, he is willing to barter with Barbossa against the interests of Will and Elizabeth, offering to reveal Will's true identity as Bill Turner's son in exchange for again becoming the captain of the *Black Pearl*. The picture even makes a joke of Sparrow's shifting loyalties: at one

-18-

point, when Elizabeth arrives to discover Sparrow fighting Barbossa, she asks, "Whose side is Jack on?"  Will replies, "At the moment?"  (*Id.* at 2:00:11.)

In short, Jones and Sparrow are not remotely similar, even at the generic level of being "good pirates."  (Indeed, other than a brief stint in the prologue, Jones is not a pirate at all.)  Nor do they have anything else in common as characters. Jones's backstory is that he was a first mate who had a dispute with Nefarious over the treasure map.  Sparrow's backstory is that he was captain of the *Black Pearl* until Barbossa led a mutiny against him and marooned him on an island.  Jones is a "dashing," "clean-shaven" rogue, while Sparrow, famously modeled on Keith Richards, walks with a drunken lilt and wears a signature hat.  Jones is not a comic character in the Screenplay, while Sparrow's dialogue is constantly clever and witty.

The other characters in the Screenplay either have no analogues in the *Pirates of the Caribbean* pictures or have analogues whose expression is radically different:

- There are no counterparts in *Pirates of the Caribbean* to the six children who are the principal characters in the Screenplay.  *See Benay*, 607 F.3d at 627 (no substantial similarity where "[t]here are a number of important characters in the Film and the Screenplay who have no obvious parallel in the other work").[14]

- In the Screenplay, Jane is a stock damsel character who is in love with Jones.  The Screenplay says nothing about her background.  In *Pirates of the Caribbean*, the character most analogous to Jane, Elizabeth, is the daughter of a colonial governor.  She is not in love with Sparrow, but rather with Will, who is a blacksmith, not a pirate.

- The villains in the two works are both evil pirate captains with

---

[14] The Appendix suggests that Gibbs, Sparrow's first mate, is similar to Stink because Gibbs is in a pigpen when he is introduced in Curse of the Black Pearl. (Screenplay at 13, 16; Appendix at 3.)  The characters are unalike:  Gibbs is an adult who is briefly locked in a pigpen, while Stink a flatulent child.

supernatural elements.  But Barbossa, the villain in *Pirates of the Caribbean*, can transform into a skeleton because he has been cursed by Cortes's gold.  In the Screenplay, Nefarious became a ghost pirate after being swallowed and regurgitated by a sea monster.  Further, Barbossa becomes a hero over the course of the pictures, ultimately sacrificing himself for his daughter.

- Plaintiffs compare Nefarious's crewmembers Stitch and Dagger to two crewmembers of Barbossa's in *Pirates of the Caribbean*, Pintel and Ragetti.  (*See* Appendix at 2.)  Both Stitch and Dagger and Pintel and Ragetti are henchmen of the pirate villain.  But they are nothing alike: Stitch and Dagger are violent, humorless pirates defined only by their weapons, while Pintel and Ragetti provide comic relief throughout each of the first three *Pirates of the Caribbean* motion pictures.

### (c)  Themes

The Screenplay is overtly moralistic, as befits a children's story.  It has clear villains and heroes, and its central theme is that greed and piracy are bad.  At the beginning of the story, the six orphaned Rascals have a romantic conception of the pirate life.  With their heads full of tales of the exploits of Nefarious and Jones, the Rascals are determined to become pirates.  They act like it, too.  In the first scene the Rascals are introduced, they are depicted leering at the Woman in Red at the "auction of wenches" and robbing a "peg leg pirate" of his bag of gold.  (Screenplay at 14–16.)  Jones is the conscience of the story, a father figure to the orphan Rascals. He knows the true costs of piracy, as he believes his greed for treasure led to Jane's death at Nefarious's hands.  At every opportunity, he lectures the Rascals on the downsides of piracy, telling them, "There is no such thing as LOYALTY or MERCY between pirates."  (*Id.* at 66.)

The nature of the treasure also reinforces the theme that greed has great costs. When the Rascals finally find a cavern full of rubies at the end of the story, Jones

tells them that it is a trap:  "Once removed, water will begin to fill through the hole you created, drowning us all…. You can't take it, you can only die with it."  (*Id.* at 93.)  Nefarious's greed leads to his downfall: he orders his men to collect the jewels, then dies in the subsequent flooding.  Speaking to Jane, Jones summarizes the Screenplay's theme: "It's not about the treasure, Jane…. Fate brought us here for a reason ... to show us that what we have is far greater than any treasure!"  (*Id.* at 97.)

The *Pirates of the Caribbean* pictures are far more morally ambiguous.  Indeed, one of their central themes is that good and evil are not easy to distinguish.  Although Barbossa is *Curse of the Black Pearl*'s "villain" and Sparrow the film's nominal "hero," both men are conflicted and ambiguous characters.  Barbossa, after all, is motivated by a desire to save his men from the terrible curse under which they have been suffering for years (and ultimately becomes a hero in later films).  Sparrow, on the other hand, has a more selfish motivation:  to recover his captaincy of the *Black Pearl*, which to him represents freedom.  This theme of moral ambiguity continues throughout the Disney franchise.  In the opening scene of *At World's End*, privateers working for the East India Trading Company conduct a mass hanging of pirates, including a child—complicating the simplistic narrative of "bad" pirates and "good" privateers reflected in the Screenplay.

