Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
**LOWE & ASSOCIATES**, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

Attorneys for Plaintiffs,
Arthur Lee Alfred II and
Ezequiel Martinez Jr.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ARTHUR LEE ALFRED, II**, an individual; AND **EZEQUIEL MARTINEZ, JR.**, an individual, <br><br> Plaintiffs, <br> v. <br><br> **THE WALT DISNEY COMPANY**, a Delaware corporation; **BRIGHAM TAYLOR**, an individual; **DISNEY ENTERPRISES INC**., a Delaware Corporation; **WALT DISNEY PICTURES**, a California company; **WALT DISNEY MOTION PICTURES GROUP, INC**., a California corporation; **THE DISNEY STORE INC.**, a California corporation; **WALT DISNEY PARKS AND RESORTS**, a Florida company; **DISNEY+** a California company; **DISNEY CONSUMER PRODUCTIONS, INC.,** a California Corporation; **DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC**., a California corporation; **DISNEY BOOK GROUP, LLC.**, a Delaware Limited | CASE NO. 2:18-CV-08074-CBM-AS <br><br> Assigned to Hon. Consuelo Marshall <br><br> PLAINTIFFS' *FIRST AMENDED* COMPLAINT FOR DAMAGES FOR: <br><br> 1. COPYRIGHT INFRINGEMENT (FILM & DERIVATIVE WORKS) <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint Filed: Nov. 14, 2017 (Colorado District Court 1:17-CV-02729) <br> Trial: TBD |

Liability Company; **DISNEY INTERACTIVE STUDIOS, INC**., a California corporation; **WALT DISNEY ATTRACTIONS TECHNOLOGY LLC**, a Delaware Limited Liability Company; **WALT DISNEY THEATRICAL RECORDINGS**, a California Corporation; **DISNEY MEDIA DISTRIBUTION**, a California company;   **BUENA VISTA PICTURES DISTRIBUTION, INC**., a California Company; **AMERICAN BROADCASTING COMPANY,** a New York Company; **BUENA VISTA MEDIA**, a California corporation; **BUENA VISTA HOME ENTERTAINMENT**, **INC**. a California Company; **BUENA VISTA THEATRICAL GROUP LTD**., a New York Corporation; **BUENA VISTA CATALOGUE CO.,** a California Company**; BUENA VISTA NON-THEATRICAL, INC.,** a California Corporation; **BUENA VISTA PRODUCTIONS,** a California corporation, **BUENA VISTA THEATERS, INC.,** a California corporation; **BUENA VISTA VIDEO ON DEMAND,** a California corporation; **BUENA VISTA BOOKS, INC.,** a California corporation; and DOES 1-50, inclusive,

Defendants.

PLAINTIFFS' FIRST AMENDED COMPLAINT

PLAINTIFFS Arthur Lee Alfred, II, and Ezequiel Martinez ("Plaintiffs") hereby allege as follows:

**PARTIES**

1. At all times mentioned herein, Plaintiff ARTHUR LEE ALFRED, II ("Alfred") is an individual residing in the State of California.

2. At all times mentioned herein, Plaintiff EZEQUIEL MARTINEZ JR. ("Martinez") is an individual residing in the State of California.

3. Alfred and Martinez shall be collectively referred to as "Plaintiffs."

4. Upon information and belief, Defendant THE WALT DISNEY COMPANY ("Defendant TWDC") is incorporated in Delaware, with its principal place of business in Burbank, California.

5. Upon information and belief, Defendant DISNEY ENTERPRISES, INC. ("Defendant DEI") is incorporated in Delaware, with its principal place of business in Burbank, California.

6. Upon information and belief, Defendant WALT DISNEY PICTURES ("Defendant Disney Pictures") is incorporated in California, with its principal place of business in Burbank, California. Defendant Disney Studios is a division of Defendant TWDC and is a film production studio arm of Walt Disney Studios.

7. Upon information and belief, Defendant WALT DISNEY MOTION PICTURES GROUP, INC. ("Defendant Disney Motion Pictures") is incorporated in California, with its principal place of business in Burbank, California.

8. Upon information and belief, Defendant THE DISNEY STORE INC. ("Defendant Disney Store") is incorporated in California, with its principal place of business in Burbank, California.

PLAINTIFFS' FIRST AMENDED COMPLAINT

9.     Upon information and belief, Defendant DISNEY CONSUMER PRODUCTIONS, INC. ("Disney Consumer") is a California corporation with its principal place of business in Burbank, California.

10.     Upon information and belief, Defendant DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., ("Disney Media") is a California corporation with its principal place of business in Burbank, California.

11.     Upon information and belief, Defendant DISNEY BOOK GROUP, LLC., ("Disney Book") is a Delaware Limited Liability Company.

12.     Upon information and belief, Defendant DISNEY INTERACTIVE STUDIOS, INC. ("Disney Interactive") is a California corporation with its principal place of business in Burbank, California.

13.     Upon information and belief, Defendant WALT DISNEY ATTRACTIONS TECHNOLOGY LLC ("Disney Attractions") is a Delaware Limited Liability Company.

14.     Upon information and belief, Defendant WALT DISNEY THEATRICAL RECORDINGS ("Disney Recordings") is a California Corporation with its principal place of business in Burbank, California.

15.     Upon information and belief, Defendant WALT DISNEY PARKS AND RESORTS U.S., Inc. ("Defendant Disney Parks") is incorporated in Florida, with its principal place of business in Orlando, Florida.

