JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
ROBIN S. GRAY (State Bar No. 316544)
robin.gray@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702

*Attorneys for Defendant Walt Disney Pictures*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-CV-08074-CBM-ASx |
| Plaintiffs, | **DEFENDANT WALT DISNEY PICTURES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE SUBSTANTIAL SIMILARITY** |
| v. | *[Filed concurrently with Statement of Uncontroverted Facts and Conclusions of Law, Declaration of Robin S. Gray, Declaration of Rebecca Cline; Declaration of Diego Parras; Declaration of David Jessen, Notice of Lodging; Proposed Order; and Proposed Judgment]* |
| WALT DISNEY PICTURES, | |
| Defendant, | |
| | Date:   October 19, 2021 |
| | Time:   10:00 a.m. |
| | Dep't:  Courtroom 8B |
| | Judge:   Hon. Consuelo Marshall |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE that, on October 19, 2021, at 10:00 a.m., in Courtroom 8B of the United States District Court, Central District of California, 350 West 1st Street, Los Angeles, California, 90012, or as soon thereafter as this matter may be heard by the Honorable Consuelo Marshall, Defendant Walt Disney Pictures will and hereby does move pursuant to Federal Rule of Civil Procedure 56 for summary judgment in favor of Defendant.

The First Amended Complaint ("FAC," Dkt. 112) alleges that Defendant's 2003 motion picture *Pirates of the Caribbean: The Curse of the Black Pearl* infringes Plaintiffs' copyright in a 2000 screenplay.  Both works are based on Disney's theme park ride.  After filtering out generic, unprotectable elements and elements that are stock features or *scenes a faire* of the pirate genre, no reasonable factfinder could conclude that the works are substantially similar.  And, because Plaintiffs concede that their screenplay is an unauthorized derivative work based on Disney's ride, it is entirely unprotectable under the governing extrinsic test for substantial similarity.  Thus, the FAC fails to state a claim of copyright infringement because the works are not substantially similar as a matter of law.

This motion is based upon this Notice of Motion and Motion; the attached Memorandum of Points and Authorities; the Statement of Uncontroverted Facts and Conclusions of Law; the Declarations of Jordan D. Segall, Rebecca Cline, Diego Parras, and David Jessen; any reply papers that may be submitted by Defendant; oral argument of counsel; all pleadings and papers on file in this action; and such other matters as properly may come before the Court for its consideration.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on August 30, 2021.

1

DATED:  September 7, 2021

MUNGER, TOLLES & OLSON LLP
  JORDAN D. SEGALL
  MARK R. YOHALEM
  ROBIN S. GRAY


By:  _____*/s/ Jordan D. Segall*_____
       JORDAN D. SEGALL
    *Attorneys for Defendant Walt Disney Pictures*

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................ 1

II.  FACTUAL BACKGROUND AND THE PARTIES' WORKS ..................... 3

    A.   Disney's "Pirates of the Caribbean" Theme Park Ride ................. 3

    B.   Disney's *Pirates of the Caribbean* Motion Picture .................. 4

    C.   Plaintiffs' *Pirates of the Caribbean* Screenplay ..................... 7

III. PROCEDURAL BACKGROUND ......................................................... 8

    A.   This Court Dismisses Plaintiffs' Complaint with Prejudice and the Ninth Circuit Calls for Expert Evidence on the Pirate Genre .......... 8

    B.   Both Parties Disclose Expert Testimony on Substantial Similarity .................................................................................. 9

        1.   Plaintiffs' Expert David Román ............................................. 9

        2.   Defendant's Expert James McDonald ..................................... 10

IV.  LEGAL STANDARD ......................................................................... 11

V.   ARGUMENT ................................................................................... 11

    A.   Unprotectable Material Must Be Filtered From the Screenplay, After Which Nothing Is Left ..................................................... 11

        1.   The Screenplay Is or Includes Unprotectable Derivative Work. ..................................................................................... 13

        2.   The Aspects of the Screenplay on Which Plaintiffs' Claim Rests Are Unprotectable Ideas, Tropes, and *Scenes a Faire.* ................................................................................... 16

    B.   The Works Are Not Substantially Similar as a Matter of Law ........... 20

        1.   All of the *Funky Films* Factors Favor WDP ......................... 20

        2.   This Case Is Controlled by *Funky Films* and *Benay* ............ 24

VI.  CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alfred v. Walt Disney Co.*,
821 F. App'x 727 (9th Cir. 2020)..................................................................9, 18

*Anderson v. Stallone*,
1989 WL 206431 (C.D. Cal. Apr. 25, 1989)..........................................13, 15, 16

*Benay v. Warner Bros. Entm't*,
607 F.3d 620 (9th Cir. 2010).............................................11, 12, 13, 17, 22, 24, 25

*Berkic v. Crichton*,
761 F.2d 1289 (9th Cir. 1985)..............................................................................11

*Bethea v. Burnett*,
2005 WL 1720631 (C.D. Cal. June 28, 2005).....................................................18

*Cavalier v. Random House, Inc.*,
297 F.3d 815 (9th Cir. 2002)..........................................................................12, 24

*Durham Indus. v. Tomy Corp.*,
630 F.2d 905 (2d Cir. 1980)..................................................................................15

*Funky Films, Inc. v. Time Warner Entm't Co.*,
462 F.3d 1072 (9th Cir. 2006)............................................11, 12, 13, 20, 24, 25

*Gallagher v. Lions Gate Entm't Inc.*,
2015 WL 12481504 (C.D. Cal. Sept. 11, 2015)....................................................11

*Kouf v. Walt Disney Pictures & Television*,
16 F.3d 1042 (9th Cir. 1994)................................................................................17

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
676 F.3d 841, 849 (9th Cir. 2012)........................................................................20

*Litchfield v. Spielberg*,
736 F.2d 1352 (9th Cir. 1984)........................................................................16, 20

*Marcus v. ABC Signature Studios, Inc.*,
279 F. Supp. 3d 1056 (C.D. Cal. 2017)................................................................23

*Mattel, Inc. v. MGA Ent., Inc.*,
616 F.3d 904 (9th Cir. 2010)..........................................................................13, 17

1

**TABLE OF AUTHORITIES**
**(Continued)**

2

**Page(s)**

3

*Pickett v. Prince*,

4

　　207 F.3d 402 (7th Cir. 2000) ......................................................................... 13, 15

5

*Rentmeester v. Nike, Inc.*,

6

　　883 F.3d 1111 (9th Cir. 2018) ................................................................ 11, 12, 19

7

*Rice v. Fox Broad. Co.*,

　　148 F. Supp. 2d 1029 (C.D. Cal. 2001) ....................................................... 12, 18

8

*Rice v. Fox Broad. Co.*,

9

　　330 F.3d 1170 (9th Cir. 2003) ...................................................................... 11, 12

10

*Shame on You Prods., Inc. v. Elizabeth Banks*,

11

　　120 F. Supp. 3d 1123 (C.D. Cal. 2015) ............................................................. 23

12

*Shaw v. Lindheim*,

13

　　919 F.2d 1353 (9th Cir. 1990) ........................................................................... 11

14

*Skidmore v. Led Zeppelin*,

15

　　952 F.3d 1051 (9th Cir. 2020) ........................................................................... 11

16

*Unicolors, Inc. v. H&M Hennes &Mauritz, L.P.*,

17

　　959 F.3d 1194, 1198 (9th Cir. 2020) ................................................................. 20

18

*Williams v. Crichton*,

　　84 F.3d 581 (2d Cir. 1996) ................................................................................ 20

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

In 2003, Walt Disney Pictures ("WDP") released *Pirates of the Caribbean: The Curse of the Black Pearl* (the "Motion Picture"), an acclaimed adaption of Disney's famous and long-running Pirates of the Caribbean theme-park ride (the "Ride"). This lawsuit, brought over *fourteen years* after the Motion Picture's release, makes an untenable claim of copyright infringement regarding that Motion Picture. In essence, Plaintiffs Arthur Lee Alfred III and Ezequiel Martinez, Jr. argue that their *unauthorized* adaptation of the Ride in the form of a derivative screenplay (the "Screenplay")—submitted with full knowledge that WDP was itself developing a movie based on the Ride—precluded WDP from adapting its own intellectual property or employing the tropes and *scenes a faire* of the pirate genre that suffuse the Ride.

