# Exhibit B

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   ARTHUR LEE ALFRED, II,        )
     et al.,                       )
 5                                 )
                     Plaintiff,    )
 6                                 )
              vs.                  )      No. 2:18-CV-0874-CBM-AS
 7                                 )
     THE WALT DISNEY COMPANY,      )
 8   et al.,                       )
                                   )
 9                   Defendants.   )
     _____ )

10

11

12

13

14

15      REMOTE VIDEO DEPOSITION OF DAVID ROMÁN, VOLUME 1

16                        Via Zoom

17                 Beverly Hills, California

18                  Thursday, May 27, 2021

19

20

21

22

     Reported by:
23   Pamela Zitny
     CSR No. 4461
24   JOB No. 4581571

25
```

```
 1    expert who intends to offer opinions at trial, correct?

 2        A    Yes.

 3        Q    How would you describe your area of expertise to

 4    the extent it is germane and relevant to the opinions you

 5    intend to offer at trial?                                    11:20

 6        A    I have a Ph.D. in comparative literature which is

 7    the study of literatures, regardless of national boundary

 8    or historical period.  And we are trained to study and

 9    compare literatures from different traditions and both

10    different genres.  So it could be works from the medieval   11:21

11    ages to the contemporary.  It could be works from the

12    German tradition or the Latin American tradition.  It

13    could be poetry, novels, plays, films, what have you.

14             And we are trained to look across disciplines,

15    across literary periods, historical moments.  You know, a   11:21

16    quick way to say it is cross-cultural and trans-historical

17    comparative study of literary works.

18        Q    And that's what you would consider your core

19    expertise?

20        A    Well, that is my training.  Yeah, I have a PhD in   11:21

21    that.

22        Q    Did you consider yourself as an expert in the

23    Pirate genre?

24        A    No. (Crossover talking.)

25        Q    I am sorry.                                         11:21
```

                                                         Page 17

```
 1              ATTORNEY LOWE:   I am going to object belatedly as
 2     vague and ambiguous.
 3              What does that mean, to be, quote, unquote, an
 4     expert in pirate genre?
 5     BY ATTORNEY SEGALL:                                        11:21
 6        Q    You can answer.  Do you consider yourself an
 7     expert in the pirate genre?
 8        A    Well, I think the question is tricky because it
 9     assumes that there is such a thing as a pirate genre,
10     right?  That there is a long history of literary texts    11:22
11     that serve as the pirate genre.  And I am familiar with
12     literature that passes into the pirate themes and stories,
13     what have you, but I don't know that I would necessarily
14     identify the pirate stores having a genre of itself.  That
15     seems like a relatively recent phenomena.                 11:22
16        Q    Okay.  So, setting aside the question of sort of
17     the definition of what a genre is, do you consider
18     yourself an expert in pirate literature?
19        A    I consider myself having familiarity with pirate
20     literature.                                               11:22
21        Q    Would you consider yourself an expert in pirate
22     literature?
23        A    I wouldn't say that -- I don't know who would be
24     able to say that they consider themselves an expert in
25     pirate literature unless they wrote books on that         11:22
```

Page 18

```
 1    this semester actually was ending classes early.  So we

 2    had to end classes before Thanksgiving so that students

 3    wouldn't be coming back from Thanksgiving break back to

 4    campus, and this has been a different COVID moment.

 5          So I knew that I was only able to agree to serve    11:25

 6    on this dependent on my work schedule with USC.  So, I

 7    needed time to go through my own professional obligations

 8    at work, USC.

 9          And then I wanted to have enough time to be able

10    to consider this case as best I could.  So I think we     11:26

11    started probably in early October, I would say.

12          But, again, I don't have -- I don't have a full

13    sense of the timeline.  But I would say early October.

14     Q    Okay.  So around that time in early October.

15    What was your understanding of specifically what you were  11:26

16    being asked to do, what your assignment was as an expert

17    witness?

18     A    I am very good about clarifications, You know,

19    and it is something I actually ask my students to think

20    clearly about.  Like, what is the assignment so that it is  11:26

21    clear that everyone knows what is expected of them.  And

22    the way that I understood my assignment is that I had to

23    read a screenplay and then screen a film.  And discuss the

24    potential similarities, if any, between them.

25     Q    And did you receive any specific instructions      11:27
```

```
 1    about what standards you should apply in comparing the

 2    works for similarities?

 3         A    No.  Not really.  I mean, this is partly that I

 4    had my own set of criteria that I was using.  Which I

 5    explained to the lawyers earlier on, that this is how I      11:27

 6    think, this is the kind of the work that I do, this is

 7    what a comparatist does.

 8         Q    So you go on to write here in Exhibit 1 that

 9    Ms. Hilvert provided you with the plaintiffs' original

10    screenplay, correct?                                         11:27

11         A    Correct.

12         Q    Then you were asked to compare that to the Disney

13    film, Pirates of the Caribbean:  Curse of the Black Pearl;

14    is that right?

