1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (Pro hac vice)
parenz@robinskaplan.com
800 LaSalle Avenue
Suite 2800
Minneapolis, Minnesota 55402
Telephone: 612 349 8500
Facsimile: 612 339 4181

**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

*Attorneys for Plaintiffs*
*Arthur Lee Alfred, II, et al.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE WALT DISNEY COMPANY et al.,<br><br>Defendants. | Case No. 2:18-cv-08074-CBM-AS<br><br>**DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT THE WALT DISNEY COMPANY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: October 19, 2021<br>Time: 10:00 a.m.<br>Dept: Courtroom 8B<br>Judge: Hon. Consuelo Marshall |

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS'
*OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## DECLARATION OF ARTHUR LEE ALFRED, II.

I, ARTHUR LEE ALFRED II, declare:

1.      I am one of the plaintiffs in this action. The facts stated herein are personally known to me and I could and would testify competently thereto if called upon as a witness under oath.

2.      I am a Screenwriter and a high school principal. I began my career in the entertainment industry over twenty years ago at MTV Films, and later worked with seasoned Hollywood Producer Tova Laiter ("Laiter"), at Avida Entertainment, optioning screenplays to Disney and Maverick Entertainment, among others. In 2010, I began working for Academy Award Winner, Forest Whitaker, as a Creative Executive developing and producing projects for film, new media, including an award-winning documentary in 2011. I also helped to develop Juntobox Films: a social media platform for independent filmmakers to create and collaborate on independent films. Since 2011, I have been employed as a counselor, assistant principal, and principal at a high school in Riverside County, California. A true and correct copy of my resume is attached hereto as **Exhibit A-1**, which accurately sets forth an overview of my background and experience.

3.      I grew up in in a lower socio-economic neighborhood in Pomona, Los Angeles Country, to a lower/middle class, hardworking family. I was the first person in my family to attend college. I obtained admission to California State University, San Bernardino which is where I first met Ezequiel Martinez, Jr. With the assistance of the film department at Cal State San Bernardino, we distinguished ourselves by being the first students at the university to produce and exhibit a full-length movie (in our senior year). It was entitled THE YETI.

4.      After college, we pursued our dream to become Hollywood screenwriters and producers. Laiter hired me as her assistant after I completed an internship with MTV Films on the Paramount lot. In early 1999, Martinez and I jointly wrote an original "spec" screenplay entitled RED HOOD ("Red Hood") which

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

was a new spin of the folklore tale, "Little Red Riding Hood" which follows Little Red Riding Hood, who is now grown up, as she pursues revenge against the wolf. We not only prepared a screenplay entitle "RED HOOD", but also produced a "sizzle reel" (i.e., a film trailer) to capture industry interest. We submitted the RED HOOD project to Laiter in 1999.

5.      Thereafter, Laiter submitted RED HOOD to Disney on our behalf. Disney "optioned" RED HOOD on January 14th, 2000.

6.      It was during this time that we were first introduced to Brigham Taylor ("Taylor") at his office on the Disney lot in Burbank, California.

7.      During an initial meeting regarding RED HOOD at Taylor's office on the Disney lot, Taylor told us that he was part of a "creative team" at Disney that We would be working with on RED HOOD; the rest of the creative team that we were introduced to in the Fall of 1999 included Josh Harmon and Michael Haynes (collectively, the Disney Creative Team).

8.      Thereafter, we worked intermittently at the Disney lot with the Disney Creative Team over a period of approximately one year (i.e., from October 1999 to October 2000) to edit, improve and polish the RED HOOD screenplay for a potential motion picture.

9.      During that period, we attended meetings with the Disney Creative Team approximately eight (8) times at the Disney lot. During this period, we would also have conference calls with the Disney Creative Team from time to time regarding the RED HOOD project.

10.      Around March 2000, Martinez and I began writing a new screenplay together which was a new spin on pirate films (the "Screenplay"). This Screenplay was _not_ based upon the Disney ride entitled "Pirates of the Caribbean" and when we wrote the Screenplay, we had no intention to relate the Screenplay in any way with the ride.

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

11.     By July 19, 2000, Martinez and I had finalized the first draft of the Screenplay which was initially titled "Pirates of the Spanish Main".  As we prepared to submit the Screenplay to Disney, we decided to retitle it "Pirates of the Caribbean" to make it more marketable to Disney (with whom we already had a working relationship via the above).

12.     The Screenplay, a true and correct copy of which is attached as **Exhibit B** to the Declaration of Ezequiel Martinez Jr., is entirely our own creation. We did not copy any other pirate movie or book. We also did not copy the ride. We just inserted some references to the ride to pique Disney's interest.

13.     The cover letter to Disney submitted with the Screenplay described the Screenplay as "a swashbuckling fun adventure, 'Goonies' meets 'Pirates of the Caribbean.'" This did not and does not mean that the Screenplay is a copy of either 'Goonies' or the ride. That description was merely a common shorthand way that people in the entertainment industry go about suggesting the general feel of a new work (by relating it to something the reviewer is presumably already familiar with).

