ROBINS KAPLAN LLP
Ronald J. Schutz (pro hac vice)
RSchutz@RobinsKaplan.com
Patrick M. Arenz (pro hac vice)
PArenz@RobinsKaplan.com
Brandon J. Pakkebier (pro hac vice)
BPakkebier@RobinsKaplan.com
800 LaSalle Avenue
Suite 2800
Minneapolis, Minnesota  55402
Telephone:  612 349 8500
Facsimile:    612 339 4181

Steven T. Lowe (SBN 122208)
*steven@lowelaw.com*
Aleksandra Hilvert (SBN 258463)
*aleksandra@lowelaw.com*
LOWE & ASSOCIATES, PC
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-cv-08074-CBM-AS |
| Plaintiffs, | *Hon. Consuelo Marshall Presiding* |
| vs. | **DECLARATION OF DAVID ROMÁN IN SUPPORT OF PLAINTIFFS' *OPPOSITION* TO DEFENDANT THE WALT DISNEY COMPANY'S MOTION FOR SUMMARY JUDGMENT** |
| THE WALT DISNEY COMPANY et al., | |
| Defendants. | Date:        October 19, 2021 |
| | Time:       10:30 am |
| | Courtroom:  8B |
| | Judge:       Hon. Consuelo Marshall |

## DECLARATION OF DAVID ROMÁN

I, David Román, declare:

1.     I am a Full Professor (tenured) of Comparative Literature at University of Southern California and have worked as a professor at USC since 1995 teaching undergraduate and graduate courses in the English Department. The facts stated herein are personally known to me and I could and would testify completely thereto if called upon as a witness under oath.

2.     Attached as **Exhibit I** is a true and correct copy of my *Curriculum Vitae* accurately setting forth my credentials. In summary, I have a PhD in Comparative Literature and I have been teaching Comparative Literature at USC for 26 years. Comparative Literature is an interdisciplinary practice that encompasses the full range of the literary, performing, and visual arts, including film. The skills employed by one who is knowledgeable in comparative literature (such as myself) are directly applicable to the task at hand: namely, to identify the structures and patterns in literature and film, including, among other things, the following: themes, plots, characters, the sequence of events, tonalities and moods, and dialogue, and also to assess their qualitative importance.

3.     I have not met the two plaintiffs in this case and I have no financial interest in the outcome of the case. As a tenured professor, I would only agree to offer my opinions as an expert witness if I believed in them and was able to apply my expertise to the matter. That is what I have done as an expert witness in this case.

4.     I was originally contacted about this case in September 2020 by Aleksandra Hilvert of the Lowe & Associates firm. I had previously been contacted by the Lowe & Associates firm to look at the issue of substantial similarity in another case, but I did not find adequate similarity in that case and declined the engagement.

5.     Initially, I was asked to confine my focus to reading the Screenplay and compare it to the Disney film, "Pirates of the Caribbean: The Curse of the Black Pearl" (the "Film") without any instruction on the law, and without reading any prior

comparisons, to determine whether I believed that the Film copied substantial portions of the Screenplay. This was the first phase of my engagement and I have since come to learn that I was hired as a consultant at that time.

6.     In or about November 2020, I performed the consulting phase of my engagement and I came to the initial conclusion that the Film did borrow substantially from the Screenplay.

7.     Thereafter, I communicated my initial impressions to the Lowe & Associates firm.

8.     At that point, they engaged me as an expert witness in this case: at that point, I was given a previous comparison that the Lowe & Associates firm had submitted to the Ninth Circuit Court of Appeals contained in the Plaintiff's Opening Brief, and I was instructed on the applicable law including the selection and arrangement test, the definition of *scenes a faire*, and other basic tenets of copyright law, to enable me to prepare my opening expert report.

9.     Attached hereto as **Exhibit J**  is a true and correct copy of my opening expert report in this case, accurately setting forth my opinions and the reasons therefor, which I intend to testify about if given the opportunity.

10.     Attached hereto as **Exhibit K**  is a true and correct copy of my Response to Mr. McDonald's rebuttal accurately setting forth my opinions and the reasons therefor, which I intend to testify about if given the opportunity.

11.     Attached hereto as **Exhibit L** is a true and correct copy of the errata to my May 27, 2021 deposition transcript and corrected pages.

12.     Attached hereto as **Exhibit Y** are true and correct copies of pages from the book *Hamnet* by Maggie O'Farrell, reflecting that *Hamnet* features a midshipman and sailors (one of whom has a jacket-wearing monkey as a pet and another one who throws a crewmember overboard), which is reminiscent of pirates and/or pirate-like I had intended to expound on this subject at my deposition, but was not given the opportunity.

DECLARATION OF DAVID ROMÁN IN SUPPORT OF PLAINTIFF'S *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1    I declare under the penalty of perjury under the laws of the United States of

2  America that the foregoing is true and correct.

3

4    Executed the ___26th___ day of September, 2021 in London, United Kingdom.

5

6  Dated: September _26_, 2021

7                                        _____
                                          Prof. David Román

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID ROMÁN IN SUPPORT OF PLAINTIFF'S *OPPOSITION* TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT I

# David Román, M.A., PhD

Department of English
University of Southern California
Los Angeles, CA 90089-0354
e-mail: davidr@usc.edu

**ACADEMIC DEGREES:**
- The University of Wisconsin-Madison; Doctor of Philosophy: Comparative Literature (1990)
- The University of Wisconsin-Madison; Master of Arts: Comparative Literature (1984)
- The University of Wisconsin-Madison; Bachelor's Degree: Comparative Literature (1981)

**EMPLOYMENT:**
- University of Southern California, Professor, Departments of English and American Studies (2003-present).
- University of Southern California, College Director of Faculty Development (2005-2008)
- University of Southern California, Associate Professor, Department of English and American Studies (1998-2003)
- University of Southern California, Assistant Professor, Department of English (1995-98)
- Yale University, Assistant Professor, Women's Studies Program (1994-95)
- University of Washington, Assistant Professor, Department of English (1991-95)
- Pomona College, Visiting Assistant Professor, Department of English, (1990-91)
- Macalester College, Instructor, Department of English, (1989-90)

**CONSULTANT ON GRANT AWARDS SELECTION MATTERS:**
- MacArthur Foundation, 1995-2020
- Guggenheim Foundation, 2000-2020
- Various national, state, and city grant commissions on the Arts

**AWARDS AND HONORS**:
- Visiting 2018 Fellow, University of London, Royal Central School of Speech and Drama, 2018
- Distinguished Messenger Lecture Professor, Cornell University, Fall 2015
- Distinguished Scholar-in-Residence, Arizona State University-Tempe, September 23-29, 2012
- Dornsife Faculty Fellow, 2011-2013
- 2010 Visiting Fellow at the University of Warwick's School of Theatre, Performance, and Cultural Policy Studies, Department of Theatre and Performance.     (Two-week residency for their International Performance Research Program).
- 2006 USC-Mellon Award for Excellence in Mentoring for School-wide Mentoring Programs at the College of Letters, Arts, & Sciences

1

- 2006 USC-Mellon Award for Excellence in Mentoring (Category: Faculty Mentoring Undergraduate Students)
- 2005 USC-Mellon Award for Excellence in Mentoring (Category: Faculty Mentoring Graduate Students)
- 1999 ATHE Award for "Outstanding Book of the Year" *for Acts of Intervention: Performance, Gay Culture, & AIDS*
- 1999 Lambda Literary Award for Drama, *O Solo Homo: The New Queer Performance*
- 1993 University of Pennsylvania Mellon Fellowship in the Humanities
- 1990 Postdoctoral Minority Scholar in Residence at Pomona College

**PUBLICATIONS:**
**Books:**
- *The Mac Book* (a collection of critical essays on the performances of Taylor Mac, coedited with Sean Edgecomb)
    - (Ann Arbor: University of Michigan Press, 2021)

- *Tarell Alvin McCraney: Theatre, Performance, Collaboration* (a collection of critical essays edited with Sharrell Lockart and Isaiah Wooden)
    - (Evanstan, Il.: Northwestern University Press, 2020)

- *Performance in America: Contemporary US Culture and the Performing Arts*
    - (Durham: Duke University Press, 2005.)
    - **[Finalist for ASTR's Outstanding Book of the Year]**

- *Acts of Intervention: Performance, Gay Culture, & AIDS.*
    - (Bloomington, IN: Indiana University Press, 1998.)
    - **[Winner of ATHE's 1999 "Outstanding Book of the Year" Award]**

- *O Solo Homo: The New Queer Performance.*  An anthology of solo performance texts co-edited with Holly Hughes.  (New York: Grove Press, 1998.)
    - **[Winner of 1999 Lambda Book Award for Drama]**

**Articles & Essays:**
- Over 30 publications in peer-reviewed journals in the Arts and Humanities including:
    - "The Distant Present of Tarell Alvin McCraney," *American Quarterly*, 2014
    - "Reviving AIDS: The Normal Heart on Broadway," *Art, AIDS, America*, 2015
    - "Remembering AIDS: A Reconsideration of the Film *Longtime Companion*," GLQ 2008
- Over 20 published reviews on the theatre, music, and performance in peer-reviewed articles in the Arts and Humanities including:
    - Rev. of *What Do We Need To Talk About? Conversations on Zoom* by Richard Nelson, Public Theatre, New York City, *Theatre Journal* 2020

2

    o   Rev. of *Ms. Blakk for President* by Tina Landau & Tarell Alvin McCraney, Steppenwolf Theatre, Chicago, *Theatre Journal* 2020.

    o   Rev. of *Two Trains Running* by August Wilson, Matrix Theatre, Los Angeles, *August Wilson Journal* 2019

    o   Rev. of *Hamlet* by William Shakespeare, Almeida Theatre, London and Public Theatre, NYC, *Theatre Journal* 2018.

    o   Rev. of Sweat by Lynn Nottage, Oregon Shakespeare Festival, Ashland *Theatre Journal* 2016.

**EDITORIAL PROJECTS:**
**Editor:**

- *Art Works: A Special Double- issue of GLQ on the Arts* coedited with Richard Meyer.  (12:2/12:3) Duke University Press, 2006.

- *Theatre Journal*.  2000-2003*, published quarterly by the Johns Hopkins University Press, The official journal of the Association for Theatre in Higher Education (ATHE).

**Book Series Editor:**
    *Triangulations*. Coeditor with Jill Dolan. University of Michigan Press.
        *(30  published books in series since 1999)*

**Editorial Boards**: *PMLA, Theatre Journal, GLQ, Aztlan, American Literature*

**LECTURES:**
**Keynote and Invited Lectures (USA):**

- Stanford University (2013, 2010, 2002)
- Harvard University (2011, 1996)
- Brown University (2019, 2006, 2003)
- Yale University (2010)
- Princeton University (2012)
- Columbia University (2008, 1995)
- Cornell University(2015)
- University of Pennsylvania (2006, 1994, 1993)
- Dartmouth College (2018)
- Swarthmore College (2007)
- Oberlin College (2003)
- Mount Holyoke College (1995)
- Macalester College (2016)
- Scripps College (2003)
- Carlton College  (2016)
- Pomona College  (2002)
- Vassar College (2000)
- University of California-Berkeley (1998, 2000)
- University of California-Los Angeles (1997, 2002, 2010)

3

- University of California-Davis (2008)
- University of California-Santa Cruz (2003)
- University of California-Riverside (1996, 2002)
- University of California-San Diego (1996, 2001)
- University of Minnesota (1996)
- University of Colorado (2000)
- University of Oregon (2003)
- University of Wisconsin (2015, 2013)
- University of Iowa (2008)
- University of Michigan (2006)
- University of Texas (2005, 2002, 2001)
- City University of New York Graduate Center (2017, 2000, 1995)
- University of Illinois (2006)
- Arizona State University (2012)
- Rutgers University (YEAR)
- University of Maryland (2012, 2007)
- Duke University (2003, 2002)
- Northwestern University (2016, 2010, 2002, 1995)
- Georgetown University (2005)
- Tulane University (1993)
- New York University (2006, 2002)

**Keynotes and Invited Lectures (International)**
- University of London (2018)
- University of Warwick (2010)
- University of Toronto (2002)
- University of Guelph (2002)
- University College Dublin (2005)
- The International Federation of Theatre Research, Jaipur, India (2003)
- International Conference on American Drama and Theatre, Seville, Spain (2012)

**LEGAL:**
- Copyright matters: case settled before analysis complete; party information unknown, 1990s

- Expert Witness, O'Donnell & Schaeffer  LLP
  Consultant on Copyright Infringement Case
  Export report, Mediation meeting, 2003 - 2004

4

# EXHIBIT J

Report of David Román

Dated November 29, 2020


I am a Professor in the Department of English at the University of Southern

California, a position I have held since 1995 (in both the undergraduate and

graduate programs).   I am the author of several award-winning books on

twentieth and twenty-first century American literature and culture, which are

listed on my CV attached hereto as Exhibit A.   I've published on a wide-

range of topics from the early modern period to our contemporary moment,

and on a wide-range of texts including plays, novels, and films.  My most

recent publication is a coedited volume of critical essays on the works of

Tarell Alvin McCraney, who won an Academy Award for best-adapted

screenplay for *Moonlight*, the film that won Best Picture at the 2017

Academy Awards.  I have lectured at colleges and universities throughout

the United States, including keynote lectures and visiting appointments at

the University of Pennsylvania, Princeton University, Dartmouth College,

Harvard University, Yale University, Brown University, Columbia

University, Stanford University, and Cornell University.    I also have taught

and lectured throughout the world.    Since 2018, I have held an academic

affiliation with the University of London's Royal Central School of Speech

and Drama.    I've also worked as a senior editor for various academic

journals and university presses including those published by Johns Hopkins

University Press, the University of Michigan Press, and The University of

Chicago Press.   I hold a PhD in Comparative Literature from the University

of Wisconsin at Madison.    Before USC, I taught at the University of

Washington and Yale University.


My training in Comparative Literature has equipped me to compare and

contrast different types of literary works in close detail.    Comparative

Literature is also an interdisciplinary practice that encompasses the full

range of the literary, performing, and visual arts, including film.     These

critical skills are especially relevant to legal cases involving copyright

infringement and issues of plagiarism.  That is because Comparative

Literature scholars are trained to identify the structures and patterns of

stories, including, among other things, the following: themes, plots,

characters, the sequence of events, tonalities and moods, and dialogue.    We

observe patterns across genres, especially the manner by which writers select

and arrange the elements that compose the literary work.

2

I was asked by Aleksandra M. Hilvert of Lowe & Associates, Attorneys at Law, to examine certain materials in the case of Arthur Lee Alfred, II and Ezequiel Martinez versus The Walt Disney Company for copyright infringement of their original screenplay entitled *Pirates of the Caribbean* (Lee v. Disney et.al. U.S.D.C. Central District of California, Case no. 2:18-cv08074). I was asked to read the plaintiff's original screenplay, which was provided to me by the firm, and compare it to the Disney film entitled *Pirates of the Caribbean: Curse of the Black Pearl* (2003), which I screened on *Netflix*, and then assess the patterns of similarities, if any, between them. After several readings and screenings of the material, I am confident that I can offer a fair and unbiased opinion on the matter.

I believe that there are enough important patterns of similarities between the two works to merit a conclusion that one is substantially similar to the other, notwithstanding the existence of some differences. Once I communicated my preliminary views to the lawyers, they provided me with secondary materials related to the case, which I also reviewed. In particular, I read and analyzed the Appellants' Corrected Opening Brief Filed with the 9th Circuit, focusing on pages 8-25 (a true and correct excerpt of which is attached hereto as Exhibit B) and I verified the accuracy of said similarities set forth

3

therein.  I adopt Exhibit B as an addendum to my report.   Finally, I was

asked to write up a report addressing the patterns of similarities between the

original Screenplay and Disney's *Pirates of the Caribbean: Curse of the*

*Black Pearl*, which I submit here.


## PRELIMINARY STATEMENT

Disney's film version of *Pirates of the Caribbean: Curse of the Black Pearl,*

which I will refer to herein as the Disney Film, has many qualitatively

significant similarities to the Screenplay.   I considered the following aspects

of the Screenplay and the Disney Film to arrive at my position: plot, themes,

dialogue, mood, setting, pace, characters and the sequence of events.   While

there are various differences between the two works that one could readily

identify, I found substantial qualitatively important similarities across the

categories of mood, tone, pace, sequence of events, themes, plot, character,

and setting, which when viewed in combination, form an overarching pattern

of creative elements which demonstrate creativity and originality, and which

are repeated in the Film.  Some of these similarities, which I will articulate

more fully below, are so nuanced and sophisticated, that they might not be

apparent on first viewing.   Other similarities are immediately apparent.

