Steven T. Lowe (SBN 122208)
*steven@lowelaw.com*
Aleksandra Hilvert (SBN 258463)
*aleksandra@lowelaw.com*
LOWE & ASSOCIATES, PC
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ARTHUR LEE ALFRED, II et al.,

Plaintiffs,

vs.

THE WALT DISNEY COMPANY et al.,

Defendants.

Case No. 2:18-cv-08074-CBM-AS

*Hon. Consuelo Marshall Presiding*

**DECLARATION OF STEVEN T. LOWE IN SUPPORT OF PLAINTIFF'S *OPPOSITION* TO DEFENDANT THE WALT DISNEY COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Date: October 19, 2021
Time: 10:30 am
Courtroom: 8B

**DECLARATION OF STEVEN T. LOWE**

I, Steven T. Lowe, declare:

1. I am one of the attorneys representing the Plaintiffs in this action. I am duly admitted to practice before all Courts in the State of California, the United States District Court (Central District of California), the 9th Circuit Court of Appeals, and the United States Supreme Court. The facts stated herein are personally known to me and I could and would testify competently thereto if called upon as a witness under oath.

2. Attached hereto as **Exhibit M** is a true and correct copy of pages from the Transcript of the Deposition of Professor David Roman, Volume I, which was taken on May 27, 2021.

3. Attached hereto as **Exhibit N** is a true and correct copy of pages from the Transcript of the Deposition of Professor David Roman, Volume II, which was taken on July 9, 2021. There were no corrections to Volume II. The total number of pages of the two (2) volumes is 349 pages.

4. Attached hereto as **Exhibit O** is a true and correct copy of pertinent pages from the Transcript of James McDonald which was taken on June 16, 2021.

5. Attached hereto as **Exhibit P** is a true and correct copy of McDonald's corrections thereto.

6. Attached hereto as **Exhibit Q** is a true and correct copy of pertinent pages from the Transcript of James McDonald, Volume II, taken on September 3, 2021, with Exhibit 19 thereto.

7. Attached hereto as **Exhibit R** is a true and correct copy of McDonald's report in this case. Of course, Plaintiffs reserve all right to object to the same.

8. Attached hereto as **Exhibit S** is a true and correct copy of publicly available information (which cannot reasonably be questioned) showing that the official release date of the first Pirates of the Caribbean Film (the "Film") was June 28, 2003, and the date production started on the Film was October 9, 2002. I obtained

this readily available information through the Internet Movie Database ("IMDB"), a generally accepted and verified database in the entertainment industry.

9. A true and correct copy of an interview with Brigham Taylor from 2016 is attached hereto as **Exhibit T.**

10. Attached hereto as **Exhibit U** are true and correct copies of pages 79, 114, 147-148 from a book about Pirates of the Caribbean, published in 2006, entitled: *Pirates of the Caribbean: From the Magic Kingdom to the Movies*. This book was written by Jason Surrell and published by Disney.

11. A true and correct copy of Taylor's IMDB page, which is generally accepted as a database for film credits, which has also been verified, listing Taylor as a either a "production executive" or a "producer" on the following sequels of the Film, is attached hereto as **Exhibit V:**

a. *Pirates of the Caribbean: Dead Man's Chest* (Production Executive) 2006

b. *Pirates of the Caribbean: At World's End* (Production Executive) 2007

c. *Pirates of the Caribbean: On Stranger Tides* (Production Executive) 2011

d. *Pirates of the Caribbean: Dead Men Tell No Tales* (Executive Producer) 2017

12. A true and correct copy of Disney's Disclosures under Rule 26 is attached hereto as **Exhibit W**.

13. A true and correct copy of the box office records for *Pirates of the Caribbean* from IMDB Pro, is attached hereto as **Exhibit X**.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

///

///

Executed on the 28th of September 2021, in Beverly Hills, California.

Steven T. Lowe

-3-

DECLARATION OF STEVEN T. LOWE IN SUPPORT OF PLAINTIFF'S *OPPOSITION* TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

# EXHIBIT M

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ARTHUR LEE ALFRED, II, )
et al., )
)
Plaintiff, )
)
vs. ) No. 2:18-CV-0874-CBM-AS
)
THE WALT DISNEY COMPANY, )
et al., )
)
Defendants. )
_______________________________)

REMOTE VIDEO DEPOSITION OF DAVID ROMÁN, VOLUME 1

Via Zoom

Beverly Hills, California

Thursday, May 27, 2021

Reported by:
Pamela Zitny
CSR No. 4461
JOB No. 4581571

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ARTHUR LEE ALFRED, II, et al.,

Plaintiff,

vs.

THE WALT DISNEY COMPANY, et al.,

Defendants.

No. 2:18-CV-0874-CBM-AS

Remote video deposition of DAVID ROMÁN, Volume 1, via Zoom, taken on behalf of Defendants, Beverly Hills, California, beginning at 11:07 a.m. and ending at 5:41 p.m. on Thursday, May 27, 2021, before Pamela Zitny, Certified Shorthand Reporter No. 4461.

APPEARANCES:

For Plaintiffs:
(Via Zoom)

LOWE & ASSOCIATES, A Professional Corporation
BY: STEVEN T. LOWE and ALEKSANDRA HILVERT
Attorneys at Law
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, California 90211
310-477-5811

For Defendant Walt Disney Pictures:
(Via Zoom)

MUNGER, TOLLES & OLSON, LLP
BY: JORDAN SEGALL and ROBIN GRAY
Attorneys at Law
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
213-683-9100

For Walt Disney Company:

KAREN FREDERIKSEN,
In-house Counsel
Walt Disney Company
500 South Buena Vista Street
Burbank, California 91521-0564
818-560-1644

VIDEOGRAPHER:
(Via Zoom)

JONATHAN MANUEL

Also Present:
(Via Zoom)

EZEQUIEL MARTINEZ, JR.
LEE ALFRED

INDEX

| WITNESS | EXAMINATION |
|---|---|
| David Román | |
| BY ATTORNEY SEGALL | 6 |

EXHIBITS

| DEPOSITION | | PAGE |
|---|---|---|
| Exhibit 1 | Report of David Román | 20 |
| Exhibit 2 | Invoices | 97 |
| Exhibit 3 | Original Complaint | 103 |
| Exhibit 4 | Ninth Circuit Court of Appeals Order | 108 |
| Exhibit 5 | Responses and Objections | 115 |
| Exhibit 6 | Curriculum Vitae | 125 |
| Exhibit 7 | Faculty Bio | 129 |
| Exhibit 8 | McDonald Report | 162 |

INSTRUCTION NOT TO ANSWER

| Page | Line |
|---|---|
| 138 | 5 |

as a potential expert witness. And then I didn't hear. And I said yes. But then we didn't really reconnect until the fall of 2020.

Q And do you have an understanding of how the plaintiffs in this matter, plaintiffs' counsel in the matter, identified as you a prospective expert witness in this copyright case? 11:13

A How did they find me?

Q Yes.

A Well, I teach at USC, University of Southern California, which has an experts list which is made available to -- I mean, it is a public record of who is on the faculty and what our areas of specializations are. 11:13

And I think anyone -- I mean, I get contacted by media, various people who want my opinion on something. So I imagine that's how Aleks found me. 11:14

Q And does that expert list that you said is maintained by the University of Southern California characterize you as have particular subjects of expertise?

A I think, like, in the English department, it is more generic; that we are all categorically experts in literary study and literary analysis and -- 11:14

Q How many times did you speak to Ms. Hilvert or Mr. Lowe in preparation -- before you filed your report in this matter? 11:14

A Before I ended up saying yes to the -- this particular case?

Q Well, let's ask that first. How many times did you speak to them before agreeing to take on this engagement? 11:15

A I think we had a conversation once that were about my qualifications, my experience, and then there was a follow-up with e-mail. And then I said -- I mean, I said yes, they said yes. So they identified me as someone that they wanted to bring into the case. And I presented 11:15 myself as someone who had the availability to do so.

Q And in connection with your retention in this matter, did you speak to the plaintiffs, Mr. Alfred or Mr. Martinez?

A No, in fact, I have never met anyone. You know, 11:15 previous to this case, I didn't know of Lowe & Associates. I never met Aleks. I thought Aleks was a man when I first started having conversations. I didn't know who the plaintiffs were. I don't mean to be too naive here, but I didn't even know what a plaintiff was. 11:15

So I have no history, personal, professional, with any of these people.

Q And is that true with respect to a former plaintiff named Tova Laiter as well?

A I have no idea who Tova Laiter is. 11:16

Q Okay. So when were you formally retained as an expert in this matter?

A When was I, like, brought in?

Q Yeah, when did you agree --

A I think it was about the fall of 2020, maybe late October. 11:16

Q Did you execute some sort of formal retention agreement, anything like that?

A What is a formal retention agreement?

Q A letter specifying the terms and conditions, any kind of contracts or agreement that -- 11:16

A No, there was no contract.

Q Okay. I am sorry. Just as a reminder, that was an example, if you could just let me finish the question.

A Okay. 11:16

Q I know it feels artificial but it will be easier for the court reporter if you let me get the full question out so that we have a clean record.

So, just -- let me ask that again. Did you execute any kind of formal retention agreement with the plaintiffs in agreeing to serve as an expert witness in this case? 11:16

A No.

Q And before you agreed to serve as an expert witness in this matter, did you perform any work in 11:17

connection with investigating the matter or in any other tasks?

A No.

Q Counsel has disclosed that you are being compensated in this litigation on an hourly basis at the rate of $425 an hour; is that right? 11:17

A Yes.

Q Is your compensation in this matter dependent in any way on the outcome of the case?

A No, absolutely not. 11:17

Q You said that before you agreed to serve as an expert, you didn't know the plaintiffs in this case, Mr. Martinez and Mr. Alfred; is that right?

A That's correct.

Q So I assume it is safe to assume that you also were unfamiliar with the screenplay that's at the core of their claims in this case; is that right? 11:17

A That's also correct.

Q Had you seen at the time that you agreed to be retained as an expert in this matter, the Pirates of the Caribbean: Curse of the Black Pearl? 11:18

A Are you asking me did I screen the film once they asked me to serve as the expert?

Q No.

A Or had I seen the film beforehand? 11:18

Q Had you seen it at the time that you were considering serving as an expert?
A No. I saw the film when it first came out. But I hadn't seen it since.
Q But you had seen it previously? 11:18
A Yeah, when it first came out. I mean, it was a blockbuster film.
Q Had you ever seen any of the other films in the Pirates of the Caribbean series?
A I might have seen one or two of the others but, 11:18 nothing that -- that I remember. I mean --
Q Had you been on the Pirates of the Caribbean amusement park ride at Disneyland, Disney World, anything like that?
A No, I didn't even know there was such a thing. 11:18
Q You don't know now or you didn't know then?
A I didn't know beforehand that there would be such a thing.
Q Okay. Do you know the defendant's expert in this case in this matter, James McDonald? 11:19
A No.
Q Do you personally know anyone that works at Disney?
A I don't think so. I mean, I imagine -- you know, Disney is such a conglomerate that there is probably 11:19

ATTORNEY LOWE: I am going to object belatedly as vague and ambiguous.

What does that mean, to be, quote, unquote, an expert in pirate genre?

BY ATTORNEY SEGALL: 11:21

Q You can answer. Do you consider yourself an expert in the pirate genre?

A Well, I think the question is tricky because it assumes that there is such a thing as a pirate genre, right? That there is a long history of literary texts 11:22 that serve as the pirate genre. And I am familiar with literature that passes into the pirate themes and stories, what have you, but I don't know that I would necessarily identify the pirate stores having a genre of itself. That seems like a relatively recent phenomena. 11:22

Q Okay. So, setting aside the question of sort of the definition of what a genre is, do you consider yourself an expert in pirate literature?

A I consider myself having familiarity with pirate literature. 11:22

Q Would you consider yourself an expert in pirate literature?

A I wouldn't say that -- I don't know who would be able to say that they consider themselves an expert in pirate literature unless they wrote books on that 11:22

tradition.

Q Have you written books on that tradition?

A No.

Q Do you consider yourself an expert in copyright law? 11:23

A No.

Q I am going to show you an exhibit. This will be a good test of our exhibit share system. So give me one moment and I will mark this.

And, Steve, we haven't done any depos in this case, right, so we are starting from Exhibit 1? 11:23

ATTORNEY LOWE: Yes.

Am I supposed to be getting on exhibit share at this point?

ATTORNEY SEGALL: Yes, you should have it in exhibit share now as Exhibit 1. Just let me know when you have got it up. 11:23

ATTORNEY LOWE: Let's try refresh. Okay.

THE WITNESS: Jordan, I have it.

ATTORNEY SEGALL: Steve, are you good? 11:24

ATTORNEY LOWE: Yes, looks like "Report of David Román," dated November 29, 2020.

BY ATTORNEY SEGALL:

Q You are getting ahead of me. So this is a document, called "Report of David Román," November 29, 11:24

2020. Do you recognize this document, sir?

(Deposition Exhibit 1, Report of David Román, was marked for identification by the court reporter.)

THE WITNESS: Are you back talking to me? 11:24

BY ATTORNEY SEGALL:

Q Yes.

A Yes.

Q And is this in fact the expert report that you drafted and filed in this matter? 11:24

A Yes.

Q Can you turn to page 3 of the expert report.

A I am there.

Q Can you see at the top of the page it reads "I was asked by Aleksander Hilvert of Lowe & Associates, 11:25 attorneys at law, to examine certain material in the case of Arthur Lee Alfred, II, and Ezequiel Martinez versus the Walt Disney Company for copyright infringement of their original screenplay entitled 'Pirates of the Caribbean.'"

Do you see that? 11:25

A Yes.

Q When were you given that specific assignment by Ms. Hilvert?

A Sometime in October, I guess, because I remember that the deadline was right around Thanksgiving. And USC 11:25

this semester actually was ending classes early. So we had to end classes before Thanksgiving so that students wouldn't be coming back from Thanksgiving break back to campus, and this has been a different COVID moment.

So I knew that I was only able to agree to serve on this dependent on my work schedule with USC. So, I needed time to go through my own professional obligations at work, USC. 11:25

And then I wanted to have enough time to be able to consider this case as best I could. So I think we started probably in early October, I would say. 11:26

But, again, I don't have -- I don't have a full sense of the timeline. But I would say early October.

Q Okay. So around that time in early October. What was your understanding of specifically what you were being asked to do, what your assignment was as an expert witness? 11:26

A I am very good about clarifications, You know, and it is something I actually ask my students to think clearly about. Like, what is the assignment so that it is clear that everyone knows what is expected of them. And the way that I understood my assignment is that I had to read a screenplay and then screen a film. And discuss the potential similarities, if any, between them. 11:26

Q And did you receive any specific instructions 11:27

about what standards you should apply in comparing the works for similarities?

A No. Not really. I mean, this is partly that I had my own set of criteria that I was using. Which I explained to the lawyers earlier on, that this is how I think, this is the kind of the work that I do, this is what a comparatist does. 11:27

Q So you go on to write here in Exhibit 1 that Ms. Hilvert provided you with the plaintiffs' original screenplay, correct? 11:27

A Correct.

Q Then you were asked to compare that to the Disney film, Pirates of the Caribbean: Curse of the Black Pearl; is that right?

A Yes. 11:27

Q And you screened that on Netflix at the time, correct?

A Correct.

Q Were you asked to review any other films in the Pirates of the Caribbean franchise? 11:27

A No.

Q Were you given any other documents at this initial stage after you received this assignment to compare --

A No. No. I simply had the screenplay and then I 11:28

had to find the film on my own.

Q How many times did you subsequently watch Curse of the Black Pearl?

A Since or for that report?

Q Well, let's start with in preparing the initial report. How many times did you watch Curse of the Black Pearl in preparation for ultimately filing your report in this matter? 11:28

A I saw it three times.

Q And how about after that? Did you watch it again after you filed your initial report? 11:28

A Yeah, I have probably seen the film six times or so, six or seven times. This is just for the case. I am not talking about previous when I just saw it in the theaters. 11:28

Q Okay. And about how many times would you say you have read the plaintiffs' screenplay at this point in total?

A Anywhere between 15 and 20.

Q Okay. Back in Exhibit 1 you say in this paragraph that you, after you screened the film, you assessed patterns of similarities and then you communicated your preliminary views to the lawyers. 11:28

You say that in the second paragraph. Do you see that? 11:29

A Yes.

Q What were your preliminary views at that time about -- about the works?

A Pretty much everything that's in the report. But it was done verbally. (Crossover talking) Comparisons between theme, mood, tone, sequence of events, characters, other kind of larger macro structural dynamics that I thought were really interesting and unusual. 11:29

That's, so, pretty much what's in the report. What I communicated to the lawyers ended up in my report. 11:29

Q Well, you just used a number of specifics. Sort of, artistic elements: Plot, mood, tone, sequence of events.

Were you given those and told specifically to consider those elements? 11:30

ATTORNEY LOWE: I am going to object. I believe the communications between the attorney and the expert are privileged, aren't they, Jordan?

ATTORNEY SEGALL: I think this is asking him about assumptions that he was given about the law. So I don't think that aspect of the attorney-expert communication would be privileged. 11:30

ATTORNEY LOWE: Yeah. And I think we have disclosed that any time in the rebuttal report. For example, he says he was informed that -- that was things 11:30

that he was informed by counsel of. I don't know if in this report he uses those words.

But, yeah, he can answer regarding, you know, assumptions that he was asked to make and/or of recitations concerning the law that we told him. 11:30

BY ATTORNEY SEGALL:

Q Okay. Mr. Román, maybe I can ask that question again.

You mentioned a number of specific elements of the works that you felt were similar: Plot, mood, tone, 11:31 sequence of events and so forth.

Were those elements that you considered on your own or were you asked specifically at this time to consider the works along those dimensions?

A Well, I think initially what I did, I said, well, 11:31 this is the kind of comparative work I can do. I can set out and look and see what the structure of each works are, how they are framed, how character is developed and sustained, what the kind of ongoing thematics are that are introduced in the screenplay, what the ongoing thematics 11:31 are that are introduced in the film, how characters are developed, what the tone of it is.

One of the things that I thought, when I was reading it, I thought that the screenplay had such an original element to it that was so unusual that I made a 11:31

note of that.

So when I was speaking to the lawyer, I said, like, well, I think the tone is really interesting here. I think, the one phrase that was new that I think that I was hearing the lawyers use was "sequence of events," 11:32 which I don't think would necessarily be my language. But I immediately knew what they were talking about.

Q So just going back to what you just testified, after your initial sort of review of the works in this case, your -- it is your testimony that your initial 11:32 impressions were essentially the same as the ones you ultimately expressed in your report; is that right?

A Yeah. I think I had time to develop my major ideas as I was writing the report and think through other comparisons that I thought were relevant and necessary to 11:32 include.

Q Did you think -- I know you said you felt there were similarities between the works when you first screened them or when you first reviewed them. Did you also feel that there were any significant differences 11:33 between the works at that time?

A Yeah, no, of course. There are obvious differences between the two works that -- that are immediately apparent. I think like anyone -- any one of us could look at these two and say oh, well, this happens 11:33

here and it doesn't happen there. Or this happen here and it didn't happen there. So, yeah, no, it is not an identical correspondence by any means.

There's differences in the screenplay. There's aspects of the screenplay that don't appear in the film 11:33 and there's moments in the film that aren't in the screenplay.

Q You mentioned a second ago, I think, that when you were doing your preliminary reviews something that stood out to you was the tone of the screenplay. 11:33

Did I get that testimony correct?

A Yes, sir.

Q What specifically about the tone did you feel stood out about the screenplay?

A Well, I thought the tone was pretty ingenious. 11:34 So, let me just state from the very beginning, just on the level of, like, the quality of the work, I thought that the screenplay was highly original, very innovative, layered, nuanced. I actually enjoyed reading it. I thought it might be somewhat tedious to read initially; 11:34 like, I didn't necessarily think I was going to be reading something so interesting.

And I think that the screenplay -- the other surprise with the screenplay is that it actually holds up. So as I keep rereading it, I keep finding it -- I still 11:34

find it interesting. I think it's an interesting piece of writing for several reasons.

And I think one of the things that really stands out for me is the sort of hybrid tone that it introduces early on. So, I found that to be both innovative, kind of 11:34 exciting and interesting. And that's what I most kind of latched on to. That it wasn't easily reduced to a particular type of screenplay.

I think it would be a misnomer to say, oh, this is a comedy. Or, this is this, or this is that. It has 11:35 the sort of hybrid elements that when combined make it sort of an unusual experience.

But, yet, I also think that it could find its origins in, you know, other pirate stories or -- I mean, I think one of the things that I found really surprising was 11:35 that the -- the quality of the intellect. The screenplay is very intelligent in so far as that it is very well aware of the traditions in which it is emerging from.

I appreciate like intelligent writing and I think I was drawn to that. So the tone is both humorous, but 11:35 there is a level of irony. It also has this sort of romantic element that I found really compelling.

I could keep going, Jordan, if you want. Do I stop or do you stop me? (Crossover talking.) You have to forgive the professor in me like sometimes goes on. 11:36

ATTORNEY LOWE: You can finish your answer. You can finish your answer. I don't think you were done.

THE WITNESS: Well, I think, just, Jordan, we are talking about the tone?

BY ATTORNEY SEGALL: 11:36

Q Yeah, I just wanted to know specifically. I wasn't really asking for everything that you liked about the screenplay. I was asking for specifically what you meant when you said you found the tone striking in your initial review of it. 11:36

So, maybe I can ask you a more specific question because it seems like you have clarified that when you say the tone, you mean the hybrid quality of the screenplay.

What do you mean by that? What elements of the screenplay are hybridized in the work? 11:36

A Well, I mean, the hybrid quality, I think, is organic to the piece and appears in all kinds of different aspects of it from character to tone to even like the plot.

So the hybridity component, what I mean by hybridity, is it kind of brings into seemingly discreet, distinct elements and creates something that combines those two into a kind of interesting, innovative, element. Right? 11:37

Q What are those two elements? That's what I am 11:37

asking specifically.

A Well, one would be if we just want to do on the hybridity of the plot, one would be it has this sort of pirate motif, like traditional pirate motif current, right? Like the battle -- you know, ships at sea, battle scenes, the protagonist/antagonist dynamic, which is very suspenseful. But then it also has this concurrent, equally viable, equally important, equally sustained throughout, romantic story line which is -- for me, was very surprising. 11:37 11:38

I thought, oh, okay, one of these is eventually is going to kind of usurp the other. One of these is going to take over the story. And what I found refreshing, and what I mean by hybridity is that the screen -- the screenplay was able to sustain both elements simultaneously. I mean, at different moments. They are heightened at different points. 11:38

So the tone is both suspenseful, like, who is going to win the battle, right? And it is also very suspenseful in, like, will this couple get together? Is this couple meant to be? 11:38

I wasn't quite sure if they were going to -- if they were actually going to stay lovers throughout or if that kind of romantic aspect was going to be continually delivered throughout the screenplay. 11:39

Q So when you say you felt the screenplay has hybrid qualities, you mean that it combines sort of adventure elements and romance elements, correct?

(Reporter asks for repeat.)

Adventure elements and romance elements? 11:39

THE WITNESS: Pam, am I speaking too quickly for you?

(Discussion off the record.)

ATTORNEY SEGALL: You've got to resist the temptation to start answering before the question finishes. It's hard to do, I understand.

THE REPORTER: I'm sorry, I didn't get the witness's answer to that question.

ATTORNEY LOWE: I think he said that only with respect to the plot. And I think he was going to -- 11:39

ATTORNEY SEGALL: Steve, let's let the witness answer for himself.

BY ATTORNEY SEGALL:

Q Is that accurate to say, Professor Román? That when you say the hybrid quality of the work, you mean that it combines adventure elements and romance elements, correct? 11:40

A On the level of the plot, yes. Yeah, there are hybrid aspects elsewhere. But in terms of the example that I pulled out, yes. 11:40

Q Were you asked to form an opinion about the quality of the screenplay, the aesthetic quality of the screenplay?

A No. But I made it clear right away what I thought it was. 11:40

Q Is that part of the opinions you are expressing in this, that this is a high-quality work?

ATTORNEY LOWE: Objection, vague.

BY ATTORNEY SEGALL:

Q You can answer. 11:40

A Oh, I can answer? Okay. One more time, Jordan? I am sorry.

Q Is that among the opinions you intend to offer as an expert in this matter, that the screenplay is sort of a high-quality work? 11:40

A Yeah, no, I totally stand by that. If that's what you are asking, if I firmly believe that this is an original, innovative piece of writing, that is sophisticated, all of that. Yeah.

Put it this way: I am very impressed by the screenplay. I didn't anticipate that I was going to find it so creatively innovative and enjoyable. So I think of it as a very sophisticated piece of writing. 11:41

Q And were you asked to form an expert opinion about whether the screenplay is an original work? 11:41

A I think that was the nature of the -- the -- part of what my project was to see if was there something original in the screenplay that was then duplicated in the film. Or what aspects of the film were borrowed from the screenplay, if any. 11:41

I mean, this is like variations on a theme. So, I ask myself these questions differently to get a grip on how to think this through.

So one of the ways I think is it is like variations on a theme. I will ask questions of myself, 11:41 think it through. Okay, let me rephrase this question a little differently and see what I come up with. And, consistently, I was coming up with more or less the same thing.

That I thought the screenplay was really 11:42 innovative and interesting. I felt like it was something new, creative. That it did have an awareness of itself as a pirate movie. And that it never lost its sort of entertainment value.

I don't find everything entertaining. But it was 11:42 clear that it had that component, was really omnipresent.

Q Let me direct your attention back to Exhibit 1, your expert report. You say in the second paragraph on page 3 that "Once I communicated my preliminary views to the lawyers, they provided me with secondary materials 11:42

related to the case, which I also reviewed."

Do you see that?

A Yes.

Q And then -- is that accurate? Did Ms. Hilvert and Mr. Lowe provide you with additional secondary materials after you communicated your preliminary views? 11:43

A Yes.

Q And in particular, they provided you with a brief that they had filed in Federal Court called the Ninth Circuit Court of Appeals; is that right? 11:43

A Correct.

Q And they gave you pages 8 through 25; is that right?

A No. They gave me the entire thing.

Q But you focused in particular on pages 8 through 25? 11:43

A Yes.

Q And you understood the brief had been drafted by attorneys, correct?

A I wasn't exactly sure. Like, I assumed so, because it was already filed in a court. 11:43

Q And what was your understanding of why you were being asked to review that legal brief?

A You know, that's a really good question. And I will tell you, I immediately got a little anxious because 11:44

I thought, wait, how much more am I supposed -- how much more material am I going to be offered? Because I, you know, I did have a lot of obligations at USC this semester and I wasn't sure if I was going to be getting more documents and it was going to entail more work. So I 11:44 wasn't exactly sure what I was going to -- what this was all about, why I was getting this and what I was supposed to do with it.

Q And did you ever form an understanding as to why you were getting -- 11:44

A Yes, because I asked, like, what am I supposed to do with this? Why am I reading this? I thought I was just doing this and this.

Q And what were you told?

A That my credibility would be based on the initial 11:44 comparison between the screenplay and the film. And that once that was confirmed and I was writing up the report, I would be getting more materials relate to the case.

I didn't know about the case per se. I didn't know the status of the case. I didn't know the players of 11:45 the case. I didn't know anything about the case. I just knew that there was a screenplay and a film that I was asked to compare to see if there were any identifiable similarities or not. And if so, what would they be.

And then I was sort of introduced to the case, 11:45

like, the legal aspect it, which I didn't know beforehand in detail.

Q So, you say at the bottom of page 3 of Exhibit 1 that you were given this appellant's opening brief that was filed with the Ninth Circuit and then you, quote, verified the accuracy of said similarities set forth therein. 11:45

Do you see that?

A Yes.

Q So, the brief that you were given describes certain similarities, at least as articulated by the authors of that brief between the screenplay and Curse of the Black Pearl; is that right? 11:45

A Yes.

Q Were you asked as part of your expert assignment in this case to verify the accuracy of the statements that were made in the brief by the lawyers who drafted it? 11:45

A No, it was more that -- because I was on a particular timeline and, again, I don't want to make a big deal of the fact that I was teaching full time and during Zoom, student need is really high. I was trying to do more time management issues really in terms of how I could do both jobs well simultaneously. 11:46

So, when I offered my initial preliminary report, I mentioned several things that were, I guess, were 11:46

already in this document, that I hadn't seen. And I didn't want to necessarily be redundant in my report and just, you know, felt, like, okay, if I think this -- so I thought, can I just -- can I use this as a shorthand to say, look, I agree with, like -- like, this is -- this corresponds to what I am saying, or do I actually have to write it all out myself? 11:46

Q So, it is fair to say that the brief that you were given by plaintiffs' counsel was to sort of give you a framework for your own expert report; is that right? 11:47

ATTORNEY LOWE: Objection, vague.

BY ATTORNEY SEGALL:

Q You can answer.

A So, just a procedural question. When -- when Steve says "Objection," everything stops, right? 11:47

Q Your counsel is going to make certain objections for the record. Those are for the benefit of the court who may rule on those objections later.

A There is no one here saying, okay, "Objection overruled." There is no person authorized here to do that. 11:47

Q That's right. So unless you are specifically instructed not to answer by your counsel, you can go ahead and answer.

A Thank you. Jordan, one more time. 11:47

Q Maybe I would ask the court reporter to read that question back, please, if you would please, Pam?

THE REPORTER: Sure.

(Record read:

"Q So, it is fair to say that the brief that you were given by plaintiffs' counsel was to sort of give you a framework for your own expert report; is that right?") 11:47

ATTORNEY LOWE: I will reassert the objection, vague and ambiguous. 11:48

THE WITNESS: I will say this and again, this is with complete respect to all parties involved. I had no idea what they wanted me to do with this report, right? I didn't question their intent. But I did feel that my kind of -- my take on the comparison had a lot more elements that weren't in that initial exhibition. 11:48

That I personally felt that the things that I was introducing in my report were stronger and more interesting and more detailed. And some of the things that are in the exhibition, I think, I totally agree with. 11:48

But I didn't think the major comparison was, like, between, you know, someone wears an outfit in one piece and they replicate that outfit in other.

BY ATTORNEY SEGALL: 11:49

Q The comparisons -- the similarities you identified were at a higher level than these details; is that right?

ATTORNEY LOWE: Objection, vague.

THE WITNESS: I wouldn't say -- it is the skill set that I have as a literary scholar and my facility to kind of look and examine the structures of narrative, the structures of storytelling, all the aspects that were important to me. And to what I do professionally and intellectually. 11:49 11:49

I don't want to diminish the report. I mean, the report is what it is. But I didn't feel -- I wasn't sure if I was supposed to reiterate everything again.

BY ATTORNEY SEGALL:

Q Well, you say here that you verify the accuracy of the similarities that were stated in the opening brief. Were you asked to do that specifically? 11:49

A I think I might have volunteered that myself and said like everything that's in the report, I completely concur with. I think this is right. But I think I am much more drawn to kind of thinking through. I thought the strength of the -- of the comparison was really more on some of the narrative structures. 11:50

Like, say, the prologue, for example. Like, I think the prologue component, which we can talk about in 11:50

detail now or later, but I thought that the -- I really wanted to spend more time talking about the similarities in the prologue, similarities in the entire framing device of the narrative structure, the ending, the hybridity of the characters, the tone stuff. That's the stuff that I 11:50 really wanted to dwell on.

And I think that -- I don't know if it is the nature of legal writing that Exhibit B didn't have the capacity to kind of introduce a fully narrative report. It was more like a list. It was like a laundry list of 11:50 correspondences. And what I wanted to do was sort of narrativize that, you know, report.

Q Okay. So when you say that the brief contained a laundry list of correspondences, you mean, specific expressive details? 11:51

A Yes.

Q That were in the works, correct?

A Yes, sir.

Q Okay. But that wasn't your focus, right, this sort of specific expressive details, right? 11:51

A No, I mean, of course, there are aspects of that in my report and there is a tremendous amount of overlap what I found and what was already in Exhibit B.

Q Did you use the brief you were given as a basis for writing up your own report? 11:51

A No.

Q Is it your expert opinion as you sit here today that the arguments on pages 8 through 25 of the opening brief you were given are accurate?

ATTORNEY LOWE: Objection to the use of the word "arguments." But -- 11:51

THE WITNESS: Can I take --

ATTORNEY LOWE: Vague and ambiguous.

ATTORNEY SEGALL: Sorry?

THE WITNESS: Jordan, can I take a quick look at that just so I know exactly what we are talking about? 11:52

BY ATTORNEY SEGALL:

Q At the brief itself?

A I think you are asking about pages 8 to 25. I just want to make sure that I know what I am about to agree to. Are you cool with that? 11:52

Q Sure, absolutely. I think --

A It is the bottom of this document.

Q It's at the bottom of the document if you turn to page 32 of this document. 11:52

A Just give me a second to get there. I just want to --

Q Of course.

A -- slow this down for a moment. Here we go. Okay, I'm sorry, go ahead. 11:53

Q Well, I guess my question here is whether you are offering as your expert opinion or as part of your expert opinion as you sit here today that the arguments made on pages -- or that the descriptions on pages 8 through 25 of plaintiffs' Ninth Circuit brief are accurate? 11:53

A Yes.

Q And you also say on the top of page 4 of Exhibit 1, your report "I adopt Exhibit B as an addendum to my report." And Exhibit B are the pages of that appellate brief, pages 8 through 235? 11:54

A Yes.

Q What function do you view those pages serving in your report?

ATTORNEY LOWE: Objection, vague and ambiguous. No foundation. 11:54

THE WITNESS: Can you just repeat the question, Jordan, for me.

BY ATTORNEY SEGALL:

Q Well, you say I adopt Exhibit B as an addendum to my report. So you actually attach the plaintiffs' brief 11:54 or at least parts of the plaintiffs' brief as an addendum to your report, correct?

A Yes.

Q So you must have done that for a reason. So I am asking what function does the appellate brief serve in the 11:54

context of your expert report?

A Again, I am not exactly sure how to answer this. But I wanted to have my report have its own kind of narrative authority and narrative voice. And while I concurred with everything in the exhibit, I -- I mean, this sounds slightly arrogant, but I just take pride in my writing. 11:55

Q So I am trying to understand, sir. You are expressing opinions regarding your own independent analysis of the works, correct? 11:55

A I just thought there was a level of redundancy that I thought that in my report I could phrase it in a way that I would feel more confident being able to stand by, like in terms of how I can actually organize an argument, or organize an idea or kind of develop a point. 11:55

Q If you proceed to offer opinions at trial, do you intend to offer the -- you know, as part of those opinions, the statements in the plaintiffs' brief that you adopted as an addendum in the report?

A One more time, please. 11:56

Q If you proceed to testify at trial and offer your expert opinions in this matter, would some of those opinions be the material contained in the appellate brief that you attached as an addendum to your expert report?

A Oh, yes. 11:56

ATTORNEY LOWE: Okay. I will let him answer. But belated objection on that is that, you know, what happens at trials calls for attorney work product. And so, you know, to the extent that may be basing his answer on attorney work product, we instruct him not to answer. 11:56
But he already answered said yes, of course, so there you go.

BY ATTORNEY SEGALL:

Q Did you understand at the time you were given this brief that Disney also filed a brief with the Ninth 11:56 Circuit?

A No.

Q Were you given a copy of any briefs that Disney filed with the Ninth Circuit?

A I looked over all my materials yesterday and 11:56 Aleks and I actually looked over all the materials that I was given and I don't think that was part of it. I have a list somewhere if you want me to double check.

Q But you don't recall reading a brief that was drafted by Disney, correct? 11:57

A No. Was I supposed to?

Q Well, you tell me. Would you have thought that was important for completeness to review any brief that Disney filed with the Ninth Circuit as well?

A Jordan, I am just going to say what I said 11:57

earlier. You know, I think that, from my understanding, my job was to read a screenplay and screen a film. And see what the overlap, if any, there was between them.

So, I kind of stayed clean to that mission, right? And that's been my guiding principal throughout. 11:57 What's in the screenplay, what's in the film, what, if any -- what if any correspondence are there between them. And if so, how might I articulate them. And how resonate are they.

So I kept it pretty -- I would use the word 11:58 clean, kept it pretty clean. So I just thought I'm looking at the screenplay, I am screening the film. I was tasked to do a comparative analysis of the two.

Q Other than the plaintiffs' Ninth Circuit brief that you describe on pages 3 and 4 of Exhibit 1, what 11:58 other secondary materials were you given at this time as you were beginning to prepare your expert report?

A I wasn't given anything other than what's here.

Q Okay. And at the time you were given this material, did counsel identify any other sort of facts or 11:58 data that you were asked to consider in forming your initial opinion?

A I was sent the artwork. There was some sort artwork, some, like, minor artwork. There were some images. And then asked to think about them. And there 11:59

was some discussion of a ride.

But, again, I wasn't familiar -- I am not fully familiar with the Disney Pirates franchise or all of that.

Q When did you receive the art that you just described? 11:59

A Well, there was art in the initial screenplay itself. So the screenwriters had some images that were attached to their screenplay that introduced the entire story. There are a little, you know, through the Xerox, they are a little fuzzy. 11:59

And then your expert report includes some images. There's just been a set of images that have been sort of -- to be slightly silly, like haunting the production of this case. They do surface every once in a while. There is like a -- there's some sort of pirate face that 12:00 shows up that I am supposed to be aware of or something.

So when the Disney report expert had those images there, I wasn't quite sure what the relevance of that was. I certainly didn't introduce any images in my report.

I think, so, that was -- that might have been it. 12:00 I have a list I could look over if you don't mind.

Q Yeah, absolutely. You can look over your list. But I guess I am trying to understand the specific materials that you considered in drafting your original report. 12:00

So we know you considered the screenplay. We know you considered the Curse of the Black Pearl film. We know you considered the plaintiffs' appellate brief that we have been discussing.

A That would be it for the initial report. 12:00

Q Okay.

A I had a little more legwork for the rebuttal.

Q So, any other materials you received or considered, that would have happened after you formed your opinions and stated them in the initial report; is that 12:01 right?

A Yes.

Q And at the time you were preparing your initial report after you sort of delivered your preliminary opinions to counsel, did counsel provide you with any 12:01 information about the legal standards that should govern your expert opinions in this case?

A Can you just walk me through "legal standards."

Q Well, did they tell you anything, for instance, about what standards governed the comparison of works for 12:01 substantial similarity in copyright cases?

A Yeah. There was just a couple of notes that, verbal, that I wasn't sure if I was supposed to write out all the things that I didn't find to be corresponding. So the dissimilarities. And I was informed that the 12:01

copyright laws aren't necessarily interested in what doesn't correspond but what does correspond.

So I didn't know if I was supposed to write up all the things that, well, this happens here, but it didn't happen here. And I was told no, no, that's not relevant. You were only asked to look -- that the legal -- that the legal requirement for copyright infringement is what actually corresponds between two texts. 12:02

Q So other than being instructed to disregard dissimilarities between the works, were you given any other information about the legal standards governing copyright cases? 12:02

A No. I mean, I think that there was some kind of casual conversations about copyright infringement cases. You know, as an intellectual, I am just sort of curious, you know, what do these things look like, or what is important here. 12:02

And Steven just walked me through generically, you know, what copyright infringement cases tend to focus or what their issues are. 12:03

Q Did you take notes? You said those were sort of verbal conversations. Did you take notes on those conversations?

A No. You know what it felt like? It felt like, 12:03

you know, conversations in the hall USC between two experts on a particular -- say I bump into, you know, the 18th century scholar. And she starts telling me about her latest book and I'm like, oh, okay. Well, like, walk me through this a little bit. I am interested in this a little bit. 12:03

But it didn't seem relevant to what I was tasked to do. I mean -- and again, I always go back to what was my particular job here. And I actually, you know, said very clearly that I had no -- I wasn't a lawyer. I don't have -- that's not my interest or area of specialization. 12:03

ATTORNEY LOWE: Jordan, since we have been going about an hour, I usually like to take a break every hour, stretch our legs.

ATTORNEY SEGALL: Yeah, I have got two or three more questions in this line and then went we will take a break. It's a good place. But let me just finish up these last couple. 12:04

BY ATTORNEY SEGALL:

Q I just want to go back to what you just testified, Professor Román. Is it fair to say that you didn't regard sort of the legal standards that governed copyright cases as relevant to the specific expert opinions that you are expressing in this case? 12:04

ATTORNEY LOWE: Objection, vague and ambiguous. 12:04

Calls for a legal conclusion.

THE WITNESS: I don't think that Lowe & Associates assumed that I had legal expertise. And given that they had selected me as the outside witness, I felt confident in my task which was in the comparison. 12:04

BY ATTORNEY SEGALL:

Q Okay.

A And if they had required me to have any kind of legal expertise, I think they would have selected someone else. 12:05

Q And, yeah, I don't want to belabor this point. But you did testify, though, that they told you that copyright laws generally disregard dissimilarities in the works. Is that --

A I would say that, yes, because I wasn't sure in 12:05 my report if I was supposed to be documenting the moments of discordance.

Q But other than that specific instruction from counsel, you can't specifically recall any other information that you were given by counsel about the legal 12:05 standards that you should apply in reaching your opinions in this matter; is that right?

A That would be correct.

ATTORNEY SEGALL: Okay. Why don't we take a break now. 12:05

ATTORNEY LOWE: Thank you.
THE WITNESS: How long the break?
ATTORNEY LOWE: Fifteen minutes?
ATTORNEY SEGALL: Yeah. I mean, we started late so maybe we should try to take 10 so we can keep it moving
12:05
along. Since I know it was 11:00 and I want to be respectful of your time if that works. But 15 if you need to. Whatever you want.
THE VIDEOGRAPHER: We are now going off the record. The time is p.m.
12:06
(Recess.)
THE VIDEOGRAPHER: We are now going back on the record. The time is 12:22 p.m.
BY ATTORNEY SEGALL:
Q Welcome back, Professor Román. During the break
12:22
your counsel had disclosed to me that he had refreshed your recollection as to additional information that he provided to you in connection with forming your expert opinions.
So I wanted to give you an opportunity to
12:22
supplement the record if you wish.
A Thank you, Jordan. Yeah, no, it has to do with the selection and arrangement and the repeated patterns in a copyright case. So we had talked about that.
Steven had walked me through what selection and
12:22

arrangement meant legally and how I should be considering not just certain types of literary characteristics like dialogue, setting, but also the particular set of arrangements, the selection and arrangement of those types. 12:23

Q Okay. And what you did you understand specifically about what the selection and arrangements (inaudible). (Reporter asks for repeat.)

-- about how the selection and arrangement test functions in copyright law? 12:23

A I mean, just on a very introductory level, I would say that there are particular tropes that might be identifiable in a particular genre but that may or may not be protected through copyright law. But there is a another set of criteria which is how those tropes are 12:23 actually put into particular patterns, in a story. And how they are selected and arranged in a story. And that that might be also something that could be protected.

Q And were you asked to apply the selection and arrangement test in forming your opinions? 12:23

A I was asked to be aware of that. I already had pretty much identified -- I didn't realize that that was the language for it. And, so, again, that was the language that was offered me.

Q Professor Román, are you a lawyer? 12:24

A No.

Q Do you have any legal training?

A Absolutely not.

Q Do you have any formal training in copyright law or copyright litigation? 12:24

A No.

Q Do you have any professional experience in copyright law?

A Insofar as -- what do you mean by that?

Q Generally speaking in your professional life, do 12:24 you have any prior professional experience in the area of copyright law?

A Are you asking me if I have worked on other cases?

Q I am asking you generally speaking, in any 12:24 professional capacity prior to this engagement whether you have professional experience in copyright law?

ATTORNEY LOWE: I will object as vague and ambiguous.

THE WITNESS: I was asked to -- I was brought in 12:24 as a consultant on a copyright infringement case beforehand.

BY ATTORNEY SEGALL:

Q And what case was that?

A I don't think I am allowed to say. 12:25

Q Is your engagement in that matter confidential?
A Well, isn't it?
Q I wouldn't know. Do you --
A I kind of thought that I wasn't supposed to say anything about the case to others. It was a long time ago. 12:25
Q Okay. Approximately when were you involved in that copyright case?
A In the early 20th century, like 2003, 2004.
Q And without disclosing specifics, what was the issue in that case generally speaking? 12:25
A Copyright infringement. Someone felt that their work had been stolen and that they weren't acknowledged.
Q And was there a lawsuit pending?
A Yes. 12:26
Q Were you hired by the plaintiff or the defendant in that lawsuit?
A I was hired by the defendant.
Q And what were you hired to do?
A Again, a kind of a comparison between -- I think this one was a novel and a screenplay. 12:26
Q And what did you conclude in that case?
A That there were limited correspondence.
Q That the works were not similar, is that what you concluded? 12:26

A Yeah, it was limited. I didn't think that there was -- you know, Jordan, this is sort of awkward because I am not actually deciding the case. I just thought, well, looking at this novel, looking at this screenplay, I couldn't, as the outside person, I couldn't agree that there was enough borrowing from the novel to build a case on it. I didn't see it. 12:26

Q And did you file a report in that matter?

A No.

Q Did you testify in that matter in either a deposition or at trial or arbitration? 12:27

A No. There was no deposition. This is my first deposition. But there was a -- like a meeting at a law firm between, like, two sets of lawyers and a client.

Q Other than that, you said that was in the early 2000s? 2003 -- 12:27

A Yeah, I think it was 2003 or 2004.

Q Other than that experience where you were hired as a defense expert in a copyright case, do you have any other professional experience in copyright laws? 12:27

A There was one when I first came to USC which was in the mid-'90s, which also was a similar situation that didn't build to a case.

Q Okay. Were you hired there by the plaintiff or the defendant? 12:27

A I was hired there by the defendant.

Q And around when was that case?

A I would -- I don't know. I came here in 1995, '96. I moved here in New York and I was just starting my career. So I remember it was early on in my career. One of my senior colleagues had recommended me. It was beginning of my career. So like '90s. 12:28

Q What were the works at issue in that case or in that case?

A That was -- again, I don't have -- it is from such a long time ago, I don't really remember. It went nowhere. So I don't really have much of a retention and when I tried going back into my files, it wasn't even on my computer anymore so I don't really have any of the details. 12:28 12:28

Q You don't remember what type of works were at issue?

A It was a screenplay, and, if not a movie, a made-for-video thing, or two different -- screenplay and some product. 12:28

Q And you were asked to form an opinion on the similarities between the works; is that right?

A Yes.

Q And what did you conclude in that matter?

A Again, I didn't -- I didn't see that it was a 12:29

strong -- I didn't see a strong correspondence.
Q Okay. So, other than those two prior expert witness engagements, do you have any other professional experience in copyright law?
A I have since worked on another case for Lowe & Associates. 12:29
Q And when did you start working on that case?
A Maybe February.
Q Of this year?
A Yeah, 2020 -- 2021, yes. 12:29
Q What was your role in that matter?
ATTORNEY LOWE: I will tell you that he was a consultant. So, since he has not been disclosed, he is at this point, you know, not going to be able to provide any specifics. 12:29
ATTORNEY SEGALL: Okay. So are you instructing him not to answer?
ATTORNEY LOWE: Yeah, I mean, he can tell you what his role is. I just can't let you know what it is about. 12:30
BY ATTORNEY SEGALL:
Q Okay. Why don't you just tell me the general nature of the role you have been retained for by Lowe & Associates in that matter.
A I was asked to look at a screenplay, similar to 12:30

this, look at someone's screenplay and look at a film and then determine again if there are any similarities between the two.

Q And have you formed an opinion as to whether there are similarities between the two? 12:30

A I thought that the case was not a strong one. So I couldn't -- I won't say I couldn't recommend it. I just didn't see -- I am not sure what the language would be on this, Jordan. I don't know what the legal language would be to say I didn't think it was there. I guess that's the 12:30 language.

I didn't see -- I didn't see -- I didn't see the correspondence.

Q And were you retained in this case that you are describing now on behalf of the plaintiff or the 12:31 defendant?

A I was working for -- I was asked to -- the plaintiff is the screenwriter, right? I was -- yeah, I was brought in -- the screenwriter was the one that asked Lowe & Associates to take on their case. And then I was 12:31 brought in as the consultant.

Q I see. Okay. Any other --

A Does that answer it?

Q Yes. I think that answers my question.

Any other expert engagements that you have 12:31

be the same as asked by, you know, University of Maryland or Harvard. They all have different criteria.

I mean, it is variations on a theme. But often they do want to know what is original and how this stands out from the field. 12:33

Q My question is a little different. My question is specifically the substantial similarity standard. You are familiar with that standard from copyright law, correct?

A Can you just walk me through it one more time. 12:33

Q Well, what do you understand "substantial similarities" to mean in the context of copyright law?

A Oh, copyright or tenure?

Q Copyright?

A Substantial similarities is, the way that I 12:33 understand it is that -- let's just say, text A, whatever that text is, has certain characteristics that may not -- may or may not appear in text B and the copyright case would be based on the -- how similar those elements are both in terms of the originality of the element and also 12:34 the sequence of events, the patterns, the repeated patterns of them, the selection and arrangement.

Q And is it your testimony that you apply those standards, for instance, in reviewing tenure files, the substantial similarities standards? 12:34

Q You can answer.

A It does feel slightly hypothetical to me so I am not exactly sure. I am often drawn to hypotheticals so I am kind of curious to see where you are going with this. But I am not exactly sure -- I'm not sure what is at the heart of the question, if it is about differentiating between academia and the legal world. 12:36

Q Well, let me ask you this. When you are analyzing tenure files in your role as an academic, are you applying the same standards for similarity and originality as you apply when you are acting as an expert witness in copyright cases? 12:36

A The difference would be it's not like I'm asked to see -- I look at two files and say compare, you know, candidate's A file to the work that's already established in candidate B's file. So candidate A's file stands on its own. And it is up to me to then be able to argue its placement in the field, be able to argue its originality, its innovations, its contributions to the field. 12:36

(Reporter asks for repeat.) 12:37

Yes. I am saying that on a tenure file, when I am asked to evaluate a tenure file, I am asked to consider the originality of the scholarship. I am asked to place the scholarship in the larger field of study.

What is its original contribution, what are its 12:37

innovation, what does it add to the field that's already established, what I find important in the work.

Q Do you know what the test is for infringement in copyright law?

A Go ahead. 12:37

Q I am asking if you know.

A Oh. I don't think so.

Q Well, let's look back at Exhibit 1 if you still have it open, which is your expert record at the top of page 3. 12:38

Are you there?

A Yes.

Q I will ask you to look at the second paragraph on page 3. This reads "I believe that there are enough important patterns of similarities between the two works 12:38 to a merit conclusion that one is substantially similar to the other, notwithstanding the existence of some differences."

Did I read that correctly?

A Yes. 12:38

Q I want to focus on the term "substantially similar." Were you familiar with that term in particular before you were engaged as an expert in this case?

A It is a term that I use. It is a term that seems fairly self-evident. 12:38

Q Were you asked as part of your expert engagement to focus your analysis on the substantial similarities between the works in this case?

A Yes.

Q And what do you understand the term "substantially similar" to mean in the terms of a copyright dispute like this one? 12:39

A I guess I would answer that there is enough substance in the similarity to merit concern.

Q Anything else? 12:39

A I mean, unless I mapped it out in my reports -- I mean, I drafted that a while ago.

Q I am just asking for your understanding as you sit here today testifying as an expert on substantial similarity. I am asking what you understand the tests for substantial similarity to be in copyright law? 12:39

A Well, again, I am not a copyright lawyer. But I would just, again, reiterate what I said, that -- a similarity that has enough substance to warrant concern.

Q And were you specifically asked to -- (crossover talking.) 12:40

A Specific -- I am sorry.

Q I am sorry. Did you have more to that answer?

A Yeah. So that whether it is in, like, the theme or the plot or the -- a character, there might be, I 12:40

guess, superficial similarities, right, that might not merit concern. So, let's just say a character in one text has, I don't know, blue eyes and the other text has blue eyes. But that's basically the only correspondence between them. I don't know if I would say that that's a substantial similarity. I would just say that that is sort of a maybe casual similarity, a kind of banal similarity. 12:40

But if there's enough differentiating aspects between those two characters, I wouldn't say that there would be substantial similarity between those characters. 12:41

Q And in connection with your assignment in this matter, were you specifically asked by counsel to apply any particular test for substantial similarity to your expert analysis? 12:41

A I wasn't guided specifically along those lines. I did mention in my report what I thought were the substantial similarities both in, you know, characters, plots, themes, moods, and how well developed they were, both in the screenplay and then echoed in the film. 12:41

So I was already going -- I was already going with what I thought was a considerable substantial similarity. And not just going for the banal, the superficial similarity. Oh, they both have, you know, blue eyes. 12:42

Q Have you ever heard something called the extrinsic test for substantial similarity?

A The extrinsic or intrinsic?

Q Extrinsic test for substantial similarity?

A Not that I can recollect. 12:42

Q Do you understand that in determining whether works are substantially similar, courts are required to distinguish between protectable and unprotectable elements of the work?

A Yes. 12:42

Q And what is your understanding of what elements of a fictional work are protectable and what elements are unprotectable?

A Let me start with the second one. I think that the phrase scènes à faire is one that's important to your 12:42 profession.

Q And do you understand scènes à faire to be protectable or unprotectable elements?

A Well, I think that the idea of a scènes à faire is that it is so intrinsic to the genre and it is repeated 12:43 so consistently that it is not protected, because it is like a cliche or something. It is like an expectation. It is a banality that, like, if one is going to see, like, a horror film, that there is going to be at some point like a monster and a corpse or something along those 12:43

lines. So.

Q So it is your understanding that if an element is considered scènes à faire, it can form the basis for a determination of substantial similarity; is that right?

ATTORNEY LOWE: Objection, calls for a legal conclusion. 12:43

BY ATTORNEY SEGALL:

Q You can answer.

A It helps, Jordan, when you say that. I am waiting for the judge to come in and say -- 12:44

ATTORNEY LOWE: Also vague and ambiguous.

BY ATTORNEY SEGALL:

Q Do you need me to repeat the question?

A Please.

Q Okay. So it is your understanding, is it not, that if an element is being a scènes à faire, that it can't form the basis for finding a substantial similarity between two works; is that right? 12:44

ATTORNEY LOWE: Objection. Calls for a legal conclusion, vague and ambiguous. 12:44

THE WITNESS: My sense is that scènes à faire is not protectable.

BY ATTORNEY SEGALL:

Q Are there any other elements that you believe are unprotectable in the substantial similarity analysis? 12:44

A Let me just clarify. By "unprotectable," I mean that they can't be claimed to be infringed upon.

Q Right. I understand, thank you.

A Oh, good, okay. Yeah.

Q Okay. Other than scènes à faire, are you aware of any other elements that are considered unprotectable in performing substantial similarity analysis? 12:44

A I don't think so.

Q In conducting your analysis of the two works at issue here, did you make any effort whatsoever to distinguish between protectable and unprotectable elements of the two works? 12:45

A I wasn't using the grid, the legal grid to write up my report, if that's what you are referring to.

Again, I was using my scholarly expertise to do a comparative study between a screenplay and a film and to see what the similarities were. 12:45

If I found that there was a substantial similarity, then, of course, I extrapolated on that in my report and made a big deal about it and was able to argue it through. 12:45

If I thought that a similarity was banal, I tended not to include it in the report, although some of those are included in the appellate brief, Exhibition B.

Q Okay. So you think the appellate brief contains 12:46

unprotectable similarities?

A No.

Q Well, when you say some are contained in the appellate brief in Exhibit B to your report, what do you mean? Some banal similarities? 12:46

A No, no, no. I am sorry. I meant to say in the report for the rebuttal. Like, just the correspondence between -- I think the Disney expert makes some case that like Jane and Elizabeth, the main protagonists, aren't really similar because they have different color hair or 12:46 something like that. So that just seemed to me, like, I don't know, seemed kind of missing the point.

Like, I mean, there is a lot to say if you are going to compare these two characters, these two female leads. I think that to say that they have -- they don't, 12:47 like, have the same hair color misses everything else that they do share and I kind of thought, well, that's -- that's interesting. Because that's not the way that I would describe the comparison between those two women.

Q Okay. Well, I want to focus on your opinion 12:47 rather than Mr. McDonald's opinion right now.

So you have testified today that you compared the screenplay and you compared the Curse of the Black Pearl and you identified certain similarities between those two works, correct? 12:47

Q Your methodology did not involve distinguishing between protectable and unprotectable elements of the work; is that fair to say?

A No, I mean, I think that I did work. I did think through what seemed to be protectable or unprotectable. 12:48 So I think that the scènes à faire, right, the recurrence of certain tropes could be understood as scènes à faire. And I think what I tried do is make sure that I was able to articulate in my report what I thought was the nuance so that they wouldn't be reduced to scènes à faire. 12:49

And I think the idea of reducing often -- and I find this with my students, too. There is a kind of reductive tendency to just like not think with any kind of critical nuance. And I think my job is to help students think a little bit more sophisticated when they do 12:49 comparative analogy.

So there are some superficial alliances between the screenplay and the films. What's important for me is to unpack those similarities so that they actually -- so I can actually present what I thought was -- what I truly 12:49 believed was that the screenplay has a tremendous amount of sophisticated original innovative ideas around character, around thought, around theme, mood, and even sequence of events that were then reiterated in the film.

So it would be enough to say oh, there is a 12:50

pirate in one, there is pirate in another. What are these things -- how are they presented and organized and created and constructed in the screenplay and do they reappear, right, with the same level of sophistication, nuance, innovation, in the film. 12:50

I was really out to pull out what I thought was original, interesting, that could be reduced to scènes à faire, I guess, in a kind of reductive read, which I think was the rhetorical move that the Disney expert made, was sort of reduce everything to -- I don't want to have an 12:50 argument. I'm not argumentative in that way.

But I did think that that strategy was incredibly limited and, actually, unimaginative and I thought, come on. Like, that just seems like a very unimaginative poor response. Like, at least, just recognize the talent in 12:51 the screenplay and -- so.

Yeah, there are tropes that are particular to a particular genre, right, that the screenplay includes, but I think that the sophistication of how that trope is presented and, then, again, with the selection and 12:51 arrangement, how they appear together is entirely innovative and interesting and I would say unusual.

I mean, I think that's -- I don't know what other language to use other than to say I found it to be an important innovation, an original, creative, highly 12:51

A Right.

Q So I am asking you, is it your opinion as an expert on expressing an opinion about substantial similarities that all of the similarities you have described in your expert report relate to protectable elements of the work? 12:53

ATTORNEY LOWE: Same objections, calls for a legal conclusion. Vague and ambiguous.

THE WITNESS: Let me answer it this way. You know, when I read the screenplay, I formed an opinion on the quality of the screenplay, its innovations, what I found interesting, what I found unusual, all of that, which I said several times already today. 12:53

Then, when I screened the film and I saw some of those echoes, I thought, well, this is interesting. It does feel like copyright infringement. 12:53

So, if what I identify as original and particular to the screenplay, I think should be protected by copyright law. But, again, I am not a lawyer and I am just saying that it does seem to me that the qualities in the screenplay that I have identified as original, even if they can be reduced to scènes à faire from an unimaginative limited perspective, I think that misses the importance of the contribution in the screenplay. 12:54

BY ATTORNEY SEGALL: 12:54

Q Is there anywhere in your expert report that I could look to to see where you distinguished between protectable and unprotectable elements in performing your substantial similarity analysis?

A I don't think I used that language, Jordan, if that's what you mean. 12:54

Q Okay. And you didn't make any effort to filter out unprotectable elements in conducting your substantial similarity analysis, did you, sir?

A And what would be an unprotectable element? 12:55

Q Regardless of what your understanding of what's protectable or unprotectable, when you conducted your substantial similarity analysis, you made no independent effort to filter out unprotectable elements, correct?

A I filtered out what I thought was not relevant or compelling to my argument that the screenplay and the film share certain patterns and repetitions. And that the selection and arrangements were similar. So I didn't filter that out. 12:55

I filtered out the, you know, one has blue eyes, the other has blue eyes. That kind of thing I didn't think -- I didn't think that was protectable, right? 12:55

Q So let me ask a slightly broader question on this topic. If two works have the same creative elements, they 12:56

So, when we think of genre, genre is a way of categorizing arts based on their formal properties and its horizon of expectations. So, in the genre, if we want to call the pirate film a genre, which I would be ambivalent to do, I don't know if it is full genre in and of itself, 12:57 when one goes to see a pirate film, one hopes to see a pirate and one hopes to see a pirate ship.

And, like, if you buy a ticket for a pirate movie and that doesn't occur, then I think then that's when talk about the horizons of expectation weren't met. 12:57

Like, oh, where is the pirate ship, right? I went to go see a pirate movie and there is no pirate in it, there's no pirate ship. So those aspects are what's expected within the genre.

Q And you would consider those elements of things 12:58 that are expected within the genre to be protectable or unprotectable elements?

A Well, I think, again, I mean, I think this is where it gets really interesting insofar as that someone could say, well, that's a scènes à faire, right? But, 12:58 again, it is, well, perhaps. Right?

The argument that becomes like, well, why are you naming that scènes à faire? And then the other argument, well, it has the components of the scènes à faire, but what is the innovation or what is the creative, original 12:58

kind of tweak or twist that if we are going to go see a pirate film and we expect to see a pirate, what kind of pirate are we anticipating. And if we come across a pirate that kind of goes against the grain of the anticipated pirate, suddenly that becomes really interesting. 12:59

So I would think that should be protected. Not that it's simply a pirate-pirate, but a particular type of pirate that might be new to the genre, that might be a kind of innovation that hasn't been seen before. 12:59

So, just to simply reduce all elements to scènes à faire seems to be unfortunate at best.

ATTORNEY LOWE: On that note, it is 1:00 p.m. and I know that we had talked about the possibility of going to lunch at 1:00. So it seems like a good stopping point, 12:59 anyway.

Should we do a half an hour, Jordan?

ATTORNEY SEGALL: Yeah, why don't we do that.

ATTORNEY LOWE: Okay. Is that enough time for everybody to grab something to eat? 12:59

(Discussion held off the record.)

THE VIDEOGRAPHER: We are now going off the record. The time is now 1:01 p.m.

(Recess.)

THE VIDEOGRAPHER: We are now back on the record. 13:36

The time is 1:37 p.m.

BY ATTORNEY SEGALL:

Q Professor Román, are you familiar with the -- a concept called the "idea of expression dichotomy" in copyright law? 13:37

A Not really.

Q Okay. When you were getting your assignment in this matter, were you ever told by plaintiffs' counsel that you should try to focus your analysis on expression in the works as opposed to ideas in the works? 13:37

A Not overtly. I think it wasn't like schematic in such a way.

Q Let me point you back to your report, which is Exhibit 1, and I want you to turn to page 6 if you would, please. 13:37

A Okay.

Q Can you see the second paragraph there, it says "While the screenplay and the Pirates of the Caribbean: Curse of the Black Pearl can readily be seen as sharing several of these themes, characters and plot devices -- " 13:37 it goes, a few lines down, it says, " -- they differ dramatically in tone from typical pirate and sailors-at-sea stories."

Do you see that?

A Yes. 13:38

Q And then you conclude, "And what is this difference? Humor, irony and wit."

Do you see that?

A Yes.

Q So is it fair to say that you consider the incorporation of humor, irony and wit into a pirates story to be really one of the essential similarities between the works, correct? 13:38

ATTORNEY LOWE: Objection, vague.

THE WITNESS: I see the introduction of humor, irony and wit as being something essential to the screenplay that seems -- the way that they use humor irony and wit seems to me especially innovative and unusual. 13:38

BY ATTORNEY SEGALL:

Q You say in the next line "The screenplay brings something entirely original to this traditional narrative by incorporating a humorous tone to the story." 13:38

Do you see that?

A Yes.

Q In your opinion would you consider a humorous tone in a literary work an idea or expression? 13:38

ATTORNEY LOWE: Objection, vague.

THE WITNESS: It is not the term. Those are the terms that literary scholars use. So, again, I would maybe ask you to just articulate, what do you mean by 13:39

those?

BY ATTORNEY SEGALL:

Q I am just asking for your understanding or your point of view, however you interpret those terms.

Would a humorous tone in a literary work, would that constitute an idea or expression? 13:39

ATTORNEY LOWE: Objection, objection. Incomplete hypothetical. Vague and ambiguous. Calls for a legal conclusion.

THE WITNESS: I would say it has the potential to be both, an idea and the expression of an idea. And an idea insofar that, oh, let's tell a pirate story and I have an idea that we should make it humorous. 13:39

And then how is that then executed becomes the question of how are you going to execute the humor, the irony, the wit. 13:39

BY ATTORNEY SEGALL:

Q It is your opinion that the humor, irony, and wit in the screenplay is something entirely original to the traditional pirate narrative, correct? 13:40

A Yes.

Q In reaching that opinion, what other pirate stories did you consider?

A Well, there are several. I mean, there is historical record in terms of the history of pirates as 13:40

actual pirates, right, before they were fictionalized. So, just a history of pirates at large.

I mean, my training in comparative literature is if I was trained -- I was trained across literary periods. But one of the periods that I was most expert in was what's loosely called The Early Modern Period, which would be like the 15th, 16th, 17th centuries, where there are a number of stories about pirates, both fictional and historical. So there is that. And then -- wait, Jordan, what was -- can you rewind again? 13:40 13:41

Q I am sorry, what was the question?

A Yeah. Are you asking me like --

Q Well, you just testified --

ATTORNEY LOWE: Wait, I think he lost track of the question. So. 13:41

THE WITNESS: Yeah, I was about to say that in the kind of early modern representation of the pirate, they would be certainly not funny. You know, it is about the threat of pirates, and what have you.

And then in the fictionalization, it begins, I guess, in the 18th century, 17th -- late 17th and early 18th century. There are different types of pirates that surface, right? And some might be more threatening than others. Some might be more menacing than others. Some might be less menacing than others. 13:41 13:41

So you start seeing variation. Then they start appearing as children in literature.

So, clearly, that's a completely different trope, too, from the historical early modern representation of the pirate. 13:42

BY ATTORNEY SEGALL:

Q Okay. But my question is a little different. My question is if you are going to opine that the screenplay's humor, irony, and wit is entirely original, don't you need to conduct some kind of review of other works in the pirate genre to determine whether it is original or not? 13:42

A No.

ATTORNEY LOWE: Objection, argumentative, incomplete hypothetical. 13:42

Go ahead.

THE WITNESS: So I can answer?

BY ATTORNEY SEGALL:

Q Yes, you can.

A Oh, okay. Yeah, no. I mean, I have seen several pirate films and I have read several pirate texts which is what I was getting at in that there's a variety of representations. 13:42

So let's just say the pirate is a scènes à faire, right? There are ways that the pirate is tweaked to 13:43

enhance whatever the tone is of the story, right?

But the idea of -- which is on -- what I found interesting in the original screenplay was that the representation of the pirate was able to maintain -- I call it the sort of hybrid character. 13:43

On the one hand, it did have this sort of menacing, you know, threatening component. And it also had this very entertaining, witty component as well.

And they -- that hybridity, I thought, was really interesting and very unusual. There might be like funny 13:43 pirates, like in the Pirates of Penzance, the Gilbert O'Sullivan opera. But that's not one that would be necessarily ominous, right? It is singing pirate.

And, again, it is debatable if you think Captain Hook is scary or not scary in the Peter Pan sequence. 13:43

But I think here, I think it would be a mistake to assume that the screenplay is modeled for children, right, that this is like a film that's based for like teenaged kids. It is not -- it's not a Goonies. It is not like the Young Rascals or whatever the Disney expert 13:44 says that there was an episode of, like children's -- young boys running around dressed as pirates.

So, I think the irony, the, wit is also incredibly sophisticated and intelligent. I don't know. I can't remember if I mentioned this already. 13:44

But one of the things -- and again this might be what you are calling overly narrative, but I just want to do it to make a point by analogy. In reading over the screenplay the several times that I have, I keep discovering different elements that are peculiar and unusual. 13:44

And I don't know, are you familiar with the films of, like, Quentin Tarantino, Jordan?

Q I am personally, yes.

A Oh, good. All right. Well, Quentin Tarantino is viewed as this sort of really innovative, intelligent filmmaker, screenwriter, right? And I think like -- I went to go see Once Upon a Time in Hollywood with a couple friends who are, you know, severe film aficionados and they were able to see -- they were able to appreciate the film in a totally different level than I was. Because I didn't have all the Hollywood references available to me that they did. 13:45 13:45

And I think that the screenplay works on that type of Quentin Tarantino level in that if you were like a huge aficionado of the pirate scene, whether literature, film, popular culture, whatever, you could see all the various references that are kind of interpolated into the screenplay. 13:45

I think it is a highly sophisticated 13:45

intertextual -- has highly sophisticated intertextual relationship (Reporter asks for repeat.)

Sorry, Pam. It has -- the screenplay, I was saying, has a sophisticated intertextual relationship to other pirate films and stories. 13:46

Q Okay. So, yeah, I appreciate that you are a big fan of the work. But I want to get back to my question specifically, which is here on page 6 --

A Okay.

Q -- you say "The screenplay brings something 13:46 entirely original to this traditional narrative by incorporating a humorous tone to this story." You wrote that, correct?

A Yes.

Q Okay. So if you went out and did some research 13:46 and you learned that there were, in fact, many well-known pirate stories that incorporated a humorous tone into a menacing pirate story, would that affect in any way in your conclusion that the two works are substantially similar? 13:46

ATTORNEY LOWE: Objection. Incomplete hypothetical.

THE WITNESS: No. But I think what I would do is I would develop this and fine-tune it to be more explicit in terms of what I was mentioning, in terms of how I 13:47

understand those terms: Irony, wit, humor.

BY ATTORNEY SEGALL:

Q But you didn't go out and review pirate works to determine whether other pirate works incorporated a humorous tone into the story -- 13:47

A No, no, and I wasn't asked to do that. That wasn't a task at hand. I was asked to use my expertise to kind of do this, again, very clean analogy, comparison, between the screenplay and the film.

Q Okay. 13:47

A Based on my understanding of like pirate narratives both in like history, literature, popular culture and film, that's what it was -- that's what I was referring to.

Q Okay. You mentioned earlier that you were 13:47 instructed by counsel about the selection and arrangement test, as I believe you called it, correct?

A Yes.

Q And I think you described your understanding of the selection and arrangement test previously. But my 13:47 question is did you offer either in your report or do you plan to offer a specific opinion regarding how generic elements in plaintiffs' screenplay are selected and arranged?

A I think that's all in my report. 13:48

Q And where can I find that in your report?

A I think under each category I go through the kind of very nuanced reading of the particular topic on hand, character, plot, whatever. And then address how the screenplay was able to create something innovative and original on that particular thing, this character, these character dynamics, this plot point, you know, the prologue, what have you. And then move even beyond that. So it is not simply, oh, this is an interesting hybrid character, right, or this is an interesting plot twist, or this is an interesting tone, or this is kind of an unusual twist on this particular story. But then actually -- first identify all of that, go through and unpack the kind of sophisticated creative energy that was put in composing that. 13:48 13:48 13:49

And then, kind of a bigger picture, or macro, say okay, if these are the elements and these elements are pretty sophisticated in and of themselves, how are they then arranged in the story to tell the story and how then does that sequence of events compare to the way that the story is told in the Pirates of the Caribbean and to see if there is any kind of comparisons there. 13:49

And that's where I thought there was a very -- nuance, I will admit it is nuance. It is not like it is immediately identifiable. But in closer inspection, you 13:49

can see that there are hybrid characters, there a kind of simultaneous plot points, all the various things I outlined in my report reappear in the Disney film. But more so.

And I think this is what -- I can't underline how 13:50 important this was in terms of my analysis, is how they are selected and arranged to tell the particular story. That seems to me really heavy -- heavily reliant on the screenplay.

And I am happy to unpack that if you want me to 13:50 go through -- I mean, it is all in the report and I think -- I mean, I feel pretty confident about the way that I articulated the report. But I am happy to reiterate any of that if you want, Jordan.

Q Well, I just ask maybe you to do one thing. Can 13:50 you give me, just so I understand how you applied -- and understood and applied the selection and arrangement test. Can you give me one concrete example of how you think both works take the same generic elements and either select or arrange them in a substantially similar way in the two 13:51 works?

A Sure. And, Pam, again, feel free to slow me down. Because I might get a little -- I might have some momentum on this.

So let's just start with the prologue, right. 13:51

So, the framing device. So the idea of the prologue in the screenplay seems to me highly innovative and original and unusual, right?

So, the fact that there is a prologue to the screenplay was a bit of a surprise when I first read it, right? I thought this is an interesting beginning, right? 13:51

And, then it reappeared in the Disney film also as a prologue. And I thought what is to be gained by having these two prologues start off their stories? It is not like this is the standard introduction to a pirate story. 13:51

And, so, just on the level of the arrangement of the prologue, that the screenplay begins with the prologue, that the film begins with a prologue, what those prologues share, right, in terms of the introduction of character, the introduction of conflict, setting, you know, the mystification of, like, the supernatural, all the elements that are introduced that are both suspenseful and highly entertaining, reappear in the film. 13:52

And it just begs the question why would the Disney version of the Pirates of the Caribbean -- what's to be gained by starting their story with a prologue? Well, everything is to be gained because we see how effective it was in the screenplay. 13:52

To both build suspense, announce its sort of 13:52

hybridity and tone and character and plot. It is unclear -- and this is what I think is brilliant in both. I mean, I have to say, it is also very effective in the film. Because I think they recognize the artistry of this in the screenplay. 13:52

Is that, even though we are in the genre of the pirate film, it is not exactly sure what's going to happen. So the prologue -- Pam, are you with me?

THE REPORTER: Yes, thank you.

THE WITNESS: The prologue is incredibly 13:53 successful in terms of starting off with the prologue. I think is incredibly successful to the success of the film. Because it introduces all these elements of suspense and even romance. We don't know exactly what's going to happen. Right? 13:53

So it does -- it is an incredibly effective kind of seduction of the viewer or reader, or whoever we are. And then, again, you know -- so the frame, in sort of sequence of events -- so then we have various incidents that happen -- 13:53

BY ATTORNEY SEGALL:

Q I don't mean to cut you off, Professor. That's fine. I just wanted one concrete example.

So your prologue example is a good one. Let me just ask you about that, though. Like when you say that 13:53

the way that the prologue is arranged, you know, that they come first in both works, so it is your opinion that one of the unique features of the arrangement of the prologue is placing it first? Is that your testimony?

A No, not at all. That would be ridiculous. 13:54
Prologues come first. I mean, if they put the epilogue first, we'd be like, oh, how, weird, they start off with an epilogue.

No, it is the prologue. So, again, I don't mean to be dismissive. But it is just the fact that they both 13:54 arrange their story plot lines, right, with a prologue, right? Sets up a particular sequence of events that is, I think, atypical of pirate movies or even stories at large.

Q I want to go back and ask you a few more questions about how other works in the pirate genre 13:54 affected or maybe didn't affect your opinions in this matter.

Can you go to page 5 of your expert report.

A Sure. There we go.

Q Okay. So, at the top of the page here you write 13:55 "Both works draw from the archetypical pirate narrative." Do you see that?

A Yes.

Q And you say that "The screenplay provides original contribution to the standard pirate story." 13:55

Do you see that?

A Yes.

Q So I want to ask you about the basis for your knowledge and understanding of what you call the archetypal pirate narrative, or the standard pirate story. 13:55 So, as a preliminary matter, you'd agree that pirate stories are sort of very common and well-established -- I will use the word genre, but a common genre in literature, correct?

ATTORNEY LOWE: Wait, wait, wait. Objection, 13:55 vague.

BY ATTORNEY SEGALL:

Q You can answer.

A I would say that the pirate is a familiar character. I wouldn't necessarily say necessarily 13:55 immediately, that there is a set pirate narrative, right? But within the pirate narrative, there are -- which would be like a subgenre. I don't think that there is the ubiquity of pirate stories like -- that are cross-cultural and trans-historical. 13:56

Q You literally you use -- (crossover talking.)

(Reporter asks for repeat.)

You literally use the phrases, "archetypal pirate narrative" and "standard pirate stories" in your report, correct? 13:56

A Yes.

Q So those are things, in your view, there is a standard pirate story, correct?

A Yes. If one were to think, like, well, tell me a pirate story, I think we would all be able to come up with 13:56 a more or less standard pirate story.

Q And do you consider yourself an expert in pirate stories?

A I think we went through this this morning, and I would say I wouldn't name myself as having an expertise in 13:56 pirate stories.

Q Okay. As a university professor, have you ever written any academic work on pirates or pirates literature?

A No. 13:57

Q Have you ever given speeches or presentations about pirates or pirate literature?

A Only in The Early Modern Period when I was in graduate school.

Q And did those speeches involve work from the 17th 13:57 century and prior?

A Yes, that's more from The Early Modern Period and, like, Colonial Era and Imperialism. They were more based on historical figures.

Q Have you ever taught any courses that have 13:57

covered pirates or pirate literature?

A Not as the main organizing theme of the course.

Q Have you ever taught a work of pirate literature in a class?

A The courses that I teach at USC are on American literature. So I was hired as an Americanist and someone who deals with the contemporary. So at USC, my courses reflect my hire, even though we have multiple expertise. We are hired to teach a particular set of courses to enhance curriculum. 13:57 13:58

So my contribution to USC on the undergraduate level is primarily as an Americanist. I teach American literature and then also as someone who works in the 20th and 21st century.

Q Okay. My question is just have you ever taught a work of pirate literature in any of your classes at USC? 13:58

A And I would say no because of the fact that I am an Americanist.

Q Was your PhD thesis related to pirates or pirate literature? 13:58

A No.

Q Before this expert engagement, had you ever written, studied, analyzed anything about pirates or pirate literature in any professional capacity either as a professor, expert witness or otherwise? 13:58

A Just through graduate school, through tests, exams on Early Modern Period.

Q Did plaintiffs' counsel in this case provide you with any pirate works other than the screenplay and Curse of the Black Pearl to review in connection with forming 13:59 your opinions?

A After the fact, I was asked to look at Goonies.

Q When you say after the fact, when was that?

A I think it was -- I'd have to look at my timeline because I think it is actually on one of my invoices that 13:59 I say I screened Goonies. Do you want me to pull that up?

Q I think we are going to get to that later. But just broadly speaking, that came after you submitted your initial report; is that right?

A That's what I am not really clear on. I man, I 13:59 remember -- I actually can visualize myself screening it but I can't actually remember if it was before the report or -- I --

Q Why don't we mark your invoices and we will take a look. 13:59

A Do you have them up there?

Q We will in a second. This is going to be Exhibit 2.

A And we have to refresh, right?

Q Yes, it should be there. 14:00

(Deposition Exhibit 2, Invoices, was marked for identification by the court reporter.)

THE WITNESS: Oh, here we go.

BY ATTORNEY SEGALL: 14:00

Q And this is a document that bears Bates label plaintiffs' 000130. These are the billing invoices that you produced in preparation for this deposition. Is that right?

A That's right. 14:00

Q Okay. So, looking at the invoice, it looks like you --

A I got it. I got it. Sorry, Pam. Sorry, Jordan. I interrupted you. But I found what you are talking about. 14:00

Q Does Exhibit 2 refresh your recollection about when and why you reviewed Goonies?

A Yes.

Q When did you review Goonies?

A I reviewed Goonies before I submitted my final report. 14:01

Q Okay. And why did you review -- why did you screen Goonies?

A Because the lawyers asked me -- they asked if I had seen Goonies and, if not, if I would take a look at 14:01

it.

Q And did your review of Goonies affect the opinions you expressed in your final report in any respect?

A Jordan, I am not exactly sure how to answer that except to say that I didn't think that Goonies -- screening Goonies didn't influence my report. I guess that's the way to phrase it. I mean, I watched the movie. I tried to see how it might be relevant to the case. 14:01

It was never really clear to me, the relevance of it, other than that plaintiffs had made mention of it in their pitch, I guess, or in some of their, in some of their language. 14:01

Q Other than Goonies, were you provided any other pirate works, books or films or otherwise to review in connection with forming your opinions? 14:02

A I -- yes, afterwards, after the rebuttal, after my report, or -- sorry. After I saw the Disney expert's report, I was asked to look at Cutthroat Island.

Q And did you, in fact, watch Cutthroat Island? 14:02

A Oh, yes.

Q Okay. Your review of Cutthroat Island is not reflected on your invoices; is that right?

A Not -- there are several sets of invoices. So this would be Phase 1 and Phase 2 of the initial report 14:02

that I had to submit by the end of November. And then I have a set of invoices that are related to the rebuttal and the Cutthroat Island should be in that.

But if I can be honest with you, all of this is happening concurrent with the end of my semester and it's just been really crazy schedule-wise and time-management-wise. So I hope that I am billing them for screening Cutthroat Island. So that's a good note to make sure I have it somewhere. 14:03

Q Don't want to give them free hours. 14:03

Okay. So you reviewed Goonies at the request of plaintiffs' counsel; is that right?

A Cutthroat Island and both of those, yes.

Q Did plaintiffs ask you to review any other pirate works other than those two? 14:03

A No.

Q And beyond what plaintiffs' counsel asked you to review, did you personally review any other pirate works in connection with forming your opinions in this matter?

A Well, it is funny that you bring it up because 14:04 after reading the Disney expert's report, I did see that they were very -- it was very important to the Disney expert report to display a kind of expertise on like the history of the pirate genre, both in sort of film and popular culture. 14:04

And it seemed that the Disney expert was basing his authority on that familiarity. So I then asked, when I had to write up my rebuttal to that, I said, you know, would it -- should I be rereading or should I be reading or screening, like, everything that they are referencing in the rebuttal report? Like, can I do a rebuttal report to an expert report if I haven't screened all the films that he is referencing in his report? Like, is that necessary for my rebuttal? 14:04

And then I was told by -- by the lawyers that, no, that wasn't -- did someone say something? 14:04

Q I am sorry. You cut out there a second. Do you mind repeating the last answer you were told by the lawyers? What?

A That it wasn't for me to screen or familiarize myself with every reference that appeared in the Disney expert's report. 14:05

Q Okay. Well, let's focus on your initial report first. And then we will talk about the rebuttal report.

A Okay. 14:05

Q For your initial report, I know you said you screened Goonies, correct?

A Yeah, at the last minute.

Q Did you review any other pirate works before you issued the report in this matter? 14:05

A No.

Q And then for your rebuttal report, did you -- you reviewed Cutthroat Island, correct?

A Yes.

Q Did you review any other pirate works in connection with preparing your rebuttal report in this matter? 14:05

A Well, I was asking the lawyers, I mean, Steven and Aleks, if I was going to be responsible for all the literature that was cited in the Disney expert report. I asked my assistant -- I have a first-year student at USC who I am mentoring and is a work-study student. I asked him, his name is Brandon, I said Brandon, do me a quick favor. Do a quick Google search on pirate literature and see what you come up with. 14:06 14:06

Partly because I was curious and partly because I hadn't given him anything to do and he is relying on some hours -- talk about billable hours. I mean, he is an undergrad hoping to get a little bit of money and I don't give him enough work. So he appreciates that kind of thing. 14:06

So he then came up with a list of, maybe, I don't know, 12 or 15 things. And on that list was a book that I thought, oh, this might be actually helpful to kind of gloss over. And it is this book. 14:06

Q Okay.

A It's listed on the -- you have a reference to that already. And I glanced that over, but I didn't dwell on it because, quite frankly, it wasn't all that interesting and also I didn't have time, you know, in the 14:07 middle of all that was going on to read an uninteresting book.

Q Did that book -- and I am sorry. I missed the title --

A "Pirates and Seafaring Swashbucklers on the 14:07 Hollywood Screen" by James Robert Parish.

Q Did that book affect your opinions in any respect in this case?

A No. But what it did do -- and, again, you know, I appreciate expertise, I appreciate encyclopedias. I 14:07 thought this was interesting. This guy just put together all the various films, you know, over time and had like plots and summaries. So it did give me a sense of what was out there.

But it didn't have any kind of theoretical or it 14:07 didn't have a thesis. It was just like an encyclopedia.

Q And can you recall as you sit here today any of the specific works that were described in that encyclopedia that you took note of it in your review of it? 14:08

A I think what I did, Jordan, I just like did a little spot-check. I thought let me look at something in the beginning because it was arranged historically. And it just said like this film was made, you know, in 1938 staring such and such a person, directed by so-and-so. 14:08 Just -- it just was a lot of that. So it was a lot of detail without any kind of narrative content, really.

Q And that sort of encyclopedia detail didn't affect your opinions, did it?

A No. 14:08

ATTORNEY LOWE: Objection, objection, vague.

BY ATTORNEY SEGALL:

Q Okay. So beyond that book, the Goonies and Cutthroat Island, as you sit here today, is there any other pirate-related work that you reviewed in forming 14:08 your opinions in this matter?

A No.

Q I want to mark as Exhibit 3 a document that's consistent with the original complaint in this matter. You should have it now. 14:09

A Here we go.

(Deposition Exhibit 3, Original Complaint, was marked for identification by the court reporter.)

BY ATTORNEY SEGALL: 14:09

Q Do you have it up?

A Yes.

Q I will represent to you that this is the first complaint that the plaintiffs filed in this matter back in 2017 when they first sued the Walt Disney Company. 14:09

Have you reviewed this document?

A Let me -- give me a minute to see if I have seen this before.

I am seeing this for the first time.

Q Okay. I want you to scroll down to page 4 of the document where there is -- the paragraphs are numbered. I want you to go to paragraph No. 8 if you could for me. 14:10

A "Throughout history, there has been the lore or myth of pirates"?

Q Yes, do you see that? 14:10

A Yes.

Q Okay. And you know, keep in mind that the plaintiffs here are submitting this document and they write "Throughout history, there has been the lore and myth of pirates that have pervaded literature, song and film," and then there is a list of works that includes The General History of the Pirates, Robinson Crusoe, Treasure Island, Peter Pan, Captain Singleton, The Pirate, The Gold Bug, the Corral Island and the Red Rover. 14:10

Do you see those? 14:10

A Yes.

Q Have you read any of these books?

A Yes.

Q Which ones?

A Most of them. Not -- certainly the Robinson Crusoe, Treasure Island, Peter Pan. Not the -- not those later ones. 14:11

Q Okay. Would you consider these to be significant works in the pirate genre?

ATTORNEY LOWE: Objection, vague. 14:11

THE WITNESS: I would answer this way: I -- what was the adjective you used?

BY ATTORNEY SEGALL:

Q Significant works in the pirate genre?

A Yeah, I would say that these are significant works in literature, not reduce them to the pirate genre. 14:11

Q Okay. And you didn't review any of these books specifically in connection with your expert assignment in this matter, did you?

A No. 14:11

Q And, then, if you look down at paragraph 10, it says "Films have covered swashbuckling pirates, many adaptations from literature, such as Treasure Island, Peter Pan, Savage Island, The Buccaneer, The Pirate, The Island, Captain Blackbeard, The Pirate, and Yellowbeard." 14:11

Do you see that?

A Yes.

Q And you would agree with the plaintiffs here that a large number of Hollywood films have covered the subject matter of pirates, right? 14:12

A Yes.

ATTORNEY LOWE: Objection, objection. Vague as to quote, unquote, a large number. Comparatively to all the films that have been generated by Hollywood since the 19 -- early 1900s? 14:12

THE WITNESS: I think Steven's point is well taken. I would agree with Steven on that.

ATTORNEY SEGALL: You know, Mr. Lowe, I'd ask you to try to restrain yourself on the speaking objections to your witness. 14:12

BY ATTORNEY SEGALL:

Q But, in general, you would agree that there is a substantial body of films about pirates, correct?

ATTORNEY LOWE: Objection, vague.

THE WITNESS: What I was trying to say earlier, I 14:12 think that, like, my training as a historian, like a literary historian is about paying attention to which genre surface in what historical periods, and what their kind of relevance is to that period.

So I think that there are moments in history when 14:13

the pirate story surfaces, right? But I wouldn't necessarily say that it is an established genre like some other genres that are more prevalent.

BY ATTORNEY SEGALL:

Q Do you agree with the complaint when it says "Films have covered swashbuckling pirates"? Do you think that's a true statement? 14:13

A Well, it is a very vague statement but I guess just on the level of films have covered swashbuckling pirates, I would say, yes, there have been swashbuckling pirates that appeared in films. 14:13

Q Have you seen any of these films in paragraph 10?

A Just, again, the popular ones and not the more obscure ones. So, no. Maybe like two or three of them. But, again, that is when I was like a kid or in high school. It just -- my recollection of, like, the plots of these aren't -- you know, isn't all that strong. 14:13

Q For instance, do you think the Treasure Island film from the 1950s is a significant pirate film?

ATTORNEY LOWE: Objection, vague. 14:14

THE WITNESS: I would answer this way: That I think that if people were to make a list of pirate films, like named five or six or eight pirate films, that more likely Treasure Island would appear on, like, most people's lists. 14:14

BY ATTORNEY SEGALL:

Q How about Peter Pan?

A Yeah, I guess so. Peter Pan, if you want to think of it as a pirate film.

Q I want to mark now a new exhibit that will be Exhibit 4. Let me know when you have that one up. 14:14

(Deposition Exhibit 4, Ninth Circuit Court of Appeals Order, was marked for identification by the court reporter.)

THE WITNESS: Got it, thank you. 14:15

BY ATTORNEY SEGALL:

Q Okay. This is an order by the Ninth Circuit Court of Appeals in the case of Alfred v. The Walt Disney Company dated July 22, 2020.

Do you see that? 14:15

A Yes.

Q Have you seen this order before?

A Let me take a look at this.

ATTORNEY LOWE: You might want to read it all the way through to see if you recall reading it or not. 14:15

THE WITNESS: I will tell you this much. I haven't read it recently if I read it all. So I should just really take a minute with this if you don't mind.

BY ATTORNEY SEGALL:

Q Sure, take your time. 14:16

A Yes.

Q Did anyone inform you when you were retained as an expert in this matter that the Ninth Circuit, the Federal Court of Appeals, had held that expert testimony would aid in determining whether certain elements in the works are unprotected generic pirate movie tropes? 14:18

ATTORNEY LOWE: Actually, wait, wait, wait. I believe that goes exactly into communications between counsel that are work product. And it doesn't fall into the categories that -- 14:18

BY ATTORNEY SEGALL:

Q Steve, I will withdraw the question. Let me ask it in a different way.

Were you aware at any point when you were preparing your report in this matter and when you were forming your opinions in this matter that the Ninth Circuit had held that expert testimony could aid in determining whether the, quote, elements the two works share in common are unprotected generic pirate movie tropes, end quote? 14:18 14:19

A It is that second part of the question that I am not fully following. But I was aware that there was an appeal and that in that appeal, there was a request for an outside expert, which is how I kind of came into the picture. 14:19

Q Do you have an understanding of what the phrase "generic pirate movie tropes" means?
A Did I write that?
Q You did not.
A Okay. 14:19
Q I am asking what that phrase means to you.
A Unprotected generic pirate movie tropes -- hang on a minute. What would you like me to do?
Q I just want to know what your understanding of the phrase -- let's just focus on the phrase "pirate movie 14:20 trope." What is a pirate movie trope?
A I think a pirate movie trope is, to go back to the language that we were using earlier, would be like the scènes à faire; like things that one would expect to be intrinsic and indispensable to a pirate movie. 14:20
Q Okay. Let me ask you a hypothetical question. Are you familiar with the genre murder mysteries?
A Murder mysteries? Yeah. I mean, again, that's a huge genre that has multiple different types of murder mystery stories. 14:20
Q Right. But there's murder mystery novels, right?
A Yeah.
Q Agatha Christy?
A Right.
Q And there's murder mystery films, correct? 14:20

A Yes.

Q So, now, let's say I hired you as an expert in comparative literature to sort of compile a list of the common genre tropes in the murder mystery genre.

Do you think you would have the relevant expertise to do that? 14:21

A I think, yeah, I think I would have a working expertise to come up with generic tropes for a murder mystery story.

Q And how would you do that assignment? What would you do, how would you go about that? 14:21

A I would take an inventory of what my training and reading habits are. Also, you know, what I have seen, you know, in film and popular culture. What I have read about the, you know, the quote, unquote, genre. The way people talk about it, people who are aficionados of the murder mystery, what they hope to, like, see in a murder mystery story. 14:21

I mean, murder mysteries are so immensely appealing to so many different readers. Sometimes people even say, oh, I read this murder mystery, but it was really disappointing because it was really more about the detective than about, like, the murderer. 14:21

People have different expectations of what that would fall into. So people talk about murder mysteries a 14:22

lot. Something very compelling about that. So I feel like, yeah, I would be qualified to begin to identify sort of generic murder mystery tropes.

Q If you wanted to do that, would you review murder mysteries themselves? 14:20

A I think that would be exhausting. Not necessarily.

Q So you would just rely on your own preexisting expertise?

ATTORNEY LOWE: Objection, asked and answered. 14:22 He already gave you a long list of things he would do. But go ahead, testify again.

THE WITNESS: I mean, it depends on what the genre is and what my intimacy is with that genre, right? So. 14:22

BY ATTORNEY SEGALL:

Q Well, I asked you about murder mysteries. If somebody asked you, I need you as an expert to compile a list of common tropes in the murder mysteries genre, would you do research in the murder mystery genre? 14:22

A It depends on what the process is. I might start doing kind of a quick rolodex in my head, like what do I have to imagine to be in a murder mystery, what are the things that I have experienced, what are the things that I have seen, what are things that people sort of expect. 14:23

And if I was feeling slightly like there might be more here, I might -- I think, just out of sheer curiosity or interest, but you know what, I haven't read --
(Reporter asks for repeat.)
I might start thinking, well, maybe, you know, it would be fun to read an Agatha Christy mystery just to kind of refresh myself on the genre and see what -- what's there. Maybe I would watch, you know, Angela Lansbury, she is so famous with Murder She Wrote and I would hope that I don't go and spiral into an endless loop of murder mysteries, just to feel kind of qualified to answer that. 14:23
Q Okay. I am going to turn to a new topic now. You understand that you are appearing here today to testify pursuant to a subpoena, correct?
A That I have been subpoenaed to testify, yes. 14:24
Q Okay. And you understand that when the defendant in this matter served that subpoena, they served certain document requests, correct?
A Yes. Things that you asked me to submit?
Q Correct. Yes. 14:24
A Yeah.
Q And you gathered responsive documents and provided them to your counsel to be produced; is that correct?
A Yes. 14:24

Q I want to mark now as Exhibit 5 the responses and objections that your counsel served to Disney's document subpoena in this matter. So just let me know when you have it up.

(Deposition Exhibit 5, Responses and Objections, was marked for identification by the court reporter.) 14:24

THE WITNESS: Okay. I have it. May 27, 2021. Oh, wow, that's today.

BY ATTORNEY SEGALL: 14:24

Q It is the date of the deposition. You may have been served yesterday.

A Oh, yeah. Okay.

Q Okay. And did you review these before they were served? 14:25

A I haven't seen this.

Q Okay. Can you just turn on Exhibit 5 to page 3, please.

A Yes. And then, Jordan, if I could just ask like in the next five minutes or so if we could just take a quick bathroom break. 14:25

Q Yeah. Why don't we do that now and then I will ask you about page 3 of this document. Will that work?

A Yeah, is that fine with you?

THE INTERPRETER: Do you guys want to go off the 14:25

record?

ATTORNEY SEGALL: Yes.

THE VIDEOGRAPHER: We are now going off the record. The time is 2:26 p.m.

(Recess.) 14:36

THE VIDEOGRAPHER: We are now back on the record. The time is 2:38 p.m.

BY ATTORNEY SEGALL:

Q Professor Román, before we continue, I just want to go back quickly to what we were talking about about 14:38 genre tropes. I just wanted to ask you one further question.

If you were hired as an expert to opine on the sort of generic genre tropes of pirate literature, do you feel you have sufficient knowledge and expertise to do 14:38 that without researching additional pirate works?

A Yes.

Q And that's just from your own experience reading pirate fiction and watching pirate movies?

A Well, from my training, in my undergrad and PhD 14:38 program and then, from, yeah, my life experience as well, there's my own reading habits and screening habits.

Q Are there any genres you would feel unqualified to opine about with respect to their genre tropes without conducting additional research? 14:39

A If you keep it between us, yes. And that would be I am not like the most fluent in, like, science fiction. I find it so overwhelming. Right? There are just so many different types of -- that genre just seems full of multiple type of stories that is hard to really get a grip on it. 14:39

Q What was the last pirate novel you read?

A Novel with a pirate?

Q Sure.

A Well, there is a beautiful book that was just published last year called Hamnet. Did you read it? 14:39

Q Yeah.

A It is good, isn't it?

Q I agree.

A Yeah. And I am trying to -- I read so much. I mean, it not that I seek out pirate, like, literature per se. I am kind of like -- this is totally off the record, I guess, but just -- good for you, Jordan, that you read that book. I mean, you sound like a super busy person. I mean, all lawyers. To be able to read Hamnet, that's pretty cool. 14:39 14:40

Q Thank you. I appreciate that.

Okay. Well, why don't we move on. Let's go back to Exhibit 5. And page 3 requests -- the information under Request for Production of Documents, No. 2, do you 14:40

see that?

A Yes.

Q And you see that we asked for all documents that you relied on or which contain any information you relied on in forming all opinions concerning any issue in this litigation. 14:40

Do you see that?

A Yes, sir.

Q Okay. And you did in fact review and produce all such documents, correct? 14:41

A Yes.

Q I want you to go down to the answer on page 4, the last full paragraph on page 4.

Do you see that?

A "Subject to?" And "without waiving the foregoing objections"? 14:41

Q Exactly.

A Yeah.

Q So there are eight -- eight documents here, eight certain items here. And I just want to ask you about them. We have already talked about a number of them. So Curse of the Black Pearl and the screenplay. But I want to ask you about No. 3, YouTube links to the Disneyland Pirates of the Caribbean ride from pre-2000. 14:41

Can you tell me about when you reviewed YouTube 14:41

footage of the Pirates of the Caribbean around?

A Yeah, that would be after the Disney expert rebuttal.

Q And why did you do that?

A Well, because the Disney expert rebuttal brings it up. 14:41

Q And how did your review of that footage affect your conclusions in your rebuttal report, if at all?

A I am not exactly sure what you are asking but I think -- and this is -- I don't have a lot of experience in terms of the sort of legal back and forth. So -- it did seem to me that there was like a kind of point/counterpoint. So, like, I would say something and this guy then would do a rebuttal. 14:42

And it felt like it was important for the Disney expert to make this point and the Disney expert seemed to really think that this was an important point to make. 14:42

So both to kind of honor the spirit of that person's position, and also to kind of reconsider my own, right? I took a look at it and I felt that there was really nothing there that would substantially change any of my opinions on this case. 14:42

So, the YouTube links to the Disney Pirates of the Caribbean ride from pre-2000, if anything, reinforce my own sense of what I had written. 14:43

Q How do they do that? How do they reinforce your opinions?

A I think that the expert was trying to make a case that there was already aspects of -- there was aspects already in the ride that were protected or were original or something. 14:43

But I think for, me, personally, I haven't been on the ride, just for the record. But having seen it, it seemed like there was, literally, like no story there.

It didn't -- there was nothing really there. The ride had no narrative structure. The video didn't have any narrative structure. 14:43

Q So, the fourth item on this list is plaintiffs' sizzle, I assume that means sizzle reel, created in conjunction with our screenplay. 14:44

Do you see that?

A Yes.

Q And did you review the sizzle reel that the plaintiffs created when they submitted their screenplay?

A Yes. I mean, I saw it. 14:44

Q When you did you review it?

A Again, in response to -- most of this other stuff is in response to the rebuttal.

Q And is that true about the artwork that plaintiffs submitted with their screenplay as well? 14:44

A No, because it is attached to the screenplay. So that was actually part of the screenplay and I took a look at it. But it didn't seem -- again, no disrespect to anyone, but I thought if it was important, it would be better quality images. 14:44

Q And did the sizzle reel affect your conclusions in the rebuttal report in any respect? Or affect your original opinions?

A I would say that the sizzle reel -- I think part of the rebuttal also was trying to suggest that the film 14:44 can be reduced to a kind of comedy of sorts, right, and that I think that it is clear when you look at the plaintiffs' sizzle that it does have this sort of ominous, threatening, it's like a kind of a darkish -- it highlights the more, like, menacing components, ominous 14:45 components. It seems a little, like, creepier than actually lighthearted in the way that, say, the Rascals Scoundrels' antics categorize the screenplay.

Q You think the tone in the sizzle reel is unique or innovative with respect to the screenplay? 14:45

A I think the -- it promotes one aspect of the screenplay.

Q Which is its ominous tone?

A Yeah, which is the more -- I mean, it is very dark. I mean, it is literally visually dark. 14:45

characteristic of your method?

A Yeah, it was more for your sake. You requested them. So I don't know what you wanted from it.

Q Items that you may have relied or considered in forming your opinions. Anything else that you can think of that is not listed here? 14:47

A I visited the Wikipedia page for the Pirates of Caribbean kind of after the fact just to see, you know, what its history was, what its -- how people were talking about it. All that kind of stuff. 14:47

But I didn't dwell there. It was more like, oh, just do a quick kind of Google, Wikipedia search. And I think, I am almost certain, that Aleks submitted that.

Q Okay. And I think you testified to this but just to make sure the record is clear, with respect to items that you relied on in forming your original opinions in this case, the first report you submitted in this case, the only works that you relied on or reviewed in connection with that are Curse of the Black Pearl, the screenplay, plaintiffs' appellate brief, and the Goonies, correct? 14:48 14:48

A Yes.

Q In rendering your opinions in this matter, did you rely on or consider any facts or other information provided by any other expert witness? 14:48

or yours in that way. I even thought, like, should I bring Brandon in here? And I thought, well, it did seem kind of like a minor request just to have him do a little pirate -- he didn't know what it was about. He didn't know why I was asking for it. And, thankfully, in that moment he wasn't curious to ask. 14:50

Q Okay. I want to briefly look at your CV which I will mark as Exhibit -- it should be Exhibit 6, I believe.

(Deposition Exhibit 6, Curriculum Vitae, was marked for identification by the court reporter.) 14:50

THE WITNESS: I am there.

BY ATTORNEY SEGALL:

Q We have covered your background in some details, so I don't want to dwell too long on this. But I just want to make sure I understand your professional progression; you attended the University of Wisconsin at Madison for college, correct? 14:50

A Yes.

Q You majored in comparative literature? 14:50

A Comparative literature, history and philosophy.

Q Did you write an undergraduate thesis?

A No. Oh, wait, no. Yes, in my department, yes, in comparative literature.

Q What was the topic of that thesis? 14:51

A The topic on that thesis -- oh, my God. Let me think about it for a moment.

Q I know it was some time ago.

A Well, it wasn't that long ago but hang on a minute. Oh, my God. It is funny because we just did the senior honors thesis in the English department. 14:51

Here we go. Oh, it was a comparative analysis of the representation of gay characters in three different literary traditions.

Q And then in graduate school, you got both a master's degree and a PhD in comparative literature also from the University of Wisconsin, correct? 14:51

A Yes.

Q And what was -- tell me this. Did you focus your graduate studies on any particular bodies of literature as a comparative literature scholar? 14:51

A Well, we were asked -- we are trained in multiple methodologies. I mean one of the things that we are trained in is in multiple methodologies and also comparative language traditions. 14:52

So, a lot of my training was in The Early Modern Period, which is understood to be the Renaissance, or like 15th, 16th, 17th century literatures from mainly Italy, Spain, you know, England, France. So I had to demonstrate competency in various languages. 14:52

And then my select period was The Early Modern Period and I was -- if I had an MA, I didn't have to write an MA. But my annual exams were pretty much on the issue of literature and censorship especially related to the Spanish Inquisition. 14:53

Q And did any aspect of your sort of graduate studies or the work you did as a graduate student involve works for pirates or piracy?

A Pirates, because of the period, were kind of populated, the literature, both in terms of archival 14:53 literature, things that were in like historical records, but also like as characters, too, both historical, fictional, autobiographical, biographical.

So, it wasn't unusual for there to be a pirate or a, you know, pirate theme or trope. 14:53

Q And did you do any writing that specifically focused on pirate themes or tropes?

A No, not really.

Q Have you ever done any writing that focused on those issues? 14:53

A No. But, like -- I mean, this is so minor I just really think it is irrelevant. But I will answer it just in so far as I was also trained in Latin, right, so there is in the Latin literary, you know, mid-century AD, there are figures, like, pirate-like figures that populate the 14:54

works of, like, Plautus and Terence. I mean, again, I don't want to waste your time, Jordan, so I am happy to go through this, but Plautus and Terence were two of the major comic writers of the moment of Roman literature. And they have characters in there; there's a lot of battle 14:54 scenes, a lot of war scenes, a lot of ship scenes.

So they are in there. And I had to write exams on all of those figures and the works of Plautus and Terence actually appear in one of the chapters of my dissertation. 14:54

Q Well, focusing on contemporary literature, drama and film from, say, contemporary at large from, say, the 18th century forward, have you ever written anything on pirates or piracy from works in that period?

A No. 14:55

Q What's your current position at the University of Southern California?

A I am a full professor.

Q And you are in the English department and the American studies departments? 14:55

A Yeah, I was -- yeah, I have what's called a joint appointment. So I hold -- well, it's shifted now. When I was hired, I was 50/50 English, 50/50 American studies. And now I am 75 percent English department, 25 percent American studies. 14:55

Q Okay. I want you to take a quick look at what I have marked as Exhibit 7 please.

A Is that my CV?

Q No. CV was Exhibit 6.

A Oh, sorry, okay. Are we done with the vita? 14:55

Q Yeah, we should be for now. Thank you.

A Oh, here we go, Exhibit 7. Oh, faculty bio.

(Deposition Exhibit 7, Faculty Bio, was marked for identification by the court reporter.) 14:55

BY ATTORNEY SEGALL:

Q You are familiar with this document, I assume?

A Right. This is -- I don't know how -- did you just pull this off the Internet?

Q I did, indeed. 14:56

A That's so funny. Was it the English department or the American studies department? I should actually go and, like, update it. Like we haven't -- go ahead. Why are we here?

Q Well, we are here because there is a "Description 14:56 of Research" and then it says "Summary Statement of Research Interests."

Do you see that?

A Yeah. I think it is fairly dated.

Q Okay. What would you -- well, first of all, let 14:56

me just read it into the record. It says "Professor Román's research focuses on theater and performance studies with an emphasis on contemporary US culture; American studies, with an emphasis on race, sexuality, and the performing arts; Latina/o studies with an emphasis on popular culture; and queer studies with an emphasis on archival practices, subcultural histories, and artistic production, primarily in 20th century America." Correct? 14:56

A Yes.

Q Is that an accurate description today of your research interests? 14:56

A No, and I think you can just see already that this is dated. It is probably for my tenure profile. I got tenure in the late 1990s and I think just the fact that it ends with primarily in the 20th century as opposed to now, it would be 20th and 21st century. 14:57

But if you keep reading, "His current projects" are actually -- I mean, this is a very old document.

Q Okay. If you were drafting a new statement of your research interests today, what would you say? 14:57

ATTORNEY LOWE: Objection, calls for speculation.

THE WITNESS: Well, I would be more specific. And I would drop the -- I would tweak the last set of sentences, "His current projects include the book --"

(Reporter asks for repeat.) 14:57

The last sentence, which is a very long convoluted sentence, which in itself is something I would revise, it says "His current projects include a book on the racial politics of American theater in the 1940s; a study of the memoirs of pre-Stonewall gay and lesbian activists; and a historical project on AIDS and cultural production in the 1980s and early 1990s." 14:58

Q So setting aside the statement of your projects may be out of date, I am interested in your statement of your research interests and the focus of your research. Is this statement of your research interests still accurate today or are there additional things that are now focused as of your research that were not listed here? 14:58

A Well, I think -- and, again, you have to understand that this document is about my hire, like, what I was hired to do at USC. So my summary statement needs to, you know, at best correspond with what USC hired me to do and this research statement is written in particular to make sense to my hire. 14:58

So that -- like, if I was hired to do things like this and I was writing books on, I don't know, medieval literature, then they could say, wait, like, you hired this guy to do this thing but he is publishing all this stuff on this -- completely outside areas, this -- you know, this is about hire. 14:59 14:59

So, this -- this is specific to what my job is at USC.

Q Okay.

A How I present myself, like, when someone says -- because of this and I should probably tweak this. I get a lot of invitations to speak or kind of write articles or, you know, consult on projects, I guess, based on things like this. 14:59

And I usually ask people, like, what are you looking for? Well, we need someone to write on, you know, AIDS and representation. I would say, okay, this is what I am working on, but you might also want to consider these other people who are doing this kind of work. 15:00

So I generally present myself as someone who is a literary historian who is interested in literature and genre and literature in politics. So all of this is true, the statement is true; but this would be kind of the detailed part of it. But my training is in literary history. So I think of myself as a literary historian even though I work in American literature. 15:00 15:00

Does that help?

Q Yes. Very helpful. Thank you. Appreciate that.

Your CV --

A Also, Jordan, if I may, sorry, Pam, this is also what my national -- if not kind of international 15:01

reputation is understood to be. So part of the thing about, like, moving through the profession is needing to both stay coherent to that and at the same time kind of build upon it.

Q Understood. Your CV lists writing lectures that you have done, invited lectures all around the world, correct? 15:01

A Yes, sir.

Q And I don't think it lists the topic of them but I just want to ask briefly, have any of those lectures related to sort of pirate stories or pirate literature that you can think of? 15:01

A No.

Q And have any of those lectures related to copyright law or the comparison works for substantial similarity as that term is used in copyright law? 15:01

A Well, insofar as the material that I sent you, those four pieces of writing, I have lectured on those. Well, mainly in the US and the UK.

Q You would agree that those pieces of writing don't implicate copyright law in any respect, correct? 15:02

A No, no.

Q Have there been any relevant updates to your CV since you produced it back in November 2020 that are relevant to this case? 15:02

A Not to the case but I have done various lectures, like Zoom stuff. My current classes aren't listed there. There are publications that I have yet to put on there that I have published in the past, like, two years. Smaller lectures that I actually should -- one of the 15:02 things I am going to do this summer is actually -- not revise the CV but, like, update it and putting all the stuff in there that is missing.

Q I just want to ask you a couple questions to summarize what we have talked about, your background. It 15:03 is accurate to say that you have never written about pirate literature in your academic career, correct?

A That's fair to say.

Q And you have never taught a course on pirate works or pirate literature, have you? 15:03

A That's fair to say, too. Jordan, in relation to that, I would say that none of my colleagues at USC, and I would even say across the profession, it would be very rare for there to be a course in an undergraduate program on like pirate literature or it would be very rare for -- 15:03 I can't even think of someone in the profession who -- an English professor or comparative literature professor -- who specializes in, like, pirate literature.

So, the fact that I haven't written on it or the fact that I haven't taught courses on it doesn't make me 15:03

exceptional; it makes me representative of the profession.

Q And you don't have any formal training in copyright law; is that -- that's correct, right?

A I have no training whatsoever in the law.

Q And you haven't taken any course work on or trainings about sort of copyright law or the legal standards applicable in copyright cases; is that true? 15:04

ATTORNEY LOWE: Objection, asked and answered. I think you have asked him this multiple times. You can ask it one more time but then I am going to have to stop. 15:04

BY ATTORNEY SEGALL:

Q Okay. You can answer, sir.

A So, just ask it one more time. I guess you have another one after that. This is a repeat.

What is the question again? Have I taken any course on copyright law? The answer is no. 15:04

Q Okay. And you testified earlier that you don't consider yourself an expert on pirate genre, right?

A But I would also qualify by saying I don't think anyone, I don't know of anyone who can say they are an expert in that field. 15:04

Q And you also don't hold yourself out as an expert on copyright in general, do you?

A Right. And there are people out there who, I guess, would certainly -- you would be able to find 15:04

people, no doubt, very easily probably in your own law firms. And I do have colleagues that are interested in literature and the law.

Q In the last 30 years you have served as an expert witness in four copyright cases total. Is that accurate? 15:05

A Yeah. Two before this one and like two with Lowe & Associates.

Q And you have never testified at a deposition, arbitration or trial as an expert witness on any topic, correct? 15:05

A You are the first person to drill me on a deposition.

Q And, in fact, before you submitted the report in this matter, you had never filed an expert report on any topic in any case; is that fair to say? 15:05

A Well, I've filed a million expert reports on, like, foundation grants and that kind of thing. But I have not worked -- I have not filed anything in a law case.

Q You have never filed an expert witness case in a legal case before this -- 15:05

A No, this is the first time.

Q All right.

A Can I ask? Do you see that as a liability or like -- what do you make of that? 15:06

Q I am just asking factual questions, trying to establish a record. I certainly don't mean to be critical.

A No, no, no, it is not critical. For me, it is interesting because this is not how I make my living. I think that would be one thing that I would stress, is that I don't rely on this as a source of income. I don't rely on this as kind of an enhancement of my national reputation. It doesn't really impact my kind of professional life in any way as a kind of ancillary career, right? I am not trying to build a career as an expert witness. So I think I would stress that. 15:06

The fact that I have limited experience in this suggests, you know -- and, again, I don't mean to be disrespectful, I am not a hat-for-hire, you know. This is not how I -- I see my career going. 15:06

Q Okay. Can we go back to Exhibit 1, which is your expert report.

A Yeah. Here we go. All right. I am there.

Q Great. I don't think I asked you this earlier. Did you personally write your expert report, your initial expert report? 15:07

A Yes.

Q Did you draft all of it?

A Absolutely. 15:07

Q Did you get comments or feedback from counsel that you incorporated?

ATTORNEY LOWE: Objection. Instruct him not to answer. That's outside of permissible scope from my understanding. 15:07

BY ATTORNEY SEGALL:

Q Okay. You testified earlier that you originally started your analysis by reviewing the works a couple times and conveying some initial impressions to counsel. Is that right? 15:07

A Yes.

Q And at that time did you make any kind of formal list of similarities between the two works? Did you jot them down?

A I basically worked off the screenplay so I had a copy of the screenplay that I would annotate and circle things, make sort of side comments. So I guess the answer is yes. 15:08

Q Okay. And did you make a list of differences between the two works when you were first going through them? 15:08

A I was -- not necessarily, like, as a list of differences. So I don't have an actual category, like on my annotation of, like, these things don't align.

I was certainly well aware of the things that 15:08

were either missing in the -- like -- I was certainly well aware of things that appeared in the screenplay that were missing in the film. And I was certainly well aware of things that were in the film that were missing in the screenplay. 15:08

Q Did you ever make a formal list of dissimilarities between the works?

A No, because I was advised early on that that wasn't necessary for my report and that it was actually kind of against what I was supposed to be doing. 15:09

Q Were you surprised as somebody who compares works for a living like this that you were asked to render an opinion on the substantial similarity of two works and you were asked to disregard the dissimilarities between them? Did that surprise you? 15:09

ATTORNEY LOWE: Objection, irrelevant, whether it surprised him or not.

BY ATTORNEY SEGALL:

Q You can answer.

A I wouldn't say I was surprised. I was more -- as 15:09 a student of genre, you know, so, earlier you said like how would I self-identify -- (Reporter asks for repeat.)

Earlier Jordan was asking me about the USC website, my dated USC profile. I said all of that is essentially accurate. I would update it and that part of 15:09

that profile is really designed as a kind of in-house promotional piece. And that I personally self-describe, when someone says what do you do, right? All of what's written in the USC faculty profile is true. I do all that. 15:10

But the short version of that is that I tell people, and I insist on this, that I am a literary historian who is interested in questions of genre and who is interested in questions of literature and politics, the arts and politics. And I have specific specializations 15:10 within that. So that's the prefatory comments to my answer to Jordan.

So, Jordan, I would say, as a student of genre, one of the things that's important for me to always ask are, like, okay, what are the formal properties of this 15:10 kind of report? Like, what's supposed to be in and out of this report?

And I think that that was important for me to know what are these reports -- like, what is structure, the formal properties of a report like this. What's 15:11 supposed to be inside of it and what's not supposed to be in it.

And the lawyers are very clear about it wasn't important for me to include the dissimilarities. So once they told me that, it wasn't that I was surprised, I was 15:11

And, secondly, with tenure, the second part of that is like do you see this scholar having the potential to further enhance the field.

So, it is not just on work that's been done but like the promise of work to come. And that's the same with associate to full. 15:12

Q If you are evaluating two works holistically to understand to the extent to which they are substantially similar, don't you think it is impossible to fairly evaluate how similar they are without also evaluating how dissimilar? 15:13

ATTORNEY LOWE: Objection, incomplete hypothetical. Vague.

THE WITNESS: So, sorry, one more time. It seems like you are suggesting that I should be expected to also be asked to consider what's dissimilar. 15:13

BY ATTORNEY SEGALL:

Q Well, I mean, do you think you can get a fair picture of the substantial similarity of two works if you are simply ignoring dissimilarities between the two works? 15:13

ATTORNEY LOWE: Same objection, vague, argumentative and incomplete hypothetical.

THE WITNESS: I mean, for the sake of this case -- that is hypothetical. But I guess one way I would answer that, Jordan, is this: Since I was tasked to 15:13

address the similarities, that's what I did. If I was tasked to address also the dissimilarities, I could produce that too.

Since that wasn't required of me, I didn't do it. But I am happily -- I am not able to necessarily, but if you want me to talk about what I found, like, missing in one or the other -- like, I do have thoughts on that. 15:14

BY ATTORNEY SEGALL:

Q But your conclusion is that the two works are -- each work is substantially similar to the other, correct? 15:14

A I think there are enough -- there are enough elements that are substantially evident in the screenplay that reappear in the film and the selection and the arrangement, right, the pattern, sequence of how these things are organized and structured are also very similar. 15:14

Q That bottom line conclusion about the substantial similarity of the works as a whole in your expert report is utterly uninformed in this case by the dissimilarities between the works. Isn't that right? You disregarded them? 15:15

ATTORNEY LOWE: Objection, calls for a legal conclusion.

THE WITNESS: Can I answer?

ATTORNEY LOWE: Vague.

THE WITNESS: Can I answer this? 15:15

ATTORNEY LOWE: Go ahead.

THE WITNESS: I am going to say this: Like with the other case that surfaced, there was such a substantial -- and I can't talk about that case but when I was -- by this very same law firm asked to look at a different screenplay, a different film, the dissimilarities were so -- there were similarities. As I mentioned, there were similarities. 15:15

The dissimilarities were so striking and were so omnipresent that it was really hard to make an argument that the similarities could carry the case, and the dissimilarities were so significant that I really couldn't in good faith make the argument that the similarities carried -- like, would carry the case through, right? 15:15

So, in relationship to this one, right, the pirates case, I -- yes, I mean, you are right. Of course, I was aware of what wasn't similar. And I evaluated the dissimilarities and I have been thinking about that throughout, because one of the things I do is keep thinking about what connections have I missed, what connections can still be made. 15:15 15:16

And over multiple readings of this, I mean, there is a moment in the screenplay -- like the Young Rascal Scoundrels do have a sequence of, like, antics, right, that are really important to the screenplay that don't 15:16

appear in the film, right?

But I didn't think that that was significant enough to disregard everything that was shared by them.

Q Well, it is not that you thought -- that you thought it wasn't significant enough, right? It is that you were instructed by your counsel who retained you to ignore the dissimilarities; isn't that right? 15:16

ATTORNEY LOWE: Objection, misstates his testimony.

THE WITNESS: Independent of that, had I found that the dissimilarities were so overpowering, I would have told them as I did with the second case that I didn't think there was something here to pursue. 15:16

BY ATTORNEY SEGALL:

Q So, dissimilarities can be relevant to your bottom-line conclusion on substantial similarities; that's what you are testifying? 15:17

ATTORNEY LOWE: Objection, calls for a legal conclusion. Vague. What's relevant or irrelevant obviously calls for a legal conclusion. 15:17

BY ATTORNEY SEGALL:

Q I am not asking for your understanding of the law. I am saying your expert opinion on substantial similarity can be affected by dissimilarities; you just conceded that, correct? 15:17

A I am saying that in the case of the Pirates of the Caribbean there was such a significant amount of overlap between the original creative and innovative elements in the screenplay with the film, just independent of the sequence of events and the way that they were 15:17 selected and arranged that merited for me the case.

And the things that I found that were either missing in the screenplay that appeared in the film or missing in the film that appeared in the screenplay, however, didn't seem significant enough to -- I mean, I 15:18 could have written it in a report. But I was instructed not to mention the dissimilarities.

Q So you testified that in the process of comparing the two works, you didn't consider, in generating your report, you didn't consider the possibility -- or you 15:18 didn't, in fact, review other pirate works; is that correct, other than the Goonies?

ATTORNEY LOWE: Objection. Are you saying like from the time that he was retained until he generated his report? Or are you saying over the last 20 years? Or 15:18 what's the time frame? Vague.

BY ATTORNEY SEGALL:

Q Sorry. From the time you were retained to the time you generated your report, you didn't review other pirate works to determine whether individual elements in 15:19

the works you were comparing were original to the screenplay, right? That's what you testified to earlier?

A Right. Because my task was very clear which is they wanted me to look at the screenplay and look at the film and base my analysis on that. 15:19

Q And did you ever say, you know, I am not going to be able to make an informed judgment about the similarity between these works without some context? I need to consider some other works in the genre? Did you ever suggest that? 15:19

A No. And nor did they suggest to me that I should have that experience.

Q Did they -- (crossover talking.)

A I was never interviewed and said, okay, we need to know your entire history with the pirate genre. 15:19

Q At the time you were preparing your original report, you understood that both works were inspired in part by the Pirates of the Caribbean theme park ride, didn't you?

A That always was slightly vague. 15:20

Q You didn't know one way or the other?

A I didn't know that there was a theme park.

Q You weren't aware that there was a theme park ride, you mean, called Pirates of the Caribbean?

A Exactly. 15:20

ATTORNEY LOWE: Objection, incomplete hypothetical.

THE WITNESS: I am pretty well versed in West Side Story. I haven't seen the Baz Luhrmann film in a while. 15:24

BY ATTORNEY SEGALL:

Q It's a straight adaptation, more or less.

A Yeah, I just remember that John Leguizamo was in it (Reporter asks for repeat.) The casting. I just remember the casting. 15:24

Q John Leguizamo was in it.

A I just remember that it had a diverse cast.

I am sorry, Jordan. I am not exactly sure what we are talking about. So maybe if we could just revisit that. 15:25

Do I think that it is important to know the source material when comparing two works that share a same source material?

Q Correct, yeah.

A I would say, yeah, it absolutely helps to know 15:25 the source material. But that would be a literary historian in me to think, yes, it is definitely interesting. And it can be relevant.

The Shakespeare analogy is slightly atypical because that Romeo and Juliet story is so well known, 15:25

right? People are kind of trained in Romeo and Juliet early on in their lives whether, you know, middle school or high school and there are so many versions of it that it is hard to escape Romeo and Juliet. Even still.

Q Okay. Before we get deeper into the substance of your report, do you intend to express any affirmative opinions in this matter that aren't set forth in your written report? 15:25

A What would that mean? Like what do you mean?

ATTORNEY LOWE: Like things that you have come to since you have generated your last report. 15:26

THE WITNESS: That are affirmative?

BY ATTORNEY SEGALL:

Q Is your report a comprehensive statement of your current affirmative opinions in this matter? 15:26

ATTORNEY LOWE: You are referring to report as his original report and his rebuttal report, correct?

ATTORNEY SEGALL: Yeah.

ATTORNEY LOWE: So he wants to know if you have come to any conclusions since generating your rebuttal report that you think are relevant. 15:26

THE WITNESS: Well, you know, each time I reread the screenplay and think this through, I mean, there are other aspects that will pop out that I think are really interesting. And, so, like, I think in my report there 15:26

was a bit of -- I didn't dwell a lot on the dialogue, right, because I think -- I was thinking, okay, well, I didn't really dwell so much on the dialogue in one and dialogue in the other.

And that is not to say that there weren't some sort of shared phrases. But I didn't think that that was the most compelling argument in terms of what was similar between the two. And in thinking about that, this could be a sidetrack, but I thought, well, what is the nature of dialogue in a kind of pirate film? Like, how do people communicate to each other? What are they trying to express?

So, like in a romantic story line, it is important for people to share a lot of personal information. To share a kind of love discourse, all of that stuff.

But in a kind of, I don't know, pirate movie, it seems that personal communication isn't the most compelling way to kind of build that story line.

So I have been thinking about the dialogue and -- but even just rereading it like this week, and thinking about the characters, so, the Disney expert kind of insists on seeing the Rascals Scoundrels as being like a scènes à faire that has no real originality or innovation or that can kind of be reduced to just like children that

15:26
15:27
15:27
15:27
15:28

have already been seen elsewhere. And he lists any number of potentials.

But in rereading them, I thought, oh, wow, like, it didn't pop out until I reread it in preparation for this. I thought those Young Rascal Scoundrels cannot be really reduced to a character type, like a stock character type. They actually do have a larger function. 15:28

And I made a big deal of them as having being mentored by Davey Jones in screenplay. But I actually was thinking through it more and seeing how they have actual plot points that are important to them. 15:28

So at one point, it is actually -- one of the characters is named Sleepy, and Sleepy's dialogue echoed some of the dialogue that we see in the pirate's movie, which I didn't see beforehand, right? So when they take over the ship, the phantom Jack Nefarious's ship, it is Sleepy who's -- everyone else is asleep except for Sleepy, right? So Sleepy is awake. And he is sees the emergence of phantom Jack Nefarious and starts saying things like, oh, the haunted, you know, pirate. And the undead pirate. And he is like kind of panicking and naming all these -- beginning to name this character, Jack Nefarious. 15:28 15:29

And then one of the other characters, Catfish, I think it is, wakes up and -- so these two kind of all-seemingly minor -- what the Disney expert would claim 15:29

minor stock characters, actually reveal a lot of the importance of the kind of undeadness of Jack Nefarious, which is then echoed in the Pirates of the Caribbean movie.

And then Catfish even -- their dialogue is also, 15:29 I think, really interesting in that -- and, again, I didn't notice this the first time around because I wasn't quite sure how important this was. But as I mentioned the Quentin Tarantino thing earlier, I mean, there's all these allusions in the screenplay that reflect on earlier pirate 15:30 stories and motives.

So at one point Captain Jack Nefarious is about to, like, seemingly kill off some of the Young -- at the end, the Young Rascal Scoundrels. And he wants them to walk the plank and I think it's Catfish says, "Walk the 15:30 plank? That's so old school," like -- as if like that's not an original story plot line.

And Captain Jack Nefarious finds that really amusing and it kind of derails him for a moment, which is very similar to the Barbossa character who, in these 15:30 moments of ominous, threatening kind of behavior, I am going to kill you, whatever, and then has a grin or a smirk or a kind of less menacing response.

So, there are components that when I keep reading, I don't know how long I am supposed to keep 15:31

reading the screenplay, but the more I read the screenplay, the more I can appreciate its originality, its authenticity, its sophistication. And the more that I can link it with the Pirates of the Caribbean film.

And, Jordan, the way that I work, the way that scholars work, we are not journalists, so we are not quick to kind of offer an immediate opinion, right? So we take time, thinking through, building a thesis, testing a thesis. 15:31

And I was just telling this to Steven and Aleks the other day that a lot of my thinking is -- I run. So when I am running, I am thinking about, like, okay, what's going on here. And it helps me -- that's where I do a lot of my note taking. So it is something -- 15:31

Q I appreciate that. I am asking something a little more concrete and I know you have got a process. 15:31

A Okay.

Q But I just want to find out whether you have got opinions, whether you've formed any opinions that aren't in your report. 15:32

So as far as I can tell from that last answer, you have two. And they both related to similarities in dialogue. And the first one is a character named Sleepy says something like, oh, it is the dead pirate, the ghost pirate, or something like that, right? 15:32

A The language of the undead, the ghost pirate, the kind of skeletal pirate, all of that is introduced throughout the film. But the dialogue does come from the Young Rascals and the whole kind of mystification of the sea monster and the sort of ominous supernatural threat. 15:32

Q Okay. And what dialogue in the Pirates of the Caribbean is that similar to?

A I was talking more about, in that case, both dialogue and character. That the characters are more than just stock characters. And that some of their dialogue 15:32 actually moves the story line in the original screenplay.

Q Okay. And what character then is Sleepy substantially similar to in the Curse of the Black Pearl?

A I mean, I think that's where I would -- it is a totally tedious task, but I would rescreen the Pirates of 15:33 the Caribbean to track that.

Q You would go looking for similarities?

A I wouldn't go necessarily looking for it just to kind of hope to win my argument. It is not that. It is more like test-driving a thesis to see if it holds. 15:33

Q Okay. The second piece of dialogue that you pointed out was that a character says walking the plank is so old school. And then you compared that -- is there a specific piece of dialogue that's similar to or you just sort of think the fact that Jack Nefarious is amused is 15:33

sort of broadly similar to the fact that Barbossa is sometimes amused? Is that --

A Yeah, that the dialogue -- even though it is limited, like the dialogue in the screenplay does have variance. It can't be just reduced to, like, stock exchanges between, you know, stock characters. That they say things that are unusual, that are interesting, that are innovative, that are clever, that are even insightful. 15:34

Q So besides these two, the Sleepy dialogue that we discussed and the walk-the-plank dialogue that we also discussed, are there any additional opinions about similarities between the works that you now have or intend to testify about that are not reflected in your two reports in that matter? 15:34

A No, no. I am not going to -- it is all in my report. 15:34

Q Okay. Why don't we take a five-minute break and we will come back and look a little more closely at the report.

THE VIDEOGRAPHER: We are now going off the record. The time is 3:35 p.m. 15:35

(Recess.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 3:49 p.m.

BY ATTORNEY SEGALL: 15:48

Q Professor Román, if you could turn to Exhibit 1 of your expert report page 6, please.
A All right. Okay, I am on page 6.
Q And at the end of the first full paragraph, we have discussed this before, you opine that humor, irony and wit is an innovation of plaintiffs' screenplay, correct? 15:49
A Yes.
Q And a humorous tone as well?
A Yes. 15:49
Q And we discussed this a little before. But is it your opinion that the screenplay's use of humor is completely original to the genre or partially original, or what's your opinion specifically about how original it is?
A Well, again, I think I mentioned this earlier, Jordan. I think that what is interesting to me is the multiple levels of humor, irony, wit that are incorporated into the screenplay. So it is not just like one funny type of thing like slapstick or like gags or like a cleaver one-liner or witty repartee. 15:49 15:50
It is that there are different elements of humor, irony, wit that appear throughout the screenplay that, I think, are also echoed in the Pirates.
I think the Pirates of the Caribbean, you know, is also like highly entertaining. It is really funny. 15:50

The characters are witty, they are entertaining, there's gags there's all kinds of different humor in there too.

What I would argue is that the screenplay originates that kind of multiplicity of types of humor as opposed to just saying, I don't know, like, one particular type of humor affiliated with that story line. 15:50

So, like, the Pirates of Penzance is a comedy. It is funny and it's light. But it is just that there are not other elements of humor that appear there. And I think the screenplay has multiple -- maybe the better way to phrase it -- I am sorry, Pam, I will slow down. 15:50

The better way to phrase it is that there are a diverse representation of humor, irony and wit throughout the screenplay. It is not just one part of humor, irony, witness. And the fact that I am using humor, irony, and wit deliberately has three separate things, I think, convey that. 15:51

I mean, there is also satire and there is also a kind of self-reflective -- like, I guess that falls under the irony component. It appears also in the film. 15:51

Q So you admit that works like Pirates of Penzance have incorporated humorous elements into pirate stories before, correct?

A Yeah. And I think that the fact that the, quote, unquote, pirate appears regularly in, like, children's 15:51

literature, whether they be stories or cartoons or even in like adolescent story lines suggest as much. That the pirate is not simply, you know, what he -- and it was a he. What he was in The Early Modern Period, which is just like this really scary figure that could really hurt you. 15:52

Q But so it is your opinion as you sit here today that works like the Pirates of Penzance that in the past incorporated humor into pirate stories are distinct somehow because they use less multifaceted comedic elements? 15:52

A That's nicely phrased.

Q And what's the basis for that opinion since you didn't review the Pirates of Penzance in connection with your assignment?

A Just my familiarity with that. I didn't review 15:52 any of the lists of works that were included in the Disney expert report.

Q And you weren't personally familiar with all of the works in Mr. McDonald's report, were you?

A No. No. I don't even know if he was, right? I 15:53 mean, I think that some of the stuff could be pulled from like the kind of encyclopedias that I was looking at. That's one of the reasons I pulled that out, to see are these sort of synopses helpful to the Disney report.

And I did ask Aleks and Steven if it was 15:53

important for me to review those materials. Like, do I need to read up on all of that? And their answer was absolutely not.

Q So, why don't you take a look at Exhibit 8 which I have just marked, which is Mr. McDonald's expert report. 15:53

A All right, hang on. Here we go.

(Deposition Exhibit 8, McDonald Report, was marked for identification by the court reporter.)

BY ATTORNEY SEGALL: 15:53

Q First of all, you recognize this document, correct?

A Yeah.

Q This is the expert report that you reviewed in submitting your rebuttal report? 15:54

A Yes.

Q And can you turn to page 23 with me, please.

A All right. Dialogue 23, "Novelty Analysis"?

Q Yes, underneath that. I am going to point you to the last sentence on this page. 15:54

And says "Comedy in pirate stories dates back to Gilbert O'Sullivan's 1879 operetta, Pirates of Penzance which satirized pirate melodramas of the period."

And you agree with that, correct?

A Well, I mean, it might even date back further. I 15:54

mean, I don't know, I am not a historian. There might be something -- a representation of a pirate earlier on that has that kind of humorous tone it.

Q Well, it says it dates back to at least 1879, correct? 15:55

A Yeah, no, that would be -- that seems -- yeah.

Q Okay. And then if you turn to the next page on page 24, it says "Humor, irony and wit are generic terms that can be applied to many pirate movies, especially in the films of the last 100 years. In fact, most of the 15:55 pirate movies --" I think there's a typo, "of the 1940s and '50s were replete the humorous, ironic, witty actions/ interactions, characters and dialogue." And then it goes on to list a number. (Phone ringing)

A Is that you? 15:55

Q Possibly. I can't tell if it is over the Zoom or (inaudible.) Apologies.

So going back to the line of Exhibit 8 here, do you have any, you know -- I know you testified you didn't review these films in connection with preparing your 15:56 rebuttal report and you were instructed that you didn't need to.

So do you have any basis as you sit here today to doubt the accuracy of what Mr. McDonald says about the pirate moves of the '40 and '50s and the humor in them? 15:56

A No, I have no reason to doubt him. But I think that what's missing in his report throughout the report is any sort of nuance. I mean, it is a very kind of absolute-ish one-line logic that allows for little nuance or sophistication. 15:56

So, I guess just on the rhetorical level that's presented here, it is presented as fact, like irrefutable fact, right? And so if this were a student paper, I would say, okay, well, here you have a thesis, right? Unpack it. Like, argue it. Show me the nuance here. What do 15:56 you mean by these things?

So I don't think I would necessarily contest what he is saying. I just think that it misses the larger point that the screenplay incorporates these aspects consistently with the kind of fullness of diversity 15:57 throughout the screenplay.

It can't be -- I don't know if the pirate from 1948 has a witty pirate that is comparable to the one in the screenplay. But it would seem very unlikely that the pirate from 1948 includes and incorporates all the levels 15:57 of humor, irony, and wit that appear in the screenplay.

And that's not to say that the screenwriters, right, didn't -- weren't influenced by The Crimson Pirate, The Pirate, The Black Swan and thought maybe, oh, you know what? There is this tradition of the kind of witty 15:57

pirate, or swashbuckler, right? There is an element of humor in some of these earlier films that first surfaced. And that we are going to kind of -- and this is, again, part of their sophisticated wit or irony or intelligence, is that they would reference that in the kind of Quentin Tarantino matters; like, okay, like, I am aware of the genre in which I am working. And I don't have the sophistication to recognize every intertextual relationship. 15:58

But I would imagine people who are intimate with this literature and these films would love the screenplay for that. 15:58

Q So, if Mr. McDonald, though, is correct that humor, irony and wit have been common in pirate works in the last hundred years, would that change your opinion that the screenplay's use of humor is, quote, entirely original? 15:58

A I don't think he said anywhere that it was common. I just think what I read was that humor, irony and wit can be applied to many pirate movies. So that they -- it could be a component of it. I don't think he ever says that they are common. 15:58

Q I guess what I am asking you, though, Professor Román, is without even a cursory review of some of the works that are cited in Mr. McDonald's report, how can 15:59

the film is also really like -- it is a cool film. There is no doubt about it. Pirates of the Caribbean is like highly entertaining. It is a fun film. It's a good time.

So, I don't -- I am losing track what I am talking about. I got caught up in praise of the Pirates of the Caribbean. 16:00

BY ATTORNEY SEGALL:

Q What is your opinion, Dr. Román, that the sort of -- the aesthetic qualities, whether something is good or not, is dispositive of whether individual elements are original to the work? 16:01

A I think that kind intertextual referencing is original to the work. I doubt that Crimson Pirate from 1952 has that kind of self-consciousness.

Q Okay. But you don't know because you haven't looked at -- 16:01

A No.

Q Let's go back to your report at Exhibit 1 and turn to page 8 if you would.

A All right. Page 8. 16:01

Q Okay. So you say in the middle of the second paragraph that both Captain Jack Nefarious and Captain Hector Barbossa are "immensely entertaining and likeable, even though they are motivated by greed."

Do you see that? 16:02

A Yes.

Q Okay. And you go on to say that "This likability of the pirate captain, quote, deviates from the treacherous pirate characterization of the standard pirate narrative." 16:02

Do you see that?

A Yes.

Q And so is it your opinion that this concept of a likeable entertaining pirate captain is original to the plaintiffs' screenplay? 16:02

A Do I think that the likability of the pirate is original to the screenplay?

Q An entertaining, likeable, pirate captain. Do think that element is original to the screenplay?

A Well, I think that there are elements of the 16:02 likable pirate that surface earlier on in the literature. But I think the way that it is presented in the screenplay is innovative and original and rifts on that.

Q Okay. So, you are familiar --

A What I am saying to try, Jordan, is there might 16:02 be likeable pirates earlier on in the literature that were kind of diluted in their kind of -- in their fear factor, right?

So I think what is interesting in the screenplay -- I don't think they are necessarily scary 16:03

characters in the screenplay, but they still do have that kind of ominous, threatening component.

Like we do see the pirate in the -- Captain Jack Nefarious in the screenplay and even Davey Jones, for that matter, like kill people, right? So it is not as if, like, they are completely muted of any kind of physical harm. Like, they do do physical harm to other people and to themselves. They cut each other when they are sword fighting. 16:03

But yet, at the same time, they have this other likability factor. I think the screenplay when they first introduced Captain Jack Nefarious, they even say, look, he is a highly charismatic pirate who, in that kind of evil -- and evil too. 16:03

Q So, it is that combination you are talking about of evil and charisma? 16:04

A Yeah. That's what I would say is the kind of hybrid quality that's introduced in the screenplay that we then see echoed in the Hector Barbossa.

Q And it is your opinion that that quality is an innovation of the screenplay, correct? 16:04

A Yes, sir.

Q Are you familiar with Long John Silver from Treasure Island?

A I wasn't asked to screen that. 16:04

Q You are familiar with the work, Treasure Island, right?
A Yeah. But I didn't review it for any of these reports or for the deposition.
Q But you understand that Treasure Island is one of the most phenomical pirate works in American literature, right? (Reporter asks for repeat.) 16:04
Phenomical pirate works in western literature, right?
A Are you waiting on Pam or me? 16:05
Q You, I'm sorry. I didn't catch your answer.
A Yes, of course. Treasure Island is what would be termed a classic.
Q So I just want to read to you, I am not going to mark to this as an exhibit, but I want to read to you from the Wikipedia description of Long John Silver. It says "Long John Silver is the secret ringleader of the pirate band. His physical and emotional strength are impressive. Silver is deceitful and disloyal, greedy and visceral, and does not care about human relations...yet he is always kind toward Jim and genuinely fond of the boy. Silver is a powerful mixture -- (Reporter asks for repeat.) 16:05 16:05
Absolutely. Do you want me to start from the top?
THE REPORTER: Sure, why not.

BY ATTORNEY SEGALL:

Q "Long John Silver is the secret ringleader of the pirate band. His physical and emotional strength are impressive. Silver is deceitful and disloyal, greedy and visceral, and does not care about human relations. Yet he is always kind toward Jim and genuinely fond of the boy. Silver is a powerful mixture of charisma and self-destructiveness, individualism and recklessness." 16:05

I am trying to understand this, Dr. Román. And you are claiming here in your report and hearing your testimony today that one of the major innovations of plaintiffs' screenplay is a sort of cunning and sinister figure who, despite their off-putting behavior, retain a high level of individual charisma. 16:06

That's what you wrote on page 8, right? 16:06

A Yes.

Q But, you know, that mix of off-putting behavior with high charisma is also shared by Long John Silver, who is one of the best known pirate characters in all of pirate literature. 16:06

So, I guess my question is how you can reconcile your contention in your expert report having concededly not reviewed Treasure Island with that description of Long John Silver's character that I just read to you?

ATTORNEY LOWE: Objection, assumes facts not in 16:07

evidence. Incomplete hypothetical. Vague and ambiguous. Argumentative. Calls for a legal conclusion. That's it.

THE WITNESS: So, do I respond?

BY ATTORNEY SEGALL:

Q You should, yes, thank you. 16:07

A Okay. I would say, you know, just from the start that, like, I wasn't asked to compare, like, Treasure Island, the screenplay of Treasure Island, and do a kind of comparison that I was asked to do with Pirates of the Caribbean. So, there is that. 16:07

But I think that, again, the screenwriters clearly demonstrated sophisticated understanding of the previous literature and that that would be another example of the intertextuality of it. That there is a kind of citational component. 16:07

But I think that, again, like, it is one of these things of like selection and arrangement how this type, this character type, kind of then moves through the story, right, and how the character type, this hybrid figure, that may have an earlier reference to Treasure Island, 16:08 then is incorporated into this particular story line, which relies on that earlier thing that I was mentioning, the multifasted levels of, you know, humor and irony and wit.

I think your point that one can go back in 16:08

history and find other figures that are, you know, both, like, entertaining and threatening, have a likability factor. I think it is this particular -- again, we need to differentiate between -- just the fact that there is even like Davey Jones and Jack Nefarious, like there are 16:09 these two figures that embody that kind of hybridity, I think is also really innovative and interesting, right, so it is a reappearing thing.

I guess, you know -- I don't think that you are doing this, but I think that maybe you want me to say that 16:09 this isn't original or that the screenwriters were kind of lazy or kind of plagiarizing something else.

But I think my point would be the opposite; that their self-awareness of the literature actually enhances the creativity of their hybrid characters and the plot 16:09 scenarios that they place them in.

So I guess I would still hold to my argument or my report. But I see your point. I think your point is valid. I think that -- but I also -- you know, Aleks and Steven asked me not to look at Treasure Island. So I 16:10 deliberately -- I deliberately, to honor the work of the court, not muddle my report with extraneous -- like, it just wasn't part of what I was asked do.

So part of me feels if you guys wanted me to do this, I would have done this and I would have been better 16:10

general instruction not to review other works?

A I know you don't make it anecdotal at this hour but, like, I was overwhelmed with, like, USC stuff and stuff. So, like, the fact that I didn't have to watch more films, like, I was happy not to have to watch more films. 16:11

Had they asked me to watch Treasure Island, yeah, I would have, of course. I did watch Cutthroat Island on request.

Q Yes. Okay. Let's go to page 9 of Exhibit 1. 16:12 And I just want to ask you quickly. You say, seven lines from the bottom, you say -- I am sorry. "This hybrid character type combining elements of the swashbuckler and the pirate appears to be an original innovation specific to the screenplay." 16:12

And, first of all, I will ask you, what's a swashbuckler?

A I think the way that I was differentiating them is that the swashbuckler has like some sense of -- was a much more flamboyant figure, right? So their antics were 16:12 really about, like, virtuosity of skill and look out -- sorry, Pam. I will slow down.

The swashbuckler is a much more flamboyant figure who, you know, a part of their appeal is in the virtuosity of their kind of fencing skills, right? And in the kind 16:13

of costume and floppiness, floppishness, of their persona.

Where I think the pirate -- and, again, I am not referring to, like, the film versions. But the pirate trope in general historically is more of an outsider figure -- sorry. My computer is sending me messages. 16:13 Hang on a minute. Okay, sorry. It wanted me to update a program.

And I think that the pirate is more of an outsider figure who doesn't invest in decorum, doesn't invest in like flamboyance. Isn't as -- I don't want to 16:13 say elegant, but is much more -- it's more of a funkier, messier figure.

And I think that's where I was putting them at, differentiating them in that capacity. And I think what's interesting is that the screenplay combines elements of 16:14 both. That's the hybridity. Bringing in the sort of floppish virtuosity, clever, like long mustache, that kind of persona, right?

Are they threatening? Yeah, of course. Right? But they are also very, you know, clever and fashionable 16:14 even, right? And they seem to come from a -- and it's not to say pirates don't come from the upper classes, but the pirate, generally, when we meet them, is already on the outside, on the fringe.

Q Okay. And what is the basis for your opinion 16:14

that the combination of pirate and swashbuckler appears to be an original innovation specific to the screenplay?

A Because I hadn't -- I hadn't seen it before, I hadn't heard of it before. I never encountered it before. No one has ever referred to it before. And I think that -- and again, I don't know, it is not that I am allowed to say this, but I think that the Pirates of the Caribbean movies came out a long time ago. So I think for some of us, certainly, for my students, for an entire generation, the representation of the pirate stems from the Pirates of the Caribbean, from that franchise, as if there was nothing beforehand. 16:15 16:15

So the commercial success, the kind of global commercial success and popularity, which is well earned -- it's a really good movie. I am not undermining the movie itself. But I think the movie was so successful in promoting this hybrid character that it became what we understand to be the pirate character now. 16:15

So, historically, I think it is interesting to kind of see, well, how did that hybridity kind of take shape. 16:16

Q Do you still have that book you referred to earlier?

A Yeah.

Q Could you remind me what the book was called. 16:16

A Actually, I am using it as what I put my computer on top of to give me leverage. So I have to lift my computer to pull it out for you. So it is actually under my computer. I will read it for you. This is the book. Pirates -- I gave it to you already, Pam. But it is 16:16 Pirates and Seafaring Swashbucklers on the Hollywood Screen by a guy named James Robert Parish, P-a-r-i-s-h, published -- do you need the publisher?

Q No, I just wanted you to remind me of the title.

A I don't recommend it, like, to be quite honest. 16:16 I was hoping it would be more interesting than it was.

Q It seemed like, though, that book must cover both swashbucklers and pirates, right?

A Exactly, yeah.

Q Did you review the text of that book to determine 16:17 whether there were any previous pirate works with swashbuckling pirates?

A I was looking to see, oh, like, is there any reference in this book to something that kind of proves the Disney expert's claims. And I didn't find it in the 16:17 report. I didn't find it in the book. So, like, I was just trying to verify the Disney expert's report through this book and it's like this is not -- this is a waste of my time. This is not really going to help me. And then I learned that I didn't have to. 16:17

Initially, I thought that I was going to have to address all of those aspects in my report, my rebuttal report.

Q Okay. I want to ask you about a couple of other things that you characterized as innovations of the plaintiffs' screenplay. So let's go back to your report if you still have it up. 16:17

A It is up.

Q And go to page 11.

A I am there. 16:18

Q You are talking here about the romance plot in the works, correct, the element of romance, correct?

A Yes.

Q You say, that "their incorporation into the story introduces the element of romance which becomes increasingly significant to the plot as the story develops." 16:18

Do you see that?

A Yes.

Q Okay. And then if you go down to page 17, you say at the bottom of the middle paragraph -- 16:18

A Okay.

Q You say "The element of romance that was so essential to the screenplay and also one of its major innovations for the typical pirate story also appears in 16:19

the Disney film."

Do you see that?

A Yes.

Q So, is it fair to say you consider this sort of romance subplot of the screenplay to be one of its major innovations as a literary work, correct? 16:19

A Yes.

Q Okay. And what is that opinion based on?

A Why do I think that in terms of the correspondence between the screenplay and the film? 16:19

Q Yeah. What's the basis for your opinion that the romance plot in the screenplay represents a major innovation to the typical pirate story?

A I don't think that one necessarily thinks of the pirate story as one having to do with romance. And that's not to say that there are not women characters in there, right? The standard representation of a woman character which we see, you know, in these films, too, is like the damsel in distress, right? I don't know if these are scènes à faire, like the damsel in distress, the harlot, right? Sort of like the woman who serves the crew, right? 16:19 16:20

And in the scene Cutthroat Island, I thought, oh, wow, so we actually have like a female lead pirate protagonist, right? But I think what was really, again, really unusual, and I found to be really interesting for 16:20

my own purposes, it kept me engaged and it also was really innovative, and it was a huge surprise -- you asked me if there were any surprises when I was reading the screenplay. The huge surprise for me was that the screen writers would continue to develop the heterosexual love plot as being nearly parallel in terms of narrative momentum and narrative interest as the resolution of, like, the pirate treasure story line. 16:20

And I even think that I would go so far -- and I think the film does this, too. That the screenplay not only is able to simultaneously maintain two kinds of narrative threads: The pirate treasure thread or current or plot line, whatever you want to call it; the heterosexual love story is not a subplot. Maybe that's the way to phrase it. The heterosexual love story is as important to the screenplay as the pirate treasure story line. 16:21 16:21

And the way that they are weaved together, I think is brilliant. I think it is really interesting. Which is to say I also find that immensely satisfying in the Pirates of the Caribbean film. And I think that the Pirates of the Caribbean film borrows that kind of double narrative momentum from the screenplay. 16:21

I don't think that a typical romance story would also, you know, if there were maybe pirates involved, 16:22

wouldn't incorporate the pirates as a major theme, right? I think it would remain on the level of the subplot if at all.

I already made my point that with the quote, unquote, pirate story, the representation of women is pretty dismal and pretty stereotypical. 16:22

So I guess I should say, I probably should have said at one point, I think I do, maybe I should have made more of it, that the incorporation of a female lead in a pirate story that isn't seen as like a barmaid, a harlot, damsel in distress, is in itself a major innovation as a major departure. 16:22

But I think that I was more drawn to -- of course, I am drawn to that. I guess I was already there, but I thought the -- being able to maintain those two parallel plot lines and weaving them as intricately as they do was very nice. Really good. 16:23

Q One of your opinions that you just stated is that it's innovative to have a female lead in a pirate story; is that right? 16:23

A Well, I don't know if I -- it is unusual to have a female lead, and I think Cutthroat Island has a female pirate lead, obviously, and has a sidekick. I always forget that guy's name. Is Matthew Modine? Did you see it recently? 16:23

Q It is Matthew Modine.

A Right. And good for him, that he had that role. It was, like, whatever happened to Matthew Modine? But he had a good moment in Cutthroat Island, I'll give him that. He was fun to watch. It is almost like the roles were 16:23 reversed. Like he became like Beefcake. He became like out of the sexy -- the woman's role, oh, the sex object. Matthew Modine inhabited the standard sex -- objectified role that the woman usually carries. And then the female lead ended up being, again, kind of -- the film Cutthroat 16:24 Island plays against standard gender norms. And I think that was clever.

Q Okay. So I guess I am just trying to understand what your opinion is, you know. You said you reviewed some of the cover art, right? 16:24

A Minimally, minimally.

Q But you saw the poster, right, that has Gina Davis's and Matthew Modine's images on it that the plaintiffs put together?

A Yeah. But, again, I didn't dwell there. Where 16:24 are you going? What do you want to say? What do you want to ask me?

Q It is fair to say that Cutthroat Island was a direct inspiration for the screenplay, correct?

A I have no idea. You have to ask the screenplay 16:24

writers. But my sense is again -- and, Jordan, I am really sorry to be redundant and, Pam, I'll slow down. I think I get quick when I feel like I have already said this before. So I am sorry about that. Again, it is not to be disrespectful. 16:25

My sense, Jordan, is that the screenwriters, these guys who wrote this film, the screenplay, had a very sophisticated understanding of the genre that they were working in and part of their kind of creativity was in what I call intertextual referencing to these other films. 16:25

(Crossover talking.)

Q Let me pause you there. Let me pause you there.

A Can I finish what I was going to say?

Q Please, go ahead.

A I think they are fully aware, the Cutthroat 16:25 Island film, and I think -- I think the Disney report is saying like, oh, even the plaintiffs agree like their screenplay is only -- he reduces it to like a really poor mashup of like Goonies and Cutthroat Island. And reduces it to that. And he says, that's not even protectable; 16:26 actually dismisses it on all levels; it's like a bad screenplay. Right? And I think that, again, is very reductive.

And he uses the artwork as sort of the basis for that argument. And I think that I personally just wasn't 16:26

fully paying attention to the artwork as what they were kind of claiming to be original, right? So if the pirates of the Caribbean used posters that, like, rift on the posters that they were using, then that might be something. It just seemed like a pitch. Like a pitch, like X meets Y. Our screenplay is like an X meets Y. Goonies meets Cutthroat Island. 16:26

Q One thing I am struggling with a little bit, Dr. Román, is you are making statements about the originality of the specific elements of plaintiffs' screenplay. 16:27

A I am talking artwork.

Q You testified moments ago --

A I don't think anything about artwork as being original.

Q I am not talking about artwork. But you testified moments ago that the screenplay's use of a strong female character is innovation; it is unique to the screenplay, correct? 16:27

A I think that if we go back to my report, that might be alluded to in there. But the report really does emphasize the romance, the heterosexual romance. 16:27

Q Okay. But a second ago you testified that most pirate stories have -- you know, don't have strong female characters in the lead. But then you say, well, when it is pointed out that in fact many do, like Cutthroat 16:27

Island, you say, oh, well, in that case, they are being intertextual.

A No, I think that that's a mischaracterization. And I think that I would say that if there are female characters, they are generally reduced to stereotype, right? And I think that Cutthroat Island is interesting because it does promote the female pirate as the lead. That is an innovation. 16:27

So, I think my point that I am trying to make that I think I made in the report and that I made in the rebuttal, is that the heterosexual love story line is equally as important to the success of the screenplay and the pirates film as the pirate treasure narrative. 16:28

And that the screenplay does a very successful job of weaving those two together so that it feels entirely organic to the narrative and the narrative momentum that propels the story line. And I think Pirates does that, too. 16:28

Q I'm going to ask you to go back now to the plaintiffs' original complaint which is Exhibit 3 in the exhibit room. 16:29

A Hang on a minute. All right.

Q Okay. And once again, you see here at the top of Exhibit 3, Arthur Lee Alfred II; Mr. Ezequiel Martinez, Jr., their names are right on this one. You understand 16:29

contention by your own clients in this case with your claim that the screenplay's use of romance is a major innovation to the typical pirate story line?

ATTORNEY LOWE: And I am going to object. First of all, this document has been amended. So there is a first amended complaint that has been filed. So I don't know what the legal effect of this original complaint is anymore in light of the fact that it has been substantially amended. That's number one. 16:30

Number two, it is argumentative. 16:31

Number three, it is vague.

BY ATTORNEY SEGALL:

Q Well, let me ask you this, Professor Román. Do you have any reason to doubt the statements of paragraph 10 of Exhibit 3 that the majority of the pirate films listed in Exhibit 10 have a love story or triangle? 16:31

A I mean, I would say this: And, again, I am just repeating myself. But I think the primacy -- I mean, it's one thing to have a love story/triangle that's incorporated into the film in some capacity. That's one thing. But to have it be like the major -- one of the major story lines, to have it -- I don't think anyone would look at any one of these films, especially the ones I know, I don't think anyone would say, oh, Peter Pan is a love story. I don't think anyone says Treasure Island is 16:31 16:31

a -- that's a story about a heterosexual romance, right? But I think what's -- again, I don't know. I have never met these guys, I don't know what their -- I have not seen this document before. And for all I know -- I don't know what they are trying to do here. 16:32

But I would say this, is that I think that, still leaving that aside, I do think that the primacy of the heterosexual love plot as being as important as the pirate treasure story line is incredibly unique.

Q But you don't have any basis to think as you sit here today, do you, sir, that the love story in Captain Blood or the love story in Blackbeard, the Pirate, is less significant to the plot of those films than the love story in the screenplay, do you? 16:32

ATTORNEY LOWE: Well, objection, assumes facts not in evidence that there is a love story in either one of those. And, so it is argumentative, calls for speculation. 16:32

BY ATTORNEY SEGALL:

Q You have no idea one way or another, do you, sir? 16:33

A Are you talking to Steven or me?

Q With you.

A One more time?

Q You have no idea one way or another whether there are significant love stories in Captain Blood or 16:33

narrative structure. The Keira Knightley and Orlando Bloom characters seem to be, like, quote, unquote, meant for each other, right? And it does become one of the major suspenses of the film, is how are they going to align given all these obstacles in their way. 16:34

And, you know, I think while watching it, we invest in that relationship in the same way that we invest in -- not initially at first, but in the same way that we invest in the relationship between Jane and Davey Jones in the screenplay. 16:35

Q So, who is the main protagonist in the screenplay in your view?

A It is definitely not the Young Rascals. Like, I don't know where that came from. I mean, I would never say that. And that's where the Disney report suggests 16:35 that somehow rather these, like, group of kids are the main protagonists. I think that's -- I don't know what that's about.

Q Well, I am asking you who is the main protagonist in the screenplay in your view? 16:35

A I think that that -- and, again, I don't mean to be difficult or, you know, elusive. But this idea of a main protagonist, I think, is already kind of missing some of the sophistication of what's happening. So I would say that there is like a primary story line that incorporates 16:36

Davey Jones and Jane, right? So, as well as Captain Jack Nefarious. So one could easily argue that the story is, like, Davey Jones's story, right? Or one could -- but in terms of a main protagonist, I think -- I would say, and this is what I did in the report, that the leading male 16:36 figures, which is the language that I used, or the leading male protagonists, are echoed in the leading male protagonists in the other films.

I don't know if I would be able to say who the main protagonist of the Pirates of the Caribbean movie is, 16:36 right? Is it Johnny Depp? Is it Geoffrey Rush? It is not Keira Knightley, we know it is not her. But we know her story line is indispensable to the success of the pirates of the Caribbean. But it is kind of a coin toss. Is it Jack Sparrow's story or Barbossa's? I mean -- 16:36

Q Barbossa is an antagonist, right?

A I don't use that language. I think part of what's really fun about the film is then like hanging out afterwards and being like, oh, like, I am all Jean Barbossa. Like, I think like Geoffrey Rush is the lead. 16:37 I actually don't know this and I don't know, maybe you do, but I would think like how did the Golden Globes differentiate these people in terms of best actor or best featured actor, right? And I would put both as best ensemble. 16:37

If the actors in the screenplay were ever to be cast -- (Reporter asks for repeat.)

Sorry. I am just rifting on who is the lead and who is not the lead. And I was saying that it would be really difficult -- not difficult. I think part of the fun of the pirates film is, well, who is the lead? Is it the Johnny Depp character? Is it the Geoffrey Rush character? And I think one can't really establish that. 16:37

And I thought maybe one way into that conversation, if it is productive, which I don't know if it is, is to see how the Golden Globes nominated these figures on their best actor, best featured actor. 16:38

Q I am quite confident that would not be productive for us today. What I'm trying to do, Professor Román, is pretty simple. Davey Jones, the pirate, the privateer, is the hero of the screenplay, right? That's fair to say? You would agree with that, wouldn't you? 16:38

A I am sorry. In the screenplay? Davey Jones? Yeah, he gets a lot of narrative time. And we follow his story all the way through. 16:38

Q Okay. And he is the lead male character and Jane is the main female character?

A Yeah, I would say that.

Q And the primary protagonist in Curse of the Black Pearl is Jack Sparrow, correct? 16:38

A That's where I think it is debatable in terms of who is the male lead. And I think --

Q So, maybe it is Jack Sparrow or maybe it is Hector Barbossa. (Crossover talking. Reporter asks for repeat.) 16:39

So maybe it is Jack Sparrow or maybe it is Hector Barbossa, one of the two is the lead male character in Curse of the Black Pearl, right?

A Yes. And I would agree that it is not Will Turner, I mean, if that's where you are going. 16:39

Q That was going to be my next question.

A Yeah. Let's just, for the sake of time, just agree that Will Turner is not the lead, the male lead, in the Pirates of the Caribbean film.

Q Okay. So, to the extent that there are romance 16:39 subplots in both -- in both films, that's a pretty fundamental difference, right? That the male lead in the screenplay is also the lead of the romance, but the male lead in Curse of the Black Pearl is not involved in the romance at all? Isn't that true? 16:39

A That might be true --

ATTORNEY LOWE: Wait, wait. I am just going to object to the word "fundamental difference," vague and ambiguous.

You can answer. 16:39

might be romances in these other films that you have been asking me about that I don't know. But that it is so central to the plot.

And so in The Pirates, I would argue that it is not, oh, is the Orlando Bloom, you know, the major figure 16:41 and what do you make of the fact that he is not the major figure, that it has to be part of the major plot. I think that the heterosexual love story is essential to the Pirates of the Caribbean story line.

And not only is it essential but it borrows from 16:42 the screenplay. And not only does it borrow from the screenplay but it fundamentally makes it incredibly appealing to a large range of people who will be bored by one or the other components.

But having that combination as part of the 16:42 hybridity makes it immensely commercially viable.

Q So just so I understand your opinion regarding the role of romance in the two works, is the way the works are similar is that they both make romance central to their plot. But you are not opining that the specific 16:42 expression of the romance in terms of who is actually involved is similar between the two works.

Am I getting that right?

A No.

ATTORNEY LOWE: Objection, argumentative. 16:42

THE WITNESS: I think that's a mischaracterization.

BY ATTORNEY SEGALL:

Q In what sense?

A Well, I think you are trying to make a point around the Orlando Bloom character, the Will Turner character, as not being one of the major male leads. But I think what I am trying to say -- and, again, I feel like I am repeating myself. So I am trying to find a different way to say it, right? 16:42 16:43

So maybe I could go into like the selection and arrangement aspect of it, right? So if we have, like, heterosexual lovers as a kind of trope that we see surface in the screenplay, right, and that is echoed in the film, right, it is not enough to say simply, oh, each have this character type, right, or this coupling, right? 16:43

It is how that coupling then moves through the entire story line. So what are the sequence of -- what is the selection and arrangement of this coupling throughout the screenplay. And the fact that they are both introduced in the prologue, I think is -- I mean, I could just go through it all. I mean, it is all in the report, Jordan. 16:43

Q I got it.

Let's go back to your report which is Exhibit 1. 16:44

If you can pull that back up for me.

A Yeah. I am going to want to take a break in a little bit. I just want to throw some water on my face.

Q Okay. Let me ask you a couple more questions on the topic and I'll try to finish up this section. And then we can take a break. 16:44

A I can't even -- I don't have any -- do you mind? Okay, thanks.

And, Jordan, thank you for your patience. I appreciate the way that you are handling this. 16:44

Q Happy to participate. Okay. So, on page 14 of Exhibit 1, you talk a little bit about the prologue which is something you testified about earlier today, correct?

A Hang on. I am in the wrong document. Sorry. I am in the wrong document. Where do you want me to go? 16:45 Exhibit 1?

Q Exhibit 1, your expert report.

A Okay. I was in the last thing we did. And what page?

Q Should be page 14 at the top. 16:45

A Okay, give me a second. All right. Got it.

Q Okay. Talking about the prologue.

A Yes.

Q You talk about the prologue and then you describe it. And then you say "There is no precedence in the genre 16:45

of the pirate story to encourage such a prologue. In fact, it is highly atypical in my opinion."

And I just want to better understand your opinion about the prologue. Are you saying that there is no precedence for the use of a prologue in general in pirate stories, or are you saying there is something specific about the prologue that lacks any precedence in pirate stories? 16:45

A I would even just go that prologues are an incredibly unusual literary device at large. Like, there are not, like, a lot of literary texts that start off with a prologue. I mean, an epilogue is much more -- if there is a standard, there's more of a sense of an epilogue than a prologue. 16:46

So the idea of a prologue attached to any genre is already going to be noteworthy and somewhat unusual. And I think that that's where I was going; that both works have this highly unusual introductory narrative frame which is the prologue, and then I went through and tried to identify how they functioned in each. 16:46 16:46

Q It is your testimony sitting here today, is it your opinion as a comparative literature expert, that prologues are an uncommon device in film and literary works? That's your testimony?

A Well, I mean, Raiders of the Lost Arc, Star Wars, 16:47

has a, you know, famous prologue. There are prologues in films and in literature. But I don't think that we are accustomed to seeing, like, stories with prologues as a kind of standard way to introduce a story. Prequels.

Q So do you think the idea of a prologue that's set in the past is a protectable element under copyright law? 16:47

A I think it would be in terms of the selection and arrangement, you know, kind of what we're given, that it would be protectable in how the prologue is incorporated into the story and how that -- in the screenplay. And then also reappears in nearly, like, identical, in the Pirates of the Caribbean movie. 16:47

Q So, by definition, though, a prologue comes at the beginning of a story, right?

A Yes, sir. 16:48

Q And prologues generally are set in the past, isn't that true? (Reporter asks for repeat.) In the past, correct?

A Well, to go back to what you introduced earlier, probably the most famous prologue in literature is the prologue to Romeo and Juliet, right? So, in Shakespeare's prologue, in Shakespeare's play, we start off with a prologue that basically lets us know what's about to happen between the warring families and the star-crossed lovers. So -- 16:48

Q Okay. So, you would agree that prologues like in Romeo and Juliet, for instance, often introduce characters, right?

A Yes.

Q And they often sort of provide context for the plot so the audience understands some critical plot context, right? 16:48

A It could be a critical plot. It could be a moral, it could be an apology. The prologue functions differently in different literary genres and then in different literary periods for different purposes, right? So there is no, like, set prologue, like every prologue does the same thing. A prologue is introduced as a kind of introduction to the work, right? 16:49

Q Okay. And so to the extent both the screenplay and Curse of the Black Pearl, you know, have prologues that serve as an introduction to characters and themes in the works to come, you wouldn't consider that unusual, would you? 16:49

A No, I think it is unusual. I mean, not how a prologue functions. It is unusual that they would both have that. That, to me, seems -- that is the first indication that something was kind of -- something was happening here. I thought, wait. Why do these both have prologues? Right? What's to be -- why -- there is no 16:49 16:50

reason for the Pirates of the Caribbean to have a prologue, right?

Maybe there is no reason for the original screenplay to have a prologue. But the original screenplay has a prologue. And the prologue functions in 16:50 a particular way, which I outline in the report. And then, the film has a prologue that functions nearly identically to the way that the prologue functions in the screenplay.

That's not a -- that's not, like, a standard 16:50 component of nearly anything. Right? So the fact that they are both so nearly identical in purpose and in content to me is -- is extremely unusual to me.

Q What's of the basis for your opinion that prologues are, quote, highly atypical in pirate stories? 16:50

A Well, it's just that they are highly atypical at large.

Q Okay. So your opinion isn't fathomed to pirate stories? You just think prologues are highly atypical in general? 16:51

A Well, I think from the pirate stories that I am familiar with, yeah, they are highly unusual.

Q Okay. Did you do any research on the use of prologues in pirate stories?

A Jordan, again, you know, I have said this before, 16:51

want to belabor the point with the Quentin Tarantino reference, but I think that one can experience -- if one is -- like Once Upon a Time in America is a very sophisticated film. It makes references -- sorry, Pam, I'm going to slow down. 17:16

Once Upon a Time in America, the Quentin Tarantino film, is a very sophisticated film that makes references to other films, both in its genre and other Hollywood films. And I guess that's part of Quentin Tarantino's aesthetic. People who follow him or fans of 17:16 him expect that in his movies.

But one can easily just go to see his films without having that knowledge base and still have an incredibly satisfying experience.

Q You understand that -- I understand that you are 17:16 a big fan of the screenplay, sir. You have mentioned that, you know, ad nauseam today. But you understand that the sophistication of the screenplay doesn't have any relevance to the question of whether it is -- the elements of the screenplay are protectable as a matter of the 17:16 substantial similarity analysis, don't you?

ATTORNEY LOWE: Objection, calls for a legal conclusion. Assumes facts not in evidence, argumentative, vague.

THE WITNESS: Well, I would say that the -- that 17:17

they are protected, Jordan. I would argue against that claim insofar as that they can't be reduced as the Disney expert set out to do as simply, you know, scènes à faire, right?

And, then, if you take each individual component, 17:17 right, it's -- it's reductive to simply say that these are like standard tropes in this type of movie, whether it is the plot, the characters or the dialogue.

And I think that, you know, what we need to do or what I found really important to do in my comparison, was 17:17 dwell in the sophisticated nuances of each of those, you know, seemingly scènes à faire to point out that they are much more than that.

And not only that, but in terms of the selection and arrangement of these, like, elements, is also very 17:17 original. So --

Q You understand that Disney -- (crossover talking.) You understand that Disney is not disputing that the plaintiffs are entitled to copyright protection (Reporter asks for repeat.) 17:18

You understand that Disney is not disputing that the plaintiffs' screenplay is entitled to copyright protection, correct?

A Well, that would be --

ATTORNEY LOWE: Objection, objection. Calls for 17:18

a legal conclusion. Argumentative.

BY ATTORNEY SEGALL:

Q You can answer.

A Even after all these hours, I am still not clear what I am supposed to say here. Answer? 17:18

Q You can answer the question, yes.

A I would hope that Disney would not foreclose a case, a copyright case, on any basis.

Q So, is it your understanding as an expert on substantial similarity that the aesthetic quality of a 17:18 particular element in a work dictates whether or not that element is protectable as a matter of copyright law?

ATTORNEY LOWE: Objection, vague and ambiguous.

THE WITNESS: If it breaks out of the scènes à faire reduction, I think it is an important component that 17:19 should be protected, both in terms of the specificity of the element itself and its placement in the selection and arrangement, in whether the screen or the film version.

So it is about recognizing the nuance of, you know, the trope or the character, whatever we are 17:19 referring to. And then how it is arranged, similar patterns of arrangement that follow.

Q You understand that stock characters aren't protectable even if they are good characters, right?

ATTORNEY LOWE: Objection, vague and ambiguous as 17:20

argumentative.

THE WITNESS: It is slightly ambiguous, Jordan. I think if you are trying -- I think that Romeo and Juliet -- I don't know if I would necessarily say that they are stock characters, but I would say that Romeo and 17:21 Juliet, if we had to trace their, like, literary character, how I would characterize them as characters, I would say that they are both ingenues.

I would also say Romeo is a typical Petrarchan lover who is in love with the idea of love, right. 17:21

BY ATTORNEY SEGALL:

Q Nobody is entitled to monopolize an ingenue character, right?

ATTORNEY LOWE: Objection, vague and ambiguous, calls for a legal conclusion. 17:21

THE WITNESS: No. But it is a matter of how that ingenue is then tweaked or represented in a work that could make it, I would say, protectable.

BY ATTORNEY SEGALL:

Q Can we look back at your expert report which you 17:22 should still have before you?

A Hang on.

Q Exhibit 1.

A All right. I am there.

Q Okay. If you go down to page 11. 17:22

A I am there.

Q And you write "There are many other elements in Pirates of the Caribbean: Curse of the Black Pearl, that overlap with the screenplay and, therefore, merit attention. The most obvious similarities have to do with 17:22 the fact that both scripts feature pirate ships with skeleton crews."

Do you see that?

A Yes, sir.

Q In your opinion as an expert on substantial 17:22 similarity in this matter, is the concept of a pirate ship with skeleton crew an idea or is it expression?

A Well, I think it is both.

ATTORNEY LOWE: Objection, vague and ambiguous. Go ahead. 17:23

THE WITNESS: Well, it has elements of both, right, that there is the idea -- the skeleton crews or the pirate ships with skeleton crews?

BY ATTORNEY SEGALL:

Q The whole thing, pirate ships with skeleton 17:23 crews.

A Yeah. I would say that those are both an idea and an expression of idea, right? It is, like, how are they represented and how do they resurface and are kind of presented throughout the story line. 17:23

Q Is it your opinion that pirate ships with skeleton crews was a unique innovation in the plaintiffs' work?

A I think that it was a specific component that was echoed in the film. Like the film could have easily -- 17:23 so, why would the film then want to, you know -- they could have done, I don't know, like vampires or something.

But for the fact that they actually pulled from what was in the screenplay is peculiar; like, they could have had a pirate ship with vampires, they could have had 17:23 pirate ships with different types of monsters; they could have had -- whatever the skeleton crews were meant to represent in the screenplay, the film version borrows that literally.

Q I understand that it is your opinion that both 17:24 works feature pirate ships with skeleton crews. I am asking something a little different, which is, is it your opinion that pirate ships with skeleton crews is an element that is original in plaintiffs' work?

ATTORNEY LOWE: Objection, vague. Are you asking 17:24 whether it was conveyed in an original way in the plaintiffs' screenplay and in the movie, or whether it is just in and of itself a pirate ship with a skeleton crew in and of itself? So, incomplete hypothetical, vague and ambiguous, argumentative. 17:24

BY ATTORNEY SEGALL:

Q Let me ask it slightly different way. Is the idea of a pirate ship with a skeleton crew unique to the plaintiffs' screenplay?

A I would say that it is not necessarily unique to the screenplay, the writers' work; but the way that it is developed and sustained throughout is interesting enough in terms of the selection and arrangement to have it be a protected component. 17:25

Q And beyond the fact that both works, both the screenplay and Curse of the Black Pearl, feature pirate ships with skeleton crews sort of generically speaking, what are the specific expressive elements of the way -- (crossover talking.) Let me just finish my question. 17:25

A Sorry. 17:25

Q What are the specific expressive elements that you think are similar in both works related to that feature?

A Well, this brings up the whole -- which we haven't talked about, this whole idea of the supernatural, right, and the supernatural elements that are introduced in the screenplay that are then echoed in the film version; this idea that it is not just a pirate ship with you know, a skeleton crew, right, but it is the skeleton crew has a haunting, ominous presence that surface at 17:25 17:26

particular, you know, moments on the ship, that have a particular ominous, threatening component throughout, that is actually, you know -- the characters in the screenplay, some recognize the skeleton crew as having supernatural elements, some don't, and are kind of suspicious of it. 17:26 Some question the supernatural components at large. Some buy into the supernatural components at large.

So I think this would be -- it is not just simply that they both share skeleton -- ships with skeleton crews. But the skeleton crews have a particular function 17:26 as pirates, given the particular supernatural power, right?

That in the screenplay becomes obvious when the Young Rascal Scoundrels first encounter them. And then they play out throughout. And then various characters 17:27 even name Jack Nefarious as undead and as haunted as the like Phantom of the Sea, that he is cursed to roam the seas, until, you know, that kind of spell is broken.

And how does the spell get broken? The spell gets broken if he gets the second half of the map that 17:27 Davey Jones has or doesn't have. But the fate of Jack Nefarious, Phantom Jack Nefarious, is held hostage to this sort of supernatural mythic-like curse-like thing that haunts -- that haunts the story line. Which is similar with what happens with Barbossa and his crew. And -- 17:27

Q You are not opining that plaintiffs' screenplay was the first work to introduce the concept of supernatural pirates, are you?

A No, no. Again, this is -- but, again, Jordan, you know, and I have said this before, and, you know, I will say it again. It is about the selection and arrangement, like how these things -- and the sequence of events. How these figures kind of move through the story line and what their impact is. 17:28

And I think it is an unfortunate reduction to just dismiss the similarity as simply a scènes à faire because there is a shared, kind of characteristic, that both have that can be found elsewhere, right? I don't think that it is simply generic. 17:28

Q You know that skeleton pirates actually appear in the ride, Pirates of the Caribbean at Disneyland, don't you? 17:28

A I don't know if I'd go so far as that. I don't think there's anything -- I mean, my experience -- I only -- I have never been on the ride, I don't know even know how long that ride is. But my sense of that ride it has actually no known narrative whatsoever. It's like a series of tableaus that, I guess -- I don't even know if they are meant to be scary or what it is. 17:28

It's just -- no disrespect to you guys, but I 17:29

just found the Disney ride thoroughly underwhelming.

Q But it does have a skeleton, pirate -- (crossover talking.) Correct?

A Right, yes. No, of course, it does have that.

Q Okay. And, you know, I mean, you wouldn't have any basis to dispute that, you know, works as old and famous as the Wagner opera, The Flying Dutchman, have deployed skeleton crews, right? 17:29

A Right, right.

Q But you don't dispute as a substantial similarity expert that this is sort of a common idea in pirate stories, supernatural elements of -- 17:29

A I wouldn't say it is common idea. Common makes it sound like it is expected; it is somehow indispensable to the genre; that when we go see this type of movie or read this kind of story, that we are going to hope to see that in it. I think it is -- I wouldn't say that. 17:30

Q But you wouldn't dispute that there are more than one pirate story that precede the screenplay that involved pirate skeletons, right? 17:30

ATTORNEY LOWE: Objection, argumentative. Are you just talking about pirate skeletons? Or are you talking about supernatural pirates? I mean, if you are talking about pirate skeletons, that's a little bit different than -- (crossover talking.) 17:30

ATTORNEY SEGALL: Steve, I really would appreciate it if you'd stop offering these speaking objections. Just state your objection and we'll move on, okay?

ATTORNEY LOWE: Vague and ambiguous and argumentative. 17:30

BY ATTORNEY SEGALL:

Q Okay. Let's start with pirate skeletons. You don't dispute that pirate skeleton have shown up in a large number of movies, correct? 17:30

A Well, yeah, the pirate skeleton, you know, I think that is a kind of a -- I am going to be careful about my words because I don't want to get sloppy here. But I would say that a pirate skeleton can be found in a pirate story. 17:31

And I think part of its function is, again, to be like, oh, no, we are not the first ones here, other people have tried to discover this treasure and here are their remains; like, they were unsuccessful pirates who kind of traversed this -- this place before us. 17:31

Which then suggest that, oh, no, like, will these characters fall into the same fate and then become themselves pirate skeletons.

So I think it has a narrative function as a kind of warning of like what you might become. 17:31

Q And you don't dispute that is there is a large number of works even outside the sort of narrower question of pirate skeletons, there is a large number of pirate works that incorporate supernatural elements, that's a common genre element, right? 17:32

ATTORNEY LOWE: Objection, vague and ambiguous. Argumentative.

THE WITNESS: I would even go bigger than that. I would say that the whole concept of the dead at large, you know, both trans-historically and cross-culturally has 17:32 a supernatural component to it in that it is so mystified and unknown what happens when we die, right, that it is sort of kind of understood to have haunting, like, unknowable, supernatural, scary, ominous -- so, even the presence of a corpse in any genre already suggests a kind 17:32 of a logic to the living.

BY ATTORNEY SEGALL:

Q Okay. You testified a moment ago that the selection and arrangement of the pirate ships with skeleton crews is similar between the two works. 17:32

Do you recall that?

A Yes.

Q I'd like you to be really specific if you can. At the level of sort of concrete expression, what do you think is similar about how the skeleton pirates concept is 17:33

I, David Román, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _______ day of _____________, 20____, at ________________________, __________________.
(City) (State)

___________________________________
David Román

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were duly sworn; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [X] was [ ] was not required.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: June 10, 2021

Pamela Zitny

CSR No. 4461

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT N

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

---oOo---

ARTHUR LEE ALFRED II, et al.,

Plaintiffs,

vs. No.2:18-CV-08074-CBM-AS

THE WALT DISNEY COMPANY, et al.,

Defendants.

______________________________/

VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF DAVID ROMAN

VOLUME 2

Taken before MICHELE J. LUCAS

CSR No. 4017

July 9, 2021

INDEX

| | | PAGE |
| --- | --- | --- |
| EXAMINATION BY MR. SEGALL | | 231 |

EXHIBITS

| | | PAGE |
| --- | --- | --- |
| Exhibit 9 | "Additional" Invoice production - 2-pg deposition prep bill | 235 |
| Exhibit 10 | Plaintiffs' Expert Witness Rebuttal Report Regarding Substantial Similarity | 264 |
| Exhibit 14 | Document entitled: "Pirates in Literature and Film." | 338 |

DEPOSITION OF DAVID ROMAN

BE IT REMEMBERED, that pursuant to Notice, and on the 9th day of July, 2021, commencing at the hour of 1:02 p.m., via videoconference before me, MICHELE J. LUCAS, a Certified Shorthand Reporter, State of California, appeared DAVID ROMAN, produced as a witness in said action, and being by me first duly sworn, was thereupon examined as a witness in said cause.

---oOo---

APPEARANCES
(All appearances via videoconference)
For the Plaintiffs:

STEVEN T. LOWE
ALEKSANDRA HILVERT
Lowe & Associates
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
310-477-5811
steven@lowelaw.com
aleksandra@lowelaw.com

For the Defendant Walt Disney Pictures:

JORDAN D. SEGALL
ROBIN GRAY
Munger, Tolles & Olson LLP
350 South Grand Avenue, 15th Floor
Los Angeles, CA 90071-3426
213-683-9100
jordan.segall@mto.com
robin.gray@mto.com

For The Walt Disney Company:

KAREN N. FREDERIKSEN
In-house Counsel
Walt Disney Company
500 South Buena Vista Street
Burbank, CA 91521-0564
818-560-1644
karen.n.frederiksen@disney.com

ALSO PRESENT: Fritz Sperberg, Videographer
Arthur Lee Alfred
Ezequiel Martinez

page of Exhibit 2, which is the last page in the document, you have some time billed for drafting your rebuttal report.

That totaled 7.5 hours, and you billed just under $3200; is that right? 01:15

A. Yes. May 5th, May 6th, May 7th, May 8th. Yeah.

Q. Okay. So it's fair to say, Professor Roman, that for the invoices you submitted in connection with the preparation of 01:15 your original and rebuttal reports, you billed over $40,000 to plaintiffs; is that right?

A. Wait. I can't see you. Let me just get back to this other screen so I can see you.

I'm sorry. Can you repeat that. 01:16

Q. Sure. My question is: We just looked at three invoices totaling $33,000, $4,000, and around $3200.

And so my question was, sir, it's fair to say that you billed slightly over $40,000 for your 01:16 expert work in connection with preparing your original and rebuttal report; is that right?

A. Oh, I see. You're just adding all the invoices up and saying is that, more or less, the total? 01:16

Q. Yes. Correct.

A. Yeah. That would be right. I mean, whatever the invoices here add up to. If it's -- that seems -- that sounds right.

Q. Okay. I am going to mark a new exhibit now. 01:16

This is going to be Exhibit 9.

(Exhibit 9 was marked for identification.)

BY MR. SEGALL:

Q. And it should be in the exhibit share now. 01:17

A. Do we have to refresh? Because I have up to Exhibit 8.

Q. Yeah. Let me rename it as well because it came in as Exhibit 1. Let me rename it as Exhibit 9, and then you will be able to open it. 01:17

A. Oh, okay.

Q. You may need to refresh.

A. Okay. Okay. Now I somehow -- they're all not there. It's under exhibit share?

Q. Yes. In the folder you were just in where we've got Exhibit 2, now it should be Exhibit 9. 01:18

A. I need to refresh it. So it disappeared. Let me see what happens if I do this.

I'm just going to ask Aleks to quickly help me here because everything seemed to 01:18

Is that true?

A. Yeah. When was the last -- when was our deposition, my first deposition?

Q. The 27th, I believe, of last month -- or of -- 01:20

MR. LOWE: May, I believe.

BY MR. SEGALL:

Q. May.

A. So this is -- I'm sorry. This is a deposition prep bill. 01:20

Q. Correct. This is an invoice for deposition preparation you did in connection with your first deposition; is that right?

A. Yes.

Q. Okay. So it's fair to say that you spent 01:20 24 hours prepping for your first deposition; is that right?

A. Yes. I mean, whatever this is, is what it is. So...

Q. Okay. Well, it says you spent 24 hours -- 01:21

A. That would be accurate.

Q. Okay. And so you met with plaintiffs' counsel at their offices for 11 hours on two separate days to prepare you for your first deposition; is that right? 01:21

problem whatsoever. I'm trying to get an account of the total amount that you have billed to the plaintiffs so far.

So it seems to me -- maybe we can step back a second -- that your first set of invoices that you produced in this litigation showed that you billed slightly over $40,000. And then this new set of invoices show that you billed approximately $14,000.

01:22

So my question is just this: Is it fair to say that you've billed approximately $55,000 in your expert work in this matter?

01:22

A. Yeah, no. I would say that's fair to say. I mean, I'm not totally adding everything up as we're going along.

01:23

I don't know. There's the implication that somehow I am --

MR. LOWE: David, I don't think there's any implication of anything. I think he's just asking you questions.

01:23

So unless he raises some issue to you that, you know, that you need to take note of --

THE WITNESS: I am just curious why we're here.

///

BY MR. SEGALL:

Q. The last time you were deposed, you testified that you were working as a consulting expert in another matter for Mr. Lowe, his law firm, Lowe & Associates. 01:23

Do you recall that testimony?

A. Yes.

Q. Are you still working on that matter for Lowe & Associates?

A. No. 01:23

Q. Do you recall how much you billed Lowe & Associates for your time as a consulting expert in this matter?

A. That was about -- how many hours? -- or how much was the -- it was like $4,000. 01:24

Q. It was $4,000? Okay.

So between this matter and the other matter you worked for for Steven Lowe, you billed the plaintiffs' counsel in this case around $60,000; is that right, in the last year? 01:24

A. Yes. Somewhere in there.

Q. I want to ask you to go back to Exhibit 2, which are the original set of invoice that we were just looking at.

A. Are you waiting on me? 01:25

Q. Yeah. I just want to make sure you have that document.

A. Thank you. I'm there.

Q. So if you look at the first page of Exhibit 2, the document Bates stamped Plaintiff 130 there in the bottom right, this invoice divides up your original work in this matter into a phase one and phase two, correct? 01:25

A. Yes.

Q. And I believe you testified at your last deposition that phase one consisted of you reviewing the original screenplay, reviewing Curse of the Black Pearl, and forming some initial impressions about whether you considered them similar. 01:25 01:25

Is that right?

A. Yes.

Q. And so this first page here of Exhibit 2 indicates that from October 6th through -- and if you go on to the next page through October 13th, you spent around 17.5 hours reading the screenplay, screening the Curse of the Black Pearl, and taking notes. 01:25

Do you see that?

A. Yes. 01:26

Q. At the point you were doing that work, you hadn't agreed to draft an expert report for plaintiff, had you?
A. No. And I wasn't even sure what -- that that was -- I wasn't sure what the next steps were. 01:26
Q. So that wasn't work you were performing in connection with preparing an expert report, right?
A. I wasn't, I wasn't sure that -- I wasn't quite sure what the process was going to be.
I was just working with the assignment at 01:26 hand, and the initial assignment at hand in this sort of phase one, if we're calling it phase one, was that Aleks from Lowe & Associates contacted me to see if I was available to serve as a consultant on a case -- I wasn't sure what the case was. She 01:26 didn't make any mention of that -- and wanted to see -- you know, she did an interview with me about my expertise and training and availability and all of that.
And once it was determined that I was both 01:26 available and that she determined that I was qualified, then she explained to me what the case was.
And I got a copy of the original plaintiffs' screenplay, and I was asked to -- all 01:27

of this is in the initial deposition from whenever that was, in May, and then screen the film.

Q. But at that point nobody had asked you to prepare or draft an expert report, correct?

A. No. 01:27

Q. So none of the work you did in what's described as phase one on this invoice in Exhibit 2 had any relationship to the preparation of an expert report; is that right?

MR. LOWE: Objection. Vague. 01:27

BY MR. SEGALL:

Q. You can answer, sir.

A. Well, then one more time.

Did I use the -- did I use this as a basis for the next step? 01:27

Q. No. That's not my question.

I'm just asking whether any of the work you did in phase one involved preparing an expert report.

A. No. Absolutely not. I had a preliminary 01:28 report I had to -- I was talking to Aleks about -- Aleks introduced me to this assignment.

And, again, just to reiterate, you know, she wanted to see if I was available, and she wanted to get my qualifications and see what my 01:28

experience was in these kinds of matters.

And I told her about the other cases that I had worked on. We had talked about my training, and then also, you know, I think it was important just to get a sense of my availability, what my 01:28 schedule was like.

And I took on the case, in part, because of Zoom and, you know, we weren't meeting at USC, and everything that was going on with the pandemic, I did have extra time. 01:28

So I thought, well, this would be a good use of my time. And I thought this could be interesting. And then I did -- I read the screenplay several times. I screened the movie a couple times. 01:28

And then I spoke with -- that's where Steven came in. I spoke with them about what my preliminary thoughts on this were.

But I wasn't, I wasn't even sure that -- I wasn't -- I mean, I don't mean to sound overly 01:29 naive, Jordan, but there was no indication that they were -- put it this way -- I mean, let me just say this: I had no idea at that point in October that I would be here in July.

Q. Okay. Thank you. 01:29

So if you look at Exhibit 2, the entry on October 6th, 10/6/2020, you spent three hours reading the original script and taking notes.

Do you see that?

A. What's the date on that? 01:29

Q. October 6th, the first entry on phase one.

A. Right.

Q. Were the notes you took written on the computer or some other format?

A. I took the notes on the original script. 01:29

Q. Okay. And do you still have those notes?

A. That's the one that I think I explained to you last time around, that I left -- I don't know where it is because I lost it, but my sense is that I left it in my hotel in Palm Springs when I was 01:30 there for a week.

Q. And when were you there?

A. I've been going -- I was going there a lot during the pandemic. So I guess maybe January.

Q. And the -- 01:30

A. That doesn't make sense. I don't know.

I can find out and let you guys know. I don't actually remember, but it couldn't have been January because everything was shut down. Right when, um -- because the hotels were shut down. 01:30

My only contact with Aleks, and my main contact has been with Aleks. My main contact with Aleks has been through email, and then with Steven it's been primarily through phone.

Q. Okay. You also state on the entry in Exhibit 2 for October 8, 2020, that you spent three and a half hours screening the film and taking notes. And then you repeated that process three days later on October 11th. 01:32

Is that right? 01:32

A. Yes.

Q. When you took notes when you were reviewing the film, where did you put those notes?

A. Those are just like mental notes. That wasn't -- I was -- I mean, I don't know how much minutia you want, but I was on my couch with the dogs. 01:32

And, again, Jordan, I don't mean to be disrespectful to the process, but I didn't realize that this was going to become so involved. I thought it was just a simple: read this screenplay. Check out this film. 01:32

Yes, I took it seriously and I was very respectful to the process, but I didn't anticipate the amount of work that this was going to involve. 01:32

So I sat on the couch with my dogs, screening the film, taking notes, mental notes, about, like, characters, and watch width, and little things like that.

And I might have jotted a couple things 01:33 down on a napkin or just in terms of, like, oh, this is happening here. This is happening there.

I didn't get really more involved with any of that until I was told that I was going to have to draft up a report. 01:33

And then I thought, oh, okay, well, that's going to be a little more involved.

Q. Okay. So your testimony is that in Exhibit 2 when you wrote that you spent six and a half hours screening the film and taking notes, 01:33 those were principally mental notes?

A. Yes. Like, maybe a jot here or there on a newspaper. Like, in the living room, there was a copy of the New Yorker or something. I might have just wrote something down very quickly in passing. 01:33 Like, oh, like, you know, the name, character, or something along those lines.

Q. And do you have any of those notes that you might have jotted down on a newspaper or magazine? 01:34

A. No, Jordan. I'm sorry. I'm an avid recycler.

Q. And then on 10/12, the entry on 10/12, on Exhibit 2 and 10/13, it says that you spent five hours writing up your notes and then finalizing notes on the case. 01:34

And so --

A. Yeah, that I did -- sorry.

Q. I'm sorry. Can I just finish my question, please? 01:34

My question, just for the record is: Do you still have the notes that you spent five hours finalizing between October 1st, and October 15th?

A. No. And those notes would be on the screenplay. So I used -- I try just to have one 01:34 document so I could put everything on it and then not have to have all these other legal pads or files and stuff.

So I would have annotated notes on the actual screenplay, and then I used that same, you 01:34 know, big fat screenplay document, the other side or the blank sides or whatever was available to write down notes from the film, and that way I could just have everything in one kind of consolidated place but... 01:35

Q. And you never provided any of those notes to counsel either?

A. No. And I would have been reluctant to, given that they were not -- you know, they were fairly, like, sloppy. 01:35

Q. Okay. I'd like you to go back to the document that was originally marked at the last deposition as Exhibit 3. It was the original Complaint that was filed in this case.

A. Okay. In the United States District Court 01:35 for the District of Colorado?

Q. That's the one. Do you have it up?

A. Yes, sir.

Q. Okay. I'll ask you to turn to page 4 of Exhibit 3, please. 01:35

A. Okay. "The parties"?

Q. It says "the parties" at the top, but I want to direct your attention to the bottom of the page where it says: "History and lore of pirates in myth, literature, film, and song." 01:36

Do you see this?

A. Yes. No. 8?

Q. Yes. We discussed this a little bit at your last deposition, but I have a few more questions about it. 01:36

A. Yeah. Go ahead.

Q. Paragraph 8 begins, quote: "Throughout history there has been the lore and myth of pirates that have pervaded literature, song, and film."

Do you agree with that? 01:36

A. Do I agree with the fact that throughout history there has been the lore and myth of pirates throughout literature, song, and film?

Yeah, do I agree with that?

Q. Do you agree with that? Yes. 01:36

A. Yeah. I don't have any reason not to agree with it.

Q. And then there's a list of books in the pirate genre. Do you see that?

A. Additionally, there's: "literature such as"? 01:36

Q. It begins: "With works like a general history of the pirates," and then it continues.

A. Yes.

Q. So you agree that the works listed in this paragraph are books in the pirate genre, correct? 01:37

MR. LOWE: Objection. Asked and answered. I think -- didn't we go over this paragraph in some detail in the last deposition?

I prefer not to go over, you know, the 01:37

same ground that we went over. So I guess we'll take it question-by-question. But asked and answered.

BY MR. SEGALL:

Q. Okay. You can answer. 01:37

A. Yeah, no. I do think that this is something we talked about in the deposition when you asked me about my expertise and what my experience was with these texts.

Q. I agree. We did discuss it briefly, and I 01:37 want to ask you with a little more specificity about your familiarity with the specific works that are identified in this paragraph. So I would just like to go through them.

Have you read Captain Charles Johnson's A 01:37 General History of the Pirates?

A. No.

Q. Have you read Daniel Defoe's Treasure Island?

A. Yes. 01:38

Q. Have you read or when did you last read Treasure Island?

A. I read Defoe's work in college and in graduate school, but I'm not an 18th Century scholar. My colleagues in 18th Century or British 01:38

lit generally teach those.

And the way the curriculum is organized at USC -- I think I mentioned this in my deposition on the first day -- is that I'm understood to be an Americanist, somebody who knows American literature. 01:38

So I wouldn't be, I wouldn't be asked to teach Defoe or any of these works. And I think this is also, we addressed, Jordan, on my USC professional profile. 01:38

Q. Sure. I appreciate that, Professor Roman.

I'm just asking for -- and I'm sorry. I misspoke, of course. You know, the Defoe novel is Robinson Crusoe, not Treasure Island.

I'm just interested in whether you've read Robinson Crusoe and when you think you last read it. 01:38

A. As I mentioned, the last time I read these works were in graduate school.

Q. Okay. 01:39

MR. LOWE: I should probably disclose to you that he did -- he has watched Treasure Island now.

BY MR. SEGALL:

Q. Okay. So of the -- maybe we can shortcut 01:39

these questions a little bit.

Why don't you tell me to the best of your recollection which of the books identified in paragraph 8 you believe you have read.

A. Well, the first three for sure. And I have not read the others, and I think this is exactly what I said in the deposition. 01:39

MR. LOWE: I will object belatedly as asked and answered.

BY MR. SEGALL: 01:39

Q. And when you say the first three, you mean Robinson Crusoe Treasure Island and Peter Pan; is that right?

A. Yes.

Q. And you don't think you have read those any more recently than graduate school; is that right? 01:39

A. I haven't.

Q. Okay. And do you consider all of these books listed in paragraph 8 of Exhibit 3 to be significant works in the pirate genre? 01:40

MR. LOWE: Objection. Vague and ambiguous. Incomplete hypothetical. Asked and answered.

///

BY MR. SEGALL:

Q. You can answer.

A. Oh, so now what happens?

I'm sorry. Do I think what, Jordan?

Q. Do you think that the works identified in paragraph 8 of Exhibit 3 are -- do you consider them significant works in the pirate genre? 01:40

MR. LOWE: Same objection.

THE WITNESS: So do I answer, or do I not answer? 01:40

BY MR. SEGALL:

Q. You do, please.

A. Okay. Yeah, I have no reason to believe that they are not.

Q. If you can move down to paragraph 10, please, there's a paragraph that begins: "Films have covered swashbuckling pirates, many adaptations from literature." 01:40

And then there's a series of films identified. Do you see those? 01:40

A. Yes, sir. Item 10. And I think there's maybe seven or eight films.

Q. And your counsel just mentioned, I believe on your behalf, that you watched Treasure Island recently. 01:41

Is that true?

A. Yes.

Q. When did you watch Treasure Island?

A. I watched Treasure Island this week in preparation for today. 01:41

Q. Why did you watch Treasure Island in preparation for today?

A. I watched Treasure Island because plaintiffs' counsel encouraged me to watch it because it was part of the Disney expert's report 01:41 that was being referred to.

And I think you had a line of questioning that was going there that I was not answering. We had spent some time there, or you had spent some time there. 01:41

Q. And did watching Treasure Island change or otherwise affect your opinions in any respect?

A. Can you just build in that a little bit?

Q. That's the entire question.

So you watched Treasure Island. And I'm 01:41 asking --

A. You're very concise, Jordan. So just one more time.

Q. I'm asking whether your viewing of Treasure Island in preparing for this deposition 01:42

changed or otherwise affected your expert opinions in this case.

A. No, it didn't change my opinions. It confirmed what I already had put forward.

Do you want my take on Treasure Island? 01:42

Q. I don't want your take on Treasure Island, but I would be interested to know how it affected your opinions specifically.

So when you say it confirmed your opinions, what aspects of your opinions did it 01:42 confirm?

A. I think that -- and, again, I did go over the deposition, and I started looking it over. So I read parts of it.

And there was a moment -- and, again, 01:42 Jordan, I'm not -- I don't -- I can't quote you directly, but I think you were interested in talking about Long John Silver as a potential, like, precursor to the pirate characters in both the screenplay and the film. 01:43

And I think you had a line of questioning around Long John Silver. So, and I had familiarity with him. I just hadn't seen that film in a while, and I had a kind of basic, you know, recollection of the film. 01:43

And I kind of remembered it more being about the boy, which was confirmed. You know, when I saw it again, I thought, oh, wow, this is really about a young boy, not necessarily coming of age, but coming into consciousness about certain things. 01:43

And so the Long John Silver character didn't seem to me to be as -- I wasn't quite sure why you were going there, and I thought maybe it's because he has a kind of likability factor, like, in the film. I mean, the fact that he developed 01:43 that relationship with the child is kind of interesting and peculiar, and I was drawn to that.

But I found Long John Silver to be a fairly one-dimensional, kind of a flat, character that served just a particular function. 01:44

He wasn't interesting in the way that those kind of hybrid characters that are introduced in the screenplay and then are kind of replicated in the film are.

So he lacked that kind of sophisticated 01:44 irony. I mean, he has little moments, but he seemed pretty one-dimensional.

And it seemed to me -- and, again, I know you get a little, like -- I don't know where you stand with this, but when I make the Quentin 01:44

Tarantino moment, like, I think that that's -- so that, to me, is a shorthand that I thought, like, oh, okay. This is more evidence that the screenwriters, the plaintiffs, were doing this intertextual referencing, this citational -- the 01:44 artistic citational practices to other.

And I thought, yes, this confirms my theory that there's a lot of citation in the plaintiffs' screenplay.

And that seemed to be -- so I would put 01:45 that in evidence there, not necessarily like the original pirate figure in the plaintiffs' screenplay that was then reappearing in the film.

Q. Okay. So you think some of the characterization of the villain in the screenplay 01:45 sort of speaks back to the character of Long John Silver?

Is that what you're saying?

A. I wouldn't, I wouldn't, I wouldn't, I wouldn't promote that as a thesis. 01:45

So if a student came to me and said, "This is the thesis I want to write," I would ask them to kind of build a little bit on that.

I'd be, like: Okay. That seems to be -- like, is there a way to kind of frame that in such 01:45

a way that makes it more interesting or more compelling or more dynamic?

Q. Other than Treasure Island, which I know you just testified you watched recently, which of the other films in paragraph 10 of Exhibit 3 have you seen personally? 01:46

A. Treasure Island, Peter Pan, The Buccaneer. I might have seen Black Beard or Yellow Beard again long time ago, and not with any -- with absolutely no reason to remember them in a way that -- there's probably, like, I don't know, dozens and dozens of other films that I have no recollection of. 01:46

Q. What would you say is the most recent of those films that you have seen other than Treasure Island? 01:46

A. Well, it would have been the other movies that the counsel had asked me to look at, which would be Cutthroat Island, would be the one that was most, like, most --

Q. Sorry. I just mean the ones listed in paragraph 10. 01:46

A. Oh, my god. I don't know. Maybe Peter Pan.

Q. When do you think you saw Peter Pan?

A. Maybe like 12 years ago, 12 or 15 years 01:47

ago.

Q. Paragraph 10 goes on to say: "The majority of these pirate films have a love story/triangle."

Do you agree with that?

A. I would not necessarily front that. 01:47

Q. And then paragraph 11 says: "Pirates are traditionally and historically evil, loathsome, feared and enemies of mankind. These works typically describe pirates as bearded, eye-patched, peg-legged with a hook in place of their hand." 01:47

Do you agree with that?

A. Again, like, I wouldn't front with that, but that wouldn't be the language I would use. There's a lot of language there on No. 11. There's a lot of description. 01:47

So, again, the editor in me would just want that, like, cleaned up a little bit.

Who wrote this?

Q. I don't know.

And then paragraph 13 says: "Pirates in 01:48 film, while handsome or good looking, have not been depicted as having a sense of humor until Captain Jack Sparrow in the pirates franchise."

Do you see that?

A. Yes. 01:48

Q. Do you agree with that?
A. Jordan, I mean, I don't know, I don't know if I would -- what's to be gained by saying pirates on film are handsome or good looking? That just seems that was -- 01:48
Q. Well, ignoring the subordinate clause: "Pirates in films have not been depicted as having a sense of humor until Captain Jack Sparrow in the Pirates franchise."
Do you agree or disagree with that 01:48 statement?
A. That part, I would say, yes, that one of the original -- you know, this is part of my report; it's part of my rebuttal; it's part of what I said in the deposition. 01:48
I would really hold firm that the introduction of human irony and wit and the level of sophistication that is introduced and played out throughout the screenplay is, again, you know, both innovative and interesting and introduces this 01:49 hybrid, you know, type of -- this hybrid character type.
And I think what's interesting about both the screenplay and the film is that, that kind of new hybrid is sustained throughout. 01:49

I mean, it is -- it's not just -- there might be, like, earlier pirates that might be either likable -- like, I think in Treasure Island, like, there's a likability factor, obviously.

The little boy -- I think his name is Jim -- is drawn to him. So we might -- he has a menacing component, but the child still bonds with him. And I think that the community of Treasure Island end up by the end endorsing that. They don't think, like, no, like, go. 01:49 01:49

Even though I think the audience might be a little uncomfortable with that relationship, the community in Treasure Island kind of, if not endorses it, at least accepts it.

Q. Correct. Sir, I appreciate this, but given our limited time, I'm just looking for a yes-or-no question. 01:50

A. Oh, okay.

Q. My understanding is that when this says: "Pirates in film have not been depicted as having a sense of humor until Captain Jack Sparrow in the pirates franchise," you agree with that generally, correct? 01:50

A. I mean, again, I would say yes, but. And the but is that there have been pirates that have 01:50

appeared before that do have a kind of -- either have a lightness to them, right? or have a kind of sarcasm to them.

So I would put a little bit of a condition on that. 01:50

Q. Okay.

A. But that sense of humor is intense. I mean, that's pretty substantial.

Q. I want to ask you some questions about your rebuttable report in this case, which we 01:50 didn't discuss a whole lot in your first deposition.

So I am going to go ahead and mark that as Exhibit 10.

(Exhibit 10 was marked for identification.) 01:51

THE WITNESS: Are you cool if I use my hard copy? I think I brought a hard copy. Or would you rather me just follow you online?

BY MR. SEGALL:

Q. No, absolutely, but I do want to mark it 01:51 for the record.

A. You know what, maybe I should follow yours because of the pagination, because I may have different pagination.

Q. Whatever is good for you. 01:51

asked to do with respect to the rebuttal report specifically?

A. Well, the first thing I was asked to do is read the Disney expert report, and so that was initially what I had to do. 01:53

And then I had to come up with a response to some of the claims that they were making and some of the -- maybe not some defenses, but I needed to kind of respond to the ways that the Disney expert was either dismissing my ideas or 01:53 calling into question, you know, my knowledge base.

Q. At the time you received the assignment to write -- to draft a rebuttal report, were you provided with any additional documents?

A. Other than the Disney expert's report? 01:53

Q. Correct.

A. No. But I think we talked about this -- and, again, this is where, Jordan, I get into a little bit of confusion with you because looking over this deposition, the time -- I sometimes -- my 01:53 testimony that's written in the deposition has a -- my responses are, um -- refer to a different timeline than the one that you were asking for.

So in terms of when I was initially contacted to review the materials, when I was 01:54

initially contacted to write up a report as an expert, so I'm going to say this, but this might be off.

But at one point I did have to look at -- and it might have been for the rebuttal -- the Disney ride because I think the Disney expert makes a big deal about the ride. 01:54

And that's something that I didn't address in my report, my initial report, because I wasn't working with the ride. So I had to look at the ride. 01:54

I had to look at all the information submitted in terms of the things that I looked at, and I have that somewhere.

Do you need me to pull that up? 01:54

Q. No, not right now.

Did counsel, when they asked you to prepare a rebuttal report, provide you any additional assumptions or legal standards to consider or apply at the time you prepared your report? 01:55

A. I might have asked them in terms of -- I know I asked them in terms of genre, like, what are the reports supposed to look like? What does a rebuttal look like? 01:55

I wasn't sent a rebuttal. I didn't see a model rebuttal, and I think that's when I volunteered to -- as I mentioned to you in the last time. I even gave you the name of the book.

I thought, am I supposed to be familiar with all of these -- this, you know, huge inventory of material that's being referred to? Do I have to screen all these films? Do I have to, like, read up more on this? Does my rebuttal need to be kind of a line-by-line rebuttal of what this person has put forward?

And that's when I went and I bought the book again. I bought the Pirates and Seafaring Swashbucklers -- I'm looking over there because that's where it is -- on the Hollywood Screen.

And we talked about this book last time. And for the court stenographer, it's a book by James Robert Parish, P-A-R-I-S-H. The title: Pirates and Seafaring Swashbucklers on the Hollywood Screen.

And I think, as I mentioned, Jordan, last time, that it wasn't really all that helpful because it was an encyclopedia.

Q. Okay.

A. I wasn't sure if I was supposed to dig

01:55 01:55 01:56 01:56 01:56

deeper into the kind of pirate archives.

Q. And, in fact, you testified previously that plaintiffs' counsel specifically instructed you not to review the works that were cited in Mr. McDonald's expert report, correct? 01:56

A. Exactly. That it was unnecessary.

Q. Did you write the entirety of the rebuttal report?

A. Let me see here. I'm just going to get back to the beginning. 01:57

Yeah. I wrote most of it. Aleks helped me structure some of it.

Q. Did counsel direct you to look at specifically things in the screenplay in forming your rebuttal? 01:57

A. No. They only asked me -- they only answered my questions in terms of what my anxieties were.

And I'll be totally honest. They were anxieties. I was a little freaked out that I 01:57 was going to have to -- because I'm teaching at the time -- that I was going to have to read all these books and screen all these films, and I wasn't -- I didn't have the time to do all that.

Q. Okay. I want to ask you about a couple of 01:57

Exhibit 10 -- you may already be there -- you write, at the end of the second paragraph, you write: "Disney's expert report drafted by Mr. McDonald," and then it goes on to say: "focuses heavily on dissimilarities that I am informed should be disregarded." 02:00

Do you see that?

A. Yes.

Q. Who informed you that dissimilarities between the works should be disregarded? 02:00

A. So this is the thing. And, Jordan, again, I don't know if we have time. I don't know when we do this.

But in looking over the deposition, I did have mistakes I need to correct, and it had to do with what counsel kind of encouraged me to do and what my assignment was. 02:00

And I kept going back to saying, you know: Oh, my assignment was, you know, to look at the screen frame; look at the film. Like, leave it at that. 02:00

But, in fact, once I switched over and was brought in as sort of an expert witness, they did give me much more advice and much more guidance about what the legal criteria was that I was 02:01

supposed to kind of keep on the front burner and use as kind of the template for what's expected in a copyright infringement case.

Q. Okay.

A. So I had to pay attention at that time to, 02:01 you know, issues of like: selection arrangement; what's protectable; what's unprotectable; what's fair, things that are, you know, already in the deposition, like, the difference between an idea and the expression of an idea. 02:01

And you asked me a question that I completely, like, screwed up on because it was the language I had never heard about, like, the dichotomy of expression of ideas or something like that. 02:01

And I'm like, oh, my god. This is really a very specific legal vernacular, and I said I never heard that.

But so counsel, Aleks and Steven, when I was hired to then write the report, when they said, 02:02 "Okay. We want your work," they then gave me a set of criteria to pay attention to and sort of model my report and what to address.

And one of the things that came up was copyright infringement -- and, again, you guys know 02:02

this much more intimately -- that I wasn't supposed to make a list of what was dissimilar, that the dissimilarities -- you know, which are -- and I even say in my report, which are obvious, and they are strong dissimilarities between the screenplay and the film. 02:02

And I was advised that that was not necessary to catalogue what was -- what the dissimilarities were because similarities were the criteria. 02:02

And it was reduced to a scene` a' faire, but the kind of selection and arrangement of similarities as well.

Q. So I want to go back --

MR. LOWE: Could we go ahead and take a break right now? I think it might be -- 02:03

MR. SEGALL: No, Steven. I think I'm going to go for a little bit longer. I want to finish this line of questioning.

MR. LOWE: I think it might be in your best interest if, you know, you want to use your time wisely but... 02:03

BY MR. SEGALL:

Q. Professor Roman, I want to ask you about what you just testified about. 02:03

You said something along the lines of you were given something by counsel to consider.

What were you talking about there?

A. When I talked to Steven -- this was just in the fall after I was hired to actually write the report, right? through the second phase -- they said that it wasn't important for me to make a list of the dissimilarities. 02:03

Q. Did they give you anything in writing explaining your assignment or your conveying the legal standards? 02:03

A. No, no. I kind of -- a part of me wished that they had, but, no, that wasn't the case.

And, again, Steven, you know, again, I respect all of you and what you do. So this is nothing -- this is not calling anything into question there. 02:04

But one of the things I was really concerned with was just not violating the protocols of your profession through my naivete. 02:04

So I wasn't sure what I was -- you know, I never -- you know, I wasn't sure what I was -- you know, what was permissible to ask or not permissible to ask without jeopardizing, you know, the case. 02:04

So I tried to stay with what Steven and Aleks were telling me and not asking them for things, right?

Q. Okay.

MR. LOWE: Can we possibly take a break? 02:04
I think we are generally allowed to take a break when we request one. We only have two hours today. So there's not going to be many breaks. We've been going for --

THE WITNESS: I could use -- 02:04

MR. LOWE: -- close to an hour.

THE WITNESS: -- a break, if you don't mind, using the restroom.

MR. SEGALL: Sure, Steve. Let's go off the record. 02:05

THE WITNESS: Thank you.

THE VIDEOGRAPHER: Off the record. The time is 2:05.

(Recess taken)

THE VIDEOGRAPHER: We're back on the 02:15
record at 2:16. Go ahead.

BY MR. SEGALL:

Q. Professor Roman, if you look back at Exhibit 10, please, at the bottom of page 1, you write: "A large portion of Disney's report focuses 02:16

on generic scenes` a' faire, hence the Disney ride (the ride) laden with references to old pirates literature and films, stock characters, and even an opera from the 1800s. I am informed that this is the wrong focus since other pirate movies are irrelevant to this case unless Disney is challenging the originality of plaintiffs' screenplay at work, which is not the case." 02:16

You wrote that, correct?

A. Yes. 02:17

Q. And who told you, as a preliminary matter, that "other pirate movies are irrelevant to this case unless Disney is challenging the originality of plaintiffs' screenplay"?

A. Well, it was brought up when I needed to ask if I was responsible for those films; if I needed to spend more time either reading literature or screening the material. 02:17

That's when they said: "No. That's not relevant for what you have to do right now." 02:17

Q. And that was a relief to you, right, because you were too busy to review that stuff anyway.

A. Oh.

Q. Um, what explanation were you given for 02:17

why other works in the pirate genre are irrelevant?

A. Well, I think, again, to go back to what I mentioned earlier in the initial deposition, was that the comparison that was key to this case was between plaintiffs' original screenplay and the subsequent Disney film, and that was the basis of the comparison. 02:18

Q. Okay. So it's your understanding that when -- when you're comparing two works, it's never relevant to consider other works in the same genre? 02:18

Is that your testimony?

A. No. I wouldn't say that, but I think, Jordan, again, this sort of came up again with the deposition.

You know, I already have a foundation in terms of my training, you know, that allows me to claim expertise. But -- 02:18

Q. The last pirate movie you watched was ten years ago?

A. Well, outside of -- 02:18

MR. LOWE: Objection. Misstates the testimony.

BY MR. SEGALL:

Q. Other than the one plaintiffs' counsel asked you to watch. 02:19

question. So I'm not actually sure if I'm hearing it correctly.

Q. Well, you've testified that you didn't have a lot of time to prepare your report.

I'm just trying to understand, you know, 02:20 if plaintiffs' counsel had come to you and --

A. Slow down for a minute.

I didn't testify that I didn't have enough time to prepare my report. I testified that I was concerned around time management issues because I 02:20 had my other job.

So I wanted to make sure that I would be able to do the report well and spend the necessary time to fulfill my obligations as the expert witness. 02:20

But I wouldn't say that I rushed through it or I didn't have enough time to do the report.

Q. I want to quote you something from your original report, which is, you say that in reviewing the plaintiffs' screenplay that you found 02:21 "an overarching pattern of creative elements, which demonstrate creativity and originality."

Do you recall that generally?

A. Yes.

Q. Do you agree that in your expert report in 02:21

this matter you opined, you expressed an opinion, that the creative elements in plaintiffs' screenplay are original, correct?

A. Absolutely.

Q. So you would agree, though, at a minimum that the contents of other pirate works are relevant to analyzing the originality of the creative elements in the plaintiffs' screenplay, wouldn't you? 02:21

A. Yes. 02:21

Q. Okay. So how did you reach the conclusion without reviewing any works in the pirate genre other than the works that -- you know, other than a handful of movies you were specifically instructed to review my plaintiffs' counsel, how did you reach your opinion? 02:22

What was the basis for your opinion that there were original elements in the plaintiffs' screenplay?

MR. LOWE: Objection. Argumentative. Incomplete hypothetical. Vague and ambiguous. Misstates the record. It's not a handful, and I guess that's all my objections at this time. 02:22

BY MR. SEGALL:

Q. You can answer, sir. 02:22

A. Well, I think, and, again, this is one of the things I think I mentioned in my report, but I might have underplayed my responses in the deposition, which is one of the things I wanted to go back to, is that, you know, my background, 02:22 Jordan, my background, you know, I have a Ph.D. in comparative literature. I am trained in -- as an historian as a student of literary genre.

So my background, my experience, my knowledge base, both in terms of my professional, 02:22 you know, portfolio, my own life experience, and having access to popular culture at large, so I think that that merits the basis to form an opinion.

Q. Well, I think you testified, though, that 02:23 your professional work hasn't involved pirates at all other than the work of Terence and Plautus.

Is that right?

A. That's funny, Terence and Plautus.

I think -- you're making me laugh. That's 02:23 funny, yeah, Terence and Plautus.

You got me. Can you just -- you made me crack up. Let's just slow down, and what was the question again?

Q. The question is: Isn't it accurate, 02:23

though, that you don't have professional experience with pirate literature other than, as noted, the works of Terence and Plautus?

A. I said this in the first deposition, that, you know, I was trained as an early modernist, 02:24 which is the period in which, you know, the pirates surfaced.

And, you know, there's a lot of literature both in, you know, the British -- the English, the Spanish, the French, and the Italian tradition that 02:24 I was responsible to know.

But, as I mentioned in my deposition in May, that, yeah, I don't teach courses on pirate literature. And, generally, there are not courses on pirate literature available in most, if any, 02:24 English departments in the profession.

Q. You didn't think it was worth brushing up before you drafted a rebuttal report?

MR. LOWE: Objection. Argumentative. Vague and ambiguous as to brushing up. 02:24

You can answer.

BY MR. SEGALL:

Q. You can answer, sir.

A. Well, this is, again, where I asked counsel what was required of me, right? Especially 02:25

with the rebuttal that did have an extensive list of references to both, you know, other films that feature pirates and other literature that feature pirates.

And, again, I was told that that was not 02:25 required of me to, to refamiliarize myself with what I already knew or revisit these things or, you know, take an advanced seminar on the stuff in between reading the report and writing the rebuttal. 02:25

Q. Let me -- let's take a look at another portion of your rebuttal report. If you could go to page 5 of Exhibit 10, sir.

A. All right. I'm there.

Q. Okay. In the first full paragraph on page 02:26 five, you wrote, quote, "Even if an element can be traced back to prior existing works that play a prominent role in shaping the genre, this does not automatically mean that the element is a standard or indispensable part of the genre." 02:26

Did I read that correctly?

A. Yes.

Q. And you wrote that, did you not?

A. Yes.

Q. So, to your mind as an expert in 02:26

substantial similarity, how do you determine whether an element is a, quote, "standard or indispensable part of the genre"?

A. Well, I think that that was one of the things that the rebuttal Disney's expert report -- 02:26 I guess it's not the rebuttal -- Disney's expert report was dismissing so many things as a scene` a' faire.

But just saying that, well, this can't count; this can't count; like, this can be 02:26 eliminated; this can be eliminated.

And what I was trying to suggest, both in my report and then also in the response to the Disney report, my rebuttal response, was that, that that move is, is -- seems like a weak move to 02:27 reduce everything to a scene` a' faire; and that the important thing is that, yeah, there might be some elements that are intrinsic to a particular genre in this case, the pirate genre.

But what's really important is how those 02:27 works are selected and arranged, right? How they are nuanced; how they are shaped through the sequence of events that constitute the story through the selection and arrangement of how the tropes move in and out of focus throughout the 02:27

screenplay or, you know, later on in the film, that then seemed to me place them in the protected category, right?

So to reduce something -- everything to a scene` a' faire simply because we have already seen it once before that's within the horizon of expectation of a particular genre, seems to me a very diminished view of both the creativity and originality of the screenplay but also in what you, you Jordan, and Steven, were asking me, the expert, to address. 02:27 02:28

So that would be my response.

Q. So I don't think you answered my question, respectfully.

I'm asking you something different. I'm asking you a mathological question as an expert on substantial similarity. 02:28

You wrote in your rebuttal report that: "The fact that an element can't be traced -- or can be traced back to a prior existing work that has a prominent role in shaping the genre doesn't automatically mean that the element is a standard or indispensable part of the genre." 02:28

Correct?

A. Yes. 02:28

Q. So I'm asking you as an expert in substantial similarity, a professed expert in substantial similarity, how do you do that?

How do you identify what elements are standard or indispensable in a particular genre? 02:29 What would you do?

A. Well, this not to get too specific in terms of, you know, the vernacular of my field.

This has to do with structure, right? So what we expect in a particular, you know, genre or 02:29 plot or story or type of story that, you know, we would hope that there are particular elements that appear that then make it recognizable as a poem, as a play, or the romance, or the whatever.

But it doesn't mean, necessarily, that 02:29 every single element that we associate with the pastoral tradition needs to be in a pastoral work or, you know, in a tragedy or, in this case, you know, in a pirate story.

But there should be a significant number 02:29 of elements that, together, can compose the recognizable genre under question, right? the pastoral, the western, the tragedy.

Q. But it's fair to say, isn't it, sir, that you personally made no effort in your own opinions 02:30

in this matter to distinguish between the standard or indispensable elements of the pirate genre and not standard elements of the pirate genre, correct?

A. No one provided me a list that says: Here is the standard elements of a pirate genre; these are the standard things that are expected in the pirate's story. 02:30

I think that all of us have enough experience with a pirate story or a text to be able -- and I think if we just went around the room and everyone said, "Okay. What are three things you assume are going to appear in a pirate story?" more or less, like, we would all agree, right? 02:30

Maybe there would be some variation, right? They'd be like, oh, yeah, that works. There would probably be three or four items or elements that would surface. I think that would be true in any tradition or any genre. 02:30

But there's no -- not that I know of, and I would be suspicious of it, actually, if there was, like, a formula, like, this has to appear, right? 02:31

And what's interesting in terms of genre is the manipulation of genre: How, like, someone could write, I don't know, something in the 02:31

pastoral tradition that kind of messes with the pastoral tradition and kind of, you know, tweaks it in such a way that makes it, like, oh, wow, like, this, this is, this is hot. This is interesting. This is quirky. This is good. Like, oh, wow, I am engaged. This is fun. This is innovative. This is cool. 02:31

Q. So it's your testimony that, if I'm understanding you correctly, that determining what the standard or indispensable parts of the pirate genre are is a matter of common knowledge as opposed to expert opinion? 02:31

Is that right?

A. No. I wouldn't say common knowledge, but there is the combination of common knowledge and expert opinion. 02:32

So it's not, it's not an either/or that one needs -- you know, that it's so seemingly available to anyone or so seemingly obscure that only a handful of people know. 02:32

And I think that it's the interplay between the attorney and then the expert, between, you know, the fan and the scholar, that kind of shape these things and particularly in film, right? which is the popular genre. 02:32

That's what makes it -- I think that's what's at the core, what's really, in reading the screenplay, to me, really thrilling about the screenplay; that it does have those kind of core components that appeal to, you know, the basic person who wants a kind of pirate story or, you know -- and, you know, understands a pirate story to be primarily an adventure story, right? 02:32

And then, though, there might be, as the expert report says, you know, the element of romance is not unusual, but the element of romance that is portrayed in the screenplay seems, you know, that it's so concurrent with the adventure trope, that it's still there. 02:32

I thought that's an interesting tweak that makes that screenplay so dynamic. And I think that Disney really picked up on that and thought: Yeah, that's really cool. Let's, let's also -- like, she -- the adventurist, you know, current, completely, like, concurrent with the romantic, like, plot, like, that's cool. Let's do that. That's really -- that's interesting. 02:33 02:33

That doesn't mean the fact that the love story is so prominent in either the screenplay or the film that it compromises the pirate story. 02:33

It just makes the pirate story all the more kind of -- I don't know. Here's where my vocabulary, like, becomes impoverished. I mean, cool, fun, like, great. So...

Q. So I just want to make sure we're clear for the record, though. 02:33

You testified a moment ago that nobody provided you with a list of standard or indispensable parts of the pirate genre, correct?

A. No. There's no -- no. No one said, you know, make sure, you know, there's no -- there was no text that was provided. And I didn't speak out to -- 02:34

Q. And you did not attempt to compile a list of the standard or indispensable parts of the pirate genre, correct? 02:34

A. Again, Jordan, I'm going to reiterate what I said before, and I probably should have stated this more forcibly in the deposition.

I don't mean to sound defensive. It's really more about clarity for the case here. 02:34

I think that part of what provides me these insights is my training, you know, my Ph.D. in comparative literature, my -- you know, just, again, I don't mean to sound like I am promoting 02:34

myself, but, like, you know, super sophisticated, you know, my experience both in terms of as a reader, as a film watcher, as a consumer of popular culture, and just the knowledge base that comes from both, which I think then plays into what I was 02:35 saying before, that once you develop an understanding of what's expected of the genre, one doesn't have to be -- I mean, one doesn't have to be a scholar to do that.

One can have a history of, whether you 02:35 want to call it fandom, whether you want to call it experience, whether you want to call it, you know, a preference.

So there are very sophisticated readers of, let's just say, the western, that maybe have 02:35 never studied the western, but given their life experience reading westerns or reading science fiction or reading romance, have a pretty sophisticated understanding of what that genre is.

Q. Sir, I appreciate your, you know, your 02:35 credentials, which are very impressive, and the nature of your expertise.

I'm asking, though, specifically what you did. You testified you didn't receive a list of standard or indispensable elements of the pirate 02:35

genre.

It is accurate, is it not, that you did not opine as an expert in this case on what the standard or indispensable elements of the pirate genre are? 02:36

That's true, isn't it?

MR. LOWE: Objection. I think that would require him to, you know, review his report and his rebuttal report to determine whether or not that's an accurate statement or not. So I -- 02:36

MR. SEGALL: Steve, I would appreciate you avoid the speaking objections, please. Just state your objection and let the witness answer for himself.

MR. LOWE: Well, yeah, I mean -- 02:36

BY MR. SEGALL:

Q. Yes or no? You are not opining in this case on what the elements -- what the standard or indispensable elements of the pirate genre are, correct? 02:36

A. When you guys get a littler heated, I think it gets really confusing.

So maybe if we could just slow down a bit, like, that would be helpful to me so I could hear, I could just hear the question. 02:36

Q. I would be happy to repeat it.

A. Yeah.

Q. My question to you, Professor Roman, is this: You as an expert in this matter are not expressing any opinions on what the standard or indispensable parts of the pirate genre are, correct? 02:37

A. I would say that that's incorrect.

Q. And where can I look in your expert opinions to find where you articulated what the standard or indispensable parts of the pirate genre are? 02:37

A. I think it's -- again, it starts with the initial report. I do an overview of, you know, the ships-at-sea genre, the sub -- I call it a sub genre, the pirate tradition. 02:37

I made references to all of these aspects in that initial report when I went through the categories, you know, eight categories, that are of consequence for the case. 02:37

I incorporate affects of the pirate tradition, what the expectation was around character, around setting, around mood, around, you know, pace, sequence, all those categories.

I might not overtly have said, like, and 02:37

here is -- I didn't, you know, set a grid at the top of my report, like, so saying this is what all the criteria is that we're going to find here.

But -- and I don't even want to suggest that it was implicit. I just think that it was 02:38 incorporated, threaded, you know, throughout the initial report.

And then in my defense of that initial report, in my rebuttal to the Disney expert, I think you could also find that I saw moments of 02:38 that in my deposition where I was referring to those components.

Q. If I can point you down to the bottom of page 5 of Exhibit 10, you quote the Disney report as saying that, you know, certain similarities 02:38 between the works, quote, "exist at such a high level of extraction that they constitute unprotectable ideas instead of protectable expression of these ideas."

Do you see that? 02:39

A. Hang on. Hang on. Page 5, is that the last --

Q. The last paragraph.

A. Okay. Let me just read that.

MR. LOWE: I'm sorry. Which exhibit? 02:39

MR. SEGALL: Exhibit 10.

THE WITNESS: It's on page 5. It's the beginning of the last paragraph. It's not a full paragraph. It goes on to page 6.

Can I just read this quickly? 02:39

BY MR. SEGALL:

Q. Please.

A. Do you want me to read it out loud?

Q. No, you don't need to unless it would be helpful. 02:39

MR. LOWE: I say read it out loud.

THE WITNESS: "At some key points, Disney's report even admits similarities to exist but qualifies this saying by saying that, quote, 'exists at such a high level of extraction, that 02:39 they constitute unprotectable ideas instead of the protectable expression of these ideas."

BY MR. SEGALL:

Q. Do you agree that ideas are unprotectable?

A. Well, I think the criteria is that ideas 02:39 are generally unprotected, and the expression of ideas are what's protected.

But I think -- and this is where you guys -- you know, this is why I think you're still at this, is that it seems to be one of the hot 02:40

topics that's in your field and this subfield of copyrights law: Like, okay. What constitutes an idea and what constitutes the expression of idea? And the concept is abstract.

Q. I would like to ask you about that content. You write on page 6 of Exhibit 10 on the second line: "I am informed that some writers have opined that once an idea is expressed, that constitutes the expression of an idea." 02:40

Do you see that? 02:40

A. Yes.

Q. Who informed you of that?

A. Well, these are conversations that I had with Steven initially around copyright infringement cases and the things that I needed to be aware of. 02:40

Q. And do you know what writers have opined that once an idea is expressed, that constitutes the expression of an idea?

A. I think -- I was assuming Steven was referring to legal, legal discourse. 02:41

Q. But he didn't point you to specific sources that have expressed that idea?

A. No.

Q. And when it says, "once an idea is expressed," is your understanding here that 02:41

something becomes expression as soon as it's written down, for instance?

A. Well, I think that's something that you guys -- I mean, this is the thing that you -- that all of you are kind of concerned with. 02:41

Q. I'm asking for your understanding, sir.

Is that what you meant when you wrote this? When you said once an idea is expressed, did you mean once it's written down it's now expression? 02:41

A. Well, I think the concept is -- the way to understand it is that one can have an idea, right? that I have a story about a person, a young person, who -- let's just say, there's a story of, like, a 16-year-old boy who gets -- who dies. 02:41

It's, like, that's an idea, and that's the story. So he dies prematurely. That's an idea.

Is that protectable? No. I mean, it's unfortunate that a six-year-old boy might die unexpectedly and prematurely and tragically, but 02:42 the expression of the idea would then be: Okay. There's a 16-year-old boy that lives outside of Chicago who, you know -- this is not me. So I'm not talking about myself, but I will use the specifics: that's a swimmer, that's on the swim 02:42

team, that, you know, is Latin X and, you know, goes on a field trip and dah, dah, dah, just like, you know, that then becomes the expression of the idea, which is the idea that there is a young person who dies prematurely. 02:42

With the expression of the idea, when you start bringing in kind of more detailed nuance, flushing out of the idea, that would be, to me, the expression of the idea; how the idea is then embellished with the tale that separates it from 02:43 other ideas that might be shared ideas: oh, I have a story about a young boy in Chicago who's 16 who dies prematurely.

Like, oh, really?

Yeah, no, but mine was a runner, and he 02:43 was Filipino.

Q. Let me ask you about a hypothetical to get at this question of once an idea is expressed that constitutes the expression of the idea.

A. Wait. Let me get some water. 02:43

Q. Wait.

THE WITNESS: If I could just ask, Michele, are you fine with the pace? Because last time I was asked to slow down.

THE REPORTER: Mr. Ramon, I will let you 02:43

know if I have any problems.

THE WITNESS: Okay. Great. Okay.

BY MR. SEGALL:

Q. Let's say, Professor Roman, that you and I are talking one day, and I tell you, you know, I'm working on a story about a drunk pirate. Okay? 02:43

I think you just testified that you would consider that an idea: I have a story idea for a drunk pirate, correct?

A. Yeah. That sounds like that's an idea. 02:44

Q. Now, let's say I write my story down, and I say, you know, chapter one: Captain Bill is a drunk pirate. And that sort of is the majority of how far I get in the story at that point.

So now the idea has been written down. It's in the story. In your opinion as an expert on substantial similarity, now that I've expressed that idea in a story, does that constitution expression as opposed to idea? 02:44

MR. LOWE: Objection. Incomplete hypothetical. Vague and ambiguous. Calls for a legal conclusion. 02:44

THE WITNESS: So what am I supposed to do here?

///

Page 300

BY MR. SEGALL:

Q. You can answer.

A. Again, Jordan, with all due respect, these moments feel like parlor games. So I'm not sure, like, what we are doing. 02:44

But is it an idea? Is it an expression of an idea? It feels to me like it's an idea.

But here's where -- you seem like a really cool guy, Jordan, and I think, like, it would be really fun to hang out and you and I, like, just 02:45 talk this through on a walk or beers or a cup of coffee, and I think that could be funny.

Q. Okay. But, I mean, the idea expression dichotomy is sort of at the core of substantial similarity. 02:45

So we're not just answering. I'm trying to understand what you meant when you wrote "once an idea is expressed" --

A. You have a story of a drunk pirate, but then that is now the expression of an idea. 02:45

Q. I'm sorry. I didn't catch that first part. Can you repeat your answer?

A. You asked earlier --

MR. LOWE: Wait. Before you answer anything, because it sounds like he may have 02:45

A. Wait. I need to -- I just need to find that again. Where is it? What line?

Q. Page two. It's the first full paragraph on the page in the middle of the page --

A. Where it's -- 02:47

Q. -- at the bottom.

Yes, that's the paragraph, but it's at the very bottom of that paragraph.

A. Oh, got it. Got it. One more time? "As the" -- 02:47

Q. "As the Nine Circuit pointed out in reversing dismissal of this case in 2020, it is also unclear whether these pirate tropes are true tropes or whether they became tropes due to the success of the POTC franchise in existence since 02:47 2003."

Do you see that?

A. Yes.

Q. As a plaintiff expert in this matter, did you undertake any independent analysis to attempt 02:47 to determine whether the Pirates of the Caribbean franchise has shaped what are now considered pirate movie tropes?

A. What would that entail?

Q. I'm just asking. Did you make any effort 02:48

to determine whether the Pirates of the Caribbean franchise has affected what are pirate movie tropes?

A. No.

Q. Okay. Can you go down to page 5 of the same Exhibit 10, please. 02:48

And I want to point you to the paragraph that begins: "Defendants cannot escape."

Do you see that?

A. Yes. 02:48

Q. And you list six things, right? You list sort of plot Bs that you believe are mirrored in the two works.

Do you see that?

A. Yes. 02:48

Q. Are you contending that these individual elements are individually protectable under copyright?

MR. LOWE: Objection. Calls for a legal conclusion. Vague and ambiguous. 02:49

THE WITNESS: And so am I supposed to respond?

BY MR. SEGALL:

Q. Yes.

A. Okay. So, Jordan, the question again. 02:49

BY MR. SEGALL:

Q. Yes.

A. Okay.

MR. LOWE: Subject to my objections.

THE WITNESS: The villains attacking a shipping port town looking for key items, do I think that that should be protected? 02:50

BY MR. SEGALL:

Q. Do you believe that element is protectable under copyright law? 02:50

MR. LOWE: Same objections.

THE WITNESS: Again, it would be protectable under the concept of the expression of idea, which would then be thought through in terms of how it's played out in, like, selection and arrangement and how it resurfaces and the nuance that come through: what type of villains? You know, where's the shipping port? What are the key items? 02:50

Those are all, I think, aspects that would generate protection. The same with the unique prologue around ten years, but some of these are a little more -- are stronger than others. 02:50

So unique prologue around ten years earlier whereby most main protagonists are -- 02:51

(Reporter clarification)

THE WITNESS: Sorry, Michele.

I'm just saying in that first point, which says: "One. A unique prologue around ten years earlier (whereby both main protagonists are 02:51 introduced at gunpoint)."

I mention this both in my initial expert report. I mention it in my rebuttal to the Disney expert report, and I mentioned this in my deposition, that the prologue, the expression -- 02:51 the way that the prologue is organized both in the screenplay and in the film is pretty detailed.

The prologue itself is an unusual setup. I'm repeating myself. I said all this stuff before, but I'm just following up here. 02:52

So I would say, yes, those are things that should be protected under copyright law.

Q. But you can't seriously contend that plaintiffs in this case, you know, own a monopoly, in effect, on the idea of villains attacking a 02:52 shipping port town in a pirate story, can you?

MR. LOWE: Objection.

THE WITNESS: No.

MR. LOWE: Wait. Objection. Argumentative. Vague and ambiguous as to what you 02:52

mean by monopoly. Calls for a legal conclusion.

You can answer.

THE WITNESS: Yeah. I was going to say, you know, that, again, you know, Jordan, the "but" part of this is how these things are then developed and sustained throughout the story line or, in this case, the screenplay in terms of the selection and arrangement of these, of these throughout the story line. 02:53

And, again, as I said before, you know: what types of villains are we talking about? You know, where's the shipping port town? Tell me more about that. What are the key items that are -- that people are either trying to retrieve or other -- um, um -- and I think that all of those six could be argued in the same way, that it's about the selection arrangement and within the story. 02:53 02:53

BY MR. SEGALL:

Q. So let me ask you about the selection and arrangement. Let me ask you about the selection and arrangement of these elements. 02:53

You say both works have a prologue, and you say that the prologue is arranged in the same manner, but prologues necessarily go at the 02:54

wisdom is that the climax comes at the end.

And I think that that word in all aspects of our usage suggests, like, the ending.

BY MR. SEGALL:

Q. So the basic sequence of prologue, plot, development, and climax, arranging those elements in that order is pretty common in adventure stories, right? 02:57

A. I would say it's one of the options, one of the more predictable options, for narrative structure. 02:57

But, generally -- and I think this is what I was trying to point out in my, again, my expert report, the rebuttal to Disney, my deposition -- that for a story to have a prologue is already pretty peculiar and unusual. 02:57

And not many stories actually -- it's an antiquated literary device. So when it surfaces, it does call attention to itself: like, oh, my god. There's a prologue here. Like, that's really weird. Like, why do we have the prologue? 02:57

You know, and I mentioned this again in deposition. So, like, Star Wars, I think people are like: Wait. What's going on here? Why is there this, like, textural prologue that we have to 02:57

kind of observe initially?

Q. Yes. I do recall that testimony.

A. Yeah.

Q. I want to turn to a new topic.

You say later in your rebuttal report 02:58 that: "The romance introduced by the two female characters expands the typical demographic of the pirate film to appeal to women and young girls, to overlapping groups who are generally not the genre's target audience." 02:58

Do you recall writing that?

A. Yeah. What page is it on?

Q. It's on page 9. It's item I, if you want to go to it.

What is the basis for your opinion that 02:58 women and girls are not typically part of the audience of pirate stories?

A. I think all you have to do is go back to just watching Treasure Island. I thought it was pretty extraordinary to see that there were 02:58 actually no girls or women in the story line whatsoever.

They don't even appear. So they are completely outside the representation of the entire story. So the introduction of women, I mean, I 02:58

think one of the historical -- this is where my training does kind of surface -- in the early modern period, there are kind of reduced ways to understand women in kind of either ships at sea or sailor stories or pirate movies. 02:59

So the fact that -- let's just stick with the Treasure Island movie -- that there's virtually no women or girls in the story at all.

And then that there would be such a big deal -- let me just go with the other one that I 02:59 screened, you know, Cutthroat Island, that there would be, like, the gimmick is: Oh, well, let's have a really strong female lead. Like, what would that look like, right?

But I don't know what the box office was 02:59 for that film, but the concept was pretty ingenious and fairly innovative.

So I think that, though there might be kind of a slightly, you know, sexist understanding here that women and girls aren't going to be drawn 03:00 to the pirate story, I'll own that, but I think that generally these pirate films aren't particularly geared to young girls.

Q. Do you have any basis at all for opining that Curse of the Black Pearl was more popular to 03:00

A. Yeah. The one that was provided after the Disney -- the one that was referred to in the Disney expert report.

Q. And you've reviewed the sizzle reels that the plaintiffs prepared? 03:17

A. Yes.

Q. And you are aware that the plaintiffs incorporated footage from the ride into their own sizzle reel, right?

MR. LOWE: Objection. Assumes facts not in evidence. 03:17

THE WITNESS: I don't remember that.

BY MR. SEGALL:

Q. Nobody told you that?

A. I actually don't remember that, Jordan. I don't remember -- someone might have said that, and maybe I saw it, but that's really not my own kind of recollection of that. 03:17

Q. You are aware, though, that when the plaintiffs and their collaborator, Ms. Later, pitched the screenplay to Disney, they described it as being based on the ride, correct? 03:18

MR. LOWE: Objection. Assumes facts not in evidence. What are you referring to?

///

BY MR. SEGALL:

Q. You can answer if you understand it, Mr. Roman.

A. Can you just repeat the question then?

Q. Sure. You understand that when the plaintiffs pitched their screenplay to Disney, they described the screenplay as having been inspired by the amusement park ride? 03:18

MR. LOWE: Objection. Assumes facts not in evidence. 03:18

THE WITNESS: I think I might have read in one of the reports, maybe in the Ninth Circuit appeal, I think that might be something that was -- I was aware -- yeah, I was aware that there was some relationship, yeah. 03:19

BY MR. SEGALL:

Q. What --

A. I can't identify where I saw that, though.

Q. Okay. Where did you -- or how many times have you watched footage of the Pirates of the Caribbean ride? 03:19

A. I think twice.

Q. And what do you recall about the plot of the ride generally?

A. Well, I think that would be very generous. 03:19

I don't think there's a plot. There's no plot, per se.

I think it's just a set of -- I don't even know what to call them -- tableaus or vignettes or little, little, like, little screen, like, little -- there's no plot, per se. There's nothing really happens. 03:19

Q. Okay. And what do you recall about the role of skeleton pirates in the ride?

A. I think we covered this in the deposition. 03:19

I think that's, I think that's, actually, Jordan, I think that was actually the last hour of the deposition when we met in June.

MR. LOWE: Then I will object belatedly as asked and answered, but I am going to let you go ahead and answer again as to what you recall about the skeletons in the ride. 03:20

THE WITNESS: I -- again, it's not like a strong image, but I don't have many strong images from the ride except of the people on the ride and their experience of it. 03:20

So, like, they move through these little scenes or little vignettes, and there is a moment, I think, where there's, like, these skeletal corpses, and maybe, like, one pops out or 03:20

something.

BY MR. SEGALL:

Q. Did you ever ask plaintiffs or their counsel to learn more about what elements of the ride were borrowed and incorporated into the screenplay? 03:21

A. Well, just for the record, I mentioned this before. I had never met the plaintiffs. I'd never spoken to the plaintiffs. I have no idea, like, essentially who they are, what they look like, anything. 03:21

So I don't remember having any conversations with them, and I didn't have any conversations with the plaintiffs' counsel either, except when I was asked to look at, look at that little clip for the ride. 03:21

And, again, because I usually ask why do I need to see this? And I think the reason that I needed to see it is that it came up in the Disney expert report that it was important -- it seemed to be important for the Disney expert report to include that. 03:21

And plaintiffs' counsel wanted me to be as -- to have a -- I don't know why they wanted, but they wanted me to be familiar with it. 03:22

Q. Okay. At the time you drafted and signed that expert report, were you aware of the ride's existence?

A. I would have to review my materials in terms of the timeline of what I was given. 03:25

And I don't recall if I was given that information for the expert report or for the Disney rebuttal.

But I do know this, Jordan, that I wasn't asked to screen the little clip, the YouTube clip 03:25 of the ride, until I read the Disney expert report, and I had to draft my rebuttal.

Q. Okay.

A. That was important for plaintiffs' counsel for me to become familiar with it. 03:25

Q. So at the time you signed and submitted your initial expert report in this matter, you had never seen footage of the Walt Disney ride?

A. I can answer that confidently that I didn't see any footage of it. 03:26

Q. And you had never ridden the Walt Disney ride?

A. No. Is it both at Disneyworld and Disneyland?

Q. I think so, yes. 03:26

A. No.

Q. Okay. If I can point you back to page 13 of Exhibit 10, please.

A. If you could just hang on a second. There's a guy making loud noise, and I don't want 03:26 to be distracted by him.

Q. Sure.

(Discussion held off the record)

THE WITNESS: Thank you. Sorry about that. 03:27

BY MR. SEGALL:

Q. No problem.

Okay. Page 13, you see paragraph No. 5?

A. Yes.

Q. You write, "Disney report disregards the 03:27 Rascal Scoundrels as generic, simply are a generic trope of children dropped into a pirate tale; however, children in a pirate story who happen to have similar traits as the crew members in the movie cannot possibly be considered scene` a' 03:27 faire."

Do you see that?

A. Yes.

Q. Is it your expert opinion that the Rascal Scoundrels have similar traits as the crew members 03:27

in the Curse of the Black Pearl?

MR. LOWE: Objection. Vague and ambiguous. Vague and ambiguous.

THE WITNESS: One more time, Jordan.

BY MR. SEGALL: 03:28

Q. Is it your expert opinion in this matter that the Rascal Scoundrels have, quote, "similar traits as the crew members in the Curse of the Black Pearl"?

MR. LOWE: Same objections. 03:28

THE WITNESS: And I would rephrase it that, because one comes first. So the screenplay comes first, and I would say then that the crew members in the pirates, there are some echoes of the Rascal Scoundrels and the crew members in the 03:28 pirate film.

BY MR. SEGALL:

Q. The Rascal Scoundrels are pretty central in the screenplay? Wouldn't you agree?

MR. LOWE: Objection. Vague and ambiguous 03:28 as to what you mean by pretty central.

THE WITNESS: And, again, I mention this both in my expert report and my rebuttal to the Disney expert, because the Disney expert was claiming somehow or another that these -- that the 03:28

Rascal Scoundrels were, in fact, the protagonist.

And I thought that was again a mis-recognition of the screenplay.

But I will say this: I think that the Young Rascals -- and I said this in my report and also in the rebuttal, and it's probably in the deposition -- that I do think they play a central role in the screenplay; that they are, again, like, that is -- that we can see traces of in the film version of the initial pirate film. 03:29 03:29

BY MR. SEGALL:

Q. In fact, in the screenplay the story literally ends with Davy Jones crediting the Rascal Scoundrels for his redemption and watching as they salute him one-by-one. 03:29

That's the end of the screenplay, isn't it?

A. Yeah. That would be one way to say that the story ends.

Q. I mean, it literally ends. That's the end of the story? 03:29

A. Yeah. But I would -- okay. If that's the ending that you want, that's the ending that you can interpret.

For me, it was really -- there is a still 03:29

an element of uncertainty, maybe, of what's going to happen with all these characters. It did feel to me that it was open to a sequel.

Q. Well, setting aside the possibility of a sequel, the screenplay literally ends with Davy saying: "I owe it all to them," and then one-by-one the Rascal Scoundrels salute him, correct? 03:30

A. Yes. I have it right here. Yeah, we see the -- what's interesting is that it ends with the romantic couple in silhouette as they lean in close, pause, and then engage in a kiss. 03:30

So it ends with Davy and Jane, but they do, actually -- I mean, I thought it was kind of cute that they all do -- the kids kind of all name their names. 03:30

Q. Okay. We can quibble about what the movie actually ends with, but the screenplay does indisputably put the Rascal Scoundrels pretty close to the center of the story.

You agree with that, right? 03:31

MR. LOWE: Objection. Vague and ambiguous.

THE WITNESS: I would not say that they were put at the center of the story.

///

BY MR. SEGALL:

Q. But there's no ragtag group of children in Curse of the Black Pearl.

You would agree with that, wouldn't you?

A. I would say that the crew has -- there are members of the crew in the pirates film that are -- you know, that serve a particular similar function in terms of comic relief but also can be childish, right? or do form a kind of core. 03:31

Q. Do you think anyone in the pirates crew in Curse of the Black Pearl is actually a child? 03:31

A. No, no. But to go back to what we were saying earlier, I don't think we expect to see a child in a pirate movie.

Q. So you testified earlier that plaintiffs' counsel instructed you in this matter that you should disregard differences between the works, correct? 03:32

A. Yes.

Q. Okay. So you've also testified that you are an expert in sort of narrative comparisons and comparing works in diverse genres as a comparative literature professor? 03:32

A. Yes.

Q. Okay. So I'm just interested in your 03:32

opinion.

Setting aside what plaintiffs' counsel instructed you to do, is it your opinion as a literary expert, as an expert in literary criticism, that the fact that the plaintiffs' screenplay, you know, centers on the high jinks of a group of orphan children while Curse of the Black Pearl has no children in it whatsoever is simply irrelevant to your opinion on substantial similarity? 03:32 03:33

A. I wouldn't agree with the way that you just phrased what's central to the screenplay. And I, I -- this is where the Disney expert and I would have different positions.

And I think the Disney expert was making the claim that the children were the main protagonists; that they were the center of the story line, and made all kinds of arguments to kind of build that thesis. 03:33

I made no such claims in either my expert report or my rebuttal for anything I said last time we met. Like, I don't think that the children are -- or the Rascal Scoundrels are at the heart of this film. 03:33

Again, they play a key component, but I 03:33

really don't think it's their story at all.

Q. So your testimony is that that distinction between the two works, that one has kids and one doesn't, doesn't matter because the Rascal Scoundrels just aren't very important. 03:33

Is that what you're testifying?

A. No.

MR. LOWE: Misstates his testimony. Compound. Vague and ambiguous.

MR. SEGALL: He just said they're not at 03:34 the center of the story. Maybe I misunderstood.

THE WITNESS: I can't agree with what you just said.

BY MR. SEGALL:

Q. How would you put it? 03:34

A. I think I just said it.

MR. LOWE: Objection. Vague and ambiguous.

BY MR. SEGALL:

Q. You said the Rascal Scoundrels are not at 03:34 the center of the story, that that's why you don't regard the fact that there is no children in the Curse of the Black Pearl as being salient to the question of whether the works are similar, right?

MR. LOWE: Misstates his testimony. 03:34

THE WITNESS: I don't think -- I would not argue if the Rascal Scoundrels are at the heart of the screenplay.

I think -- and, again, I'm just repeating myself. I think they are important components to the story line. They have a function in the story line that is sustained throughout. 03:34

They are also -- again, you know, we could call them the Rascal Scoundrels, but they are differentiated, right? I think they can't be reduced to a generic scene` a' faire that the expert says that they are -- each have their own unique way of being, that each have their own unique dialogue. 03:35

They have -- among them they have different reports, you know. They are clearly a group, right? but, like, Jimmy's their leader. They have different -- they are not a -- they are not a flat set of characters. I think they are pretty -- I wouldn't say they are as nuanced as the adult characters, but they're not as reductive as the Disney expert sets them out to be. 03:35 03:35

I don't think the expert even at all differentiates any of them, and just puts them in this group as a generic -- this is it. This is 03:36

what he says: a generic trope of children dropped into a pirate tale seems to me an unfortunate way, an unfortunate way of understanding the Young Rascals -- the Rascal Scoundrels.

BY MR. SEGALL: 03:36

Q. You have offered a lot of testimony over the course of your two days, and you mention this in both your reports, I believe, that you believe -- it's your opinion that Disney sort of copied the heterosexual love plot from the 03:36 screenplay in Curse of the Black Pearl, correct?

A. Yes.

Q. Who's the main protagonist in the screenplay, to your mind?

A. Again, that's debatable. You know, like, 03:36 but some would say it's, you know, Davy Jones. Some would say it's Jack Nefarious.

And here's where, Jordan, again, I'm a little --

Q. I'm just asking for your opinion, 03:37 Professor Roman.

Who do you consider the main protagonist in the screenplay?

A. And I'm rejecting the question.

Q. I'm sorry? 03:37

A. I'm rejecting the logic of the question because it presumes that there is only one main protagonist.

And I think, again, this is a very limited way of reading both the screenplay and then also 03:37 the film. And I think that one of the things that's really interesting is that there is this, like, interplay and this sort of fluidity.

And this is done in the screenplay where there's a heightened episode that's all about, 03:37 like, Davy Jones or maybe Davy Jones and the Rascal Scoundrels, Davy Jones and Jack Nefarious, Davy Jones and Jane.

And then we go to another sequence that's equally compelling and filling and flesh out that 03:37 focuses on Jack Nefarious. And this we see echoed -- this is, again, something that we see echoed in the film that I think would be really difficult.

And I even -- I think we ended -- this is 03:38 so funny, Jordan. We're just doing the same thing that we did last time. I ended on this. I said I even think, like, it would be interesting to see how the profession -- like, the actors union would even identify who is the protagonist and who is the 03:38

secondary character.

Like, so, I said the Golden Globes, would they be nominating Geoffrey Rush or Johnny Depp in the lead roles? Would they both be lead roles? Would they both be up for best actor? Would Johnny 03:38 Depp be the supporting actor and Geoffrey Rush, or would it be -- and I think that there's a logic to say, oh, no, they're both best actors, right? They are both the main protagonist, or one is this, and one is the other. 03:38

And I think this is where the studio figures out, I guess -- and I'm not an expert on this at all -- which is the one that has the better chance of winning in that category.

Q. So -- 03:38

A. That's what the -- and I think that's immediately borrowing from the kind of the power of the screenplay to keep that, you know, in play; that, like, well, who is the lead in the plaintiffs' screenplay? 03:39

That's what makes it really interesting to -- that's what made it really interesting -- I thought that was -- I saw that as an innovation.

So that's why I'm refusing your question because I think it suggests that there's only one 03:39

way to understand these characters, their setting, and the dynamic.

Q. Well, who do you think are the candidates for the -- who -- if I asked you who are the protagonists in the screenplay, who would you say 03:39 are viable candidates, just a list?

A. The screenplay? You know, I think it's a pointage between Jack Nefarious and Davy Jones. And that might be leaning more toward Davy Jones at certain times and also to Jack Nefarious. 03:39

Q. You don't consider Jack Nefarious as an antagonist?

MR. LOWE: I am going to object as asked and answered. I remember this exact same conversation in the last deposition. So, yeah, 03:40 asked and answered.

BY MR. SEGALL:

Q. My question to you on the heterosexual plot is this: though neither of the two people you just identified, Davy Jones and Captain Jack 03:40 Nefarious, end up, um, um -- I'm sorry. Let me start that over.

Davy Jones ends up in a heterosexual love plot, correct, in the screenplay?

A. Yes. 03:40

Q. Okay. And it is your opinion in your report that -- and I believe we talked about this in the original Complaint as well -- that the sort of correlate of Davy Jones in Curse of the Black Pearl is Jack Sparrow, correct? 03:40

A. Again, no, Jordan. I wouldn't say that is necessarily correct. I think you're missing my point. There is a nuance versus protagonist and protagonist lead, you know, sub-lead.

So I think where you're trying to go with 03:40 this is that, well, there's -- none of these, you know, end up in a relationship at the end of the pirates movie.

And I think -- just because I know we're low on time -- I would say the fact that there is 03:41 so much narrative time around a heterosexual relationship in the original screenplay, and the fact that there's so much narrative time -- by narrative time, I mean that there are main characters to fulfill these roles -- that the plot 03:41 is invested in that story line; that the sequence of events, you know, really follows through on the development of these characters and their romantic -- on every level, the story of the heterosexual romance, whoever it involved, right? 03:41

But in the pirates movie, that heterosexual -- that is not a secondary plot line. That heterosexual, just as in the screenplay, that heterosexual plot line, romance plot line, is integral to the success, the logic, of the screenplay. 03:41

It's what makes it really interesting. It's what makes it unusual. It's what makes it innovative. I would say even that it's the original contribution, right? that has not been seen before. 03:42

MR. LOWE: David, you're not answering his question, though. You're anticipating his next question.

All he asked you was whether Davy Jones -- or Jack Sparrow was a correlate of Davy Jones. 03:42

BY MR. SEGALL:

Q. Okay. Well, let me just see if I can try to summarize what you just said.

To the extent there's a similarity between the two romantic subplots in Curse of the Black Pearl and the screenplay, is that both sort of devote the same amount of narrative attention in that subplot, correct? 03:42

A. I would phrase it the way I just said it 03:42

REPORTER'S CERTIFICATE

I, MICHELE J. LUCAS, a Shorthand Reporter, State of California, do hereby certify:

That DAVID ROMAN, in the foregoing deposition named, was present and by me sworn as a witness in the above-entitled action at the time and place therein specified;

That said deposition was taken before me at said time and place, and was taken down in shorthand by me, a Certified Shorthand Reporter of the State of California, and was thereafter transcribed into typewriting, and that the foregoing transcript constitutes a full, true and correct report of said deposition and of the proceedings that took place;

IN WITNESS WHEREOF, I have hereunder subscribed my hand this 27th day of July, 2021.

MICHELE J. LUCAS, CSR No. 4017
State of California

DAVID ROMAN

davidr@usc.edu

JULY 27, 2021

RE: ALFRED II vs. THE WALT DISNEY COMPANY

JULY 9, 2021, DAVID ROMAN, VOLUME 2, JOB NO. 4661267

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

XX Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

# EXHIBIT O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

ARTHUR LEE ALFRED, II, et al.,

Plaintiff,

vs.

THE WALT DISNEY COMPANY, et al.,

Defendants.

CASE NO. 2:18-cv-08074-CBM-AS

DEPOSITION OF

JAMES MCDONALD

HELD REMOTELY FROM LOS ANGELES, CALIFORNIA

JUNE 16, 2021

11:04 A.M. PACIFIC TIME

Atkinson-Baker, a Veritext Company
(800) 288-3376
www.depo.com

REPORTED BY: SUSAN M. GEE, RMR, CRR

FILE NO.: AF04301

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

- - -

| | |
|---|---|
| ARTHUR LEE ALFRED, II, et al.,<br><br>Plaintiff,<br>vs.<br><br>THE WALT DISNEY COMPANY, et al.,<br><br>Defendants. | CASE NO. 2:18-cv-08074-CBM-AS |

Remote deposition of JAMES MCDONALD, taken on behalf of the Plaintiff, at 1818 Colby Avenue, No. 301, Los Angeles, California 90025, commencing at 11:04 a.m., Pacific Time, Wednesday, June 16, 2021, before Susan M. Gee, RMR, CRR.

REMOTE APPEARANCES:

FOR THE PLAINTIFF:

LOWE & ASSOCIATES
BY: STEVEN T. LOWE, ESQ.
ALEKSANDRA HILVERT, ESQ.
AIDA MARASLI, ESQ.
8383 Wilshire Boulevard
Beverly Hills, California 90211
310.477.5811
steven@lowelaw.com
aleksandra@lowelaw.com
aida@lowelaw.com

FOR THE DEFENDANTS:

MUNGER, TOLLES & OLSON LLP
BY: JORDAN DENTLER SEGALL, ESQ.
ROBIN GRAY, ESQ.
350 South Grand Avenue
50th Floor
Los Angeles, California 90071
213.683.9100
jordan.segall@mto.com
robin.gray@mto.com

ALSO PRESENT: Arthur Lee Alfred
Ezequiel Martinez, Jr.
Karen Frederickson, Esq., Walt Disney Company
Michael Kelly, Videographer

I N D E X

WITNESS: JAMES MCDONALD

| CROSS-EXAMINATION | PAGE |
|---|---|
| By Mr. Lowe | 6 |
| EXAMINATION | |
| By Mr. Segall | 185 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 11 | Career History | 41 |
| 12 | Invoice for expert witness work Bates MCDONALD_00001 - 3 | 54 |
| 13 | Script of Pirates of the Caribbean Bates ER000213 to 324 | 143 |

with a specialty in film and television. 11:11:43
Q. Okay. And, then, an MFA, what does that stand for? 11:11:49 11:11:53
A. Master of fine arts. It's as high a degree as you can get in the arts, in the practice of the arts. It was in directing for television and film. 11:11:54 11:11:57 11:12:03 11:12:08
Q. Right. When did you graduate Stanford, and when did you graduate UCLA? 11:12:09 11:12:12
A. Stanford was '72. UCLA was '75 -- 1975. I'm sorry. 11:12:16 11:12:21
Q. All right. Did you go to work after graduating UCLA in 1975? 11:12:28 11:12:30
A. My first job in Hollywood was as an intern in the Mary Tyler Moore Show with Allan Burns and Jim Brooks and Ed Weinberger. My first paying job was in 1975, '76 with the Irwin Allen Company. 11:12:35 11:12:37 11:12:44 11:12:48
Q. I'm sorry. What was it called? 11:12:55
A. Irwin Allen. He made Towering Inferno, disaster pictures. 11:12:56 11:13:02
Q. How long did you work for Irwin Allen? 11:13:03
A. I was with the Irwin Allen Company for about a year and a half. Yeah. 11:13:07 11:13:09
Q. And what was your position there? 11:13:12
A. I was assistant to the executive 11:13:14

producer, basically on a particular film and -- yeah. I was the assistant and did a little bit of everything. 11:13:16 11:13:25 11:13:30

Q. All right. And what was your next job after that? 11:13:31 11:13:33

A. I became a union analyst in '77, went to work for MGM. I spent the next six years at MGM. 11:13:37 11:13:41

Q. What's a union analyst? 11:13:49

A. Story analysts have -- are part of the Editors Guild now. Back then, they had their own union, IATSE, International Artists and Technicians and Service or something employees. It's a union position, much like cameramen or editors. 11:13:54 11:13:57 11:14:01 11:14:05 11:14:10

Q. What do they do? 11:14:19

A. Story analysts work for the studios, usually in their story department. Every production company, every agency, every studio will have some sort of story department or story analyst to review screenplays to consider for making a motion picture or developing for to make a motion picture. 11:14:21 11:14:23 11:14:27 11:14:31 11:14:36 11:14:40

In the studio system, at least then and, I think, now -- I haven't been in a story department in over 15, 18 years -- the materials that were solicited by executives would be reviewed by analysts, who would synopsize what was in them and 11:14:42 11:14:44 11:14:47 11:14:55 11:15:01

analyze their contents as to their viability for development into a motion picture. 11:15:06 11:15:11

Q. That's sometimes referred to as coverage? 11:15:14 11:15:17

A. Yes. 11:15:18

Q. So how long were you a story analyst for MGM? Did you say you did that for six years? 11:15:19 11:15:21

A. Yeah. Until '83. 11:15:25

Q. And, basically, you stayed in the same position for those six years? 11:15:27 11:15:29

A. Yes. 11:15:30

Q. All right. And what did you do in 1983? 11:15:32 11:15:34

A. In '83, '83, an executive fired the entire story department, so I went and worked at Paramount for a while, and then I worked at Orion for a while, and in '84, I moved over to 20th Century Fox and became John Davis' story editor and handled acquisitions for his partner. It's a complicated -- it was a complicated situation. John Davis owned the studio. His father owned the studio, family owned it. He was a producer on the, on the lot, and so I was specifically his analyst for all the material that was being submitted to him. 11:15:35 11:15:44 11:15:47 11:15:51 11:15:56 11:16:03 11:16:12 11:16:15 11:16:19 11:16:25 11:16:29

Q. And what were your duties? 11:16:32

A. Coverage and notes on development projects. Yeah. Back -- I mean, all story analysts will do, will be involved in the development of process within the studio as far as notes being sent or drafts being sent down to be reviewed for what works, what doesn't work, things like that. 11:16:35 11:16:39 11:16:45 11:16:51 11:17:00 11:17:05

I've been working with writers and directors and producers since, certainly since graduate school, probably since my junior year of college, both inside and outside the studio. The -- I even had -- I have had several films or several film projects in development at one time or another. 11:17:07 11:17:09 11:17:14 11:17:17 11:17:24 11:17:29

Q. That you co-wrote on? 11:17:33

A. No, I didn't write them. I was developing them as a producer, co-producer. 11:17:35 11:17:40

Q. Got it. So up till what year were you a story analyst for 20th Century Fox? 11:17:43 11:17:48

A. '84, '85, '86. '86, the end of '86. 11:17:54

Q. All right. And so far, can we say that your employment history has been to work for the studios as of, at least as of 1986? 11:18:00 11:18:02 11:18:07

A. Yes. 11:18:12

Q. Okay. And studios, just for a purpose of clarification, how many studios are there or were there in 1986? 11:18:13 11:18:18 11:18:24

MR. SEGALL: Objection. Vague and ambiguous. 11:18:27 11:18:28

BY MR. LOWE: 11:18:31

Q. You can answer if it's not too vague for you. 11:18:31 11:18:37

A. Well, okay. Let's say the major studios, let's start there. You had MGM, Fox, Paramount, Universal, Columbia, Warner Bros., Disney. Yeah, there were seven major studios at the time. MGM is no longer considered a major studio. There were a bunch of minor studios. Orion was a minor studio. Lorimar was a minor studio or considered a minor studio. There were a couple of others, New World. I don't remember any others at the moment. 11:18:38 11:18:40 11:18:44 11:18:52 11:18:57 11:19:02 11:19:05 11:19:10 11:19:16

Q. And so where did you go to at, after -- at the end of 1986? 11:19:20 11:19:23

A. In 1987, I got hired by a producer, former studio president named Freddie Fields. Freddie was a big producer at that time. He had produced -- well, do you want Freddie's history? You go back to he created ICM, then sold it and went and became a producer at Paramount making, Looking for Mr. Goodbar and American Gigolo. He was president of MGM at one point and had a development deal at MGM through the '80s. In '87, I became his vice president in charge 11:19:25 11:19:31 11:19:38 11:19:41 11:19:48 11:19:52 11:19:56 11:20:01 11:20:05

of development, and we moved him out of his deal from MGM into independent production. I worked with him for about two years.

Q. All right. So that puts us at about 1988?

A. Uh-huh.

Q. Or 1989?

A. 1988.

Q. Okay. By the way, you, unfortunately, during a deposition, cannot, we cannot -- the court reporter can't take down uh-huhs and huh-uhs. You have to always respond audibly, yes or no, that kind of thing.

So that takes us to 1988. Where did you -- where did you go in 1988 or 1989, if anywhere?

A. 1988, I was -- there was a writer's strike on, so jobs were hard to come by. I was working with a young man who produced a movie called Metropolitan, which won some awards and got a screen play nomination for Academy Award. And we were developing a script that a friend of mine had written and trying to get it set up.

I did odd work, you know, part time at Universal, pretty much Universal. I don't remember if I -- I may have done a week or two at Columbia as an

analyst. Story analyst job was always my plumber's license, so that if I couldn't -- if I wasn't making any money developing projects or I couldn't get an executive job somewhere or whatever, I would put my name on the list and go back and be an analyst for a while. 11:21:48 11:21:54 11:21:57 11:22:00 11:22:05 11:22:08

Somewhere around '89, '90, I went over and started working. I did -- I was hired at Disney and working story department at Disney, not as a full-time employee but part time. And I did part-time work in the story department off and on for the next 10 years or so, maybe a little more, usually on special projects. Like, the writers -- there was a -- there was a writers' scholarship that Disney put out, so I would offer work. I'm just culling through that stuff. 11:22:12 11:22:15 11:22:22 11:22:27 11:22:35 11:22:41 11:22:48 11:22:53 11:22:57 11:23:01

Q. When you say -- when you say "culling through that stuff," basically, again, you're doing coverage, which is, correct me if I'm wrong, it's summarizing the work and then giving your notes on the commercial liability? 11:23:02 11:23:04 11:23:08 11:23:12 11:23:16

A. Well, in the case of the writers' scholarship, it was to determine whether or not these writers, Disney wanted to bring these writers in, give them money, hire them to develop projects. Whether 11:23:18 11:23:22 11:23:25 11:23:30

they had talent was a -- they were looking for new writers. It was a new writers' program. 11:23:34 11:23:38

In '92, the head of business affairs for Disney Animation called me and asked me to help him determine who should get a screenplay credit on the film Aladdin, because he had about 15, 20 writers who had worked on it. So -- 11:23:43 11:23:46 11:23:52 11:23:59 11:24:03

Q. Wait. Before we get there, so I am correct, though, that, as a story analyst, what you're doing is you're providing coverage, and coverage is a summary of the work with your notes about the commercial viability. Is that an accurate statement? 11:24:04 11:24:12 11:24:15 11:24:18 11:24:21

A. That, plus when -- for in-house projects, we were usually assigned development, to a development executive or development project to do development notes on it. Occasionally, we would get -- we would get what we call legal comparisons. Somebody in the IP department would send down scripts and say, run a comparison of these two scripts or this film against this script, and we'd do side-by-side comparisons on similarities and differences. 11:24:27 11:24:29 11:24:32 11:24:36 11:24:38 11:24:45 11:24:49 11:24:55 11:24:59

Q. Okay. So of your time as a story analyst at Disney, how much time would you say, if you had to allot 100 percent, how much time was spent doing coverage versus doing development notes versus 11:25:06 11:25:12 11:25:16 11:25:21

doing comparisons? 11:25:25

A. Oh. More than 90 percent was gonna be coverage, yes. I mean, the comparison stuff or legal stuff was infrequent. 11:25:29 11:25:34 11:25:38

Q. Rare? 11:25:42

A. How do you define "rare"? 11:25:46

Q. All right. Less than once a year? 11:25:48

A. I don't remember, really, but I imagine it was no more than once or twice a year. 11:25:57 11:25:59

Q. All right. And you worked for Disney from when to when? 11:26:04 11:26:09

A. Well, I've been working for Disney on and off since 1989 -- not 1989. Yeah, 1989, late '89, '90. I don't remember exactly when I started. The -- yeah. The last 30 years, most of the work has -- more than half of the work from the '90s involved the forensic analysis of the development process of animated films for them. They hired me as their outside analyst who had -- you know, because I had an independent opinion on the process. 11:26:14 11:26:17 11:26:26 11:26:34 11:26:40 11:26:46 11:26:53 11:26:56 11:27:03

I would do a report that had or book that had a factual breakdown of what happened, when it happened and who did it. I'd make recommendations as to who should get a screenplay write credit or a story write credit based on what happened, sort of much like 11:27:09 11:27:12 11:27:17 11:27:20 11:27:25

discovery.

I look at everything that was written down and whether it's notes, outlines, screenplays, sequence graphs, emails, even picture books, things like that. He needed, for their determination, their writer credit determination process, he needed an outside analyst who wasn't involved with any of the executives in the department or any of the writers or anything like that.

Q. Okay. But you say that you've been -- you know, you've worked for Disney on and off since 1989/1990. At first, you were an actual employee, correct?

A. Part time. I was not a full-time employee.

Q. Got you. You were a part-time employee.

A. I was a temp. I think I was classified as a temporary employee.

Q. Understood. How long did you work as a part-time employee for Disney?

A. Technically, from a payment standpoint, I have -- because they pay me as an employee for each of the projects. It was the deal I made back then, that I wanted them to pay me through my union so that

11:27:30 11:27:31 11:27:33 11:27:43 11:27:47 11:27:53 11:27:56 11:28:00 11:28:04 11:28:06 11:28:10 11:28:15 11:28:19 11:28:20 11:28:21 11:28:23 11:28:23 11:28:25 11:28:28 11:28:29 11:28:33 11:28:42 11:28:48 11:28:54 11:28:57

I would get my benefits, and they would have to pay me at a lower rate and a lower hourly rate, which was beneficial to the head of business affairs and it worked fine for me. So, technically, I have been a temporary employee the entire time to this day. 11:29:01 11:29:04 11:29:12 11:29:17 11:29:23

Q. A part-time employee, you mean? 11:29:26

A. Part time, yes. Every time a project comes up, I get paid as a -- through my union. 11:29:32 11:29:39

Q. You get paid as an employee? 11:29:42

A. I get a W-2. 11:29:45

Q. Okay. So what you're saying is that you've been a part-time employee of Disney since 1990? 11:29:47 11:29:49

MR. SEGALL: I'll object. That also calls for a legal conclusion. 11:29:56 11:29:57

A. Yes. It depends on how you characterize it. 11:30:00 11:30:01

BY MR. LOWE: 11:30:03

Q. You've been getting W-2s since 1990? 11:30:03

A. I've been getting W-2s since 1990. 11:30:07

Q. From Disney? 11:30:13

A. 1990. 11:30:13

Q. Okay. So have you -- at any time, were you a full-time employee of Disney or has it always been a part-time employee? 11:30:13 11:30:21 11:30:25

A. Always been a temporary. 11:30:28

Q. Well, can we say temporary when it's been over 30 years? When does it become nontemporary, I guess? 11:30:29 11:30:32 11:30:36

MR. SEGALL: Argumentative. 11:30:38

BY MR. LOWE: 11:30:38

Q. Maybe part time is the better way to describe it. 11:30:38 11:30:40

MR. SEGALL: I'm going to object, because it's argumentative and misstates the witness' testimony. 11:30:41 11:30:41 11:30:45

A. My relationship with Disney sort of morphed starting in '92 and certainly morphed by '97 to basically being an outside consultant. Even though I was classified for payment purposes as a story analyst, I had this sort of unique position, and most of the work that I did certainly, certainly in the last 20 years and probably -- yeah, most of the work since '92, because I've pretty much done a forensic analysis, the development process on almost every Disney and Pixar movie that's been made. 11:30:47 11:30:49 11:30:55 11:30:59 11:31:03 11:31:12 11:31:15 11:31:24 11:31:27 11:31:30

By the way, I've also done some analysis work for other studios in the same vein. I got to be known as an expert in screenplay credits. I've even worked with some writers on their arbitration cases with the Guild. So other studios 11:31:47 11:31:49 11:31:50 11:31:53 11:31:57

have called to ask about screenplay credit issues over the years. 11:32:06 11:32:08

BY MR. LOWE: 11:32:09

Q. And I'm going to get -- I'm going to get to that for sure. I just want to keep the transcript as clean as possible. 11:32:09 11:32:09 11:32:14

All right. So beginning in 1990 and continuing until today, you worked on a part-time basis for Disney, but, presumably, at any time, I think my last question was, at any time, did you work on a full-time basis for Disney? 11:32:15 11:32:19 11:32:20 11:32:26 11:32:28

A. No. I was never a full-time employee. 11:32:31

Q. Okay. And so also during this time period in the last 31 years, you've also done some consulting work for other studios and for law firms; is that correct? 11:32:35 11:32:37 11:32:42 11:32:47

A. Other studios, other production companies and law firms, yes. 11:32:50 11:32:52

Q. Okay. So how do we, in effect, summarize your career at this point? In other words, we kind of -- we went pretty slowly from 1968 to 1990, and then we kind of did the 31 years rather quickly. Have I -- have I described the totality of your career up till this point by saying, you know, part time for Disney in the last 31 years, plus doing other 11:32:57 11:32:59 11:33:03 11:33:07 11:33:18 11:33:20 11:33:22

consulting work, primarily on, you know, forensic analysis of screenplays for purposes of credit determination for not only Disney but for other, for lawyers and for production companies and other companies as well? 11:33:25 11:33:27 11:33:33 11:33:36 11:33:38

A. Yes. Plus I've also worked on developing film projects outside of the studio system and trying to sell them to the studio system. I've also worked with a lot of writers and producers and directors on a particular projects. I usually get called, because I know something about storytelling and screenwriting, and they usually want an honest opinion. One of the reasons that I am working still is that people value my opinion. 11:33:40 11:33:45 11:33:50 11:33:54 11:33:57 11:33:59 11:34:04 11:34:09 11:34:12

Q. Got it. And that's from years of doing coverage and offering your opinion on the commercial viability in the coverage itself, correct? 11:34:17 11:34:21 11:34:25

A. Yes. And/or how to develop it. Analysis covers, yes, all of that. Is it viable? Should we get involved with this? 11:34:29 11:34:33 11:34:37

Q. Right. And, then, in terms of the projects that you've shepherded, if you will, that you've been involved in that people have called you for your opinion, have any of those ever been released? 11:34:40 11:34:42 11:34:46 11:34:47 11:34:52

A. I did the development work on a movie Glory, for Freddie, that was made and released while I was head of his development company -- or while I was his development head. 11:34:55 11:34:58 11:35:05 11:35:08

Q. When you say "Freddie," Freddie Fields, correct? 11:35:09 11:35:10

A. Freddie Fields. I'm sorry. Yes. 1987-1988. I believe the movie went into production in the summer of '88 and maybe was released in '89. I don't remember the exact date. I was not part of the company when he went into production and made the movie. As to the projects that I had, a couple of them came close, but things happen. 11:35:11 11:35:14 11:35:19 11:35:27 11:35:29 11:35:32 11:35:38

Q. Understood. This is Hollywood. 11:35:49

A. Uh-huh. 11:35:51

Q. Okay. So do you have any projects right now that you're working on that are in development at Disney? 11:35:51 11:35:58 11:36:00

A. No. 11:36:01

Q. Do you have any projects that you're working on that are in development with any major studio? 11:36:03 11:36:04 11:36:07

A. No. 11:36:08

Q. Let's talk about the times that you've been employed as an expert witness. Now, the last one 11:36:15 11:36:17

was the, was the Wilson case. That was the frozen trailer case, correct? 11:36:25 11:36:33

A. Yes, as an expert witness. 11:36:35

Q. Okay. And your deposition was taken in that case, correct? 11:36:37 11:36:46

A. Correct. 11:36:47

Q. And you offered an expert report in that case, correct? 11:36:48 11:36:51

A. Correct. 11:36:52

Q. And that was also on behalf of Disney, correct? 11:36:54 11:36:56

A. Yes. And their lawyers. 11:37:01

Q. All right. And who were their lawyers? 11:37:02

A. Jordan Segall and Kelly Klaus. 11:37:08

Q. Is there any -- there was a transcript prepared of your -- there was a transcript prepared of that deposition, correct? 11:37:17 11:37:19 11:37:19

A. Yes. 11:37:22

MR. LOWE: Okay. Jordan, is there any reason that we don't have that transcript of his deposition in that case? 11:37:23 11:37:26 11:37:29

MR. SEGALL: We served responses and objections. They're in there. 11:37:32 11:37:35

MR. LOWE: Oh, okay. I think we might have an issue with that, but we can talk about 11:37:36 11:37:38

that after the deposition, and we'll probably want to reserve our rights, because I do think we're entitled to that. I think it's very relevant.

BY MR. LOWE:

Q. But, anyway, are you aware that in the Wilson case, the Court ruled both on the motion to dismiss and on the summary judgment in favor of the plaintiff on that case?

MR. SEGALL: Calls for a legal conclusion. Lacks foundation.

A. So do I answer that question?

BY MR. LOWE:

Q. You can answer unless he instructs you not to answer it, and actually, I'm not sure he can instruct you not to answer it, because you're technically an independent witness.

A. Okay. I did not hear that they had settled in favor of the plaintiff. What I did know going in was the judge had pretty much dismissed everything except sequence of events in that, in that case.

Q. Well, let me just ask you this so we can kind of cut to the chase. Have you read the Court's opinions in that case either on the motion to

11:37:41
11:37:43
11:37:45
11:37:50
11:37:56
11:37:56
11:37:56
11:38:01
11:38:04
11:38:05
11:38:06
11:38:09
11:38:12
11:38:12
11:38:13
11:38:15
11:38:17
11:38:21
11:38:29
11:38:37
11:38:39
11:38:42
11:38:43
11:38:44
11:38:47

dismiss or the motion for summary judgment? 11:38:51

A. Not for the motions to dismiss. I didn't read that. The motions for summary judgment, I read something, and I don't know whether that was the motion for summary judgment that spelled out what I was supposed to -- that the judge had basically limited the scope of my expert witness report. 11:38:53 11:38:56 11:39:07 11:39:10 11:39:13 11:39:18

Q. And I believe in that case, it was your opinion, was it not, that it was -- 11:39:24 11:39:27

A. I disagreed with the judge. Sorry. 11:39:31

Q. Right. You disagreed with the judge, correct, and I think -- and you also, you took the position that most of what was utilized by Disney in that case were scènes à faire? 11:39:34 11:39:36 11:39:38 11:39:50

A. Yes. 11:39:54

Q. And that's sort of what you said in this case as well, correct? 11:39:54 11:39:55

MR. SEGALL: Argumentative. Misstates the record. 11:39:58 11:39:59

A. Can we back up just a little? 11:40:03

BY MR. LOWE: 11:40:06

Q. Sure. 11:40:06

A. I don't remember exactly what was in my report from back then. There's been a lot of things since then, and I don't remember whether or not I 11:40:13 11:40:16 11:40:19

passed it off as simply scènes à faire, okay? I did an extrinsic test and filtered out the things that were sort of stock and common, and since it was focused on sequence of events, I was more concerned on the arrangement and coordination of the elements and how they played out. 11:40:25 11:40:32 11:40:36 11:40:42 11:40:46 11:40:50

So I can't -- I'm not gonna -- did I mention some things were scènes à faire, stock, common, common elements? Yes, I probably did. Beyond that, I don't really remember. 11:40:55 11:41:00 11:41:06 11:41:10

Q. Okay. Well, hopefully, we'll get your deposition and we'll be able to get into that a little bit with more detail. 11:41:13 11:41:15 11:41:18

Besides that case, the Wilson case, Wilson versus Disney, have you ever testified in any other case -- strike that. 11:41:19 11:41:22 11:41:26

Have you ever offered your opinion in any other case concerning the issue of substantial similarity in a, in a copyright infringement dispute? 11:41:29 11:41:33 11:41:36

A. Yes. 11:41:43

Q. Okay. Tell me about the other times that you've done that. 11:41:45 11:41:46

A. Excuse me. Other times. 1997, all right, a couple of attorneys in the Disney litigation department called me in and asked me to be an expert 11:41:48 11:42:06 11:42:09

witness in a trial case, a case that was going to trial. So we were past summary judgment. We were past anybody. I did not do an expert witness report. I merely testified for two days. I take that back. I may have done a sort of expert witness report, but I don't remember. But I testified for two days. 11:42:15 11:42:20 11:42:24 11:42:32 11:42:37 11:42:43

The case was won by the defendants, and they liked what I did, so from '97 on, I would get called as a consultant to look at cases. Usually what happens is I get a phone call and say read the script, look at that movie and tell us, was there anything taken by the people who made the movie? And I did a number of those cases. 11:42:48 11:42:53 11:43:03 11:43:08 11:43:15 11:43:18 11:43:24

There was another case that I consulted on in '99, but they called me and asked me, is there anything here we've got to worry about? That was -- they wanted an outside independent opinion, and they trusted that I would tell them if there was a problem, they had a problem. 11:43:28 11:43:30 11:43:40 11:43:41 11:43:46 11:43:48

Q. Let me interrupt you there, because I want to make sure I get a complete answer on this, but I do want to interrupt you. Have you ever opined that there was substantial similarity in a copyright infringement case? 11:43:51 11:43:54 11:43:57 11:44:01 11:44:04

MR. SEGALL: Vague and ambiguous. 11:44:07

A. Did I give an opinion that there were similarities that they should investigate or be concerned about? For Disney, at least once. For a couple of other places, more than once -- I mean, for a couple of other places. And that's -- there's one that I remember that I went, oh, yeah. You might want to look at this because of this, this, this and this. 11:44:15 11:44:17 11:44:22 11:44:29 11:44:31 11:44:38 11:44:43

BY MR. LOWE: 11:44:48

Q. What was that? 11:44:48

A. Well, I don't remember. That was back in, geez, '99, 2000, 2001, something like that. The -- over the years, I -- and then Warner Bros. called on a couple. A couple of other people called as well. 11:44:48 11:44:51 11:44:58 11:45:05 11:45:08

Q. All right. So let's see if we can't break this up. So I understand that people call you and they want to consult with you about substantial similarity. How many times have you done that since 1997 when Disney had you testify for those two days at trial? By the way, what case was that? Do you remember? 11:45:10 11:45:12 11:45:15 11:45:19 11:45:24 11:45:28 11:45:30

A. No. Oh, the '97 case -- 11:45:32

Q. Yeah. 11:45:35

A. -- was Sister Act. Sister Act. 11:45:35

Q. Sister Act case. Okay. 11:45:39

And that was the one where you testified about substantial similarity for the defendant, namely for Disney and Disney won. And so, after that, they were like great job. We may want to use you in some other matters, correct? 11:45:39 11:45:41 11:45:43 11:45:47 11:45:51

MR. SEGALL: Objection. Argumentative. 11:45:53

A. Correct. 11:45:57

BY MR. LOWE: 11:45:59

Q. Okay. So since then, how many times has Disney called you and have you consulted? Let's just talk about Disney and consultations, not on credit arbitration proceedings but on copyright infringement proceedings on the issue of substantial similarity. How many times, best estimate? 11:45:59 11:46:03 11:46:07 11:46:12 11:46:16 11:46:19

A. I don't remember a specific number. My best estimate would be probably more than 10, but certainly, certainly less than 20. 11:46:25 11:46:30 11:46:42

Q. Okay. 11:46:45

A. Maybe somewhere between 10 and 15, you know. 11:46:46 11:46:49

Q. Okay. All right. And now, same question for all other studios. 11:46:50 11:46:52

A. Less than 10. Maybe as many as five. 11:47:08

Q. All right. Those are all the times -- well, wait. Are there any other? So now we've got 11:47:15 11:47:17

Disney somewhere between 10 and 20, all other studios somewhere between 1 and 10, and then have we covered all the times that people have hired you as a consultant or have I missed anything? 11:47:20 11:47:25 11:47:29 11:47:32

A. Hired me or approached me? 11:47:39

Q. Well, I mean, I assume you don't start working until someone writes you a check? 11:47:42 11:47:42

A. Those are all the ones that I was hired. 11:47:48 11:47:51

Q. Okay. 11:47:51

A. I've been approached three times by plaintiffs' attorneys. 11:47:51 11:47:52

Q. I've got it. And those you turned down? 11:47:54 11:47:56

A. Yes. 11:47:57

Q. All right. So of those times that the, approximately as much as 30 times that you have been hired as a consultant, is it true that only one time with Disney did you think that there was substantial similarity that needed to be quote/unquote "investigated" and then one time with the other studios? 11:47:57 11:48:11 11:48:14 11:48:21 11:48:25 11:48:26 11:48:32

MR. SEGALL: Objection. Misstates the witness' testimony. 11:48:33 11:48:34

A. The second half of that, there were 11:48:40

probably -- I remember three cases or situations at other studios. The one at Disney is the only one I remember at the moment. There might have been -- there might have been another one. There might have been two more. I don't know. 11:48:42 11:48:50 11:48:53 11:48:55 11:48:58

BY MR. LOWE: 11:49:00

Q. Okay. 11:49:00

A. I don't remember. 11:49:00

Q. Got it. All right. But it's true that you've never issued an expert report ever taking the position that two works were substantially similar, correct? 11:49:01 11:49:03 11:49:08 11:49:12

A. No. 11:49:13

Q. No, that's not correct? 11:49:15

A. I'm sorry. You're asking me if I ever did a report that said these two pieces are substantially similar? 11:49:16 11:49:23 11:49:29

Q. Correct. 11:49:33

A. No. I wouldn't have done that. 11:49:34

Q. It calls for a yes or no answer. 11:49:42

A. Yeah. No. 11:49:43

Q. No. Okay. By the way, the three times that you're approached by plaintiffs' attorneys to, you know, consult on a case, why did you turn those three attorneys, why did you turn them down? 11:49:44 11:49:46 11:49:53 11:49:58

that that you could utilize, do you? There you go. 12:20:32

A. Does that help? 12:20:38

Q. Yeah. Actually, that, that does. 12:20:39

A. Is that better? 12:20:41

Q. Yeah. 12:20:41

A. With the light shining down on my face? 12:20:41

Q. No, no. That's -- I think that's -- I think that's -- I think that's helpful. That's better. 12:20:45 12:20:46 12:20:48

Okay. Back on the record. 12:20:48

Mr. McDonald, what percentage of your income has come from Disney, or one of its affiliates, over the last five years? 12:20:52 12:20:55 12:20:58

A. You are talking about my income as opposed to the income for the household, right? 12:21:12 12:21:13

Q. Right. Your income, correct. 12:21:16

A. Depending on the year, it's probably somewhere in the neighborhood of 50 percent, maybe a little more, maybe a little less, depending on the year. 12:21:18 12:21:22 12:21:26 12:21:28

Q. Would you say an average of 50 percent? 12:21:29

A. Yeah, pretty close. 12:21:34

Q. And then that was for the last five years. Would you say that it was basically the same for the, say, you know, 25 years prior to that or did 12:21:37 12:21:39 12:21:42

it vary? 12:21:49
A. It varied. 12:21:51
Q. Would it -- do you think the average would still come out to 50 percent over the previous 25 years? So I'm basically talking about from 2000, say, 15, through, going backwards, 1990. 12:21:55 12:21:56 12:22:00 12:22:03
MR. SEGALL: That calls for speculation. 12:22:11 12:22:11
BY MR. LOWE: 12:22:15
Q. Best estimate. 12:22:15
A. During the '90s, most of my income, yes, did come from Disney. 12:22:16 12:22:20
Q. During -- 12:22:24
A. 2000 -- 12:22:24
Q. I'm sorry. Let me interrupt up you there. So during -- during the '90s -- 12:22:25 12:22:26
MR. SEGALL: Why don't you let the witness finish his answer? He was about to -- he was about to add a second part to his answer. 12:22:30 12:22:31 12:22:33 12:22:35
MR. LOWE: Okay. 12:22:36
A. During the 2000s, say from 2000 to 2005, '6, '7, it fell off dramatically with the end of the new writers' program. 12:22:37 12:22:41 12:22:48

BY MR. LOWE: 12:22:56
Q. Okay. And then pick back up in 2008? 12:22:56
A. Well, let's say it -- no. It's been pretty consistent since 2008 -- since 2005, '6, '7, '8, yeah. 12:23:01 12:23:13 12:23:18
Q. Okay. And that when you say "consistent," you mean approximately 50 percent average? 12:23:18 12:23:19 12:23:21
A. Yeah. 50 percent is okay. It can be anywhere from 40 to 60. 12:23:24 12:23:27
Q. All right. 12:23:30
A. You want to say 50? Fine. 12:23:30
Q. And, then, in the 1990s, where it was mostly from Disney, would that have been -- would that be a higher percentage during the 1990s? 12:23:32 12:23:35 12:23:37
A. Yes. More like about 70 to 80 percent. 12:23:41
Q. Okay. All right. Now, when were you first contacted about this case? 12:23:54 12:23:56
A. 2017. 12:23:59
Q. And did you start basically maintaining records beginning in 2017 of your -- the time that you were spending on this case? 12:24:06 12:24:08 12:24:12
A. Yes. 12:24:14
Q. By the way, quick question for you. Does -- do any of your other family members work for 12:24:18 12:24:19

extrinsic test process at that point. 12:38:47

Q. And you mentioned the "extrinsic test process." What do you think the extrinsic test process is? 12:38:52 12:38:55 12:38:58

A. Extrinsic test process is copyright laws. You're talking about standards of copyright law, and it's a filtration process. Basically, the idea is to determine the difference between ideas and the expression of ideas, because ideas, to my understanding, are not protectable. 12:39:01 12:39:07 12:39:10 12:39:16 12:39:23 12:39:26

And so I'm supposed to filter out all the elements and dynamics that are more on the idea side of the spectrum than the expression side of the spectrum, stock elements, you know, functioning parts of the story, tropes, generic pieces, things that are highly abstract. 12:39:29 12:39:33 12:39:43 12:39:47 12:39:56 12:40:02

For example, pirate movies have romances, okay? That's an abstract idea, some end-of-the-idea expression spectrum. And so then you go down and say, okay. If you're comparing two, two romance, two pirate films, two romances, then you go down top who's in them? Who's having the romance? Who are they? What do they look like? How's the romance play out? And as you move towards concrete expression of them, then you get to the point where 12:40:06 12:40:11 12:40:18 12:40:23 12:40:26 12:40:30 12:40:33 12:40:38 12:40:41

you go, how similar are they? And, you know, until you get to a concrete expression, the elements aren't necessarily predictable.

Q. And in your analysis, unprotectable elements get filtered out, correct?

A. Correct.

Q. But you are familiar, are you not, with something called a selection and arrangement test?

A. Generally, it's basically the same thing in the, in the extrinsic test is -- oh, shit. Sorry. Excuse me. I apologize. I thought I had disconnected this phone.

Q. No problem.

A. A selection and arrangement.

Q. Right. So were you aware that, for example, in the selection and arrangement test, that nothing actually gets filtered out, that there's -- that, basically, the courts look for patterns and that those patterns can include unprotectable elements? Were you aware of that?

MR. SEGALL: Argumentative. Assumes facts not in evidence and calls for a legal conclusion.

A. Yeah. No. Basically, it all -- it's still part of the extrinsic test. According to what I

read in the Ninth Circuit's judgment, it's still part of the extrinsic test. All it does is diminish the originality issue. So, yeah, you can have tropes or generic stock elements. The key here is how much of those generic stock elements are abstract on the idea side of the idea expression dichotomy. You need to -- yeah. 12:42:15 12:42:20 12:42:25 12:42:31 12:42:34 12:42:39 12:42:47

You can have -- the best example I can give you is from your plaintiffs' script, okay? There's a sequence, pages 64 to 74, where your rascal scoundrels are going -- they're on the island. They're going over alligator pits, fire things. They go through a cave where they have -- a booby trapped cave to get a map piece, and then they have to escape. 12:42:49 12:42:51 12:42:53 12:43:08 12:43:11 12:43:14 12:43:20

Well, those are not particularly original elements. Those are -- many of those elements are right out of Goonies, and those elements are also, go back to Indiana Jones and the Raiders of the Lost Ark or even back to serials from the 1930s or other adventure films. 12:43:25 12:43:28 12:43:31 12:43:35 12:43:40 12:43:46

So the key here isn't that these -- they don't necessarily have to be original. It's the expression of them, concrete expression of, you know, how they are played out scene by scene, beat by beat, that sort of thing. That could be protectable, but in 12:43:51 12:43:55 12:43:57 12:44:02 12:44:10

this particular case, there is nothing about any of that sequence that is in The Curse of the Black Pearl. So, you know, it doesn't matter whether it's creative or original. The originality comes down to the expression of it, the arrangement of it.

BY MR. LOWE:

Q. So and that's your understanding of this selection and arrangement test, correct?

A. Correct.

Q. And when does an idea become an expression of an idea, in your mind?

MR. SEGALL: Calls for a legal conclusion. Vague and ambiguous.

A. When does an idea become the expression of an idea?

BY MR. LOWE:

Q. Yes.

A. It comes down to how it plays out on the screen in detail, beat by beat. What are the characteristics of it? If you're going to talk about a character, the expression of a character, then you have to look at -- and if you're going to compare it to another character, you look at the appearance of the character, the age, the occupation, the relationships they have, the wants, the needs, things

12:44:14 12:44:24 12:44:28 12:44:33 12:44:39 12:44:47 12:44:48 12:44:48 12:44:50 12:44:51 12:45:00 12:45:02 12:45:03 12:45:05 12:45:07 12:45:08 12:45:09 12:45:09 12:45:12 12:45:16 12:45:19 12:45:21 12:45:25 12:45:37 12:45:41

like that. You're gonna get down to specifics, and then you've got to place it in the context of the story. 12:45:42 12:45:44 12:45:46

To get down to that level, now, if there are some similarities, okay. But, basically, it's got to be if you're looking for substantial similarities, you've gotta have -- you've got to look through all of those elements and run them side by side. 12:45:50 12:45:58 12:46:01 12:46:04 12:46:07 12:46:11

Q. And but, but when you do your analysis, you apply a filtration process whereby if you deem something to be unprotectable, it gets filtered out from your analysis from inception, correct? 12:46:19 12:46:20 12:46:24 12:46:26

A. It gets classified as a, either a stock element that is common to the genre, and the question then becomes, if it's common to the genre, then the specific expressions have to be very, very close. Otherwise, you play -- you know, it's about substantial differences as well as -- you're looking at differences and similarities. How different is this character from that character? How different is the scene from that scene or this plot line from that plot line? 12:46:34 12:46:40 12:46:48 12:46:52 12:46:54 12:46:59 12:47:02 12:47:05 12:47:08 12:47:13

Q. Right. That's a -- looking at similarities to determine whether they're actually 12:47:14 12:47:21

similarities or not or whether they're actually different from, so different from each other that they're not similarities, I understand that that's part of your analysis, but my first question is: Are you filtering out what you deem to be unprotectable elements, including ideas? If you deem them to be unprotectable, are you filtering that out of your analysis? 12:47:24 12:47:25 12:47:28 12:47:30 12:47:36 12:47:42 12:47:45 12:47:49

A. Yes. 12:47:50

Q. And when you do that filtration analysis, is there ever anything left after you filter everything up? 12:47:50 12:47:52 12:47:57

MR. SEGALL: Vague and ambiguous. Argumentative. As to "ever" in the context of this -- 12:47:59 12:47:59 12:48:03

BY MR. LOWE: 12:48:03

Q. I'm talking about in his entire 35-year career, after you finish the filtration analysis, has there ever been anything left ever after you filtered out all of what you considered to be the unprotectable elements? 12:48:04 12:48:07 12:48:12 12:48:15 12:48:19

A. I don't remember. 12:48:22

Q. I think if you checked back, you'd find out after you filtered out things that you considered scènes à faire, things that you considered ideas, 12:48:31 12:48:32 12:48:34

things that you considered quote/unquote "stock characters," or whatever they might be, that you will find that there's never anything left after the filtration process is completed. I'll just put that to you. Let me ask you this. In terms of -- 12:48:37 12:48:40 12:48:42 12:48:45 12:48:48

MR. SEGALL: I'm going to lodge an objection that that's argumentative and move to strike it from the record. 12:48:50 12:48:52 12:48:53

MR. LOWE: Fair enough. 12:48:57

BY MR. LOWE: 12:48:58

Q. Before we continue along with your invoice in this case, let me ask you about dissimilarities, okay? So you pointed out, for example, 64 to 74 of our clients, pages 64 to 74 of our script, is just not in the movie at all, right? 12:48:58 12:49:00 12:49:03 12:49:06 12:49:12

A. The elements and the dynamics of the elements, the setting, those are not in Curse of the Black Pearl. 12:49:23 12:49:25 12:49:28

Q. Got it. So and then there are presumably some things in The Curse of the Black Pearl that are not in the screenplay, correct? 12:49:33 12:49:33 12:49:37

A. Please repeat the question. 12:49:43

Q. Sure. There are elements or scenes in The Curse of the Black Pearl which you cannot find at all anything remotely similar in the screenplay, 12:49:44 12:49:50 12:49:54

correct?

A. Correct.

Q. All right. When you were doing your analysis, were you considering any of that?

MR. SEGALL: Vague and ambiguous as to "that."

BY MR. LOWE:

Q. Were you considering dissimilarities? And let me see if I can explain to you what I mean by "dissimilarities." I understand that if we say, you know, this character is similar to this character, that you're going to go in and you're going to check to see if those two characters really, truly are similar or whether there's so many differences between the two characters, one from the screenplay and one from the movie, that they're really not similar, and that analysis, of course, is fine.

What I'm asking about now is whether or not, when you were doing your analysis, you considered elements or scenes that were in the movie, that there was no possible corresponding scene or element in the screenplay.

A. Considered them how?

Q. Did you take that into account in forming your opinion?

A. Yes. 12:51:04

Q. Okay. And we're talking about the latter now, the situation where things that appear in the screenplay -- I'm sorry. Things that appear in the movie we're not even contending were similar. You took those into account when forming your opinion, correct? 12:51:06 12:51:10 12:51:12 12:51:15 12:51:20 12:51:24

MR. SEGALL: Vague and ambiguous. 12:51:26

A. Yeah. You don't understand the question? Please repeat it. 12:51:28 12:51:29

BY MR. LOWE: 12:51:30

Q. I'm trying to -- I'm trying to distinguish between the concept of dissimilarities in two circumstances, okay? There's dissimilarities which potentially negate a similarity, right? And that, obviously, you considered that, but now I'm talking about dissimilarities that were in the movie that plaintiff hasn't even contended were the same. In other words, plaintiff has not contended that that was borrowed or copied, if you will, from our screenplay. Did you consider those at all, those dissimilarities? 12:51:31 12:51:31 12:51:36 12:51:40 12:51:44 12:51:48 12:51:52 12:51:55 12:51:58 12:52:01 12:52:04

MR. SEGALL: Compound. It's vague and ambiguous and bordering on incoherent. 12:52:06 12:52:08

A. I believe I noted them in my report. 12:52:12

Swan is '41. That's Tyrone Power and Maureen O'Hara. And Captain Blood, you know, because you used that as one of your -- you cited it as a foundational piece in the pirate genre. 01:00:49 01:00:54 01:00:58 01:01:07

Q. Captain Blood, what year was that, if you know? 01:01:09 01:01:12

A. '30 -- I think it was '35. 01:01:14

Q. All right. Now, it is your -- it is your opinion that the plaintiffs' screenplay is sufficiently original work, correct? 01:01:21 01:01:25 01:01:28

MR. SEGALL: Calls for a legal conclusion. Vague and ambiguous. 01:01:32 01:01:32

A. Sufficiently original how? 01:01:34

BY MR. LOWE: 01:01:40

Q. You're not -- it is not your opinion that the plaintiffs' work is not original, right? 01:01:41 01:01:41

MR. SEGALL: Again, calls for a legal conclusion, and it's vague and ambiguous. 01:01:44 01:01:47

A. Yes. It is an original work in that it -- its combination, its arrangement of elements is generally original to it. The elements within it, most of them you can find, if not all of them, you can find in other movies, so they are the elements, and some of the dynamics in them are not all that original. 01:01:50 01:01:54 01:02:03 01:02:09 01:02:12 01:02:16 01:02:19

Q. Right, but -- not to interrupt you, but I'm asking you, I'm asking you this question initially prior to December 2nd, 2020. Because, I mean, obviously, I can see that you spent 93 hours, and a good portion of it appears to be, you know, doing research on the pirate genre, but I'm asking prior to December 2nd, 2020, would you consider yourself an expert in the pirate genre?

A. I'd say I'd had a lot of experience in the pirate genre.

Q. And when you say "a lot of experience in the pirate genre," do you mean basically watching the movies that you previously identified and looking at, I believe, what you identified to be a website called pirateking.com?

MR. SEGALL: Objection. Misstates his testimony.

BY MR. LOWE:

Q. Anything else?

A. Well, there are other websites as well that I researched. And, you know, I don't remember the specifics of what went on between 2005 and 2017, but there were occasions where I went back to review materials, because somebody had a question about something.

A. Counselor, I didn't know anything about this case prior to the fall of August of 2017, absolutely nothing. 02:09:09 02:09:14 02:09:23

Q. Right. 02:09:25

A. As was mentioned earlier, there was a prior pirates case that I had been engaged to do some research and some consulting work on back in 2005. 02:09:27 02:09:31 02:09:37

Q. Right. 02:09:45

A. And I believe that that particular case wandered on for a long time. The specifics I don't know. And, you know -- and every once in a while, I'd get a phone call saying, well, what do you think about this? What do you know about that? 02:09:45 02:09:49 02:09:55 02:10:00 02:10:03

Q. Got it. 02:10:06

A. Specifically what those were, I don't remember. 02:10:07 02:10:16

Q. So prior to December 2nd, 2020, which is the first date on this particular invoice of Exhibit 12, I'm trying to just identify what, you know, what familiarity that you had with the pirate genre, if there is such a thing as a pirate genre, but let's assume, for purposes of discussion, that there is. What familiarity had you had with the pirate genre prior to then? And I think you've already testified to that, and I guess I'm wondering if 02:10:18 02:10:22 02:10:25 02:10:31 02:10:33 02:10:40 02:10:42 02:10:49 02:10:51

there's anything else that you have recalled during the lunch break or anything like that. 02:10:55 02:10:58

MR. SEGALL: Asked and answered. 02:11:01

A. Well, the pirate -- pirate is probably a subgenre of the adventure genre, if you're gonna be -- 02:11:02 02:11:05 02:11:11

Q. Right. 02:11:11

A. -- technical on specifics, but the -- I've seen an awful lot of pirates movies and read some books and -- excuse me. Sorry. 02:11:11 02:11:17 02:11:22

Q. Okay. Well -- 02:11:31

A. My expert -- just given my expertise is in storytelling and screenwriting, that's what I usually get hired for. And if a subject comes up, then I'll do the research to get into that and find out as much about it as I can if, for no other reason, than to make sure that I know what the stock elements, what the common elements are within that genre, so that I can reference them when I try to make a point. 02:11:31 02:11:32 02:11:38 02:11:41 02:11:44 02:11:47 02:11:52 02:11:55

BY MR. LOWE: 02:12:00

Q. All right. So let's go through that. So the eight hours on 12/2, that was reviewing case materials and researching a few pirate movies. Any idea what those pirate movies were? 02:12:01 02:12:05 02:12:11 02:12:15

A. Those specific pirate movies? No. But 02:12:18

Pirates was a book that gave biographies on most of the well-known pirates of the time and -- like Blackbeard, like Henry Avery, like Anne Bonny, like Mary Read, et cetera, et cetera. 02:17:51 02:17:55 02:18:01 02:18:05

Q. I see. So Cordingly and 1724, this is basically nonfiction research about pirates? 02:18:09 02:18:14

A. The historic -- the history of pirates. 02:18:17

Q. Got it. 02:18:19

A. The history of pirates in both fiction and nonfiction. 02:18:19 02:18:21

Q. Okay. So both, both these books included the history of pirates in fiction as well? 02:18:26 02:18:28

A. No. Only Cordingly's book. 02:18:35

Q. Okay. 02:18:37

A. The General History of Pirates is a nonfiction book about real pirates and real piracy and the culture of real piracy. 02:18:37 02:18:42 02:18:46

Q. Okay. And, then, what about Wikipedia? What was that? What did you look on that? 02:18:49 02:18:52

A. Well, just sort of general -- well, I looked at specific things like buried treasure and piracy. And, let's see, what else? Those are the only things I can think of off the top of my head. But anything that involved -- the idea behind it was to find out how common stock elements were and/or 02:18:56 02:18:58 02:19:10 02:19:13 02:19:16 02:19:21

where they, where they started. Some of the stuff -- I'm an information junky, so I search around as much as I can for stuff. 02:19:28 02:19:34 02:19:37

Q. But you understand that things that may have happened in history with respect to pirates does not necessarily mean that that becomes some sort of scène à faire in pirate literature or movies, correct? 02:19:39 02:19:42 02:19:48 02:19:54

MR. SEGALL: Calls for a legal conclusion. 02:20:02 02:20:03

A. Well, there are elements in real life that -- with real pirates, pirate ships, pirate flags, buried treasure, sword fights, the pirate's code. These were all real things that have been used in fiction over the years. 02:20:04 02:20:08 02:20:13 02:20:23 02:20:28

BY MR. LOWE: 02:20:30

Q. Okay. All right. And we'll get to that. And then on February 12th, it says, "writing/researching my historical perspective." What do you mean by "historical perspective"? 02:20:31 02:20:32 02:20:37 02:20:42

A. I drafted out. As part of my research process, I drafted out, basically, a historical perspective of the culture of things that had happened, a general summary of what had happened in the last 300 years in the, in the genre, in the fiction genre of pirate stories and plays and films 02:20:45 02:20:51 02:20:58 02:21:02 02:21:05 02:21:12

as not being a question. Why don't you stick to questions, Steve?

MR. LOWE: Absolutely. Absolutely.

BY MR. LOWE:

Q. So based upon this review of these movies and everything, what is your opinion as to the scènes à faire in the pirate genre? Do you have a list of them?

MR. SEGALL: Vague, ambiguous. Calls for a narrative response. Calls for speculation.

A. Do I have a specific list of them?

BY MR. LOWE:

Q. Yeah.

A. No, I don't have a specific list. There are a number of things that I could kind of rattle off, if you like, but those things that are quite common in the pirate genre.

Q. Sure. Rattle off. Rattle them off.

A. Buried treasures, treasure maps, skull islands, skulls, skeletons, ghost pirates, zombie ghost pirates, heros, dashing heros like Errol Flynn in Captain Blood and -- oh, Against All Flags. That was another film that I looked at recently. The -- let's see.

02:27:48 02:27:51 02:27:52 02:27:53 02:27:54 02:27:55 02:28:01 02:28:07 02:28:08 02:28:09 02:28:12 02:28:13 02:28:16 02:28:17 02:28:17 02:28:25 02:28:28 02:28:33 02:28:36 02:28:41 02:28:45 02:28:52 02:29:03 02:29:07 02:29:12

The daughter or niece or relative of the Governor of Port Royal being kidnapped showed up in at least two or three films. Often, there were films that had an aristocratic lady who was being kidnapped. There was always going to be an antagonist, a villain who would be -- the hero has to vanquish, depending on what they were fighting over. Some of it was battling the British, freeing political prisoners. That's in Raiders of the Lost -- of the Seven Seas and in Crimson Pirate. There's treasures, treasure caves, you know, drunken pirates. At the moment, that's it. 02:29:22 02:29:25 02:29:30 02:29:34 02:29:39 02:29:44 02:29:51 02:29:56 02:30:08 02:30:15 02:30:27 02:30:34

Q. That's good. If you think of any more, you can feel free to tell me. But let's, let's figure out how, first how you determined whether something was a scène à faire. First of all, you've already testified as to, you know, your understanding of what the definition of a scène à faire is. How did you, for example, determine that something was a scène à faire of the ones you just rattled off? If it appeared in two or more previous works, did that make it a scène à faire? 02:30:39 02:30:42 02:30:44 02:30:47 02:30:47 02:30:54 02:30:58 02:31:02 02:31:05 02:31:09

MR. SEGALL: It's a compound question. 02:31:13

A. If I find it in two or three, it's probably in a few more. There -- you know, the key is 02:31:17 02:31:20

understanding and you did bring this understanding to your analysis that the selection and arrangement of unprotectable elements can be protectable, right?

MR. SEGALL: Calls for a legal conclusion.

A. Repeat the question again. I think we talked about this earlier.

BY MR. LOWE:

Q. We did, and I've just got a couple more questions about it. It is your, was your understanding, and you did bring this to your analysis, that the selection and arrangement of unprotectable elements can be protectable?

MR. SEGALL: Renew --

THE WITNESS: I'm sorry, Jordan. What did you say?

MR. SEGALL: I just was renewing the objection, Jim. You can answer.

THE WITNESS: Okay.

A. Yes. On a limited basis, yeah. The elements don't have to be unique or original. It's the arrangement on the level of expression that has to be unique and original, and it has to be very specific.

02:52:59 02:53:01 02:53:02 02:53:10 02:53:10 02:53:14 02:53:15 02:53:17 02:53:17 02:53:20 02:53:22 02:53:24 02:53:26 02:53:30 02:53:33 02:53:35 02:53:36 02:53:38 02:53:41 02:53:41 02:53:48 02:53:52 02:53:57 02:54:03

BY MR. LOWE: 02:54:04

Q. Well, it doesn't need to be unique, though, does it? 02:54:05

MR. SEGALL: Steve. Steve, please let him finish his answer. 02:54:07

MR. LOWE: Oh, I thought he was. 02:54:11

BY MR. LOWE: 02:54:12

Q. Go ahead. 02:54:12

A. Well, if you take five elements that are all very common elements and you put them together in a particular way, that would be a unique assembly. And, yes, if that's the assembly, then, yes, on a narrow basis, that -- I understand that would be protectable within someone's screenplay. 02:54:13

Now, if you're gonna compare that unique assembly to another screenplay or movie, then you've got to get -- you know, you've got to get the stock elements that are not original. They've got to be pretty close, and the arrangement has to be very close to be -- so that they -- you know, it's how similar are they? Are they substantially similar or are just they vaguely similar? 02:54:41

BY MR. LOWE: 02:55:12

Q. Okay. But is it your opinion that it is has to be a unique arrangement? 02:55:13

A. By the very nature of creating it, it is a unique arrangement unless they copied somebody else in specific. 02:55:22 02:55:25 02:55:27

Q. Well, do you understand the difference between the concept of originality and uniqueness? 02:55:30 02:55:31

MR. SEGALL: Calls for a legal conclusion, and it's vague and ambiguous. 02:55:38 02:55:39

A. Okay. Go back to your -- that would be pretty close together. Usually, unique comes with -- oh, dear. I'm getting an unstable internet connection. Did anybody else get that? 02:55:41 02:55:45 02:55:52 02:55:56

Q. I -- mine's fine. 02:56:00

A. Yeah. Mine should be. I apologize if for some reason it shouldn't. I'm sitting right next to the router. Yeah. The question -- let's back up. I lost my train of thought. I'm sorry. 02:56:03 02:56:06 02:56:10 02:56:23

Q. All right. Well, let me ask you another question, then, so -- although related. 02:56:26 02:56:28

So were you, when you were doing your analysis, were you looking for selection in arrangement, original selections and arrangements of unprotectable elements that might have been repeated in the Pirates of the Caribbean film? 02:56:33 02:56:39 02:56:43 02:56:49 02:56:54

A. Yes. I would have been doing that as part of the extrinsic test, but you're looking at the 02:57:01 02:57:03

whole thing on a whole holistic level as to, yeah, there are generally similar stock elements in both works, but they are on such an abstract level of expression that they are not substantially similar. 02:57:07 02:57:15 02:57:22 02:57:27

Q. So but were you looking for original selection arrangements or were you looking for unique selection arrangements? 02:57:36 02:57:38 02:57:43

MR. SEGALL: That's vague and ambiguous. 02:57:46 02:57:46

A. I was looking for similar arrangements. 02:57:50

BY MR. LOWE: 02:57:54

Q. Okay. 02:57:55

A. They didn't have to be unique or original, you know, just how similar or how different were they. 02:57:55 02:58:00 02:58:04

Q. And how many times did you read the screenplay before you did your analysis? "The screenplay" meaning the plaintiffs' screenplay. 02:58:12 02:58:14 02:58:15

A. Well, I read through it once, and then by the time I started the second time, I was breaking down the scenes in it so that I could work from my breakdown, and that was back in 2017. And in what -- in December or January, when I was asked to do a report, I went back through the whole thing again. I pulled up my notes from 2017, moved them to the 2020 02:58:19 02:58:22 02:58:29 02:58:31 02:58:47 02:58:57 02:59:01

grinning and smirking.

A. Grinning. Oh. So a pirate grins? There are a lot of pirates who grin. There's a whole bunch of them on the ride at Disneyland.

Q. So -- so even though --

A. Those are very vague descriptions.

Q. Right. But he was described in the screenplay as charismatic in an evil way, correct?

A. Correct.

Q. All right. But you disagreed with that? You didn't think -- you didn't find him to be charismatic in an evil way?

A. Not in the context of his actions and interactions and words.

Q. All right. Now, can we say that that's -- might have been a subjective opinion on your part?

MR. SEGALL: Argumentative.

MR. LOWE: I'll withdraw that. Never mind.

BY MR. LOWE:

Q. Okay. were you instructed on any facts by your counsel in this case, anything that you, either on the law -- were you instructed on the law, were you instructed -- were there any things that you

03:02:10 03:02:11 03:02:14 03:02:17 03:02:23 03:02:25 03:02:28 03:02:29 03:02:34 03:02:34 03:02:35 03:02:39 03:02:41 03:02:43 03:02:44 03:02:48 03:02:51 03:02:53 03:02:57 03:02:59 03:03:05 03:03:06 03:03:07 03:03:12 03:03:18

were instructed by counsel in this case that you kind of took as a given when doing your report, whether it be on a factual issue or a legal issue? 03:03:20 03:03:23 03:03:27

MR. SEGALL: Vague and ambiguous and compound, and I would caution the witness not to reveal the substance of attorney communications except to the extent they involve specific legal or factual assumptions you were asked to make in connection with your opinions. 03:03:32 03:03:32 03:03:34 03:03:36 03:03:40 03:03:42 03:03:44

MR. LOWE: Yeah. I would agree. 03:03:45

A. Beyond explaining the extrinsic test to me at one point and discussing the specifics of that, he -- the -- your selection and arrangement, what would you call it? Selection and arrangement part of the extrinsic test or case that was referred to in the appeals court decision, and so I -- yes, that was generally explained to me. 03:03:54 03:03:57 03:04:03 03:04:17 03:04:19 03:04:29 03:04:38

Most of the time, you know, as far as the legal stuff goes, that's really something that I leave to the attorneys. My expertise comes in comparing two works, their similarities and their differences, and how you categorize those differences, and trying to find how substantial the differences and the similarities are. 03:04:48 03:04:49 03:04:52 03:04:56 03:05:00 03:05:04 03:05:16

And it really comes back to the whole, as I talked about earlier, the idea expression spectrum. You know, if you're looking at something at 40,000 feet, they all look the same, you know. Until you get down into the, into the details at ground level and start looking at the specifics of the characters, the specifics of the plot, the specifics of the settings and the themes, and you then break it down there as to similar and difference -- similarities and differences. 03:05:17 03:05:19 03:05:20 03:05:23 03:05:27 03:05:32 03:05:34 03:05:39 03:05:44 03:05:46

And then you look at the whole picture as to how they interact with each other, again, I go back to stories are about elements and their dynamics. And the dynamics and those elements, the expression of them, the specific expression of them, those are the things that you compare, you know. 03:05:51 03:05:53 03:05:57 03:06:02 03:06:05 03:06:08

Q. And along those lines, when you're talking about the expression of something, it doesn't -- the two don't have to be identical for you to consider something similar, right? 03:06:14 03:06:15 03:06:18 03:06:21

A. No. 03:06:23

Q. Yeah. So, for example, if there's a character in one movie of approximately the same age and has a lot of the same characteristics and the similar, you know, appearance, but maybe has one or 03:06:23 03:06:29 03:06:34 03:06:39

two minor differences between those characters, would you consider those two characters similar enough to consider that in your analysis as a character that's similar in both? 03:06:45 03:06:47 03:06:51 03:06:55

MR. SEGALL: I'm going to object that that's an incomplete hypothetical. 03:06:57 03:06:58

A. Well, again, it comes back to, yes, they could be similar. The question is: How substantial is that similarity? And if it's just a superficial similarity, then it may not be substantial enough to, to be protectable. 03:07:00 03:07:02 03:07:05 03:07:11 03:07:16

BY MR. LOWE: 03:07:23

Q. Okay. So getting back to Captain Nefarious, for example, as an example, it is true that Captain Nefarious, even though being the villain in the plaintiffs' work, is humorous and funny, correct, at times? 03:07:24 03:07:24 03:07:29 03:07:33 03:07:37

A. I don't think so. I didn't find him at all funny. This is a guy who walks in the room and kills people. He's basically sadistic in his actions and his words. He -- you know, like I said, he plays more like the villain in Cutthroat Island. I don't remember him saying anything funny. He wasn't the one who was saying funny things, and most of the funny stuff was being said by the kids, who were basically 03:07:38 03:07:42 03:07:45 03:07:51 03:07:57 03:08:12 03:08:13 03:08:15

your central characters. 03:08:18

One of the things I did on Sunday was when I went back and read through the whole thing, it's an old trick that writers do when they're trying to get credit is they count up scenes and words and lines, and I went through and I counted how many pages the kids show up on, and it's somewhere in the neighborhood of 58, many of them all by themselves. And your villain only shows up on about 41, and your hero only shows up on about 45, and your heroine only shows up on about 35. 03:08:23 03:08:25 03:08:28 03:08:32 03:08:36 03:08:38 03:08:41 03:08:45 03:08:52 03:08:55

And the kids are the ones who are driving the whole story. They're the ones going after the map. They're the ones who steal it. They're the ones -- everybody seems to be following them all the way to the treasure cave. Those are -- you know, that's -- that's this guy's original take on this story. You can like it or not. The kids are the ones that are humorous. They're the ones who are pulling off the slapstick comedy. I didn't find the villain to be humorous at all, and the heroine and the hero weren't terribly humorous either. 03:08:57 03:08:59 03:09:03 03:09:05 03:09:08 03:09:13 03:09:18 03:09:23 03:09:26 03:09:32 03:09:45

Q. So have you ever heard the expression that a plagiarist cannot excuse his wrong by showing how much he did not pirate? 03:09:49 03:09:50 03:09:56

MR. SEGALL: Calls for speculation. Lack of foundation. 03:09:58
A. I've never -- I've never heard that expression. 03:10:02
BY MR. LOWE: 03:10:04
Q. And you've never -- you've never been advised of that law by your counsel, correct? 03:10:05
A. There's a law? 03:10:10
Q. Yes. 03:10:11
A. Okay. Okay. There's a law. 03:10:12
Q. All right. So no one's ever told you that you should be focusing on the similarities and determining whether there's substantial enough similarity without regard to whether there may also be some dissimilarities? And, again, I'm distinguishing, as I did earlier in this deposition, between dissimilarities that might negate a similarity versus dissimilarities that are in addition to the alleged similarity. Do you understand that distinction? 03:10:20
MR. SEGALL: It's vague and ambiguous, misstates facts, and calls for a legal conclusion. 03:10:52
A. Look, it seems like you're splitting legal hairs here. You got to look at this thing as a whole picture. You pull, you outline -- I outline the 03:11:03

similarities and the differences. The similarities -- differences, I don't know about negating similarities, whether they do or they don't, but similarities, you look at them and say, okay. How similar are these in -- on the spectrum of idea to expression, how similar are they and, you know, in the context of the story, in the context of the scene. I remember -- you know, in the context of a sequence of events or actions. You know, similar, okay? 03:11:15 03:11:18 03:11:25 03:11:28 03:11:34 03:11:39 03:11:47 03:11:54 03:12:03

The -- there's a part of the plaintiffs' script, and I think I detail it in my report, that -- where the pirates come into the port, and they disembark from their ship, and they go ashore. And they go looking for Davy Jones, and they eventually find him, and there's -- then these privateers show up and start pounding the town. And I think Romàn was comparing this to The Curse of the Black Pearl, and, yeah, there are some similarities there. 03:12:16 03:12:17 03:12:20 03:12:30 03:12:36 03:12:41 03:12:46 03:12:53 03:12:59 03:13:05

You've got ships attacking a port, but -- and, you know, you had pirates on the port, and then you had people stealing ships and leaving. But in the context of the story, if you get down to the specifics, yes, there is some similarity there. Substantial similarity? No, I don't think so, 03:13:05 03:13:07 03:13:15 03:13:21 03:13:24 03:13:27

something stock or common or familiar recognizable. Pirate captains are a recognizable idea. Who they are, how they act, you know, that's where you get down beyond the level of idea and down to the level, you know, on the spectrum between idea and expression. Sorry. I do that a lot.

BY MR. LOWE:

Q. I don't think you answered my question. You're not opining that a pirate captain losing his ship is somehow a scène à faire, correct?

MR. SEGALL: Asked and answered. Calls for a legal conclusion. Vague and ambiguous.

A. It strikes me as something that probably is, but I don't know.

BY MR. LOWE:

Q. All right. So just to finish up in terms of the similarities, I understand you're saying your talking point, if you will, is that Davy Jones is a traditional hero character while Jack Sparrow is an anti-hero, but separate and apart from that, you have agreed that they both drink quite a bit, correct?

A. Uh-huh.

Q. Yes?

A. Drinking pirates, though, would be a --

Q. I'm sorry.

should switch to him. 03:51:09

THE WITNESS: Oh, okay. 03:51:12

BY MR. LOWE: 03:51:14

Q. Okay. So, previously, we were talking about whether or not Phantom Jack Nefarious is humorous, if he's -- is he a funny character? Is he charismatic? And I believe you said "no," right? Do you recall that testimony? 03:51:15 03:51:17 03:51:26 03:51:34 03:51:36

A. I don't -- I didn't find him humorous. I found him brutal and sort of uncaring about the people around him. He's monofocused on getting the map and getting his treasure and killing anyone who got in his way. 03:51:37 03:51:38 03:51:44 03:51:51 03:51:55

Q. Okay. Well, we've now put up pages 78 and 79 of the screenplay. 03:51:59 03:52:02

MR. SEGALL: Steve, are you marking this as an exhibit? 03:52:07 03:52:08

MR. LOWE: Yeah. Oh, let's mark the screenplay as Exhibit 13, please. 03:52:12 03:52:13

(Exhibit 13 was marked for identification.) 03:52:16 03:52:16

BY MR. LOWE: 03:52:16

Q. Now, I don't think I need to necessarily read it into the record, although I could. Why don't we first, everyone, read pages 78 and 79 to 03:52:28 03:52:29 03:52:38

themselves, and then I'm going to ask you whether or not you think that this Jack is humorous and/or funny on these two pages. Thank you for blowing it up. 03:52:43 03:52:46 03:52:57

A. You need to scroll up a little more. I'm sorry. Scroll down. 03:53:18 03:53:20

Q. Scroll down. 03:53:26

A. Surprisingly, the Phantom breaks out in laughter. He's laughing at the kids because he finds them -- 03:53:35 03:53:38 03:53:49

Q. Uh-huh. 03:53:59

COURT REPORTER: He finds them what? I didn't hear that. 03:53:59 03:54:01

A. Funny. I'm sorry. He finds them funny. It doesn't necessarily make him funny. 03:54:02 03:54:03

BY MR. LOWE: 03:54:06

Q. All right. Keep reading. 03:54:08

A. Okay. 03:54:23

Q. You don't think this interchange here about, "Lad, I'm beginning to like you, but I'm afraid I'm going to have to kill you" is humorous? 03:54:24 03:54:26 03:54:29

A. Sure. A light-hearted, humorous moment. But by and large, okay, you've picked out one line, one small scene. Most of the humor in this scene comes from the kids, not him. 03:54:37 03:54:40 03:54:44 03:54:48

Q. Well, I mean, he is described early on 03:54:51

character's name? 03:56:18
A. Hector Barbossa. 03:56:19
Q. And Hector Barbossa, in Curse of the Black Pearl, would you describe him as charismatic in an evil way? 03:56:23 03:56:27 03:56:33
A. He could be described -- well, evil, yeah. He could be described as charismatic in an evil way. Again, a fairly superficial comparison. 03:56:35 03:56:37 03:56:42
Q. I understand. All right. 03:56:47
Now, it's your position, is it not, that there were no undead pirates, if you will, in the plaintiffs' screenplay, correct? 03:56:50 03:56:56 03:57:02
A. It doesn't seem that there were any undead pirates in the Pirates' screenplay. He describes them as skull-head pirates. The skeletons that are on the ship, those are just skeletons, as far as I remember. 03:57:05 03:57:07 03:57:12 03:57:19 03:57:25
I'm having trouble here because all I'm seeing is me. Excuse me. 03:57:26 03:57:30
Q. Well, why don't we take this -- 03:57:34
A. There. Hang on just a sec. Okay. Got it. All right. Thank you. Forgive me for being a little slower here with the technology, but I've finally got a picture of you, Jordan and Susan. 03:57:37 03:57:39 03:57:42 03:57:46
Q. Oh, fantastic. 03:57:50

So, first of all, you said there were skull-head pirates, right, and those were the pirates that paint their faces like skulls, correct? 03:57:51 03:57:52 03:57:55

A. Right. That was his -- that's Nefarious' crew, and I don't believe they're dead, maybe because he shoots one of them and kills it, and Davy Jones kills a couple. 03:57:58 03:58:00 03:58:05 03:58:08

Q. Uh-huh. And, then, let's go to page 31 of the screenplay. 03:58:11 03:58:18

MS. HILVERT: Steven, it's actually on page 32, which is up right -- 03:58:57 03:58:58

MR. LOWE: Okay. All right. I'm looking for the part about "The Ghost Who Sails," "Jack, the Undead." 03:59:00 03:59:13 03:59:16

MS. HILVERT: Oh, okay. You're right. Yeah, that's on 31. 03:59:23 03:59:24

MR. LOWE: All right. 03:59:27

BY MR. LOWE: 03:59:39

Q. All right. Do you see -- wait. Can you go to the top there? You see there where it says, "The Ghost Who Sails"? 03:59:40 03:59:41 03:59:45

A. Uh-huh. 03:59:52

Q. Yes? 03:59:52

A. Yes. 03:59:52

Q. They're referring to Jack Nefarious, 03:59:53

correct? 03:59:55

A. They're referring to him. That doesn't necessarily mean he's a ghost. 03:59:55 04:00:03

Q. And then they call him -- 04:00:03

A. They are perceiving him to be a ghost. 04:00:03

Q. Understood. They're perceiving him to be a ghost. And then they refer to him as the Phantom Jack, right? 04:00:06 04:00:07 04:00:11

A. Yes. 04:00:18

Q. And then another character refers to him as the Phantom of the Seas, right? 04:00:18 04:00:19

A. Uh-huh. 04:00:21

Q. Yes? 04:00:21

A. Correct. 04:00:21

Q. And then another character refers to him as Jack the Undead, correct? 04:00:22 04:00:24

A. Correct. 04:00:26

Q. So, I mean, there's the actual appearance of the word "undead." Do you agree with me that there is actual undead pirates in the screenplay? 04:00:26 04:00:34 04:00:38

A. No, I don't. All they're doing is talking about them being undead. That doesn't make them undead. There is nothing anywhere else that I remember in this screenplay that indicates or shows that they are actually undead or skeletons. There are 04:00:42 04:00:44 04:00:47 04:00:52 04:00:59

skeletons on the ship that the kids are playing with, but those skeletons are just that, skeletons. They are not animated characters. They are not animated. They are not characters. They're just props. The -- 04:01:04 04:01:08 04:01:12 04:01:14

Q. It's not enough for you -- all right. Go ahead. 04:01:18 04:01:18

A. You know, there's a difference between, you know, promoting yourself as being a ghost or a phantom, or something like that, and actually being a ghost or a phantom, and I didn't get any indication in this script that that was the case, that Jack was actually a ghost or a phantom. He talks about it, but he also dies at the end, and he bleeds, you know. 04:01:19 04:01:23 04:01:28 04:01:32 04:01:37 04:01:41 04:01:47

Q. So you wouldn't say we're splitting hairs on this one? 04:01:55 04:01:57

A. No. I don't think he's dead. 04:01:59

Q. So undead? Undead? 04:02:07

A. I'm sorry. What? 04:02:09

Q. Let's go to page 93. Let me know -- are we there? 04:02:10 04:02:31

A. It doesn't look like it. 04:02:38

MS. HILVERT: It's actually on page 94, Steven. It's right here. 04:02:41 04:02:44

MR. LOWE: Oh, okay. Yeah. Thank you. 04:02:44

BY MR. LOWE:

Q. So do you see where James says, "Now that we've all died once, let's see who dies harder"? Do you see that?

A. Uh-huh.

Q. Yes?

A. Yes, I do.

Q. Okay. What's the significance of that, in your mind?

MR. SEGALL: Calls for speculation.

A. I don't feel that it's significant at all. It's just a comment. There's no -- there's nothing to support the fact that they actually died once before. It could be just that, you know, she says -- you know, it could have been, well, we all escaped death once before. But, okay. If she's saying she died once before, and now it's a question of do they die again harder, one sentence?

BY MR. LOWE:

Q. It's more than one sentence. We've pointed out other places. What about the skull-faced pirates? So the skull-faced pirates aren't enough to suggest to you that that's substantially similar to the skull pirate, faced pirates in Pirates of the Caribbean?

A. No. They are decidedly different. The skull -- the skull-faced pirates, it appear as -- I even think it's described as being painted on, one. Two, the pirates in the, in the Caribbean, the cursed pirates in the movie, they don't show up as skeletons unless they're in the moonlight. That's decidedly different. Your skull-faced pirates, they die. You know, they get shot and killed, or stabbed, or something like that, which indicates to me that they're not dead. They're just painting themselves up to be ghost-like to scare people. 04:03:59 04:04:04 04:04:07 04:04:15 04:04:20 04:04:25 04:04:28 04:04:35 04:04:40 04:04:43 04:04:49

Q. Right. But for something to be substantially similar, they don't need to be identical, right? 04:04:52 04:04:55 04:04:58

MR. SEGALL: Vague and ambiguous. 04:05:00

BY MR. LOWE: 04:05:02

A. They don't need to be identical? 04:05:03

Q. Yeah. I mean, when you were doing your analysis, you weren't looking for identical matches, right, if something could be substantially similar without being identical, correct? 04:05:04 04:05:05 04:05:09 04:05:12

A. Yes, something can be substantially similar without being identical, but in this case, I don't feel that those pirates in their appearances are substantially similar to the others, because the 04:05:15 04:05:19 04:05:22 04:05:28

others all look like regular, ordinary pirates until they hit the moonlight, and then, all of a sudden, they're skeletons. 04:05:32 04:05:35 04:05:37

The other part of it is, okay, how do these pirates act, react and where -- you know, what's happening in the context of the story. Yeah. Your -- it's not a substantial similarity, as far as I'm concerned. 04:05:39 04:05:45 04:05:47 04:05:52 04:05:58

Q. Okay. And so we've pointed out several places where it's actually referred to as -- Jack Nefarious is referred to as undead or having died. Why don't we go to page 32, the song that the pirates sing. Let's see if you see if there's any significance to this. I don't know that I'll ever be able to convince you. 04:05:59 04:06:05 04:06:09 04:06:15 04:06:20 04:06:23 04:06:25

MR. SEGALL: I'm going to move to strike all of this nonquestion editorializing by counsel. 04:06:28 04:06:28 04:06:31

A. You should have asked the question, if these were supposed to be ghost pirates, why didn't the writer specifically state that they are ghost pirates in the descriptions and things like that? He's just talking about people, the kids, who think they are. 04:06:47 04:06:48 04:06:52 04:06:56 04:06:58 04:07:03

BY MR. LOWE:

Q. Okay.

A. He could have very easily put in that these guys were ghosts, but he didn't.

Q. Okay. What about the marching pirate song where they say "a phantom's life, indeed"? See that on page 30? I believe this is 32, although I see page 39 at the bottom.

A. "Yo ho, a phantom's life indeed. We bury, abduct, we sin and slay. Avast ye scurvys, yo ho!"

Q. Phantoms of the night?

A. Okay. They're singing a song.

Q. Right. And they're describing themselves as phantoms. True?

A. True.

Q. Okay. How would you describe a phantom?

A. A phantom would be a ghost. It's another name for ghost.

Q. Okay. All right.

A. But they're using phantom in this case as an adjective, a phantom's life, okay? So they're playing at the life of being a ghost, not necessarily being a ghost.

BY MR. LOWE: 04:34:29

Q. Okay. So explain it to me like I'm a 10-year-old. What did you find to be protectable in the plaintiffs' work? 04:34:30 04:34:36 04:34:38

MR. SEGALL: Again, that calls for a narrative, and it's vague and ambiguous. 04:34:42 04:34:42

A. I think that anything that would be protectable -- I didn't find anything that was so original that I couldn't find recognizable in another film or story in the plaintiffs' screenplay. The -- unless you're -- you know, as to what's protectable, the specific descriptions that they have, I guess. I'm sorry. I shouldn't be guessing. 04:34:47 04:34:49 04:34:53 04:35:02 04:35:12 04:35:21 04:35:26

No. I can't give you a specific element, or, you know, the way that the sequences were put together, some of them were familiar to other places, but they have their own identity, so they may be protectable, yes. 04:35:32 04:35:37 04:35:44 04:35:47 04:35:53

BY MR. LOWE: 04:35:56

Q. Okay. So isn't that what I just said, that the only thing you found to be protectable in the plaintiffs' screenplay is the selection and arrangement of unprotectable elements? Isn't that an accurate statement? 04:35:57 04:35:57 04:36:01 04:36:04 04:36:09

MR. SEGALL: Misstates the witness' 04:36:10

testimony.

A. I'm not saying it's protectable. I'm saying --

BY MR. LOWE:

Q. It may be protectable?

A. It may be. I don't know.

Q. So it's your -- it's your testimony that there's nothing in the plaintiffs' screenplay that's protectable other than possibly the selection and arrangement of unprotectable elements. Is that your testimony?

A. Very possibly. Or I should say not very possibly but possibly. But if you're talking about this in a vacuum, it only becomes -- the arrangement and the selection only become sort of viable as protectable to me if you're comparing it to something else. You know, I don't -- in the -- in the vacuum, I don't see them as protectable.

Q. You don't see what as protectable? Anything?

A. Anything.

Q. Including the selection and arrangement?

A. Yeah, including the selection and arrangement, unless and where you're gonna compare it

04:36:12 04:36:12 04:36:13 04:36:13 04:36:14 04:36:17 04:36:21 04:36:20 04:36:23 04:36:25 04:36:30 04:36:36 04:36:40 04:36:47 04:36:50 04:36:56 04:37:00 04:37:07 04:37:18 04:37:18 04:37:19 04:37:21 04:37:22 04:37:22 04:37:24

to something else. 04:37:27

Q. So, basically, it's your opinion that there's nothing protectable contained in the plaintiffs' screenplay whatsoever? 04:37:28 04:37:29 04:37:32

A. I'm saying there's nothing substantially similar in the plaintiffs' screenplay to what's in The Curse of the Black Pearl. 04:37:35 04:37:36 04:37:40

Q. That's not what I asked, though. 04:37:45

A. I know. And that "protectable" is more of a legal situation than mine. I'm asked to compare differences and similarities, find substantial similarities between two works. And, you know, if there are -- if I am -- if you're saying, okay, these two things are similar, then I'm going to look at it and say, all right. How similar are they? Are they also stock elements or stock combinations of elements? And I'm looking at the whole thing as, you know, in comparison, not in a vacuum. 04:37:47 04:37:49 04:37:55 04:38:01 04:38:08 04:38:11 04:38:14 04:38:20 04:38:27 04:38:37

Q. Well, but I'm asking you in a vacuum and I'm also -- so, just to -- so we can finish this and move on, is it your opinion that at least the selection and arrangement of elements in plaintiffs' screenplay is an original selection and arrangement and so that's protectable? 04:38:42 04:38:42 04:38:47 04:38:50 04:38:56 04:38:58

MR. SEGALL: It's been asked and 04:39:01

answered multiple times. 04:39:02

A. I can't give you an answer on that because I don't -- it isn't the way -- this is what I was asked to do. I was asked to make comparisons between the two works. 04:39:11 04:39:12 04:39:14 04:39:16

BY MR. LOWE: 04:39:17

Q. If you can't answer it, just say you can't answer it. 04:39:18 04:39:19

A. Okay. Sorry. 04:39:20

Q. You can't answer it? 04:39:21

MR. SEGALL: Steve, he was answering your question. You cut him off in the middle. He was not done with his answer. 04:39:22 04:39:23 04:39:26

BY MR. LOWE: 04:39:28

Q. Can you answer my question or you can't answer my question? 04:39:29 04:39:33

MR. SEGALL: Again, why don't you repeat the question for the record, Steve? 04:39:34 04:39:34

MR. LOWE: Could the court reporter read it back, please? 04:39:35 04:39:35

(The record was read.) 04:40:01

MR. SEGALL: That question is vague and ambiguous as to what elements you're talking about and how they've been selected and arranged. 04:40:02 04:40:04 04:40:05 04:40:07

specific expression, scene by scene, sequence by sequence, character by character, who are the characters. That's what defines the differences. I mean, you're looking for -- if anything that is selected and arranged is protectable, then if you're trying to make any stock type protectable with how you use it, then say, for example, I've got white and black, and I'm going to create a painting, okay? 04:45:00 04:45:06 04:45:08 04:45:11 04:45:21 04:45:31 04:45:37 04:45:42

If somebody else has white and black and creates the same painting, does that make them -- you know, is my black and white painting protectable against any and other all black and white paintings? No. It would come down to the specific design within the painting. What's the painting about? What's the story line? That sort of thing. 04:45:47 04:45:50 04:45:54 04:46:05 04:46:08 04:46:10 04:46:13

BY MR. LOWE: 04:46:17

Q. Do paintings have story lines? 04:46:19

A. Some can, yeah. 04:46:20

Q. All right. 04:46:22

A. Usually, if you think of a painting as capturing an event. 04:46:24 04:46:27

Q. Have you ever testified -- I may have asked you this. Have you ever testified the two works are substantially similar? 04:46:31 04:46:35 04:46:40

MR. SEGALL: Asked and answered. 04:46:41

A. Testified? Like I said, this is my second deposition, and the only other time I have testified was in the Sister Act case in '97. 04:46:49 04:46:51 04:46:53

BY MR. LOWE: 04:47:00

Q. Well, okay. What about the Wilson case? 04:47:01 04:47:04

A. That's what I said, other than that one and this one and the other one -- 04:47:06 04:47:08

Q. So every time -- 04:47:12

A. -- in terms of when I've ever testified. 04:47:13 04:47:15

Q. Right. So the only times you've ever testified, you've determined that the works were not substantially similar, correct? 04:47:15 04:47:18 04:47:21

A. Within the parameters of -- yes. Within the parameters of what I was asked in the Wilson case, yes. 04:47:26 04:47:30 04:47:34

Q. And so what about issuing an expert report? Have you ever issued an expert report the two works were substantially similar? 04:47:35 04:47:42 04:47:46

A. No. 04:47:48

MR. LOWE: Okay. All right. Let's take a five-minute break. I may -- oh, let me just ask a few questions. 04:47:52 04:48:00 04:48:02

BY MR. LOWE: 04:48:04
Q. You've seen the Pirates of the Caribbean ride, right? 04:48:05 04:48:09
A. It's been a long time since I've been on the ride. 04:48:10 04:48:13
BY MR. LOWE: 04:48:14
Q. Okay. Does the ride have a story, in your opinion? 04:48:14 04:48:16
A. It's a collection of scenes that pull together a whole bunch of tropes. I don't remember now what the introduction to the whole thing is. But, so I don't remember if there is a specific story line to the ride, but I believe that, you know, they may have put one together. 04:48:17 04:48:27 04:48:31 04:48:33 04:48:44 04:48:46
Q. But you don't recall? 04:48:49
A. No, I don't. 04:48:52
Q. And when was the last time you've been on the ride, Pirates of the Caribbean? 04:48:54 04:48:55
A. Probably about 12 years ago. 10, 12 years ago when my granddaughter was about eight, seven, I think. 04:49:03 04:49:07 04:49:10
Q. Okay. So that puts you at what, 2009? 04:49:12
A. Yeah. Probably somewhere between 2000 -- she would have been six, seven -- probably somewhere between 2007 and 2010. 04:49:18 04:49:21 04:49:26

STATE OF ______________________________ )
) SS.
COUNTY OF ______________________________ )

I, the undersigned, declare under penalty of perjury that I have read the foregoing transcript, and I have made any corrections, additions or deletions that I was desirous of making; that the foregoing is a true and correct transcript of my testimony contained therein.

EXECUTED this ________ day of ________________, __________, at ________________, ________________.
(City) (State)

________________________________
JAMES MCDONALD

C E R T I F I C A T E

State of Ohio :
: SS
County of Hamilton :

I, Susan M. Gee, RMR, CRR, the undersigned, a duly commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, JAMES MCDONALD was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by JAMES MCDONALD; that said deposition was taken in all respects pursuant to stipulations of counsel; that I am neither a relative of nor employee of any of their parties or their counsel, and have no interest whatever in the result of the action; that signature was requested; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I have hereunto set my hand and official seal of office at Cincinnati, Ohio, on this 13th day of July, 2021.

My commission expires: September 20, 2025.

S/ Susan M. Gee, RMR, CRR
Notary Public - State of Ohio
Commission No.: 2015-RE-532638

# EXHIBIT P

JORDAN D. SEGALL (State Bar No. 281102)
Jordan.Segall@mto.com
MARK R. YOHALEM (State Bar No. 243596)
Mark.Yohalem@mto.com
ROBIN S. GRAY (State Bar No. 316544)
Robin.Gray@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Walt Disney Pictures*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

ARTHUR LEE ALFRED, II et al.,

Plaintiffs,

v.

WALT DISNEY PICTURES,

Defendant,

Case No. 2:18-CV-08074-CBM-ASx

**NOTICE OF ERRATA RE: DEPOSITION TRANSCRIPT OF JAMES MCDONALD**

Judge: Hon. Consuelo Marshall

TO THE COURT AND ALL PARTIES:

On June 16, 2021, James McDonald provided his deposition testimony in the above captioned case. A transcript of his deposition testimony was made available to him on July 14, 2021. Pursuant to Federal Rule Civil Procedure 30(e)(1), Mr. McDonald hereby submits an Errata to his deposition transcript dated June 16, 2021 (attached hereto as **Exhibit A**).

DATED: August 11, 2021

Respectfully submitted,
MUNGER, TOLLES & OLSON LLP

By: */s/ Jordan D. Segall*
Jordan D. Segall

*Attorneys for Defendant Walt Disney Pictures*

# EXHIBIT A

**Errata to Deposition Transcript (James McDonald)**

June 16, 2021
*Alfred, II, et al. v. Walt Disney Pictures* (Case No. 2:18-cv-08074-CBM-ASx)

| Page:Line | Change From | Change To | Reason |
|---|---|---|---|
| 2:17 | 301 | 302 | Reflect accurate address of witness (*See* 7:7-9) |
| 3:17, 5:24, 5:25, 55:9, 55:12, 57:25, 63:6, 63:7, 63:8, 63:16, 74:20 | Frederickson | Frederiksen | Correct spelling |
| 20:24 | write credit | writing credit | Correct mistranscription |
| 20:25 | write credit | writing credit | Correct mistranscription |
| 37:25 | standard | standing | Correct mistranscription |
| 39:16 | write credit | writing credit | Correct mistranscription |
| 39:17 | write credit | writing credit | Correct mistranscription |
| 49:3 | case in the 2021 case. I | case, and the 2021 case, I | Correct mistranscription |
| 72:9 | You | I | Correct mistranscription |
| 98:25 | 1630 | 1730 | Correct misstatement |
| 100:22 | oldmovie.com | allmovie.com | Correct mistranscription |
| 146:14 | Pirates' | Plaintiffs' | Correct misstatement / mistranscription |
| | | | |

I hereby approve the above-referenced deposition transcript by signing below.

Date: August 10, 2021

Signature: [signature]
James McDonald

**PROOF OF SERVICE**

*Arthur Lee Alfred, II, et al v. Walt Disney Pictures*
Case No. 2:18-CV-08074-CBM-AS

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 350 South Grand Avenue, Fiftieth Floor, Los Angeles, CA 90071-3426.

On August 11, 2021, I served true copies of the following document(s) described as

**NOTICE OF ERRATA RE: DEPOSITION TRANSCRIPT OF JAMES MCDONALD**

on the interested parties in this action as follows:

STEVEN T. LOWE
steven@lowelaw.com
ALEKSANDRA HILVERT
aleksandra@lowelaw.com
LOWE & ASSOCIATES
8383 Wilshire Boulevard, Suite 1038
Beverly Hills, CA 90211
Tel: (310) 477-5811

*Attorneys for Plaintiffs*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address Robin.Gray@mto.com to the persons at the e-mail addresses listed in the Service List after such parties agreed to electronic service pursuant to Fed.R.Civ. P. 5(b)(2)(E). I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on August 11, 2021, at Los Angeles, California.

*/s/ Robin Gray*

Robin Gray

# EXHIBIT Q

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

ARTHUR LEE ALFRED, II, et al.,

Plaintiffs,

vs. Case No. 2:18-cv-08074-CBM-AS

THE WALT DISNEY COMPANY, et al.,

Defendants.

---

REMOTE VIDEOTAPED DEPOSITION OF JAMES MCDONALD
VOLUME I
Los Angeles, California
Friday, September 3, 2021

Reported by:
DENISE MARLOW
CSR No. 11631
Job No. 4771081
PAGES 1 - 59

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ARTHUR LEE ALFRED, II, et al.,

Plaintiffs,

vs.

Case No. 2:18-cv-08074-CBM-AS

THE WALT DISNEY COMPANY, et al.,

Defendants.

---

Remote Videotaped Deposition of JAMES MCDONALD, taken at Los Angeles, California, commencing at 11:09 a.m. and ending at 12:15 p.m. on Friday, September 3, 2021, before Denise Marlow, RPR, CSR No. 11631.

APPEARANCES:

FOR PLAINTIFFS:

LOWE & ASSOCIATES
BY: STEVEN T. LOWE, ESQ.
ALEKSANDRA HILVERT, ESQ.
8383 Wilshire Boulevard
Beverly Hills, California 90211
(310) 477-5811
steven@lowelaw.com
aleksandra@lowelaw.com

FOR DEFENDANT:

MUNGER TOLLES & OLSON LLP
BY: JORDAN SEGALL, ESQ.
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
(213) 683-9208
jordan.segall@mto.com

ALSO PRESENT:

KAREN FREDRIKSEN, IN-HOUSE COUNSEL
FOR THE WALT DISNEY COMPANY

MICHAEL ABALOS, VIDEOGRAPHER

I N D E X

FRIDAY, SEPTEMBER 3, 2021

WITNESS

JAMES MCDONALD

EXAMINATION BY PAGE

Mr. Lowe .................................. 7

JAMES MCDONALD

Alfred, II, et al. v. The Walt Disney Co., et al.

Friday, September 3, 2021

INDEX TO EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 15 | "Wilson v. Disney" Order Granting in Part and Denying in Part the Motion to Dismiss | 11 |
| Exhibit 16 | "Wilson v. Disney" Expert Report | 8 |
| Exhibit 17 | "Wilson v. Disney" Rebuttal Report of James McDonald | 26 |
| Exhibit 18 | "Wilson v. Disney" Order Denying Cross-Motions for Summary Judgment | 29 |
| Exhibit 19 | Disney Substantial SS Document | 17 |
| Exhibit 20 | June 17, 2021, Invoice | 42 |
| Exhibit 21 | "Wilson v. Disney" Deposition of James McDonald | 41 |

You remember it from the last time when we took your deposition in June. Correct? 11:11:29 11:11:32

A. Correct. 11:11:34

Q. All right. I want to go back in time for a minute. I want to bring you back to the year 2015 and in particular February or January of 2015. Do you remember preparing an expert report in the case of Wilson versus Disney? 11:11:34 11:11:37 11:11:40 11:11:50 11:11:52

A. Yes. 11:11:56

(Exhibit 16 marked) 11:11:56

BY MR. LOWE: 11:11:56

Q. Okay. Let's just get that for the record, Exhibit 16. Why don't you take a look at it and see if this is in fact your -- your expert report? 11:11:56 11:12:02 11:12:05

MR. LOWE: I guess, Aleks, you're going to share it? 11:12:13 11:12:16

MS. HILVERT: Yes, I'm trying to. One second. 11:12:19 11:12:21

MR. LOWE: Good. 11:12:23

MS. HILVERT: Apologies. 11:12:27

You guys see -- do you guys see anything on the screen? 11:12:45 11:12:45

THE WITNESS: No, sorry. 11:12:45

MR. LOWE: Not yet. 11:12:45

MS. HILVERT: Okay. Hold on. Hold on. You 11:12:46

THE WITNESS: Yes. 11:13:50

MR. LOWE: Yes. 11:13:52

MS. HILVERT: Okay. Apologies. 11:13:53

MR. LOWE: Terrific. So why don't you scroll through it real quick, at least to the signature line, so Mr. McDonald can tell us whether he thinks this is his report from February. 11:13:54 11:13:57 11:14:00 11:14:04

THE WITNESS: That's mine. 11:14:09

BY MR. LOWE: 11:14:13

Q. Okay. Well, you can tell already, but let's just go to your signature line, Mr. McDonald. 11:14:13 11:14:15

All right. So is -- is Exhibit 16 a true and accurate copy of your expert report in the Wilson versus Disney case executed on February 9th, 2015? 11:14:32 11:14:33 11:14:33 11:14:35

A. Yes. 11:14:37

Q. Okay. Now, at the time that you had -- that you prepared this report, you had already read the Court's opinion on a motion to dismiss in this case. Correct? 11:14:37 11:14:41 11:14:49 11:14:53

MR. SEGALL: Objection. Lacks foundation, vague and ambiguous. 11:14:55 11:14:57

THE WITNESS: The -- I believe I did, yes. 11:14:59

BY MR. LOWE: 11:15:03

Q. Okay. And in fact you say -- you mentioned 11:15:03

the Court opinion. 11:15:05

MR. LOWE: Scroll up a little bit. 11:15:06

THE WITNESS: Yeah. 11:15:10

BY MR. LOWE: 11:15:10

Q. You also have a section -- 11:15:11

A. Yes, I read -- I read it. 11:15:13

MR. LOWE: Okay. Just, you know, keep going, Aleks, please. Let's just make sure. 11:15:16 11:15:18

BY MR. LOWE: 11:15:20

Q. Court's ruling, and that's the July 30th, 2014, Court ruling? Correct? 11:15:20 11:15:22

A. Correct. 11:15:28

Q. All right. All right. So let's -- let's bring that up now. 11:15:29 11:15:31

MR. LOWE: Can you bring up -- well, first -- yeah, that's right. Let's -- yeah, let's bring up Exhibit 15. 11:15:41 11:15:41 11:15:41

(Exhibit 15 marked) 11:15:42

MS. HILVERT: Okay. 11:15:43

All right. Can you see that? 11:15:49

THE WITNESS: Yes. 11:15:51

MR. LOWE: Yes. It's actually perfect. 11:15:51

BY MR. LOWE: 11:15:55

Q. So -- so I want you to scroll down to the bottom of the first page. 11:15:56 11:15:58

Q. Did you read the L.A. Printex case before you prepared your -- your report, Exhibit 16? 11:18:13 11:18:16
A. No. No. 11:18:19
Q. No, you did not? 11:18:20
A. No, I did not. 11:18:21
Q. Well, did -- did anyone ever advise you as to the holdings of the L.A. Printex case? 11:18:21 11:18:24
A. No. 11:18:27
Q. Okay. So then you went ahead and prepared a report without reading a case that the Court had relied upon for making one of its holdings in the motion for motion to dismiss ruling? 11:18:28 11:18:34 11:18:37 11:18:40
MR. SEGALL: Asked and answered. 11:18:45
THE WITNESS: Yes. 11:18:51
BY MR. LOWE: 11:18:51
Q. Okay. Has anyone ever advised you that the L.A. Printex case stands for the fact that one of its holdings is that -- that nonprotectable elements may form a pattern such that nonprotectable elements are considered under something called the selection, coordination and arrangement test? Has anyone ever told you about that? 11:18:52 11:18:55 11:18:58 11:19:01 11:19:05 11:19:08 11:19:11
MR. SEGALL: Assumes facts not in evidence, calls for a legal conclusion, and lacks foundation. 11:19:13 11:19:15
THE WITNESS: Not in regard to the L.A. 11:19:21

Printex Industries case, no. 11:19:23

BY MR. LOWE: 11:19:26

Q. Okay. Has -- when did somebody tell you that? Or strike that. 11:19:27 11:19:30

Has anyone ever told you that? 11:19:33

MR. SEGALL: Vague and ambiguous as to "that." 11:19:36 11:19:36

BY MR. LOWE: 11:19:37

Q. All right. Let me clean it up for the record. 11:19:38 11:19:40

You understand that the selection and arrangement test, also called the selection, coordination, and arrangement test considers unprotectable elements and looks for a pattern in order to conclude that there is a protectable expression and potentially infringement. Is that -- is that your understanding? 11:19:42 11:19:46 11:19:49 11:19:53 11:19:56 11:19:59 11:20:04

A. Yes. 11:20:05

Q. Okay. And -- and -- and how did you come upon that understanding? 11:20:09 11:20:11

MR. SEGALL: Assumes facts not in evidence and calls for a legal conclusion. 11:20:13 11:20:15

THE WITNESS: Specifically when or how, I -- 11:20:21

BY MR. LOWE: 11:20:23

Q. When and how? 11:20:24

A. I don't know -- I don't know. 11:20:27
Q. Okay. 11:20:28
A. I've known about it for a while. 11:20:29
Q. Okay. Do you think you knew about it when you looked at this judge's opinion citing to the L.A. Printex case in 2014 before you prepared Exhibit 16? 11:20:32 11:20:34 11:20:37 11:20:42
MR. SEGALL: Calls for speculation. 11:20:44
THE WITNESS: In truth, I don't remember. 11:20:49
BY MR. LOWE: 11:20:51
Q. Okay. 11:20:52
A. I'm -- Mr. Lowe, I'm not a lawyer, so those things, as we talked about back on June 16th, my job is to use the extrinsic test and go through and find similarities and how substantial are they. I understand the selection arrangement part of it, but as to when specifically I learned about it, I don't remember. I'm sorry. 11:20:52 11:20:56 11:21:00 11:21:05 11:21:08 11:21:17 11:21:24
Q. Okay. 11:21:26
A. That issue never came up in this case. 11:21:26
Q. I'm sorry? 11:21:28
A. No one ever brought that issue up in -- to me in this case. 11:21:30 11:21:33
Q. Right. And in fact, you did receive some written instructions on the law in this case, namely 11:21:34 11:21:39

the Wilson case. Correct? 11:21:43

A. Some -- you mean the extrinsic test, the -- the outline of what the extrinsic test is, yes. 11:21:45 11:21:50

Q. Okay. And let's just -- let's jump to that for a second. That is the Exhibit 19. 11:21:54 11:21:56

(Exhibit 19 marked) 11:22:04

MR. LOWE: Can we put Exhibit 19 up, please? 11:22:07

(Telephone Interruption) 11:22:21

MR. LOWE: Sorry. Hopefully somebody will get that soon. There we go. 11:22:22 11:22:23

BY MR. LOWE: 11:22:28

Q. All right. I will represent to you that this was a document that was -- 11:22:29 11:22:31

MR. LOWE: Can you scroll down, please? 11:22:32

MS. HILVERT: Sorry, do you guys see the bar, my zoom bar? 11:22:35 11:22:37

THE WITNESS: Yes. 11:22:42

MS. HILVERT: Oh. 11:22:42

THE WITNESS: No. No. 11:22:45

MS. HILVERT: No. You just needed one document. Right? 11:22:45 11:22:45

THE WITNESS: No. Well, there's a couple of documents on the left. 11:22:46 11:22:47

MS. HILVERT: Okay. I see. 11:22:50

All right. Tell me when to keep scrolling, 11:22:52

Steven. 11:22:56

BY MR. LOWE: 11:23:00

Q. Yeah. So this -- this was produced to us in this case. It -- it -- it bears Bates stamp in this case -- it's a little complicated because this was produced in the other case and it was produced in this case, so I'm going to try to simplify it. 11:23:00 11:23:02 11:23:03 11:23:06 11:23:07

But, Aleks, can you scroll down just a little bit? 11:23:11 11:23:13

MS. HILVERT: Sure. 11:23:15

BY MR. LOWE: 11:23:16

Q. Okay. So you see in this case that this was produced as McDonald Bates Stamp 00127? You see that? 11:23:16 11:23:18 11:23:23

A. Yes. 11:23:23

Q. All right. So let's disregard the fact that it has an exhibit stamp of 204 in the other case, and you know it's the other case because you can see that it's dated February 25th, 2015. You see that? 11:23:24 11:23:26 11:23:30 11:23:33

A. Yes. 11:23:37

Q. Okay. So this -- this was produced in this case. And am I correct that this was the law that you were advised upon in writing in connection with that case, namely, the Wilson case? 11:23:38 11:23:42 11:23:44 11:23:48

A. The -- the law? This was the extrinsic test 11:23:55

analysis. I don't know whether this constitutes a law or not, but this was the guidelines for the extrinsic tests that I was asked to use in analyzing the similarities and differences in the case. 11:23:58 11:24:02 11:24:05 11:24:10

Q. Okay. And so when you say you don't know if this is the law, you do see that it refers to the law. 11:24:14 11:24:17 11:24:19

MR. LOWE: Can we -- can you scroll down a little bit, Aleks? 11:24:20 11:24:22

THE WITNESS: I know it refers to the law, but I -- 11:24:23 11:24:23

BY MR. LOWE: 11:24:24

Q. Right. 11:24:24

A. Yes. Okay. 11:24:24

Q. Okay. 11:24:25

A. I know that -- 11:24:25

MR. SEGALL: Mis- -- that question misstated the document. 11:24:25 11:24:27

BY MR. LOWE: 11:24:28

Q. Okay. And -- and this was provided to you by your attorneys in that case. Correct? 11:24:29 11:24:32

A. Correct. 11:24:34

Q. All right. And in fact, you even produced this in the Wilson case to show what -- how you were instructed on the law in that case. Correct? 11:24:35 11:24:38 11:24:43

A. Correct. 11:24:46

MR. SEGALL: Lacks foundation. 11:24:47

BY MR. LOWE: 11:24:47

Q. And then you see that -- you see that it talks extensively about filtering out unprotectable elements. You see that? 11:24:50 11:24:53 11:24:56

A. Yes. 11:25:01

Q. Okay. And I want you to scroll through the document and see if anywhere in here it mentions this -- what's commonly referred to as a selection and arrangement test. And she's going to go slowly through it, and you tell me if it's in there anywhere. 11:25:02 11:25:04 11:25:06 11:25:10 11:25:14 11:25:15

MS. HILVERT: Let me go up to the top, guys, sorry. Towards the beginning. 11:25:18 11:25:21

THE WITNESS: Would you -- 11:25:25

MR. SEGALL: I'm going to object to the form. I'm going to object that the document speaks for itself. 11:25:26 11:25:28 11:25:32

THE WITNESS: It specifically says "selection and arrangement." 11:25:37 11:25:38

BY MR. LOWE: 11:25:40

Q. Or refers to that test that you can consider unprotectable elements? 11:25:40 11:25:43

A. I don't see it in there, no. 11:25:45

Q. Okay. In fact, it says that you have to -- the instructions you were given was to filter out unprotectable elements, correct, ab initio? 11:25:47 11:25:49 11:25:53

A. Yes. 11:25:58

Q. Okay. So at least in Wilson, at that time you were not instructed in writing with respect to the selection and arrangement test. I notice that in this case you've never produced one of these documents. Have you been instructed in writing since that time, since this -- are you instructed in connection with the Wilson case? 11:25:59 11:26:01 11:26:04 11:26:07 11:26:10 11:26:13 11:26:17

MR. SEGALL: Assumes facts not in evidence. It's compound, and it's vague and ambiguous. 11:26:22 11:26:24

THE WITNESS: I don't understand your question. 11:26:27 11:26:27

BY MR. LOWE: 11:26:27

Q. All right. Let me break it down a little bit. 11:26:28 11:26:30

We know you produced this document, what we're -- what we're calling Exhibit 19 in this case, your -- your guidelines, as you put it, for the -- 11:26:31 11:26:33 11:26:37

A. Right. 11:26:40

Q. -- for the extrinsic test. We know you produced this document in connection with the Wilson case. 11:26:41 11:26:43 11:26:47

A. Correct. 11:26:47

Q. I'll represent to you that you haven't produced a similar document in connection with this case. I'm wondering, between 2015 and now, have you received, either in connection with this case or otherwise, any written instructions regarding the law, like Exhibit 19? 11:26:47 11:26:49 11:26:51 11:26:55 11:26:57 11:27:00

A. I don't believe so, no. I pulled this out as part of formatting my report. 11:27:06 11:27:11

Q. Okay. And so you -- you looked at this -- this same one again in connection with your report in this case, these guidelines, Exhibit 19? 11:27:14 11:27:18 11:27:20

A. I was asked -- I was asked to do an extrinsic test on plaintiff's screenplay and the movie Pirates of the Caribbean. I did my analysis. In fact, since I had been tau- -- since I had been given an organizational format back in 2015 that worked for my clients, I pulled it up and said, Oh, let's put the format at the top of my report. 11:27:23 11:27:25 11:27:29 11:27:36 11:27:42 11:27:47 11:27:55

Q. So you did use the -- you used the same format for your report -- 11:28:00 11:28:03

A. Right. 11:28:04

Q. -- in this case as the one that you used in the Wilson case. Correct? 11:28:04 11:28:07

A. Correct. 11:28:10

Q. All right. But my question was, did -- 11:28:11
A. Did anybody tell me to do it? No. 11:28:13
Q. No, that's not my question. 11:28:17
A. Oh. 11:28:19
Q. This is my question. The question that I asked was whether or not you looked at this document, Exhibit 19, when you were preparing your report in the present case. 11:28:19 11:28:21 11:28:23 11:28:25
A. The -- is -- the outline that Mr. Klaus had given me back in 2'15? Yes. 11:28:27 11:28:37
Q. Okay. And -- and that's Exhibit 19. Right? That's the exhibit that's right in front of you. Correct? 11:28:41 11:28:44 11:28:46
A. Scroll back up. Is this -- is this the one that's -- yeah -- yes, I believe it -- yes. 11:28:47 11:28:49
Q. Yes. Okay. So -- and -- so -- so besides this document, have you been instructed in writing concerning the law in connection with the present case? 11:28:52 11:29:00 11:29:03 11:29:06
MR. SEGALL: Asked and answered. 11:29:09
THE WITNESS: I don't understand the question. 11:29:10 11:29:11
BY MR. LOWE: 11:29:11
Q. Besides this document, Exhibit 19, have you been instructed on the law in writing in connection 11:29:12 11:29:17

with the present case? 11:29:20

MR. SEGALL: Asked and answered. 11:29:24

THE WITNESS: Not that I know of. I'm -- 11:29:25

BY MR. LOWE: 11:29:27

Q. All right. That's fine. 11:29:27

Now, question: Besides Exhibit 19, have you been instructed -- instructed orally in connection with this case regarding the law? "Yes" or "no"? 11:29:31 11:29:36 11:29:38

MR. SEGALL: Again, asked and answered. And I would caution the witness not to reveal the contents of privileged communications in your answer. You can answer "yes" or "no" as to whether you've received oral instructions on the law in connection with the present assignment. 11:29:43 11:29:44 11:29:47 11:29:49 11:29:52 11:29:56

THE WITNESS: Yes. 11:29:58

BY MR. LOWE: 11:29:59

Q. Okay. Okay. Did the oral instructions on the law that you received in connection with the present case, did -- were they anything that's not contained in Exhibit 19? 11:30:00 11:30:13 11:30:15 11:30:18

MR. SEGALL: Vague and ambiguous. 11:30:23

BY MR. LOWE: 11:30:28

Q. Did you learn anything -- 11:30:29

A. I learned about selection and arrangement, yes. 11:30:31 11:30:34

Q. Okay. And so you were orally instructed on selection and arrangement in connection with the present case? 11:30:34 11:30:38 11:30:41

A. Yes. 11:30:41

Q. Okay. And so you -- it is your understanding now, for sure, that you are allowed to consider unprotected elements when doing the analysis under the selection and arrangement test. Yes? 11:30:42 11:30:44 11:30:51 11:30:54 11:30:57

MR. SEGALL: Assumes facts not in evidence and calls for a legal conclusion. 11:30:58 11:31:00

THE WITNESS: Yes. 11:31:04

BY MR. LOWE: 11:31:05

Q. Okay. Now, going back to the -- strike that. 11:31:06 11:31:14

And in connection with the present case, have you been apprised of the L.A. -- anything about the L.A. Printex case now? 11:31:16 11:31:18 11:31:20

A. No. This is the first time anybody has pointed it out to me. 11:31:22 11:31:25

Q. Okay. 11:31:27

A. I didn't -- I didn't bother looking through the cases. 11:31:27 11:31:30

Q. I understand -- 11:31:34

A. That's what -- 11:31:37

Q. -- but do you see in Exhibit 19 -- 11:31:40
A. That's what -- 11:31:41
Q. You understand in Exhibit 19 there's a lot of kinds of cases cited. You see that. Right? 11:31:41 11:31:41
A. Correct. 11:31:44
Q. Okay. So you saw -- in 2015 you saw this Court's opinion referring to the L.A. Printex case and the Wilson versus Disney case. We already talked about the fact that you saw that. 11:31:44 11:31:48 11:31:52 11:31:56
Did you know that the Court of Appeals in our case, the Pirates of the Caribbean case, also referred to the L.A. Printex case? 11:31:58 11:32:02 11:32:06
A. I don't remember that. I did read their ruling, but I don't remember them referring to that. 11:32:08 11:32:10
Q. All right. So -- all right. And ultimately it is correct that you submitted another report in connection with the Wilson case that is your rebuttal report, Exhibit 17. 11:32:13 11:32:16 11:32:24 11:32:26
(Exhibit 17 marked) 11:32:29
MR. LOWE: Can we just bring that up? 11:32:30
MS. HILVERT: All right. Do you see it? It should be there. 11:32:33 11:32:58
MR. LOWE: Yeah. Why don't you scroll down to the bottom. 11:32:59 11:33:00

BY MR. LOWE: 11:33:01

Q. And you saw -- you saw that you did another rebuttal report. This is your report. Correct? 11:33:02 11:33:04

A. Yes. That's my report. 11:33:07

Q. All right. And basically your position was that even though the Court had found that the selection -- I'm sorry, the sequence of events was adequate to cont- -- constitute the artistic expression of an idea, you disagreed with the Court on that. Correct? 11:33:08 11:33:13 11:33:17 11:33:26 11:33:29 11:33:32

A. Correct. 11:33:33

Q. All right. And let's just go to actually back to your first report for a minute. Sorry. Go to page 14 of your first report, which is exhibit -- sorry for jumping around -- which is Exhibit 16. 11:33:34 11:33:37 11:33:49 11:33:52

MS. HILVERT: Okay. 11:33:59

MR. LOWE: Go to page 14, please. 11:34:00

MS. HILVERT: All right. 11:34:02

BY MR. LOWE: 11:34:09

Q. You see how you say on the top of the page, "In my opinion, a number of these elements either should be filtered out or are not components of the sequent (sic) of events." 11:34:10 11:34:12 11:34:17 11:34:21

So why, in your opinion, were -- should the Court have filtered out events in the sequence of 11:34:22 11:34:24

events? 11:34:30
MR. SEGALL: Vague and ambiguous. 11:34:33
THE WITNESS: I spelled it out right there because -- mainly because the Court was looking at this on much too high an abstract, general level. He wasn't dealing with concrete expression of what the sequences of events were. 11:34:36 11:34:39 11:34:42 11:34:47 11:34:51
They were sort of cherry-picked. Okay? And you obviously read my report, so the -- my reasoning is -- is right there in black and white. 11:34:55 11:35:01 11:35:05
BY MR. LOWE: 11:35:09
Q. Okay. And so the Court ultimately did not change its ruling on the motion for summary judgment. The Court still found that a reasonable jury could find substantial similarity, at least on a trailer. Right? 11:35:09 11:35:11 11:35:14 11:35:17 11:35:20
(Simultaneous speakers) 11:35:20
MR. SEGALL: Calls for a legal conclusion, lacks foundation. 11:35:26 11:35:28
MR. LOWE: Well, let's -- let's bring it up. 11:35:30
(Reporter clarification) 11:35:30
MR. SEGALL: Calls for a legal conclusion, and lacks foundation. 11:35:30 11:35:30
Jim, just try to pause a second before you answer so we can make sure that I can object to 11:35:31 11:35:33

questions and the court reporter can take it down without us speaking over each other. 11:35:36 11:35:39

THE WITNESS: Okay. Sorry Jordan. 11:35:42

MR. SEGALL: Thank you. No, no. 11:35:45

MR. LOWE: Okay. So let's bring it up, Exhibit 18. 11:35:47 11:35:49

(Exhibit 18 marked) 11:35:50

BY MR. LOWE: 11:35:59

Q. You see that the Court denied the cross-motions for summary judgment? You knew that. Right? 11:36:00 11:36:02 11:36:04

MR. SEGALL: Calls for a legal conclusion. 11:36:05

BY MR. LOWE: 11:36:08

Q. I'm sorry? 11:36:09

A. Actually, no, I never saw this document. 11:36:10

Q. All right. But you -- you said you were apprised that the Court in the Wilson case denied the motions for summary judgment, finding that a reasonable juror could go either way on whether the works were substantially similar? Were you apprised of that? 11:36:16 11:36:17 11:36:22 11:36:25 11:36:28 11:36:30

A. Not back -- 11:36:35

MR. SEGALL: Same objection. 11:36:35

THE WITNESS: Not back in 2015 or '16 or whenever that happened. I got an e-mail saying 11:36:36 11:36:40

they'd settled the case. 11:36:43

BY MR. LOWE: 11:36:45

Q. Okay. 11:36:45

A. That's all I got. 11:36:46

Q. So no one ever told you that the rule -- Court ruled on the motions for summary judgment? 11:36:47 11:36:49

A. I suspect I was told much later, yeah. 11:36:52

Q. Okay. 11:36:56

A. But I didn't get any details as to what the judgment was or what the argument was or what the judge said. 11:36:57 11:37:00 11:37:04

Q. So no one told you that the -- the judge found that a reasonable juror could go either way on whether the two works were substantially similar? 11:37:06 11:37:10 11:37:13

A. No. 11:37:16

MR. SEGALL: Assumes facts not in evidence. 11:37:16

BY MR. LOWE: 11:37:18

Q. Yeah, but you see that now, right? We're showing you it right now. You have no reason to dispute that this is in fact the Court's ruling denying the cross-motion for summary judgment. Correct? 11:37:18 11:37:21 11:37:24 11:37:27 11:37:29

A. Correct. 11:37:30

Q. Okay. And I'll represent to you, if you scroll down to the bottom, that this is dated 11:37:31 11:37:33

April 16th, 2015. 11:37:37
A. Yeah. 11:37:38
Q. See that? 11:37:46
A. Okay. 11:37:47
Q. All right. 11:37:47
A. Yeah. 11:37:47
Q. So -- so -- so can we say that the Court did not adopt your opinion that the two works were not substantially similar? Correct? 11:37:48 11:37:51 11:37:57
MR. SEGALL: Lacks foundation and calls for a legal conclusion. 11:38:03 11:38:04
THE WITNESS: It appears the Court didn't like my argument. 11:38:06 11:38:08
BY MR. LOWE: 11:38:09
Q. And -- 11:38:10
A. I think the Court was wrong. 11:38:11
Q. Understood. 11:38:13
And did you read the judge's decision in this case, the Court of Appeals decision in this case? Have you ever read it? 11:38:14 11:38:16 11:38:19
A. In -- in the current case that you're representing? 11:38:23 11:38:25
Q. Yes. 11:38:27
A. Yes. The Ninth Circuit? 11:38:28
Q. Yeah. 11:38:31

A. Yes. 11:38:31

Q. Okay. And I assume you disagree; you think the -- the -- the three unanimous judges of the Ninth Circuit are also wrong. Correct? 11:38:31 11:38:35 11:38:37

MR. SEGALL: Lacks foundation, vague and ambiguous, calls for a legal conclusion. 11:38:41 11:38:42

THE WITNESS: I disagree with them, yes. 11:38:45

BY MR. LOWE: 11:38:47

Q. Okay. So -- and you're sure of the fact that you're -- you're disagreeing with these two judges, namely, Vince Chhabria and the three justices of the Ninth Circuit on the present case, you're sure that the reason you're disa- -- not -- you're disagreeing with them was not because of your loyalty to Disney. Correct? 11:38:48 11:38:51 11:38:54 11:38:59 11:39:02 11:39:03 11:39:06

A. Correct. 11:39:08

MR. SEGALL: Argumentative. 11:39:09

THE WITNESS: Of course. I am disagreeing with them because I -- I don't find them substantially similar. If I thought for a moment that there was even a doubt as to the substantial similarities, then I would have brought it up to Disney and said, you know, you've got a problem here. But I don't believe it is. 11:39:11 11:39:12 11:39:16 11:39:20 11:39:25 11:39:32 11:39:34

A. Uh-huh. 11:43:21
Q. "Yes"? 11:43:22
A. Yeah. Yes. 11:43:22
Q. Okay. Can -- and you can't reveal any information about that. Right? 11:43:26 11:43:27
A. No. 11:43:29
Q. And prior to that, had that occurred on any prior occasion where you found substantial similarity? 11:43:33 11:43:35 11:43:37
A. I don't remember. If I did it was -- it was a long time ago. 11:43:38 11:43:47
Q. All right. And it is true that in the -- since 1997, in the reports and expert testimony that you've given for Disney, that you in all occasions have found that there is not substantial similarity. Correct? 11:43:48 11:43:49 11:43:56 11:44:00 11:44:03
MR. SEGALL: Lacks foundation, misstates the witness's testimony. 11:44:04 11:44:07
BY MR. LOWE: 11:44:08
Q. Other -- other than that one in 2020, for all of 2020? 11:44:10 11:44:12
A. I don't think I can answer that question in the extreme. There might have been occasions where I said, Here, there are similarities here that you need to consider. It comes back to, Mr. Lowe, 11:44:15 11:44:22 11:44:27 11:44:30

again, all I'm usually asked for is to run a similarity test between properties and tell them how substantial those similarities are. 11:44:34 11:44:45 11:44:48

You know, in the Wilson case and in this case I was asked to play expert witness, be expert witness, because I am an expert, and provide a report for it, a much more detailed report. 11:44:51 11:44:54 11:44:59 11:45:03

Q. I -- I appreciate that. But my question was, besides this one time in 2020, do you remember any other occasion for Disney where you found substantial similarity between a third party's work and a Disney work? 11:45:08 11:45:10 11:45:22 11:45:26 11:45:29

MR. SEGALL: Again, vague and ambiguous as to whether you're talking about his -- in his capacity as a testifying expert or in his capacity as a consultant, or both? 11:45:30 11:45:32 11:45:34 11:45:36

MR. LOWE: Both. 11:45:38

THE WITNESS: I -- I remember one. But it was, again, like 18 or 19 years ago. 11:45:44 11:45:45

BY MR. LOWE: 11:45:47

Q. All right. And what one was that? 11:45:56

A. That -- I can't give you the name of it. It was -- I was -- 11:45:58 11:45:59

Q. Why can't you give a name of it? 11:46:01

A. Because I don't remember it. 11:46:05

MR. LOWE: Aleks? 11:51:05

THE WITNESS: If it's 121 pages, yes, this is mine. 11:51:10

MS. HILVERT: It is. It is 121 pages, you see at the top there. 11:51:10

THE WITNESS: Yes. 11:51:11

BY MR. LOWE: 11:51:12

Q. Okay. 11:51:12

A. Yeah, it's mine. 11:51:12

Q. All right. 11:51:12

MS. HILVERT: Examination by, witness James McDonald. 11:51:14

THE WITNESS: Yeah. Yeah. 11:51:15

MR. LOWE: Thank you. 11:51:17

THE WITNESS: Yes. 11:51:18

(Exhibit 20 marked) 11:51:19

BY MR. LOWE: 11:51:19

Q. All right. And then let's just put Exhibit 20 up, which is your June 2021 invoice. And this is -- is this a true and correct copy of your invoice from June of 2021? 11:51:20

A. Yes. 11:51:48

Q. Okay. This is everything up till your deposition was taken? 11:51:49

A. Yes. 11:51:54

in this case? 12:14:27

A. Yes. 12:14:27

Q. Okay. Were you asked to apply the selection and arrangement test in this case? 12:14:28 12:14:31

MR. SEGALL: And I'm going to object -- object there, again, that the existence of a separate test called the selection and arrangement test, quote/unquote, misstates the law, mischaracterizes the witness's past testimony and assumes facts that are not in evidence. This entire line of questioning has been repeatedly asked and answered. The witness has explained what test he was asked to apply and explained what he did. And this is getting to a point where you're badgering the witness. 12:14:33 12:14:34 12:14:36 12:14:38 12:14:41 12:14:43 12:14:46 12:14:48 12:14:50 12:14:53 12:14:56

MR. LOWE: I'm just trying to get an answer to this one question. He just testified he was asked to apply the filtration test in this case. Now I'm just asking him whether he was also instructed to apply the selection and arrangement, otherwise known as the selection, coordination and arrangement test in this case. 12:14:57 12:14:58 12:15:01 12:15:03 12:15:06 12:15:08 12:15:10

MR. SEGALL: And I restate my objections. 12:15:11

MR. LOWE: Okay. 12:15:13

THE WITNESS: No, not specifically. 12:15:19

REPORTER'S CERTIFICATION

I, the undersigned, a certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that the witness in the foregoing proceedings, prior to testifying, was administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [ X ] was not requested.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 13th day of September, 2021.

Denise Marlow

Denise Marlow, CSR No. 11631

STEVEN T. LOWE, ESQ.

steven@lowelaw.com

September 13, 2021

RE: ALFRED VS. THE WALT DISNEY COMPANY

SEPTEMBER 3, 2021, JAMES MCDONALD, JOB NO. 4771081

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

__ Federal R&S Requested (FRCP 30(e)(1)(B)) — Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

**1. "Substantial Similarity"**

Substantial similarity between the plaintiff's and defendant's works is an essential element of actionable copying. *See Kustoff v. Chaplin*, 120 F.2d 551 (9th Cir. 1941). But only the unique and particular expression of an idea, not the idea itself or other generic elements, is protected by copyright. *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010). When similar works resemble each other only in *unprotected* elements, there is no substantial similarity. *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288, 1294-95 (C.D. Cal. 2008).

**2. Relevant Elements**

In the Ninth Circuit, the "extrinsic test" for substantial similarity in works such as these focuses on "articulable similarities between the **plot, themes, dialogue, mood, setting, pace, characters, and sequence of events** of the two works." *Funky Films, Inc. v. Time Warner Entertainment Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006).

Extrinsic analysis is objective in nature. "[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed." *Id.* In applying the extrinsic test, this court "compares, not the basic plot ideas for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.*

Many plots are similar at a "very high level of generality," But "[g]eneral plot ideas are not protected by copyright law; they remain forever the common property of artistic mankind." See *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Similarities between "concrete renderings" of "detailed sequence[s] of events" are necessary to establish *substantial* similarity between works with the same general idea. *Funky Films*, 462 F.3d at 1081.

**3. Filtration – Elimination of Unprotectable Elements**

**Filtration** is part of "extrinsic analysis": is the process of identifying and discarding unprotectable elements before comparing two works to determine their substantial similarity.

EXHIBIT 204
Deponent McDonald
Date 2-25-15 Rptr. RH
WWW.DEPOBOOK.COM

MCDONALD_000204

- Judge Learned Hand described the "abstractions test" to draw the line between protectable and non-protectable elements, *Nichols v. Universal Pictures Co.*, 45 F.2d 119, 121 (2d Cir. 1930):

> "Upon any work and especially upon a play a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about and at times consist of only its title, but there is a point in this series of abstractions where they are no longer protected since otherwise the playwright could prevent the use of his ideas to which apart from their expression his property is never extended.

- Courts evaluate substantial similarity by first "filtering out" the unprotectable elements and comparing only the protectable elements. *Mattel, Inc.*, 616 F.3d at 913.
- Unprotectable elements includes "ideas, scenes a faire (standard features) and unoriginal components." *Mattel, Inc.*, 616 F.3d at 913.
    - Example: "Many of the other similarities [plaintiff] lists—including depictions of the small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young people on one hand, and conservative or evil bureaucracies on the other—are also unprotectable. These familiar scenes and themes are among the very staples of modern American literature and film. The common use of such stock cannot raise a triable issue of fact on the plaintiff's copyright claim." *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985)

### 3.1 Scenes-a-faire

"Scenes-a-faire" are certain patterns, situations, and scenes that are bound to occur given the parameters of a particular plot. Scenes-a-faire are unprotectable and must be excluded in the filtration analysis.

- "The doctrine of scènes à faire . . . teaches, sensibly enough, that a copyright owner can't prove infringement by pointing to features of his work that are found in the defendant's work as well but that are so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another. *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003)
- "Scenes-a-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement. In *Williams*, for example, we found no infringement because the common elements of electrified fences, automated tours, dinosaur nurseries, and uniformed workers were scenes-a-faire that flowed from the concept of a dinosaur zoo." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002).

**3.2 Merger**

Merger is similar, but not identical, to the scenes-a-faire doctrine. The merger doctrine applies when there is a "merger" of idea and expression, such that a given idea is inseparably tied to a particular expression. In such instances, rigorously protecting the expression would confer a monopoly over the idea itself, so courts disallow it. Generally merger applies when there is only one way or very few ways to express a particular idea.

- "Under the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way, lest there be a monopoly on the underlying idea. In such an instance, it is said that the work's idea and expression 'merge.'" *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000).

- Example: the Ninth Circuit has held that a jewelry pin in the form of a jewel-encrusted bee was only capable of one particular form of "expression." *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738 (9th Cir. 1971).
- "The merger doctrine operates as an exception to the normal idea-expression dichotomy. The doctrine holds that, when there are so few ways of expressing an idea, not even the expression is protected by copyright. To illustrate this point, imagine the symbol often used on public signs displaying a circle with a diagonal line crossed through it. When, for example, an image of a cigarette is centered in the middle of the circle with the line through it, this visual sign expresses the idea that smoking is not allowed. This same symbol is used in a wide variety of contexts to express that something is prohibited, e.g., no swimming, no food or drink, no cell phone. Since there are effectively only a few ways of visually presenting the idea that an activity is not permitted, copyright law would not protect the expression in this case, i.e., the circle with the line through it." *BUC Int'l Corp. v. Int'l Yacht Council Ltd.*, 489 F.3d 1129, 1143 (11th Cir. 2007) .

**3.3 Functional constraints**

In addition to filtering generic or unoriginal elements, ideas, and scenes-a-faire, it is proper to filter out elements where functional considerations in the subject matter or medium selected constrain the author's creative choices.

- "[T]he visual depiction of karate matches is subject to the constraints inherent in the sport of karate itself. The number of combatants, the stance employed by the combatants, established and recognized moves and motions regularly employed in the sport of karate, the regulation of the match by at least one referee or judge, and the manner of scoring by points and half points are among the constraints inherent in the sport of karate. Because

of these constraints, karate is not susceptible of a wholly fanciful presentation. Furthermore, the use of the Commodore computer for a karate game intended for home consumption is subject to various constraints inherent in the use of that computer. Among the constraints are the use of sprites, and a somewhat limited access to color, together with limitations upon the use of multiple colors in one visual image." *Data E. USA, Inc. v. Epyx, Inc.*, 862 F.2d 204, 209 (9th Cir. 1988)

# EXHIBIT R

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Arthur Lee Alfred, II and Ezequiel Martinez, Jr.,<br><br>Plaintiffs,<br><br>v.<br><br>Walt Disney Pictures,<br><br>Defendant. | Case No. 2:18-CV-08074-CBM-AS |

**Expert Report of James McDonald**

**March 30, 2021**

## BACKGROUND AND QUALIFICATIONS

I am a Story Analyst and consultant on screenwriting and writer-credit issues for motion pictures. I have a Bachelor of Arts in Communications from Stanford University and an M.F.A. in Directing for Film & TV from the UCLA Film School.

Over the last four decades, I have worked for every major studio and several other studios and production companies. In that time, I have read and analyzed more than 10,000 submissions for feature film development. I spent two years as vice president in charge of development for an independent production company. As a producer, with partners, I put three feature film projects into development at studios and production companies.

Over the last three decades, I have reviewed and analyzed the development process of more than 90 films and TV series and made recommendations as to writing credits.

My current curriculum vitae is attached to the end of this report.

Within the last five years, I have testified as an expert at one arbitration, the 2016 arbitration case *The Writers Guild of America West, Inc. vs. Touchstone Television Pictures, LLC, ABC Studios and Film 49 Productions, Inc.*, No. 15-CR-0040.

I have prepared and delivered this report in connection with the case *Arthur Lee Alfred, II, et al. v. The Walt Disney Company et al.*, No. CV 18-8074-CBM-ASx, currently pending in the United States District Court for the Central District of California. I have been retained by defense counsel to analyze and testify about the similarities and differences between the Plaintiffs' screenplay *Pirates of the Caribbean* ("Plaintiffs' Screenplay") and the Defendant's feature film *Pirates of the Caribbean: The Curse of the Black Pearl* ("Disney Film" or "*Curse of the Black Pearl*"). I am being compensated for my time spent conducting this analysis at the rate of $200 per hour. In the event that I testify, I will be compensated for my time at the rate of $400 per hour.

## ASSIGNMENT AND APPLICABLE STANDARDS

At defense counsel's request, I have analyzed Plaintiffs' Screenplay and the Disney Film under what I understand to be the standards applicable to the "extrinsic test" for substantial similarity under applicable copyright laws. I have been asked to assume that the extrinsic test requires a comparison of the two works' setting, plot, characters, theme, mood, pace, dialogue, and sequence of events. Further, I understand that I should "filter" out certain unprotectable elements that fall on the "idea" side of the "idea-expression" dichotomy. Within the framework of the filtration standards I have been asked to assume and apply, I have brought to bear my knowledge and experience with respect to the creation and development of stories into motion pictures.

My analysis in this report assumes that the following principles guide the filtration analysis.

I understand that filtration is the process of identifying and discarding unprotectable elements before comparing two works to determine their substantial similarity. As explained to

me, I understand that U.S. Supreme Court Judge Learned Hand described a test of "abstractions" to draw the line between protectable and non-protectable elements. I am informed that Judge Hand described this test as follows: "Upon any work and especially upon a play a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about and at times consist of only its title, but there is a point in this series of abstractions where they are no longer protected since otherwise the playwright could prevent the use of his ideas to which apart from their expression his property is never extended."

I have assumed that, at the extrinsic stage of analysis, unprotectable elements must be filtered out before a court compares the two works. I understand that these unprotectable elements include ideas, expression merged with ideas, *scenes a faire* (or stock scenes and features), features dictated by functional considerations, as well as features that are not original to the copyright plaintiff.

I understand that *scenes a faire* are defined as stock elements that flow from a basic idea. These stock elements may be patterns, motifs, situations, or scenes that are bound to occur given certain story parameters. I also understand that the merger doctrine is similar, but not identical, to the *scenes a faire* doctrine. I understand that the merger doctrine applies when there is a "merger" of idea and expression, such that a given idea is inseparably tied to a particular expression. I further understand that, where functional considerations in the subject matter or medium selected constrain the author's creative choices, the constrained elements must be filtered out.

**MATERIALS AND INFORMATION CONSIDERED**

In conducting my analysis, I have reviewed and considered the following materials:

- Plaintiffs' screenplay *Pirates of the Caribbean*;
- Disney's motion picture *Pirates of the Caribbean: The Curse of the Black Pearl*;
- the Expert Report of David Román attached as Exhibit 6 to Plaintiffs' First Amended Complaint ("Román Expert Report");
- the Court's "Order Re: Defendants' Motion to Dismiss Plaintiffs' Complaint," dated May 13, 2019;
- Plaintiffs' original "Complaint & Jury Demand," including attachments, dated November 14, 2017;
- Plaintiffs' First Amended Complaint, dated November 30, 2020, including the "sizzle reel" included as an exhibit;
- footage of the Disneyland theme park ride "Pirates of the Caribbean" (the "Disneyland Ride"); and
- relevant works in the pirate genre, such as works cited in paragraph 8 of Plaintiffs' original Complaint: *A General History of the Pyrates*, *Robinson Crusoe*, *Treasure Island*, *Peter Pan*, *Captain Singleton*, *The Pirate*, *The Gold-Bug*, *The Coral Island*, and *The Red Rover*, and films cited in paragraph 10 of Plaintiffs' original complaint: *Treasure Island*,

*Peter Pan*, *Savage Island*, *The Buccaneer*, *The Pirate*, *The Island*, *Captain Blood*, *Blackbeard the Pirate*, and *Yellowbeard*. (Some of these works have appeared in multiple media, e.g., a novel, a play, a film.) I have also reviewed *The Goonies*, a pirate film referenced in Plaintiffs' pitch materials that were exhibits to Plaintiffs' original and amended complaints, and *Cutthroat Island*, a pirate film at least indirectly referenced in Plaintiffs' pitch materials.

## SUMMARY OF AFFIRMATIVE AND REBUTTAL OPINIONS

Based on the materials I have reviewed and the analysis that I describe below, I conclude that, especially after filtering out the unprotectable elements of Plaintiffs' Screenplay, there is no substantial similarity between Plaintiffs' Screenplay and the Disney Film at the level of expressive content. This conclusion holds along all of the pertinent dimensions of plot, characters, themes, mood, setting, pace, dialogue, and sequence of events.

I understand that David Román, the Plaintiffs' expert, has stated that his contentions regarding the protectable similarities of expression may be found in his expert report. I therefore have reviewed his report to consider whether the points he raises change my analysis. They do not. In fact, I believe Dr. Román's report reflects a lack of familiarity with the pirate genre in general and of the specific works Plaintiffs state are characteristic of the genre. The similarities and novelties that Dr. Román identifies either do not exist, are common to other pirate films and literature, or exist at such a high level of abstraction that they constitute unprotectable "ideas" instead of the protectable "expression" of those ideas.

## SIMILARITY ANALYSIS

### I. Plaintiffs' Screenplay Is a Generic Combination of Two Well-Known works, *The Goonies* and *Cutthroat Island*

Plaintiffs' Screenplay is about two pirates fighting over the pieces of a map to a lost treasure with the hero winning the battle and ending up with his real treasure, love and family. As Plaintiffs' cover letter describes, at its base, their Screenplay is "'Goonies' meets 'Pirates of the Caribbean.'" (First Amended Complaint, Exhibit 2.) In my opinion, that is in essence all Plaintiffs' Screenplay is.

| *The Goonies* | Plaintiffs' Concept Art | *Cutthroat Island* |
|---|---|---|

Plaintiffs' concept art (above, center), submitted with their pitch materials, further confirms that their Screenplay is merely a pastiche of existing ideas. Plaintiffs prepared and submitted a mock-up poster that literally overlays posters from two well-known pirate-related films—*The Goonies* (above, left) and *Cutthroat Island* (above, right)—adding a few minor elements taken from Disney's Pirates of the Caribbean amusement park attraction. At the center of the concept art is a group of children, huddled together in front of their parents and over a skull atop a pile of treasure—borrowed entirely from *The Goonies* movie poster. And nearer to the top, almost in the background, is the faded center image of the movie poster for *Cutthroat Island*, a film Plaintiffs relied on in creating the concept for their Screenplay.

*The Goonies*, released in 1985, is an iconic film about a group of young misfits who discover a treasure map that takes them on an adventure to find the long-lost treasure of a 17th-century pirate, One-Eyed Willy. In the end, the characters come together and discover the real treasure is love and family.

*Cutthroat Island*, released in 1995, is a pirate film about a female pirate and her con-man companion finding three pieces of a map in a quest to find a hidden island full of treasure (the eponymous "Cutthroat Island"). In the process, the female pirate and her companion find both moral redemption and love in one another.

Plaintiffs' Screenplay is a generic and uninventive combination of these two well-known works.

## II. Plaintiffs' Screenplay and the Disney Film Are Fundamentally Dissimilar in All Respects Relevant to the Extrinsic Test

Though both works under analysis are about pirates in the Caribbean, they tell two different stories with substantially different plots, characters, and relationship dynamics. Plaintiffs' Screenplay is about two pirates fighting over the pieces of a map to an immense

wealth of treasure, with the hero teaming up with a band of child misfits, winning the battle, and ending up with his real treasure, love and family. In the end, the pirate-hero abandons piracy for a respectable family life. Disney's *Curse of the Black Pearl* is about two adult heroes teaming up to rescue the governor's daughter and retake the first hero's ship from cursed, undead pirates intent on lifting the curse. In the end, the curse is lifted; the formerly cursed pirates die or are captured; the pirate-hero gets his ship back *and resumes a life of piracy*; and the non-pirate hero wins the governor's daughter, whom he has long adored.

While both works fall within the pirate genre (and thus feature characteristic scenes from that genre) and both draw upon the Disneyland Ride, they are substantially different. Plaintiffs' Screenplay is a pastiche of *The Goonies*, *Cutthroat Island*, and the Disneyland Ride—heavy on slapstick humor, focusing largely on a group of misfit kids, and ultimately about giving up piracy and treasure-hunting for family life. *Curse of the Black Pearl* is a clever, supernatural story about undead pirates who must break their curse and thus find life (and death) by recovering the last piece of a treasure they stole long ago. The Disney Film's protagonists are drawn *to* piracy, not away from it, and they are all adults. It is not a redemption story but a liberation story. While both works have humor, the humor in Plaintiffs' Screenplay is conventional slapstick humor imitative of *The Goonies*. The Disney Film has more sophisticated humor, embodied in the wry and ludicrous Jack Sparrow, a character unlike anyone in Plaintiffs' Screenplay. As explained more thoroughly below, similarities can be found between the works because they both fall in the pirate genre; but they are not substantially similar, especially once generic elements are filtered out.

I believe that the fundamental differences in the two works are reflected in each of the characteristics relevant to the extrinsic test.

**A. Plot**

If "story" is defined as what a narrative is about, then "plot" is how the elements and dynamics of the story are told—i.e., its narrative structure or story line.

Even though Plaintiffs' Screenplay and the Disney Film's stories are about pirates, the plot differences between the two works are substantial, while the similarities are superficial to the point that the works only share abstract and/or generic ideas. To clearly spell out their similarities and differences, one can apply the paradigmatic three-act plot structure and framework formula.[1] This structure consists of an "inciting incident," which sets up a "conflict" (act one), which is then "complicated" (act two) as it builds to a "climax," which ends with a "resolution" (act three).

1. *Inciting Incident.*

Both plots start at sea with ships, but the ships, the characters and the action are different. Plaintiffs' plot starts with a full-on battle between a pirate ship and a British privateer ship[2]—

[1] On the three-act structure, see Syd Field, *Screenplay* (1979).

[2] Privateers, unlike pirates, operated lawfully under the auspices of a government such as the British crown. Sir Francis Drake, for instance, was a privateer.

reminiscent of the opening of *The Black Swan* (1942)—and ends with the privateer captain, Nefarious, betraying and killing his crew then taking command of the pirate ship as part of his deal with the pirate captain, Davey Jones, with whom he shares a treasure map.

*Curse of the Black Pearl*'s plot starts with a British warship, escorting the new Governor and his daughter, Elizabeth Swan, age ten, to Port Royal, coming upon a burning ship and rescuing an unconscious boy, Will Turner, age ten or eleven, floating on debris in the sea. While watching over Will on deck, Elizabeth finds he's wearing a gold Aztec medallion and thinks the boy is a pirate. As she stands and pockets the medallion, she glimpses a ship with black sails disappearing into the ghostly fog covering the calm seas.

      2.    *Conflict.*

Plaintiffs' plot conflict is set up with Nefarious and Davey each holding half a treasure map and not trusting each other. The action in the prologue has Davey giving his half of the map to his lover, Jane; them getting into a confrontation with Nefarious, who grabs Jane and threatens to throw her overboard if Davey doesn't give him his half of the map; Davey hesitating then giving up the map; Nefarious tossing Jane overboard; a sea monster destroying the ship; and Davey escaping with his half of the map into the rough seas.

  Disney's plot conflict is set up at the beginning of Act I with the introduction of the second male hero, Captain Jack Sparrow, who wants to get his ship, the *Black Pearl*, back; the cursed *Black Pearl* pirates, led by Captain Barbossa, kidnapping Elizabeth, now age eighteen; and the revelation that the pirates need to return the gold medallion to break their curse.

      3.    *Complication.*

The most logical (and common) way to develop plot complications is to introduce obstacles for the characters to overcome. Plaintiffs' Screenplay's complications have Jane coming back into Davey's depressed, drunken life after ten years, betraying him to Nefarious then changing her mind, and helping him escape; the orphan Rascal Scoundrels having to survive a gauntlet of booby traps in a cave to retrieve Nefarious' half of the treasure map then getting caught by Nefarious; Nefarious holding Jane captive for betraying him; and Davey needing to rescue Jane and the Rascal Scoundrels then beat Nefarious and his pirates to the treasure.

*Curse of the Black Pearl*'s complications have Jack and Will escaping jail, stealing the British Navy Commodore Norrington's fastest ship, gathering their own pirate crew, and chasing down the *Black Pearl*; and Barbossa and his pirates discovering they need Will's blood along with the medallion to break the curse. After Jack, Will, and their crew lose a sea battle with the *Black Pearl*, Will gives himself up to Barbossa in return for Jack and Elizabeth's freedom. Barbossa holds the crew captive and maroons Jack and Elizabeth on an island. Jack and Elizabeth are rescued by the Norrington and his men; and Elizabeth promises to marry Norrington if he goes after the pirates and rescues Will.

      4.    *Climax.*

Though the climaxes of both works take place in and around an island cave filled with treasure and have plenty of swashbuckling action (in the grand pirate movie tradition), why the

characters are there and how the action elements and dynamics play out are significantly different. In Plaintiffs' Screenplay, the major battle action takes place on the pirate ship and involves Davey heroically battling Nefarious and his pirates to free Jane and the Rascal Scoundrels. The battle action that takes place in the treasure cave has Nefarious first attacking Jane then dueling Davey while the pirates pop jewels out of the cave wall, fend off the Rascal Scoundrels, and try to stop the water pouring through the holes they've created in the wall; and the climactic sequence ends with Davey defeating Nefarious by pinning him to the wall with a sword then escaping with Jane and the Rascal Scoundrels in a rowboat as the cave fills with water and a sea monster swallows Nefarious, followed by the entire island sinking into the sea.

*Curse of the Black Pearl*'s climactic sequences start with Norrington and his men in rowboats outside the treasure cave entrance waiting to ambush the pirates as they leave. Jack rows into the cave and stops Barbossa from cutting Will's throat over the Aztec treasure chest by telling him that Norrington and his men are outside waiting for them. As he palms a medallion from the chest, Jack talks Barbossa into waiting to lift the curse until after they've defeated Norrington and taken his flagship. Jack then offers a deal where he gets the *Black Pearl* and will sail under Barbossa's flagship colors. While Barbossa's cursed pirates walk across the bottom of the sea and ambush the crew of the flagship, Elizabeth slips away in a rowboat to the *Black Pearl* and frees Jack's captive pirate crew, but can't get them to help her rescue Will. While the crew sail off in the *Black Pearl*, Norrington and his men get back to the ship and battle the cursed pirates, and Jack and Barbossa duel in the treasure cave. As Elizabeth arrives and Will defeats the last remaining pirate in the cave, Jack puts his blood on the medallion and flips it to Will as Barbossa threatens to shoot Elizabeth. Jack shoots Barbossa, who is then surprised to see Will lifting the curse by dropping both medallions with Jack's and his blood into the chest. Back on the ship, the cursed pirates find they are mortal again and surrender.

     5.    *Resolution.*

Plaintiffs' Screenplay ends with the protagonists quitting piracy. Davey, Jane, and the Rascal Scoundrels are rescued by a British privateer ship. Davey and the Rascal Scoundrels leave piracy behind forever to be commissioned as privateers, and are given a ship as reward for ridding the Caribbean of Nefarious. They all sail off with Jane—an ersatz nuclear family—for their next adventure.

*Curse of the Black Pearl* ends with the protagonist *returning* to piracy. At the end of the Disney Film, Jack has been sentenced to hang. Will helps Jack escape the noose with a little distraction from Elizabeth, and Will and Jack take out several soldiers before they are captured on the parapet. Elizabeth then sides with Will and Jack, and the Governor orders his soldiers to lower their weapons. Jack sees a parrot and escapes backwards over the wall into the sea, knowing his *Black Pearl* crew has come for him. The Governor and Commodore accept Elizabeth's choice of life with Will. Significantly, Jack ends the film as a pirate captain of a pirate ship—*not* a privateer—whistling the Ride's iconic "a pirate's life for me" song.

     6.    *Plaintiffs' Alleged Plot Similarities in the Complaint and Expert Report*

I noted that paragraphs 104 through 109 in the First Amended Complaint describe three alleged plot similarities between the two works. None of the ideas reflected in the purported plot

similarities are novel.  And, when one compares the specific expression of the plot elements in the context of their respective scenes, they are substantially different.

In paragraphs 105 and 106, Plaintiffs argue that the scenes in their Screenplay and the Disney Film of pirates heckling women as they are brought aboard are both unique and similar. Pirates heckling women, however, should be filtered out as generic.  In fact, at that level of generality, the idea was already expressed in the Disneyland Ride, which depicted pirates having captured women or pursuing women.  The idea of pirates threatening women with violence is expressed differently in the two works:

- In Plaintiff's Screenplay, Jane kicks Pirate #1 in the groin, which prompts his attack; and then, after Nefarious snaps a whip around Pirate #1's neck and orders him keel-hauled, Jane lunges at Nefarious with her dagger but has to stop when she feels Stitch's pistol in her side and his knife at her throat.

- In the Disney Film, Elizabeth is simply slapped by a pirate, whose arm is then grabbed by Barbossa.

To the extent the similarity Plaintiffs are drawing is a pirate captain restraining mistreatment of a female prisoner by pirates, such scenes are routine in the genre, included in works referenced by Plaintiffs, such as *Captain Blood* (1922 novel; 1935 film).

In paragraph 107, Plaintiffs allege that both works depict male pirates disguising themselves as women to deceive enemies during battle.  The basic idea of pirates dressing up as women is a generic plot idea that should be filtered out.  (This is explained further below in Section III C of this report.)  And again, the specific expression of this idea in each work occur in different circumstances with different characters and different action.  In Plaintiffs' Screenplay, Jane dresses Davey up to try and sneak him past Nefarious and his crew in the port town midway through the plot.  In *Curse of the Black Pearl*, two minor characters, Pintell and Ragetti, are disguised as women in a rowboat to distract the British soldiers just before the climactic battle.

In paragraph 108, Plaintiffs allege that both works contain similar scenes in which the two protagonists take control of their rival's ships.  The idea of taking over a ship is generic to the pirate genre (and indeed to virtually all adventure stories set at sea).  The scenes are also strikingly dissimilar:

- In Plaintiffs' Screenplay, the Rascal Scoundrels are on the pirate ship looking for the map when the British privateers attack the port town.  Davey escapes Nefarious and his men, and then swims to the pirate ship when he sees the boys there and his own ship blown up.

- In *Curse of the Black Pearl*, Elizabeth sneaks off Norrington's flagship as the climactic battle starts, rows to the *Black Pearl*, and frees Jack's pirate crew.  Refusing to go with her to the treasure cave to rescue Will, Jack's pirate crew sails off in the *Black Pearl*.  In the end, they return to collect Jack, who has just escaped the hangman's noose.

Dr. Román argues that the "most obvious" similarity between the works is "the fact that both scripts feature pirate ships with skeleton crews."  (Román Expert Report, p. 11.)  But he does not mention that skeleton or undead pirates are a generic element in pirate stories, including

in the Disneyland Ride that inspired both works. In fact, Plaintiffs' "sizzle reel" included footage of the Ride's skeleton pirates, and it appears that Plaintiffs' inclusion of pirates with painted skeleton faces was intended to superficially link their Screenplay to the Ride. Pirates who are skeletons, ghosts, or undead also appear in well-known works such as the opera *The Flying Dutchman*, the acclaimed comic *Watchmen*, the novel *On Stranger Tides*, the video game *Monkey Island*, and many pirate movies. (This is explained further below in Section III C of this report.)

Also, Dr. Román's description of the works is inaccurate in key respects. For example, in *Curse of the Black Pearl*, Barbossa and his crew *actually are* undead skeletons. The undead pirates appear to be human (and pass themselves off as such), but when struck by moonlight are revealed as skeletons. Being dead already, they cannot be killed until the curse is lifted. In Plaintiffs' Screenplay, by contrast, there are no *actual* skeleton pirates—there are merely pirates who are "ghostly *looking*" with "their faces *painted* into TRIBAL SKULLS," referred to as "skull-faced pirates." In other words, the pirates in Plaintiffs' Screenplay are ordinary humans decorated as skeletons, not vice-versa, and their appearance does not magically change. (The Rascal Scoundrels find skeletons on Nefarious' ship, but they are ordinary inanimate skeletons, not undead pirates.)

**B. Characters**

Along with their physical appearance, age, personality, occupation, and/or social status, characters are defined by their emotional and psychological wants and needs, goals, motivations, beliefs, inner conflicts, talents and shortcomings, and relationships—all of which should change and/or grow through the course of the story.

The few similarities there are between Plaintiffs' Screenplay and the Disney Film's characters and relationships are superficial and generic. None of the characters from Plaintiff's work exist in the Disney Film. And even at the highest level of generality (e.g., "pirate protagonist" or "heroine love interest"), there are characters that do not have a conceivable counterpart in each work. For example, the key characters of the Rascal Scoundrels in Plaintiffs' Screenplay (the *Goonies* half of Plaintiffs' pitch to Disney) lack any counterparts in *Curse of the Black Pearl*; and Governor Swan, Will Turner, and Commodore Norrington in *Curse of the Black Pearl* have no counterparts in Plaintiffs' Screenplay. Also, Plaintiffs' Screenplay's pirate crew is significantly different from both of the pirate crews in *Curse of the Black Pearl*—as noted, Plaintiffs' villainous pirates are ordinary pirates motivated by greed who wear makeup to appear scary, while the *Black Pearl*'s crew are cursed, undead skeletons who are motivated by their desire to lift the curse. The crew assembled by Jack and Will in the Disney Film are not villains at all, but protagonists.

1. *Plaintiffs' Alleged Character Similarities*

Plaintiffs draw comparisons between (1) Davey Jones (Plaintiffs' Screenplay) and Captain Jack Sparrow (Disney Film); (2) Jack Nefarious (Plaintiffs' Screenplay) and Hector Barbossa (Disney Film); (3) the Rascal Scoundrels (Plaintiffs' Screenplay) and Jack Sparrow's "crew" (Disney Film); and (4) Jane (Plaintiffs' Screenplay) and Elizabeth Swan (Disney Film). As explained below, these comparisons are superficial and inaccurate.

(a)     The Protagonists: Davey Jones v. Captain Jack Sparrow

Plaintiffs' Screenplay's **Davey Jones** is an archetypal pirate hero in the tradition of *Captain Blood* (1922 novel; 1935 film), *The Sea Hawk* (1940), and *Against All Flags* (1952).  He is introduced in the Prologue as a cocky "dashing young rogue whose talents in piracy are unsurpassed" then, after losing the love of his life (Jane), becomes a self-pitying, lost drunk until she re-enters his life ten years later.  Jane gives Davey Jones the chance to redeem himself by heroically fighting for what he really wants and needs—Jane and the orphans, not gold.  He has a conscience and a moral compass.  In the end, he renounces piracy and becomes a privateer.  The character arc is very similar to that of Captain Blood, a dashing young rogue who becomes a pirate, falls into drink and despair when he believes he has lost his chance at the love of his life, recovers in order to redeem himself in her eyes, becomes a privateer, and wins her love.  Plaintiffs acknowledged the influence of *Captain Blood* (1922 novel; 1935 film) in their original complaint.

*Curse of the Black Pearl*'s **Jack Sparrow** is a non-traditional hero.  He has no morals and not much of a conscience as he schemes and fights to get his ship back.  Like Davey—and most pirates—he is drunk a lot.  The difference is that Jack drinks for pleasure (a happy drunk) while Davey drinks to forget (a sad, pathetic drunk).  Unlike Davey, Jack has no romantic relationship, and isn't seeking one—he makes crude passes at Elizabeth Swan, but does not seek (or win) her love in *Curse of the Black Pearl*.  In the end, he is still a pirate, which is what he wants to be.  Unlike Davey Jones, he does not become law-abiding, romantically attached, or a father figure to anyone.  Jack's arc is not from pirate to family man, but from ousted pirate captain *back to pirate captain*.  In short, Jack and Davey's wants, needs and motivations are completely different, as are their relationships with the other characters in their stories.

Plaintiffs' claim that Davey Jones and Jack Sparrow are similar focuses on generic personal characteristics: Plaintiffs allege that both men are "cocky," "dashing," "morally ambiguous," "opportunistic," and fond of rum.  (First Amended Complaint, paragraphs 83–84.)  These character traits are too generic to be protectable under the applicable rules and should be filtered out.  Moreover, they largely merge with the idea of a pirate captain.

Dr. Román also opines that the two characters are similar, but his analysis of them is factually inaccurate.  Davey Jones is not introduced as a "disillusioned pirate with a drinking problem."  (Román Expert Report, p. 7.)  In fact, when he is first introduced in the prologue, he is described as a dashing young rogue, "clean-shaven, hair pinned back in a tail," with "unsurpassed" talents.  It isn't until Nefarious betrays him and he loses Jane that he is seen (ten years later) as disillusioned and drunk.  Nor is Davey ever depicted as "morally suspect."  He is introduced as a classic hero, whose disillusionment is easy to understand and empathize with because he blames himself for losing the love of his life, Jane, in the Prologue.  He is clearly the hero, and Plaintiffs' Screenplay encourages the audience to identify with him and root for his redemption.

Jack Sparrow, by contrast, is not young or dashing in an archetypal way (he was portrayed by an actor nearly 40 years of age).  His morality isn't merely "questionable"—he clearly has no morals, as he tells Will at the end of their swordfight.  Jack drinks because he likes

it; not out of self-pity like Davey. In key respects, he is an anti-hero. Davey and Jack are substantially different in their appearance, attitudes, interests, motivations, and relationships.

(b) The Villains: Captain Jack Nefarious v. Captain Hector Barbossa

Plaintiffs' Screenplay's **Jack Nefarious** is an archetypal pirate villain, much like Dawg Brown in *Cutthroat Island* (1995). Like Dawg's character, he is relentlessly focused on getting a map to lost treasure. He's introduced as a "distinguished naval officer and pirate hunter with a savage instinct and sinister nature" then quickly becomes a ruthless killer, who blows up his privateer crew and ship and takes command of Davey's pirate ship and crew. He has no loyalty to anyone or any moral code, as he readily betrays his partnership in the map with Davey. When he re-enters the story as "Phantom Jack," his "ghostly persona" is clad in the classic baroque style of several real pirate captains of the late 1600s. Like the real Blackbeard, he has fuses in his hair and beard, which he uses against privateers who try to capture him. Though he and his crew have been posing as ghosts, they are not actually dead or cursed.

*Curse of the Black Pearl*'s **Hector Barbossa** is defined by two qualities that Jack Nefarious lacks: he is cursed, and he has honor. Barbossa and his crew are cursed to live halfway between life and death, unable to die until the curse is lifted. He can't taste or smell food, and yearns to. In the moonlight, he is revealed to be a skeleton. He and his crew are not motivated by greed, but by a desire to lift the curse and become human again: in an inversion of the classic pirate trope, he and his crew are hunting for treasure not to become wealthy, like a typical pirate (and like Jack Nefarious), but to lift the curse they are under.

Barbossa's second defining characteristic is his honor. He has always been a pirate who lives by the Pirate Code. Unlike Nefarious, his word is his bond when he gives it, and he keeps it. He is loyal to his crew and cooperates with them to lift the curse. Barbossa's relationship with Jack Sparrow is a rivalry over captaining the *Black Pearl*.

Plaintiffs claim that the two villains are "sinister, morally ambiguous and opportunistic." (First Amended Complaint, paragraph 86.) Not only is this stating obvious, generic, functional characteristics of almost any pirate story's antagonist, but the two characters are not actually similar. An examination of Nefarious' actions and dialogue reveals there is nothing "ambiguous" about his morality; he is a vicious pirate with no morals whatsoever. Barbossa, on the other hand, has enough morality to live by the "Pirate Code" and be loyal to his crew.

Plaintiffs also mischaracterize the relationship between Nefarious and Barbossa, whom they claim "were originally Davey Jones'/Jack Sparrow's first mates." (First Amended Complaint, paragraph 86.) That is inaccurate: Barbossa was Jack's first mate, but Nefarious was *not* Davey's—Plaintiffs have flipped the relationship of their characters, as Davey was *Nefarious's* first mate.

Plaintiffs also argue the characters are similar because both "shoot their own crew members to further their own objectives." (First Amended Complaint, paragraph 86.) Pirate captains killing their crew members is a trope as old as the genre (and no doubt true to life, given the brutal means by which authority was maintained in such criminal enterprises). In any case, the specific expressive details of these scenes—i.e., the settings, the context of the scenes, the reason for the shooting, and the outcome—are completely different. In the prologue of

Plaintiffs' Screenplay, Nefarious shoots and kills his privateer first mate to blow up his ship and take over Davey's pirate ship.  In *Curse of the Black Pearl*, Barbossa shoots a crewman in the treasure cave to test whether the curse has been lifted, but the crewman doesn't die.

Dr. Román's comparison of the characters also rests on generic character traits—he argues that both characters are cunning, sinister, and charismatic.  These traits are too generic to be relevant to the extrinsic test.  Dr. Román also claims that, while both villains are "motivated by greed at all costs," they are "also immensely entertaining and likable," which he claims "deviates from the treacherous pirate characterization of the standard pirate narrative."  (Román Expert Report, p. 8.)  This characterization is confusing as well as highly abstract.  Nefarious is not depicted as "immensely entertaining and likable"; Plaintiffs' Screenplay characterizes him as a dark, mysterious, and violent villain.

Even if taken at face value, Dr. Román's description seems to describe many famous pirate villains who are both evil and entertaining, such as Long John Silver in *Treasure Island* (1950) or Captain Hook in *Peter Pan* (1953).  It is unclear what is meant by the "standard treacherous pirate characterization," how these two specifically deviate from it, and how that makes them "less menacing."  In fact, Barbossa is not "motivated by greed at all costs"; his motivation in the Disney Film is not greed but a desire to break the curse at all costs.  Nefarious, on the other hand, is "motivated by greed at all costs," like generic villains in pirate movies where finding a hidden treasure is the main goal that drives the plot action.

(c)　　　Rascal Scoundrels v. Jack Sparrow's Crew

The Rascal Scoundrels are a group of six orphan children, ages seven to fifteen, who, as Plaintiffs describe in their original submission letter to Disney, mirror the ragtag group in *The Goonies* (1985).  Each character is specifically introduced to the audience.  Jimmy, age fifteen, is the oldest and usual leader of the group.  Catfish, age thirteen, wears oversized clothes.  Clumsy, age twelve, has a stutter and is, as the name suggests, clumsy.  Stink, age eleven, is overweight and constantly eating.  Snooze, age ten, again as the name suggests, is always tired.  And Littles, age seven, is the youngest of the group.  These characters are stock figures in film.  While Plaintiffs identified *The Goonies* as the specific source of their copying, it is clear that the Rascal Scoundrels also owe much to the Little Rascals—who went on a pirate adventure seeking treasure in a cave in *Mama's Little Pirates* (1934).  Similar ensembles appear in numerous movies such as *The Sandlot* (1993), *The Bad News Bears* (1976), and *Stand By Me* (1986).

The Rascal Scoundrels are nothing more than a generic trope of a group of children dropped into a pirate tale and should be filtered out as generic.  Further, despite Plaintiffs' attempt to cast them as "supporting characters," the Rascal Scoundrels are their Screenplay's *central* characters, with their Screenplay's plot focusing on the Rascal Scoundrels' actions, interactions, and what happens to them in the end.  Indeed, the fact that, in their cover letter, Plaintiffs describe their Screenplay as "'Goonies' meets 'Pirates of the Caribbean'" further emphasizes Plaintiffs' concept of the Rascal Scoundrels as their Screenplay's central characters.  In *The Goonies* (1985), the main group of children is the center of the story and the namesake of the film.

The Rascal Scoundrels have *no analogue* in *Curse of the Black Pearl*. Jack Sparrow's crew, whom Plaintiffs' complaint compares to the Rascal Scoundrels, actually *are* supporting characters: they have few or no lines of dialogue, they have no character development, and neither the plot arc nor the resolution of *Curse of the Black Pearl* concern them. Showing how implausible this comparison is, Dr. Román abandons it: his expert report compares the Rascal Scoundrels to Will Turner, not to Jack Sparrow's crew. (Román Expert Report, p. 12–13.)

Both claims of similarity are forced at best. The group of orphans in Plaintiffs' Screenplay could not be more different from Sparrow's crew of adult pirates. The Rascal Scoundrels are a group of children, interested in being pirates, who loyally serve as the crew for an adult pirate. Jack Sparrow is a lone wolf for many points in his pirate career, has no one singular crew, associates only with grown men, and has betrayed or been betrayed by many of them. Plaintiffs claim that the two crews share immaturity and violent tendencies, but that does not make them similar. Humor and violence are common in many pirate crews depicted in pirate stories. See above at Section III A. The only concrete comparison Plaintiffs draw between the groups of characters is between Stink in their Screenplay and Gibbs in the Disney Film, on the ground that both are "smelly." (First Amended Complaint, paragraph 89.) But Gibbs' sleeping with the pigs is an explicit reference to the Disneyland Ride, and in any event most pirates would likely have had poor hygiene.

(d)     Jane v. Elizabeth

Plaintiffs' Jane character, an adult pirate, is a "savvy wench" stock heroine, in the tradition of Captain Rouge in *The Golden Hawk* (1952), Captain Anne Providence in *Anne of the Indies* (1951), Prudence 'Spitfire' Stevens in *Against All Flags* (1952), and Morgan Adams in *Cutthroat Island* (1995), the latter of whom Plaintiffs explicitly incorporated into their concept art as the model for Jane. She is out for herself in the beginning and throughout much of the story. When she first appears in the Prologue, she is dressed as a pirate and indicates she and Davey have had a long history together. They're like a married couple in conflict trying to sort out their relationship. When she reappears, she is hustling and pickpocketing pirates in a bar and working with Nefarious against Davey. She then saves him from Nefarious when Davey tells her he still loves her. In the end, she too realizes love and family are more important than gold.

The Disney Film's Elizabeth Swan is a fundamentally different character type: she is an archetypal "kidnapped aristocratic heroine" and love interest found in many pirate works—often, as with Elizabeth, the daughter or niece of an island governor. Like Will, her character arc is a "coming of age" journey—from being a sheltered, unsure-of-herself girl confined by the conventions of her station (literally stifled by a corset) to a self-confident woman willing to stand up for herself and choose her own life and love. She and Will are archetypal "young lovers." Other than being a female captive of the villain, she has nothing in common with Jane.

Plaintiffs' and Dr. Román's abstract comparisons lack specific expressive detail within the context of each story line—e.g., Dr. Román opines, "[b]oth female leads also help rescue their love interest from the trappings set by the rival ship captains." (Román Expert Report, p. 11.) Aside from being a vague statement without detailed support, female leads helping rescue their love interest is a common genre trope. Also, several of their statements are inaccurate. For example, Dr. Román claims that "[n]either Jane nor Elizabeth is the standard 'Damsel in

Distress' in need of rescue." (Román Expert Report, p. 10). But early in the Disney Film the Elizabeth character is a classic "damsel in distress" in need of rescue, before the film complicates that trope later. Plaintiffs' Jane character, by contrast, is *never* portrayed as a damsel in distress and isn't taken hostage by Nefarious and his crew until more than halfway through Plaintiffs' Screenplay.

There are other inaccuracies in Dr. Román's comparisons of Elizabeth and Jane. First, Dr. Román opines that the two women "share the same physical characteristics, age, and temperament and function." (Román Expert Report, p. 10.) In Plaintiffs' Screenplay Prologue, Jane is introduced as a full-grown, red-haired woman in "buccaneer clothes," probably at least twenty or twenty-one, who has had a romantic and working pirate relationship with Davey for some time. Ten years later, Jane is a tavern wench hustling drunken pirates for money and in cahoots with Nefarious to get Davey's map. When the Disney Film's Elizabeth character is introduced on a British warship in the film's prologue, she is a child around ten, and the Governor's daughter. Eight years later, she is a proper, aristocratic, brown-haired young lady, attired in a corset and fancy dress, living in the Port Royal Governor's mansion and about to be proposed to by a Commodore in the British Navy. Among many other differences, the women don't share the same age, physical characteristics, or social rank and status.

Second, Dr. Román opines that "the women are thrown overboard and into the sea by the main villain pirate while the male romantic lead begs him to 'let her go!'" This idea is both generic and inaccurate. In the Plaintiffs' Screenplay's prologue, Nefarious throws Jane overboard in response to Davey (their Screenplay's male romantic lead) begging him to "let her go." In *Curse of the Black Pearl*, however, Barbossa and his pirates make Elizabeth walk the plank after they discover she's not the daughter of Bootstrap Bill Turner and of no use to them. Jack Sparrow, who is *not* "the male romantic lead" in the Disney Film, goes overboard after her, and the two of them are marooned on an island. Elizabeth's romantic interest, Will Turner, isn't even on the pirate ship when she walks the plank. So, considering the action in the context of each story line, both women go overboard in different ways, for different reasons, and at different places in the story.

Third, Dr. Román offers that both Jane and Elizabeth "engage the pirates on nearly equal terms in matters of skill, wit, and athletics." (Román Expert Report, p. 10.) This opinion appears to be little more than the claim that both works feature strong female protagonists, which is obviously a generic idea. Again, the expression is utterly different: Jane is a savvy pirate, living by her wits by hustling and pickpocketing other pirates. Elizabeth is the Governor's sheltered daughter trying to survive her kidnapping by pirates.

### C. Themes

The definition of "theme" in art and literature is "a unifying motif" or "recurrent or central idea" that resonates through the development of the characters and plot from beginning to end. It is what the story is about on a philosophical, emotional or psychological level—e.g., Coming of Age, Courage and Perseverance, Revenge, Redemption, Friendship, Family and Love. Themes can be "the moral of the story." Often themes are presented as a dichotomy—e.g., good vs. evil, love vs. hate, rich vs. poor and appearance vs. reality—and used as a filter in developing the arcs of the characters and relationships. Stories often have multiple themes, but

there is typically a major theme that is the most significant theme of the story, and the overriding drive of the whole story—e.g., loyalty to family is the major theme of *The Godfather* book and films; and, true love means being selfless enough to sacrifice one's happiness, or even life, for another is a common theme of works like *Casablanca* (1942), *A Tale of Two Cities* (1935), and *Titanic* (1997), among many others.

The major theme of Plaintiffs' Screenplay's story is that "life's real treasure is love and family, not gold and jewels." The thematic conflict set up in the Prologue is "treasure vs. love"—Davey has to choose between giving Nefarious his half of the map to save Jane. It is repeated midway through the plot when Jane betrays Davey to Nefarious then has a change of heart, and then in the end, when Davey and Jane choose saving each other and the orphans over the treasure. There is also a "redemption" theme in Davey's character arc.

As previously stated, *Curse of the Black Pearl* is a liberation story, "freedom vs. captivity." Historically, liberation (e.g. freedom from oppression, poverty, slavery, indentured servitude, captivity, etc.) was often what drove people into piracy, which was one of the few "democratic" societies of the time. The thematic dynamic of "liberation" drives each of the main characters to free (liberate) someone or something they love and/or themselves from the social, magical or actual physical restraints or constraints that shackle them:

- Barbossa (and his crew) are driven to liberate themselves from the Aztec curse, which holds them captive between life and death.
- Jack Sparrow is driven by the desire to liberate his beloved ship from the mutinous Barbossa and crew that marooned him on an island. Jack also is constantly fighting and scheming to avoid or escape captivity throughout the Disney Film—from being chased by the Port Royal soldiers, his swordfight with Will, and his imprisonment in the fort jail cells in Act I; through being captured by Barbarossa and marooned a second time then captured by Norrington in Act II; to the hangman's noose at the end of Act III.
- Will trains with his sword every day as part of his internal drive to liberate himself from the constraints of his social status as an orphan and apprentice to a drunken sword maker. When Elizabeth is kidnapped, Will is driven to rescue (liberate) her from her captors, even to the point of taking her place as Barbossa's captive.
- Elizabeth's internal struggle with the restraints and constraints of her social status as the Governor's daughter is initially illustrated by her battle with a tight-fitting corset as she is being dressed for her meeting with her Father and Norrington. When kidnapped, she argues, negotiates, and battles for her freedom; and then, once freed by Will's sacrifice, she argues, negotiates, and battles to free him from captivity.
- Will and Elizabeth are also lovers overcoming the obstacles and outside forces thwarting their relationship and the development of their romance. They are brought together by the cursed medallion as kids then separated by it in their late teens, whereupon they choose not to "suffer the slings and arrows of outrageous fortune" but "take up arms against a sea of troubles, and, by opposing, end them." The romance between lower-class Will and upper-class Elizabeth is a further instance of these characters being liberated from their respective social classes (e.g., working-class apprentice, upper-class marital token).

In the end, the main characters in the Disney Film are all liberated from their social, magical, and physical shackles and free to live the lives they choose: Jack gets his ship back and is free to sail the seas as a pirate; Elizabeth and Will are freed from their social constraints and obligations so they can love and build their life together; and, Barbossa and his crew are freed from the curse.

1. *Plaintiffs' Alleged Thematic Similarities*

In paragraphs 110 and 111 of the First Amended Complaint, Plaintiffs argue the two works share a common theme of a "pirate ghost story." Not only does this ignore the generic elements that should be filtered out, as explained above, there are no "undead pirates" in Plaintiffs' Screenplay; they are only talked about by Davey and the Rascal Scoundrels, and faked by Nefarious and his crew. "Undead pirates" do exist as a central plot element in *Curse of the Black Pearl*; so the specific expression of this "theme" in each work is significantly different. In keeping with the childish tone of Plaintiffs' Screenplay, the "undead pirates" are more like the masked ghost pirates of *Scooby Doo* than the actual skeletons of the Disney Film.

In paragraph 112, Plaintiffs argue whether the characters are trying to find treasure (their Screenplay) or return it (*Curse of the Black Pearl*) is a distinction without a difference. This is not so. In the Disney Film, the characters are hunting down one medallion to return it to a treasure that is not lost to break the curse they are under, which is distinctly different from fighting over a map to find a "lost treasure." In any case, there are few plot elements more universal in pirate stories than a hunt for treasure.

As to the theme of "redemption," which Plaintiffs argue in paragraph 113 is characteristic of both works, it applies to their Screenplay's story but not the Disney Film's story. The Merriam-Webster definition of redemption is "the act, process, or an instance of redeeming," where redeeming is defined as "serving to offset or compensate for a defect." In Plaintiffs' Screenplay, Davey spends ten years wallowing in self-pity and self-blame for almost choosing the treasure map over Jane and losing her, then climbs out of the bottle to redeem himself by saving her and the Rascal Scoundrels from Nefarious and his crew. Jack Sparrow in the Disney Film, however, is not a "shell of (his) former self" at the beginning; he's simply without his ship. He's the pirate he always was and doesn't change character through the Disney Film, but he does get his ship back in the end.

Dr. Román's expert report also includes inaccurate statements: Davey is not "a younger pirate" when he "finds redemption through romance." (Román Expert Report, p. 12.) Will is not a pirate at the start of *Curse of the Black Pearl*, and never becomes one—the closest is a jest from Elizabeth at the very end. And Will's romance with Elizabeth has nothing to do with "redemption": neither Will nor Elizabeth does anything wrong for which they need to be redeemed.

**D.    Setting**

Both stories are set in the Caribbean, which, as described above, is the ultimate generic setting for a pirate story and should be filtered out. The same is true for particular scenes, such as a British colonial port town with a governor's mansion and fort, or a pirate-controlled port. The specific instances of these in the *Curse of the Black Pearl* (Port Royal and Tortuga) appear

in numerous pirate works, including *Captain Blood* (1922 novel; 1935 film). These elements are so generic because they are historically accurate. As described above, deserted islands, sea caves, pirate ships, and the Caribbean Sea are common to both of these stories, and to many pirate stories in movies, literature, and history. Plaintiffs' Screenplay's treasure and the cave settings—including the waterfall entrance—are generic as well, with examples given above. Moreover, these various scenes appear in the Disneyland Ride, and they are acknowledged as such in the scene's action descriptions (e.g., Plaintiffs' Screenplay, p. 91, "The boat continues sailing through the cavern like the *DISNEYLAND RIDE, 'PIRATES OF THE CARIBBEAN'*.").

1. *Plaintiffs' Claims.*

No specific setting or scenes are described—and no comparative and analytic detail has been made—by Plaintiffs or Dr. Román. Plaintiffs suggest that the ghost ship, port town, and cove with hidden treasure are all similar, but this is not so. First, Nefarious's "ghost ship" isn't a "ghost ship at all." It's just a pirate ship, described as having "a gothic interior (that) would be perfect for Dracula." The Rascal Scoundrels find a lot of skeletons on the ship and a revolving trick bed. Second, Plaintiffs' Screenplay scenes in the port town are: an auction of wenches on an outdoor stage (taken directly from the Disneyland Ride); a clothing store where the Rascal Scoundrels try to buy pirate clothes; an alleyway; Davey's docked privateer ship; the tavern where Davey is first reunited with Jane; and Jane's room. None of these specific settings have any similarity to the specific Port Royal settings in *Curse of the Black Pearl*—e.g., the fort, the Governor's mansion, the blacksmith shop, or the jail. Third and finally, as to the cove where the treasure is hidden, Plaintiffs' Screenplay describes a waterfall entrance in the dark, which is nothing like the sea cave entrance in the Disney Film, and is an explicit reference to the Disneyland Ride. In short, when you compare the specific details, even the generic Caribbean-pirate-story settings in both works are expressed very differently.

**E. Mood**

For the most part, the overall tone of Plaintiffs' Screenplay's action and interaction is light-hearted mishmash of juvenile slapstick comedy with the Rascal Scoundrels, romantic melodrama with Davey and Jane, and swashbuckling action. Plaintiffs were candid in their pitch materials that this is simply a synthesis of *The Goonies* (1985), *Cutthroat Island* (1995), and the Disneyland Ride. The overall tone of the Disney Film, on the other hand, artfully weaves together several elements: satirical comedy, with Jack Sparrow's antics and reactions; romantic adventure, with Will's heroics in rescuing Elizabeth; and horror, with Barbossa and his cursed pirate crew. Comedy, adventure, romance, drama, suspense, melodrama, and horror are common tonal elements found in many pirate movies, plays and literature. Comparing Plaintiffs' Screenplay and the Disney Film, the former is less sophisticated and pitched at a younger audience.

1. *Plaintiffs' Claims.*

Dr. Román opines that the two works evoke similar moods by using slapstick humor, emotions invoked by supernatural presences, and the presence of a black ship. (Expert Report, p. 24–25.) First, as explained further below in Section III A of this report, humor, irony, and wit, along with physical, gag, and situational comedy are generic terms that can be applied to many pirate movies. *Curse of the Black Pearl*'s comedy is more gag comedy than slapstick (e.g.,

Pintell's eye keeps popping out). Second, as to the "eerie mood" evoked when the "true nature of the supernatural pirates" is revealed, that may refer to particular *moments* in each work but says little about how the moods of the two works compare overall. Also, the "true nature" of Plaintiffs' Screenplay's pirates is that they are live humans made up to look like ghosts, while the "true nature" of the cursed pirates in *Curse of the Black Pearl* is that they're somewhere between life and death and cannot die. Third, and as explained below, a black ship with black sails and a pirate flag sailing out of the fog is a common pirate film trope. And that description of a pirate ship is generic. Indeed, it is a featured element of the acclaimed song "Pirate Jenny" in Berthold Brecht's *Threepenny Opera* (1928): "And the ship / The Black Freighter / Runs a skull up its masthead / And a cheer rings the air / By noontime the dock / Is a-swarmin' with men / Comin' out of the ghostly freighter / They're moving in the shadows / Where no one can see / And they're chainin' up people / And they're bring' em to me." The fact that a pirate ship creates a "sinister and foreboding mood" is its very functional intent—considering that pirate ships literally fly a flag with a skull and crossbones on it.

**F. Pace and Sequence of Events**

If pace is defined as how dynamically the plot moves forward, then the pace of Plaintiffs' Screenplay is actually quite slow or, at best inconsistent. Most of the set pieces (sequence of events) in the first half of the story—e.g., from the Prologue to the port town scenes to the Rascal Scoundrels on Nefarious ship—are over-written and don't move the plot forward very fast. For example, the Prologue is 11 pages long, with the initial battle action taking up the first page and the sea monster attack taking up the last page-and-a-half; the eight-and-a-half pages in between are exposition-heavy in introducing Nefarious, Davey, Jane, and their relationships. If you use a page a minute as a rule of thumb, the Prologue takes at least 12 minutes. Immediately following this, pages 12 to 30 are spent with the Rascal Scoundrels somewhat aimlessly running around town before the arrival of Nefarious and his pirate crew in the port and before Davey and Jane are reunited. Nefarious doesn't appear until page 47, then confronts Davey about the map on page 52 and takes Jane hostage on page 54. By this point, we're halfway through the script and the plot hasn't moved very far from where it started, with Nefarious confronting Davey and demanding his half of the map.

In comparison, the Disney Film's Prologue takes 4 minutes and 52 seconds. In the next 35 minutes, Jack Sparrow is introduced; he tries to steal a ship; he rescues Elizabeth from drowning; he escapes his initial capture; he duels with Will, is captured and jailed; and the cursed pirates attack the port and kidnap Elizabeth. By this point, we're a third of the way through the Disney Film, and all the character, relationship, and plot elements have been set up and are moving forward full steam.

The bottom line is that the neither the pace nor the sequence of events in the two works is similar.

1. *Plaintiffs' Claims.*

As to Plaintiffs' claims, once one looks beyond their very general, macro view to the specific expressive details of the "events" summarized, the inaccuracies and the substantial differences of expression become clear.

In paragraph 92 of the First Amended Complaint, and in Dr. Román's expert report, Plaintiffs claim the prologues in the two works are similar. As explained below, the idea of a story with a prologue is generic and should be filtered out. Nor are the two prologues in fact similar. Each prologue has different characters in different situations, with different actions and results:

- In Plaintiffs' Screenplay, a full-on battle between a pirate ship and a British privateer ship—reminiscent of the opening of *The Black Swan* (1942)—ends with the privateer captain, Nefarious, betraying and killing his crew then taking command of the pirate ship as part of his deal with the pirate captain, Davey Jones. The plot is set up with Nefarious and Davey each holding half a treasure map and not trusting each other. The action has Davey giving his half of the map to his lover, Jane; them getting into a confrontation with Nefarious, who grabs Jane and threatens to throw her overboard if Davey doesn't give him his half of the map; Davey hesitating then giving up the map; Nefarious tossing Jane overboard; a sea monster destroying the ship; and Davey escaping with his half of the map into the rough seas.

- In *Curse of the Black Pearl*, a British warship, escorting the new Governor and his daughter, Elizabeth, age ten, to Port Royal, comes upon a burning ship and rescues an unconscious boy, Will, floating on debris in the sea. While watching over Will on deck, Elizabeth finds he's wearing a gold Aztec medallion and thinks the boy is a pirate. As she stands and pockets the medallion, she glimpses a ship with black sails disappearing into the ghostly fog covering the calm seas.

Other differences abound. In *Curse of the Black Pearl*, the gold medallion is only introduced—not explained—in the prologue. The audience does not learn of its significance or back-story until eight years later (after the prologue) when the pirates aboard the *Black Pearl* attack the city and kidnap Elizabeth. Also, the Disney Film's lead character—Jack Sparrow—and his "motivation" aren't introduced or established in the prologue. Hence, neither the Disney Film's lead character nor the key plot dynamic—i.e., that returning the coin will break the curse—are introduced in the Film's prologue. In Plaintiffs' Screenplay, by contrast, the key character, key relationships, and key plot point (that obtaining both halves of the map will lead to the treasure) are all fully established. In short, other than taking place on a ship at sea and the image of another ship burning, the specific expression of story elements and their dynamics in the two prologues—i.e., "the foundation for the plot," "the motivation for the main characters," and "conflict on the ship that throws the viewer into the pirate story"—are completely different.

In paragraph 93 of the First Amended Complaint, Plaintiffs describe that the characters are "engaged in a series of battles," following the prologue, which is highly generic in pirate stories.

In paragraph 94, Plaintiffs argue the introduction of Davey Jones and Jack Sparrow are similar in the two works. This is not remotely true. In Plaintiffs' Screenplay, Davey is first seen on his pirate ship surrounded by privateers with guns pointed at him after the sea battle, while in *Curse of the Black Pearl* Jack Sparrow is first seen atop the mast of a ship as it slowly sinks sailing into a Port Royal dock. Sparrow's history with Barbossa is not depicted, only recounted, while Nefarious' betrayal of Davey plays out in Plaintiffs' Prologue. Also, Nefarious' betrayal of Davey isn't a mutiny since Nefarious is already in command of the pirate ship when it

happens; whereas, Barbossa led a mutiny of the Black Pearl crew to supplant Jack as its captain. All mutinies are a form of betrayal, but not all betrayals are mutinous.

In paragraph 95, Plaintiffs argue the attacks on the port towns are similar. Not so:

- Nefarious and his crew sail into the port town after getting a message from Jane via a peg-leg parrot to find Davey and get his half of the map. The pirates don't attack the town. Nefarious marches them into town; questions pirates in the tavern; and lets Jane lead Davey to him and his men. Three British privateers attack the town and blow up Davey's ship. The pirates attack and take over one of the British ships after Davey escapes and makes off with the pirate ship.
- By contrast, in the Disney Film the *Black Pearl* and her cursed pirate crew have a pitched gun battle with the Port Royal fort guns; land and attack the town and fort; and hunt down and kidnap Elizabeth from the Governor's mansion. Plaintiffs' Davey character escapes Nefarious and his men with Jane's help, for which she is taken prisoner, while Disney's Jack character is in jail throughout the battle and doesn't get out until Will springs him from his cell the next morning, long after the battle.

Other than both being examples of the generic pirate-work scene of an amphibious attack on a port town, the scenes share no similarities.

In paragraph 96, Plaintiffs assert that two island scenes are similar. As an initial matter, islands with skulls or references to the dead are generic and should be filtered out.[3] Scenes on islands are one of the most fundamental *scenes a faire* in the pirate genre. Moreover, in Plaintiffs' Screenplay, the action on Calavera Island has the Rascal Scoundrels following the map they have through a jungle, across a gorge to a cave in the shape of Skull & Crossbones, where they retrieve another treasure map from a skeleton pirate sitting on a throne then have to escape (Indiana Jones-style) from the booby-trapped cave just before it closes. They are immediately captured by Nefarious' pirates and taken to the pirate ship. In the Disney Film, the cursed pirates take Elizabeth to the treasure cave on Isla de Muerta and discover her blood on the Aztec medallion doesn't lift the curse; Will sneaks her and the medallion out of the cave and back to the ship he and Jack stole from Norrington; the cursed pirates find Jack Sparrow while searching for Elizabeth; and Jack makes a deal with Barbossa to keep from being killed.

Plaintiffs allege in paragraph 97 that both works feature a ship battle. But again, naval battles are *scenes a faire* in pirate works—one even appears in the Disneyland Ride. In any case, the two ship-battle scenes are expressed very differently. In Plaintiffs' Screenplay, Nefarious and his pirates retake the pirate ship; find that Davey is not there; and prepare to kill the Rascal Scoundrels as they sail to a cove. Davey appears—looking and sounding like the "dashing and brave" "young rogue" he was ten years ago. While Davey battles Nefarious and his men and rescues Jane, the Rascal Scoundrels escape in a rowboat. The gun and cannon battle between Davey and the pirates leads to the ship blowing up. Nefarious and his men escape to a rowboat,

---

[3] To name a few, *Treasure Island* (1883) features "Skeleton Island"; *Cutthroat Island* (1995) has the eponymous "Cutthroat Island"; *Peter Pan* (1953) has "Skull Rock"; and *Curse of Monkey Island* (1997) has "Skull Island." *The Goonies* (1985) has a skull-shaped cave with a pirate ship in it for its climax.

while it appears Davey and Jane have perished in the blast. The tide takes the Rascal Scoundrels' boat into a thick fog in the cove then over a waterfall into the cavern, reminiscent of the Disneyland Ride. Nefarious and his men follow in their boat.

In *Curse of the Black Pearl*, however, the Black Pearl overtakes the ship with Elizabeth, Will, and Jack's crew. After a pitched battle between the ships and crews, during which Barbossa's monkey retrieves the medallion for him, Will threatens to kill himself if Elizabeth isn't set free and his crew isn't left unharmed. Agreeing to Will's terms, Barbossa maroons Elizabeth and Jack on the same island he marooned Jack before then heads back to Isla Muerta with Will and Jack's crew in chains. Jack and Elizabeth are rescued from the island by Commodore Norrington in his flagship. Elizabeth agrees to marry Norrington if he'll save Will. Jack leads Norrington to Isla de Muerta then slips ashore while Norrington and his men wait in boats outside the treasure cave entrance.

In paragraph 98, Plaintiffs' state the scenes in the caverns are similar. As detailed above under "Plot," in Plaintiffs' Screenplay, the battle action that takes place in treasure cave has Nefarious first attacking Jane then dueling Davey while the pirates pop jewels out of the cave wall, fend off the Rascal Scoundrels, and try to stop the water pouring through the holes they've created in the wall. The climactic sequence ends with Davey defeating Nefarious by pinning him to the wall with a sword then escaping with Jane and the Rascal Scoundrels in a rowboat as the cave fills with water and a sea monster swallows Nefarious, followed by the entire island sinking into the sea. Davey, Jane, and the Rascal Scoundrels are rescued by a British privateer ship. Davey and the Rascal Scoundrels are commissioned as privateers and given a ship as reward for ridding the Caribbean of Nefarious; and they all sail off with Jane for their next adventure.

The Disney Film's climactic sequences start with Norrington and his men in rowboats outside the treasure cave entrance waiting to ambush the pirates as they leave. Jack rows into the cave and stops Barbossa from cutting Will's throat over the Aztec treasure chest by telling him that Norrington and his men are outside waiting for them. As he palms a medallion from the chest, Jack talks Barbossa into waiting to lift the curse until after they've defeated Norrington and taken his flagship. Jack then offers a deal where he gets the Black Pearl and will sail under Barbossa's flagship colors. While Barbossa's cursed pirates walk across the bottom of the sea and ambush the crew of the flagship, Elizabeth slips away in a rowboat to the Black Pearl and frees Jack's captive pirate crew, but can't get them to help her rescue Will. While the crew sail off in the Black Pearl, Norrington and his men get back to the ship and battle the cursed pirates, and Jack and Barbossa duel in the treasure cave. As Elizabeth arrives and Will defeats the last remaining pirate in the cave, Jack puts his blood on the medallion and flips it to Will while Barbossa threatens to shoot Elizabeth. Jack shoots Barbossa, who is then surprised to see Will lifting the curse by dropping both medallions with Jack's and his blood into the chest.

Back on the ship, the cursed pirates find they are mortal again and surrender. Jack is arrested and sentenced to hang. Will helps Jack escape the noose with a little distraction from Elizabeth. Will and Jack take out several soldiers before being captured on the parapet. Elizabeth sides with Will and Jack. The Governor orders the soldiers to lower their weapons. Seeing the parrot, Jack falls back over the wall into the sea, knowing his *Black Pearl* crew has come for him. The Governor and Commodore accept Elizabeth's choice of life with Will, and give Jack a day's head start.

### G. Dialogue

I found no lines in the Disney Film identical to lines in Plaintiffs' Screenplay. Though there might be a few lines in Plaintiffs' Screenplay vaguely similar to ones in the Film, they are said in different situations within the context of each story and by or to different characters for different reasons. In some instances, Plaintiffs' Screenplay has taken lines from the Disneyland Ride that are also referenced in the Disney Film.

1. *Plaintiffs' Claims.*

Plaintiffs lists several lines of dialogue taken out of the specific context of the scenes they are found in and calls them "instances of similarity." The dialogue compared in paragraphs 100 through 103 of the First Amended Complaint may be vaguely similar, but the lines are said in different contextual circumstances by and/or to different people for different reasons. The statements in paragraphs 100, 101, and 102 are nothing more than generic statements about cursed pirates or ships with black sails which, as described above, harken back to the legend of *The Flying Dutchman*. The statements in paragraph 103 about characters being slapped by women are simply, and literally, slapstick humor in pirate films, which are similarly generic. In fact, women taunting pirates was featured in the Disneyland Ride by a scene of a woman chasing a pirate and a scene of a wife shouting at her husband being held over a well, "Don't be chicken!"

Dr. Román's expert report makes no specific references to any dialogue. Instead, he insists that the two works share "multiple original patterns of similarities," which is a vague and abstract conclusion. "Patterns" are not specific detailed expressions of settings, plot, characters, relationships, action, theme, pacing, or sequence of events and demonstrate nothing specifically similar.

## NOVELTY ANALYSIS

## III. None of the Elements Dr. Román Relies Upon are Original to Plaintiffs' Screenplay

Every element of Plaintiffs' Screenplay identified as inventive or original in the expert report of Dr. Román is borrowed from classic works in the pirate genre, in most instances from works referenced in Plaintiffs' original complaint as establishing the central tropes of the genre.

### A. Tone and Mood

Dr. Román posits that Plaintiffs' introduction of irony and wit to a pirate story was an original contribution of Plaintiffs'. This is incorrect.

While real pirates were fearsome criminals, savage murderers, and brutal robbers, and expressed as such in historical non-fiction and fictional accounts, over the last 300 years, many fictional pirates have been romanticized in literature, poetry, song, plays, and films as tragic figures, romantic heroes, and/or glamorous, witty, rogues. Indeed, comedy in pirate stories dates back to at least Gilbert and Sullivan's 1879 operetta, *The Pirates of Penzance*, which satirized the pirate melodramas of the period.

Humor, irony, and wit are generic terms that can be applied to many pirate movies, especially in the films of the last 100 years. In fact, most of the pirate moves of the 1940s and 1950s were replete with humorous, ironic and witty actions, interactions, characters, and dialogue—e.g., *The Crimson Pirate* (1952), *The Pirate* (1948), *The Black Swan* (1942), *Raiders of the Seven Seas* (1953), and *The Princess and the Pirate* (1944). Humor and comedy were a main selling point of the pirate adventure. Even the Disneyland Ride—which Plaintiffs explicitly borrowed from in their Screenplay—played up this "humorous tone" with scenes of women chasing pirates, drunk pirates laying with the pigs, imprisoned pirates trying to lure a dog with a skeleton's bone, and the like.

For example, *Yellowbeard* (1983)—a film cited by Plaintiffs in their original complaint as being a centerpiece work in the genre—was a fast-paced, action-adventure comedy that self-promoted as "the comedy of the century—the seventeenth century" and included humorous dialogue (e.g., Dan, Yellowbeard's son: "I can't kill him, he brought me up, just like a father." Yellowbeard: "Oh—you mean he beat you and kicked you and smashed you in the teeth?" Dan: "No, he's been kind and gentle." Yellowbeard: "What kind of father is that?! Kill him!") and wit (e.g., Yellowbeard: "What, you again?" Yellowbeard's wife: "Again?! I haven't seen you for fifteen years!" Yellowbeard, exasperated: "What is it this time?").

Similarly, *The Goonies* (1985), to which Plaintiffs compared their Screenplay, was a comedy adventure film that fully captured a humorous tone, "diluting the impeding sense of danger." (Román Expert Report, p. 6.)

In *Under the Black Flag: The Romance and the Reality of Life Among the Pirates* (1995), David Cordingly explains that along with Blackbeard, Captain Hook, and Byron's Corsair, Long John Silver's tall, powerful, wily character, "which alternates between jovial good humor and utter ruthlessness in the pursuit of gold," has come to represent many people's image of a pirate.

**B. Characters**

Dr. Román opines that various character types are unique to Plaintiffs' Screenplay, when in fact each character is a generic archetype common throughout the pirate genre.

***Pirate with a drinking problem***. Dr. Román argues that Plaintiffs' inclusion of a disillusioned pirate with a drinking problem is a unique element. A drunken pirate is a common genre trope, and part of the Disneyland Ride. Even handsome roguish, heroic protagonists in pirate movies drink a lot—e.g., *The Black Swan* (1942). *Captain Blood* (1922 novel; 1935 film), cited by Plaintiffs' as being central to the genre, similarly features Dr. Peter Blood, the lead pirate, who is also admittedly a disillusioned drunk (e.g., at one point he says, "Such a partnership requires sober thought. My poor head has been dancing with rum this whole week past."). A critical plot arc of *Captain Blood* is the pirate captain's descent into despair and drink, and his ultimate rehabilitation for the sake of a woman he hopes to impress and win. *The Sea Hawk* (1940) featured rum-soaked pirates in an attempt to save England. And *Treasure Island* (1883), similarly cited by Plaintiffs as being central to the genre, introduced "Dead Man's Chest," a famous and fictional sea song flattering the drunk pirate life, featuring the iconic line "drink and the devil had done for the rest—yo-ho-ho, and a bottle of rum!"

***Cunning but likeable second lead character.*** Similarly, Plaintiffs' claim to a second male lead who is cunning and sinister but also charismatic and likeable is not a novel concept. Indeed, many pirate tales focus on a lead pirate with a right hand man or sidekick fitting this exact description. For example, in *Cutthroat Island* (1995), Morgan Adams, the lead captain of her father's, is accompanied by William Shaw, a crafty and charming secondary lead—his introductory scene portrays the doctor-turned-thief working an elegant dancing ball, charming and stealing from the female guests. Similarly in *Savage Islands* (1983; also known as *Nate and Hayes*), another work cited by Plaintiffs in their original complaint as a centerpiece for the pirate genre, lead character Nate Williamson teams up with an unsuspecting ally, the roguish yet charming William Hayes (e.g., Hayes: "You sound like a very sad and bitter old lady, Ben."). As to Dr. Román's claim that this type of character uniquely made Plaintiffs' Screenplay "highly engaging and entertaining" and "more friendly to a mass audience," most of the pirate movies of the 1940s and 1950s were about being lighthearted, engaging, and entertaining—e.g. *The Black Swan* (1942), *The Princess and the Pirate* (1944), *Raiders of the Seven Seas* (1953), and *The Crimson Pirate* (1952).

***"Swashbuckling" pirates.*** Although Dr. Román thinks that "combining elements of the swashbuckler and the pirate appears to be an original innovation specific to [Plaintiffs'] Screenplay," it is anything but. As an initial matter, the distinction between swashbuckler and pirate is artificial at best. "Swashbuckling pirates" has itself been a trite expression and common in much of pirate lore. For instance, in the trailer for *Captain Blood* (1935), cited by Plaintiffs as being central to the genre, the lead pirate, Peter Blood, is described as a "swashbuckling leader." Even a cursory search on Google Books for the phrase "swashbuckling pirate" confirms that this concept has been commonplace for decades if not centuries. For instance, the search turns up *The Real Story of the Pirate* (1923) ("But once again Mary proved only a woman with a romantic soul and a tender heart, though she was a swashbuckling pirate with pistols and cutlass in her belt and murder on her soul."). It turns up *Pirates and Seafaring Swashbucklers on the Hollywood Screen: Plots, Critiques, Casts and Credits for 137 Theatrical and Made-for-Television Releases* (1995). And it turns up *Postcolonial Piracy* (2014), which states that the "[t]he swashbuckling pirate-figure has a pop-cultural history" dating to *A General History of Pyrates* (1724)—one of the works cited in Plaintiffs' original complaint. Similarly, searching for "pirate swashbuckler" in Google Books turns up instances such as *Burt Lancaster: Hollywood's Magic People* (1971) (describing *The Crimson Pirate* (1952) as "the pirate swashbuckler to end all swashbucklers").

Further, swashbuckling "with flamboyance and swagger" and pirates being swashbucklers have been common in pirate movies since Douglas Fairbanks Sr. in *The Black Pirate* (1926). Flamboyance and swagger are, literally, included in the definition of swashbuckling. The dictionary definition of swashbuckler is "a skilled swordsman, soldier, adventurer, or daredevil." The idea of the hero and villain being skilled swordsmen is ubiquitous in pirate movies—think of *Peter Pan*—and various other adventure movies.

As explained above, while real, live, historical pirates were not "good men" but common criminals, often savage murderers and brutal robbers, fictional pirates in books, plays, and films have often been portrayed as heroes—swashbuckling "good men" who defeat the corrupt villain and win the heroine's heart.

Men of upright stature turned pirates is likewise a genre trope. For example, *Captain Blood* (1922 novel; 1935 film), a work cited by Plaintiffs as central to the genre, tells the story of Peter Blood, an honorable physician and former soldier and sailor who is driven to piracy after being unjustly deemed a part of the Monmouth rebellion. In *Treasure Island* (1883), also cited by Plaintiffs as being a centerpiece in the genre, the lead character is an innkeeper's son turned pirate. *Captain Singleton* (1720), yet another work cited by Plaintiffs as central to the genre, features the lead character as a child from a well-to-do family who was kidnapped and eventually turned to a life as a pirate. Somewhat similarly, in *The Buccaneer* (1938), yet another work Plaintiffs agree is central to the genre, the lead pirate Laffite demonstrates a sense of loyalty and decorum towards the Louisiana government. The Pirate King of *The Pirates of Penzance* (1879 opera; 1981 Broadway production) is similarly held out as highly noble.

***Lead women.*** The "lively adventurous young women who dream of a life beyond the constraints of the port town where they've been raised" is similarly not novel. For instance, in *Blackbeard the Pirate* (1952), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, a privateer turned pirate falls in love with a pirate's daughter onboard who set sail with her father. Even the notion that these young women "engage the pirates on nearly equal terms in matters of skill, wit, and athletics" is not novel. *Cutthroat Island* (1995), which Plaintiffs' own artwork indicates as a key source of their Screenplay's material, tells the story of female pirate Morgan Adams on a quest for treasure. Similarly, Captain Rouge in *The Golden Hawk* (1952), Captain Anne Providence in *Anne of the Indies* (1951), and Prudence 'Spitfire' Stevens in *Against All Flags* (1952) are female pirate leads who hold their own against their male counterparts. Further, notorious, real-life female pirates have inspired pirate lore: real-life female pirate Mary Read inspired *Queen of the Seas* (1961) and Grace O'Malley inspired *Grania: She-King of the Irish Seas* (1986). Certainly the portrayal of strong female leads in pirate lore is not an invention of Plaintiffs' Screenplay.

Pirates and privateers wooing the daughter of a local official or gentry is also an extremely common genre trope. For instance, it provides the central narrative impetus of *Captain Blood* (1922 novel; 1935 film), where the eponymous pirate Peter Blood tries to prove himself worthy of the governor's niece, Arabella. He goes so far as to kill his villainous partner, Levasseur, in a duel to save her from him. Indeed, one of the short stories that Rafael Sabatini ultimately wove into *Captain Blood* was simply titled "The Governor's Daughter." The trope was so well established that winning the hand of a governor's daughter is a victory condition in a popular series of computer games entitled *Sid Meier's Pirates!*, first released in 1987.

**C. Theme, Plot, and Sequence of Events**

The theme, plot, and sequence of events of Plaintiffs' Screenplay are also not inventive.

***Skeleton crews.*** "Pirate ships with skeleton crews," cursed pirates, lost or stolen treasure, etc. are all stock elements in film and literature. For instance, *The Flying Dutchman* is an ancient myth, dating back to the 17th century, of a ghost ship that was said to be cursed to sail the oceans forever; *The Flying Dutchman* was also popularized by films like *Pandora and the Flying Dutchman* (1951), poems like *The Rime of the Ancient Mariner* (1797), and novels like *The Phantom Ship* (1839). The acclaimed comic miniseries *Watchmen* (1986-1987) features as a story-within-story "Tales of the Black Freighter," which depicts a phantom pirate ship crewed by

the damned undead. Similarly, *On Stranger Tides* (1987)—nominated for the World Fantasy Award for Best Novel—features a pirate ghost ship, undead pirate crews, attempts to undo curses, and quests that take the characters to various islands. The *Monkey Island* video game series (1990-2009), is set on fictional Caribbean islands around the 17th century featuring a main character pirate, Guybrush Threepwood, who woos the adventurous female Governor Marley while facing off against the villainous zombie-ghost pirate LeChuck and his skeletal crew. Skeletal crews and the ghost ship are also featured in the Disneyland Ride—indeed, Plaintiffs' sizzle reel incorporated that footage from the Ride. Numerous films, such as *The Ghost Pirates* (1909), *James and the Giant Peach* (1996), *Dead Men Tell* (1941), *Ghost in the Noonday Sun* (1973), *Matusalem* (1993), and *Peter Pan and the Pirates: Ghost Ship* (1992), all also feature pirates with skeleton crews, cursed pirates, and lost or stolen treasure. The children's television show *Scooby Doo* has also featured multiple episodes with ghost pirates.

***Dressing up as women.*** Plaintiffs' complaint argues that dressing up like women is a unique, similar element in the works. But it is not at all unique. Men dressing up as women is common in many comedic movies—including pirate movies. For instance, *The Crimson Pirate* (1952) featured the hero pirate, Captain Vallo, and two others dressed up as women to deceive the villainous governor and his soldiers. In *A High Wind in Jamaica* (1929 novel, 1965 film), pirates, some disguised as women, capture a ship and take the children aboard prisoner; the children wind up serving aboard the ship. In the 1925 Basil Lubbock painting "Pirates Decoying an American Ship," the pirates are disguised as women. Thus, employing the commonplace comedic trope of a male character disguising himself as a woman is neither unique in film nor even unique in the pirate genre.

***Romance.*** Dr. Román posits that "the element of romance [was] … one of [Plaintiffs' Screenplay's] major innovations to the typical pirate story." This statement is wholly inaccurate. In most, if not all, the pirate movies of the 1920s, 1930s, 1940s, and 1950s, a romance between the protagonist pirate and the female lead was "central" to the story, including many of the films cited by Plaintiffs in their original complaint as central to the pirate genre: *Captain Blood* (1935), *The Buccaneer* (1938), *The Pirate* (1948), *Blackbeard the Pirate* (1952), and *Peter Pan* (1953). Redemption through romance, the moral that there is more to life than greed, and community support for the romantic relationship are also all commonplace in the pirate genre. For example, in *Yellowbeard* (1983), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, Yellowbeard not only reunites with his estranged son and finds redemption, but his son also finds love in the daughter of one of the film's villains; the entire crew is supportive of the new unions. In *Captain Blood* (1922 novel; 1935 film), romance is a centerpiece of the story, and Blood's romantic pursuit of the governor's niece, Arabella, both leads him away from piracy and redeems his pirate crew. *The Pirate* (1948), another work Plaintiffs cited as being at the center of the pirate genre in their original complaint, similarly features a redemption story through love, the moral that there is more to pirate life than greed, and an ultimate romantic union that is supported by the community.

Romance in pirate genre is also explained historically. In *Under the Black Flag: The Romance and the Reality of Life Among the Pirates* (1995), David Cordingly calls the Golden Age of Piracy the beginning of the change in public perception about pirates. By the early 1700s, the threat of piracy and attacks on merchant shipping in the Caribbean and along the American seaboard was receding due to stepped-up naval patrols. Historical facts were blended

with fiction, and the common murderers and robbers that pirates were (and are) in reality began to take on the status of romantic outlaws in ballads, plays, poems, and novels.

For example, in 1713, *The Successful Pyrate* play was based loosely on the real life of Captain Henry Avery and portrayed him as a brave outlaw. The play also features a love story between an Indian princess and a young man. It became the first in a long line of melodramas with pirate themes that entertained London theatergoers over the next 150 years, with most featuring love stories. Similarly, in 1720, novelist Daniel Defoe published *Captain Singleton*, a work cited by Plaintiffs as being central to the genre, which is a fictional pirate's autobiography where the pirate finds love. The romantic pirate outlaw and his exotic adventures also gained popularity from *The Corsair*, an 1813 epic poem by Lord Byron, and Walter Scott's 1822 novel, *The Pirate*; both are about tragic figures attractive to women and admired by their crews.

***Orphans.*** Orphaned characters in pirate stories are also not novel. In *Captain Blood* (1922 novel; 1935 film), a work cited by Plaintiffs as being central to the genre, the main character, Peter Blood, lost his mother in childhood and his father at age 20. *The Coral Island* (1857), another work Plaintiffs cited as being at the center of the pirate genre, tells the story of three boys marooned on an island who become a family of their own and seek mentorship in the pirate crew who shows up on the island. *Captain Singleton* (1720), another work Plaintiffs cited as being at the center of the pirate genre, tells the story of Daniel Defoe, a child from a well-to-do family who was stolen, raised by gypsies, and eventually becomes a pirate. Maybe the ultimate orphan story in the pirate genre, *Peter Pan* (1904 play; 1911 novel; 1953 Walt Disney Productions film), not only centers on an orphaned boy with no parents looking to make a family but also includes the Lost Boys, a group of orphans whom Peter raises on the island, forming bonds among themselves, and ultimately finding a sense of family. *Pirates of Penzance* (1879 opera; 1981 Broadway production), similarly tells the story of a pirate crew composed of orphans who bond among themselves, forming an orphan pirate family, and even spare any lives along the way if they too are orphans; the main character Frederic even invites them to give up piracy and go with him but later Frederic joins the pirates aboard their ship as one of the crew.

***Prologue.*** Prologues are common in movies and literature, and Dr. Román even acknowledges this is a common plot device in literature and drama. As to there being "no precedent in the genre of the pirate story to encourage such a prologue," that is plainly untrue. Prologues are commonplace in the pirate genre, and regularly introduce the major characters and include a conflict that throws the audience into the pirate story. For instance, in *Yellowbeard* (1983), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, the film starts with a prologue set in the 1600s on a ship 20 years before the main plot and features an act of betrayal and stolen treasure. *Captain Blood* (1935), another work cited by Plaintiffs as being central to the genre, similarly features a prologue set in the 1600s where the main character is convicted of being a traitor and exiled to the British Colonies of the Caribbean. *Raiders of the Seven Seas* (1953) also has a prologue set in the 16th century in which the heroic pirate Barbarossa escapes a Spanish prison in Morocco and steals a Spanish galleon before jumping ahead in time to action in the Caribbean. *The Princess and the Pirate* (1944) also has a prologue featuring the Pirate Captain burying his treasure on an island then killing the map maker and men who buried the treasure. Even the Disneyland Ride arguably has a prologue, introducing riders to the port town and time period before riders are swept away into the action.

***Climatic ending.*** Dr. Román again suggests a romantic ending is unique in the pirate genre, but, as explained above, this is not the case. The other element Dr. Román suggests is novel is a final battle in a cave. Caves are common place in the pirate genre and a centerpiece of the Disneyland Ride *Pirates of the Caribbean*. As Plaintiffs advertised in their cover letter, their Screenplay was in fact based on the Disneyland Ride. Just like in the Ride, in Plaintiffs' Screenplay the cave is accessed by riding a boat over a waterfall. Further, Plaintiffs' Screenplay even explains that the "boat continues sailing through the cavern like the DISNEYLAND RIDE, *'PIRATES OF THE CARIBBEAN'*" and that the cave is decorated with skeletons of pirates impaled by swords and treasure off to the side of the boat, like in the Ride. (Plaintiffs' Screenplay, p. 98.) The Disneyland Ride also ends with an epic shootout in a cave. A cave is also the resting place of the treasure in *Treasure Island* (1883 novel; 1950 Walt Disney Productions film), a work Plaintiffs claimed in their original complaint was central to the pirate genre. Skull Rock in *Peter Pan* (1904 play; 1911 novel; 1953 Walt Disney Productions film) is also a cave. And in *The Goonies* (1985), which Plaintiffs admitted in their cover letter inspired their Screenplay, the final showdown also happens in a cave. *Cutthroat Island* (1995) likewise features climactic battle scenes in a treasure-filled cave on the titular Cutthroat Island.

### D. Pace, Setting, and Dialogue

***Pace.*** Dr. Román suggests that the fact that both works share a fast-paced and adventurous nature is notable. Far from being notable, however, nearly all works in the pirate genre, and particularly nearly all films in the pirate genre, share an adventurous and fast-paced momentum.

***Setting.*** Dr. Román also emphasizes that both works take palce in the Caribbean seas, on boats, and in an island cave. Again, nearly all pirate works occur in part on the high seas, on boats, and on islands. This is also the exact setting of the Disneyland Ride and it is not surprising that it would be used in the Disney Film. The Caribbean as a setting for a pirate story is not only literally in the name of the Disneyland Ride, it is far and away the most common setting for the genre, and is the setting of numerous works cited by Plaintiffs as central to the genre, e.g., *A General History of the Pyrates* (1724), *The Pirate* (1948), *The Red Rover* (1827), *Captain Blood* (1922 novel; 1935 film).

***Dialogue.*** Finally, Dr. Román argues that the dialogue is echoed between the works—albeit without highlighting any examples himself. The examples identified in the First Amended Complaint, however, are of little note, and only highlight: (1) comments about a ghost ship, which as explained above is not novel and featured in the Disneyland Ride; (2) pirates being ruthless, which is similarly an extremely common trope in the genre and featured in the Ride; (3) references to cursed pirates, which is also explained above as not being novel and again featured in the Ride; and (4) comedic scenes with women, which is again not only featured in the Disneyland Ride by women chasing pirates or the scene of a woman telling her husband being held over a well "don't be chicken" but also common place in the pirate genre generally. Certain lines, such as the "yo ho, yo ho, a pirate's life for me" song, are common in the works because they are iconic elements of the Disneyland Ride that Plaintiffs admit they appropriated into their Screenplay.

which as explained above is not novel and featured in the Disneyland Ride; (2) pirates being ruthless, which is similarly an extremely common trope in the genre and featured in the Ride; (3) references to cursed pirates, which is also explained above as not being novel and again featured in the Ride; and (4) comedic scenes with women, which is again not only featured in the Disneyland Ride by women chasing pirates or the scene of a woman telling her husband being held over a well "don't be chicken" but also common place in the pirate genre generally. Certain lines, such as the "yo ho, yo ho, a pirate's life for me" song, are common in the works because they are iconic elements of the Disneyland Ride that Plaintiffs admit they appropriated into their Screenplay.

## CONCLUSION

Based on my knowledge and experience with respect to the creation and development of stories into motion pictures, and the foregoing filtration analysis, I conclude that there is no substantial similarity of protectable expression between Plaintiffs' Screenplay and the Disney *Pirates of the Caribbean* Film. The similarities that do exist between the two works exist at such a high level of abstraction as to constitute similarities between abstract ideas rather than similarities of actual, concrete expression.

Respectfully submitted,

Dated March 30, 2021

James McDonald

**JAMES McDONALD**

1818 Colby Ave., #302
Los Angeles, CA 90025
310/473-1818 – Home
310/804-2039 – Cell
jmmcdonald@earthlink.net

# CAREER HISTORY

## 1990 to Present

**PRODUCER**
Feature/TV Films

- Development deals with Walt Disney Pictures, Polygram Entertainment, Propaganda Films, and Image Organization.
- Partnerships with The Avnet/Kerner Co., Allagash Films, and Partisan U.S.A.

Music

- Managing Partner of the My Songs Company (1993-Present).

**STORY CONSULTANT, EXPERT WITNESS and ANALYST**
Walt Disney Corporation

- Disney and Pixar Animation Business Affairs Depts.: Forensic analyst for writer credit determinations (1992-Present).
- Feature Film Dept.: Development consultant and Story Analyst (1990-2008).
- Litigation Dept.: Story consultant/expert witness on several copyright cases (1997-Present).

Barnes & Thornburg Law Firm

- Litigation Dept.: Expert Witness on one credit arbitration case (2016)

Munger, Toles & Olsen Law Firm

- Litigation Dept.: Expert witness on two copyright cases (2015 & 2021).

Akin Gump Law Firm

- Litigation Dept.: Expert witness on one credit arbitration case (2010).

Butzel Long Law Firm

- Litigation Dept.: Expert witness on one copyright case (2007).

Paul, Hastings, Jovanovich Law Firm

- Litigation Dept.: Expert witness on two copyright cases (1997 & 1999).

Warner Bros., HBO, 20th Century Fox, MGM, Miramax, Lionsgate and Walden Media Inc.

- Story consultant and/or analyst for writer credit determinations & issues.

## 1977 to 1990

**DEVELOPMENT EXECUTIVE**
Freddie Fields Productions – V.P., Production. Handled development of the movie GLORY.
20th Century Fox – Director of Acquisitions & Story Editor/Analyst for John Davis (studio owner at the time).

**STORY ANALYST**
20th Century Fox, Paramount, Orion, Lorimar, Columbia, Universal, Disney and MGM.

## EDUCATION

U.C.L.A. – M.F.A. in Directing, Film & Television Dept.
Stanford University – B.A., Communications

# EXHIBIT S

IMDbPro members receive 40% off of Dropbox Plus. Learn More 

Track

Add to list

# Pirates of the Caribbean: The Curse of the Black Pearl (2003)

Share Visit on IMDb

PG-13 143 min | Action, Adventure, Fantasy

Blacksmith Will Turner teams up with eccentric pirate "Captain" Jack Sparrow to save his love, the governor's daughter, from Jack's former pirate allies, who are now undead.

Read more: Plot summary | Synopsis

| | |
|---|---|
| Director | Gore Verbinski |
| Writers | Ted Elliott (screen story) (screenplay) \| Terry Rossio (screen story) (screenplay) \| Stuart Beattie (screen story) \| Jay Wolpert (screen story) |
| Producer | Jerry Bruckheimer |
| Composer | Klaus Badelt |
| Cinematographer | Dariusz Wolski |
| Editors | Stephen E. Rivkin (as Stephen Rivkin) \| Arthur Schmidt \| Craig Wood |
| Casting Directors | Jennifer Alessi \| Ronna Kress |
| Production Designer | Brian Morris |

See all filmmakers & crew (1,231)

### Trending & News

MOVIEmeter 479

News articles 946

### Box Office

| | |
|---|---|
| Budget | $140,000,000 |
| Opening weekend | $46,630,690 |
| Gross (US & Canada) | $305,413,918 |
| Gross (World) | $654,264,015 |

See all box office data

Release date
Jul 9, 2003 (United States)

### Awards

Nominated for 5 Oscar Awards.
Another 38 wins & 99 nominations

## Contacts

+ Add

**Production Company**

Walt Disney Pictures
disney.com
+1 818 560 1000 phone
500 S Buena Vista St
Burbank, CA 91521
USA
See map (bing.com)

**Distributor**

Buena Vista Pictures
disney.com
+1 818 560 1000 phone
(818) 560-1930 fax
500 S Buena Vista St
Burbank, CA 91521
USA
See map (bing.com)

See all company credits (97)

Cast | Filmmakers | Images | Videos | **Details** | Box Office | Companies | News

## Details

Edit details

### Plot Summary

This swash-buckling tale follows the quest of Captain Jack Sparrow, a savvy pirate, and Will Turner, a resourceful blacksmith, as they search for Elizabeth Swann. Elizabeth, the daughter of the governor and the love of Will's life, has been kidnapped by the feared Captain Barbossa. Little do they know, but the fierce and clever Barbossa has been cursed. He, along with his large crew, are under an ancient curse, doomed for eternity to neither live, nor die. That is, unless a blood sacrifice is made.

Written By: **the lexster**

See 4 more

### Synopsis

* not verified by IMDb

Warning this synopsis may contain spoilers

As Governor Weatherby Swann and his twelve-year-old daughter, Elizabeth, sail to Port Royal, Jamaica, their vessel, HMS Dauntless encounters a shipwreck with a sole survivor, the young Will Turner, floating among the wreckage. Elizabeth finds and hides a gold medallion she found around the unconscious Will's neck, fearing he would be accused of piracy. She then glimpses a ghostly pirate ship (the Black Pearl), disappearing into the mist.

Eight years later Captain James Norrington of the British Royal Navy is promoted to Commodore. At his ceremony, he

See more

### Awards

Nominated for 5 Oscar Awards. Another 38 wins & 99 nominations

2013 People's Choice Awards, USA
**Nominated**, People's Choice Award
Favorite Move Fan Following
Rum Runners

2010 Gold Derby Awards
**Nominated**, Gold Derby Award
Lead Actor of the Decade
Johnny Depp
As Captain Jack Sparrow

2005 Satellite Awards
**Nominated**, Golden Satellite Award
Best Overall DVD
For the 3 DVD Set.

See more

## Technical Details

| | |
|---|---|
| Runtime | 143 minutes |
| Sound Mix | Dolby Digital EX / SDDS / DTS |
| Color Info | Color |
| Aspect Ratio | 2.39 : 1 |
| Camera | Panavision Panaflex Lightweight, Panavision Primo Lenses / Panavision Panaflex Platinum, Panavision Primo Lenses |
| Laboratory | Technicolor, Hollywood (CA), USA (prints) / Technique, Burbank (CA), USA (digital intermediate) |
| Film Length | 3920 m (Sweden) |
| Negative Format | 35 mm (Eastman EXR 50D 5245, Kodak Vision 320T 5277) |
| Process | Digital Intermediate (2K) (master format) / Super 35 (common-top) (source format) |
| Printed Format | 35 mm (anamorphic) (Kodak Vision 2383, Vision Premier 2393) |

## Release Details

| | |
|---|---|
| Country of Origin | United States |
| Languages | English |

## International Release Details

| Country | Also Known As | Release Date | Details |
|---|---|---|---|
| United States | P.O.T.C. | Jun 28, 2003 | (Disneyland) (premiere) |
| | Pirates of the Caribbean | Jul 9, 2003 | — |
| Canada | Pirates des Caraïbes - La malédiction de la Perle Noire (French title) | Jul 9, 2003 | — |
| | Pirates of the Caribbean: The Curse of the Black Pearl (English title) | | |
| Uruguay | Piratas del Caribe - La maldición del Perla Negra | Jul 17, 2003 | — |
| Argentina | La maldición del Perla Negra | Jul 17, 2003 | — |

See more

## Production Status

* All dates refer to when the status was entered

| Status | Updated * | Details |
|---|---|---|
| Released | Jun 28, 2003 | Derived from earliest release of 2003-06-28 (US) |

## Filming Locations

13 filming locations

- Stage 2, Walt Disney Studios, 500 South Buena Vista Street, Burbank, California, USA (Isla de Muerta)
- Bequia, St Vincent and the Grenadines
- Dominica
- Kingstown, St Vincent, St Vincent and the Grenadines
- Little Europe, Backlot, Universal Studios - 100 Universal City Plaza, Universal City, California, USA
- Long Beach, California, USA
- Los Angeles, California, USA
- Marineland of the Pacific - 6610 Palos Verdes Drive South, Rancho Palos Verdes, California, USA
- Mediterranean Square, Backlot, Universal Studios - 100 Universal City Plaza, Universal City, California, USA
- Mexican Street, Backlot, Universal Studios - 100 Universal City Plaza, Universal City, California, USA
- Samana, Dominican Republic
- Wallilabou Bay, St Vincent and the Grenadines
- Walt Disney Studios, 500 South Buena Vista Street, Burbank, California, USA

## Filming Dates

1 filming date

| Start | End | Details |
|---|---|---|
| October 9, 2002 | March 7, 2003 | |

## Soundtracks

2 songs

### Yo Ho (A Pirate's Life for Me)

Words by Xavier Atencio
Music by George Bruns
Performed by Lucinda Dryzek, Keira Knightley, and Johnny Depp

### Pirate Musk

Written by Craig Eastman
Performed by Craig Eastman

## Official websites

Displaying 4 links out of 453 total external links

Cascade Film (pirates.film.ru) | hotstar (hotstar.com) | Official Facebook (facebook.com) | Official site (pirates.disney.com)

See all links (453)

## Trivia

152 trivia items

On August 10, 2002, a fire started on the soundstage where the movie was shot. Nobody was hurt, and the damage was estimated to be 350,000 dollars.

Stick around after the credits for an additional scene.

References to the Disneyland attractions include (but are not limited to): three uses of the song "(Yo Ho, Yo Ho) A Pirate's Life for Me" by Xavier Atencio and George Bruns in the opening scene (sung by young Elizabeth), when Jack and Elizabeth are marooned on the island, and in the end by Jack. The jail scenes, in which the prisoners try to tempt the dog who holds the key to their cell. Jack says, "That dog is never going to move" - although the movie dog eventually does, the one in the ride doesn't. Jack later tries to tempt it with a bone, as does one of the audio-animatronic pirates in the ride. The "burning town" sequence, and within it, the redheaded prostitute (who slaps Jack), the "stuffed pirate" drinking the rum spurting out

of a barrel, and the pirate chasing the lady (in the ride they're circling a barrel or pillar) Jack's initial discovery of Gibbs sleeping with the pigs The line "Dead men tell no tales", said by the macaw, which is repeated throughout the ride's narration A quick shot of a skeleton sprawled on the beach of the Isla de Muerta, with a crab nearby During the raid on the town, seen is a man being dunked into a well. A skeletal Barbossa drinks wine, which trickles through his exposed ribcage, as one of the skeletal pirates do. During the battle scene between the two ships, Black Pearl and the Interceptor Captain Barbossa refers to his crew as "bloomin cockroaches" just like the captain in the ride does when his ship attacks a local town fort. In Tortuga, we see a pirate drinking rum on top of two barrels and is wobbling just like in the ride. There are references to cursed treasure in the ride: old pirates speak of cursed treasure and how you probably don't believe in it, and the line "Who knows when that evil curse will strike the greedy beholders of this bewitched treasure." The woman wearing a red dress at Tortuga island that slaps Jack and he wonders if he deserved it is a character in the ride. Part of the Caribbean Beach Resort at Walt Disney World in Orlando, Florida, is called "Port Royal". It is also the name of the shop at the exit of The Pirates Attraction in Disneyland.

The figurehead (a sculpted ornament on the bow of ancient vessels) of the ship carrying Elizabeth and Governor Swann at the beginning of the movie is actually the coat of arms of the United Kingdom, and it is the figurehead of an actual ship of the line, the H.M.S. Victory, which participated in the Trafalgar Battle against combined French and Spanish navies under the command of Lord Horatio Nelson in 1805. H.M.S. Victory is now preserved at Portsmouth, England, as a museum and is the oldest commissioned warship in the world. She still has a Captain and crew, although is no longer seaworthy, having been in dry dock since 1922. The crest holds the French motto of the British monarchs "Dieu et mon droit" (God and my right) and the Old French motto of the Order of the Garter "Honi soit qui mal y pense" (Evil be unto him that thinks evil).

WILHELM SCREAM: Heard during the battle on the Dauntless between the Royal Navy and Barbossa's crew.

The island "Isla de Muerta" is Spanish for "Island of Death", or "Death Island". Tortuga is also Spanish, meaning "turtle".

The skull and crossed blades flag was the flag of "Calico" John Rackam, longtime lover of notorious female pirate Anne Bonny.

This was the first PG-13 release under the Walt Disney Pictures label in the United States. The Walt Disney Company, however, has released PG-13 and R-rated films under the Touchstone Pictures and Hollywood Pictures labels since the 1980s.

(at around 2h 10 mins) One of the film's last lines - "Bring me that horizon" - was conceived by Johnny Depp on the morning the scene was filmed.

Keira Knightley wore colored contact lenses, like Johnny Depp's, in the last scene of the movie. But since her eyes are lighter than Depp's, they had to be dark in the center and light on the outside. She complained they made her so dizzy that she threw them away the night after shooting.

See 142 more

## MOVIEmeter

479 Up 150 this week

3 months | 6 months | 1 year | 3 years | 5 years | All

300
400
500
600
700
800
900

Oct Nov Dec Jan 2021 Feb Mar Apr May Jun Jul Aug Sep

## Ratings Breakdown

★ 8 / 10 | 1,044,749 votes

Rate

| | | |
|---|---|---|
| 45+ | 8 | 7.7 |
| 30-44 | 8.1 | 8 |
| 18-29 | 8.3 | 8.2 |
| Under 18 | 8.1 | 8.3 |
| All ages | 8.2 | 8 |
| US users | 8.1 | |
| Non-US users | 8 | |
| All users | 8 | |

This month
Down 79

Last 12 months
Up 83

Scale: Logarithmic

0 2 4 6 8 10

Male Female Male & Female

295 external reviews & 158 more links

Edit page

# EXHIBIT T

# Disney producer Brigham Taylor shares insights into 'The Jungle Book'

By **Derrick Clements daily Herald -** | Apr 13, 2016

1 / 6

**Producer Brigham Taylor** onstage at Disney's "The Jungle Book" press conference at The Beverly Hilton on April 4 in Los Angeles. Taylor, who has ties to Utah himself, said Disney films have always done well in the Beehive State. "I remember coming up in the film group at Disney Studios and learning from our head of distribution at the time how much he loved the filmgoers out here," Taylor said. "Our films always over-performed wildly in Utah."

Courtesy of Alberto E. Rodriguez/Getty Images

With a name like Brigham Taylor, it's not hard to believe that the producer of "The Jungle Book" has ties to Utah.

"My father grew up here, down in Provo," Taylor said. "He had moved to California by the time I was born, so I grew up there, but I came back (for) school."

I met Taylor during a recent visit on his promotional tour for his new live action adaptation, which opens Friday nationwide.

Having graduated from Brigham Young University in 1992, where he studied Humanities with a Film emphasis, Taylor has been with Disney for more than 20 years, first as an executive and now as a producer. Taylor has helmed several large franchises and tentpoles, including "Pirates of the Caribbean," "Oz the Great and Powerful," "Tron: Legacy" and "The Chronicles of Narnia."

But it all started in Utah.

"(BYU) was sort of my launching pad," Taylor said, "and while I was here I also started volunteering at the Sundance Film Festival and the Filmmakers Lab, and that's where my sort of passion and geekdom for film blossomed into a hopeful career."

The Filmmakers Lab at Sundance was founded by Robert Redford "in response to the shared conviction that the budding independent film movement had the potential for far-reaching creative and cultural impact if given adequate resources and a place to foster self-expression and a sense of community," its website says. For Taylor, the Lab was a valuable place to observe filmmakers at work.

"I was just a fly on the wall listening to these screenwriters and these directors dispense advice, and so I got a little glimpse into how it was made," Taylor said. "It was an amazing education."

If Utah's institutions helped launch Taylor's career, Utah's audiences have no doubt played some role in helping his films throughout his career. Disney executives have long appreciated the particular success their films typically find here in the state, he said.

"I remember coming up in the film group at Disney Studios and learning from our head of distribution at the time how much he loved the filmgoers out here," Taylor said. "Our films always over-performed wildly in Utah."

The state population, more than half of which are members of The Church of Jesus Christ of Latter-day Saints, has a noted affinity with Disney movies.

”I think it’s, there’s a focus on the family in both groups,” Taylor said. “And so there’s an obvious overlap, and so that all makes sense.”

Before “The Jungle Book,” Taylor struck gold in his career in a surprising place.

”I think I’m only sitting here because I was part of a small team that … helped develop and launch ‘Pirates,’ ” Taylor said. “That was something that, it was a vocabulary that the studio hadn’t dealt in in a while, I mean these sort of large general audience action/adventures. We were pretty good making family comedies and a few family dramas and some sort of big adaptations like ‘Flubber’ and ‘101 Dalmations’ of other material, but this was one we felt like sort of was a quadrant we had left aside for a while, which was this big, general audience action/adventure films that we’d grown up with like ‘Raiders of the Lost Ark.’ “

As Taylor and his team considered what stories could work in that genre, another member of the team with Utah ties, a screenwriter who has taught classes at BYU, came up with the idea.

”Josh Harmon, another local son here who teaches nearby, just threw out the title, like ‘Pirates of the Caribbean,’ ” Taylor said. “And it seemed crazy even to us at the time. But after five minutes in thinking about it and what the possibilities were, we were really intrigued.”

After pitching the idea to Disney and investing in its development, Taylor got “Pirates” into the hands of Jerry Bruckheimer and director Gore Verbinski, and a new tide in Disney entertainment had begun. For one thing, “Pirates of the Caribbean” was the first PG-13 movie under the Disney logo, Taylor said.

”Obviously that rating had only existed since whatever it was, ’85, ’86,” he said, “but still there had never been one, and this was the one title that Dick Cook, chairman at the time, felt like it deserves it.”

With zombie pirate action and some scary moments, the film was officially given the rating for “action/adventure violence.”

”It felt like it was in the spirit of the ride itself, and we weren’t violating — I mean, you know, I think Dick realized that even in the park itself there are rides where you have to be so tall to get on, and this is just one of those rides, in film form,” he said.

When “Pirates” became a hit in the box office as well as with critics, gaining five Oscar nominations including one for Johnny Depp, the film spawned not only several sequels (the next one’s set for 2017 and Taylor is producing) but also a whole new kind of

movie for the Disney company, which has gone on to include Marvel superhero films and “Star Wars.”

Although “The Jungle Book” has been rated PG (for “some sequences of scary action and peril”), the new film, directed by “Iron Man” director Jon Favreau, also fits in the same tradition that “Pirates” launched: it’s a big, action-packed adventure, darker in some ways than the 1967 animated version.

”This is the journey of a mancub in the jungle,” Taylor said. “And the conflict is, is the home safe for him anymore there, does he have to leave it? But we did want to make a film that stood on its own or that had its own wrinkles creatively from the story that Walt told in ’67, and we did make some changes … that in our gut felt like for today might resonate better. I mean there’s nothing wrong with ’67, that is a sort of perfect experience, but we wanted to throw some curve balls.”

The setting of “The Jungle Book,” and its main cast of characters, required many special effects, on the level of “Avatar,” “Hugo” and “The Lord of the Rings.” Weta Digital handled many of the effects.

Audiences may not realize, when they see the photorealistic animals moving around in a lush, sun-lit jungle, how much of the film was actually filmed on a soundstage in California.

”All of it,” Taylor said. “I mean it was all between two small stages in downtown Los Angeles. … We stepped outside of the stages, like 100 yards to build a very small bathtub basically that we could put (Mowgli, played by Neel Sethi) in when he was supposed to be in a river, but that was it. You know the closest we got to a jungle were some trees like in Reseda or somewhere. … Everything that was actually photographed and in the movie was on these stages.”

With so many effects shots, the film is practically an animated film itself, Taylor said, a fact that was reflected not only in the final result, but in the production process, which mirrored the process more typically found in animation.

”We mimicked best we could the early process of creating story reels,” Taylor said. “We had a story department, just cranking out sketches and ideas, and we cut all that together, and that was the initial version of our movie.”

They also sought advice from both Walt Disney Animation and Pixar, and John Lasseter, chief creative officer at Disney and Pixar, had an idea that took the new “Jungle Book” back to the 1967 animated version, which had opened on a short live action segment with a book opening up onscreen.

"John sort of conceptualized and was insistent that we find — we actually tracked down the original prop that was the physical book that was shot in 1967," Taylor said. "And so we went to our friends at the Animation Archives and they found it. Ironically if you open it, for whatever reason that has maybe been lost to the sands of time, but you opened it and the cover page was actually 'Robin Hood,' as we know was produced in 1973, so they somehow mixed and matched, (but) we were able to use that original hardcover, and we were able to, rather than opening, we were able to close that book and be a true sort of bookend to what we feel like was a spiritual beginning of this in 1967."

In that way, the 1967 and 2016 version are both largely animated movies with a tiny bit of live action mixed in. So far, audiences are responding with enthusiasm toward the film in advance screenings.

"I've been very pleased to hear a lot of these wonderful reactions," Taylor said. "It's really gratifying to feel people reacting the way you wanted them to, to be really immersed and swept along on a journey, and to feel the emotion of it, and that there's humor and there's intensity, and so that it feels like there's something for everyone. And that was always the goal, and it felt like that's what it was to audiences in '67, and we felt like in creating a different experience and going for this live action aesthetic, we felt like we could do that again and have something that appealed to hopefully everyone."

Another trend that Taylor has noticed, and not just at Disney, is the increasing reliance by studios on larger, big-budget movies, like "The Jungle Book."

"I think that it's hard, in the studio environment, it's hard to whittle down numbers below a certain point," Taylor said, "because of just the way we operate, and the kind of overhead we have, and how we have to function with our unions, but these kinds of films, you know, coming out of Sundance, that can be produced at an intelligent level, and don't have to go out and earn so much, that's where there's still freedom for these smaller ideas. And I think that there will always hopefully be a market. (But in) the studio environment, it's harder and harder not to just lean into these bigger films where you feel like you can capture a lot of attention."

Big movies are not the only ones Taylor has worked on, however.

"In truth I've worked on a lot of lovely lower budgeted movies (as well)," Taylor said. "One of my last movies as an executive was 'Million Dollar Arm,' which I really adored working on, and one of my earliest favorite films from an executive standpoint was 'The Rookie.' Intimate movies, and I loved those two, but yeah, I've had the great opportunity to work on a lot of these sort of tentpole-style movies. And I love that, too."

**Director:** Jon Favreau

**Cast:** Neel Sethi and vocal performances by Bill Murray, Ben Kingsley, Idris Elba, Lupita Nyong'o, Scarlett Johansson and Christopher Walken

**Running time:** 1 hour, 45 mins.

**Rating:** PG for some sequences of scary action and peril

**Locations:** Opens April 15 in theaters nationwide

# EXHIBIT U



Includes updated information on the attractions and movies

# PIRATES of the CARIBBEAN

## FROM THE MAGIC KINGDOM TO THE MOVIES

BY JASON SURRELL

# PIRATES of the CARIBBEAN

## FROM THE MAGIC KINGDOM TO THE MOVIES

JASON SURRELL

FOREWORDS BY

MARTIN A. SKLAR AND TOM FITZGERALD

A Welcome Book

EDITIONS

NEW YORK

This book is for X Atencio, Harriet Burns, Alice Davis, and Blaine Gibson: artists, Imagineers, friends.

And for Ted Elliott and Terry Rossio, whose ghost story made us believe all over again.

The author would also like to thank the following for their contributions to this book: X Atencio, Harriet Burns, Alice Davis, Blaine Gibson, and Dick Nunis; at Disney Editions: Wendy Lefkon and Jody Revenson; at Jerry Bruckheimer Films: KristiAnne Reed; at the Walt Disney Photo Library: Andrea Recendez; at The Walt Disney Archives: Dave Smith and Robert Tieman; at *Pirates of the Caribbean* II & III: Orlando Bloom, Jerry Bruckheimer, Johnny Depp, Ted Elliott, Keira Knightley, Terry Rossio, Geoffrey Rush, Michael Singer, and Gore Verbinski; at Walt Disney Imagineering: Tony Baxter, Patrick Brennan, Denise Brown, Alex Caruthers, Anne Clark, Tom Fitzgerald, Chris Goosman, Bruce Gordon, Jason Grandt, Barbara Hastings, Eric Jacobson, Gary Landrum, Kathy Mangum, Bernie Mosher, Diane Scoglio, Marty Sklar, David Stern, Don Winton, and Alex Wright; at the Walt Disney Studios: Christine Cadena, Dick Cook, Nina Jacobson, and Brigham Taylor. Special thanks for their contributions go to: Lindsay Frick, Jack E. Janzen, Leon J. Janzen, Chris Leps, Kevin Vincent, and Rick West.

The book's producers would also like to thank the following for their assistance: Jess Allen, Stacy Cheregotis, Anne D'Arras, Masayo Enomoto, Julie Enzer, David Fisher, Greg Gujda, Jonathan Heely, Mike Jusko, Chaz McEwan, Betsy Mercer, Mary Mullen, Tracey Ramos, Ed Storin, and Muriel Tebid. Additional thanks to Marilyn Waters and George Savvas.

Also by Jason Surrell: *The Haunted Mansion: From the Magic Kingdom to the Movies, The Art of the Haunted Mansion, Screenplay by Disney*, contributor to *The Imagineering Way* and *The Imagineering Workout*.

Produced by Welcome Enterprises, Inc.
6 West 18th Street, New York, NY 10011.
www.welcomebooks.com

Designed by H. Clark Wakabayashi

**PAGE 1:** Concept art by Marc Davis. **PAGE 2:** *Rogues' Gallery. Famous Pirates of the Spanish Main* (detail). Concept painting by Bruce Bushman depicting real-life pirates, including the infamous Edward Teach, better known as "Blackbeard," and, in the rear, the two best-known female pirates, Anne Bonny and Mary Read. **THIS SPREAD:** *Buccaneers. Taking a Prize* (detail). Concept painting by Bruce Bushman of a shipboard battle.

Copyright © 2005, 2006 Disney Enterprises, Inc.
All rights reserved. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without written permission from the publisher.

The following are registered trademarks of The Walt Disney Company: Adventureland, Audio-Animatronics®, Disneyland® Resort, Disneyland® Resort Paris, Fantasyland, Frontierland, Imagineering, Imagineers, "it's a small world," Main Street, U.S.A, monorail, New Orleans Square, Splash Mountain, Tokyo Disneyland® Resort, Tomorrowland, Walt Disney World® Resort.

"Yo Ho (A Pirate's Life for Me)": Words by F. Xavier Atencio. Music by George Bruns. © Walt Disney Music Company. Lyrics used by permission.

Academy Award® and Oscar® are registered trademarks of the Academy of Motion Picture Arts and Sciences.

Golden Globe(s)® is the registered trademark of the Hollywood Foreign Press Association.

Page 7: Photo by Jess Allen. Page 19: Photo of Herb Ryman courtesy of Ryman Arts. Page 68: The Cabildo (1912), Robert Glenk. Courtesy of the Louisiana State Museum. Page 100: Hidden Maiden at Disneyland Resort Paris © Vincent Leloup/Disney. Page 113: Photo by Elliott Mark. Photos on pages 146 (Left) and 147 (Left and Below) by Scott Brinegar/Disneyland.

Photos of Disneyland Resort Paris on page 73, The Landing; page 78, Flooded Fort/Jail Scene; page 83, The Captain's Quarters; page 102, The Burning Town; page 109, Talking Skull © Sylvain Cambon/Disney.

For information address:
Disney Editions
114 Fifth Avenue, New York, NY 10011-5690.

Editorial Director: Wendy Lefkon
Senior Editor: Jody Revenson

Library of Congress Cataloging-in-Publication Data on file

ISBN 13: 978-1-4231-0709-5
ISBN 10: 1-4231-0709-8

Printed in Singapore
FIRST EDITION 10 9 8 7 6 5 4 3 2 1

# Contents

Forewords by Martin A. Sklar and Tom Fitzgerald — 6
Introduction — 9

COURSE HEADING — **Disneyland and the Magic Kingdoms**
Charting a Course for Adventure — 13
Rascals, Scoundrels, Villains & Knaves — 27
Setting Sail for Florida and the Far East — 53
The European Invasion — 60

COURSE HEADING — **The Spanish Main**
The Port of New Orleans — 68
Laffite's Landing — 72
The Blue Bayou — 74
Approaching the Waterfall — 76
Entering the Grotto — 77
Dead Man's Cove — 79
Hurricane Lagoon — 80
Crew's Quarters — 81
Captain's Quarters — 83
Treasure Room — 84
Ghostly Grotto — 86
Bombarding the Fort — 88
The Well — 92
The Auction — 94
The Chase — 98
The Burning Town — 101
The Jail — 104
The Arsenal — 105
The Upramp — 108

COURSE HEADING — **The Movies**
Return of the Swashbuckler — 113
Jerry and the Pirates — 122
The World of *Pirates of the Caribbean* — 131
Chilling Effects — 136
The Pirates Cast Off — 142

Charting a Course for the Future — 145

# *Dead Man's* COVE

*"Dead men tell no tales!"*

THE BATEAUX glide by a lonely beach littered with the skeletal remains of pirates who fell short in their search for buried treasure. One lies sprawled facedown in the sand, a cutlass protruding from his back. Another, a captain, by the look of his decaying uniform, stands impaled on a rocky outcropping, a sword having been run through his chest. A seagull squawks at guests from its nest in the dead Pirate Captain's tricornered hat as the bateaux pass by this lonely graveyard of lost souls.

**What's My Line?**

**GHOSTLY VOICE #1:** ***"Hear ye a dead man's tale o' a dastardly deed. Brave seamen, these . . . Helped bury the gold they did, then silenced forever. Har! So thought that black 'earted divil! . . . But stay, I told their tale 'afore . . . now I be tellin' it again. Here be where the gold . . . Dead men tell no tales !"***

**GHOSTLY VOICE #2:** ***"Dead men tell no tales, Harrr, heh-heh-heh! Look there upon these pirates bold, take heed whilst I tell ye the gruesome details o' their slight misfortune . . . and the treacherous act what did them in. Unsuspectin' rogues, unmindful . . . Dead men tell no tales!"***

**If that dialogue doesn't sound familiar, it shouldn't—it was ultimately cut from the show. Each scene in the Grotto sequence originally featured ghostly narration and even witty dialogue for its skeletal performers, performed by Paul Frees (Voice #1) and J. Pat O'Malley (Voice #2) in what was to be a ghostly counterpoint to Frees's recurring warning, "Dead men tell no tales." Walt and his Imagineers ultimately concluded that the moody visuals spoke for themselves and packed more punch without dialogue. We finally let these involuntarily mute pirates have their say now, proving once and for all that perhaps dead men *do* tell tales!**

TOP, ABOVE LEFT, AND BELOW: Marc Davis renderings of Dead Man's Cove, including a 1962 concept for the walk-through attraction in which Anne Bonny and Mary Read can be seen admiring their treasure. The women were ultimately cut, but the rest of the scene remains largely intact in the final ride-through version.



to see get made. It was in that meeting that we talked about the possibility of a pirate movie and the fact that we were the only ones who could call a pirate movie, *Pirates of the Caribbean*. We were jazzed about it, but a little sheepish at the same time, due to the possibility of getting laughed out of the room because it is the most failed movie genre of the modern era. But that was also a reason to pursue a pirate movie. No one has gotten it right, and we have the best title out there."

As a big-budget Hollywood film, however, it would still be considered a major risk, both creatively and financially. Brigham and his co-conspirators felt they should at least go into the pitch meeting properly armed. "We spent several months hatching a story in our spare time, and going over the pitfalls of the pirate genre and other movies that didn't quite get it right," Brigham recalls.

In July of that year, the executives emerged from that process with a rough treatment that broadly outlined the story of Will, a lowly prison guard who dreams of becoming a member of the Governor's elite guard. Will's hopes are dashed when Defoe, the Captain of the Guard, cruelly rejects him in front of the Governor himself and his daughter, Elizabeth. When Elizabeth boards a ship bound for the mainland, she is kidnapped by the notorious pirate, Blackheart, and held for an exorbitant ransom. The Governor dispatches Defoe with the payment, but the Captain of the Guard is secretly in league with Blackheart and plans to exploit the situation and unseat the Governor. It is up to Will to save Elizabeth, and he must form an uneasy alliance with the roguish Jack, a prisoner and a former member of Blackheart's bloody crew, to rescue her. In the end, Blackheart is vanquished, Defoe ends up in prison, and Will and Elizabeth end up together. And Jack, of course, is named the new Captain of the Guard, much to Will's dismay.

Brigham presented the idea and their treatment to Nina Jacobson, president, Buena Vista Motion Pictures Group. "They built a story with the bones of the movie we ultimately made," Nina recalls. "The basic underlying love triangle was there to some degree, but none of the attitude was in there and neither was the curse." The executive immediately saw the vast cinematic potential of Pirates of the Caribbean, however. "These attractions are deeply ingrained in our childhood memories," she states. "They also tell really wonderful stories; they're just great narratives."

Encouraged by her initial response to the general idea, Brigham and company polished their treatment and brought it back to the studio head for a second look. This time, Nina returned with the green light

**TOP:** Darek Gogol concept of the *Black Pearl* and its signature figurehead. **RIGHT:** Rendering by storyboard artist Simon Murton of a classic pirate movie swordfight high atop the *Dauntless*, a scene that did not appear in the film.





**LEFT:** Hiding in plain sight, per Johnny Depp. **ABOVE:** Captain Jack claims his prize. Concept art by Chris Turner. **BELOW:** Jack Sparrow spies on the pooped pirate.

## DEAD MEN TELL NEW TALES

JOHNNY DEPP, Geoffrey Rush, and Bill Nighy (Davy Jones) all signed on to voice their movie roles in the attraction, making significant creative contributions. "Johnny Depp and Geoffrey Rush both adjusted dialogue to be appropriate for their character," Kathy recalls. "In the conversations Michael Sprout and the team had with Johnny, they determined that Captain Jack's motivation is not really getting the treasure," Kathy explains. "His motivation is the freedom the loot allows him to have." Johnny's tweaks to Captain Jack's speech in the final treasure-cache scene gave the overall experience new depth.

Johnny also made suggestions about the staging of the scenes in which Captain Jack appeared. As Kathy explains, "We had to figure out how to put Jack Sparrow in the [Well] scene so he's blending in with the environment, but not hiding. Johnny's recommendation was to do a gag. He said, 'You know, I should really be coming out from under the dress of the redhead. I mean that's where Captain Jack Sparrow would be, right?' Well, we couldn't do that for obvious reasons, but we came up with the gag where he's standing behind a dressmaker's form and initially he looks almost like he's wearing the dress."

The movie characters weren't the only new sights and sounds Imagineers had in store for Pirates of the Caribbean. The Disneyland original was the subject of a stem-to-stern enhancement, including a digitally re-mastered sound track and a new playback system featuring over 270 speakers. The upgrades also extended to an enhanced lighting-design package and refocused fixtures, new special effects and illusions, music from the movies, and a fresh infusion of props and set dressing.

The new incarnation of Pirates of the Caribbean premiered at Disneyland on June 24, right along with the second film in the series. This time Johnny Depp was on hand not only to unveil his new film to the world, but also to come face-to-face with the three Audio-Animatronics likenesses of himself that would forever be a part of the attraction that inspired his most famous role. "It's really astonishing," Johnny said. "Their work is amazing . . . fine details, the movement, the gestures, the movement of the eyes







**Clockwise from left:** Scenes from *Pirates of the Caribbean: Dead Man's Chest.* Jack Sparrow en route to Tia Dalma in the "Blue Bayou"; Father and son reunited; Elizabeth, Ragetti, and Pintel meet the crew of *The Flying Dutchman.* Captain Davy Jones.

. . . it's staggering." The attraction opened to the public two days later, but the Imagineers had already won over the toughest critic of all.

The Walt Disney World version followed on July 7, the same day *Dead Man's Chest* opened in theaters nationwide. From that point on, it would no longer matter if audiences experienced the attraction before the film series or vice versa, for the Imagineers had created a common frame of reference that fused the two into a narrative whole, another episode in the ongoing adventures of the Pirates of the Caribbean.

## From the Magic Kingdom to the Movies . . . and Back Again

And so, a pirate movie based on a theme park attraction inspired by classic pirate films brought Pirates of the Caribbean full circle, celebrating all it had been while illuminating everything it could be. At the movies, the *Pirates of the Caribbean* trilogy re-invented the pirate film and re-established it as a viable genre. At Magic Kingdoms around the world, the films have also introduced a whole new generation of fans to the attraction on which they are based, something that has left a profound effect on both the Walt Disney Studios and Walt Disney Imagineering.

Meanwhile, back in the Magic Kingdom, Pirates fans can discover—or rediscover—the adventure that started it all, experiencing the original Disney magic and delighting in the indelible connections between attraction and film, now solidified with appearances by Captain Jack, Barbossa, and Davy Jones. Guests now experience an attraction based on a film adapted from a previous incarnation of the attraction, which itself was inspired by still other films, making Pirates of the Caribbean the first to journey from the Magic Kingdom to the movies . . . and back again.

Of the future, only one thing is certain, and perhaps Captain Jack himself put it best: "Bring me that horizon."

# EXHIBIT V

IMDbPro members receive 40% off of Dropbox Plus.

Learn More

Dropbox

IMDbPro

# Brigham Taylor

Create IMDbPro card | Visit on IMDb

Producer | Additional Crew

Known for The Jungle Book (2016), Tomorrowland (2015), Pirates of the Caribbean: Dead Man's Chest (2006), TRON: Legacy (2010)

External links 1 link

**Images** (9)

Find more **producers** with Discover People.

Trending & News

STARmeter 134,432

News articles 152

Awards

1 win

Track

Add to list

## Contacts

Edit

**Legal Representative**

Goodman, Genow, Schenkman, Smelkinson & Christopher

+1 310 385 9300 phone
+1 310 385 9333 fax
9665 Wilshire Blvd
5th Floor
Beverly Hills, CA 90212
USA
See map (bing.com)

Representatives (1)

Michael Schenkman

Filmography | About | Images | Videos | Box Office | Network | Clients | News

## Filmography

Edit filmography | Filter by profession

38 titles

| Projects in Development (9 titles) | Budget | Status |
|---|---|---|
| Jungle Book 2<br>Producer | | Announced |
| Orb<br>Producer | | Script |
| The Faithful<br>Producer | | Script |
| The Haunted Mansion<br>Producer | | Pre-Prod |
| The Rocketeers<br>Producer | | Pre-Prod |
| The Sword in the Stone<br>Producer | | Announced |
| Unsanctioned<br>Producer | | Treatment |
| Untitled Bobby Smith Jr/Disney+ Project<br>Producer | | Pitch |
| Untitled Twain/Tesla Project<br>Producer | | Script |

| Past Film & Video (28 titles) | Budget | Opening Weekend | Gross (US & Canada) | Gross (Worldwide) |
|---|---|---|---|---|
| The One and Only Ivan (2020)<br>Producer (p.g.a.) | | | | |
| Lady and the Tramp (2019)<br>Producer (p.g.a.) | | | | |
| Her Smell (2018)<br>Special Thanks | | $37K | $256K | $260K |
| Christopher Robin (2018)<br>Producer (produced by) | $75MM | $25MM | $99MM | $198MM |
| Pirates of the Caribbean: Dead Men Tell No Tales (2017)<br>Executive Producer | $230MM | $63MM | $173MM | $795MM |
| The Jungle Book (2016)<br>Producer | $175MM | $103MM | $364MM | $967MM |
| Tomorrowland (2015)<br>Executive Producer | $190MM | $33MM | $93MM | $209MM |
| Million Dollar Arm (2014)<br>Production Executive | $25MM | $11MM | $36MM | $38MM |
| Oz the Great and Powerful (2013)<br>Production Executive | $215MM | $79MM | $235MM | $493MM |
| Pirates of the Caribbean: On Stranger Tides (2011)<br>Production Executive | $250MM | $90MM | $241MM | $1.05B |
| TRON: Legacy (2010)<br>Production Executive | $170MM | $44MM | $172MM | $400MM |
| Secretariat (2010)<br>Production Executive | $35MM | $13MM | $60MM | $60MM |
| The Sorcerer's Apprentice (2010)<br>Production Executive (uncredited) | $150MM | $18MM | $63MM | $215MM |
| The Chronicles of Narnia: Prince Caspian (2008)<br>Production Executive | $225MM | $55MM | $142MM | $420MM |
| The Game Plan (2007)<br>Production Executive | $22MM | $23MM | $91MM | $148MM |
| Pirates of the Caribbean: At World's End (2007)<br>Production Executive | $300MM | $115MM | $309MM | $961MM |
| Bridge to Terabithia (2007)<br>Production Executive | $17MM | $23MM | $82MM | $138MM |



| Title | | | | |
|---|---|---|---|---|
| Pirates of the Caribbean: Dead Man's Chest (2006)<br>Production Executive | $225MM | $136MM | $423MM | $1.07B |
| The Chronicles of Narnia: The Lion, the Witch and the Wardrobe (2005)<br>Production Executive | $180MM | $66MM | $292MM | $745MM |
| Hidalgo (2004)<br>Production Executive | $100MM | $19MM | $67MM | $108MM |
| Miracle (2004)<br>Production Executive | $28MM | $19MM | $64MM | $64MM |
| The Santa Clause 2 (2002)<br>Production Executive | $65MM | $29MM | $139MM | $173MM |
| The Rookie (2002)<br>Production Executive | $22MM | $16MM | $76MM | $81MM |
| Crazy/Beautiful (2001)<br>Production Executive | $13MM | $4.7MM | $17MM | $20MM |
| Brigham City (2001)<br>Special Thanks | $1MM | $104K | $852K | $852K |
| Remember the Titans (2000)<br>Production Executive | $30MM | $21MM | $116MM | $137MM |
| God's Army (2000)<br>Special Thanks | $300K | | $2.6MM | $2.6MM |
| Rigoletto (1993)<br>(Video) - Production Assistant | | | | |

See fewer

**Self** (1 title)

Christopher Robin: A Movie Is Made For Pooh (2018)
(Short) - Self

## STARmeter

134,432 Down 14,540 this week

3 months | 6 months | 1 year | 3 years | 5 years | All

## People also viewed

| Name | STARmeter |
|---|---|
| Charlie Bean<br>Animation Department | 86,158 |



70,000
80,000
90,000
100,000
200,000
Oct
Nov
Dec
Jan
2021
Feb
Mar
Apr
May
Jun
Jul
Aug
Sep
This month
Up 19,459
Last 12 months
Down 46,269
Scale: Logarithmic

Edit page

-482-
EXHIBIT V

# EXHIBIT W

MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
ROBIN GRAY (State Bar No. 316544)
robin.gray@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendant

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ARTHUR LEE ALFRED, II, an individual; AND EZEQUIEL MARTINEZ, JR., an individual,

Plaintiffs,

v.

WALT DISNEY PICTURES, a California company,

Defendant,

Case No. 2:18-CV-08074-CBM-AS

**DEFENDANT WALT DISNEY PICTURES' RULE 26(a)(1) INITIAL DISCLOSURES**

Judge: Hon. Consuelo Marshall

Compl. Filed: Nov. 14, 2017
FAC Filed: Nov. 30, 2020
Trial Date: TBD

Pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure and the Court's order dated January 19, 2021 (Dkt. 122), Defendant Walt Disney Pictures ("WDP") makes the following initial disclosures to Plaintiffs Arthur Lee Alfred, II and Ezequiel Martinez, Jr. ("Plaintiffs").

## GENERAL STATEMENT

1. WDP's investigation and discovery in this action is continuing, and these disclosures reflect only the current status of its investigation and discovery of the allegations and claim in Plaintiffs' First Amended Complaint. WDP reserves the right to supplement or amend these disclosures as additional information becomes known to it, or if Plaintiffs amend their allegations and claims, although WDP undertakes no affirmative obligation to do so beyond any obligations imposed by law.

2. WDP construes the requirements of Rule 26(a)(1) not to require the production or disclosure of any information or documents protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection from disclosure. WDP intends to and does assert a privilege over or right not to produce all such information and documents. Inadvertent disclosure shall not constitute a waiver of any such privilege or other legal protection.

3. These initial disclosures are made without waiving WDP's rights (1) to object to the admission or discoverability of any materials or testimony on any proper ground, (2) to object to the use of any information, for any purpose, in whole or in part, in any subsequent proceeding in this action or any other; or (3) to object on any and all proper grounds, at any time, to any discovery request or proceeding involving or relating to the subject matter of these disclosures.

4. This General Statement is incorporated in its entirety into each of the following disclosures. It shall be deemed continuing as to each such disclosure, and it is not waived, or in any way limited, by the following disclosures.

# INTITIAL DISCLOSURES

## I. Individuals; Rule 26(a)(1)(A)(i)

WDP provides the following list of individuals who are likely to have discoverable information that WDP may use to support its defense, other than solely for impeachment.

| Name | Subject(s) of Information | Location |
|---|---|---|
| Arthur Lee Alfred, II | The claims asserted by Plaintiffs; the development of the Screenplay[1]; WDP's access to the Screenplay. | Plaintiff. |
| Ezequiel Martinez, Jr. | The claims asserted by Plaintiffs; the development of the Screenplay; WDP's access to the Screenplay. | Plaintiff. |
| Tova Laiter | The claims asserted by Plaintiffs; the development of the Screenplay; WDP's access to the Screenplay. | Unknown. |
| Brigham Taylor | WDP's access to the Screenplay; independent conception and creation of the motion pictures in the *Pirates of the Caribbean* franchise. | May be contacted through WDP's counsel. |
| Ted Elliott | WDP's access to the Screenplay; independent conception and creation of the motion pictures in the *Pirates of the Caribbean* franchise. | May be contacted through WDP's counsel. |

[1] In these initial disclosures, the term "the Screenplay" refers to the screenplay allegedly drafted by Plaintiffs and attached as Exhibit 2 to the First Amended Complaint. *See* Dkt. 112-2.

| | | |
|---|---|---|
| Terry Rossio | WDP's access to the Screenplay; independent conception and creation of the motion pictures in the *Pirates of the Caribbean* franchise. | May be contacted through WDP's counsel. |
| Stuart Beattie | WDP's access to the Screenplay; independent conception and creation of the motion pictures in the *Pirates of the Caribbean* franchise. | May be contacted through WDP's counsel. |
| Jay Wolpert | WDP's access to the Screenplay; independent conception and creation of the motion pictures in the *Pirates of the Caribbean* franchise. | May be contacted through WDP's counsel. |
| Fact witness regarding "Pirates of the Caribbean" theme park attraction | Original elements of theme park attraction. | May be contacted through WDP's counsel. |

## II. Category and Location of Documents; Rule 26(a)(1)(A)(ii)

WDP provides the following list of the categories of documents, electronically stored information, and tangible things that WDP may use to support its defense, other than solely for impeachment. WDP provides this list without conceding the discoverability of any particular category of information or documents.

| **Documents** | **Location** |
|---|---|
| Documents relating to the independent creation of *Pirates of the Caribbean: The Curse of the Black Pearl.* | WDP or affiliates. |

| | |
|---|---|
| Documents, if any, relating to Plaintiffs' alleged submission of the Screenplay to WDP and/or its affiliates or employees. | WDP or affiliates; Plaintiffs; third party Tova Laiter. |
| Documents supporting WDP's position that the Screenplay and *Pirates of the Caribbean: Curse of the Black Pearl* are not substantially similar. | WDP or affiliates; third parties. |
| Documents supporting WDP's position that the elements of the Screenplay that Plaintiffs claim are infringed are not elements as to which Plaintiffs may assert copyright ownership. | WDP or affiliates; Plaintiffs; third parties. |
| Prior drafts or alternative versions of the Screenplay. | Plaintiffs and third party Tova Laiter. |
| Documents demonstrating Plaintiffs' access to and reliance on Disneyland's "Pirates of the Caribbean" theme park attraction in drafting the Screenplay. | Plaintiffs and third party Tova Laiter. |

**III. Damages; Rule 26(a)(1)(A)(iii)**

WDP does not currently seek damages in this action. WDP reserves all rights with respect to the recovery of its attorney's fees and costs.

**IV. Insurance; Rule 26(a)(1)(A)(iv)**

WDP has an insurance policy that may apply to the defense of this action and any judgment. The primary insurer on coverage is Illinois Union Insurance Company.

DATED: January 29, 2021

MUNGER, TOLLES & OLSON LLP

By: */s/ Jordan D. Segall*
JORDAN D. SEGALL
Attorneys for Defendant Walt Disney Pictures

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 350 South Grand Avenue, 50th Floor, Los Angeles, CA 90071-3426.

On January 29, 2021, I served true copies of the following document(s) described as **DEFENDANT WALT DISNEY PICTURES' RULE 26(A)(1) INITIAL DISCLOSURES** on the interested parties in this action as follows:

STEVEN T. LOWE
steven@lowelaw.com
ALEKSANDRA HILVERT
aleksandra@lowelaw.com
HEATHER COLE
heather@lowelaw.com
LOWE & ASSOCIATES
8383 Wilshire Boulevard, Suite
1038 Beverly Hills, CA 90211
(310) 477-5811

*Attorneys for Plaintiffs*

**BY E-MAIL OR ELECTRONIC TRANSMISSION:** Based on an agreement of the parties to accept service by e-mail or electronic transmission, I caused the document(s) to be sent from e-mail address Jordan.Segall@mto.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on January 29, 2021, at Los Angeles, California.

*/s/ Jordan D. Segall*
Jordan D. Segall

# EXHIBIT X

Domestic International Worldwide Calendar All Time Showdowns Indices

# Pirates of the Caribbean: The Curse of the Black Pearl (2003)

Blacksmith Will Turner teams up with eccentric pirate "Captain" Jack Sparrow to save his love, the governor's daughter, from Jack's former pirate allies, who are now undead.

Cast information
Crew information
Company information
News
Box office
Franchise rankings
Genre keyword rankings

Title Summary All Releases

## All Releases

DOMESTIC (46.7%)
**$305,413,918**
INTERNATIONAL (53.3%)
**$348,850,097**
WORLDWIDE
**$654,264,015**

| | |
|---|---|
| Domestic Distributor | Walt Disney Studios Motion Pictures See full company information |
| Domestic Opening | $46,630,690 |
| Budget | $140,000,000 |
| Earliest Release Date | July 9, 2003 (Domestic) |
| MPAA | PG-13 |
| Running Time | 2 hr 23 min |
| Genres | Action Adventure Fantasy |
| IMDbPro | See more details at IMDbPro |

Performance Cast and Crew All-Time Rankings Related Stories Similar Movies

### By Release

| Release Group | Rollout | Markets | Domestic | International | Worldwide |
|---|---|---|---|---|---|
| Original Release | July 9-October 31, 2003 | 29 markets | $305,413,918 | $348,850,097 | $654,264,015 |
| 2021 Re-release | | Australia | – | – | – |

### By Region

| Domestic | # Releases | Lifetime Gross | Rank |
|---|---|---|---|
| Domestic | 1 | $305,413,918 | 85 |

| APAC | # Releases | Lifetime Gross | Rank |
|---|---|---|---|
| Japan | 1 | $59,861,990 | 90 |
| Australia | 2 | $18,476,252 | 177 |
| Russia/CIS | 1 | $9,060,000 | 458 |
| New Zealand | 1 | $2,773,373 | 157 |

| | | | |
|---|---|---|---|
| Taiwan | 1 | $1,827,556 | 396 |
| Hong Kong | 1 | $1,260,924 | 714 |
| India | 1 | $1,171,600 | 726 |

| EMEA | # Releases | Lifetime Gross | Rank |
|---|---|---|---|
| United Kingdom | 1 | $47,801,332 | 128 |
| Germany | 1 | $44,650,393 | 60 |
| Spain | 1 | $27,158,123 | 36 |
| France | 1 | $22,139,594 | 263 |
| Italy | 1 | $19,028,837 | 117 |
| Netherlands | 1 | $7,181,017 | 118 |
| Austria | 1 | $5,323,779 | 56 |
| Norway | 1 | $4,492,069 | 100 |
| Greece | 1 | $3,528,750 | 55 |
| Finland | 1 | $2,092,881 | 158 |
| Poland | 1 | $1,640,275 | 580 |
| South Africa | 1 | $1,575,272 | 242 |
| Turkey | 1 | $1,420,275 | 576 |
| Czech Republic | 1 | $1,166,187 | 252 |
| Hungary | 1 | $494,939 | 594 |
| Egypt | 1 | $216,536 | 328 |
| Bulgaria | 1 | $119,897 | 783 |

| LATAM | # Releases | Lifetime Gross | Rank |
|---|---|---|---|
| Mexico | 1 | $10,985,286 | 311 |
| Argentina | 1 | $2,754,861 | 281 |
| Chile | 1 | $913,747 | 388 |

| China | # Releases | Lifetime Gross | Rank |
|---|---|---|---|
| China | 1 | $2,980,000 | 1,313 |

BoxOfficeMojo.com by IMDbPro - an IMDb company.

© IMDb.com, Inc. or its affiliates. All rights reserved. Box Office Mojo and IMDb are trademarks or registered trademarks of IMDb.com, Inc. or its affiliates. Conditions of Use and Privacy Policy under which this service is provided to you.

IMDbPro members receive 40% off of Dropbox Plus.  

Track

Add to list

# Pirates of the Caribbean: The Curse of the Black Pearl (2003)

Share Visit on IMDb

PG-13 143 min | Action, Adventure, Fantasy

Blacksmith Will Turner teams up with eccentric pirate "Captain" Jack Sparrow to save his love, the governor's daughter, from Jack's former pirate allies, who are now undead.

Read more: Plot summary | Synopsis

Director Gore Verbinski

Writers Ted Elliott (screen story) (screenplay) | Terry Rossio (screen story) (screenplay) | Stuart Beattie (screen story) | Jay Wolpert (screen story)

Producer Jerry Bruckheimer

Composer Klaus Badelt

Cinematographer Dariusz Wolski

Editors Stephen E. Rivkin (as Stephen Rivkin) | Arthur Schmidt | Craig Wood

Casting Directors Jennifer Alessi | Ronna Kress

Production Designer Brian Morris

See all filmmakers & crew (1,231)

Trending & News

MOVIEmeter 595

News articles 949

Box Office

Budget $140,000,000

Opening weekend $46,630,690

Gross (US & Canada) $305,413,918

Gross (World) $654,264,015

See all box office data

Release date

Jul 9, 2003 (United States)

Awards

Nominated for 5 Oscar Awards.

Another 38 wins & 99 nominations

## Contacts

+ Add

**Production Company**

Walt Disney Pictures

disney.com

+1 818 560 1000 phone

500 S Buena Vista St
Burbank, CA 91521
USA
See map (bing.com)

**Distributor**

Buena Vista Pictures

disney.com

+1 818 560 1000 phone

(818) 560-1930 fax

500 S Buena Vista St
Burbank, CA 91521
USA
See map (bing.com)

See all company credits (97)

Cast | Filmmakers | Images | Videos | Details | Box Office | Companies | News

## Box Office

Data for this title is provided by Box Office Mojo. All currency values in USD unless otherwise noted.

Filter: Original Release | US & Canada | Weekly

**US & Canada lifetime gross: $305,413,918**

| Date | Rank | Weekly Gross | % Change | Theaters | Avg. by Theater | Gross to Date |
|---|---|---|---|---|---|---|
| Fri, Jul 4, 2003 - Thu, Jul 10, 2003 Week 1 | Rank: 3 | $23,995,281 | — | 3,023 | $7,937 | $23,995,281 |
| Fri, Jul 11, 2003 - Thu, Jul 17, 2003 Week 2 | Rank: 1 | $74,977,536 | +212.4% | 3,269 | $22,935 | $98,972,817 |
| Fri, Jul 18, 2003 - Thu, Jul 24, 2003 Week 3 | Rank: 2 | $54,729,309 | -27.1% | 3,359 | $16,293 | $153,702,126 |
| Fri, Jul 25, 2003 - Thu, Jul 31, 2003 Week 4 | Rank: 2 | $36,985,122 | -32.5% | 3,416 | $10,827 | $190,687,248 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Fri, Aug 1, 2003 - Thu, Aug 7, 2003 Week 5 | Rank: 2 | $29,040,911 | -21.5% | 3,390 | $8,566 | $219,728,159 |
| Fri, Aug 8, 2003 - Thu, Aug 14, 2003 Week 6 | Rank: 4 | $19,825,227 | -31.8% | 3,170 | $6,254 | $239,553,386 |
| Fri, Aug 15, 2003 - Thu, Aug 21, 2003 Week 7 | Rank: 6 | $14,096,864 | -28.9% | 2,710 | $5,201 | $253,650,250 |
| Fri, Aug 22, 2003 - Thu, Aug 28, 2003 Week 8 | Rank: 6 | $10,549,512 | -25.2% | 2,404 | $4,388 | $264,199,762 |
| Fri, Aug 29, 2003 - Thu, Sep 4, 2003 Week 9 | Rank: 4 | $12,360,162 | +17.1% | 2,227 | $5,550 | $276,559,924 |
| Fri, Sep 5, 2003 - Thu, Sep 11, 2003 Week 10 | Rank: 3 | $6,818,048 | -44.9% | 2,203 | $3,094 | $283,377,972 |
| Fri, Sep 12, 2003 - Thu, Sep 18, 2003 Week 11 | Rank: 5 | $5,636,972 | -17.4% | 2,029 | $2,778 | $289,014,944 |
| Fri, Sep 19, 2003 - Thu, Sep 25, 2003 Week 12 | Rank: 8 | $4,323,835 | -23.3% | 1,746 | $2,476 | $293,338,779 |
| Fri, Sep 26, 2003 - Thu, Oct 2, 2003 Week 13 | Rank: 12 | $2,962,722 | -31.5% | 1,443 | $2,053 | $296,301,501 |
| Fri, Oct 3, 2003 - Thu, Oct 9, 2003 Week 14 | Rank: 14 | $2,145,251 | -27.6% | 1,211 | $1,771 | $298,446,752 |
| Fri, Oct 10, 2003 - Thu, Oct 16, 2003 Week 15 | Rank: 13 | $1,457,104 | -32.1% | 801 | $1,819 | $299,903,856 |
| Fri, Oct 17, 2003 - Thu, Oct 23, 2003 Week 16 | Rank: 17 | $857,921 | -41.2% | 493 | $1,740 | $300,761,777 |
| Fri, Oct 24, 2003 - Thu, Oct 30, 2003 Week 17 | Rank: 16 | $628,316 | -26.8% | 379 | $1,657 | $301,390,093 |
| Fri, Oct 31, 2003 - Thu, Nov 6, 2003 Week 18 | Rank: 21 | $555,205 | -11.7% | 331 | $1,677 | $301,945,298 |
| Fri, Nov 7, 2003 - Thu, Nov 13, 2003 Week 19 | Rank: 34 | $142,000 | -74.5% | 472 | $300 | $302,845,731 |
| Fri, Nov 14, 2003 - Thu, Nov 20, 2003 Week 20 | Rank: 16 | $776,454 | +446.7% | 425 | $1,826 | $303,753,725 |
| Fri, Nov 21, 2003 - Thu, Nov 27, 2003 | Rank: 21 | $695,820 | -10.4% | 375 | $1,855 | $304,449,545 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Week 21 | | | | | | |
| Fri, Nov 28, 2003 - Thu, Dec 4, 2003 Week 22 | Rank: 24 | $517,998 | -25.6% | 342 | $1,514 | $304,967,543 |
| Fri, Dec 5, 2003 - Thu, Dec 11, 2003 Week 23 | Rank: 28 | $215,591 | -58.4% | 283 | $761 | $305,183,134 |
| Fri, Dec 12, 2003 - Thu, Dec 18, 2003 Week 24 | Rank: 40 | $119,590 | -44.6% | 213 | $561 | $305,302,724 |
| Fri, Dec 19, 2003 - Thu, Dec 25, 2003 Week 25 | Rank: 51 | $74,900 | -37.4% | 34 | $2,202 | $305,377,624 |
| Fri, Dec 26, 2003 - Thu, Jan 1, 2004 Week 26 | Rank: 68 | $25,816 | -65.6% | 34 | $759 | $305,403,440 |
| Fri, Jan 2, 2004 - Thu, Jan 8, 2004 Week 27 | Rank: 77 | $10,478 | -59.5% | 27 | $388 | $305,413,918 |

## Admissions

+ Add Admissions

| Country | Date | Theater Admissions |
|---|---|---|
| Argentina | July 29, 2003 | 511,206 |
| Argentina | July 22, 2003 | 148,210 |
| Brazil | October 5, 2003 | 1,753,404 |
| Brazil | September 28, 2003 | 1,667,380 |
| Brazil | September 21, 2003 | 1,533,279 |
| Brazil | September 14, 2003 | 1,307,615 |
| Brazil | September 7, 2003 | 951,442 |
| Brazil | August 31, 2003 | 430,191 |
| France | October 21, 2003 | 3,755,228 |
| France | October 14, 2003 | 3,735,926 |
| France | September 30, 2003 | 3,610,297 |
| France | September 23, 2003 | 3,482,760 |
| France | September 16, 2003 | 3,314,411 |
| France | September 9, 2003 | 3,064,772 |
| France | September 2, 2003 | 2,732,688 |
| France | August 26, 2003 | 2,036,845 |
| France | August 19, 2003 | 1,181,208 |
| Germany | May 27, 2007 | 6,159,654 |

| | | |
|---|---|---|
| Germany | July 30, 2006 | 6,086,066 |
| Germany | January 4, 2004 | 5,816,576 |
| Germany | November 16, 2003 | 5,728,723 |
| Germany | September 21, 2003 | 3,769,460 |
| Germany | September 14, 2003 | 3,000,109 |
| Germany | September 7, 2003 | 1,660,290 |
| Italy | July 25, 2004 | 2,798,735 |
| Italy | July 18, 2004 | 2,798,671 |
| Italy | July 4, 2004 | 2,798,571 |
| Italy | March 7, 2004 | 2,798,442 |
| Italy | February 8, 2004 | 2,798,266 |
| Italy | February 1, 2004 | 2,798,160 |
| Italy | January 11, 2004 | 2,798,093 |
| Italy | January 4, 2004 | 2,797,744 |
| Italy | December 28, 2003 | 2,797,620 |
| Italy | December 14, 2003 | 2,797,409 |
| Italy | December 7, 2003 | 2,796,676 |
| Italy | November 30, 2003 | 2,796,260 |
| Italy | November 23, 2003 | 2,795,097 |
| Italy | November 16, 2003 | 2,792,549 |
| Italy | November 9, 2003 | 2,789,738 |
| Italy | November 2, 2003 | 2,785,816 |
| Italy | September 7, 2003 | 923,859 |
| Netherlands | December 31, 2003 | 992,070 |
| Norway | December 2, 2003 | 434,802 |
| Norway | November 2, 2003 | 417,445 |
| Spain | January 4, 2004 | 5,816,576 |
| Spain | October 19, 2003 | 4,760,694 |
| Spain | October 12, 2003 | 4,705,513 |
| Spain | October 5, 2003 | 4,614,605 |
| Spain | September 28, 2003 | 4,478,017 |
| Spain | September 21, 2003 | 4,218,543 |

| | | |
|---|---|---|
| Spain | September 14, 2003 | 3,969,829 |
| Spain | September 7, 2003 | 3,586,301 |
| Spain | August 24, 2003 | 2,086,416 |
| Spain | August 17, 2003 | 927,982 |