### (d)    Dialogue

"To show substantial similarity based on dialogue, a plaintiff must establish 'extended similarity of dialogue.'"  *Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1156 (C.D. Cal. 2015), *aff'd sub nom. Shame on You Prods., Inc. v. Banks*, 690 F. App'x 519 (9th Cir. 2017).  Ordinary words and phrases are not entitled to copyright protection, nor are "[p]hrases and expressions conveying an idea typically expressed in a limited number of stereotyped fashions …."  *Narell v. Freeman*, 872 F.2d 907, 911–12 (9th Cir. 1989).

DEFENDANTS' MOTION TO DISMISS COMPLAINT

In the Appendix, Plaintiffs fail to identify any extended similarity of dialogue sufficient to support a copyright claim.[15]   The few examples of remotely similar dialogue Plaintiffs point to are only unprotectable phrases or expressions.  For example, both Sparrow and Jones are slapped by women in the two works.  Sparrow responds, "[I'm] not sure [I] deserved that," while the woman who slaps Jones tells him, "You had that coming."  Plaintiffs claim this is a "similarity."  (Compl. Ex. 5, at 3.)  Even if the utterances were similar, which they are not, they are stereotypical one-liners when a character is slapped by a romantic interest.  They are not protectable.

In fact, the characters in the works speak very differently.  In the Screenplay, Nefarious speaks like a pirate-movie cliché:  "Gather our numbers, lad.  Hijack thar main vessel and pipe the rest of those ruddy wreckages away!  We're going after Jones!"  (Screenplay at 58.)  By contrast, the villain in *Curse of the Black Pearl*, Hector Barbossa, addresses his crew in a florid, literate pirate patois:

> Gentlemen, the time has come! Our salvation is nigh! Our torment is near an end! For ten years we've been tested and tried, and each man jack of you here has proved his mettle a hundred times over, and a hundred times again! Suffered, I have! Punished, we were, the lot of us. Disproportionate to our crime! Here it is! The cursed treasure of Cortés himself. Every last piece that went astray, we have returned. Save for this.

(1:10:01.)  In the same vein, Sparrow's witty, idiosyncratic manner of speech has no analogue in Davey, whose dialogue is generic and indistinct.  Further, the Screenplay makes frequent anachronistic references to pop culture (*see, e.g.*, Screenplay at 21 (character referring to "R.E.S.P.E.K.T.")), while the pictures do not.

### (e)    Mood and Pace

The mood and pace of the Screenplay is fast and slapstick, as befits a work intended for children.  Most of that work is spent with the Rascals wandering around

---

[15] Plaintiffs do identify the lyrics of the theme song to Disney's own ride, seemingly suggesting Disney *copied the Screenplay* in using Disney's own song.  (Appendix at 5, 13.)

1    solving puzzles and cracking juvenile jokes.  The action is extremely fast:  the

2    Rascals reach Calavera Island on page 65 of the screenplay, and just 10 pages later,

3    the Rascals have Nefarious's map in hand, having hiked through the jungle, crossed

4    a ravine over crocodile-infested water, and broken into the "Pit of the Dead" where

5    the map is hidden.

6           The action in *Curse of the Black Pearl* occurs more slowly and in more

7    locales, with the characters going back and forth between Jamaica, Tortuga, the

8    island on which Sparrow and Elizabeth are marooned, and Isla de Muerta.  And the

9    mood of the films is far darker than the Screenplay; it is impossible to imagine the

10   execution scenes that open *At World's End* taking place in the Screenplay.

## (f)    Setting

12          Both the Screenplay and the *Pirates of the Caribbean* pictures are chiefly set

13   in the Caribbean.  Because virtually all pirate works take place in the Caribbean, the

14   setting is an unprotectable *scene a faire*.  *See, e.g.*, *Cavalier v. Random House, Inc.*,

15   297 F.3d 815, 824 (9th Cir. 2002) (night sky setting was unprotectable *scene a faire*

16   where it "naturally and necessarily flows from the basic plot premise").

## IV.   CONCLUSION

18          Because the Complaint does not plausibly plead substantial similarity, it does

19   not state a claim for copyright infringement.  Further, it is not possible that Plaintiffs

20   could amend their pleading to allege facts that could state an infringement claim.

21   *See Campbell v. The Walt Disney Co.*, 718 F. Supp. 2d 1108, 1116 (N.D. Cal. 2010)

22   (failure to establish substantial similarity as a matter of law is a "defect [that] cannot

23   be cured by amendment").  Thus, Disney respectfully requests that the Court dismiss

24   the Complaint with prejudice.

25

26

27

28

1

DATED:  November 16, 2018

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MUNGER, TOLLES & OLSON LLP
   GLENN D. POMERANTZ
   MELINDA E. LEMOINE
   JORDAN D. SEGALL
   J. MAX ROSEN

By:     */s/ Melinda E. LeMoine*
   MELINDA E. LEMOINE
Attorneys for Defendants The Walt Disney
Company et al.

DEFENDANTS' MOTION TO DISMISS COMPLAINT