16.     Upon information and belief, Defendant DISNEY+ ("Defendant Disney+") is owned and operated by DISNEY MEDIA DISTRIBUTION.

17.     Defendant DISNEY MEDIA DISTRIBUTION ("Defendant Disney Distribution") is incorporated in California, with its principal place of business in Burbank, California.

18.     Upon information and belief, Defendant BUENA VISTA PICTURES DISTRIBUTION ("Defendant Buena Vista") is owned and operated

3

by Defendant AMERICAN BROADCASTING COMPANY.   Defendant Buena Vista, among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

19.   Upon information and belief, Defendant BUENA VISTA HOME ENTERTAINMENT ("Defendant Buena Vista Ent.") is incorporated in California, with its principal place of business in Burbank, California. Defendant Buena Vista Ent., among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

20.   Upon information and belief, Defendant BUENA VISTA MEDIA ("Defendant Buena Vista Media") is incorporated in California, with its principal place of business in Burbank, California.

21.   Upon information and belief, Defendant BUENA VISTA PRODUCTIONS ("Defendant Buena Vista Productions") is incorporated in California, with its principal place of business in Burbank, California.

22.   Upon information and belief, Defendant BUENA VISTA THEATERS, INC ("Defendant Buena Vista Theaters") is incorporated in California, with its principal place of business in Burbank, California.

23.   Upon information and belief, Defendant BUENA VISTA THEATRICAL GROUP LTD. ("Defendant Buena Vista Theatrical") is incorporated in New York, with its principal place of business in New York, New York.

24.   Upon information and belief, Defendant BUENA VISTA VIDEO ON DEMAND ("Defendant Buena Vista VOD") is incorporated in California, with its principal place of business in Burbank, California.

25.   Upon information and belief, Defendant BUENA VISTA BOOKS ("Defendant Buena Vista Books") is incorporated in California, with its principal place of business in Burbank, California.

PLAINTIFFS' FIRST AMENDED COMPLAINT

26.     Upon information and belief, Defendant BUENA VISTA NON THEATRICAL, INC. ("Defendant Buena Vista Non-Theatrical") is incorporated in California, with its principal place of business in Burbank, California.

27.     Upon information and belief, Defendant AMERICAN BROADCASTING COMPANY ("Defendant ABC") is incorporated in New York, with its principal place of business in New York, New York. Defendant ABC, among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

28.     The foregoing entities shall hereinafter be collectively referred to as "Disney".

29.     For the purposes of this pleading, the Pirates of the Caribbean franchise currently consists of the original film "Pirates of the Caribbean: Curse of the Black Pearl" (the "Film") released to the public on June 28, 2003; "Pirates of the Caribbean: Dead Man's Chest" ("POTC 2") released to the public on June 24, 2006;  "Pirates of the Caribbean: At World's End" ("POTC 3") released to the public on May 25, 2007; "Pirates of the Caribbean: On Stranger Tides" ("POTC 4") released to the public on May 7, 2011; "Pirates of the Caribbean: Dead Men Tell No Tales" ("POTC 5") released to the public May 26, 2017 and any other films not yet released but which are ultimately released and are derivative of the Film.  The Film, POTC 2, POTC 3, POTC 4, and POTC 5 shall be collectively herein referred to as the "Film Franchise."

30.     At all times mentioned herein, Disney and Taylor shall be jointly referred to as "Defendants".

31.     Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that

5

Plaintiff's damages as herein alleged were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

32.     Plaintiffs are informed and believe and on that basis alleges that Defendants at all times relative to this action, were agents, servants, partners, joint venturers, and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all of the other conspirators.

## JURISDICTION AND VENUE

33.     This action arises under the Copyright Laws of the United States (Title 17, U.S.C. § 101 *et seq.*) and the common law of the State of California.

34.     This court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

35.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of Los Angeles, California.

PLAINTIFFS' FIRST AMENDED COMPLAINT

## PRELIMINARY STATEMENT

36.     Every young screenwriter dreams of writing that commercial screenplay that can catch the attention of a major film studio. The opportunity to have a major film studio, such as the defendants to this case, take a screenwriter's original spec screenplay and turn the work into a major motion picture is the ultimate dream.

37.     The screenwriter Plaintiffs almost realized that dream, but this dream quickly turned into a nightmare, when their original screenplay entitled "Pirates of the Caribbean" was intentionally copied and commercially exploited by Defendants, with no credit or compensation to either of the Plaintiffs.

38.     Plaintiff Alfred is a 1998 graduate of California State University in San Bernardino.  Coming from a small African American family, he was the first in his family to graduate college; in fact, Plaintiff Alfred grated at the top of his class with a degree in Communications and Television.  Also, he, along with Plaintiff Martinez, were the first to produce independent films at the university. After graduating, Plaintiff Alfred worked as an intern at MTV Films while simultaneously perfecting his craft of screenwriting.  Thereafter, beginning in 2001, Plaintiff Alfred began working as a producer in the entertainment industry whereby he produced a number of music videos, commercials, infomercials and corporate videos. In 2010, Plaintiff Alfred began working for famous award winning actor/producer/director Forest Whitaker as a Creative Executive. He and Mr. Whitaker worked together for three (3) years.   As Whitaker's Creative Manager, Plaintiff Lee helped develop Juntobox Films, a social media platform for independent filmmakers to create and collaborate on independent films.