Application of both controlling precedent and the Ninth Circuit's guidance on this very case to the uncontroverted material facts compels summary judgment against Plaintiffs. The first step of the governing extrinsic test for substantial similarity requires that this Court filter out (1) Plaintiffs' unauthorized, extensive, and conceded copying of Disney's Ride and (2) elements common to the pirate genre. That filtration defeats any claim of substantial similarity between the two works, and hence any infringement claim. That is what this Court recognized at the pleading stage in dismissing Plaintiffs' original complaint, holding that the works were not substantially similar. (*See* Dkt. 93.) The Ninth Circuit reversed, but its disagreement centered on its ruling that expert testimony could aid in clarifying whether the limited elements the works share in common "are unprotected generic, pirate-movie tropes."

WDP now offers expert testimony surveying the genre and confirming this Court's conclusion that any similarities between the works are *scenes a faire* and well-worn genre tropes. Plaintiffs' expert, in disregard of the Circuit's instructions, made no effort to survey the genre or distinguish between protectable and unprotectable elements. The Court should again hold the works are not substantially similar.

It is important to emphasize how unusually weak Plaintiffs' case is. Plaintiffs *concede* they prepared an unauthorized adaptation of WDP's intellectual property. They pleaded that they "envision[ed] their screenplay incorporating the basic elements of the Pirates of the Caribbean ride." (Dkt. 1 ¶ 26.) When pitching it to WDP, they described it as "'Goonies' meets 'Pirates of the Caribbean' … with the image and expectations families associate with the Disney ride." (Dkt. 112-2 at 1.) Their pitch acknowledged they had taken not only "the basic elements" of the Ride and its "image and expectations," but also specific expressions, including the song "Yo Ho (A Pirate's Life for Me)" and other "Ride references." (*Id*.) The Screenplay copied the Ride's title, tagline ("Sail with the wildest crew that ever sacked the Spanish Main!"), dialogue (*e.g.*, "Dead men tell no tales!"), scenes (*e.g.*, the bride auction), and settings (*e.g.*, a "cavern like the DISNEYLAND RIDE, 'PIRATES OF THE CARIBBEAN'"). (*See* Dkt. 1-1 (hereafter "Screenplay") at 1, 10, 21, 98.) Plaintiffs visualized the Screenplay with a "sizzle reel" that used unauthorized Ride footage, including of its iconic skeletal pirates. (Dkt. 112-4.) Given the inevitable overlap between WDP's adaption of the Ride and Plaintiffs', Plaintiffs urged WDP that "yours can be the sequel!" (Dkt. 112-2 at 1.) Plaintiffs so clearly recognized that their Screenplay incorporated WDP's intellectual property that they promised to remove all elements of the Ride from the Screenplay before marketing it elsewhere. (*Id.*)

As to generic elements, which are likewise unprotectable, Plaintiffs pleaded that the pirate genre is full of such tropes and listed numerous works establishing *scenes a faire* and common plots in the genre. (Dkt. 1 ¶¶ 8, 10.) Following remand from the Circuit, all that remained was for the parties to submit expert testimony as to what those tropes *were*, so they could be filtered from the Screenplay at the first step of the extrinsic test. WDP's expert, James McDonald, comprehensively documented the genre's tropes, illustrating their use in numerous famous works, including many taken from Plaintiffs' own complaint. By contrast, Plaintiffs' expert David Román made *no* effort to distinguish between protectable and unprotectable elements, and was

instructed by his counsel to *disregard* other works in the pirate genre.  As a result, Román offered no meaningful response other than to question the pirate genre's very existence—an untenable position given Plaintiffs' original complaint, the Ninth Circuit's mandate, common sense, and controlling precedent.

As is plain from a comparison of the works, and as the experts confirmed, the only overlap between the Screenplay and the Ride is merely a grab-bag of Ride elements and genre tropes that show up in both parties' works.  Equally plain is that despite both works using the Ride's genre, setting, and content, the two works are radically different in plot, themes, dialogue, mood, pace, characters, and sequence of events.  Under controlling precedent and the uncontroverted facts, this is not a close case.  The Court should grant summary judgment for WDP.

## II.     FACTUAL BACKGROUND AND THE PARTIES' WORKS

### A.     Disney's "Pirates of the Caribbean" Theme Park Ride

Designed in the early 1960s by Walt Disney and his expert designers, and operating since 1967, Disneyland's famed Pirates of the Caribbean ride takes guests through a rousing pirate adventure as riders observe "a bloodthirsty pirate crew in their sack of the Spanish Main."  (Defendant's Statement of Uncontroverted Facts and Conclusions of Law ("DSUF") 1.)  Despite this violent premise, the Ride takes its pirates "away from the *scary* and towards the *humorous*."  (Cline Decl. Ex. B at 10.)

The Ride begins with a "prologue," setting the stage for the adventure that follows.  Riders depart from civilization, and as they near a waterfall leading into a cavern, a talking pirate captain's skull warns that "there be plundering pirates lurking in every cove" ahead and intones, "Dead men tell no tales."  (DSUF 2–3.)  Riders pass through scenes of cursed skeletal pirates (one steering a ship, another studying a map, another guzzling rum, another clutching gold coins) in treasure-filled caves, as an eerie voice repeats the "dead men tell no tales" refrain.  (DSUF 4–5.)  The prologue ends with the skeleton pirates telling of an "evil curse" upon the "bewitched treasure": "No fear have ye of evil curses, says you?"  (DSUF 6–7.)

Riders enter the Caribbean as a pirate ship attacks a port.  (DSUF 8.)  They demand a surrender ("we'll see you to Davey Jones"), then open fire.  (DSUF 8.)

The town falls to the pirates, and riders watch as it is sacked.  (DSUF 9.)  Riders pass a colorful "take a wench for a bride" auction, with drunken pirates chanting "we wants the redhead."  (DSUF 10.)  Riders continue through another tunnel in the cave and they approach more pirates singing the now-famous song "Yo Ho (A Pirate's Life for Me)."  (DSUF 11.)  Comic elements include a pirate balancing many hats on his head, a smiling pirate snuggling in the mud with pigs, and jailed prisoners attempting to escape by using a bone to lure a dog with keys to their cell.  (DSUF 12–13.)  In the finale, a pirate in a cave shoots a barrel of gunpowder marked "EXPLOSIVO," causing an explosion.  (DSUF 14.)  Riders emerge, pass an island with buried treasure, and return to civilization, where they disembark.  (DSUF 15–16.)

## B.  Disney's *Pirates of the Caribbean* Motion Picture

In the late 1990s, WDP began adapting the Ride into a movie.  (FAC ¶ 52.)  That Motion Picture tells the story of two protagonists, antiheroic pirate Jack Sparrow and heroic blacksmith Will Turner, as they team up to rescue Will's love interest (a third protagonist, governor's daughter Elizabeth Swann) and retake Jack's ship (the *Black Pearl*) from Captain Hector Barbossa and his cursed crew, who seek to reverse the curse that has made them undying skeletons, as moonlight reveals.  (DSUF 17.)