15         A    Yes.                                               11:27

16         Q    And you screened that on Netflix at the time,

17    correct?

18         A    Correct.

19         Q    Were you asked to review any other films in the

20    Pirates of the Caribbean franchise?                          11:27

21         A    No.

22         Q    Were you given any other documents at this

23    initial stage after you received this assignment to

24    compare --

25         A    No.  No.  I simply had the screenplay and then I   11:28
```

Page 22

1    note of that.

2          So when I was speaking to the lawyer, I said,

3    like, well, I think the tone is really interesting here.

4    I think, the one phrase that was new that I think that I

5    was hearing the lawyers use was "sequence of events,"      11:32

6    which I don't think would necessarily be my language.  But

7    I immediately knew what they were talking about.

8    Q    So just going back to what you just testified,

9    after your initial sort of review of the works in this

10   case, your -- it is your testimony that your initial      11:32

11   impressions were essentially the same as the ones you

12   ultimately expressed in your report; is that right?

13   A    Yeah.  I think I had time to develop my major

14   ideas as I was writing the report and think through other

15   comparisons that I thought were relevant and necessary to  11:32

16   include.

17   Q    Did you think -- I know you said you felt there

18   were similarities between the works when you first

19   screened them or when you first reviewed them.  Did you

20   also feel that there were any significant differences      11:33

21   between the works at that time?

22   A    Yeah, no, of course.  There are obvious

23   differences between the two works that -- that are

24   immediately apparent.  I think like anyone -- any one of

25   us could look at these two and say oh, well, this happens  11:33

Page 26

1          Q      Maybe I would ask the court reporter to read that

2      question back, please, if you would please, Pam?

3                 THE REPORTER:   Sure.

4                 (Record read:

5                 "Q   So, it is fair to say that the                11:47

6                 brief that you were given by

7                 plaintiffs' counsel was to sort of give

8                 you a framework for your own expert

9                 report; is that right?")

10                ATTORNEY LOWE:   I will reassert the objection,     11:48

11     vague and ambiguous.

12                THE WITNESS:   I will say this and again, this is

13     with complete respect to all parties involved.  I had no

14     idea what they wanted me to do with this report, right?  I

15     didn't question their intent.  But I did feel that my kind   11:48

16     of -- my take on the comparison had a lot more elements

17     that weren't in that initial exhibition.

18                That I personally felt that the things that I was

19     introducing in my report were stronger and more

20     interesting and more detailed.  And some of the things      11:48

21     that are in the exhibition, I think, I totally agree with.

22                But I didn't think the major comparison was,

23     like, between, you know, someone wears an outfit in one

24     piece and they replicate that outfit in other.

25     BY ATTORNEY SEGALL:                                          11:49

                                                       Page 38

```
 1              ATTORNEY LOWE:  Okay.  I will let him answer.

 2    But belated objection on that is that, you know, what

 3    happens at trials calls for attorney work product.  And

 4    so, you know, to the extent that may be basing his answer

 5    on attorney work product, we instruct him not to answer.    11:56

 6    But he already answered said yes, of course, so there you

 7    go.

 8    BY ATTORNEY SEGALL:

 9         Q    Did you understand at the time you were given

10    this brief that Disney also filed a brief with the Ninth    11:56

11    Circuit?

12         A    No.

13         Q    Were you given a copy of any briefs that Disney

14    filed with the Ninth Circuit?

15         A    I looked over all my materials yesterday and     11:56

16    Aleks and I actually looked over all the materials that I

17    was given and I don't think that was part of it.  I have a

18    list somewhere if you want me to double check.

19         Q    But you don't recall reading a brief that was

20    drafted by Disney, correct?                                 11:57

21         A    No.  Was I supposed to?

22         Q    Well, you tell me.  Would you have thought that

23    was important for completeness to review any brief that

24    Disney filed with the Ninth Circuit as well?

25         A    Jordan, I am just going to say what I said        11:57
```

Page  44

```
 1   earlier.  You know, I think that, from my understanding,

 2   my job was to read a screenplay and screen a film.  And

 3   see what the overlap, if any, there was between them.

 4            So, I kind of stayed clean to that mission,

 5   right?  And that's been my guiding principal throughout.    11:57

 6   What's in the screenplay, what's in the film, what, if

 7   any -- what if any correspondence are there between them.

 8   And if so, how might I articulate them.  And how resonate

 9   are they.

10            So I kept it pretty -- I would use the word        11:58

11   clean, kept it pretty clean.  So I just thought I'm

12   looking at the screenplay, I am screening the film.  I was

13   tasked to do a comparative analysis of the two.

14       Q   Other than the plaintiffs' Ninth Circuit brief

15   that you describe on pages 3 and 4 of Exhibit 1, what       11:58

16   other secondary materials were you given at this time as

17   you were beginning to prepare your expert report?

18       A   I wasn't given anything other than what's here.

19       Q   Okay.  And at the time you were given this

20   material, did counsel identify any other sort of facts or   11:58

21   data that you were asked to consider in forming your

22   initial opinion?