14.     Growing up in Southern California, I had been to Disneyland in Anaheim, California, about 4-5 times when I was a child and approximately 4 more times as a teenager/college student.  I had been on the ride prior to the time we wrote the screenplay in July 2000. The ride had no "story", no recurring characters, and no plot, or narrative, like in a movie or book.  Martinez and I did not use anything in the ride to create the expressive components of our Screenplay. Only the title is the same, along with the minimal references below.

15.     The ride references that we added to the Screenplay to increase its appeal to Disney are:

      a)     Page 1, Dialogue- Captain Jack says "Run up yer white flag…"

      b)     Page 8, Dialogue- Jane says "Sail with the wildest crew that ever sacked the Spanish Main, huh?"

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

c)   Page 12, Visual Description- sign says "Take a Wench for a Bride"

d)   Page 13-14, Visual Description- Wench's at an auction, Woman in Red, Pirates shouting "We wants the REDHEAD!"

e)   Page 30, Visual Description- Skelton at the help of a wrecked ship

f)   Page 33, Dialogue- Pirates sing Disney song "Yo Ho Yo Ho a pirate's life for me…"

g)   Page 41, Visual Description- Wooden sign that reads: THAR BE NO PLACE LIKE HOME"

h)   Page 67, Dialogue- the Rascal Scoundrels sing "We kidnap and ravage and don't give a hoot, drink up me' earties yo-ho…"

i)   Page 75, Dialogue- Captain Nefarious says "Ye come seekin adventure with salty old pirates, aye?"

j)   Page 79, Dialogue- Captain Nefarious says "ya bloomin' cockroaches!"

k)   Page 91, Visual Description- "The boat continues sailing through the cavern like the DISNYLAND RIDE, 'PIRATES of THE CARIBBEAN'."

l)   Page 91 and 96, Visual Description- General descriptions of skeletons impaled by swords in the cavern.

m)   Page 93, Dialogue- Captain Nefarious says "No fear have ye of evil curses says you... no fear of plunderin' pirates lurking in every cove, says you…"

n)   Page 102, Dialogue- Leggo [the parrot] says "Yo ho, yo ho, a PARROTS life for me.".

**The combined references amount to no more than two (2) pages of our 104 page Screenplay.**

-4-

16.     None of the foregoing ride references are included in our claim for copyright infringement (and none of the foregoing ride references are in the Film except 15(f) and 14(j) above).

17.     I have reviewed Exhibit D to Gray's declaration , which alleges  that page 32 and 45 of the Screenplay contain references to the ride because the songs use the phrase "Yo-Ho". However, Martinez and I created the lyrics on those two pages by ourselves. In particular, the song lyrics that we created at page 32 are: "Yo ho, yo ho, a phantom life indeed. We bury, abduct, we sin and slay, avast ya scurvys yo ho! We're banshees of fright and phantoms of night, avast ye scurvy yo ho...." The song we created at page 45 are: "We hack and raze, behead and set blaze, avast ya scurvys yo ho! w murder with greed, do treacherous deeds, Avast ye scurvy' a yo ho! In search of the map you' 11 fall in our trap, Avast y scurvy'• yo ho! The Phantom is near, his evil strikes fear, avast-ya-scurvys-yo HOOOOO!!!" Only the words "yo ho" have any similarity with the song in the ride and our songs have no melodies. To the best of my knowledge, the phrase "Yo-Ho" has long been associated with pirates and is not something that Disney created for the ride.

18.     Exhibit D to Gray's declaration also claims that the ride has an "explosion" caused by pirates shooting at explosive barrels at its conclusion. I do not recall such an explosion in the ride. I have also reviewed footage of the ride from 1967 and it appears that the explosion is superimposed on the video.

19.     I also disagree with the contention in Exhibit D that the Screenplay used imagery of a skeleton in a bed from the ride. In the Screenplay, the bed was a booby trap set up aboard a ship which flips over, whereas in the ride the bed is just a bed with a skeleton.

20.     It was my interpretation that the skeletons contained in the ide were dead in their place and not "undead". For example, in the ride, the skeleton is at the wheel of a shipwreck on some rocks and is not actually "steering" anything (because the ship is not moving).

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

21.     At the time that Martinez and I created the Screenplay, the only "Pirate-related" movies that I recall being familiar with were *Peter Pan* and *Captain Blood*. I had neither seen nor had any familiarity with *A General History of the Pyrates*, *Robinson Crusoe*, *Treasure Island*, *Captain Singleton*, *The Pirate*, *The Gold-Bug*, *The Coral Island*, *The Red Rover*, *Savage Island*, *The Buccaneer*, *Blackbeard the Pirate*, *Yellowbeard*, nor *Cutthroat Island*.

22.     The Screenplay (other than the ride references) was from my imagination and that of my co-writer, Martinez.

23.     In about July 2000, our producer, Tova Laiter had a conversation with Taylor by telephone wherein she briefly described the Screenplay to Taylor.

24.     I was on this call with Laiter and Taylor, as I was working as Laiter's assistant at the time and it was common practice for me to stay on the line on these calls in order to take notes and/or schedule further calls or meetings.  My presence on the line was known to all parties.