4

## SIMILARITIES IN BOTH WORKS IN TONE and MOOD

Both works draw from the archetypical pirate narrative, but the Screenplay provides an original contribution to the standard pirate story. One way it does this is by introducing irony and wit, which are interspersed throughout the work. Let me explain by providing you the context for one the Screenplay's innovations to the standard pirate story. Ships-at-sea stories typically include the depiction of power differences and the tensions resulting from those conflicts; male bonding and the shipmen as kin motif; maritime culture including work life and quotidian experience; storms at sea or other unforeseen challenges from nature; the necessity of recruiting a future captain to replace an aging or retiring captain; and the overarching threat of mutiny.

Pirate stories, as a subgenre of the sailor at sea stories, share some of these characteristics but generally follow a different pattern focusing on an individual pirate, who looms large and wields great power among his crew. There is usually the threat of mutiny. In these archetypes, the pirate is presented as dangerous and threatening. Ship stories--and typical pirate stories, especially--share a distinct narrative tone that's based on suspense.

5

They entertain primarily through adventure, and a sequence of thrilling narrative events that are based on an imminent sense of danger.

While the Screenplay and the *Pirates of the Caribbean: Curse of the Black Pearl* can readily be seen as sharing several of these themes, characters, and plot devices (albeit selected and arranged in substantially similar ways as more fully explained below and in Exhibit B), they differ dramatically in tone from typical "pirate" and "sailors-at-sea" stories. And what is this difference? Humor, irony, and wit.

The Screenplay brings something entirely original to this traditional narrative by incorporating a humorous tone to the story. The Screenplay is playful, ironic, and funny. It also goes further by diluting the impeding sense of danger that characterizes pirate stories. While the aspect of suspense remains, the threat of the actual danger is diminished by the Screenplay's playfully entertaining tone and mood. Even the moments suggesting the danger of mutiny are rendered non-threatening in the Screenplay. While there is suspense, there is no fear. The Screenplay presents an original, atypical "spin" on the standard pirate story to appeal to a wider demographic. It maintains much of the suspense and sense of adventure

anticipated in a pirate story, but it does so in what are in my opinion, original ways.   By lightening the tone and mood of the story to include humor, irony, and even satire, the Screenplay deviates from the conventional narrative without completely undermining its effect.   It's still a pirate story—but with a twist.

The Disney Film adapts this ironic and humorous tone from the Screenplay and exploits it throughout the entire film. The Screenplay sets out to entertain a wide and diverse demographic including the coveted family audience.  The lighthearted mood of the Film makes it enjoyable and immensely entertaining.  In my opinion, the Disney Film is a much more enjoyable experience than other films in this genre, and as a result, more commercially viable in part because of the mood and tone.

**SIMILARITIES IN ORIGINAL PATTERNS IN BOTH WORKS IN CHARACTERS**

There are also substantial similarities in the patterns of the main characters. In the Screenplay, the character Davey Jones is introduced as a disillusioned pirate with a drinking problem.  He's also morally suspect, which is to say, it's unclear initially if we are able to identify with him or not.   In the

Disney Film, the character Jack Sparrow (played by Johnny Depp) is also a drunkard of equally questionable morality. Despite their reputations as pirates, others who encounter Davey Jones and Jack Sparrow doubt the legendary status that both these leading characters self-promote.

The second set of analogous male leads, itself an unusual similarity between the Screenplay and the Disney Film, are Captain Jack Nefarious and Captain Hector Barbossa (played by Geoffrey Rush). Both of these men are cunning and sinister figures who despite their off-putting behavior retain a high level of individual charisma.   While both Captain Jack Nefarious and Captain Hector Barbosa are motivated by greed at all costs, they are also immensely entertaining and likeable.    This likeability deviates from the treacherous pirate characterization of the standard pirate narrative and makes these two figures much less menacing.   Both works share the lack of a menacing antagonist and offer instead a highly engaging and entertaining character, thereby making the Screenplay and the Disney Film much more friendly to a mass audience. In my opinion, these are important similarities to the mass appeal of the Film.

8

Further, both the Screenplay and the Disney Film also include a set of central male characters who excel at the skills of a swashbuckler yet maintain the outsider edginess necessary of a pirate.  In the Screenplay, Davey Jones best embodies these elements, but they are also evident in Captain Jack Nefarious.  In the Disney Film, each of the male leads exhibit aspects of this innovative hybrid persona including the "villain" Captain Hector Barbossa.   Captain Jack Sparrow and William Turner, however, are the best example of this new character type, which helps explain their connection throughout the Disney Film.  Typically the archetypal swashbuckler, who performs with swagger and flamboyance in stories of adventure, maintains a level of chivalric decorum even as he fights off the villain.  The pirate, while equally skilled, is often the swashbuckler's nemesis and generally resides on the fringes of society.  The Screenplay ingeniously blurs these two stock characters to create a new type of protagonist with the qualities of both character types.  This hybrid character type combining elements of the swashbuckler and the pirate appears to be an original innovation specific to the Screenplay.   While this manipulation of the standard pirate depiction is at the core of both works, its origins are located in the Screenplay.

9

Finally, in addition to the similar original patterns of the male leads, we add to that pattern the similarity of the lead women in both works. Both of the lead women in the Screenplay (Jane) and the Disney Film (Elizabeth) are lively, adventurous young women who dream of a life beyond the constraints of the port town where they've been raised. Both of these spirited women engage the pirates on nearly equal terms in matters of skill, wit, and athletics. Neither Jane nor Elizabeth is the standard "Damsel in Distress" in need of rescue. In both works, the women are thrown overboard and into the sea by the main villain pirate while the male romantic lead begs him to "let her go!" Also, Jane and Elizabeth share a sense of resilience even as they are used as bargaining chips between the competing male pirates. They are more than merely love interests; they are full dimensional romantic matches. Both the Screenplay and the Disney Film feature this strong female heroine who share the same physical characteristics, age, and temperament and function the same in both works. And both the Screenplay and the Disney Film share dialogue claiming that it's bad luck to have a woman on a ship, a line that foreshadows the power each of these women will later display.

10

EXHIBIT J

Both female leads also help rescue their love interest from the trappings set by the rival ship captains in the Screenplay and the Film.   Again, I find it striking that the Disney Film's depiction of Elizabeth functions so similarly as the Screenplay's Jane, especially given the similarities of the Davey Jones/Jack Sparrow and Jack Nefarious/Hector Barbossa characters.   These women characters are important qualitatively in both works.   Their incorporation into the story introduces the element of romance, which becomes increasingly significant to the plot as the story develops.   This aspect of romance also contributes to the commercial viability of both works.   The love story enabled by the presence of a strong and attractive woman character expands the typical demographic of the pirate film to appeal to women and young girls, two overlapping groups who generally are not the genre's targeted audience.


**SIMILARITIES IN ORIGINAL PATTERNS IN BOTH WORKS IN THEME, PLOT, and SEQUENCE OF EVENTS**

There are many other elements in *Pirates of the Caribbean: Curse of the Black Pearl* that overlap with the Screenplay and therefore merit attention. The most obvious similarities have to do with the fact that both scripts feature pirate ships with skeleton crews. In both works, these skeleton crews

11

mainly surface at night during scenes of epic battle and provide a sensational thrill-driven aura to the story.  Both works also rely on a curse or a haunted legend that the characters in each story set out to rectify or undue, a quest that involves in both cases the search for lost or stolen treasures on remote islands.

In each story, a younger pirate finds redemption through romance.  Thus, both share, as one of their common themes, the moral that there is more to life than greed and the search for wealth.  The entire community of the original Screenplay, including the set of comic young rascal scoundrels, endorses and supports this romantic ending, and everyone benefits from the union of the couple.   In the Disney Film, the younger pirate similarly wins the approval from the other men who hold power in the British Empire, and who initially rejected him as a suitor to the main female lead.

The Screenplay and the Disney Film also share a common theme of mentorship of male orphans. In the Screenplay, this is most evident in the presentation of the rascal scoundrels, who are orphan boys.  While the boys form a caring bond among themselves, they are also drawn to Davey Jones as a mentor figure.  They believe that Jones can help them become better

12

pirates.  By the end of the Screenplay, Jones appreciates the orphans for more than just their bravery and success at sea.  He chooses to build a family with Jane and the orphans, and decides to raise the young boys as his own.

Similarly, in the Disney Film, a young William Turner (Orlando Bloom) is orphaned in the opening prologue of the film.   While the Disney Film's Will Turner has some aspects of the personality of the Screenplay's Davey Jones, as outlined above, he also shares some similarities with the Screenplay's orphans. Like the young rascal scoundrels in the Screenplay, young Will Turner seeks out mentors, beginning with the drunken blacksmith who trains him in his trade, and including Jack Sparrow, with whom he learns about the pirate culture and his father's history. Similarly, like the young rascal scoundrels from the Screenplay, Will is a capable and ingenious fighter whose participation in the pirate battles lead to the defeat of the main antagonist villain.

With respect to the sequence of events, the Disney Film begins with a prologue that introduces some of the main characters and sets up some of the plot points that will be explored throughout the story. The action of the Film's prologue takes place entirely on a ship at sea.  This prologue is set

13

EXHIBIT J

eight years before the actual story begins and the story resumes eight years later and stays consistently in that time frame until its conclusion.   There is no precedent in the genre of the pirate story to encourage such a prologue; in fact, it's highly atypical in my opinion.

Similarly, the Screenplay begins with a prologue set in 1602 where the main plot device of retrieving the missing map is introduced in a showdown between the two leads, Davey Jones and Captain Jack Nefarious.   The prologue begins with a conflict on the ship that throws us immediately into the pirate story.  In a quick sequence of events, we meet the major players, including Jane, the female love interest, who will later be revealed to have a more significant role.  The struggle between Davey Jones and Jack Nefarious takes place at sea during a storm and involves a series of reveals and betrayals.   The prologue concludes with a sea monster attacking the ship and leaving everything in chaos.  The story then resumes ten years later, in 1612, and stays consistently in that time frame until its conclusion.  While the plot points in the two prologues may differ somewhat, the prologue itself functions in the same way in both works.

14

In the Screenplay and the Disney Film, the prologue functions as a framing device.   In both works, it provides a backstory for some of the lead characters that feature prominently in the main story and offers a historical context for the central themes and concerns of the primary story.  In both works, the prologue sets the foundation for the plot and introduces the motivation for the main characters.  In both works, it also sets the tone and mood of the story, which in this case, can be categorized as adventurous, suspenseful, and entertaining.  In both works, there is unfinished business introduced in the prologue that will be revisited approximately a decade later in both stories.  In both works, we meet some of the major players in the prologue, including the female lead. In both works, the action takes place on a ship in rough seas under threatening skies. In both works, there is a conflict on the ship that throws the viewer into the pirate story.  The prologue is a device borrowed from classical and medieval literature, mainly drama, and its incorporation in the Screenplay, and the way it is utilized, is sufficiently creative and original in my opinion.

I was surprised to see that the Disney Film also begins with a prologue set nearly a decade before the actual main story.   And while the time period (the early 18th century rather than the early 17th century) and while the

15

EXHIBIT J

duration between the prologue and the rest of the story, differs ever so slightly, the function of the prologue in the Disney Film is identical to that of the Screenplay.   It too begins at sea and introduces key themes, characters, and symbols that will permeate the rest of the Film.

Furthermore, both prologues leave us wondering who survived the conflicts at sea, something that both the Screenplay and the Disney Film address in the later sequences. These later sequences in both the Screenplay and the Disney Film underscore the impact of betrayals set up in the backstory of the prologue between the two male protagonists, who were once allies.   This is the same in both works.  In the Screenplay's prologue, Davey Jones and Captain Jack Nefarious are at opposite ends in a "merciless battle" pitting pirates against privateers.   Captain Jack Nefarious, in a double-betrayal, turns first against his crew of pirate hunters, and then against Davey Jones for complete control of the map leading to the location of the treasures. Similarly, in the Disney Film, after the prologue, we learn of the mutiny of the Black Pearl ship by Hector Barbossa who betrayed Captain Jack Sparrow, a fellow pirate who previously was his friend, advisor, and ally.

The Disney Film also resembles the Screenplay in its climatic ending in two qualitatively important respects.   First, the Screenplay ends with a love resolution, nearly as if in a Shakespearean comedy, where the figures blocking the romance between the leading male and female (Davey and Jane) are removed.  Further, the couple gains the support of their community, thus insuring a happy ending.   The Disney Film borrows this structure with Will Turner and Elizabeth Swann's romance, which like in the Screenplay, must endure a sequence of nail-biting episodic events that they maneuver through and survive in order to solidify their bond.  By the end of the Film, Norrington (Elizabeth's initial suitor) and Govenor Swann (Elizabeth's father) endorse the young lovers' relationship having at first vehemently disapproved.  The element of romance that was so central to the Screenplay, and also one of its major innovations to the typical pirate story, also appears in the Disney Film.  This plot device, where the success of the lovers is central to the story's climax, appears in both works.

Furthermore, the Disney Film, like the original Screenplay, sets out to resolve the dilemma of the lovers as much as that of the pirates.  The narrative momentum in each work invests equally in bringing the lovers together, a somewhat unusual overlap between the two works given the

17

EXHIBIT J

genre. Davey learns that the treasure he was seeking was always right there in front of him: love and family.   The Film similarly ends on the note that love wins, as the community bonds to celebrate the hard fought union of Will Turner and Elizabeth Swann.   Both the Screenplay and the Disney Film focus on the heterosexual romance between the male and female leads as much as they do the antagonistic duals between the two male pirate leads.

There is also a second significant plot point in the sequence of events where the endings substantially overlap. Both the Screenplay and the Film locate their final epic showdown in a remote and ominous cave that is inaccessible except by small boats. This final battle in the Screenplay takes place in the "Lost City in the Caribbean Coves," which is inhabited by the skull-faced pirates who emerge to attempt to fend off Davey Jones, Jane, and the young rascal scoundrels.  Similarly, in the Disney Film, the final showdown between Jack Sparrow (joined by Will Turner and Elizabeth Swann) and Hector Barbossa occurs in a cavernous location equally distant and inaccessible to the other seamen except through smaller boats.   This final scene also summons the phantom skeleton crew pirates to engage in battle. This similarity is a significant one in and of itself.  The climactic endings of the Screenplay and the Disney Film are strikingly similar in form and

18

content. This combination of multiple elements, including a pattern of main

characters, similar themes, and sequence of events, mood, tone, and pace are

original in the Screenplay; a similar pattern of elements emerges in the

Disney Film.    There are more similarities regarding sequence of events

identified in the Opening Brief (Ex. B).


## SIMILARITIES In BOTH WORKS IN PACE, SETTING, and DIALOGUE

The two works also share the same pacing.  The Screenplay is composed of

a sequence of fast-paced episodes that maintain the story's narrative

momentum.   This adventurous pacing delivers and sustains the story's

excitement and suspense.  The Screenplay's setting is primarily located on

the Caribbean seas where much of the action unfolds.   But the Screenplay's

setting can also be placed on the ship itself, which becomes the site where

the interpersonal dynamics of the main characters plays out, and in the cave

where the climatic battle ensues.  The Film's pace and setting are virtually

identical to the Screenplay; in each work the pace and the setting contribute

to the overall appeal of the story, albeit not atypical for the pace and setting

to be similar in this genre (which is why I have addressed this last.) As for

the dialogue:  there are also moments when characters in the Disney Film

19

EXHIBIT J

echo the words written in the Screenplay.   The Appellants' Opening Brief identifies many of these overlaps, and I have mentioned one or two above. I concur with the findings in the Brief and would add that although the similarities in the Dialogue, Setting, and Pace between the two works are among the most obvious points, there are substantial and more sophisticated similarities less immediately apparent to be made here, all of which are outlined above (or in Exhibit B).