39.     Plaintiff Martinez attended California State University in San Bernardino where he studied Film and Television.  Upon information and belief, he produced the first student feature film in the history of any California State University student.   While in school, he was awarded top film student in

7

PLAINTIFFS' FIRST AMENDED COMPLAINT

Southern California by his professors.  Thereafter, he joined Paramount Pictures as an intern working on the film VARSITY BLUES.  Plaintiff Martinez has made a living as a screenwriter for over twenty-two (22) years, having worked for several years with Madonna's production company Maverick (from 2003 to 2006).  At Maverick, he worked with every major studio setting up film and television projects in the entertainment industry.

## PLAINTIFFS SOLD DISNEY THEIR ORIGINAL SCREENPLAY CALLED "RED HOOD" BEFORE SUBMITTING THE PIRATES SCREENPLAY

40.     In or about early 1999, Plaintiffs jointly wrote an original "spec" screenplay entitled RED HOOD ("*Red Hood*").  *Red Hood* was an updated version of the folklore tale of *Little Red Riding Hood*.  Plaintiffs were able to use their collective experiences as minorities growing up in Los Angeles in the 1980s and 1990s to infuse their writing with an edgy, commercial appealability to a diverse audience.  To date, Plaintiffs have jointly written three (3) screenplays together.

41.     Plaintiffs, through their producer, Tova Laiter ("Laiter") submitted *"Red Hood"* to various producers and production companies, including Disney, in or about 1999.

42.     Defendants, including Taylor, favorably received the *Red Hood* screenplay and elected to option *Red Hood*.

43.     Thereafter, Taylor/ Disney, made an offer to Plaintiffs to work with Taylor (and other Disney executives) to develop *Red Hood*. In or about this time, Disney paid for Plaintiffs to join the Writers Guild of America, as was required for all screenwriters who work with Disney.

44.     In or about fall of 1999, Defendants, specifically, Taylor, who was at that time employed by Disney as a creative executive, invited Plaintiffs to work with himself, Josh Harmon ("Harmon"), Michael Haynes ("Haynes") and

8

others on the "development" of the *Red Hood* Project.  Upon information and belief, Harmon and Haynes worked in the same department at Disney (along with Taylor); upon information and belief, that department was the motion pictures group department.

45.     Thereafter, beginning in approximately the fall of 1999, Plaintiffs began attending multiple meetings in person at the Disney lot in Burbank, California (and telephonically) with Taylor, Harmon and Haynes, for the purpose of developing *Red Hood*.

46.     In or about January of 2000, Plaintiffs optioned *Red Hood* to Disney for $15,000.  *Red Hood* was never produced by Disney.

47.     For approximately one year, from October 1999 through October 2000, Plaintiffs working with Taylor, along with other members of Defendant Disney's creative team, on *Red Hood*, primarily at the Disney lot in Burbank, California.

## PLAINTIFFS WRITE AN ORIGINAL SCREENPLAY ENTITLED "PIRATES OF THE CARIBBEAN"

48.     In or about March of 2000, Plaintiffs developed an idea for an original spec screenplay originally entitled *Pirates of the Spanish Main* and began writing the same.

49.     On or about July 19, 2000, Plaintiffs finalized the first draft of *The Pirates of the Spanish Main* (which they later retitled *Pirates of the Caribbean* to make it more marketable to Disney) (the "Screenplay").  Given their existing relationship with Disney, Plaintiffs retitled the Screenplay and added some relatively minimal characteristics from the Disney theme park ride of the same name (the "Ride") for the purposes of submitting the Screenplay to Disney.

50.     Plaintiffs registered the Screenplay with the United States Copyright Office (a true and accurate copy of a printout from the US Copyright Office database is attached hereto as **Exhibit 1**) registration no. Pau-003855850.

9

PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs have requested an official copy of the registration itself from the US Copyright Office (which has been delayed due to Covid-19) and will seek to substitute it as Exhibit 1 once received.

51.    Plaintiffs are the owners of all copyright rights in and to the original creative work, the Screenplay in all of its original, unique and protected permutations, and has never assigned, licensed or otherwise transferred its copyright protection to any of the Defendants, nor to any other third party.

52.    On or about August 2, 2000, Laiter had a conversation with Taylor by telephone wherein she described the Screenplay to Taylor.  During that conference, Taylor stated that Disney wanted to make a film related to the Ride and were discussing the foregoing internally.

53.    At that time, Taylor solicited a submission of Plaintiffs' Screenplay. Taylor sounded highly interested during the call – which is to be expected since Taylor already knew that Plaintiffs were capable of writing marketable screenplays.

54.    On or about August 7, 2000, Laiter had a second call with Taylor advising him that she would send the Screenplay to Taylor on August 9, 2000.

55.    Upon Taylor's request, Laiter submitted the Screenplay to Taylor on August 9, 2000.  A true and accurate copy of Laiter's cover letter and the Screenplay itself is attached hereto as **Exhibit 2.**

56.    At the end of the submission letter, Laiter included the following: "Please let me know as soon as possible as I have a draft that does not have the Disney song or the Ride references that I plan to take to other studios."  In other words, the Screenplay stands on its own two feet as a self-contained original creative work, without any dependence upon the Ride.  The Ride references were ancillary, and extraneous added solely to make the Screenplay more marketable to Disney.

PLAINTIFFS' FIRST AMENDED COMPLAINT

57.    Thereafter, Plaintiffs hand delivered a sizzle reel about their project (i.e. a one-minute trailer) and original artwork in order to fully present their concepts to Disney.  The Screenplay, a sizzle reel and original artwork is collectively referred to as the "Materials".  A true and accurate copy of the artwork is attached hereto as **Exhibit 3**; and the sizzle is being lodged herewith as **Exhibit 4**.