The Motion Picture incorporates not just the name, setting, genre, theme, and tone of the Ride, but also many iconic elements: the "Yo Ho" song, the line "dead men tell no tales," the skeleton pirates and cursed treasure, the attack on a port town, the redhead from the pirate auction, pirates sleeping with pigs, the prison dog with keys, and the spooky, watery cavern.  (DSUF 21–27.)  It also draws on the Ride's overall structure: it has a prologue in which travelers leave the safety of civilization for the pirate-infested Caribbean, despite grim warnings, followed by the attack on a town, the capture of a woman, and a final battle in a cave.  (DSUF 28–30.)

The Motion Picture begins with a child Elizabeth finding the only survivor of a

shipwreck, the unconscious young boy Will.  (DSUF 32.)  Realizing the medallion Will wears marks him as a pirate, she steals it to protect him from being discovered and arrested.  (DSUF 33.)  She then spots a pirate ship sailing off: the *Black Pearl*. (DSUF 34.)  A few years later, Elizabeth—now a young woman stifled by upper-class mores in the town of Port Royal—is attending James Norrington's promotion in the British Royal Navy.  (DSUF 35.)  He asks her to marry him.  Unable to breathe in her corset, she falls over a cliff into the sea, revealing that she is wearing the stolen medallion, which lets off a mysterious pulse.  Jack Sparrow, who is in Port Royal to steal a ship, sees her fall and reluctantly jumps in to save her.  Norrington recognizes him from a tattoo and attempts to arrest him for piracy.  (DSUF 36–42.)  Sparrow flees but encounters Will.  Like Elizabeth, he is stifled by social circumstances:  in his case, as an unappreciated apprentice to a drunken blacksmith.  Will, who despises pirates, engages Sparrow in a swordfight and captures him.  (DSUF 43–46.)

That night, the *Black Pearl* attacks Port Royal.  (DSUF 47.)  Two pirates capture Elizabeth, who conceals her identity by saying her last name is Turner.  She demands to see their captain.  (DSUF 48–50.)  Other pirates visit Sparrow in his jail cell.  As one pirate reaches through the bars of Sparrow's cell, his arm becomes skeletal in the moonlight.  (DSUF 51–52.)  Once aboard the *Pearl*, Elizabeth meets the charming but evil Captain Barbossa and urges him to leave port; Barbossa agrees, but takes Elizabeth hostage.  (DSUF 53–54.)  Will asks Sparrow for help and the two set off for Tortuga to assemble a rescue crew.  There, Will learns that Sparrow used to be the *Pearl*'s captain, but Barbossa mutinied and marooned him.  (DSUF 55–57.)

Back on the *Pearl*, Elizabeth dines with Barbossa.  He explains his men found the gold medallions, but realized too late that the treasure was cursed, turning them into immortal skeletons.  (DSUF 58–59.)  When the *Pearl* reaches Isla de la Muerta, where the gold is kept, Barbossa explains that to break the curse they must return the medallions, as well as blood from everyone (or a descendant) who took them.  (DSUF 60–61.)  Barbossa believes he is missing a medallion and blood from a single

crewmember—Bill Turner, Will's father.  Thinking Elizabeth is Turner's child (because she had the medallion and claimed to be named Turner), Barbossa cuts her hand and drops the bloody medallion into the chest.  The curse is not broken.  Will, hiding nearby with Sparrow, knocks out Sparrow and saves Elizabeth.  Barbossa's men capture Sparrow and chase Will, Turner's true heir.  (DSUF 62–66.)

The *Pearl* catches Will and Elizabeth.  Will threatens to kill himself to make the curse unbreakable.  Barbossa agrees to free Elizabeth and Sparrow, leaving them where he once marooned Sparrow.  He keeps Will (and Sparrow's crew) captive and returns to Isla de la Muerta to break the curse.  (DSUF 67–70.)  Marooned on an island, Sparrow and Elizabeth drink rum as Sparrow tells her the *Pearl* represents freedom.  (DSUF 71.)  He collapses, drunk, and Elizabeth uses the rum to build a fire.  The Navy spots the smoke and rescues them.  (DSUF 72–73.)  Once aboard Norrington's ship, Elizabeth pleads that he rescue Will.  Finally, she promises to marry Norrington, who agrees to save Will "as a wedding gift."  (DSUF 74–75.)

Back on Isla de la Muerta, Barbossa prepares to shed Will's blood and break the curse.  Sparrow shows up, tells him the Navy is outside, and suggests he wait to break the curse until after using the crew's immortality one last time to defeat the Navy.  Sparrow proposes an alliance, with Barbossa in charge.  Barbossa agrees, and his crew ambush Norrington's ship by walking under the water, as they do not need to breathe.  At the same time, Elizabeth boards the *Pearl* and frees Sparrow's crew, who promptly sail off, leaving Elizabeth to head alone to Isla de la Muerta.  (DSUF 76–81.)

Barbossa stabs Sparrow, but he survives—he took a medallion and is cursed with immortality.  (DSUF 82.)  Elizabeth saves Will, and they battle pirates.  Sparrow and Will break the curse, just as Sparrow shoots Barbossa in the heart.  (DSUF 84.)

Days later in Port Royal, the Navy prepares to hang Sparrow for piracy.  Elizabeth declares her love for Will, and they help Sparrow escape to the *Pearl*.  The movie ends with Sparrow, still an unredeemed pirate, whistling "Yo ho, a pirate's life for me."  (DSUF 85–88.)  They have separately found freedom via the pirate's life.

### C.    Plaintiffs' *Pirates of the Caribbean* Screenplay

Plaintiffs learned WDP was developing a movie based on the Ride, and decided to pitch their own proposed adaptation of the Ride (the Screenplay) as a spec script. Plaintiffs "envision[ed] their [S]creenplay incorporating the basic elements of the *Pirates of the Caribbean* ride" while supplying additional story elements.  (DSUF 95.) In the August 9, 2000 cover letter to WDP accompanying the Screenplay, Plaintiffs' agent Tova Laiter acknowledged Plaintiffs knew WDP had its own Ride adaptation in the works, proposing "yours can be the sequel!"  (DSUF 93.)

The Screenplay, entitled "Pirates of the Caribbean,"[1] had the tagline "IT ISN'T JUST A RIDE ANY MORE" above the Ride's famous talking pirate skull.  (DSUF 97.)  Plaintiffs visualized the Screenplay with Ride footage (DSUF 98–99) and summarized their Screenplay in the cover letter to Disney as "'Goonies' meets [the] 'Pirates of the Caribbean' [ride]."  (DSUF 91.)

The Screenplay transposes the child characters from *The Goonies* (a 1985 Warner Bros. picture) into the setting, action, and feel of the Ride.  (DSUF 91.)  The Screenplay centers on a gang of six wannabe-pirate kids ("the Rascal Scoundrels"), ranging in age from seven to fifteen, who ultimately clean up and find a surrogate family.  The Screenplay, like the Ride and Motion Picture, starts with a prologue, but it is very different:  an extended action sequence involving a treasure map, a pirate named Davey Jones, his pirate love interest Jane, his adversary Jack Nefarious, pirate hunters (called "privateers"), and a sea monster.  (DSUF 101–104.)  The action turns to the Rascals, who visit the Screenplay's recreation of the Ride's "auction of wenches," with the Ride's exact dialogue.  (DSUF 105–107.)  They steal pirate clothing and head back to Davey.  Soon they meet the Screenplay's translation of the Ride's skeleton pirates: pirates whose "faces are painted into TRIBAL SKULLS[.]"

---

[1] Plaintiffs claim they wrote an earlier script titled *Pirates of the Spanish Main* (FAC ¶¶ 48–49), but do not allege they provided it to Disney, do not claim the Motion Picture infringes it, and were unable to produce it in discovery.  Their claim concerns only their *Pirates of the Caribbean* Screenplay.

(DSUF 110.)  But these are not *actually* skeletons, as is demonstrated when a protagonist "swiftly kicks the skull-faced pirate dead in the balls."  (DSUF 111.)