23       A   I was sent the artwork.  There was some sort

24   artwork, some, like, minor artwork.  There were some

25   images.  And then asked to think about them.  And there     11:59
```

                                                    Page 45

1    was some discussion of a ride.

2            But, again, I wasn't familiar -- I am not fully

3    familiar with the Disney Pirates franchise or all of that.

4        Q    When did you receive the art that you just

5    described?                                                    11:59

6        A    Well, there was art in the initial screenplay

7    itself.  So the screenwriters had some images that were

8    attached to their screenplay that introduced the entire

9    story.  There are a little, you know, through the Xerox,

10   they are a little fuzzy.                                       11:59

11           And then your expert report includes some images.

12   There's just been a set of images that have been sort

13   of -- to be slightly silly, like haunting the production

14   of this case.  They do surface every once in a while.

15   There is like a -- there's some sort of pirate face that     12:00

16   shows up that I am supposed to be aware of or something.

17           So when the Disney report expert had those images

18   there, I wasn't quite sure what the relevance of that was.

19   I certainly didn't introduce any images in my report.

20           I think, so, that was -- that might have been it.    12:00

21   I have a list I could look over if you don't mind.

22       Q    Yeah, absolutely.  You can look over your list.

23   But I guess I am trying to understand the specific

24   materials that you considered in drafting your original

25   report.                                                       12:00

                                                     Page 46

1           So we know you considered the screenplay.  We

2      know you considered the Curse of the Black Pearl film.  We

3      know you considered the plaintiffs' appellate brief that

4      we have been discussing.

5           A    That would be it for the initial report.        12:00

6           Q    Okay.

7           A    I had a little more legwork for the rebuttal.

8           Q    So, any other materials you received or

9      considered, that would have happened after you formed your

10     opinions and stated them in the initial report; is that    12:01

11     right?

12          A    Yes.

13          Q    And at the time you were preparing your initial

14     report after you sort of delivered your preliminary

15     opinions to counsel, did counsel provide you with any      12:01

16     information about the legal standards that should govern

17     your expert opinions in this case?

18          A    Can you just walk me through "legal standards."

19          Q    Well, did they tell you anything, for instance,

20     about what standards governed the comparison of works for  12:01

21     substantial similarity in copyright cases?

22          A    Yeah.  There was just a couple of notes that,

23     verbal, that I wasn't sure if I was supposed to write out

24     all the things that I didn't find to be corresponding.  So

25     the dissimilarities.  And I was informed that the          12:01

                                                    Page 47

1    copyright laws aren't necessarily interested in what

2    doesn't correspond but what does correspond.

3         So I didn't know if I was supposed to write up

4    all the things that, well, this happens here, but it

5    didn't happen here.  And I was told no, no, that's not      12:02

6    relevant.  You were only asked to look -- that the

7    legal -- that the legal requirement for copyright

8    infringement is what actually corresponds between two

9    texts.

10   Q    So other than being instructed to disregard        12:02

11   dissimilarities between the works, were you given any

12   other information about the legal standards governing

13   copyright cases?

14   A    No.  I mean, I think that there was some kind of

15   casual conversations about copyright infringement cases.   12:02

16   You know, as an intellectual, I am just sort of curious,

17   you know, what do these things look like, or what is

18   important here.

19        And Steven just walked me through generically,

20   you know, what copyright infringement cases tend to focus   12:03

21   or what their issues are.

22   Q    Did you take notes?  You said those were sort of

23   verbal conversations.  Did you take notes on those

24   conversations?

25   A    No.  You know what it felt like?  It felt like,       12:03

Page 48

```
 1    you know, conversations in the hall USC between two

 2    experts on a particular -- say I bump into, you know, the

 3    18th century scholar.  And she starts telling me about her

 4    latest book and I'm like, oh, okay.  Well, like, walk me

 5    through this a little bit.  I am interested in this a        12:03

 6    little bit.

 7              But it didn't seem relevant to what I was tasked

 8    to do.  I mean -- and again, I always go back to what was

 9    my particular job here.  And I actually, you know, said

10    very clearly that I had no -- I wasn't a lawyer.  I don't    12:03

11    have -- that's not my interest or area of specialization.

12              ATTORNEY LOWE:  Jordan, since we have been going

13    about an hour, I usually like to take a break every hour,

14    stretch our legs.

15              ATTORNEY SEGALL:  Yeah, I have got two or three    12:04

16    more questions in this line and then went we will take a

17    break.  It's a good place.  But let me just finish up

18    these last couple.

19    BY ATTORNEY SEGALL:

20       Q    I just want to go back to what you just            12:04

21    testified, Professor Román.  Is it fair to say that you

22    didn't regard sort of the legal standards that governed

23    copyright cases as relevant to the specific expert

24    opinions that you are expressing in this case?