25.     During that call, Laiter mentioned to Taylor that we were working on a Screenplay about pirates, that we intended to title "Pirates of the Caribbean".  Taylor seemed very interested in getting a copy of the Screenplay; he mentioned that Disney was internally discussing whether they wanted to make a movie called "Pirates of the Caribbean" or not.  At that time, I had no idea about Taylor's thoughts about the possibility of Disney producing a movie called Pirates of the Caribbean until that very moment.  During that conversation, Taylor did not, for example, mention that Disney had a treatment or a Screenplay. Taylor specifically asked for Laiter to submit the Screenplay so that he could review the Screenplay.

26.     Laiter informed us that on August 9, 2000, Laiter submitted the Screenplay and a cover letter to Taylor via messenger.

27.     Soon thereafter, Martinez and I also created a "sizzle reel" to go with the Screenplay and some original artwork to  present our concept to Disney.

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION*
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

28.     We had these materials hand delivered to Taylor in August 2000. We did not hear back from Taylor for many weeks.

29.     In early October 2000, Martinez and I  attended a meeting with Taylor, Haynes and Harmon to work on Red Hood at the Disney lot in Burbank, California.

30.     We arrived early for the meeting and a Disney receptionist brought us into Taylor's office to wait for him. At that point, I saw our Screenplay and artwork on Taylor's coffee table in his office. The Screenplay (**Exhibit B**) has a very distinctive cover, so it stood out.

31.     When Harmon came into Taylor's office, Martinez mentioned the Screenplay to him and asked whether we would be discussing the Screenplay at the meeting.  Almost immediately thereafter, the receptionist quickly ushered us out of Taylor's office and asked us to wait in the reception area.

32.     When the Red Hood meeting commenced in Taylor's office a short time later, the Screenplay and artwork were gone. The meeting was cold and unproductive, and  ended quickly and abruptly.

33.     Intentionally Omitted.

34.     Disney later told Laiter that they were passing on the Screenplay in about the Fall of 2000.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed the 27th of September 2021, in Los Angeles, California.

_____

Arthur Lee Alfred, II.

DECLARATION OF ARTHUR LEE ALFRED, II IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A-1

# Lee Alfred II
## Writer/Producer

| Biography |
| --- |

Lee Alfred II began his career in entertainment over 20 years ago as an intern/assistant with MTV Films. His creativity landed him a job with seasoned Hollywood Producer Tova Laiter at Avida Entertainment. Together they developed projects ultimately optioning screenplays to Disney and Maverick Entertainment.

Soon Lee took his producing skills solo where he began producing a number of independent and short films, music videos, commercials, infomercial and corporate videos. In 2010 Lee began working for Academy Award Winner Forest Whitaker as a Creative Executive. The team developed and produced projects ranging from film, television, corporate infomercial/PSA's, award winning documentaries and new media. As Whitaker's Creative Manager, Lee helped develop Juntobox Films, a social media platform for independent filmmakers to create and collaborate on independent films.

With a background and M.A. in Educational Counseling, Lee also led Forest Whitaker's Philanthropic division where they established The International Institute for Peace. The nonprofit partnered with UNESCO in Paris to establish global peace building programs for underprivileged youth. As a Philanthropic Executive, Lee produced several informative videos and non-profit PSA's for the institution to help raise awareness and inspire global change. Currently Lee executive produced "The House Next Door'' which was released theatrically by Lions Gate in July 2021. Even as a current high school principal, Lee continues his screenwriting with several scripts in progress.

FILM/ OTHER

| | | |
| --- | --- | --- |
| The House Next Door (exec prod) | Lions Gate | 2021 |
| Repentance (associate producer) | Feature film Significant Productions | 2011 |
| Rising from Ashes (co-producer) | Award winning documentary | 2011 |
| Hell Ride (associate producer) | Feature film- Quentin Tarantino Productions | 2008 |
| Burn In Hell (producer) | Independent Film | 2008 |
| Get Em Girl (producer) | Music Video with Platinum Artist Ray J | 2009 |

WRITER/SCREENPLAY

| | | |
| --- | --- | --- |
| The House Next Door (Lions Gate) | Story By, Exec Prod | 2012 |

EXHIBIT A-1

| | | |
|---|---|---|
| San Diablo (Maverick Ent) | Writer, Optioned | 2003 |
| San Diablo (Jan Korbalin) | Writer, Optioned | 2005 |
| Red Hood (Disney) | Writer, Optioned | 2000 |

<u>CORPORATE/EDUCATIONAL</u>

| | | |
|---|---|---|
| Perris Unified School District | Education media designed to inform high school level content | 2012-15 |
| The International Institute for Peace (IIP) | Non-Profit PSA for Academy Award winner Forest Whitaker | 2012 |
| Juntobox Films.com | Web based- how to & introduction video's | 2012 |
| UNESCO | PSA Non-Profit commercial | 2011 |
| AT&T | The Black List Corporate PSA | 2012 |
| RJ Innovations | Coin Sorter product/branding web-video | 2012 |
| Tokyo 5 Jeans | Web based branding commercial's | 2010 |

IMDB Credits: https://www.imdb.com/name/nm2207265/?ref_=nv_sr_srsg_0

EXHIBIT A-1