**CONCLUSIONS:**

The overlap of character, plot devices, tone and mood, sequence of events, and major themes between the Screenplay and the *Pirates of the Caribbean: Curse of the Black Pearl* is significant and substantial.   While there are several tropes typical of pirate stories in both works, the manner in which these tropes are selected and arranged within the Disney Film suggests a prior familiarity with the Screenplay in that they are very similar.   The ten-year prologue, which introduces the story, and the happy romantic ending following a battle in a cave, which concludes it, are nearly identical in both works.  The narrative content that appears within this framing device, largely set forth in Exhibit B, has enough similarity to support my opinion that there are substantially similar qualitatively important patterns that appear in both

works.   The Screenplay sets into motion a sequence of adventurous events that build great suspense and provide highly entertaining, often amusing, results.    The Disney Film shares this ironic tonality and a similar fast-paced and suspenseful narrative momentum.

In conclusion, I believe that the Screenplay and *Pirates of the Caribbean: The Curse of the Black Pearl* share multiple original patterns of similarities. In other words, in my opinion the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film. Furthermore, although some of the similarities are more nuanced, the selection and arrangement of these elements point to a pattern of resemblances first found in the Screenplay.  In my opinion, the Screenplay is a first-rate piece of original writing, showcasing a brilliant and highly innovative retelling of the standard pirate narrative.  Some of the Screenplay's creative innovations, which I have outlined above, constitute sufficiently original, atypical contributions to the pirate storyline not evident before in the literature that I am familiar with.

Based on my thorough analysis, I believe that the Disney Film *Pirates of the Caribbean: The Curse of the Black Pearl* borrows heavily from the Screenplay, and does so in a very sophisticated manner that obscures the plagiarism at first glance. A thorough analysis, however, reveals that the Disney Film substantially relies on the major original innovations of the Screenplay for its success. The Disney Film becomes a better more dynamic and entertaining film, and subsequently a more commercially successful one, based on what it mimics from the Screenplay. The Screenplay's originality, which I have outlined above, appeals to a much broader audience than the standard pirate narrative. Disney's film *Pirates of the Caribbean: The Curse of the Black Pearl* effectively loots the innovative treasures originally found in the Screenplay.

Respectfully submitted,

David Román

_____

David Román

Professor, Department of English, University of Southern California

22

# EXHIBIT "A"

EXHIBIT J

# David Román, M.A., PhD

Department of English
University of Southern California
Los Angeles, CA 90089-0354
e-mail: davidr@usc.edu

**ACADEMIC DEGREES:**
- The University of Wisconsin-Madison; Doctor of Philosophy: Comparative Literature (1990)
- The University of Wisconsin-Madison; Master of Arts: Comparative Literature (1984)
- The University of Wisconsin-Madison; Bachelor's Degree: Comparative Literature (1981)

**EMPLOYMENT:**
- University of Southern California, Professor, Departments of English and American Studies (2003-present).
- University of Southern California, College Director of Faculty Development (2005-2008)
- University of Southern California, Associate Professor, Department of English and American Studies (1998-2003)
- University of Southern California, Assistant Professor, Department of English (1995-98)
- Yale University, Assistant Professor, Women's Studies Program (1994-95)
- University of Washington, Assistant Professor, Department of English (1991-95)
- Pomona College, Visiting Assistant Professor, Department of English, (1990-91)
- Macalester College, Instructor, Department of English, (1989-90)

**CONSULTANT ON GRANT AWARDS SELECTION MATTERS:**
- MacArthur Foundation, 1995-2020
- Guggenheim Foundation, 2000-2020
- Various national, state, and city grant commissions on the Arts

**AWARDS AND HONORS**:
- Visiting 2018 Fellow, University of London, Royal Central School of Speech and Drama, 2018
- Distinguished Messenger Lecture Professor, Cornell University, Fall 2015
- Distinguished Scholar-in-Residence, Arizona State University-Tempe, September 23-29, 2012
- Dornsife Faculty Fellow, 2011-2013
- 2010 Visiting Fellow at the University of Warwick's School of Theatre, Performance, and Cultural Policy Studies, Department of Theatre and Performance.     (Two-week residency for their International Performance Research Program).
- 2006 USC-Mellon Award for Excellence in Mentoring for School-wide Mentoring Programs at the College of Letters, Arts, & Sciences

1

- 2006 USC-Mellon Award for Excellence in Mentoring (Category: Faculty Mentoring Undergraduate Students)
- 2005 USC-Mellon Award for Excellence in Mentoring (Category: Faculty Mentoring Graduate Students)
- 1999 ATHE Award for "Outstanding Book of the Year" *for Acts of Intervention: Performance, Gay Culture, & AIDS*
- 1999 Lambda Literary Award for Drama, *O Solo Homo: The New Queer Performance*
- 1993 University of Pennsylvania Mellon Fellowship in the Humanities
- 1990 Postdoctoral Minority Scholar in Residence at Pomona College

**PUBLICATIONS:**
**Books:**
- *The Mac Book* (a collection of critical essays on the performances of Taylor Mac, coedited with Sean Edgecomb)
  - o (Ann Arbor: University of Michigan Press, 2021)

- *Tarell Alvin McCraney: Theatre, Performance, Collaboration* (a collection of critical essays edited with Sharrell Lockart and Isaiah Wooden)
  - o (Evanstan, Il.: Northwestern University Press, 2020)

- *Performance in America: Contemporary US Culture and the Performing Arts*
  - o (Durham: Duke University Press, 2005.)
  - o **[Finalist for ASTR's Outstanding Book of the Year]**

- *Acts of Intervention: Performance, Gay Culture, & AIDS.*
  - o (Bloomington, IN: Indiana University Press, 1998.)
  - o **[Winner of ATHE's 1999 "Outstanding Book of the Year" Award]**

- *O Solo Homo: The New Queer Performance.* An anthology of solo performance texts co-edited with Holly Hughes. (New York: Grove Press, 1998.)
  - o **[Winner of 1999 Lambda Book Award for Drama]**

**Articles & Essays:**
- Over 30 publications in peer-reviewed journals in the Arts and Humanities including:
  - o "The Distant Present of Tarell Alvin McCraney," *American Quarterly*, 2014
  - o "Reviving AIDS: The Normal Heart on Broadway," *Art, AIDS, America*, 2015
  - o "Remembering AIDS: A Reconsideration of the Film *Longtime Companion*," GLQ 2008
- Over 20 published reviews on the theatre, music, and performance in peer-reviewed articles in the Arts and Humanities including:
  - o Rev. of *What Do We Need To Talk About? Conversations on Zoom* by Richard Nelson, Public Theatre, New York City, *Theatre Journal* 2020

2

    o   Rev. of *Ms. Blakk for President* by Tina Landau & Tarell Alvin
        McCraney, Steppenwolf Theatre, Chicago, *Theatre Journal* 2020.
    o   Rev. of *Two Trains Running* by August Wilson, Matrix Theatre, Los
        Angeles, *August Wilson Journal* 2019
    o   Rev. of *Hamlet* by William Shakespeare, Almeida Theatre, London and
        Public Theatre, NYC, *Theatre Journal* 2018.
    o   Rev. of Sweat by Lynn Nottage, Oregon Shakespeare Festival, Ashland
        *Theatre Journal* 2016.

## EDITORIAL PROJECTS:
**Editor:**
- *Art Works: A Special Double- issue of GLQ on the Arts* coedited with Richard
  Meyer.  (12:2/12:3) Duke University Press, 2006.

- *Theatre Journal.*  2000-2003, published quarterly by the Johns Hopkins
  University Press, The official journal of the Association for Theatre in Higher
  Education (ATHE).

**Book Series Editor:**
    *Triangulations.* Coeditor with Jill Dolan. University of Michigan Press.
        *(30  published books in series since 1999)*

**Editorial Boards**: *PMLA, Theatre Journal, GLQ, Aztlan, American Literature*

## LECTURES:
**Keynote and Invited Lectures (USA):**
- Stanford University (2013, 2010, 2002)
- Harvard University (2011, 1996)
- Brown University (2019, 2006, 2003)
- Yale University (2010)
- Princeton University (2012)
- Columbia University (2008, 1995)
- Cornell University(2015)
- University of Pennsylvania (2006, 1994, 1993)
- Dartmouth College (2018)
- Swarthmore College (2007)
- Oberlin College (2003)
- Mount Holyoke College (1995)
- Macalester College (2016)
- Scripps College (2003)
- Carlton College  (2016)
- Pomona College  (2002)
- Vassar College (2000)
- University of California-Berkeley (1998, 2000)
- University of California-Los Angeles (1997, 2002, 2010)

3

- University of California-Davis (2008)
- University of California-Santa Cruz (2003)
- University of California-Riverside (1996, 2002)
- University of California-San Diego (1996, 2001)
- University of Minnesota (1996)
- University of Colorado (2000)
- University of Oregon (2003)
- University of Wisconsin (2015, 2013)
- University of Iowa (2008)
- University of Michigan (2006)
- University of Texas (2005, 2002, 2001)
- City University of New York Graduate Center (2017, 2000, 1995)
- University of Illinois (2006)
- Arizona State University (2012)
- Rutgers University (YEAR)
- University of Maryland (2012, 2007)
- Duke University (2003, 2002)
- Northwestern University (2016, 2010, 2002, 1995)
- Georgetown University (2005)
- Tulane University (1993)
- New York University (2006, 2002)

**Keynotes and Invited Lectures (International)**
- University of London (2018)
- University of Warwick (2010)
- University of Toronto (2002)
- University of Guelph (2002)
- University College Dublin (2005)
- The International Federation of Theatre Research, Jaipur, India (2003)
- International Conference on American Drama and Theatre, Seville, Spain (2012)

**LEGAL:**
- Copyright matters: case settled before analysis complete; party information unknown, 1990s

- Expert Witness, O'Donnell & Schaeffer  LLP
  Consultant on Copyright Infringement Case
  Export report, Mediation meeting, 2003 - 2004

4

# EXHIBIT "B"

# No. 19-55669

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

ARTHUR LEE ALFRED, II, ET AL.,

*Plaintiffs-Appellants*,

v.

THE WALT DISNEY COMPANY, ET AL.,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the Central District of California
No. 2:2018cv08074
Hon. Consuelo B. Marshall

## APPELLANTS' CORRECTED OPENING BRIEF

Steven T. Lowe, Esq.
Lowe & Associates, P.C.
8383 Wilshire Blvd. #1038
(310) 477-5811
Email: steven@lowelaw.com

*Attorney for Appellants*
Arthur Lee Alfred, II
Tova Laiter
Ezequiel Martinez

Pages 1-8 and 26-46
Have Been Redacted from Exhibit B to
David Roman's Report

Redacted

**B.    Statement of Facts**

Access to Appellants' work is undisputed (ER 97) and there are significant

and substantial similarities between the Screenplay and the Film with respect to the

film's plot, theme, dialogue, mood, setting, characters, pace and sequence of

events. As more fully set forth hereinbelow, the Court must consider them in

combination and **is not permitted to exclude any of them** (as the lower court did)

prior to performing its analysis. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S.

340, 349 (1991) ("if the selection and arrangement are original, [unprotectable] elements of the work are eligible for copyright protection"); *Williams v. Gaye*, 885 F.3d 1150, 1181 (9th Cir. 2018) ("substantial similarity can be found in a combination of elements, even if those elements are individually unprotected"); *see also Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000) ("It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because the over-all impact and effect indicate substantial appropriation.*") (internal quotations omitted)*; see also, Metcalf v. Bochco*, 294 F.3d 1069, 1073 (9th Cir. 2002) ("The extrinsic test is an objective one that focuses on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events.").

### 1.    Characters

a)    <u>Main Character: Captain Davey Jones v. Captain Jack Sparrow</u>

In the Screenplay, Davey Jones is described as a cocky, dashing young rogue who is a talented pirate (ER 221). Similarly, in the Film, Jack Sparrow is a dashing young rogue character that is cocky, and a highly adept pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:08:52; 00:09:43; 00:09:58). For example, in the Film, Jack Sparrow struts down the plank of a boardwalk to steal a ship, taunts British guards by saying "but you have heard of me" and flashes a coy smile at the guards while stealing their ship (*Pirates of the Caribbean: The Curse*

*of the Black Pearl*, at 00:11:40; 00:18:20; 00:46:50).

Both Jack Sparrow and Davey Jones are also morally ambiguous, opportunistic and more concerned with rum than piracy. The character of Captain Jack Sparrow is introduced as a morally ambiguous, opportunistic pirate who is more concerned with his ship, the Black Pearl, rum and women, than being a pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:10:29; 00:10:41; 00:12:10; 00:44:13; 01:36:00-01:39:00; 01:40:20-40). It is said of Jack Sparrow early in the Film: "That is without a doubt the worst pirate I have ever seen." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:17-20; 00:46:40). Similarly, in the Screenplay the Rascal Scoundrels question Davey Jones' reputation saying: "the great Davey Jones, huh? That's some legend you've got there" (ER 242).

Davey Jones has a significant alcohol problem and is disillusioned with piracy (ER 247-49; 252). Similarly, Jack Sparrow has a significant alcohol problem and is also disillusioned with piracy (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:53:58; 01:35:40-01:36:40; 01:41:01). Both Jones and Sparrow want to be known as great pirates, and are even encouraged at some point to be the pirates they once were, or that legend claims them to be (ER 279) (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:18:20; 01:37:17); however, they routinely fail at doing so. The Rascal Scoundrels are disappointed in Davey

Jones, who is always drunk, (ER 242; 248-49; 279; 285) just as others are

disappointed in Jack Sparrow who is always drunk (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:53:58; 01:35:40; 01:39:00).[7]

> b)    Main Character: Captain Jack Nefarious v. Captain Barbossa

In the Screenplay, Captain Jack Nefarious is sinister, morally ambiguous and

opportunistic. Nefarious is a pirate that is more concerned with finding treasure by

any means necessary, including forcing Davey Jones overboard while taking his

ship (ER 229-30). Similarly, in the Film, Captain Barbossa is seen as sinister,

morally ambiguous and opportunistic. For example, Barbossa betrays Sparrow,

maroons him on an island and hijacks the Black Pearl. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:25). Nefarious/Barbossa were originally

Davey Jones'/Jack Sparrow's first mates and the pairs quickly become arch-rivals

in both the Screenplay and the Film (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:45; 00:53:12; 01:07:00; 01:52:25) (ER 223-228; 312-317). In

---

[7] Appellees can appropriate Appellants' work without making the characters *identical* (*see*, §VII.(D)., *infra*); superficial or non-exact, or general similarities must be taken into consideration in the analysis. *See, e.g., L.A. Printex Indus., Inc. v. Aeropostale, Inc.,* 676 F.3d 841 (9th Cir. 2012) (it is not necessary that Defendants' design be 'virtually identical' to infringe). Furthermore, the Court should only look at the similarities and not the differences. *See, Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936) (a plagiarist cannot excuse his wrong by showing what he "did not pirate."). The similarity of the Jack Sparrow character is just the tip of the iceberg as to what Disney copied from the Screenplay.

yet another parallel, Nefarious and Barbossa both even shoot their own crew member to further their own objectives (ER 303) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:13:03). However, both characters somehow remain infinitely likable and charming in their own way. *See generally,* Screenplay and Film.

  c) <u>Supporting Characters: Rascal Scoundrels v. Jack Sparrow's Crew</u>

In the Screenplay, the Rascal Scoundrels are introduced as a ragtag crew of orphans, fiercely loyal to Davey Jones (ER 231-32; 236). The Rascal Scoundrels are immature, as demonstrated by their slapstick humor, yet they have violent tendencies (ER 234-36; 241; 243; 257; 313-14). Appellants' Screenplay depicts this crew of Rascal Scoundrels led by a dissolute, charismatic pirate captain – Davey Jones (ER 234; 272). The Scoundrels, as orphaned children, are fascinated with the pirate life (ER 241-42).

In the Film, (as in the Screenplay,) Jack Sparrow's crew is introduced in a shipping port town: they are all simple-minded and childlike (engaging in juvenile slapstick humor,) yet have violent and opportunistic tendencies. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:50:43; 1:01:06). While Jack Sparrow's crew may not be children, they are very childlike in behavior. Furthermore, Pintel and Ragetti (albeit members of Barbossa's crew) provide comic relief throughout the Film, such as when they dress up as women to confuse

British soldiers, but are also shown as having violent tendencies, similar to the Rascal Scoundrels in the Screenplay (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:30:51; 01:49:07-24).

In yet another purported coincidence, the character Stink in the Screenplay is described as round and plump, with a funny pudgy face, gulping down the last piece of whatever he was eating. Stink is vile and smelly (ER 232; 235; 241). In the Film, the character Gibbs, who is round and plump with a pudgy face, is known to sleep with pigs and is also described as smelly (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:31; 00:52:11).