58.    Plaintiffs waited to hear from Taylor as to whether Defendants would be interested in producing the Screenplay.  Much to Plaintiffs' dismay, they heard nothing from Taylor for a few months.  This was especially surprising since Laiter's letter included a request for Taylor's prompt response.

59.    Approximately two (2) months later, in early October 2000, Plaintiffs attended a meeting with Taylor and Harmon at the Disney lot to work on *Red Hood*.   Plaintiffs arrived early for the meeting and were brought into Taylor's office to wait for him.

60.    It was at that time that they specifically witnessed their Materials - the Screenplay and artwork on a coffee table in Taylor's office.

61.    Pleasantly surprised, Plaintiffs mentioned the Screenplay to Harmon and asked whether they would be discussing the Screenplay.  Almost immediately thereafter, Plaintiffs were quickly ushered out of Taylor's office.

62.     When the *Red Hood* meeting officially commenced in Taylor's office a short time later, all Materials including the Screenplay were removed and the meeting ended abruptly.  Plaintiffs' invitation to the Disney lot was unceremoniously revoked immediately thereafter.

63.    Thereafter, Plaintiffs were not invited back to meet with either Taylor or other executives at Defendant Disney regarding *Red Hood* or any other project.

64.    Shortly thereafter, Laiter was informed by Taylor via telephone that the Defendants were going to pass on the project due to the presence of children

PLAINTIFFS' FIRST AMENDED COMPLAINT

in the Screenplay.   This seemed to be a strange reason to pass given children are in most of Disney's films and television shows.

## PLAINTIFF'S ORIGINAL SCREENPLAY WAS NOT RETURNED UNTIL THE FILM WAS IN PRODUCTION

65.     It is custom and practice in the film industry for original works to be returned immediately to the agent or individual who submitted the work when a studio passes on a project. This is an industry accepted standard designed to prevent the "unintentional" copying of original spec screenplays.

66.     However, at the time that Defendants passed on Plaintiffs' original spec screenplay, it was not returned to Laiter.

67.     Instead, just over two years later, on November 26th, 2002, the Screenplay was returned to *Plaintiff Martinez*, via U.S.P.S. Priority Mail, with the return address of Taylor ("B. Taylor") at Disney.   A true and accurate copy of the return envelope is attached hereto as **Exhibit 5.**

68.     Upon information and belief, in or about September of 2002, Defendants already drafted the final version of the "Shooting Script" (which is the final version of a screenplay used in filming) and production began on the Film on October 9, 2002. Therefore, by the time the original spec screenplay was returned to Plaintiff Martinez, Defendants were already in production on the Film which incorporated significant, striking and substantial elements from Plaintiffs' Screenplay. Defendants had over two (2) years to pour over the contents of the Screenplay, and pirate it as they so desired.

69.     Upon information and belief, in or about May of 2001, Taylor was promoted from Director of Production to Vice President of Production at Disney.

## DISNEY RELEASES PIRATES OF THE CARIBBEAN IN 2003

70.     The first "*Pirates of the Caribbean*" film, "*Pirates of the Caribbean: The Curse of the Black Pearl*" (the "Film") premiered just over

PLAINTIFFS' FIRST AMENDED COMPLAINT

seven months later, on June 28, 2003.  This was the first installment in what turned out to be an incredibly successful franchise for Disney.

71.     Thereafter, on June 24, 2006, Defendants released *Pirates of the Caribbean: Dead Man's Chest* ("POTC 2") in theaters nationwide. POTC 2 is a direct sequel to the Film and a derivative work thereof.  POTC 2 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof. POTC 2 is therefore a separate infringement of Plaintiff's Screenplay.

72.     On May 25, 2007, Defendants released *Pirates of the Caribbean: At World's End* ("POTC 3") in theaters nationwide.  POTC 3 is a direct sequel to the Film and a derivative work thereof. POTC 3 utilizes the same basic core expression of the Screenplay, as well containing other similarities according to proof.  POTC 3 is therefore a separate infringement of Plaintiff's Screenplay.

73.     On May 7, 2011, Defendants released *Pirates of the Caribbean: On Stranger Tides* ("POTC 4") in theaters nationwide. POTC 4 is a direct sequel to the Film and a derivative work thereof.  POTC 4 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof.  POTC 4 is therefore a separate infringement of Plaintiff's Screenplay.

74.     On May 26, 2017, Defendants released *Pirates of the Caribbean: Dead Men Tell No Tales* ("POTC 5") in theaters nationwide. POTC 5 is a direct sequel to the Film and a derivative work thereof.  POTC 5 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof.  POTC 5 is therefore a separate infringement of Plaintiff's Screenplay.

75.     Many of the similarities identified hereinbelow carried over throughout the entire *Pirates of the Caribbean* franchise.

76.     In 2020, Disney announced that a sixth installment in the Film franchise is being planned for release.

PLAINTIFFS' FIRST AMENDED COMPLAINT

77.     Upon information and belief, the entire POTC Franchise has earned Disney approximately $40,000,000,000 which figure is growing by the second given the vast amount of ticket sales, DVD/Blu-ray and downloaded content, television and streamed content, merchandise, and books and video games.