Jones then sobers up, abandons piracy, gets the girl and adopts the kids; the kids drop the pirate monikers and aspirations, overcome stereotypical flaws (like a stutter), and gain parents.  Together, they find the two halves of a map, solve various puzzles and booby traps, reach a cave full of treasure, and defeat the evil Captain Nefarious. The Screenplay ends with all of them cleaned up and dressed in privateer uniforms, a reconstructed nuclear family of sea police.  (DSUF 112–115.)  "I owe it all to them," Davey says of his beloved scamps.  (DSUF 116.)  They have beaten piracy.

The Screenplay uses not only the Ride's setting and theme, but also specific episodes and dialogue.  For example, the Screenplay has a segment set in a "cavern like the DISNEYLAND RIDE, 'PIRATES OF THE CARIBBEAN,'" where the protagonists ride a boat down a waterfall (as in the Ride) and pass skeletons impaled by swords into the walls (as in the Ride) while "[a]n eerie voice echoes throughout the cavern" delivering the Ride's dialogue: "No fear have ye of evil curses says you … no fear of plunderin' pirates lurking in every cove, says you."  The Screenplay also uses the Ride's song "Yo Ho," tagline "Sail with the wildest crew that ever sacked the Spanish Main," and refrain "dead men tell no tales."  (DSUF 117–121, 122–139.) The Rascal Scoundrels take their very name from a lyric in "Yo Ho."  (DSUF 132.)

## III.   PROCEDURAL BACKGROUND

### A.   This Court Dismisses Plaintiffs' Complaint with Prejudice and the Ninth Circuit Calls for Expert Evidence on the Pirate Genre

Despite the Motion Picture's 2003 release, Plaintiffs did not sue until late 2017. (*See* Dkt 1.)  Like their 2000 pitch letter, Plaintiffs' original complaint states their Screenplay is based on the Ride (*id.* ¶ 26), and acknowledges the existence of the pirate genre, going so far as to name 18 core pirate genre books and movies and recognizing these works are "among many others."  (*Id.* ¶¶ 8, 10.)

This Court granted WDP's motion to dismiss on substantial similarity grounds,

holding that the "works are not substantially similar as a matter of law under the extrinsic test" and that "amendment would be futile."  (Dkt 93 at 18–19.)  Applying the extrinsic test, the Court filtered out "unprotectable elements" and determined the plot, characters, themes, dialogue, mood, setting, and pace of the works were not substantially similar.  (*Id.*)

Plaintiffs appealed, and the Ninth Circuit reserved and remanded so that the parties could submit expert evidence.  *Alfred v. Walt Disney Co.*, 821 F. App'x 727 (9th Cir. 2020).  The Circuit recognized that this Court's ruling rested on its determination that "many of the elements the two works share in common are unprotected generic, pirate-movie tropes."  *Id.* at 729.  It then held that determination could be aided by expert testimony identifying which elements of the pirate genre were generic and unprotectable tropes and *scenes a faire*, and which elements were truly original.  *Id.* (expert evidence "would aid in determining whether the similarities Plaintiffs identify"—such as "treasure stories that take place on islands and in jewel-filled caves" and "stories of betrayal by a former first mate"—are common in the pirate genre).

Following remand, Plaintiffs filed an amended complaint[2] that excised all references to the pirate genre having familiar tropes and canonical works.  (Dkt. 112.)  Their agent, Laiter, withdrew as a plaintiff.  (*Id.*)  The parties agreed to bifurcate fact discovery and treat substantial similarity as a threshold question suitable for resolution on summary judgment, informed by expert testimony regarding the pirate genre as the Ninth Circuit instructed.  (*See* Dkt. 143.)

### B.    Both Parties Disclose Expert Testimony on Substantial Similarity

### 1.    Plaintiffs' Expert David Román

Plaintiffs submitted an expert report by David Román, a professor of comparative literature at USC.  Román admits he is not an expert in the pirate genre

---

[2] The FAC alleges similarities only as to the Motion Picture (Dkt. 1 ¶¶ 79–118), and drops any claim that the sequels are substantially similar to the Screenplay.

and has only a passing familiarity with it.  (DSUF 155, 157.)  He questions whether the pirate genre exists (DSUF 156), and his background with pirate works is so limited that, when asked what the last pirate novel he read was, he replied *Hamnet*—a 2020 novel about Shakespeare's family that features no pirates or piracy.  (DSUF 170.)

Román testified that he had never heard of the extrinsic test for substantial similarity, and that the "methodology" he applied was impressionistic.  (DSUF 164–166.)  The law "didn't seem relevant to what [he] was tasked to do" (DSUF 163), and he could not recall his counsel telling him anything about the legal standards he should apply in reaching his opinions other than that he should disregard dissimilarities between the works.  (DSUF 160–164.)  In conducting his analysis of the two works, he also made no effort whatsoever to distinguish between their protectable and unprotectable elements.  (DSUF 166.)

Despite the Ninth Circuit's directive that expert testimony should help distinguish tropes of the pirate genre from original elements in the works, Román testified that he formed his expert opinion without reviewing any works in the genre. (DSUF 167, 169.)  Perhaps recognizing this flaw, *after* forming his expert opinions Román reviewed two pirate works—the movies *Goonies* and *Cutthroat Island*, which Plaintiffs had admittedly copied.  (DSUF 169.)  Román stated repeatedly that he did not review other pirate works because Plaintiffs' counsel asked him not to and informed him that "other pirate movies are irrelevant to this case."  (DSUF 148, 167.)

Finally, despite the undisputed fact that both works drew from the Ride, Román testified that he had never been on or even heard of the Ride, and did not review any footage of it in connection with forming his opinions.  (DSUF 171, 177–178.)

## 2.    Defendant's Expert James McDonald

WDP submitted an export report by James McDonald, a seasoned story analyst with over thirty years of professional experience reviewing almost a hundred films and television series.  He had extensive familiarity with the pirate genre from prior engagements.  (DSUF 185.)  He supplemented that familiarity by surveying a wide

1  array of relevant novels and films in the genre, including those cited as canonical in

2  Plaintiffs' original complaint.  (DSUF 180.)  He is familiar with the extrinsic test for

3  substantial similarity, and in his expert report he applies that test by identifying

4  unprotectable elements and filtering them out.  (DSUF 179, 182–184.)  Based on his

5  extensive knowledge of the pirate genre and the governing legal standard, McDonald

6  conducted a "novelty analysis" that examined whether the similarities identified in

7  Román's report constitute original pirate genre elements, or instead are unprotectable

8  tropes, stock elements, and *scenes a faire*.  (DSUF 183.)  His novelty analysis also

9  considered which elements of the Screenplay and Motion Picture are unprotectable in

10 the Screenplay because they originate from the Disney Ride.  (DSUF 183.)

11 **IV.   LEGAL STANDARD**

12        Summary judgment is appropriate "if the court can conclude, after viewing the

13 evidence and drawing inferences in a manner most favorable to the non-moving party,

14 that no reasonable juror could find substantial similarity."  *Shaw v. Lindheim*, 919

15 F.2d 1353, 1355 (9th Cir. 1990).[3]  Courts in the Ninth Circuit routinely grant summary

16 judgment on substantial similarity in copyright cases.  *See, e.g.*, *Berkic v. Crichton*,

17 761 F.2d 1289, 1292 (9th Cir. 1985) (collecting cases); *Gallagher v. Lions Gate*

18 *Entm't Inc.*, 2015 WL 12481504, at *2 (C.D. Cal. Sept. 11, 2015) (same).

19 **V.    ARGUMENT**

20        **A.    Unprotectable Material Must Be Filtered From the Screenplay,
             After Which Nothing Is Left**

21

22        To state a copyright infringement claim a plaintiff must allege "(1) ownership

23

24 _____

   [3] In *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1066–69 (9th Cir. 2020) (en banc), the
   Court repudiated the inverse-ratio rule and held that a showing that the defendant had

25 a high degree of access to a copyrighted work does not lower the required substantial-
   similarity showing.  In so holding, the Court overruled in part *Shaw*; *Funky Films, Inc.*

26 *v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006); *Benay v. Warner Bros.*
   *Entm't*, 607 F.3d 620 (9th Cir. 2010); *Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir.