25              ATTORNEY LOWE:  Objection, vague and ambiguous.   12:04
```

Page 49

```
1    guess, superficial similarities, right, that might not

2    merit concern.  So, let's just say a character in one text

3    has, I don't know, blue eyes and the other text has blue

4    eyes.  But that's basically the only correspondence

5    between them.  I don't know if I would say that that's a        12:40

6    substantial similarity.  I would just say that that is

7    sort of a maybe casual similarity, a kind of banal

8    similarity.

9         But if there's enough differentiating aspects

10   between those two characters, I wouldn't say that there         12:41

11   would be substantial similarity between those characters.

12   Q    And in connection with your assignment in this

13   matter, were you specifically asked by counsel to apply

14   any particular test for substantial similarity to your

15   expert analysis?                                                12:41

16   A    I wasn't guided specifically along those lines.

17   I did mention in my report what I thought were the

18   substantial similarities both in, you know, characters,

19   plots, themes, moods, and how well developed they were,

20   both in the screenplay and then echoed in the film.             12:41

21        So I was already going -- I was already going

22   with what I thought was a considerable substantial

23   similarity.  And not just going for the banal, the

24   superficial similarity.  Oh, they both have, you know,

25   blue eyes.                                                      12:42
```

Page 65

1      Q     Have you ever heard something called the

2   extrinsic test for substantial similarity?

3      A     The extrinsic or intrinsic?

4      Q     Extrinsic test for substantial similarity?

5      A     Not that I can recollect.                    12:42

6      Q     Do you understand that in determining whether

7   works are substantially similar, courts are required to

8   distinguish between protectable and unprotectable elements

9   of the work?

10      A     Yes.                                          12:42

11      Q     And what is your understanding of what elements

12   of a fictional work are protectable and what elements are

13   unprotectable?

14      A     Let me start with the second one.  I think that

15   the phrase scènes à faire is one that's important to your  12:42

16   profession.

17      Q     And do you understand scènes à faire to be

18   protectable or unprotectable elements?

19      A     Well, I think that the idea of a scènes à faire

20   is that it is so intrinsic to the genre and it is repeated  12:43

21   so consistently that it is not protected, because it is

22   like a cliche or something.  It is like an expectation.

23   It is a banality that, like, if one is going to see, like,

24   a horror film, that there is going to be at some point

25   like a monster and a corpse or something along those  12:43

                                                  Page 66

1        A     Let me just clarify.  By "unprotectable," I mean

2   that they can't be claimed to be infringed upon.

3        Q     Right.  I understand, thank you.

4        A     Oh, good, okay.  Yeah.

5        Q     Okay.  Other than scènes à faire, are you aware     12:44

6   of any other elements that are considered unprotectable in

7   performing substantial similarity analysis?

8        A     I don't think so.

9        Q     In conducting your analysis of the two works at

10  issue here, did you make any effort whatsoever to              12:45

11  distinguish between protectable and unprotectable elements

12  of the two works?

13       A     I wasn't using the grid, the legal grid to write

14  up my report, if that's what you are referring to.

15            Again, I was using my scholarly expertise to do a   12:45

16  comparative study between a screenplay and a film and to

17  see what the similarities were.

18            If I found that there was a substantial

19  similarity, then, of course, I extrapolated on that in my

20  report and made a big deal about it and was able to argue     12:45

21  it through.

22            If I thought that a similarity was banal, I

23  tended not to include it in the report, although some of

24  those are included in the appellate brief, Exhibit B.

25       Q     Okay.  So you think the appellate brief contains   12:46

Page 68

1      A      Right.

2      Q      So I am asking you, is it your opinion as an

3   expert on expressing an opinion about substantial

4   similarities that all of the similarities you have

5   described in your expert report relate to protectable      12:53

6   elements of the work?

7          ATTORNEY LOWE:  Same objections, calls for a

8   legal conclusion.  Vague and ambiguous.

9          THE WITNESS:  Let me answer it this way.  You

10   know, when I read the screenplay, I formed an opinion on    12:53

11   the quality of the screenplay, its innovations, what I

12   found interesting, what I found unusual, all of that,

13   which I said several times already today.

14          Then, when I screened the film and I saw some of

15   those echoes, I thought, well, this is interesting.  It     12:53

16   does feel like copyright infringement.

17          So, if what I identify as original and particular

18   to the screenplay, I think should be protected by

19   copyright law.  But, again, I am not a lawyer and I am

20   just saying that it does seem to me that the qualities in   12:54

21   the screenplay that I have identified as original, even if

22   they can be reduced to scènes à faire from an

23   unimaginative limited perspective, I think that misses the

24   importance of the contribution in the screenplay.

25   BY ATTORNEY SEGALL:                                         12:54

                                              Page 74