> d)     <u>Supporting Character: Jane v. Elizabeth</u>

In the Screenplay, the character of Jane, is a young woman who lives in the shipping port town, and longs for adventure on the high seas (ER 232; 254; 267-71). Similarly, in the Film, Elizabeth is a young woman who lives in the shipping port town and dreams of pirates and adventure on the high seas. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:32-00:00:52; 00:01:55). In fact, she says "I think it'd be rather exciting to meet a pirate" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:25). Both Jane/Elizabeth rise to the occasion to become fierce warriors and competent pirates, far from being the stereotypical "damsel in distress." (ER 268-272) (01:59:53). In addition, both Jane/Elizabeth are sly and cunning, tricking Nefarious/Barbossa to prevent them

13

-45-

EXHIBIT J

from finding the final treasure (ER 271) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:39:45).

### 2.     Pace and Sequence of Events

The pace and sequence of events in the Screenplay is mirrored in the Film. The Screenplay is fun and fast-paced. The Film is also fun and fast-paced. The sizzle reel prepared by the Plaintiffs that accompanied their Screenplay envisions a fast paced, feature-length film (ER 76).[8] The following is a synopsis of the sequence of events of the Screenplay and the Film:

The Screenplay and Film both uniquely begin with a prologue set around ten years earlier that introduces the characters and love interests before the story begins. (ER 220) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:27). In the Screenplay, a privateer ship and a pirate ship exchange cannon fire while Jane and Davey Jones first appear (ER 220). The opening of *The Curse of the Black Pearl* shows the aftermath of a privateer ship torn apart by cannon fire after being attacked by pirates where Elizabeth first meets Will (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:02:26-00:02:54). Thereafter, in the Screenplay, Davey Jones is engaged in a series of battles with his arch rival and former first mate, Captain Jack Nefarious (ER 223-28; 298-307; 312-17).

---

[8] Because Appellants were denied leave to amend, the "sizzle reel" never became part of the record. This is another reason leave to amend should have been granted, at a minimum. *See*, § VI(F)., *infra*.

Similarly, in the Film, Jack Sparrow and his crew are thereafter engaged in a series of battles with his former first mate, Captain Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:10; 01:25:11-02:01:36).

In both the Screenplay and the Film, the Davey Jones and Jack Sparrow characters are formally introduced at gunpoint (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:17:40) (ER 221). The backstory to Captain Barbossa in the Film is that Barbossa initiated a mutiny where Jack Sparrow was kicked off the Black Pearl so that Barbossa could commandeer the ship to seek treasure. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:06:25). Similarly, in the Screenplay, Captain Nefarious' rivalrous history with Davey Jones begins when Nefarious betrays Davey Jones, taking his ship and treasure map (ER 220-30).

Both works continue when Nefarious/Barbossa attack the shipping port town in the present looking for key items they need to get to the treasure (ER 263-67) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:08-00:37:10). In both battles, the supernatural pirates are first revealed (ER 265) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:10). [9] During the course of the

---

[9] Appellees have argued that in the Screenplay "Stitch and Dagger are not ghosts, but pirates with their faces painted to look like skulls." (ER 91). However, Stitch and Dagger are in fact "ghostly looking", as revealed in the Screenplay (ER 265-266). The use of "skeleton faces" in the Screenplay is substantially similar to the supernatural/undead pirates in the Film. Also, the main character Nefarious is referred to as a ghost and "Phantom Jack" throughout the Screenplay (ER 213-323).

battle, both Davey Jones/Jack Sparrow manage to escape unscathed (ER 278)
(*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:44:28). However, in
both, Nefarious/Barbossa also manage to take Jane/Elizabeth captive, imprisoning
them on their ships (ER 281) (*Pirates of the Caribbean: The Curse of the Black
Pearl*, at 38:00)

Next, Davey Jones/Jack Sparrow and their crews make their way to an
ominous island (ER 283) (*Pirates of the Caribbean: The Curse of the Black Pearl*,
1:05:08). In the Screenplay this occurs on "Calavera Island," (ER 283); in the
Film, it occurs on "Isla de Muerta," (*Pirates of the Caribbean: The Curse of the
Black Pearl*, 01:05:08).[11] Both islands hold the promise of the final treasure, but
leave the characters disappointed by the actual outcome (ER 280) (*Pirates of the
Caribbean: The Curse of the Black Pearl*, at 01:12:33).

After leaving the island, Davey Jones/Jack Sparrow endure a series of
conflicts with Nefarious/Barbossa that culminate in a fierce ship battle as the
characters reach the cavern containing the final treasure. (ER 300) (*Pirates of the
Caribbean: The Curse of the Black Pearl*, at 01:50:45) During both battles, the
characters escape the ships by rowboat to enter the treasure cavern (ER 300)

---

[11] Translating the names of both islands from Spanish reveals that even the names
are similar. "Calavera Island" means "Skull Island," while "Isla de Muerta"
translates to "Island of the Dead." Both islands also have physical attributes that
include half-submerged skulls (ER 283) (*Pirates of the Caribbean: The Curse of
the Black Pearl*, 01:05:08).

(*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:50:38)

Once the characters enter the cavern in the climax of both the Screenplay and the Film, Davey Jones/Jack Sparrow fight Nefarious/Barbossa and their supernatural crews over the sought after treasure (ER 312-317) (*Pirates of the Caribbean: The Curse of the Black Pearl*, 01:52:25-02:00:00). Both battles show swords sticking through the rib cages of skeletons, (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:55:48) (ER 315) and during this swordfight, Barbossa/Nefarious say to their adversary that they "can't die"/"can't [be] beat" (ER 315) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 1:55:16-18). However, Davey Jones/Jack Sparrow find a way to defeat their adversaries and flee the cavern by rowboat with Jane/Elizabeth (ER 316) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). Despite both caves being filled with gold and jewels, Davey Jones/Jack Sparrow only end up being able to take a small fraction of the treasure with them while escaping the cavern (ER 316) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). As they emerge from the treasure caverns Davey Jones/Jack sparrow are finally rescued, not by their crews, but by privateer ships (ER 320) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:37). Both works conclude in the bay of the port town, with Davey Jones/Jack Sparrow aboard their respective ships, and returned to their former positions as prestigious captains (ER 321) (*Pirates of the Caribbean: The*

*Curse of the Black Pearl*, at 2:12:00).

Neither the Film nor Screenplay is a love story; they are both action films with supernatural elements. However, both make reference to the importance of romantic relationships – in the Film, Jack Sparrow says that "not all treasure is silver and gold" in reference to Will Turner's relationship with Elizabeth Swan, and in the Screenplay Davey Jones pronounces to his love interest, Jane, that what "we have is far greater than any treasure!" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:09:55) (ER 316).

### 3. Dialogue

The Screenplay and the Film have several instances of similarity of dialogue. In the Film, the Black Pearl is described as "A ship with black sails, that's crewed by the damned" (*Pirates of the Caribbean: The Curse of the Black Pearl*, 00:12:54-55) and in the Screenplay "His ghost sails the seas in his ghost ship" (ER 246). While a black ship with black sails may be common in pirate lore or pirate stories, the use of the description and visual imagery of this ship is strikingly similar; moreover, as discussed *infra,* purported "scenes a faire" are **included** in the analysis. Also, the Black Pearl is "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black*

*Pearl*, at 00:12:54-00:13:00). The Screenplay similarly has the dialogue "Legend says that a big sea monster ate him and spat him out" (ER 246).[13]

A quote from the Screenplay states of Nefarious that "[f]or ten years the Phantom has stopped at nothing… and he'll CRUSH anyone…who gets in his way" (ER 285). In *The Curse of the Black Pearl*, the characters state of Barbossa and his ship that "She's been praying on ships and settlements for near ten years. [And] never leaves survivors." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:52).

In the Film, Elizabeth tells Captain Barbossa, "I hardly believe in ghost stories anymore." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:56:44). Similarly, the Screenplay has the Rascal Scoundrels discussing that the tale of "undead Jack" is an old seaman's tale and not real (ER 250). Further, the existence of cursed pirates is touched on throughout the Film. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:59; 00:37:14; 00:56:30; 00:57:31). Later in the Screenplay two pirates also say "perhaps he be a Ghost! Maybe he thinks he be Phantom Jack" referring to "undead Jack" Nefarious (ER 253). Nefarious and Barbossa's dialogue are mirrored in the works as well. While being attacked both pirate villains state that they "can't die." (ER 315) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:31:32).

---

[13] A sea monster is also prominent in Sequel #1.

In the Screenplay, Davey Jones tries to convince a woman in the tavern that he was once a dashing, swashbuckling pirate (ER 253). In the Film, Jack Sparrow constantly tries to convince everyone of his lore as a great pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:20). Furthermore, both Davey Jones and Jack Sparrow are slapped by women in comedic scenes. In the Screenplay the woman states, "You had that coming, Davey Jones!" (ER 254). In the Film, Jack Sparrow says, "Not sure I deserved that," followed by "I may have deserved that." (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:20-30). While the latter may be funnier than the former, they convey the same message.

### 4. Plot

*See*,"Sequence of Events" § IV(B)(2), *supra;* "Theme" § IV(B)(5), *infra.* In addition to the similarities in plots/sequence of events between the Screenplay and the Film identified herein above, both also contain scenes that are so unique they cannot be considered scènes à faire.

For example, when Jane/Elizabeth are first taken hostage by Nefarious/Barbossa, they are both brought aboard ship where they are taken past crew members before meeting with Nefarious/Barbossa directly. (ER 282) (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:15). In the Screenplay, Jane is heckled by crew members while being escorted across the deck. (ER 281)

After being insulted, one crew member tries to attack Jane before Nefarious intervenes. (ER 282). Nefarious, in response, reprimands the crew member as a warning to the rest of the crew not to harm Jane. *Id.* In the Film, Elizabeth is similarly heckled by crew members on the deck of the ship before meeting face to face with Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:09). As she attempts to respond, she is slapped by one of the crew members (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:13). Just as Elizabeth is struck, Barbossa appears, grabs the crew member's arm and threateningly warns that no one is to lay a hand on her. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:18).

In another uniquely similar scene, male pirates in the Screenplay and Film poorly disguise themselves as women to deceive enemies during battle (ER 269) (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). In the Screenplay, Davey Jones dresses as a "wench" before revealing himself and attacking the invading pirates ( ER 269*). The scene is comedic, with one of the pirates attempting to kiss Davey Jones before he says "Love hurts" and strikes the pirate. *Id.* In the Film, two members of Barbossa's crew dress up as young maidens to create a distraction and mount a surprise attack (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). The otherwise rugged pirates fan each other, even complimenting each other's outfits before viciously engaging in sword

21

EXHIBIT J

fights with enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46).

In yet another remarkable similarity, Davey Jones/Jack Sparrow both take control of their rivals' ghost ships in the Screenplay and Film in almost the exact same manner. In the Screenplay, while Davey Jones is busy fighting Nefarious and his supernatural pirates, Davey Jones' crew is able to climb aboard the unoccupied Phantom Ship. (ER 255). The crew takes control of the ship without Davy Jones, bringing him aboard only at the last minute during a hot pursuit. (ER 274). In the Film, Jack Sparrow's crew also takes the Black Pearl while Barbossa and his crew are fighting Jack and other enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46). After regaining control of the empty Black Pearl without Jack, they likewise welcome him aboard at the conclusion of a hot pursuit. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 02:09:53).

The three comparisons are a non-exhaustive list of scenes from the Screenplay and Film with stark parallels. They are far from similarities of generic pirate elements; they evidence substantial copying.

### 5. Theme

Supernatural elements and undead pirates are one of the main recurring themes of the Screenplay, as it is in the Films. Captain Barbossa says to Elizabeth "You better start believing in ghost stories Ms. Turner, you're in one." (*Pirates of*

*the Caribbean: The Curse of the Black Pearl*, at 1:00:25). The "hook" of the Screenplay and the Film that made it new, different, and exciting was the supernatural theme: supernatural undead/ghost pirates (ER 249; 259; 265; 267-68; 277) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:09; 00:58:54; 01:00:45).

Similarly, the theme of the Screenplay centers on a pirate ghost story. In the Screenplay, Davey Jones discusses ghost stories with the Rascal Scoundrels telling them that "There is no Phantom Jack. It's an old seaman's tale" and that Jack's "ghost ship" is not real (ER 247). But in fact they are (ER 247). In the Screenplay, Stink says that "a big sea monster ate [Jack Nefarious] and then spit him out" (ER 246). In the Film, Captain Barbossa's ship is described as "A black ship with black sails, crewed by the damned" and "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55; 00:13:00).

Indeed, while Captain Barbossa and his crew are not trying to find lost treasure, but rather trying to return it, as argued by Appellees (ER 103), it is a distinction without a difference: Barbossa and his crew are *seeking* treasure (including the gold medallion worn by Elizabeth), which will break the curse that made them undead. This search for treasure advances the main theme and plot of the Screenplay and Film.

Another common theme in both the Screenplay and Film are Davey Jones/Jack Sparrow's redemption. In both works, Davey Jones/Jack Sparrow are first depicted as shells of their former selves (ER 242) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:17-20. However, throughout both works they demonstrate their true character, defeating the rivals that have haunted them and returning to their former glory. (ER 321) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:12:00).

### 6.   Mood

There is slapstick humor in both films. In the Film, the monkey provides slapstick humor throughout, as do the characters of Pintel and Ragetti (members of Barbossa's crew), much like the Rascal Scoundrels do in the Screenplay.

In the Screenplay, the emotion that is invoked when the true nature of the supernatural pirates is revealed is substantially similar to the emotion invoked during the same events in the Film: an eerie mood (ER 249) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:07).

The presence of a black ship, black sails, fog indicating the arrival of the ship, as well as other "common" pirate symbols are used in substantially the same selection and arrangement in both the Screenplay and the Film, to create a similar sinister and foreboding mood (ER 224; 249-51; 255; 295) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:04:45; 00:16:52; 00:29:08;

01:21:43).

### 7.    Setting

The Screenplay and the Film share specific settings of specific scenes. The ghost ship (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55) (ER 246); the port town (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:29:45) (ER 264); and the cove where the treasure is hidden (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:08:08) (ER 309). Again, while not separately protectable, setting **is** one of the elements that must be analyzed. *See, Metcalf v. Bochco*, 294 F.3d at 1073 ("The extrinsic test is an objective one that focuses on "articulable similarities between the plot, themes, dialogue, mood, **setting**, pace, characters, and sequence of events.") (emphasis added).

The foregoing is by no means an exhaustive recitation of similarities, and are anything but random; they are tied together by theme, sequence of events, and major characters. Again, the court must look at the **combination** of these elements and cannot exclude **anything** as the lower court incorrectly did.

Redacted

25

-57-

# EXHIBIT K

1   Steven T. Lowe, SBN 122208
2   Aleksandra Hilvert, SBN 258463
    LOWE & ASSOCIATES, a Professional Corporation
3   8383 Wilshire Blvd. Suite 1038
4   Beverly Hills, California 90211
    Telephone: (310) 477-5811
5
6   *Attorneys for Plaintiffs Arthur Lee Alfred II and*
    *Ezequiel Martinez Jr.*
7

8                   UNITED STATES DISTRICT COURT
9                 CENTRAL DISTRICT OF CALIFORNIA
10

11   ARTHUR LEE ALFRED, II et al.,        Case No. 2:18-cv-08074-CBM-AS
12              Plaintiffs,               **PLAINTIFFS' EXPERT WITNESS**
13                                        **REBUTTAL REPORT**
                                          **REGARDING SUBSTANTIAL**
14        vs.                             **SIMILARITY**
15   THE WALT DISNEY COMPANY et
16   al.,
                                          Judge:  Hon. Consuelo B. Marshall
17              Defendants.
18

19
20
21
22
23
24
25
26
27
28

Pursuant to Federal Rule of Civil Procedure 26(a)(2) and the stipulation of the parties (Dkt. 121), Plaintiffs Arthur Lee Alfred, II and Ezequiel Martinez, Jr. ("Plaintiffs") hereby disclose the Rebuttal Report of Professor David Román on the issue of substantial similarity. Professor Román, who is serving as Plaintiffs' expert witness on the issue of substantial similarity, may present evidence at trial. Professor Román's rebuttal report is attached hereto as **Exhibit A**.