78.     Inexplicably, in or about 2011 or 2012, Taylor sent Plaintiff Martinez several movie posters for the Film.

**THE SCREENPLAY AND DISNEY'S FILM ARE**
**SUBSTANTIALLY SIMILAR**

79.     The Defendants intentionally, blatantly, and without authorization copied the Plaintiffs' Screenplay.  Themes, settings, pace, plot, sequence of events, mood, several characters, and dialogues from the Screenplay, some practically verbatim, have been copied by the Defendants.

80.     David Román, a Professor in the Department of English at the University of Southern California, performed an in depth review and analysis of the Screenplay and the Film and has determined that "there are enough important similarities between the two works to merit a conclusion that one is substantially similar to the other" and otherwise as set forth in his report attached hereto.  Report, pg. 1.

81.     Professor Román holds a PhD and an Master of Arts in Comparative Literature from the University of Wisconsin at Madison and is the author of several award-winning books on twentieth and twenty-first century American literature and culture.   Before teaching at USC, Professor Román taught at the University of Washington and Yale University.    A true and accurate copy of Professor Román's expert report along with his *curriculum vitae* is attached hereto as **Exhibit 6.**

82.     Furthermore, Professor Román has acknowledged, verified and confirmed each of the additional similarities, which were specifically identified

PLAINTIFFS' FIRST AMENDED COMPLAINT

in Plaintiffs' Corrected Opening Brief filed with the Ninth Circuit Court of
Appeals on October 8, 2019 as follows:

**Characters**

a. <u>Main Character: Captain Davey Jones v. Captain Jack Sparrow</u>

83.     In the Screenplay, Davey Jones is described as a cocky, dashing
young rogue who is a talented pirate. Similarly, in the Film, Jack Sparrow is a
dashing young rogue character that is cocky, and a highly adept pirate (*Pirates
of the Caribbean: The Curse of the Black Pearl*, at 00:08:52; 00:09:43;
00:09:58). For example, in the Film, Jack Sparrow struts down the plank of a
boardwalk to steal a ship, taunts British guards by saying "but you have heard of
me" and flashes a coy smile at the guards while stealing their ship (*Pirates of the
Caribbean: The Curse of the Black Pearl*, at 00:11:40; 00:18:20; 00:46:50).

84.     Both Jack Sparrow and Davey Jones are also morally ambiguous,
opportunistic and more concerned with rum than piracy. The character of
Captain Jack Sparrow is introduced as a morally ambiguous, opportunistic pirate
who is more concerned with his ship, the Black Pearl, rum and women, than
being a pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at
00:10:29; 00:10:41; 00:12:10; 00:44:13; 01:36:00-01:39:00; 01:40:20-40). It is
said of Jack Sparrow early in the Film: "That is without a doubt the worst pirate
I have ever seen." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at
00:18:17-20; 00:46:40). Similarly, in the Screenplay the Rascal Scoundrels
question Davey Jones' reputation saying: "the great Davey Jones, huh? That's
some legend you've got there".

85.     Davey Jones has a significant alcohol problem and is disillusioned
with piracy. Similarly, Jack Sparrow has a significant alcohol problem and is
also disillusioned with piracy (*Pirates of the Caribbean: The Curse of the Black
Pearl,* at 00:53:58; 01:35:40-01:36:40; 01:41:01). Both Jones and Sparrow want
to be known as great pirates, and are even encouraged at some point to be the

pirates they once were, or that legend claims them to be (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:18:20; 01:37:17); however, they routinely fail at doing so. The Rascal Scoundrels are disappointed in Davey Jones, who is always drunk, just as others are disappointed in Jack Sparrow who is always drunk (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:53:58; 01:35:40; 01:39:00).

### b.  Main Character: Captain Jack Nefarious v. Captain Barbossa

86.    In the Screenplay, Captain Jack Nefarious is sinister, morally ambiguous and opportunistic. Nefarious is a pirate that is more concerned with finding treasure by any means necessary, including forcing Davey Jones overboard while taking his ship.  Similarly, in the Film, Captain Barbossa is seen as sinister, morally ambiguous and opportunistic. For example, Barbossa betrays Sparrow, maroons him on an island and hijacks the Black Pearl. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:25). Nefarious/Barbossa were originally Davey Jones'/Jack Sparrow's first mates and the pairs quickly become arch-rivals in both the Screenplay and the Film (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:29:45; 00:53:12; 01:07:00; 01:52:25). In yet another parallel, Nefarious and Barbossa both even shoot their own crew member to further their own objectives (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:13:03). However, both characters somehow remain infinitely likable and charming in their own way. *See generally,* Screenplay and Film.

### c) Supporting Characters: Rascal Scoundrels v. Jack Sparrow's Crew

87.    In the Screenplay, the Rascal Scoundrels are introduced as a ragtag crew of orphans, fiercely loyal to Davey Jones. The Rascal Scoundrels are immature, as demonstrated by their slapstick humor, yet they have violent tendencies. Appellants' Screenplay depicts this crew of Rascal Scoundrels led by

16

a dissolute, charismatic pirate captain – Davey Jones. The Scoundrels, as orphaned children, are fascinated with the pirate life.

88.     In the Film, (as in the Screenplay,) Jack Sparrow's crew is introduced in a shipping port town: they are all simple-minded and childlike (engaging in juvenile slapstick humor,) yet have violent and opportunistic tendencies. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:50:43; 1:01:06). While Jack Sparrow's crew may not be children, they are very childlike in behavior. Furthermore, Pintel and Ragetti (albeit members of Barbossa's crew) provide comic relief throughout the Film, such as when they dress up as women to confuse British soldiers, but are also shown as having violent tendencies, similar to the Rascal Scoundrels in the Screenplay (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:30:51; 01:49:07-24).