27 2003); *Rice v. Fox Broad. Co.*, 330 F.3d 1170 (9th Cir. 2003); and *Rentmeester v.*
   *Nike, Inc.*, 883 F.3d 1111 (9th Cir. 2018), in a manner that makes Plaintiffs' claims

28 even weaker here, as some of those cases found no substantial similarity even after
   lowering the standard based on the inverse-ratio rule.

of a valid copyright, and (2) copying of constituent elements of the work that are original." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006).  To satisfy the second element, Plaintiffs must plausibly allege "that the two works are substantially similar." *Id.* (internal quotation marks omitted).

Courts in the Ninth Circuit determine whether two narrative works are substantially similar using both the "intrinsic test," which "examines an ordinary person's subjective impressions," and the "extrinsic test," which is "objective in nature" and focuses on key similarities in elements of the works. *Funky Films*, 462 F.3d at 1077.  "[I]f the [plaintiff] cannot show a triable issue of fact under the extrinsic test," the defendant "necessarily prevail[s] on summary judgment." *See Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002).

The extrinsic test focuses on "articulable similarities" as to eight factors: "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Funky Films*, 462 F.3d at 1077.  A court considering two narrative works must compare only *protectable* elements in the two works.  *See Benay v. Warner Bros. Entm't*, 607 F.3d 620, 624 (9th Cir. 2010); *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003) ("[A] party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'").[4]  "[A]n author may claim protection only in those elements of a copyrighted work which are original with that author"; the claim cannot rest on elements "borrowed from another author, from the 'public domain,' or which are otherwise not a plaintiff's original expression." *Rice v. Fox Broad. Co.*, 148 F. Supp. 2d 1029, 1052 (C.D. Cal. 2001), *aff'd in part,*

---

[4] Material *differences* between the works are also relevant. *See Benay*, 607 F.3d at 627 (noting "important characters in the Film and the Screenplay who have no obvious parallel in the other work"); *Funky Films*, 462 F.3d at 1078 n.3 (noting "scenes [in plaintiffs' screenplay] with no equivalent in [defendants' television show]"); *id.* at 1078 ("At first blush, these apparent similarities in plot appear significant; however, an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood, pace, dialogue, or sequence of events."); *see also Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1121 (9th Cir. 2018) (explaining that differences between photos were "significant" to the Court's analysis).

*rev'd in part*, 330 F.3d 1170 (9th Cir. 2003).  In applying the extrinsic test, the Court "filter[s] out and disregard[s] the non-protectable elements."  *Funky Films*, 462 F.3d at 1077.  One work "may freely copy" another work's ideas, "unoriginal components," and other "unprotectable elements."  *Mattel, Inc. v. MGA Ent., Inc.*, 616 F.3d 904, 913 (9th Cir. 2010).

Here, the process of filtering out unprotectable elements involves two steps. First, because both works adapt the same source material—Disney's Ride—the Court must filter out aspects of the Screenplay that are unprotectable because they derive from Disney's intellectual property.  Second, the Court must filter ideas, "generic plot-lines," *Funky Films*, 462 F.3d at 1077, "[s]cene-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise," "[f]amiliar stock scenes and themes that are staples of literature," and "[h]istorical facts," *Benay*, 607 F.3d at 624–25.  The uncontroverted expert analysis of WDP's expert McDonald confirms what the Court concluded at the pleading stage: those aspects of the pirate genre cover any similarities between the Screenplay and the Motion Picture.

### 1.     The Screenplay Is or Includes Unprotectable Derivative Work.

As explained above, Plaintiffs candidly concede that their Screenplay took significant content from Disney's Ride.  As an unauthorized derivative work, it is entirely unprotectable—meaning *all* elements must be filtered, leaving nothing that could be substantially similar between the Screenplay and the Motion Picture.  At a minimum, the myriad specific copied elements must be filtered.

Plaintiffs' claim is barred by the long-recognized rule that a plaintiff cannot "sue the party whose work he has infringed upon for infringement of his infringing derivative work."  *Anderson v. Stallone*, 1989 WL 206431, at *9 (C.D. Cal. Apr. 25, 1989).  As was true in *Anderson*, Plaintiffs have not "provide[d] a single case" supporting the "extraordinary proposition" that such a suit can go forward.  *Id.*  Such opportunistic copyright suits—though very rare—consistently fail.  *See, e.g.*, *Pickett v. Prince*, 207 F.3d 402, 406 (7th Cir. 2000) (Posner, J.).

Plaintiffs *pleaded* that they "envision[ed] their screenplay incorporating the basic elements of the Pirates of the Caribbean ride." (Dkt. 1 ¶ 26.)  In addition to these "basic elements" of genre, setting, and tone, Plaintiffs suffused the Screenplay with specific expressions from the Ride—copying that is beyond dispute because Plaintiffs expressly identified it in their pitch materials and in the Screenplay itself.  Specific copying includes:  (1) the name; (2) the tagline; (3) key scenes (e.g., the bride auction); (4) key locations (e.g., the cave); (5) the theme song, used with variations throughout the Screenplay to define different characters; (6) much of the dialogue; and (7) key motifs (e.g., skeleton pirates, including the iconic skeleton helmsman, and a ghostly, unseen voice giving the same grim warnings).  (DSUF 122–139.)  Exhibit D to the concurrently filed Declaration of Robin Gray fully details Plaintiffs' copying of the Ride.  In promising to remove these "Ride references" before pitching the Screenplay elsewhere (Dkt. 112-2), Plaintiffs tacitly and correctly admitted they had no authorization to use them.

Long before they dreamed up this suit, Plaintiffs also rightly admitted that their Screenplay was "'Goonies' meets 'Pirates of the Caribbean' … with the image and expectations families associate with the Disney ride."[5]  (Dkt. 112-2.)  Based on the extent of their copying, Plaintiffs—without having seen any of WDP's materials for the Motion Picture, which was then in development—proposed that it could be a sequel to the Screenplay.  (DSUF 93.)  In other words, Plaintiffs knew that they had copied so much from the Ride that whatever the already-planned Motion Picture was, the Screenplay would necessarily share significant common elements with it.

Plaintiffs admitted—and cannot now dispute—that the Screenplay is full of specific expressions stolen from the Ride.  And more generally, the Screenplay also has the Ride's genre (pirates), setting (the Caribbean), and tone (mixing of humor,

---

[5] Plaintiffs' poster mock-up further confirms they were also copying from the 1995 Carolco Pictures pirate-romance movie *Cutthroat Island*.  (*See* Dkt. 133-1 [McDonald Report] at 5.)  Plaintiffs have never claimed they were authorized to take from *The Goonies* or *Cutthroat Island*, so these elements must also be filtered out.

particularly physical comedy, with action involving guns, ships, swords, etc.).  To be sure, these elements are generic to pirate stories and are not protectable.  But, Plaintiffs' claim against WDP rests on equivalent similarities between the Screenplay and the Motion Picture.  (*E.g.*, Dkt. 112-6 (hereafter "Román Report") at 19 ("The Screenplay's setting is primarily located on the Caribbean seas.").)  If the Court accepts Plaintiffs' view that these elements can be protected, then Plaintiffs' infringement of the Ride is much more extensive than what Plaintiffs confessed.