```
 1    understand those terms:  Irony, wit, humor.
 2    BY ATTORNEY SEGALL:
 3        Q    But you didn't go out and review pirate works to
 4    determine whether other pirate works incorporated a
 5    humorous tone into the story --                        13:47
 6        A    No, no, and I wasn't asked to do that.  That
 7    wasn't a task at hand.  I was asked to use my expertise to
 8    kind of do this, again, very clean analogy, comparison,
 9    between the screenplay and the film.
10        Q    Okay.                                         13:47
11        A    Based on my understanding of like pirate
12    narratives both in like history, literature, popular
13    culture and film, that's what it was -- that's what I was
14    referring to.
15        Q    Okay.  You mentioned earlier that you were    13:47
16    instructed by counsel about the selection and arrangement
17    test, as I believe you called it, correct?
18        A    Yes.
19        Q    And I think you described your understanding of
20    the selection and arrangement test previously.  But my   13:47
21    question is did you offer either in your report or do you
22    plan to offer a specific opinion regarding how generic
23    elements in plaintiffs' screenplay are selected and
24    arranged?
25        A    I think that's all in my report.              13:48
```

                                                    Page 87

```
 1        A    Yes.

 2        Q    So those are things, in your view, there is a

 3   standard pirate story, correct?

 4        A    Yes.  If one were to think, like, well, tell me a

 5   pirate story, I think we would all be able to come up with   13:56

 6   a more or less standard pirate story.

 7        Q    And do you consider yourself an expert in pirate

 8   stories?

 9        A    I think we went through this this morning, and I

10   would say I wouldn't name myself as having an expertise in    13:56

11   pirate stories.

12        Q    Okay.  As a university professor, have you ever

13   written any academic work on pirates or pirates

14   literature?

15        A    No.                                                 13:57

16        Q    Have you ever given speeches or presentations

17   about pirates or pirate literature?

18        A    Only in The Early Modern Period when I was in

19   graduate school.

20        Q    And did those speeches involve work from the 17th  13:57

21   century and prior?

22        A    Yes, that's more from The Early Modern Period

23   and, like, Colonial Era and Imperialism.  They were more

24   based on historical figures.

25        Q    Have you ever taught any courses that have         13:57
```

Page 94

```
1              And it seemed that the Disney expert was basing

2    his authority on that familiarity.  So I then asked, when

3    I had to write up my rebuttal to that, I said, you know,

4    would it -- should I be rereading or should I be reading

5    or screening, like, everything that they are referencing      14:04

6    in the rebuttal report?  Like, can I do a rebuttal report

7    to an expert report if I haven't screened all the films

8    that he is referencing in his report?  Like, is that

9    necessary for my rebuttal?

10             And then I was told by -- by the lawyers that,       14:04

11   no, that wasn't -- did someone say something?

12     Q    I am sorry.  You cut out there a second.  Do you

13   mind repeating the last answer you were told by the

14   lawyers?  What?

15     A    That it wasn't for me to screen or familiarize          14:05

16   myself with every reference that appeared in the Disney

17   expert's report.

18     Q    Okay.  Well, let's focus on your initial report

19   first.  And then we will talk about the rebuttal report.

20     A    Okay.                                                   14:05

21     Q    For your initial report, I know you said you

22   screened Goonies, correct?

23     A    Yeah, at the last minute.

24     Q    Did you review any other pirate works before you

25   issued the report in this matter?                             14:05
```

                                                    Page 100

```
 1       A    No.

 2       Q    And then for your rebuttal report, did you -- you

 3  reviewed Cutthroat Island, correct?

 4       A    Yes.

 5       Q    Did you review any other pirate works in          14:05

 6  connection with preparing your rebuttal report in this

 7  matter?

 8       A    Well, I was asking the lawyers, I mean, Steven

 9  and Aleks, if I was going to be responsible for all the

10  literature that was cited in the Disney expert report.  I  14:06

11  asked my assistant -- I have a first-year student at USC

12  who I am mentoring and is a work-study student.  I asked

13  him, his name is Brandon, I said Brandon, do me a quick

14  favor.  Do a quick Google search on pirate literature and

15  see what you come up with.                                 14:06

16           Partly because I was curious and partly because I

17  hadn't given him anything to do and he is relying on some

18  hours -- talk about billable hours.  I mean, he is an

19  undergrad hoping to get a little bit of money and I don't

20  give him enough work.  So he appreciates that kind of      14:06

21  thing.

22           So he then came up with a list of, maybe, I don't

23  know, 12 or 15 things.  And on that list was a book that I

24  thought, oh, this might be actually helpful to kind of

25  gloss over.  And it is this book.                          14:06
```

Page 101

```
 1    the pirate story surfaces, right?  But I wouldn't

 2    necessarily say that it is an established genre like some

 3    other genres that are more prevalent.

 4    BY ATTORNEY SEGALL:

 5        Q    Do you agree with the complaint when it says        14:13

 6    "Films have covered swashbuckling pirates"?  Do you think

 7    that's a true statement?

 8        A    Well, it is a very vague statement but I guess

 9    just on the level of films have covered swashbuckling

10    pirates, I would say, yes, there have been swashbuckling    14:13

11    pirates that appeared in films.