The following is provided without prejudice to Plaintiffs' right to supplement this disclosure in later stages of discovery or to designate additional experts, including rebuttal experts, at the appropriate time and consistent with the parties' agreement, the Federal Rules of Civil Procedure, and this Court's Local Rules.

Respectfully submitted,

DATED:  May 7, 2021            LOWE & ASSOCIATES


By:      _/s/ steven lowe_____
            STEVEN T. LOWE
            Attorneys for Plaintiffs

# EXHIBIT "A"

# PLAINTIFFS' REBUTTAL

Notwithstanding the highly biased testimony of Disney's expert, Mr. James McDonald, [1] there are significant and substantial similarities between Plaintiff's Screenplay *Pirates of the Caribbean* ("Screenplay") and Disney's *Pirates of the Caribbean* ("Disney's Movie"), with respect to plot, theme, dialogue, mood, setting, characters, pace and sequence of events.   As I concluded in my initial expert report, "While there are various differences between the two works that one could readily identify, I found substantial qualitatively important similarities across the categories of mood, tone, pace, sequence of events, themes, plot, character, and setting which when viewed in combination, form an overarching pattern of creative elements which demonstrate creativity and originality, and which are repeated in the Film."

Disney's expert report drafted by Mr. McDonald ("Disney's Report") fails to address several key similarities (which supports a concession of such similarities), intentionally and consistently distorts the works in a self-serving, conclusory manner, and focuses heavily on dissimilarities that I am informed should be disregarded.

## Disney's Report Focuses on Movie Tropes In the Pirate Genre, Which I am Informed Are Largely Irrelevant Under the Appropriate Analysis

A large portion of Disney's Report focuses on generic, *scenes a faire* and the Disney ride (the "Ride") laden with references to old pirate literature and films, stock characters and even an opera from the 1800s.[2]  I am informed that this is the wrong focus since other pirate movies are irrelevant to this case unless Disney is challenging the originality of Plaintiffs' Screenplay work (which it is not the case).  However, it is my opinion that the Screenplay has much more than

---

[1] Mr. McDonald is a longstanding loyal Disney employee.  Mr. McDonald has worked for Disney since 1990 (and in the litigation department since 1997); and has also worked for 20th Century Fox (owned by Disney) from 1977 to 1990.  This speaks volumes about his impartiality; he is <u>not</u> a truly unbiased expert witness. Rep. pg. 32.

[2] As revealed by his C.V., Mr. McDonald does not have experience or education in the history of film.  Even his filmography career is devoid of any reference to pirate films yet Disney's Report mentions a total of <u>*sixty (60)*</u> different pirate books, films or other works. I, on the other hand, have an extensive background in literary history and incorporate film and film theory in my humanities classes at USC.

1

sufficient originality and creativity to constitute an original work, within what I am informed is the requirement of the Copyright Act of a "modicum" of creativity. Also, I am informed that *scenes a faire* are, in fact, considered in a "selection and arrangement" analysis. Instead, I am informed that the focus should be on the core characters in both works, dialogue comparisons, which coalesce in a new take on the pirate genre (and the pirate captain) and the key sequence of events in both works. Those latter elements are at the core of proving the works are, in fact, substantially similar.

Disney's Report, at its core, claims that Plaintiffs' Screenplay is "uninventive" and dismisses any similarities as merely generic. Rep., *passim*. Specifically, it states that, "the similarities and novelties that Dr. Román identifies either do not exist, are common to other pirate films and literature, or exist at such a high level of abstraction that they constitute unprotectable "ideas" instead of the protectable "expression" of those ideas." Rep. pg. 4. I am also informed that Mr. McDonald's unilateral decision to filter out all generic elements is further flawed given such elements are included under the "selection and arrangement" analysis. In fact, Disney's Report uses the term "generic" over 30 times; "genre" over 50 times and "trope" a total of 13 times. I also note that most of the "generic" references are to obscure works which are not widely known [e.g. *The Red Rover* (1827), *The Black Pirate* (1926)] and therefore, I am informed that Disney has not met its burden to provide sufficient evidence that a particular element is, in fact, *scenes a faire*. One can be certain that if Paramount or MGM released a film with the same core elements featured in Disney's Movie, Disney would undoubtedly sue them for copyright infringement. As the 9th Circuit pointed out in reversing the dismissal of this case in 2020, it is also unclear whether these pirate tropes are true tropes or whether they became tropes due to the success of the POTC franchise - in existence since 2003:

> "As Plaintiffs note, expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant. *See* <u>Newton v. Diamond</u>, 388 F.3d 1189, 1196 (9th Cir. 2004). This would be particularly useful in this circumstance, where the works in question are almost twenty years old and the blockbuster *Pirates of the Caribbean* film franchise may itself have shaped what are now considered pirate-movie tropes."

2

_Alfred v. Disney et al_. 9th Cir. 19-55669 07/22/2020; Ninth Cir.

(Hon Paez, Hon. Bade and Hon. Melgren)


Without addressing each element which Disney's Report contends is a _scenes a faire_ (i.e. virtually everything), my opinion is that he has been overly liberal in his conclusions, has relied upon insufficient "evidence", thereof, and has neglected to apply the appropriate analysis, which includes said _scenes a faire_.  To summarize, focusing on the generic elements has very limited relevance where there is no possible contention that the Plaintiffs' work is not sufficiently original.  In fact, as I opined in my original report, the way Plaintiffs combined elements is actually a new twist on pirate genre movies including, but not limited to, "lightening the tone and mood of the story to include humor, irony, and even satire." Pl. Rep. pg. 7.  I further opined that "the Screenplay deviates from the conventional narrative without completely undermining its effect. It's still a pirate story—but with a twist."  Pl. Rep. pg. 7.  McDonald's refusal to see the innovation and reduce the Screenplay dismissively as simply "a generic and uninventive combination of two well-known works ("_Goonies_" and "_Cutthroat Island_") is wrong in my opinion.. [3]  This depiction blatantly disregards Plaintiffs' innovations in their Screenplay, to a much more contemporary version of the antiquated pirate story (which, of course, Disney borrowed from Plaintiffs). [4]


Furthermore, Disney's Report's side-by-side comparison of _The Goonies_, _Treasure Island_ and the artwork which was submitted by Plaintiffs to Disney does not mean that the Screenplay is lacking sufficient originality.   Pitches often connect an original screenplay in conversation with already familiar works to help make the sale (e.g. as one of many examples, it is commonly known that "Stranger Things" is a cross between "E.T." and Stephen King's "IT").

---

[3] Of importance, in stark contrast to Mr. McDonald's assertion on page 3 of Disney's Report, Goonies is _not_ a pirate movie – it is a comedy/adventure about kids who are trying to avoid losing their house by searching for treasure in a small Oregon town.

[4] I am informed that, as alleged in Plaintiffs' First Amended Complaint, Disney's Executive Brigham Taylor ("Taylor") solicited, read, and spent significant time (2 months) considering Plaintiffs' Screenplay; Taylor also sent it to then-Disney's studio head Nina Jacobson. Therefore, Plaintiffs' Screenplay must have been innovative and commercially-viable to be worthy of such extensive studio consideration.

3

It is also widely recognized that combining pre-existing images with a pitch is standard operating procedure in Hollywood.

Also, Disney's Report uses a definition of literary aspects such as plot, character, *etc*. which are grossly antiquated and arbitrary.   For example, the term "plot" is not determined by a 3-act structure exclusively (according to a source cited from 1979).  Rep., Pg. 6.  The 1979 definition used by Mr. McDonald is helpful in the structuring an argument, but it assumes the screenwriters were using this model.  It also assumes that this 3-act model is the only model available to structure a plot, something that isn't actually true.   Therefore, I have not adhered to these definitions and have used what I understand to be currently accepted definitions thereof.

Disney's Report also ignores one of the key findings in my initial report regarding the Screenplay - that Plaintiffs' Screenplay incorporates "humor, irony and wit" and even romance which was a major departure from the typical "tyranny at sea" pirate story. Pl. Rep. *passim*.   While Plaintiffs' Screenplay might include humorous films and pop culture references that Disney's Report cites, both works' use of humor, irony, wit, and romance is one of the ways that the Plaintiffs' Screenplay was able to make the pirate genre commercially appealing to a contemporary audience.  Some of these other stories that the Disney report cites [Gilbert and Sullivan's *Pirates of Penzance* (1879); *Yellowbeard* (1983)] are exclusively comedies, unlike the Screenplay and Movie, which are mixed genres.  The Screenplay is not merely a comedy with pirates, as the Disney Report suggests.  The Screenplay is a far more sophisticated hybrid genre.  As previously pointed out, while there is nothing new under the sun (when each element is broken off and inspected separately), the Plaintiffs' Screenplay is a new twist on an old genre. Pl. Rep., pg. 5-7.

In a similar vein, Disney's Report attempts to refute my opinion to the effect that the likeable protagonist pirate found in both works is "more friendly [and appeals] to a mass audience" by citing a number of popular films of the 1940s and 1950s which feature likeable pirates. Pg. 25.   However, this misses my point:  Plaintiffs' Screenplay combines numerous elements in a creative way. Isolating the nuanced use of likeable pirates in earlier works does not debunk that the two works overlap consistently and substantially. Furthermore, under the

4

selection and arrangement test (which, I am informed, is the law as dictated by the Ninth Circuit) these similarities are considered when looking for similar patterns between the two works.

Even if an element can be traced back to prior existing works that play a prominent role in shaping the genre, this does not automatically mean that the element is a standard or indispensable part of the genre. With this in mind, it is my understanding that even if separate elements resemble those featured in prior works, such similarities are only consequential to the effect that they may establish a particular element is a "*scenes a faire*" (which are nevertheless <u>included</u> in the analysis.

### Disney's Report Fails to Address Key Similarities

It is my opinion that another major flaw with Disney's Report is not what it states - *but what it fails to state*.  Disney's Report ignores numerous detailed comparisons identified in my initial report and instead resorts to putting forth conclusory "differences" which I am informed are not even supposed to be considered under well-established case law.

Defendants cannot escape the truth that the pace and sequence of events in the Screenplay is mirrored in Disney's Movie which include: 1) a unique prologue around 10 years earlier (whereby both main protagonists are introduced at gunpoint); 2) villains attacking a shipping port town looking for key items; 3) protagonist pirate losing his prized ship; 4) the protagonists and their crews making their way to an ominous island; 5) followed by a series of conflicts with the antagonists; 6) concluding with a climactic scene inside a cavern, among numerous other similarities in the sequence of events in both works.  Pl. Rep. 16-17.  The characters are also virtual mirror images of each other in both works.  Pl. Rep. pg.  7-11.  Disney's Movie could have been about a pirate's quest to steal a ship or a lifetime supply of rum; or about taking over a port town.  The main protagonist could have been a privateer saving the town from the evil pirates.  However, it was not.

At some key points, Disney's Report even admits similarities do exist – but qualifies the same by saying they "exist at such a high level of abstraction that they constitute unprotectable *'ideas'* instead of the protectable *'expression'* of these ideas."  Rep., Pg. 4.  However, first of all,

5

exactly when an element transforms from an idea to the expression of an idea is difficult to determine.   I am informed that some writers have opined that once an idea is expressed, that constitutes the expression of an idea.  Moreover, I am informed that ideas, and other unprotectable elements, are still considered when looking for similar patterns in both works under the selection and arrangement test.  Furthermore, as my earlier report points out, the two works "share multiple original patterns of similarities…the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film."  Pl. Rep. pg. 21.  Nevertheless, a non-exhaustive list of similarities which Disney's Report failed to refute is as follows:

1.      Disney's Report does not dispute that the function of the prologue in both the Screenplay and the POTC is similar.   While the Disney Report points out differences in the actual details of each respective prologue (i.e. the female lead is a child in one and a young lady in the other), *it cannot challenge the importance and function of the prologue to the overall narrative.*  Of course there are stories with prologues, and maybe even some pirate stories have prologues, but Disney's Report recognizes that the prologues at issue herein do much more than what prologues generally do.    Every prologue is different and serves a specific function to its story.  And even here, while some details in plot vary, the sequence of them remains similar.   Finally, despite Disney's allegation that the Disney Movie's prologue does not create a conflict, it is my opinion that said prologue was rife with conflict (e.g. whether the boy lost at sea was a pirate, whether pirates exist, whether they will attack the governor's ship, etc.)

2.      Disney's Report does not dispute that Plaintiffs' Screenplay's choice to highlight the heterosexual love plot was innovative, apparently it was innovative enough to use in Disney's Movie.  Pl. Rep., pg. 18-19. The Disney Report attempts to undermine this claim by (again) citing examples of romance in other pirate stories.   However, it is the similarity of this pattern whereby the Screenplay successfully maintains both major plot lines (the pirate adventure, and the heterosexual romance) to the end, that makes this similarity an important one.  The success of both works finale is in the satisfaction from watching the resolution of both the pirate antagonist conflict and the romantic conflict.

6

3.      Disney's Report also attempts to create distinctions in connection with various scenes which truly parallel each other; only by ignoring the glaring similarities and hyper-focusing on the minor differences.  For example, consider the two scenes with pirates heckling women.  Disney's Report ignores that the entire scene has many similarities including: 1) the capture of the female lead; 2) the heckling by a pirate; 3) a slap by the head pirate toward the heckling pirate; and, 4) reprimand/embarrassment.  Just because the men are slapped or kicked in different parts of the body ignores the glaring similarities.  Another example is the scene in _both_ works wherein male pirates are disguised as women "to deceive enemies during battle".  Rep., pg. 9.  Once again, Disney's Report focuses on the minor differences in these scenes (one is trying to evade while and the other is trying to distract) but they are basically identical - and both undoubtedly provide the comedic relief that they are intended to provide.  Disney's Movie could have featured a man dressing up as a farm animal, or an elderly person, or snuck in by a cart or wagon.  Indeed, both works utilize the same vehicle to serve the same purpose.  Finally, Disney's Report attempts to split hairs over the scene in which the protagonists take control of rival ships.  By hyper-focusing on the granular detail, Disney's Report inadvertently highlights the similarity between the scenes.  Both scenes involve the protagonist's crew gaining control over the rival ship where their leader comes on board at the last possible second. Pl. Rep. pg. 22.  These scenes are effectively identical in my opinion.

4.      Disney's Report attempts to refute my expert opinion that neither female lead is the standard "damsel in distress" (Pl. Rep. pg. 10) by saying that Elizabeth _begins_ the story as a classic "damsel in distress" yet she evolves into a stronger female lead.  However, in doing so, Disney actually _admits_ that Elizabeth was actually not a standard damsel in distress - thereby making my point.  Rep. pg. 15.  My initial report emphasized that Elizabeth (like Jane in the original screenplay) is a much more nuanced character and plays a much more advanced role in the plot than simply a stock female role in a typical pirate adventure.

7

5. There are over twenty (20) other similarities in my initial report which Disney's Report fails to refute. [5] For the sake of brevity, instead of analyzing each one in the context of the analysis above, a non-exhaustive list is provided below:

a) My initial report opines that characters who meet the main characters in both works – Davey Jones (Screenplay) and Jack Sparrow (Disney Movie) – "doubt the legendary status that both these leading characters self-promote" despite their reputations. Pl. Rep. pg. 8. Disney does not refute this.

b) My initial report opines that Captain Jack Nefarious (Screenplay) and Captain Hector Barbossa (Disney Movie) are both "cunning and sinister figures who despite their off-putting behavior retain a high level of individual charisma." Pl. Rep. pg. 8. Disney does not refute this.

c) My initial report opines that the characters of Captain Jack Nefarious (Screenplay) and Captain Hector Barbossa (Disney Movie) make their respective works friendlier to a mass audience. Pl. Rep. pg. 8. Disney does not refute this.

d) My initial report opines that the characters of Davey Jones (Screenplay), Captain Jack Nefarious (Screenplay), Captain Hector Barbossa (Disney Movie), Captain Jack Sparrow (Disney Movie), and William Turner (Disney Movie) each embody the "innovative hybrid persona" where they "excel at the skills of a swashbuckler yet maintain the outsider edginess of a pirate." Pl. Rep. pg. 9. Disney does not refute this.

e) My initial report opines that the female characters in both works – Jane (Screenplay) and Elizabeth (Disney Movie) – "share a sense of resilience even

---

[5] The foregoing list does not include the numerous detailed similarities I concurred with which were delineated in Plaintiffs' Corrected Appellant Brief (and which were not addressed in Disney's Report).