89.     In yet another purported coincidence, the character Stink in the Screenplay is described as round and plump, with a funny pudgy face, gulping down the last piece of whatever he was eating. Stink is vile and smelly. In the Film, the character Gibbs, who is round and plump with a pudgy face, is known to sleep with pigs and is also described as smelly (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:31; 00:52:11).

### d) Supporting Character: Jane v. Elizabeth

90.     In the Screenplay, the character of Jane, is a young woman who lives in the shipping port town, and longs for adventure on the high seas. Similarly, in the Film, Elizabeth is a young woman who lives in the shipping port town and dreams of pirates and adventure on the high seas. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:32-00:00:52; 00:01:55). In fact, she says "I think it'd be rather exciting to meet a pirate" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:25). Both Jane/Elizabeth rise to the occasion to become fierce warriors and competent pirates, far from being the stereotypical "damsel in distress." (01:59:53). In addition, both

17

Jane/Elizabeth are sly and cunning, tricking Nefarious/Barbossa to prevent them from finding the final treasure (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:39:45).

### Pace and Sequence of Events

91.     The pace and sequence of events in the Screenplay is mirrored in the Film. The Screenplay is fun and fast-paced. The Film is also fun and fast-paced. The sizzle reel prepared by the Plaintiffs that accompanied their Screenplay envisions a fast paced, feature-length film.  The following is a synopsis of the sequence of events of the Screenplay and the Film:

92.     The Screenplay and Film both uniquely begin with a prologue set around ten years earlier that introduces the characters and love interests before the story begins (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:27). In the Screenplay, a privateer ship and a pirate ship exchange cannon fire while Jane and Davey Jones first appear. The opening of *The Curse of the Black Pearl* shows the aftermath of a privateer ship torn apart by cannon fire after being attacked by pirates where Elizabeth first meets Will (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:02:26-00:02:54). Thereafter, in the Screenplay, Davey Jones is engaged in a series of battles with his arch rival and former first mate, Captain Jack Nefarious.

93.     Similarly, in the Film, Jack Sparrow and his crew are thereafter engaged in a series of battles with his former first mate, Captain Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:10; 01:25:11-02:01:36).

94.     In both the Screenplay and the Film, the Davey Jones and Jack Sparrow characters are formally introduced at gunpoint (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:17:40). The backstory to Captain Barbossa in the Film is that Barbossa initiated a mutiny where Jack Sparrow was kicked off the Black Pearl so that Barbossa could commandeer the ship to seek

PLAINTIFFS' FIRST AMENDED COMPLAINT

treasure. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:06:25). Similarly, in the Screenplay, Captain Nefarious' rivalrous history with Davey Jones begins when Nefarious betrays Davey Jones, taking his ship and treasure map.

95.     Both works continue when Nefarious/Barbossa attack the shipping port town in the present looking for key items they need to get to the treasure (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:08-00:37:10). In both battles, the supernatural pirates are first revealed (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:10). During the course of the battle, both Davey Jones/Jack Sparrow manage to escape unscathed (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:44:28). However, in both, Nefarious/Barbossa also manage to take Jane/Elizabeth captive, imprisoning them on their ships (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 38:00).

96.     Next, Davey Jones/Jack Sparrow and their crews make their way to an ominous island (*Pirates of the Caribbean: The Curse of the Black Pearl*, 1:05:08). In the Screenplay this occurs on "Calavera Island,"; in the Film, it occurs on "Isla de Muerta," (*Pirates of the Caribbean: The Curse of the Black Pearl*, 01:05:08).[1]  Both islands hold the promise of the final treasure, but leave the characters disappointed by the actual outcome (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:12:33).

97.     After leaving the island, Davey Jones/Jack Sparrow endure a series of conflicts with Nefarious/Barbossa that culminate in a fierce ship battle as the characters reach the cavern containing the final treasure. (*Pirates of the*

---

[1] Translating the names of both islands from Spanish reveals that even the names are similar. "Calavera Island" means "Skull Island," while "Isla de Muerta" translates to "Island of the Dead." Both islands also have physical attributes that include half-submerged skulls (*Pirates of the Caribbean: The Curse of the Black Pearl*, 01:05:08).

*Caribbean: The Curse of the Black Pearl*, at 01:50:45) During both battles, the characters escape the ships by rowboat to enter the treasure cavern (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:50:38).

98.     Once the characters enter the cavern in the climax of both the Screenplay and the Film, Davey Jones/Jack Sparrow fight Nefarious/Barbossa and their supernatural crews over the sought after treasure (*Pirates of the Caribbean: The Curse of the Black Pearl*, 01:52:25-02:00:00). Both battles show swords sticking through the rib cages of skeletons, (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:55:48) and during this swordfight, Barbossa/Nefarious say to their adversary that they "can't die"/"can't [be] beat" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 1:55:16-18). However, Davey Jones/Jack Sparrow find a way to defeat their adversaries and flee the cavern by rowboat with Jane/Elizabeth (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). Despite both caves being filled with gold and jewels, Davey Jones/Jack Sparrow only end up being able to take a small fraction of the treasure with them while escaping the cavern (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). As they emerge from the treasure caverns Davey Jones/Jack sparrow are finally rescued, not by their crews, but by privateer ships (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:37). Both works conclude in the bay of the port town, with Davey Jones/Jack Sparrow aboard their respective ships, and returned to their former positions as prestigious captains (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 2:12:00).