This case is on all fours with *Anderson*, where the plaintiff wrote a spec treatment for *Rocky IV*, then sued Sylvester Stallone for developing his own *Rocky IV* film.  The court rightly rejected this gambit:  "Plaintiff has written a treatment which is an unauthorized derivative work.  This treatment infringes upon Stallone's copyrights and his exclusive right to prepare derivative works which are based upon these movies [*Rocky I*, *II*, and *III*]."  1989 WL 206431, at *11.  As in *Anderson*, "[s]ince [the Screenplay] is an unauthorized derivative work, no part of [it] can be granted copyright protection."  *Id.* at *8 (title capitalization removed).  In other words, *all* of the Screenplay must be filtered.  Otherwise WDP's "right to copy (or to permit others to copy) its own creations would, in effect, be circumscribed" by Plaintiffs' derivative work.  *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 911 (2d Cir. 1980).

This case demonstrates the policy behind this rule:  "prevent[ing] what might otherwise be an endless series of infringement suits posing insoluble difficulties of proof."  *Pickett*, 207 F.3d at 406.  "Consider two translations into English of a book originally published in French.  The two translations are bound to be very similar and it will be difficult to establish whether they are very similar because one is a copy of the other or because both are copies of the same foreign-language original."  *Id.*

Plaintiffs attempt to exploit presumed "difficulties of proof" resulting from the Screenplay and Motion Picture being "translations" of the same source material (the Ride).  Suppose the Plaintiffs had not titled the Screenplay "Pirates of the Caribbean," had not tried to capture the "image and expectations families associate with the

Disney ride," had not "incorporate[ed]" the Ride's "basic elements," and had not copied verbatim its signature song, dialogue, scenes, and imagery as "Ride references," and had not named its protagonist Rascal Scoundrels after a "Yo Ho" lyric.  Suppose they had not set their Screenplay in the Caribbean and grounded it in the pirate genre, with its well-established tropes and *scenes a faire*.  Even the most aggressive plaintiff would not claim that the Motion Picture infringed a slapstick picaresque screenplay entitled, for example, "Six Orphan Urchins Find a Dad" simply because both had a prologue, a romance, and a betrayal.  But, that is what this case would be absent Plaintiffs' unauthorized use of the Ride.

Finally, even if the Screenplay is not *entirely* filtered out (as it should be), then at least the common elements between the Ride and the Screenplay must be filtered.

### 2.    The Aspects of the Screenplay on Which Plaintiffs' Claim Rests Are Unprotectable Ideas, Tropes, and *Scenes a Faire.*

In their first complaint Plaintiffs attached a list of purported similarities between the Screenplay and the *Pirates of the Caribbean* franchise.  (Dkt. 1-5.)  In granting WDP's motion to dismiss on substantial similarity grounds, the Court acknowledged that it was obligated to "filter out and disregard the non-protectable elements" in making its substantial similarity determination.  (Dkt. 93 at 4.)  Guided by that principle, the Court carefully analyzed Plaintiffs' list of similarities and concluded that all of them—from ghost pirates and sea monsters to a Caribbean setting and rum-loving pirate captains—were "unprotectable elements" that were common in the pirate genre.  (*Id.* at 7, 9, 17.)  After these unprotectable elements were filtered out, what remained were "random similarities scattered throughout the parties' works" (*id.* at 18), which as a matter of law cannot establish substantial similarity. *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (lists of random similarities between works are "inherently subjective and unreliable").

Following the Ninth Circuit's call for expert testimony on the tropes and stock elements of the pirate genre, Plaintiffs took a new tack, premising their claim of

substantial similarity on the report of their expert Román.  (FAC ¶¶ 80–81.)  But, as Román freely conceded at his deposition, he made *no effort* to distinguish between protectable and unprotectable elements, as the extrinsic test for substantial similarity requires.  (DSUF 164–66.)  In fact, Plaintiffs' counsel instructed him *not* to attempt to distinguish between protectable and unprotectable elements.  (Dkt. 139 at 2.)  As a result, virtually all of the similarities identified in Román's report are unprotectable ideas that are also genre tropes.[6]  For example, Román opines:  both the Screenplay and the Motion Picture have an "ironic and humorous tone"; both have villains who are "cunning and sinister," but "retain a high level of individual charisma"; and both "feature pirate ships with skeleton crews."  (Román Report at 7, 8, 11.)  None of these elements is protectable:  no author can monopolize a rhetorical device like irony, stock traits like cunning or charisma, or genre tropes like ghost ships.  *Benay*, 607 F.3d at 624–25 ("themes that are staples of literature" must be filtered out); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1046 (9th Cir. 1994) (substantial similarity requires that characters resemble each other "in detail," not in "superficial" ways); *Mattel*, 616 F.3d at 913 ("unoriginal components aren't protectable").

Compounding the deficiency of his substantial similarity analysis, Román made no effort whatsoever to survey pirate works to identify the tropes, common elements, and *scenes a faire* of the genre, as the Circuit instructed.  (DSUF 167.)  Instead, Román opined that considering other works in the pirate genre is misguided because "other pirate movies *are irrelevant to this case*."  (DSUF 148 (emphasis added).)  That, of course, is flatly wrong under governing Ninth Circuit law.

Because the extrinsic test filters elements "borrowed from another author, from

---

[6] In many instances, Román identifies "similarities" between elements that this Court has rightly determined are unprotectable.  (*Compare* Román Report at 19 (opining that "[t]he Screenplay's setting is primarily located on the Caribbean seas," on ships, and "in the cave where the climatic [*sic*] battle ensues"), *with* Dkt. 93 at 17 ("[T]he settings of the parties' works aboard ships in the Caribbean and in a cavern are unprotectable because they flow from the natural premise of a story based on Disney's Pirates of the Caribbean theme park ride.").)

1   the 'public domain,' or which are otherwise not a plaintiff's original expression,"

2   *Rice*, 148 F. Supp. 2d at 1052, courts ruling on substantial similarity routinely canvass

3   other works in the genre to identify stock elements that are not protectable.  *See, e.g.*,

4   *Bethea v. Burnett*, 2005 WL 1720631, at *12–14 (C.D. Cal. June 28, 2005)

5   (unoriginal elements "done on other reality television programs such as *Big Brother*,

6   *Survivor* and The *Real World*" were "unprotected 'staples' of the reality television

7   genre" that could not receive protection).  Hence the Circuit's remand for expert

8   testimony about other genre works to "help inform" the Court on whether various

9   elements "are unprotected generic, pirate-movie tropes."  *Alfred*, 821 F. App'x at 729.

10      Because Román misunderstood the law and consciously avoided learning about

11   other works in the pirate genre, he failed to realize that purported similarities he

12   identified were well-established stock elements or *scenes a faire* in pirate stories, as

13   McDonald's report describes in detail.  (*See generally* Dkt. 133-1 (hereafter

14   "McDonald Report") at 23–30.)

15      For example, Román claims that one of the "innovations" found in both works

16   is that the male characters combine the "swashbuckler" with the "pirate."  (Román

17   Report at 9.)  This is no innovation, as McDonald's survey of the pirate genre shows;

18   the "swashbuckling pirate" has been common for at least a century, and pirates with

19   chivalric or heroic qualities appear in foundational genre works like *Treasure Island*,

20   *Captain Blood*, and *Captain Singleton*.  (McDonald Report at 25–26.)

21      Similarly, Román opines that the two works are similar because both "begin[]

22   with a prologue"—which he describes as "an incredibly unusual literary device"—

23   "that introduces some of the main characters and sets up some of the plot points that

24   will be explored throughout the story."  (Román Report at 13; Gray Decl. Ex. B

25   [Román Dep.] at 199:9–10.)  The prologue, of course, has been a common literary

26   device since the ancient Greeks.  But, even within the pirate genre, prologues set in

27   the past that set the scene for the action to come are commonplace, including in works

28   that Plaintiff's original pleading cited as major works of the genre.  (*See* McDonald

-18-

1    Report at 28 (describing prologues in, *inter alia*, *Captain Blood* and *Yellowbeard*); *see*

2    *also* Dkt. 1 ¶¶ 8, 10 (recognizing these as significant pirate works).)