12        Q    Have you seen any of these films in paragraph 10?

13        A    Just, again, the popular ones and not the more

14    obscure ones.  So, no.  Maybe like two or three of them.

15    But, again, that is when I was like a kid or in high        14:13

16    school.  It just -- my recollection of, like, the plots of

17    these aren't -- you know, isn't all that strong.

18        Q    For instance, do you think the Treasure Island

19    film from the 1950s is a significant pirate film?

20             ATTORNEY LOWE:  Objection, vague.                  14:14

21             THE WITNESS:  I would answer this way:  That I

22    think that if people were to make a list of pirate films,

23    like named five or six or eight pirate films, that more

24    likely Treasure Island would appear on, like, most

25    people's lists.                                             14:14
```

Page 107

```
 1        A    If you keep it between us, yes.  And that would

 2   be I am not like the most fluent in, like, science

 3   fiction.  I find it so overwhelming.  Right?  There are

 4   just so many different types of -- that genre just seems

 5   full of multiple type of stories that is hard to really      14:39

 6   get a grip on it.

 7        Q    What was the last pirate novel you read?

 8        A    Novel with a pirate?

 9        Q    Sure.

10        A    Well, there is a beautiful book that was just      14:39

11   published last year called Hamnet.  Did you read it?

12        Q    Yeah.

13        A    It is good, isn't it?

14        Q    I agree.

15        A    Yeah.  And I am trying to -- I read so much.  I    14:39

16   mean, it not that I seek out pirate, like, literature per

17   se.  I am kind of like -- this is totally off the record,

18   I guess, but just -- good for you, Jordan, that you read

19   that book.  I mean, you sound like a super busy person.  I

20   mean, all lawyers.  To be able to read Hamnet, that's        14:40

21   pretty cool.

22        Q    Thank you.  I appreciate that.

23             Okay.  Well, why don't we move on.  Let's go back

24   to Exhibit 5.  And page 3 requests -- the information

25   under Request for Production of Documents, No. 2, do you     14:40
```

Page 117

```
 1        A    I am saying that in the case of the Pirates of

 2    the Caribbean there was such a significant amount of

 3    overlap between the original creative and innovative

 4    elements in the screenplay with the film, just independent

 5    of the sequence of events and the way that they were          15:17

 6    selected and arranged that merited for me the case.

 7             And the things that I found that were either

 8    missing in the screenplay that appeared in the film or

 9    missing in the film that appeared in the screenplay,

10    however, didn't seem significant enough to -- I mean, I       15:18

11    could have written it in a report.  But I was instructed

12    not to mention the dissimilarities.

13        Q    So you testified that in the process of comparing

14    the two works, you didn't consider, in generating your

15    report, you didn't consider the possibility -- or you        15:18

16    didn't, in fact, review other pirate works; is that

17    correct, other than the Goonies?

18             ATTORNEY LOWE:  Objection.  Are you saying like

19    from the time that he was retained until he generated his

20    report?  Or are you saying over the last 20 years?  Or       15:18

21    what's the time frame?  Vague.

22    BY ATTORNEY SEGALL:

23        Q    Sorry.  From the time you were retained to the

24    time you generated your report, you didn't review other

25    pirate works to determine whether individual elements in     15:19
```

Page 146

```
1    the works you were comparing were original to the

2    screenplay, right?  That's what you testified to earlier?

3        A    Right.  Because my task was very clear which is

4    they wanted me to look at the screenplay and look at the

5    film and base my analysis on that.                      15:19

6        Q    And did you ever say, you know, I am not going to

7    be able to make an informed judgment about the similarity

8    between these works without some context?  I need to

9    consider some other works in the genre?  Did you ever

10   suggest that?                                           15:19

11       A    No.  And nor did they suggest to me that I should

12   have that experience.

13       Q    Did they -- (crossover talking.)

14       A    I was never interviewed and said, okay, we need

15   to know your entire history with the pirate genre.      15:19

16       Q    At the time you were preparing your original

17   report, you understood that both works were inspired in

18   part by the Pirates of the Caribbean theme park ride,

19   didn't you?

20       A    That always was slightly vague.                15:20

21       Q    You didn't know one way or the other?

22       A    I didn't know that there was a theme park.

23       Q    You weren't aware that there was a theme park

24   ride, you mean, called Pirates of the Caribbean?

25       A    Exactly.                                       15:20
```

Page 147

```
 1              ATTORNEY LOWE:  Objection, incomplete

 2   hypothetical.

 3              THE WITNESS:  I am pretty well versed in West

 4   Side Story.  I haven't seen the Baz Luhrmann film in a

 5   while.                                              15:24

 6   BY ATTORNEY SEGALL:

 7       Q    It's a straight adaptation, more or less.

 8       A    Yeah, I just remember that John Leguizamo was in

 9   it (Reporter asks for repeat.)  The casting.  I just

10   remember the casting.                               15:24

11       Q    John Leguizamo was in it.

12       A    I just remember that it had a diverse cast.

13              I am sorry, Jordan.  I am not exactly sure what

14   we are talking about.  So maybe if we could just revisit

15   that.                                               15:25

16              Do I think that it is important to know the

17   source material when comparing two works that share a same

18   source material?