8

as they are used as bargaining chips between the competing male pirates." Pl. Rep. pg. 10. Disney does not refute this.

f) My initial report opines that Jane and Elizabeth serve as "more than merely love interests; they are full dimensional romantic matches." Pl. Rep. pg. 10. Disney does not refute this.

g) My initial report opines that "both the Screenplay and the Disney Film share dialogue claiming that it's bad luck to have a woman on a ship, a line that foreshadows the power of these women…" Pl. Rep. pg. 10. Disney does not refute this.

h) My initial report opines that the female characters in both works – Jane (Screenplay) and Elizabeth (Disney Movie) – are important qualitatively in both works and that "their incorporation into the story introduces the element of romance, which becomes increasingly significant as the story develops." Pl. Rep. pg. 11. Disney does not refute this.

i) My initial report opines that the romance introduced by the two female characters in both works "expands the typical demographic of the pirate film to appeal to women and young girls, two overlapping groups who generally are not the genre's targeted audience." Pl. Rep. pg. 11. Disney does not refute this.

j) My initial report opines that both works share "the moral that there is more to life than greed and the search for wealth." Pl. Rep. pg. 12. Disney does not refute this.

k) My initial report opines that the skeleton crews in both works mainly surface at night during scenes of epic battle. Pl. Rep. pg. 12. Disney does not refute this.

9

l)      My initial report opines that the skeleton crews "provide a sensational thrill-driven aura to the story." Pl. Rep. pg. 12. Disney does not refute this.

m)      My initial report opines that William Turner from the Disney Movie shares similarities to the Screenplay's orphans, known as the young rascal scoundrels, specifically the idea that both Turner and the scoundrels seek out mentors. Pl. Rep. pg. 13. Disney does not refute this.

n)      My initial report opines that both William Turner and the young rascal scoundrels participate in the pirate battles that lead to the defeat of the main antagonist villain in their respective works. Pl. Rep. pg. 13. Disney does not refute this.

o)      My initial report opines that the prologue in both works: (1) "sets the tone and mood of the story;" (2) introduces unfinished business "that will be revisited approximately a decade later;" (3) introduces "some of the major players, including the female lead;" (4) "takes place on a ship in rough seas under threatening skies;" and (5) introduces a "conflict on the ship that throws the viewer into the pirate story." Pl. Rep. pg. 15. Disney does not directly refute any of this.

p)      My initial report opines that the prologues of both works "leave us wondering who survived the conflicts at sea," which is something that both works address in later sequences. Pl. Rep. pg. 16. Disney does not refute this.

q)      My initial report opines that both works end on a note that love wins. Pl. Rep. pg. 18. Disney does not refute this.

r)      My initial report opines that the climatic endings of both works "substantially overlap" as they both "locate their final epic showdown in a remote and

10

ominous cave that is inaccessible except by small boats." Pl. Rep. pg. 18.
Disney does not refute this.

s)   My initial report opines that the final scenes of both works revive "the skull-
faced pirates who emerge to attempt to fend off Davey Jones, Jane, and the
young rascal scoundrels" (Screenplay) and "the phantom skeleton crew pirates
to engage in battle" (Disney Movie). Pl. Rep. pg. 18. Disney does not refute
this.

t)   My initial report opines that the climatic endings of both works are similar in
form and content by combining "multiple elements, including a pattern of main
characters, similar themes, and sequence of events, mood, tone, and pace." Pl.
Rep. pg. 18-19. Disney does not refute this.

u)   My initial report opines that the setting of both works is virtually identical. Pl.
Rep. pg. 19. Disney does not refute this.

**Disney's Expert Report Inappropriately Highlights Dissimilarities Between the Works –
and in Doing So, Materially *Mischaracterizes* the Works.**

Despite what can only be characterized as a tremendous amount of similarity, Disney's
Report also attempts to focus on a set of red-herring arguments highlighting dissimilarities.
However, I am informed that "dissimilarities" are generally not to be considered because a
plagiarist cannot excuse copying by showing how much work he did not appropriate.  It is my
opinion that the Disney Report "muddies the waters" with alleged dissimilarities.  Because they
do not actually negate the similarities, I am informed that they should not be given any
consideration.  Also, Disney's Report includes self-serving descriptions of the differences, which
are largely based on a flawed review of the works at issue.  A few such examples are as follows:

1.     Disney's Report repeatedly advances the idea that Plaintiffs' Screenplay is
a redemption story and the Disney Movie is a liberation story.  See, e.g., Rep., pg. 6, 11, 16-
17.  However, this is not correct in my opinion.   Disney's Movie is actually a redemption

11

story of Jack Sparrow.  Sparrow begins the Movie as a type of loser figure (in fact, a failed pirate) - but by the end of the Movie, he "redeems" his reputation as a potent pirate capable of much mischief.  His "redemption" as a pirate in the initial film becomes the basis for the entire franchise.  Also, Plaintiffs' Screenplay also can be described as a "liberation" story, given that the path to redemption for Davey, for Jane, and for the Rascal Scoundrels, is to *liberate* themselves from previous held positions, beliefs, and values.    The report sets up a false dichotomy between "redemption" and "liberation" creating a distinction where one does not exist. They both incorporate both themes.

2.      Disney's Report tries to posit that the Movie's Barbossa is not motivated by greed at all costs. Rep. pg. 12-13.  This is not accurate; while Barbossa is motivated in part to lift the curse on him and his crew, he is <u>also</u> motivated by *greed* and a desire to resume his piracy to pillage and plunder uninterrupted or encumbered by the curse.    Lifting the curse is a means to an end.  Also, Barbossa's entire back story is fueled by greed.  His reasoning for marooning Jack Sparrow was for the sake of a greedy desire to take the treasure and the Black Pearl.  His core greediness motivates much of his behavior in the Movie.

3.      Disney's Report opines that Plaintiffs' Screenplay did not incorporate an element of a "curse".  Rep., pg. 17.  This is also incorrect.  Plaintiffs' Screenplay referenced Phantom Jack's curse numerous times.  For example, Plaintiffs' Screenplay includes dialogue from one of the Rascal Scoundrels saying, "Legend says that a big sea monster ate [Jack Nefarious] and then spit him out… Now his ghost sails the seas in his Ghost ship. Searching and sailing. Sailing and searching". Screenplay, pg. 27.  A reasonable interpretation thereof is that Jack Nefarious did not die; but he is eternally cursed.  In addition, the characters in Plaintiffs' Screenplay reference Captain Jack as a "ghost" who sails. Screenplay pgs. 27, 31, 34.  That is exactly what the curse of Barbossa is based upon – a perpetual search for something that may last for an eternity.  In Disney's Movie, Barbossa tells Elizabeth "you best start believing in ghost stories, you're in one" – clearly Disney's Movie was also envisioned as a ghost story.  Yet again it appears, in my opinion, that Disney adopted Plaintiffs' unique thematic elements.

12

4.      Disney's Report also insists that Barbossa "has enough morality to live by the pirate code" (Rep. pg. 12) but this is also a mischaracterization.  My view is that Barbossa manipulates the pirate code to serve his own interests and not to uphold some sense of loyalty to a code of honor.   He tricks Elizabeth by invoking the pirate code only to then deceive her, and he does this publicly to show his crew how clever and sinister he is; in fact, Barbossa even tells Elizabeth, "the code is more what you call guidelines, than actual rules" meaning he has no honor and lies and deceives as needed.

5.      Disney's Report disregards the "Rascal Scoundrels" as "generic": simply are a "generic trope of children dropped into a pirate tale".  However, children in a pirate story who happen to have similar traits as the crew members in the Movie cannot possibly be considered *scenes a faire*.   Rep. pg. 13.  Furthermore, the viewer does not know exactly what will happen to these boys when they are first introduced in the Screenplay, and there is considerable suspense surrounding their actions.  In other words, they are more than merely predictable stock characters.  The Disney Report also suggests that the Rascal Scoundrels are not supporting characters because of the "concept" of *Goonies* in the Plaintiff's complaint.   The issue here is not whether the Screenplay differs or departs from *Goonies*; it's whether the Disney Movie differs or departs from the Screenplay.  The case is not whether Plaintiffs' Screenplay is a rip-off of *The Goonies,* which it is not in my opinion.

6.      Disney's Report's also unduly dissects the female leads; opining that Plaintiff's comparison of Jane and Elizabeth is simply that both are "strong female protagonists" (and calling that a "generic idea").  Rep., pg. 15.  Yet this disregards my opinion that the two women are "lively, adventurous young women who dream of a life beyond the constrains of the port town where they've been raised…[and] both of these spirited women engage the pirates on nearly equal terms in matter of skill, wit, and athletics" who are drawn to the pirate life and are not scared or intimidated by pirates Pl. Rep. pg. 10.   My opinion on the similarities between Jane and Elizabeth is that they are similar in virtually every detail.

13

7.     Disney's Report also seeks to conflate ghost pirates, undead pirates, cursed pirates, and living pirates.  Rep., *passim*.   The distinction between the foregoing, while nuanced, is important in this case.  In fact, both works involve cursed, skeleton pirates.  Disney's Movie could have featured vampire pirates, witch pirates, werewolf pirates - or any other feared, supernatural being.  But both works use of ghostly skeleton pirates is an important similar feature – no matter the granular detail used by Disney to distinguish them.  I am informed that, in literary work cases, minor deviations do not negate similarities.

8.     Furthermore, Plaintiffs' Screenplay revolves around a myth of ghosts with skull faces who are feared because of this myth (and given it is unclear to the reader/viewer if they are dead or alive – this would ultimately be up to the filmmaker to decide how to portray this visually).  This is very similar to that in Disney's Movie.  While a pirate trope may be the fear of a black flag with crossbones, Plaintiffs' Screenplay created a new fear - a fear based upon supernatural mythology so terrifying that even those pirates who fly a black flag fear the legend of the ghost pirates. This is an element that was prominent in the Screenplay and reappears in the Disney Movie, to set up their blockbuster franchise.

9.     With respect to the setting, even if the Caribbean is standard in many pirate stories, that doesn't mean that Plaintiffs' Screenplay doesn't tweak this element in new and original ways. See, Pl. Rep. Ex. B.

10.     Disney's Report next claims Plaintiffs' Screenplay was geared to a younger audience often describing it as a "slapstick comedy" - which is simply not true. Rep., pg. 6, 18.  This opinion ignores the fact that Plaintiffs' Screenplay contains ominous elements that Plaintiffs showcased not only in the Screenplay itself but also via their sizzle/trailer.  See, Pl. Rep. Ex. B ("In the Screenplay, the emotion that is invoked when the true nature of the supernatural pirates is revealed is substantially similar to the emotion invoked during the same events in the Film: an eerie mood").  The trailer, submitted along with Plaintiffs' Screenplay, was certainly not childish, and cartoonish.

14

And Disney's Report fails to rebut my position that both works took a somewhat dramatic departure from typical "pirate" and "sailors-at-sea" stories by emphasizing humor, irony, and wit to a far greater extent than is typical in this genre. Rep., pg. 6. Disney's Report also ignores my opinion that the Screenplay appeals to a wide range of viewers interested in adventure, romance, and family entertainment. Rep., pg. 18. The Disney Movie repeats this mood and the aforementioned tone for their wildly successful franchise. Disney's Movie is no less juvenile than Plaintiffs' Screenplay. Both utilize suspenseful humor. Also, Disney's Movie actually incorporates slapstick comedy elements – as evidenced by characters Rigetti and Pintel who dress up like women, and continuously bicker providing quirky humor throughout Disney's Movie. These unusual and peculiar characters are also similar to some of the Rascal Scoundrels in Plaintiffs' Screenplay. Pl. Rep., pg. 12, 24.

11.     In describing Plaintiffs' Screenplay, Disney's Report conveniently omits who Plaintiffs' "band of child misfits" win a battle against (saying instead that the hero teams up with a "band of child misfits, winning the battle, and ending up with real treasure…" Rep., pg. 6). That's because this omission is another key similarity – in both works the protagonists battle "cursed, undead pirates" – not just how the Disney Movie as their report would like us to believe. Rep. pg. 6.

12.     Similarly, in describing Plaintiffs' Screenplay's Nefarious and Davey, the Disney Report goes to great lengths to omit the fact that they are enemies at their core – just like in Disney's Movie. Rep., pg. 7.

13.     Disney's Report also conclusively (and falsely) states that "Dave and the Rascal Scoundrels leave piracy behind forever". Rep. pg. 8. This was an assumption made by Disney's Expert; and in fact, there is no dialogue or narration that says they have given up piracy forever. This is mere conjecture; and therefore, not accurate.

15

14.     Disney's Report also claims that skeletal or "undead" pirates are featured in the Disney's "Pirates of the Caribbean" Ride.[6]  However, "undead" pirates were not found in the Ride – the Ride originally featured immobile skeleton remains.  These are not "undead" –  they were just positioned in the way they died.  The skeletons on the Ride were not living/dead pirates.

15.     There are other flawed representations about the Ride found in Disney's Report. For example, Disney's Report claims that "Skeletal crews and the ghost ship are also featured in the Disneyland ride—indeed, Plaintiffs' sizzle reel incorporated that footage from the Ride". Rep. pg. 27.  This is false.  There was no "ghost ship" anywhere in the Ride to my understanding – and it's not even clear from Disney's Report exactly what he is referring to in making that conclusory statement. The only image I saw were skeletal remains frozen in time and various scenes or vignettes.  Disney's Report also claims that the Ride ends "with an epic shootout in a cave".  Rep., pg. 29.  Not so.   From my review of the videos, the only shootout is between a ship and a port in the first half of the Ride; and the Ride ends with drunk, half cross-eyed pirates who are smirking, laughing and shooting guns aimlessly while drinking rum.   It is more reminiscent of a celebration after looting a town or ship than a "shootout". Finally, this "scene" in the Ride takes place in an armory full of gunpowder barrels that will blow if any stray bullet strikes them – not a cave.

16.     Also, the Ride provides no backstory that discloses whether any pirates were cursed; and there is no inference from the ride that the skeletons would rise from the dead.  This is in stark contrast to Disney's Report that posits that the Ride featured "references to cursed pirates".  Rep., pg. 29.  Finally, in Jason Surrell's *Pirates of the Caribbean* book, Brigham Taylor says that he and Disney screenwriter Jay Wolpert did not get a narrative from the Ride during their walk-through.  ("We went to Walt Disney Imagineering and they arranged a walk-through of the attraction with Tony Baxter and X Atencio…They walked Jay and me through the show before it was open.  We didn't get a narrative from the ride, but we did get a backdrop, a milieu, from the ride.") Pg. 115.

---

[6]  In response to Disney's Report that focused on the Ride, I then proceeded to watch video footage available on the internet of the Pirates of the Caribbean Ride in order to respond to the opinions about the Ride.

16

17.     Disney's Report contradicts itself with respect to describing the generic "pirate captain". First, on page 11 of their Report, Disney claims that generic pirate captains are "cocky", "dashing" and "fond of rum".  This is contradicted by their subsequent statement that pirate captains are generally "tall, powerful, wily" characters, who alternate between "jovial good humor and utter ruthlessness in the pursuit of gold" – what, in fact, is a generic pirate captain?  It is my opinion that the pirate captain in the Screenplay and the Movie is not a "generic" pirate captain at all.  Rep. pg. 24.

18.     On page 11 of Disney's Report, Disney asserts that "Davey is never depicted as morally suspect".  This is incorrect.  Davey is depicted as morally suspect from the very beginning of the Screenplay.  As just one example, he takes advantage of the Rascal Scoundrels.  When the Rascal Scoundrels catch on to this, they abandon.  Pl. Screenplay, Pg. 26-30.  Also, Davey Jones is called out for his womanizing, lying and deceit when Jane slaps him in the tavern.  Screenplay, Pg. 35.

19.     Disney's Report also claims that Jack Sparrow does not drink "out of self-pity."  Pg. 11-12.  Another incorrect statement.  In fact, every time Sparrow is doomed or starting to give up, he starts drinking. When he and Elizabeth are marooned on the island, he starts drinking to drown out his sorrow. Sparrow's whole existence is largely one of self-pity (e.g., he was marooned by Barbossa's crew and lost the Black Pearl).

20.     Disney's Report attempts to make a big deal out of the character flip between pirate captain and first mate which is a distinction without a difference.  Rep., pg. 12 ("Barbossa was Jack's first mate, but Nefarious was *not* Davey's—Plaintiffs have flipped the relationship of their characters, as Davey was *Nefarious's* first mate). The fact remains that these main characters, the protagonist and the villain still share a very important backstory – they were once pirates on the same ship with a head pirate and subordinate pirate relationship.