99.     Neither the Film nor Screenplay is a love story; they are both action films with supernatural elements. However, both make reference to the importance of romantic relationships – in the Film, Jack Sparrow says that "not all treasure is silver and gold" in reference to Will Turner's relationship with Elizabeth Swan, and in the Screenplay Davey Jones pronounces to his love

20

interest, Jane, that what "we have is far greater than any treasure!" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:09:55).

**Dialogue**

100.   The Screenplay and the Film have several instances of similarity of dialogue. In the Film, the Black Pearl is described as "A ship with black sails, that's crewed by the damned" (*Pirates of the Caribbean: The Curse of the Black Pearl*, 00:12:54-55) and in the Screenplay "His ghost sails the seas in his ghost ship". While a black ship with black sails may be common in pirate lore or pirate stories, the use of the description and visual imagery of this ship is strikingly similar; moreover, as discussed *infra,* purported "scenes a faire" are **included** in the analysis. Also, the Black Pearl is "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:54-00:13:00). The Screenplay similarly has the dialogue "Legend says that a big sea monster ate him and spat him out".[2]

101.   A quote from the Screenplay states of Nefarious that "[f]or ten years the Phantom has stopped at nothing... and he'll CRUSH anyone...who gets in his way". In *The Curse of the Black Pearl*, the characters state of Barbossa and his ship that "She's been praying on ships and settlements for near ten years. [And] never leaves survivors." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:52).

102.   In the Film, Elizabeth tells Captain Barbossa, "I hardly believe in ghost stories anymore." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:56:44). Similarly, the Screenplay has the Rascal Scoundrels discussing that the tale of "undead Jack" is an old seaman's tale and not real. Further, the existence of cursed pirates is touched on throughout the Film. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:59; 00:37:14; 00:56:30;

---

[2] A sea monster is also prominent in Sequel #1.

PLAINTIFFS' FIRST AMENDED COMPLAINT

00:57:31). Later in the Screenplay two pirates also say "perhaps he be a Ghost! Maybe he thinks he be Phantom Jack" referring to "undead Jack" Nefarious. Nefarious and Barbossa's dialogue are mirrored in the works as well. While being attacked both pirate villains state that they "can't die." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:31:32).

103.   In the Screenplay, Davey Jones tries to convince a woman in the tavern that he was once a dashing, swashbuckling pirate. In the Film, Jack Sparrow constantly tries to convince everyone of his lore as a great pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:20). Furthermore, both Davey Jones and Jack Sparrow are slapped by women in comedic scenes. In the Screenplay the woman states, "You had that coming, Davey Jones!". In the Film, Jack Sparrow says, "Not sure I deserved that," followed by "I may have deserved that." (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:20-30). While the latter may be funnier than the former, they convey the same message.

**Plot**

104.   In addition to the similarities in plots/sequence of events between the Screenplay and the Film identified herein above, both also contain scenes that are so unique they cannot be considered *scènes à faire.  See*, "Sequence of Events" *supra;* "Theme" *infra.*

105.   For example, when Jane/Elizabeth are first taken hostage by Nefarious/Barbossa, they are both brought aboard ship where they are taken past crew members before meeting with Nefarious/Barbossa directly.  (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:15). In the Screenplay, Jane is heckled by crew members while being escorted across the deck.

106.   After being insulted, one crew member tries to attack Jane before Nefarious intervenes. Nefarious, in response, reprimands the crew member as a warning to the rest of the crew not to harm Jane. *Id.* In the Film, Elizabeth is

PLAINTIFFS' FIRST AMENDED COMPLAINT

similarly heckled by crew members on the deck of the ship before meeting face to face with Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:09). As she attempts to respond, she is slapped by one of the crew members (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:13). Just as Elizabeth is struck, Barbossa appears, grabs the crew member's arm and threateningly warns that no one is to lay a hand on her. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:18).

107.   In another uniquely similar scene, male pirates in the Screenplay and Film poorly disguise themselves as women to deceive enemies during battle (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). In the Screenplay, Davey Jones dresses as a "wench" before revealing himself and attacking the invading pirates. The scene is comedic, with one of the pirates attempting to kiss Davey Jones before he says "Love hurts" and strikes the pirate. *Id.* In the Film, two members of Barbossa's crew dress up as young maidens to create a distraction and mount a surprise attack (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). The otherwise rugged pirates fan each other, even complimenting each other's outfits before viciously engaging in sword fights with enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46).

108.   In yet another remarkable similarity, Davey Jones/Jack Sparrow both take control of their rivals' ghost ships in the Screenplay and Film in almost the exact same manner. In the Screenplay, while Davey Jones is busy fighting Nefarious and his supernatural pirates, Davey Jones' crew is able to climb aboard the unoccupied Phantom Ship. The crew takes control of the ship without Davy Jones, bringing him aboard only at the last minute during a hot pursuit. In the Film, Jack Sparrow's crew also takes the Black Pearl while Barbossa and his crew are fighting Jack and other enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46). After regaining control of the empty Black

23

Pearl without Jack, they likewise welcome him aboard at the conclusion of a hot pursuit. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 02:09:53).

109.   The three comparisons are a non-exhaustive list of scenes from the Screenplay and Film with stark parallels. They are far from similarities of generic pirate elements; they evidence substantial copying.

**Theme**

110.   Supernatural elements and undead pirates are one of the main recurring themes of the Screenplay, as it is in the Films. Captain Barbossa says to Elizabeth "You better start believing in ghost stories Ms. Turner, you're in one." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 1:00:25). The "hook" of the Screenplay and the Film that made it new, different, and exciting was the supernatural theme: supernatural undead/ghost pirates (ER 249; 259; 265; 267-68; 277) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:09; 00:58:54; 01:00:45).