3         At times, Román's ignorance of, and failure to study, the pirate genre lead him

4    to absurd propositions that contradict Plaintiff's own pleadings.  For instance, Román

5    opines that a "major innovation[]" of the Screenplay is "[t]he element of romance,"

6    and that the Screenplay and the Motion Picture are substantially similar because both

7    "focus on the heterosexual romance between the male and female leads as much as

8    they do the antagonistic duals [*sic*] between the two male pirate leads."  (Román

9    Report at 18.)  But Plaintiffs themselves pleaded that "the majority" of pirate films

10   "have a love story/triangle" (Dkt. 1 ¶ 10)—a genre fact confirmed by McDonald's

11   report, which shows that romance plots have been ubiquitous in the pirate genre since

12   the 18th century.  (*See* McDonald Report at 27–28.)  Likewise, *contra* Román's claim

13   that Plaintiffs invented a hybrid swashbuckler-pirate, Plaintiffs pleaded that "[f]ilms

14   have covered swashbuckling pirates."  (Dkt. 1 at ¶ 10.)

15        In sum, only the opinions of WDP's expert assist the Court in applying the

16   extrinsic test by identifying the stock elements, tropes, and *scenes a faire* of the pirate

17   genre.  Because Plaintiffs' expert is unfamiliar with the genre and avoided surveying it

18   in forming his opinions—and because he eschewed the entire task of distinguishing

19   between protectable and unprotectable elements—his opinions offer no basis on which

20   to conclude that the Screenplay is substantially similar to the Motion Picture.  Both

21   common sense and McDonald's thorough survey of the pirate genre confirm what the

22   Ninth Circuit required of the parties, and none of the purported similarities identified

23   in Román's report—from generic narrative elements like romance plots and prologues

24   to genre tropes like skeletons and treasure caves—is original or protectable.

25        Plaintiffs have argued the Court should apply the "selection and arrangement

26   test," *instead of* the extrinsic test, and thus cannot filter generic elements.  That is

27   mistaken:  the extrinsic test is mandatory in the Ninth Circuit and *always* focuses

28   "only on the protectable elements of the plaintiff's expression."  *Rentmeester*, 883

-19-

F.3d at 1118.  The selection-and-arrangement doctrine reflects only that, in certain rare circumstances, the specific "selection, coordination, and arrangement of unprotectible elements" may itself be so unusual, original, and distinctive as to constitute protectable expression under the extrinsic test.  *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849 (9th Cir. 2012), *abrogated on other grounds as recognized in Unicolors, Inc. v. H&M Hennes &Mauritz, L.P.*, 959 F.3d 1194, 1198 (9th Cir. 2020).  Here, the Screenplay's selection and arrangement of unprotected elements is not strikingly distinct.  To the contrary, it is simply a collection of tropes that commonly appear together in the pirate genre, arranged in a standard narrative.  Even Román's opinions, such as that the prologue is set in the past and introduces the action, reveal only convention.  (Román Report at 13.)

**B.    The Works Are Not Substantially Similar as a Matter of Law**

**1.    All of the *Funky Films* Factors Favor WDP**

In its prior order, this Court carefully considered the eight *Funky Films* factors and determined there were no substantial similarities between the works' plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.  (Dkt. 93 at 6–18.)

The Court's analysis remains correct.  The only new evidence Plaintiffs offer is Román's report, which, as noted, merely lists generic and unprotectable similarities and makes no effort to distinguish original and unoriginal elements of the pirate genre.  His method is "inherently subjective and unreliable" and cannot substitute for a holistic examination of the works.  *See Litchfield*, 736 F.2d at 1356; *accord Williams v. Crichton*, 84 F.3d 581, 589–90 (2d Cir. 1996) (judgment as a matter of law on lack of substantial similarity between the film *Jurassic Park* and plaintiff's book about a dinosaur theme-park, despite "scattershot" identification of similarities).

***Plot and Sequence of Events.***  The dissimilarity between the Screenplay and the Motion Picture is most evident on the dimensions of plot and sequence of events.  The plots of the two works have virtually nothing in common.  The Screenplay's plot centers on a ragtag group of kids, the Rascal Scoundrels, who dream of becoming

pirates.[7]  The plot's action revolves around the search for two halves of a treasure map:  Nefarious is searching for his former partner Davey Jones (believing that he has the other half of the map), while the Scoundrels (who actually have Jones's half of the map) are searching for Nefarious's half.  The searches collide on Calavera Island, where the Rascals find the second half of the map but are captured by Nefarious. Jones ultimately redeems himself, rescues the children, and defeats Nefarious.  The Rascals learn that piracy does not pay, and form a quasi-family with Jane and Jones.

The Motion Picture's plot does not involve a children's coming-of-age arc, nor the corollary arc of an irresponsible caretaker of children cleaning up into a proper father.  Nor are any of the specific plot beats for the Rascals (common to "gang of ragtag kid" movies like *The Goonies*, *The Sandlot*, *Stand By Me*, etc.) in the Disney movie.  There is no divided map or a race to uncover riches.  Instead, there is Barbossa's quest to break an ancient curse of living death by *returning* treasure, Sparrow's effort to *resume* a life of piracy aboard the *Black Pearl*, and Will and Elizabeth's striving to break from stifling social constraints.

Román's report opines that the "most obvious similarit[y]" between the plot and sequence of events in the two works is that "both scripts feature pirate ships with skeleton crews."  (Román Report at 11.)  As this Court previously held, the idea of skeleton pirates—in addition to being a frequent element of acclaimed works in the genre, *see* McDonald Report at 26–27—is drawn from the Ride.[8]  (Dkt. 93 at 7.)  And Nefarious's pirates are *not* skeletons; they are flesh-and-blood men with face paint. *Supra* at 7–8.  Other similarities that Román identifies—battle scenes, a romance subplot, a younger character seeking out a mentor, a prologue—are random, non-

---

[7] Plaintiffs' own pitch letter acknowledged that this *Goonies*-like band of children was the central conceit of their Screenplay, describing their work as "Goonies meets Pirates of the Caribbean."  (DSUF 91.)

[8] The same is true of the other "significant" overlapping plot point that Román identifies—a denouement in a "remote and ominous cave that is inaccessible except by small boats," (Román Report at 18.)  That literally describes the Ride, but because Román had never heard of, seen, or ridden the Ride, he had no idea of that.

1    specific similarities isolated from two works that tell fundamentally different stories.

2    And they are nonspecific ideas and pirate-genre tropes.  (McDonald Report at 26–29.)

3        ***Characters.***  The protagonists of the Screenplay include the six Rascal

4    Scoundrels, who have no counterpart in the Motion Picture.  *Cf. Benay*, 607 F.3d at

5    627 (citing as significant the "number of important characters in the Film and the

6    Screenplay who have no obvious parallel in the other work").  A protagonist of the

7    Motion Picture, Will (an upright adult ally and rival to Sparrow) has no counterpart in

8    the Screenplay.  Recognizing this problem, Román focuses on purported similarities

9    between Jones and Sparrow, on the one hand, and Nefarious and Barbossa, on the

10   other.  (Román Report at 7–11.)  But, as the Court previously concluded, to the extent

11   these characters have any similarity at all, those similarities (e.g., that both Jones and

12   Sparrow are "drunkard[s] of … questionable morality," Román Report at 8) are "non-

13   distinct" characteristics that are not protectable.  (Dkt. 93 at 9.)  They are also traits

14   commonly applied to characters in the pirate genre.  (McDonald Report at 24–25.)

15       By contrast, the differences between these characters are substantial.  Davey

16   Jones is a conventional hero going from bad to good: by the end, he sobers up, quits

17   piracy, rescues the Rascals, treats Jane right, and goes forth "as a privateer [i.e., a

18   pirate hunter] with his newfound family at his side."  (DSUF 112.)  Sparrow subverts

19   conventional hero tropes—he lies constantly, shifts his loyalties unpredictably, and

20   pursues self-interest always.  Far from renouncing piracy to become a family man and

21   sea cop, he ends the movie on the lam, retaking the *Black Pearl* and *resuming* piracy.