19       Q    Correct, yeah.

20       A    I would say, yeah, it absolutely helps to know   15:25

21   the source material.  But that would be a literary

22   historian in me to think, yes, it is definitely

23   interesting.  And it can be relevant.

24              The Shakespeare analogy is slightly atypical

25   because that Romeo and Juliet story is so well known,      15:25
```

                                        Page 151

```
 1    literature, whether they be stories or cartoons or even in
 2    like adolescent story lines suggest as much.  That the
 3    pirate is not simply, you know, what he -- and it was a
 4    he.  What he was in The Early Modern Period, which is just
 5    like this really scary figure that could really hurt you.    15:52
 6        Q     But so it is your opinion as you sit here today
 7    that works like the Pirates of Penzance that in the past
 8    incorporated humor into pirate stories are distinct
 9    somehow because they use less multifaceted comedic
10    elements?                                                    15:52
11        A     That's nicely phrased.
12        Q     And what's the basis for that opinion since you
13    didn't review the Pirates of Penzance in connection with
14    your assignment?
15        A     Just my familiarity with that.  I didn't review   15:52
16    any of the lists of works that were included in the Disney
17    expert report.
18        Q     And you weren't personally familiar with all of
19    the works in Mr. McDonald's report, were you?
20        A     No.  No.  I don't even know if he was, right?  I   15:53
21    mean, I think that some of the stuff could be pulled from
22    like the kind of encyclopedias that I was looking at.
23    That's one of the reasons I pulled that out, to see are
24    these sort of synopses helpful to the Disney report.
25            And I did ask Aleks and Steven if it was           15:53
```

Page 161

```
 1    important for me to review those materials.  Like, do I

 2    need to read up on all of that?  And their answer was

 3    absolutely not.

 4        Q    So, why don't you take a look at Exhibit 8 which

 5    I have just marked, which is Mr. McDonald's expert report.  15:53

 6        A    All right, hang on.  Here we go.

 7             (Deposition Exhibit 8, McDonald Report,

 8             was marked for identification by the

 9             court reporter.)

10    BY ATTORNEY SEGALL:                                       15:53

11        Q    First of all, you recognize this document,

12    correct?

13        A    Yeah.

14        Q    This is the expert report that you reviewed in

15    submitting your rebuttal report?                          15:54

16        A    Yes.

17        Q    And can you turn to page 23 with me, please.

18        A    All right.  Dialogue 23, "Novelty Analysis"?

19        Q    Yes, underneath that.  I am going to point you to

20    the last sentence on this page.                           15:54

21             And says "Comedy in pirate stories dates back to

22    Gilbert O'Sullivan's 1879 operetta, Pirates of Penzance

23    which satirized pirate melodramas of the period."

24             And you agree with that, correct?

25        A    Well, I mean, it might even date back further.  I  15:54
```

                                                        Page 162

1    characters in the screenplay, but they still do have that

2    kind of ominous, threatening component.

3         Like we do see the pirate in the -- Captain Jack

4    Nefarious in the screenplay and even Davey Jones, for that

5    matter, like kill people, right?  So it is not as if,        16:03

6    like, they are completely muted of any kind of physical

7    harm.  Like, they do do physical harm to other people and

8    to themselves.  They cut each other when they are sword

9    fighting.

10        But yet, at the same time, they have this other       16:03

11   likability factor.  I think the screenplay when they first

12   introduced Captain Jack Nefarious, they even say, look, he

13   is a highly charismatic pirate who, in that kind of

14   evil -- and evil too.

15       Q    So, it is that combination you are talking about   16:04

16   of evil and charisma?

17       A    Yeah.  That's what I would say is the kind of

18   hybrid quality that's introduced in the screenplay that we

19   then see echoed in the Hector Barbossa.

20       Q    And it is your opinion that that quality is an     16:04

21   innovation of the screenplay, correct?

22       A    Yes, sir.

23       Q    Are you familiar with Long John Silver from

24   Treasure Island?

25       A    I wasn't asked to screen that.                     16:04

Page 169

1    of the pirate story to encourage such a prologue.   In

2    fact, it is highly atypical in my opinion."

3           And I just want to better understand your opinion

4    about the prologue.  Are you saying that there is no

5    precedence for the use of a prologue in general in pirate    16:45

6    stories, or are you saying there is something specific

7    about the prologue that lacks any precedence in pirate

8    stories?

9      A    I would even just go that prologues are an

10   incredibly unusual literary device at large.  Like, there    16:46

11   are not, like, a lot of literary texts that start off with

12   a prologue.  I mean, an epilogue is much more -- if there

13   is a standard, there's more of a sense of an epilogue than

14   a prologue.

15          So the idea of a prologue attached to any genre    16:46

16   is already going to be noteworthy and somewhat unusual.

17   And I think that that's where I was going; that both works

18   have this highly unusual introductory narrative frame

19   which is the prologue, and then I went through and tried

20   to identify how they functioned in each.    16:46

21     Q    It is your testimony sitting here today, is it

22   your opinion as a comparative literature expert, that

23   prologues are an uncommon device in film and literary

24   works?  That's your testimony?

25     A    Well, I mean, Raiders of the Lost Arc, Star Wars,   16:47

                                                    Page 199