17

21.     Disney's Report states that Sparrow's crew is not part of the plot or resolution – which is yet another false generalization. Rep., pg. 14. The crew is vital to the climactic battle scene. The Movie ends with Jack Sparrow now having recovered the Black Pearl and having a full crew. They are not only prominently featured at the end – but they are Sparrow's crew going forward.  Rep. pg. 14.

22.     Disney's Report also claims that "Sparrow's history with Barbosa is not depicted, only recounted, while Nefarious' betrayal of Davey plays out in Plaintiff's prologue".  This is yet another distinction without a difference.  Rep. pg. 20.  Both had similar betrayals at sea with the antagonist.

23.     Disney's Report relies heavily on the opinion that the Disney Movie is about a treasure that needs to be _returned_ – not a search for treasure. Rep., pg. 17. As exhaustively briefed for the court and the Ninth Circuit, that truly is a distinction without a difference. First, the mission to return the treasure only commences half way through the Movie after the last piece of gold is found.  The first half of Disney's Movie is about a _search_ for treasure - searching for the last piece to lift the curse (just like Plaintiffs' Screenplay).  Furthermore, the search for treasure advances the main theme and plot of both the Screenplay and Movie.

24.     Finally, Disney's Report completely ignores the laundry list of similarities found in Plaintiffs'/Appellants' Corrected Opening Brief submitted to the Ninth Circuit on the issue of substantial similarity which was attached to my initial report as Exhibit B.  I had verified the accuracy of said similarities and adopted those similarities as an addendum to the Plaintiff's Report.   Those similarities, along with the ones I have addressed in my Report and this Rebuttal, all provide for striking similarity between Plaintiffs' Screenplay and Disney's Movie.

18

## CONCLUSION

To summarize, Disney's Report does not fundamentally refute my opinions and conclusions that the two works are substantially similar, including the following:

"...in my opinion the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film. Furthermore, although some of the similarities are more nuanced, the selection and arrangement of these elements point to a pattern of resemblances first found in the Screenplay. In my opinion, the Screenplay is a first-rate piece of original writing, showcasing a brilliant and highly innovative retelling of the standard pirate narrative. Some of the Screenplay's creative innovations, which I have outlined above, constitute sufficiently original, atypical contributions to the pirate storyline not evident before in the literature that I am familiar with." Pl. Rep. pg. 21.

Respectfully Submitted,

_____

Prof. David Román

19

EXHIBIT K

# EXHIBIT L

Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
**LOWE & ASSOCIATES**, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

*Attorneys for Plaintiffs Arthur Lee Alfred II and*
*Ezequiel Martinez Jr.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-cv-08074-CBM-AS |
| Plaintiffs, | *Hon. Consuelo B. Marshall Presiding* |
| vs. | **NOTICE OF ERRATA RE:** |
| THE WALT DISNEY COMPANY et al., | **DEPOSITION TRANSCRIPT OF** |
| | **PROF. DAVID ROMÁN** |
| Defendants. | |

NOTICE OF ERRATA TO PROF. ROMÁN DEPOSITION TRANSCRIPT

-82-

EXHIBIT L

## **TO THE COURT AND ALL PARTIES:**

Professor David Román ("Prof. Román") provided his deposition testimony on May 27, 2021; a transcript of which was made available to him thereafter ("Deposition Transcript").  Afterwards, Prof. Román became aware of certain errors in said Deposition Transcript.  Prof. Román hereby submits an Errata to his deposition transcript dated May 27, 2021 pursuant to Fed. Rule Civ. Procedure 30(e)(1) attached hereto as **Exhibit A**.

Dated:  July 12, 2021

Respectfully submitted,

**LOWE & ASSOCIATES**

By*:___/s/ Aleksandra Hilvert_____*
Aleksandra Hilvert
Attorney for Plaintiffs

# EXHIBIT "A"

## EXHIBIT A: DEPOSITION TRANSCRIPT ERRATA

1. **Page 14; line 3.  Change "No" to "Yes."**

   a. Reason: Misunderstood the question.  Change made to be consistent with further testimony.  I did "investigate" the matter before agreeing to be the expert.  I was a consultant first and then agreed to become an expert.

2. **Page 22; line 3.  Change "No. Not really" to "No. Not really at first but once I was engaged to write the report I was given standards from the lawyers."**

   a. Reason: Misunderstood the question.

3. **Page 36 line 18.  Change "No, it was more that" to "Yes eventually I was. But at first I was confused as to what they wanted me to do with it."**

   a. Reason: Misunderstood the question.  I was differentiating between my time investigating the matter before becoming a testifying expert.

4. **Page 40; Line 10.  Add "necessary" before "laundry".**

   a. Reason:  Clarification of response.

5. **Page 40; Line  21.  Change "No" to "No- you're wrong."**

   a. Reason:  Clarification of response.

6. **Page 48; Line 14.  Change "No" to "Yes."**

   a. Reason: Refreshed recollection; I misspoke.  Answer changed to make it consistent with the remainder of my testimony.

7. **Page 52; Line 21. Add "Yes" at the beginning of the first sentence.**

   a. Reason: Clarification of response. Misunderstood the question.

8.   **Page 63; Line 7.  Change "Oh. I don't think so" to "Oh. I just went
over that a minute ago."**

   a.   Reason.  Clarification of response. Misunderstood the question.

9.   **Page 65; Line 16.  Add "At first" to beginning of sentence.**

   a.   Reason: Clarification of response. Misunderstood the question.

10.   **Page 79; Line 11-12.  Add "but that's what I did" to the end of the
sentence.**

   a.   Reason: Misunderstood the question. Clarification of response.

11.   **Page 83; Line 13.  Change "No" to "No. My background and
experience is adequate."**

   a.   Reason: Clarification of response.

12.   **Page 101; Line 1.  Change "No" to "No. No other works between
October of 2020-November 30, 2020."**

   a.   Reason: Clarification of response as to time.

13.   **Page 103; Line 17.  Change "No" to "No. Not between October
2020- November 30, 2020 but yes as to all of the literature, movies
and plays that I had read or watched in my life."**

   a.   Reason: Clarification of response as to time.

14.   **Page 107; line 14.  Change "So, no" to "So, yes."**

   a.   Reason: Clarification of response; consistent with other
testimony.

15.   **Page 159; line 8.  Change "Yes" to "Yes; the way that it was
expressed."**

   a.   Reason: Clarification of response.

16.   **Page 159; line 10.  Change "Yes" to "Yes; the way that it was
executed."**

   a.   Reason: Clarification of response.

NOTICE OF ERRATA TO DEPOSITION OF PROF. ROMÁN DATED MAY 27, 2021
EXHIBIT L

17. **Page 218; line 8.  Change "I would go even bigger than that" to "No and I would go even bigger than that in that supernatural elements in and of themselves exist across genres.  But it is not an indispensable element in the pirate genre."**

    a.    Reason: Clarification of response.

Dated:  July 12, 2021

                           Respectfully submitted,

                           By:_David Román_____

                           PROFESSOR DAVID ROMÁN
                           University of Southern California



1

2

3

4

5

6

7

8

9          I, David Román, do hereby declare under penalty

10   of perjury that I have read the foregoing transcript; that

11   I have made any corrections as appear noted, ~~in ink,~~    *per Ex. A to Errata Notice*

12   ~~initialed~~ by me; that my testimony as contained herein, as    *signed*

13   corrected, is true and correct.

14

15          EXECUTED this _____12_____ day of __July_____,

16   20__21__, at __Los Angeles_____, __CA_____.
                        (City)                        (State)

17

18

19                  *David Román*
                  _____

                          David Roman

20

21

22

23

24

25

                                              Page 223

# PROOF OF SERVICE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

I am a resident of the United States and employed in the County of Los Angeles, State of California, over the age of 18 and not a party to the within action or proceedings; my business address is 8383 Wilshire Blvd, Suite 1038, Beverly Hills, California 90211.

On July 12, 2021 I served the foregoing document(s) described as:

**NOTICE OF ERRATA RE: DEPOSITION TRANSCRIPT OF PROF. DAVID ROMÁN AND EX. A (ERRATA)**

on the interested parties and/or through their attorneys of record by depositing the original or true copy thereof as designated below, at Los Angeles, California, addressed to the following as follows:

**Mark R Yohalem**
**Munger, Tolles & Olson LLP**
**mark.yohalem@mto.com**

**Jordan Dentler Segall**
**Munger, Tolles & Olson LLP**
**jordan.segall@mto.com**

**Robin Gray**
**Munger, Tolles & Olson LLP**
**Robin.Gray@mto.com**

( )  **BY MAIL:**  I deposited in the United States Mail in a sealed envelope with postage fully prepaid at Los Angeles, California, following the ordinary practice at my place of business of collection and processing of mail.

( )  **BY HAND DELIVERY/PERSONAL SERVICE:**  I caused said document(s) to be personally served to the addressee listed above.

( )  **BY TELECOPY/FACSIMILE:**  I caused said document(s) to be telecopied to the addressee listed above; telecopier ("Fax") number:

( )  **BY EXPRESS/OVERNIGHT MAIL:**  I caused said document(s) to be deposited with an express service carrier in a sealed envelope designed by the carrier as an express mail envelope, with fees and postage prepaid.

Proof of Service

1

1

**( X ) BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused said document(s) to be sent from e-mail address aleksandra@lowelaw.com to the persons at the e-mail addresses listed in the Service List after such parties agreed to electronic service pursuant to Fed.R. Civ. P. 5(b)(2)(E). To the best of my knowledge, I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. This was also done pursuant to the parties agreement to accept service by electronic transmission.

2

3

4

5

6

**( X )** (State) I declare under penalty of perjury under the laws of the United States of America that the above is true and correct.

7

8

Executed July 12, 2021 at Los Angeles, California.

9

10

11

ALEKSANDRA HILVERT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
 1    connection with investigating the matter or in any other
 2    tasks?
 3         A    No.  Yes.
 4         Q    Counsel has disclosed that you are being
 5    compensated in this litigation on an hourly basis at the      11:17
 6    rate of $425 an hour; is that right?
 7         A    Yes.
 8         Q    Is your compensation in this matter dependent in
 9    any way on the outcome of the case?
10         A    No, absolutely not.                                 11:17
11         Q    You said that before you agreed to serve as an
12    expert, you didn't know the plaintiffs in this case,
13    Mr. Martinez and Mr. Alfred; is that right?
14         A    That's correct.
15         Q    So I assume it is safe to assume that you also     11:17
16    were unfamiliar with the screenplay that's at the core of
17    their claims in this case; is that right?
18         A    That's also correct.
19         Q    Had you seen at the time that you agreed to be
20    retained as an expert in this matter, the Pirates of the     11:18
21    Caribbean:  Curse of the Black Pearl?
22         A    Are you asking me did I screen the film once they
23    asked me to serve as the expert?
24         Q    No.
25         A    Or had I seen the film beforehand?               11:18
```

Page 14

1    about what standards you should apply in comparing the

2    works for similarities?

     No. Not really at first but once I as engaged  to write the report I was given standards from the lawyers.

3        A    ~~No.  Not really.~~  I mean, this is partly that I

4    had my own set of criteria that I was using.  Which I

5    explained to the lawyers earlier on, that this is how I        11:27

6    think, this is the kind of the work that I do, this is

7    what a comparatist does.

8        Q    So you go on to write here in Exhibit 1 that

9    Ms. Hilvert provided you with the plaintiffs' original

10   screenplay, correct?                                           11:27

11       A    Correct.

12       Q    Then you were asked to compare that to the Disney

13   film, Pirates of the Caribbean:  Curse of the Black Pearl;

14   is that right?

15       A    Yes.                                                  11:27

16       Q    And you screened that on Netflix at the time,

17   correct?

18       A    Correct.

19       Q    Were you asked to review any other films in the

20   Pirates of the Caribbean franchise?                            11:27

21       A    No.

22       Q    Were you given any other documents at this

23   initial stage after you received this assignment to

24   compare --

25       A    No.  No.  I simply had the screenplay and then I      11:28

Page 22

```
 1    like, the legal aspect it, which I didn't know beforehand
 2    in detail.
 3         Q    So, you say at the bottom of page 3 of Exhibit 1
 4    that you were given this appellant's opening brief that
 5    was filed with the Ninth Circuit and then you, quote,      11:45
 6    verified the accuracy of said similarities set forth
 7    therein.
 8              Do you see that?
 9         A    Yes.
10         Q    So, the brief that you were given describes      11:45
11    certain similarities, at least as articulated by the
12    authors of that brief between the screenplay and Curse of
13    the Black Pearl; is that right?
14         A    Yes.
15         Q    Were you asked as part of your expert assignment  11:45
16    in this case to verify the accuracy of the statements that
17    were made in the brief by the lawyers who drafted it?
18         A    No, it was more that -- because I was on a
19    particular timeline and, again, I don't want to make a big
20    deal of the fact that I was teaching full time and during  11:46
21    Zoom, student need is really high.  I was trying to do
22    more time management issues really in terms of how I could
23    do both jobs well simultaneously.
24              So, when I offered my initial preliminary report,
25    I mentioned several things that were, I guess, were        11:46
```

Yes eventually I was. But at first I was confused as to what they wanted me to do with it.

Page 36

1    detail now or later, but I thought that the -- I really

2    wanted to spend more time talking about the similarities

3    in the prologue, similarities in the entire framing device

4    of the narrative structure, the ending, the hybridity of

5    the characters, the tone stuff.  That's the stuff that I        11:50

6    really wanted to dwell on.

7            And I think that -- I don't know if it is the

8    nature of legal writing that Exhibit B didn't have the

9    capacity to kind of introduce a fully narrative report.

10   It was more like a list.  It was like a laundry list of        11:50

                                                     *— necessary*

11   correspondences.  And what I wanted to do was sort of

12   narrativize that, you know, report.

13      Q    Okay.  So when you say that the brief contained a

14   laundry list of correspondences, you mean, specific

15   expressive details?                                            11:51

16      A    Yes.

17      Q    That were in the works, correct?

18      A    Yes, sir.

19      Q    Okay.  But that wasn't your focus, right, this

20   sort of specific expressive details, right?                    11:51

                        *No - you're wrong.*

21      A    ~~No~~, I mean, of course, there are aspects of that

22   in my report and there is a tremendous amount of overlap

23   what I found and what was already in Exhibit B.

24      Q    Did you use the brief you were given as a basis

25   for writing up your own report?                                11:51

Page 40

```
 1    copyright laws aren't necessarily interested in what

 2    doesn't correspond but what does correspond.

 3            So I didn't know if I was supposed to write up

 4    all the things that, well, this happens here, but it

 5    didn't happen here.  And I was told no, no, that's not      12:02

 6    relevant.  You were only asked to look -- that the

 7    legal -- that the legal requirement for copyright

 8    infringement is what actually corresponds between two

 9    texts.

10        Q    So other than being instructed to disregard       12:02

11    dissimilarities between the works, were you given any

12    other information about the legal standards governing

13    copyright cases?
                   Yes.
14        A    No.  I mean, I think that there was some kind of

15    casual conversations about copyright infringement cases.   12:02

16    You know, as an intellectual, I am just sort of curious,

17    you know, what do these things look like, or what is

18    important here.

19            And Steven just walked me through generically,

20    you know, what copyright infringement cases tend to focus  12:03

21    or what their issues are.

22        Q    Did you take notes?  You said those were sort of

23    verbal conversations.  Did you take notes on those

24    conversations?

25        A    No.  You know what it felt like?  It felt like,   12:03
```

Page 48

```
 1    arrangement meant legally and how I should be considering

 2    not just certain types of literary characteristics like

 3    dialogue, setting, but also the particular set of

 4    arrangements, the selection and arrangement of those

 5    types.                                                    12:23

 6        Q    Okay.  And what you did you understand

 7    specifically about what the selection and

 8    arrangements (inaudible).  (Reporter asks for repeat.)

 9             -- about how the selection and arrangement test

10    functions in copyright law?                               12:23

11        A    I mean, just on a very introductory level, I

12    would say that there are particular tropes that might be

13    identifiable in a particular genre but that may or may not

14    be protected through copyright law.  But there is a

15    another set of criteria which is how those tropes are      12:23

16    actually put into particular patterns, in a story.  And

17    how they are selected and arranged in a story.  And that

18    that might be also something that could be protected.