111.   Similarly, the theme of the Screenplay centers on a pirate ghost story. In the Screenplay, Davey Jones discusses ghost stories with the Rascal Scoundrels telling them that "There is no Phantom Jack. It's an old seaman's tale" and that Jack's "ghost ship" is not real. But in fact they are. In the Screenplay, Stink says that "a big sea monster ate [Jack Nefarious] and then spit him out". In the Film, Captain Barbossa's ship is described as "A black ship with black sails, crewed by the damned" and "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55; 00:13:00).

112.   Indeed, while Captain Barbossa and his crew are not trying to find lost treasure, but rather trying to return it, as argued by Appellees, it is a distinction without a difference: Barbossa and his crew are *seeking* treasure (including the gold medallion worn by Elizabeth), which will break the curse

that made them undead. This search for treasure advances the main theme and plot of the Screenplay and Film.

113.    Another common theme in both the Screenplay and Film are Davey Jones/Jack Sparrow's redemption. In both works, Davey Jones/Jack Sparrow are first depicted as shells of their former selves (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:17-20. However, throughout both works they demonstrate their true character, defeating the rivals that have haunted them and returning to their former glory (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:12:00).

**Mood**

114.    There is slapstick humor in both films. In the Film, the monkey provides slapstick humor throughout, as do the characters of Pintel and Ragetti (members of Barbossa's crew), much like the Rascal Scoundrels do in the Screenplay.

115.    In the Screenplay, the emotion that is invoked when the true nature of the supernatural pirates is revealed is substantially similar to the emotion invoked during the same events in the Film: an eerie mood (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:07).

116.    The presence of a black ship, black sails, fog indicating the arrival of the ship, as well as other "common" pirate symbols are used in substantially the same selection and arrangement in both the Screenplay and the Film, to create a similar sinister and foreboding mood (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:04:45; 00:16:52; 00:29:08; 01:21:43).

**Setting**

117.    The Screenplay and the Film share specific settings of specific scenes. The ghost ship (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55); the port town (*Pirates of the Caribbean: The Curse of the Black*

*Pearl,* at 00:29:45); and the cove where the treasure is hidden (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:08:08).

118.   The foregoing is by no means an exhaustive recitation of similarities, and are anything but random; they are tied together by theme, sequence of events, and major characters.

## FIRST CLAIM FOR RELIEF
## (COPYRIGHT INFRINGEMENT REGARDING THE PIRATES OF THE CARIBBEAN FILM FRANCHISE)
## (Against All Defendants)

119.   Plaintiff repeats, alleges and incorporates by reference the paragraphs hereinabove as though fully set forth herein.

120.   In or about June of 2003, Defendants the Film to the public.

121.   Interestingly, Taylor was not credited on the first film although he has stated in interviews and books published later that he created the story with Harmon and Haines.  It was not until the second film, *"Pirates of the Caribbean: Dead Man's Chest"*, released in 2006, that Taylor was credited as a production executive.   Indeed, Taylor, the suspected architect of the scheme to steal and copy from Plaintiffs' work, was credited as producer on each of the films except the first one.

122.   As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay, without any permission, in the Film and the subsequent derivative works released by Defendants.

123.   Upon information and belief, the named Defendants intentionally broadcast, distributed, published, sold, conveyed, and otherwise exploited the Screenplay without authorization, in violation of Plaintiffs' rights.

124.   Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

26

125.   Upon information and belief, the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage, including through cinematic sequels (such as *Dead Man's Chest*, *At World's End*, *On Stranger Tides*, *Dead Men Tell No Tales*, and the recently announced sixth installment) and other related media. Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

WHEREFORE Plaintiff prays,

### ON ALL CAUSES OF ACTION:

1.   For a preliminary and permanent injunction enjoining Defendants from infringing the copyright of Plaintiffs in any manner;

2.   For actual damages and profits according to proof;

3.   That Defendants be required to pay to Plaintiffs such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiffs' copyright and to account for:

    a.   All gains, profits and advantages derived by Defendants by their infringement of Plaintiffs' copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $100,000,000;

    b.   That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies or other materials used to make infringing copies;

4.   For statutory damages, costs, and attorney fees with respect to *Pirates of the Caribbean: The Curse of the Black Pearl* and any other derivative works;

5.   For an accounting;

6.   For cost of suits and interest; and,

27

PLAINTIFFS' FIRST AMENDED COMPLAINT

7.     For such relief as is just and proper.

Dated: November 30, 2020

LOWE & ASSOCIATES

/s/ *Steven Lowe*

_____

STEVEN T. LOWE, ESQ.
ALEKSANDRA HILVERT, ESQ.
Attorney for
PLAINTIFFS ARTHUR LEE ALFRED,
II, EZEQUIEL MARTINEZ JR.

28

1
2
3

## **<u>DEMAND FOR JURY TRIAL</u>**

4

Plaintiffs hereby demand a jury trial on all issues so triable.

5
6

Dated: November 30, 2020

7

LOWE & ASSOCIATES

8
9

/s/ *Steven Lowe*

10

STEVEN T. LOWE, ESQ.

11

ALEKSANDRA HILVERT, ESQ.

Attorney for

12

PLAINTIFFS ARTHUR LEE ALFRED, II,

13

EZEQUIEL MARTINEZ JR.

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

29