22       Likewise, Nefarious and Barbossa have little in common beyond the fact that

23   they are both pirate villains.  As the Court recognized (Dkt. 93 at 10–12), Nefarious

24   and Barbossa are different in every particular, from the way they look to the way they

25   speak.  And their motivations are fundamentally different:  Nefarious, like most pirate

26   villains in literature, seek to *obtain* lost treasure to enrich himself, while Barbossa

27   seeks to *return* treasure to free his crew from a terrible curse.

28       Román also compares Elizabeth to Jane, but the only similarities he can muster

-22-

are broad ideas: "lively," "spirited," and "resilient." (Román Report at 10.) These traits are common to the pirate genre (McDonald Report at 26), and the women are not similar. Elizabeth is a governor's daughter who chafes against her upper-class life and ultimately helps Sparrow resume piracy, while Jane is a pirate and tavern-worker (described as a "harlot") who renounces piracy to become a mother to the Scoundrels.

*Themes.* The fundamental dissimilarity between the Screenplay and the Motion Picture is reflected in the works' divergent themes. As befits a children's story, the Screenplay is overtly moralistic, with clear villains and heroes and the basic theme that greed and piracy are bad, family and law enforcement are good. The Motion Picture is far more morally ambiguous; its central theme is that individuals will always pursue liberation from constraints. (*See* McDonald Report at 15–17.)

The only common theme Román identifies is "mentorship of male orphans." (Román Report at 12.) This is a "plot idea, which copyright law does not protect," not a theme. *See Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1067 (C.D. Cal. 2017). Further, orphaned boys are common in the genre and found in works like *Peter Pan*, *Captain Blood*, and *Captain Singleton* (*see* McDonald Report at 28), all identified by Plaintiffs as seminal to the genre. (*See* Dkt. 1 ¶ 8, 10.) At any level of specificity, the relationship between Jones and the Rascal Scoundrels bears no resemblance to the relationship between Sparrow and his adult rival Will.

*Dialogue.* "To show substantial similarity based on dialogue, a plaintiff must establish 'extended similarity of dialogue.'" *Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1156 (C.D. Cal. 2015), *aff'd*, 690 F. App'x 519 (9th Cir. 2017). This Court held that Plaintiffs' Screenplay "does not include dialogue similar to the dialogue from Defendants' Films." (Dkt. 93 at 14–15.) Román opines "there are … moments when characters in the Disney Film echo the words written in the Screenplay," but identifies none. (Román Report at 19–20.) The only overlapping dialogue is taken from the Ride, which Román would not recognize.

*Mood.* The Screenplay is a work for children, and it has a lighthearted mood to

-23-

1  match:  much of the Screenplay is spent with the Rascals cracking jokes, engaging in

2  slapstick comedy, and solving puzzles.  As the Court recognized, the mood of the

3  Motion Picture is "much darker."  (Dkt. 93 at 16.)  Its humor comes from Sparrow's

4  sharp wit and off-kilter manner, not goofy kids farting, stuttering, or being illiterate.

5       **Setting.**  Román opines that the Screenplay and the Motion Picture are both set

6  in the Caribbean, on ships, and in a cave.  (Román Report at 19.)  These are *scenes a*

7  *faire* in a pirate story, which also come from Disney's Ride.  (*See* McDonald Report at

8  29; Dkt. 93 at 16–17); *see also Cavalier*, 297 F.3d at 824 (night sky setting was

9  unprotectable *scene a faire* where it "necessarily flows from the basic plot premise").

10       **Pace.**  Román opines that both works are "fast-paced."  (Román Report at 19.)

11  Both works have adventure story pacing, but the action in the Screenplay is much

12  faster-paced.  The Rascals reach Calavera Island on page 65 of the Screenplay, and

13  just 10 pages later, they have Nefarious's map in hand—having hiked through a

14  jungle, crossed a ravine over crocodile-infested water, and broken into the "Pit of the

15  Dead."  The action in the Motion Picture develops more slowly in more varied locales.

## 2.    This Case Is Controlled by *Funky Films* and *Benay*

17       The substantial similarity issue here is controlled by two canonical Ninth

18  Circuit copyright cases, *Funky Films* and *Benay*.  In both cases, the Ninth Circuit

19  affirmed summary judgment for the defendant on substantial similarity, despite the

20  parties having submitted competing expert reports on substantial similarity.

21       The plots of the works at issue here have far less in common than the works at

22  issue in *Funky Films* and *Benay*.  In those cases, the works had essentially *identical*,

23  and highly specific, premises.  In *Funky Films*, 462 F.3d at 1077–78, both works told

24  the story of a small funeral home operated by two brothers after the sudden death of

25  their father.  The works in *Benay* were even more similar (607 F.3d at 625):

26      Both have identical titles; both share the historically unfounded premise
        of an American war veteran going to Japan to help the Imperial Army by
27      training it in the methods of modern Western warfare for its fight against
        a samurai uprising; both have protagonists who are authors of non-fiction
28      studies on war and who have flashbacks to battles in America; both

-24-

1   include meetings with the Emperor and numerous battle scenes; both are
2   reverential toward Japanese culture; and both feature the leader of the
    samurai rebellion as an important foil to the protagonist.  Finally, in both
3   works the American protagonist is spiritually transformed by his
    experience in Japan.

4       Notwithstanding these extensive similarities, in both cases the Ninth Circuit

5   held that close examination of *how* the works elaborated on their similar premises

6   revealed that the works were *dissimilar* as a matter of law.  In *Funky Films*, the court

7   concluded that the plaintiff's work was "a murder mystery," while the defendant's

8   work was a drama about the characters struggling to deal with "the cataclysmic death

9   of the father."  462 F.3d at 1078.  In *Benay*, the court likewise concluded that the same

10  narrative premise was executed differently in the two works—one was "largely a

11  revenge story," while the other was a "captivity narrative."  607 F.3d at 626.

12      Here, the works do not share anything like the factually detailed common

13  premises as the works in *Funky Films* and *Benay*.  Fundamentally, the Screenplay is a

14  children's movie: it is about a band of orphans that teams up with a down-on-his-luck

15  caretaker to find a treasure map, defeat an evil pirate captain, recover lost treasure,

16  and form a family.  By contrast, *Curse of the Black Pearl* is not about children at all; it

17  tells the story of the morally ambiguous, idiosyncratic, antihero Sparrow, who battles

18  the cursed pirate captain Barbossa as Sparrow strives to regain command of his pirate

19  ship and Barbossa strives to break an ancient curse of living death.

20      Upon reviewing the two works at the motion to dismiss stage, this Court

21  concluded that "they tell very different stories."  (Dkt. 93 at 9.)  That judgment was

22  spot-on.  The works here do not share even the significant superficial similarities as

23  the works in *Funky Films* and *Benay*—cases that resulted in affirmed summary

24  judgments for the defendants.  *Funky Films* and *Benay* control the result here, and

25  compel the conclusion that the works are not substantially similar as a matter of law.

26  **VI.   CONCLUSION**

27      WDP respectfully requests that the Court enter summary judgment in favor of

28  WDP and against Plaintiffs.

-25-

1    DATED:  September 7, 2021       MUNGER, TOLLES & OLSON LLP
2                                                  JORDAN D. SEGALL
3                                                  MARK R. YOHALEM
                                                 ROBIN S. GRAY

4

5                                     By:       */s/ Jordan D. Segall*
6                                                    JORDAN D. SEGALL
                                         *Attorneys for Defendant Walt Disney Pictures*
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT WALT DISNEY PICTURES' MOTION FOR SUMMARY JUDGMENT