```
 1          I, the undersigned, a Certified Shorthand
 2   Reporter of the State of California, do hereby certify:
 3          That the foregoing proceedings were taken before
 4   me at the time and place herein set forth; that any
 5   witnesses in the foregoing proceedings, prior to
 6   testifying, were duly sworn; that a record of the
 7   proceedings was made by me using machine shorthand which
 8   was thereafter transcribed under my direction; that the
 9   foregoing transcript is a true record of the testimony
10   given.
11          Further, that if the foregoing pertains to the
12   original transcript of a deposition in a Federal Case,
13   before completion of the proceedings, review of the
14   transcript [X] was [ ] was not required.
15          I further certify I am neither financially
16   interested in the action nor a relative or employee of any
17   attorney or party to this action.
18          IN WITNESS WHEREOF, I have this date subscribed
19   my name.
20   Dated: June 10, 2021
21
22
23
24          Pamela Zitny
25          CSR No. 4461
```

Page  224

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3                        ---oOo---

 4

 5   ARTHUR LEE ALFRED II, et al.,

 6         Plaintiffs,

 7   vs.                           No.2:18-CV-08074-CBM-AS

 8   THE WALT DISNEY COMPANY, et

     al.,

 9

           Defendants.

10   _____/

11

12

13

14    VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DAVID ROMAN

15                      VOLUME 2

16

17           Taken before MICHELE J. LUCAS

18                    CSR No. 4017

19                    July 9, 2021

20

21

22

23

24

25
                                         Page 225
```

```
 1              You said something along the lines of you

 2    were given something by counsel to consider.

 3              What were you talking about there?

 4        A.  When I talked to Steven -- this was just

 5    in the fall after I was hired to actually write the   02:03

 6    report, right? through the second phase -- they

 7    said that it wasn't important for me to make a list

 8    of the dissimilarities.

 9        Q.  Did they give you anything in writing

10    explaining your assignment or your conveying the      02:03

11    legal standards?

12        A.  No, no.  I kind of -- a part of me wished

13    that they had, but, no, that wasn't the case.

14              And, again, Steven, you know, again, I

15    respect all of you and what you do.  So this is       02:04

16    nothing -- this is not calling anything into

17    question there.

18              But one of the things I was really

19    concerned with was just not violating the protocols

20    of your profession through my naivete.                02:04

21              So I wasn't sure what I was -- you know, I

22    never -- you know, I wasn't sure what I was -- you

23    know, what was permissible to ask or not

24    permissible to ask without jeopardizing, you know,

25    the case.                                             02:04
```

Page 275

```
 1          Q.  Okay.  At the time you drafted and signed

 2     that expert report, were you aware of the ride's

 3     existence?

 4          A.  I would have to review my materials in

 5     terms of the timeline of what I was given.          03:25

 6          And I don't recall if I was given that

 7     information for the expert report or for the Disney

 8     rebuttal.

 9          But I do know this, Jordan, that I wasn't

10     asked to screen the little clip, the YouTube clip    03:25

11     of the ride, until I read the Disney expert report,

12     and I had to draft my rebuttal.

13          Q.  Okay.

14          A.  That was important for plaintiffs' counsel

15     for me to become familiar with it.                   03:25

16          Q.  So at the time you signed and submitted

17     your initial expert report in this matter, you had

18     never seen footage of the Walt Disney ride?

19          A.  I can answer that confidently that I

20     didn't see any footage of it.                        03:26

21          Q.  And you had never ridden the Walt Disney

22     ride?

23          A.  No.  Is it both at Disneyworld and

24     Disneyland?

25          Q.  I think so, yes.                            03:26
```

Page 323

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, MICHELE J. LUCAS, a Shorthand Reporter,

 4     State of California, do hereby certify:

 5          That DAVID ROMAN, in the foregoing deposition

 6     named, was present and by me sworn as a witness in the

 7     above-entitled action at the time and place therein

 8     specified;

 9          That said deposition was taken before me at

10     said time and place, and was taken down in shorthand by

11     me, a Certified Shorthand Reporter of the State of

12     California, and was thereafter transcribed into

13     typewriting, and that the foregoing transcript

14     constitutes a full, true and correct report of said

15     deposition and of the proceedings that took place;

16          IN WITNESS WHEREOF, I have hereunder

17     subscribed my hand this 27th day of July, 2021.

18

19

20     _____

       MICHELE J. LUCAS, CSR No. 4017

21     State of California

22

23

24

25
```

Page 346