19        Q    And were you asked to apply the selection and

20    arrangement test in forming your opinions?                 12:23

21        A    I was asked to be aware of that.  I already had

22    pretty much identified -- I didn't realize that that was

23    the language for it.  And, so, again, that was the

24    language that was offered me.

25        Q    Professor Román, are you a lawyer?                12:24
```

Yes.

Page 52

```
 1    innovation, what does it add to the field that's already

 2    established, what I find important in the work.

 3         Q    Do you know what the test is for infringement in

 4    copyright law?

 5         A    Go ahead.                                        12:37

 6         Q    I am asking if you know.
               Oh. I just went over that a minute ago.
 7         A    Oh.  I don't think so.

 8         Q    Well, let's look back at Exhibit 1 if you still

 9    have it open, which is your expert record at the top of

10    page 3.                                                   12:38

11              Are you there?

12         A    Yes.

13         Q    I will ask you to look at the second paragraph on

14    page 3.  This reads "I believe that there are enough

15    important patterns of similarities between the two works   12:38

16    to a merit conclusion that one is substantially similar to

17    the other, notwithstanding the existence of some

18    differences."

19              Did I read that correctly?

20         A    Yes.                                             12:38

21         Q    I want to focus on the term "substantially

22    similar."  Were you familiar with that term in particular

23    before you were engaged as an expert in this case?

24         A    It is a term that I use.  It is a term that seems

25    fairly self-evident.                                      12:38
```

                                                       Page 63

```
 1    guess, superficial similarities, right, that might not

 2    merit concern.  So, let's just say a character in one text

 3    has, I don't know, blue eyes and the other text has blue

 4    eyes.  But that's basically the only correspondence

 5    between them.  I don't know if I would say that that's a      12:40

 6    substantial similarity.  I would just say that that is

 7    sort of a maybe casual similarity, a kind of banal

 8    similarity.

 9         But if there's enough differentiating aspects

10    between those two characters, I wouldn't say that there      12:41

11    would be substantial similarity between those characters.

12    Q    And in connection with your assignment in this

13    matter, were you specifically asked by counsel to apply

14    any particular test for substantial similarity to your

15    expert analysis?                                             12:41
                        At first
16    A    I wasn't guided specifically along those lines.

17    I did mention in my report what I thought were the

18    substantial similarities both in, you know, characters,

19    plots, themes, moods, and how well developed they were,

20    both in the screenplay and then echoed in the film.         12:41

21         So I was already going -- I was already going

22    with what I thought was a considerable substantial

23    similarity.  And not just going for the banal, the

24    superficial similarity.  Oh, they both have, you know,

25    blue eyes.                                                   12:42
```

Page 65

```
 1    The time is 1:37 p.m.

 2    BY ATTORNEY SEGALL:

 3        Q    Professor Román, are you familiar with the -- a

 4    concept called the "idea of expression dichotomy" in

 5    copyright law?                                        13:37

 6        A    Not really.

 7        Q    Okay.  When you were getting your assignment in

 8    this matter, were you ever told by plaintiffs' counsel

 9    that you should try to focus your analysis on expression

10    in the works as opposed to ideas in the works?         13:37

11        A    Not overtly.  I think it wasn't like schematic in

12    such a way.  ←— but that's what I did

13        Q    Let me point you back to your report, which is

14    Exhibit 1, and I want you to turn to page 6 if you would,

15    please.                                                13:37

16        A    Okay.

17        Q    Can you see the second paragraph there, it says

18    "While the screenplay and the Pirates of the Caribbean:

19    Curse of the Black Pearl can readily be seen as sharing

20    several of these themes, characters and plot devices -- "  13:37

21    it goes, a few lines down, it says, " -- they differ

22    dramatically in tone from typical pirate and

23    sailors-at-sea stories."

24             Do you see that?

25        A    Yes.                                          13:38

                                                      Page 79
```

```
1            So you start seeing variation.  Then they start
2    appearing as children in literature.
3            So, clearly, that's a completely different trope,
4    too, from the historical early modern representation of
5    the pirate.                                            13:42
6    BY ATTORNEY SEGALL:
7       Q    Okay.  But my question is a little different.  My
8    question is if you are going to opine that the
9    screenplay's humor, irony, and wit is entirely original,
10   don't you need to conduct some kind of review of other    13:42
11   works in the pirate genre to determine whether it is
12   original or not?
13      A    No. No. My background and experience is adequate.
14           ATTORNEY LOWE:  Objection, argumentative,
15   incomplete hypothetical.                                   13:42
16           Go ahead.
17           THE WITNESS:  So I can answer?
18   BY ATTORNEY SEGALL:
19      Q    Yes, you can.
20      A    Oh, okay.  Yeah, no.  I mean, I have seen several  13:42
21   pirate films and I have read several pirate texts which is
22   what I was getting at in that there's a variety of
23   representations.
24           So let's just say the pirate is a scènes à faire,
25   right?  There are ways that the pirate is tweaked to       13:43
```

Page 83

1      A      No. No. No other works between October of 2020-
              November 30, 2020.

2      Q      And then for your rebuttal report, did you -- you

3  reviewed Cutthroat Island, correct?

4      A      Yes.

5      Q      Did you review any other pirate works in          14:05

6  connection with preparing your rebuttal report in this

7  matter?

8      A      Well, I was asking the lawyers, I mean, Steven

9  and Aleks, if I was going to be responsible for all the

10  literature that was cited in the Disney expert report.  I   14:06

11  asked my assistant -- I have a first-year student at USC

12  who I am mentoring and is a work-study student.  I asked

13  him, his name is Brandon, I said Brandon, do me a quick

14  favor.  Do a quick Google search on pirate literature and

15  see what you come up with.                                  14:06

16          Partly because I was curious and partly because I

17  hadn't given him anything to do and he is relying on some

18  hours -- talk about billable hours.  I mean, he is an

19  undergrad hoping to get a little bit of money and I don't

20  give him enough work.  So he appreciates that kind of       14:06

21  thing.

22          So he then came up with a list of, maybe, I don't

23  know, 12 or 15 things.  And on that list was a book that I

24  thought, oh, this might be actually helpful to kind of

25  gloss over.  And it is this book.                           14:06

                                               Page 101

```
 1      A    I think what I did, Jordan, I just like did a

 2  little spot-check.  I thought let me look at something in

 3  the beginning because it was arranged historically.  And

 4  it just said like this film was made, you know, in 1938

 5  staring such and such a person, directed by so-and-so.      14:08

 6  Just -- it just was a lot of that.  So it was a lot of

 7  detail without any kind of narrative content, really.

 8      Q    And that sort of encyclopedia detail didn't

 9  affect your opinions, did it?

10      A    No.                                                  14:08

11          ATTORNEY LOWE:  Objection, objection, vague.

12  BY ATTORNEY SEGALL:

13      Q    Okay.  So beyond that book, the Goonies and

14  Cutthroat Island, as you sit here today, is there any

15  other pirate-related work that you reviewed in forming      14:08

16  your opinions in this matter?

17      A    No.  No. Not between October 2020 - November 30, 2020 but
                  yes as to all of the literature, movies and plays that
                  I had read or watched in my life.
18      Q    I want to mark as Exhibit 3 a document that's

19  consistent with the original complaint in this matter.

20  You should have it now.                                      14:09

21      A    Here we go.

22          (Deposition Exhibit 3, Original

23          Complaint, was marked for

24          identification by the court reporter.)

25  BY ATTORNEY SEGALL:                                          14:09
```

                                                    Page 103

```
 1    the pirate story surfaces, right?  But I wouldn't

 2    necessarily say that it is an established genre like some

 3    other genres that are more prevalent.

 4    BY ATTORNEY SEGALL:

 5        Q    Do you agree with the complaint when it says      14:13

 6    "Films have covered swashbuckling pirates"?  Do you think

 7    that's a true statement?

 8        A    Well, it is a very vague statement but I guess

 9    just on the level of films have covered swashbuckling

10    pirates, I would say, yes, there have been swashbuckling   14:13

11    pirates that appeared in films.

12        Q    Have you seen any of these films in paragraph 10?

13        A    Just, again, the popular ones and not the more
                          So, yes.
14    obscure ones.  S̶o̶,̶ ̶n̶o̶.̶  Maybe like two or three of them.

15    But, again, that is when I was like a kid or in high       14:13

16    school.  It just -- my recollection of, like, the plots of

17    these aren't -- you know, isn't all that strong.

18        Q    For instance, do you think the Treasure Island

19    film from the 1950s is a significant pirate film?

20             ATTORNEY LOWE:  Objection, vague.                 14:14

21             THE WITNESS:  I would answer this way:  That I

22    think that if people were to make a list of pirate films,

23    like named five or six or eight pirate films, that more

24    likely Treasure Island would appear on, like, most

25    people's lists.                                            14:14
```

                                               Page 107

```
 1        Q       Professor Román, if you could turn to Exhibit 1

 2   of your expert report page 6, please.

 3        A       All right.  Okay, I am on page 6.

 4        Q       And at the end of the first full paragraph, we

 5   have discussed this before, you opine that humor, irony      15:49

 6   and wit is an innovation of plaintiffs' screenplay,

 7   correct?

 8        A       Yes.  Yes; the way that it was expressed.

 9        Q       And a humorous tone as well?

10        A       Yes.  Yes; the way that it was executed.          15:49

11        Q       And we discussed this a little before.  But is it

12   your opinion that the screenplay's use of humor is

13   completely original to the genre or partially original, or

14   what's your opinion specifically about how original it is?

15        A       Well, again, I think I mentioned this earlier,    15:49

16   Jordan.  I think that what is interesting to me is the

17   multiple levels of humor, irony, wit that are incorporated

18   into the screenplay.  So it is not just like one funny

19   type of thing like slapstick or like gags or like a

20   cleaver one-liner or witty repartee.                          15:50

21            It is that there are different elements of humor,

22   irony, wit that appear throughout the screenplay that, I

23   think, are also echoed in the Pirates.

24            I think the Pirates of the Caribbean, you know,

25   is also like highly entertaining.  It is really funny.        15:50
```

Page 159

1      Q     And you don't dispute that is there is a large

2   number of works even outside the sort of narrower question

3   of pirate skeletons, there is a large number of pirate

4   works that incorporate supernatural elements, that's a

5   common genre element, right?                          17:32

6             ATTORNEY LOWE:  Objection, vague and ambiguous.

7   Argumentative.       *No and I would go even bigger than that in that supernatural elements in and of themselves exist across genres. But it is not an indispensible element in the pirate genre.*

8             THE WITNESS:  ~~I would even go bigger than that.~~

9   I would say that the whole concept of the dead at large,

10  you know, both trans-historically and cross-culturally has  17:32

11  a supernatural component to it in that it is so mystified

12  and unknown what happens when we die, right, that it is

13  sort of kind of understood to have haunting, like,

14  unknowable, supernatural, scary, ominous -- so, even the

15  presence of a corpse in any genre already suggests a kind  17:32

16  of a logic to the living.

17  BY ATTORNEY SEGALL:

18     Q     Okay.  You testified a moment ago that the

19  selection and arrangement of the pirate ships with

20  skeleton crews is similar between the two works.       17:32

21            Do you recall that?

22     A     Yes.

23     Q     I'd like you to be really specific if you can.

24  At the level of sort of concrete expression, what do you

25  think is similar about how the skeleton pirates concept is  17:33

                                              Page 218

# EXHIBIT Y

Excerpt of *Hamnet* by Maggie O'Farrell

2020

He goes down the gangplank, clutching the purse given to him by the **midshipman**, along with a short, sharp kick in the backside, which would explain the boy's listing, limping gait. His **crewmates** are hauling crates of Malaysian cloves and Indian indigo **off the ship**, before taking on sacks of coffee beans and bales of textiles. The dockside, under the cabin boy's feet, is disconcertingly firm and solid **after weeks at sea**. Nevertheless, he staggers off towards what looks to him like a tavern, passing a stall selling spiced nuts, a woman holding a snake about her neck. He pauses to look at a **man with a monkey on a golden chain**. Why? Because he has never seen a monkey before. Because he loves animals of all kinds. Because he is, after all, not much older than Hamnet, who is, at this very moment, sitting in a cold wintry schoolroom, watching the schoolmaster hand out horn books of Greek poetry. **The monkey at the port of Alexandria is wearing a little red jacket and a matching hat;** its back is curved and soft, like that of a puppy, but its face is expressive, oddly human, as it peers up at the boy. The cabin boy—a young lad from a Manx family—looks at the monkey and the monkey looks at the boy. The animal puts its head on one side, eyes bead-bright, and chatters softly, a slight judder of sound, its voice light and fluting. It reminds the boy of an instrument his uncle plays at gatherings on the Isle of Man, and for a moment he is back at his sister's churching, at his cousin's wedding, back in the safety of his kitchen at home, where his mother would be gutting a fish, telling him to mind his boots, to wipe his shirt front, to eat up now. Where his uncle would be playing his flute and everyone speaking the language he had grown up with, and no one would be yelling at him or kicking him or telling him what to do, and later on there might be dancing and singing.

(pg. 141-142)

The man is getting to his feet, gesturing at the boy. **He has skin that is pocked and scarred, a mouthful of blackened teeth, an eye that doesn't quite match its pair**, in either direction or colour. He is rubbing the fingers of his hand together, in the universal language that means: **money**. The boy shakes his head. The monkey clings tighter, curling its tail about the boy's neck. The man with the scarred, pocked skin bears down, gripping the boy's arm. He repeats his gestures. **Money**, he is insisting, **money**. He points at the monkey, then makes the gesture again. Again, the boy shakes his head, presses his lips together, puts a protective hand over the purse tied to his belt. He knows what will happen to him if he returns to the ship without food, without ale. He will carry the memory of the midshipman's lash—given to him twelve times in Malacca and seven times in Galle, ten in Mogadishu—for ever. "No," says the boy. "No." The man lets out a stream of angry words, into the boy's face. The language they speak in this place called Alexandria is jabbing, nicking, like the point of a knife. The man reaches up to seize the monkey, which chatters and then shrieks, a piercing high cry of distress, gripping the boy's hair, the collar of his shirt, the tiny black nails scoring the skin of his neck.

(pg. 142-143)

EXHIBIT Y

The **midshipman** is wrapped in a sheet and brought up on deck. The **sailors** nearby cover their noses and mouths with cloth: the corpse is excessively odorous. The captain gives a short reading from the Bible; he, too, is struggling with the dead man's smell, **despite twenty-five years at sea and more watery funerals than he can recall.** "In the name of the Father," the captain enunciates, raising his voice above the sounds of discreet retching at the back, "the Son and the Holy Ghost we commend this body unto the waves. "You," he gestures at the two **sailors** nearest him, **"take the…do the…ah…yes…overboard."** They dart forward and, with green faces, lift the corpse up and over the side. The choppy, pleated surface of the Mediterranean folds over the body of the **midshipman**. By the time they reach Constantinople, with an order to collect a consignment of furs from the north, the cats are all dead and the rat population is becoming a problem. They are eating through the crates and getting at the dried-meat rations, the second officer tells the captain. There were fifteen or sixteen of them in the cook's quarters this morning. The men are demoralised, he says, keeping his eyes on the line of horizon out of the window, and several more have fallen ill overnight. Two more men die, then a third, and a fourth. All with the same Afric fever that swells the neck and turns the skin red and blistered and black in places. The captain is forced to make an unscheduled stop in Ragusa, to take on more **sailors**, for whom he has no references or recommendations, which is the kind of hasty, slipshod **seamanship** he likes to avoid. These new **sailors** are **shifty-eyed, snaggle-toothed**; they keep to themselves and speak very little, and only in some kind of Polack language. The Manx crew distrusts them on sight and will not communicate with them, or willingly share quarters. The Polacks, however, are skilled at killing rats. They approach it as a sport, baiting a string with food, then lying in wait with an enormous shovel. When the creature appears—sleek, with drooping belly, gorged as it is on the **sailors'** rations—the Polacks leap on it, shouting, singing, and beat it to death, rat brains and entrails sprayed on the walls and ceilings. They then cut off the tails and string them to their belts, passing around a clear liquid in a bottle, from which they all drink. Turns your stomach, one of the Manx **sailors** says to the cabin boy, watching from across the cabin. Doesn't it? Then he swats at his neck, his shoulder; the place is overrun with fleas. Damned rats, he growls…

(pg. 146-147)