**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (Pro hac vice pending)
parenz@robinskaplan.com
800 LaSalle Avenue
Suite 2800
Minneapolis, Minnesota 55402
Telephone: 612 349 8500
Facsimile: 612 339 4181

*Attorneys for Plaintiffs*
*Arthur Lee Alfred, II, et al.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II, et al.,<br><br>Plaintiff,<br><br>v.<br><br>WALT DISNEY PICTURES,<br><br>Defendant. | Case No. 2:18-CV-08074-CBM-ASx<br><br>**[CORRECTED] PLAINTIFFS' OPPOSITION TO DEFENDANT WALT DISNEY PICTURES' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT RE: SUBSTANTIAL SIMILARITY**<br><br>Date:      October 19, 2021<br>Time:     10:00 a.m.<br>Dept:     Courtroom 8B<br>Judge:    Hon. Consuelo Marshall |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

[CORRECTED] PLAINTIFFS' OPPOSITION
TO DISNEY MSJ
2:18-CV-08074-CBM-ASX

# TABLE OF CONTENTS

**Page**

Introduction ............................................................................................ - 1 -

Factual Background ............................................................................... - 2 -

I.    Lee Alfred Jr. and Ezequiel Martinez, with help from their mentor Tova Laiter, defied the odds to become Hollywood screenwriters. ................................................................... - 2 -

II.    Disney copied Alfred and Martinez's supernatural and humorous pirate story. ...................................................... - 4 -

    A.    Alfred and Martinez's humorous supernatural take on a pirate movie. ............................................................ - 4 -

    B.    Taylor at Disney accepted Alfred and Martinez's Pirates screenplay from Laiter. ............................................. - 4 -

    C.    Disney's Pirates film became a blockbuster hit after Disney copied original components of Alfred and Martinez's Pirates screenplay. ....................................... - 5 -

III.    Alfred and Martinez's long journey in this litigation. ..................... - 6 -

    A.    Professor David Román applied a comparative literature approach to analyze the selection and arrangement of the two works. ............................................................... - 7 -

    B.    James McDonald—a Disney employee—ignored the original selection and arrangement of the Pirates screenplay. ...................................................... - 8 -

Argument .............................................................................................. - 9 -

I.    The Court should deny Disney's motion because this Court may not accept Disney's biased expert testimony as true or resolve the battle of experts on summary judgment. ..................................... - 9 -

    A.    This Court may not resolve a battle of the experts on summary judgment. ............................................... - 9 -

    B.    The Court may not accept or credit Disney's expert testimony as true. .............................................. - 11 -

C.   The Court may not disregard Alfred and Martinez's expert at this stage. .............................................................. - 12 -

II.   This Court should deny Disney's motion because a genuine dispute exists over the substantial similarity between the Pirates screenplay and Pirates film. ........................................................ - 14 -

A.   The original selection and arrangement of elements in the Pirates screenplay is a question of fact for the jury. ............. - 16 -

B.   The similarities between the Pirates screenplay and Pirates film are likewise a question for the jury. .................. - 19 -

C.   The differences Disney point to do not eliminate the fact dispute over the substantial similarity to the screenplay's original expression. ............................................................ - 25 -

III.   Disney's ride is irrelevant to the question of substantial similarity. ........................................................................ - 27 -

A.   Disney's ride is "not material" to this motion. ..................... - 27 -

B.   Disney's unauthorized derivative work argument is outside the scope for this motion and lacks merit. .............. - 29 -

Conclusion ......................................................................... - 30 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abs. Ent. v. CBS Corp.*,
  908 F.3d 405 (9th Cir. 2018) ............................................................................... 30

*Alfred v. Walt Disney Co.*,
  821 F. App'x 727 (9th Cir. 2020) .................................................................. *passim*

*Alfred v. Walt Disney Co.*,
  No. 19-55669 (9th Cir. Dec. 20, 2019) ......................................................... 2, 27

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................. 9

*Anderson v. Stallone*,
  No. 87-0592, 1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ............................... 30

*Baird v. BlackRock Institutional Trust Co., N.A.*,
  No. 17-cv-01892-HSG, 2021 WL 681468 (N.D. Cal. Jan. 28, 2021) ............... 13

*Barris/ Fraser Enters. v. Goodson-Todman Enters.*,
  5 U.S.P.Q.2d (BNA) 1887 (S.D.N.Y. 1988) ..................................................... 15

*Baxter v. MCA, Inc.*,
  812 F.2d 421 (9th Cir. 1987) ....................................................................... 15, 26

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ....................................................................... 10, 18

*Bullen v. De Bretteville*,
  239 F.2d 824 (9th Cir. 1956) ............................................................................. 29

*Burke v. City of Santa Monica*,
  No. CV 09-02259 MMM, 2011 WL 13213593 (C.D. Cal. Jan. 10,
  2011) ................................................................................................................... 12

*California v. Green*,
  399 U.S. 149 (1970) ........................................................................................... 12

*Campbell v. PricewaterhouseCoopers, LLP*,
  642 F.3d 820 (9th Cir. 2011) ............................................................................. 10

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

iii

PLAINTIFFS' OPPOSITION TO DISNEY MSJ
2:18-CV-08074-CBM-ASX

*Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Stud.*,
  No. SACV 16-226-JLS, 2016 WL 7486286 (C.D. Cal. May 25,
  2016) ................................................................................................. 16

*Espanade Prods. Inc. v. Walt Disney Co.*,
  768 Fed. App'x 732 (9th Cir. 2019) ................................................... 29

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
  499 U.S. 340 (1991) ...........................................................11, 16, 19

*Fleener v. Trinity Broad. Network*,
  203 F. Supp. 2d 1142 (C.D. Cal. 2001) ........................................ 14, 26

*Funky Films, Inc. v. Time Warner Entm't Co.*,
  462 F.3d 1072 (9th Cir. 2006) ..............................................10, 18, 19

*Gold Value Int'l Textile, Inc. v. Charlotte Russe, Inc.*,
  No. CV 2:16-cv-294-CBM-PLA, 2017 WL 8237898 (C.D. Cal.
  Oct. 27, 2017) ..................................................................................... 27

*Granite Music Corp. v. United Artists Corp.*,
  532 F.2d 718 (9th Cir. 1976) .............................................................. 14

*Jason v. Fonda*,
  526 F. Supp. 774 (C.D. Cal. 1981), *aff'd,* 698 F.2d 966 (9th Cir.
  1982) ................................................................................................... 19

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) ......................................................... 16, 26

*Lewert v. Boiron, Inc.*,
  212 F. Supp. 3d 917 (C.D. Cal. 2016), *aff'd*, 742 F. App'x 282 (9th
  Cir. 2018) .............................................................................................. 9

*Litchfield v. Spielberg*,
  736 F.2d 1352 (9th Cir. 1984) ............................................................ 29

*Liuget v. Danney*,
  No. SACV 18-01683 AG (DFMx), 2019 WL 7906432 (C.D. Cal.
  Dec. 6, 2019) ....................................................................................... 11

*Lobato v. Gomez*,
  No. 1:15-cv-00686-EPG, 2016 WL 6494713 (E.D. Cal. Nov. 1,
  2016) ................................................................................................... 11

iv

*Mattel Inc. v. MGA Ent. Inc.*,
    616 F.3d 904 (9th Cir. 2010) ......................................................... 26

*Metcalf v. Bochco*,
    294 F.3d 1069 (9th Cir. 2002) ............................................... *passim*

*Morgan Creek Prods., Inc. v. Capital Cities/ABC Inc.*,
    22 U.S.P.Q.2d 1881 (C.D. Cal. 1991) ........................................... 15

*NetFuel, Inc. v. Cisco Sys. Inc.*,
    438 F. Supp. 3d 1031 (N.D. Cal. 2020) ........................................... 9

*Ovieda v. Sodexo Operations, LLC*,
    No. CV 12-1750-GHK, 2013 WL 12122413 (C.D. Cal. Oct. 9,
    2013) ............................................................................................... 27

*Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*,
    752 F.3d 807 (9th Cir. 2014) ......................................................... 12

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.*
    *U.S. Dep't of Agr.*,
    499 F.3d 1108 (9th Cir. 2007) ....................................................... 17

*Scharf v. U.S. Attorney General*,
    597 F.2d 1240 (9th Cir. 1979) .................................................. 9, 10

*Shaw v. Lindheim*,
    919 F.2d 1353 (9th Cir. 1990) ............................................... *passim*

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) .................................................. 15, 16

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ........................................................... 9

*Three Boys Music Corp. v. Bolton*,
    212 F.3d 477 (9th Cir. 2000) .................................................. 15, 19

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
    715 F.2d 1327 (9th Cir. 1983) ................................................ 14, 15

*Universal Pictures Co. v. Harold Lloyd Corp.*,
    162 F.2d 354 (9th Cir. 1947) ......................................................... 24

*Walt Disney Prods. v. Filmation Assocs.*,
    628 F. Supp. 871 (C.D. Cal. 1986) ......................................................................... 15

*Williams v. Gaye*,
    895 F.3d 1106 (9th Cir. 2018) ........................................................................ 15, 26

*Wilson v. Walt Disney Co.*,
    123 F. Supp. 3d 1172 (N.D. Cal. 2015) ................................................................. 15

*Wilson v. Walt Disney Co.*,
    No. 14-cv-01441-VC, 2014 WL 4477391 (N.D. Cal. July 30, 2015) ................ 27

**Statutes**

U.S. Code § 102 ........................................................................................................ 29

**Other Authorities**

Nimmer on Copyright § 13.03 [A][1][E] ................................................................ 26

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**Introduction**

After review of both the *Pirates* screenplay and *Pirates* film, the Ninth Circuit determined that both works included "more than de minimis" similarities. *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 729 (9th Cir. 2020). Both works "begin with a prologue that takes place ten years prior to the main story; introduce the main characters during a battle, at gunpoint; involve treasure stories that take place on islands and in jewel-filled caves; include past stories of betrayal by a former first mate; contain fearful moments driven by skeleton crews; focus on the redemption of a young, rogue pirate; and share some similarities in dialogue and tone." *Id.* Thus, the court reversed and remanded, and invited expert testimony.

The essential difference between the case upon remand and now is that both parties have offered competing expert opinions. Professor Román, the Plaintiffs' expert, detailed his opinions about the combination of "substantial qualitatively important similarities" across both works through the eight extrinsic test factors. He also explained how these works uniquely diverged from the archetypical pirate story. Mr. McDonald—Disney's expert and a Disney employee for over three decades—disagreed with Professor Román (and the Ninth Circuit's decision). At base, Disney's motion demands that the Court accept its expert's opinions as true and disregard Professor Román's opinions. But that is not how the summary judgment standard works. This Court may neither resolve a "battle of the experts," nor weigh the evidence on summary judgment. The parties' dueling expert opinions require—not eliminate—a trial.

The Ninth Circuit also held that comparison of the "original selection and arrangement of the unprotectible elements between the two works" is a necessary test here. 821 F. App'x at 729. Yet Disney and its expert refused to do so. Disney's brief continues to insist that the Court focus only on the alternative filtration test. Indeed, despite its irrelevant "novelty" arguments about prior works, Disney still failed to identify a *single* pirate work that features the combination of elements that

the Ninth Circuit found similar across the *Pirates* screenplay and film here (let alone the many more similarities detailed by Professor Román). The combination of expressive elements across both works here is far greater here than what the Ninth Circuit found sufficient to overcome summary judgment in *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990) and *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002).

Disney's heavy reliance on its amusement park ride is "not material" for four reasons. First, Disney conceded that the ride is "not material to the determination that the works are not substantially similar as a matter of law." (Answering Brief at 5, *Alfred v. Walt Disney Co.*, No. 19-55669 (9th Cir. Dec. 20, 2019) (Dkt. 28).) That Disney asks the Court to make this exact determination now confirms that the ride is immaterial. Second, Disney's evidentiary support is not properly before the Court. Disney disclosed none of the fact witnesses in its Rule 26 disclosures that Disney now seeks to rely on. Third, Disney failed to inform the Court that it made changes to the ride between 1968 and 2005. Thus, whatever existed in 2005 is irrelevant to any comparison with the originality of the screenplay in 2000, when Alfred and Martinez wrote it. Fourth, Disney's surprise effort to argue that the screenplay is an unauthorized derivative work—its twelfth affirmative defense—betrays the unambiguous stipulation that this motion is limited only to substantial similarity. Even then, a clear fact issue exists over Disney's authorization of that work, among other fact disputes. In total, Disney's focus on its ride is a sideshow from the Ninth Circuit's focus on similarities between the two works, its direction to consider expert testimony and to apply the original selection and arrangement test. The Court should deny Disney's motion in full.

**Factual Background**

**I.**  **Lee Alfred Jr. and Ezequiel Martinez, with help from their mentor Tova Laiter, defied the odds to become Hollywood screenwriters.**

The Plaintiffs Arthur Lee Alfred II and Ezequiel Martinez lack the silver-spoon pedigree common in Hollywood. Both Alfred and Martinez grew up in lower

socioeconomic neighborhoods in Los Angeles County (Alfred in Pomona, and Martinez in East Los Angeles). (Statement of Genuine Disputes of Material Fact Part I.B (Stmt. F. 1.) Yet both secured admissions to Cal State San Bernardino. (*Id.* F. 2.) In college, Alfred and Martinez met each other and discovered a mutual interest in film. (*Id.* F. 3.) By their senior years, they produced the first-ever film— The Yeti—made and aired at the college. (*Id.*) After that, Alfred and Martinez pursued their dream to become Hollywood screenwriters. (*Id.*) They then met Tova Laiter in 1999 through their respective internships. (*Id.* F. 4.)

Laiter is a well-established Hollywood film and TV producer. (*Id.* F. 5.) Her introduction to Hollywood started on the set of *Godfather 2*. (*Id.* F. 6.) She later served as Vice President of Warner Brothers (Head of Story Department), Senior Vice President of Imagine Entertainment, President of Production at Cinergi Pictures, and in other executive positions in the entertainment industry. (*Id.* F. 7.) As an industry veteran with an eye for talent, she was immediately impressed with Alfred and Martinez's creativity, work ethic, and potential. (*Id.* F. 8.)

In 1999, Alfred and Martinez presented their first professional screenplay— *Red Hood*—to Laiter. (*Id.* F. 9.) *Red Hood* is a new spin on the classic fairy tale that follows Little Red Riding Hood as an adult pursuing revenge on the wolf. (*Id.* F. 10.) Alfred and Martinez prepared both a full screenplay and a "sizzle reel" to capture industry interest. (*Id.* F. 11.) Laiter then marketed this project to her contacts in Hollywood. (*Id.* F. 12.) Disney optioned the *Red Hood* screenplay. (*Id.* F. 13.) As part of this option, Disney's creative team led by young executive Brigham Taylor, and joined by Josh Harmon and Michael Haynes, often met with Alfred and Martinez at Disney's offices on the Disney Lot in Burbank, California, to edit, improve, and polish the screenplay for a potential motion picture. (*Id.* F. 14.)

## II. Disney copied Alfred and Martinez's supernatural and humorous pirate story.

### A. Alfred and Martinez's humorous supernatural take on a pirate movie.

Alfred and Martinez created a pirate story with ghosts in 2000. (*Id.* F. 15.) Their story departed from the archetypal pirate narrative. (*Id.* F. 16.) Under the archetype, stories focus on an individual pirate with significant power over his crew and a corresponding threat of mutiny. (*Id.* F. 17.) The pirate is dangerous and threatening. (*Id.* F. 18.) And the overall story entertains through suspense, adventure, and thrilling events with an imminent sense of danger. (*Id.* F. 19.)

Alfred and Martinez's screenplay is an original twist on a pirate story. (*Id.* F. 20.) It starts with a prologue that introduces the two lead characters, Davey Jones and Captain Jack Nefarious, in immediate conflict. (*Id.* F. 21.) The story resumes ten years later with Davey Jones—a humorous, swashbuckling, morally ambiguous pirate with a drinking problem—seeking redemption. (*Id.* F. 22.) Jones and his crew battle Nefarious and his supernatural "phantom" ghost crew as they seek the lost treasure. (*Id.* F. 23.) The story ends in a final battle on a small, cavernous island as Jones overcomes the skull-faced pirates. (*Id.* F. 24.)  While the story maintains suspense and adventure, it is also playfully entertaining with layers of humor, irony, and wit. (*Id.* F. 25.)

### B. Taylor at Disney accepted Alfred and Martinez's *Pirates* screenplay from Laiter.

In summer 2000, Laiter called Taylor about Alfred and Martinez's *Pirates* screenplay. (*Id.* F. 26.) Laiter introduced the screenplay to Taylor, and Taylor responded with interest. (*Id.* F. 27.) He mentioned that he and others at Disney internally discussed the possibility of doing a movie called "*Pirates of the Caribbean*." (*Id.* F. 28.) Neither Laiter, Alfred, nor Martinez knew about Taylor's abstract thoughts about a pirate movie before this conversation. (*Id.* F. 29.) Taylor agreed to accept the screenplay from Laiter. (*Id.* F. 30.)

Laiter sent the screenplay to Taylor on August 9, 2000.[1] (*Id.* F. 31.) At this time, two versions of the screenplay existed. In their first version, the script bore its original name: *Pirates of the Spanish Main*. (*Id.* F. 34.) As with *Red Hood*, Laiter marketed this script to studios other than Disney. (*Id.* F. 35.) Alfred and Martinez also customized a second version of their screenplay to market it to Disney. (*Id.* F. 36.) This version incorporated various references to Disney's ride. (*Id.* F. 37.) Alfred and Martinez created the story—and all original constituent parts—from their own creativity. (*Id.* F. 38.)

Taylor did not respond to Laiter for several weeks after her submission. (*Id.* F. 39.) When Laiter followed up, Taylor told Laiter that he liked the screenplay and that Taylor had submitted it to his superior at Disney, Nina Jacobson. (*Id.* F. 40.) After even more time passed, far longer than industry practice, Taylor called Laiter to tell her that Jacobson did not like the children in the screenplay and thus Disney would "pass." (*Id.* F. 41.)

Alfred and Martinez last saw their *Pirates* screenplay on Taylor's desk at their final meeting about *Red Hood*. (*Id.* F. 42.) When they asked Harmon about the screenplay, Disney abruptly ushered them out of the office. (*Id.* F. 43.)

**C.   Disney's *Pirates* film became a blockbuster hit after Disney copied original components of Alfred and Martinez's *Pirates* screenplay.**

Industry practice is for studios to return a screenplay just after passing on it. (*Id.* F. 44.) Yet Disney did not return it until November 2002. (*Id.* F. 45.) Disney then released the *Pirates of the Caribbean* film seven months later in summer 2003. (*Id.* F. 46.) Three years after the release, Disney undertook a "stem-to-stern enhancement" of the ride that included "new special effects and illusions." (*Id.* F. 47.)

---

[1] In that cover letter, Laiter mentioned that the screenplay is "a swashbuckling fun adventure, 'Goonies' meets 'Pirates of the Caribbean.'" (*Id.* F. 32) This does not mean that the screenplay actually is a combination of those two prior works. Rather, this presentation is a common shorthand practice in the entertainment industry to suggest the general feel of a new work by relating it to something the person has probably already seen. (*Id.* F. 33.)

Crowds flocked to see *Pirates of the Caribbean* at the box office. (*Id.* F. 48.) Disney claims the film "re-invented" the pirate movie. (*Id.* F. 49.) Taylor is credited as serving on a "small team that helped develop and launch" it. (*Id.* F. 50.) Disney has since converted *Pirates of the Caribbean* into a multi-billion dollar franchise across four sequels. (*Id.* F. 51.) Disney credits Taylor as a production executive or executive producer on each sequel. (*Id.* F. 52.)

Alfred and Martinez's epilogue is less lucrative. Martinez continues to make a living as a screenwriter today, but was denied his big break. (*Id.* F. 53.) In 2011, Alfred transitioned out of the entertainment industry and now works with at-risk kids as a high school principal in Riverside, California. (*Id.* F. 54.)

### III.    Alfred and Martinez's long journey in this litigation.

This case has a long history since Alfred and Martinez filed their complaint in 2017. (Dkt. No. 1.) After this Court dismissed the complaint, the Ninth Circuit reversed in summer 2020. *Alfred*, 821 F. App'x at 729-30. The Ninth Circuit found error in "failing to compare the original selection and arrangement of the unprotectible elements between the two works." *Id.* at 729. As applied, the Ninth Circuit found that "the selection and arrangement of the similarities between [the two works] is more than de minimis." *Id.*

On remand, Alfred and Martinez filed an amended complaint. (Dkt. No. 112.) The parties also stipulated—at Disney's request—to phase the litigation. (Dkt. No. 121.) The stipulation limits the first phase only to the issue of substantial similarity. (*Id.* ¶ 2.) The second phase encompasses all remaining issues. (*Id.* ¶ 14.) The Court scheduled trial for February 2023. (Dkt. No. 145.)

This first phase focused on expert discovery about substantial similarity across the screenplay and film.

### A. Professor David Román applied a comparative literature approach to analyze the selection and arrangement of the two works.

Arthur and Martinez's expert witness is Professor David Román. Unlike Disney's expert, Professor Román is not a professional expert witness for one side in copyright cases. (Stmt. F. 55.) He is a tenured professor at the University of Southern California with a Ph.D. in Comparative Literature. (*Id.*) There, he teaches undergraduate and graduate courses in the Department of English. (*Id.* F. 56.) His publications cover a wide range of plays, novels, and films. (*Id.* F. 57.) Since 2018, he has held an affiliation with the University of London's Royal Central School of Speech and Drama. (*Id.* F. 58.)

Professor Román detailed his opinion that Disney's *Pirates* film is substantially similar to the *Pirates* screenplay. (*Id.* F. 59.) Professor Román's expertise in comparative literature holds special relevance here. Comparative literature is an interdisciplinary practice that encompasses literary, performance, and visual arts. (*Id.* F. 60.) His expertise scrutinizes structures across stories, like themes, plots, characters, sequence of events, tonalities, moods, and dialogue. (*Id.* F. 61.) Professor Román applied this expertise here.

Professor Román started his analysis with his opinions about "the archetypical pirate narrative" as "a subgenre of the sailor at sea stories." (*Id.* F. 62.) He explained why both the *Pirates* screenplay and the *Pirates* film differ from this archetype. (*Id.* F. 63.) ("It's still a pirate story—but with a twist"). Professor Román then detailed the many similarities across both works—some "nuanced and sophisticated" and others "immediately apparent." (*Id.* F. 64.) Professor Román concluded that the *Pirates* film is substantially similar to the *Pirates* screenplay based on the "substantial qualitatively important similarities" across the core elements for the extrinsic test. (*Id.* F. 65.) He also submitted a rebuttal report that details his many disagreements with Disney's expert report and identifies the many

similarities that Disney's expert failed to rebut. (*Id.* F. 66.) Disney cross-examined Professor Román over two days (totaling 349 pages of transcript). (*Id.* F. 67.)

**B.    James McDonald—a Disney employee—ignored the original selection and arrangement of the *Pirates* screenplay.**

Disney's expert witness is James McDonald. Mr. McDonald has a long history as a defense expert witness for Disney and other major studio companies. (*Id.* F. 68.) Disney has also employed Mr. McDonald as a W-2 employee for over 30 years. (*Id.* F. 69.) Throughout that time, he has worked for "every major studio," although most of his income has come from Disney. (*Id.* F. 70.)

Throughout his engagements, he has never issued a report that two works were substantially similar. (*Id.* F. 71.) Nor does he recall ever finding a single protectible element after his application of the filtration analysis. (*Id.* F. 72.) And after Mr. McDonald argued that no substantial similarity existed in a dispute involving Disney's *Frozen* trailer, Judge Chhabria denied Disney's summary judgement motion. (*Id.* F. 73.) Mr. McDonald believes "the Court was wrong." (*Id.* F. 73.) He also disagrees with the Ninth Circuit's decision here. (*Id.* F. 75.)

Mr. McDonald continued his longstanding defense work through his rebuttal expert report. Mr. McDonald concluded that the *Pirates* screenplay and *Pirates* film are not substantially similar. (*Id.* F. 76.) He then set forth his "novelty" analysis over the elements that Professor Román identified. (*Id.* F. 77.) As background, Mr. McDonald spent 93 hours watching pirate movies and visiting websites like pirateking.com and wikipedia.com. (*Id.* F. 78.) Mr. McDonald did not issue an opinion that the *Pirates* screenplay is a derivative work from Disney's ride. (*Id.* F. 79.) Indeed, he conceded that the ride is a "collection of scenes that pull together a whole bunch of tropes" and has "no story." (*Id.* F. 80.) Mr. McDonald also concedes that Disney did not ask him to apply the original selection and arrangement test. (*Id.* F. 81.) Thus, Disney has failed for the second time to

1  consider the selection and arrangement of Alfred and Martinez's *Pirates*
2  screenplay, even though McDonald recognizes the test is proper. (*Id.* F. 82.)

3                                **Argument**

4        Rule 56 does not allow Disney a mini-trial on the merits. On summary
5  judgment, this Court accepts Alfred and Martinez's evidence as true and draws all
6  reasonable inferences in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
7  255 (1986). And this Court does not make credibility determinations or weigh
8  conflicting evidence. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809
9  F.2d 626, 630 (9th Cir. 1987). Disney's motion fails this standard in spades.

10 **I.    The Court should deny Disney's motion because this Court may not
11        accept Disney's biased expert testimony as true or resolve the battle of
        experts on summary judgment.**

12       The core difference between the case now and at the time of the Ninth
13 Circuit's reversal is that both parties have offered expert testimony to support their
14 positions. Professor Román detailed his opinion that the *Pirates* film is substantially
15 similar to the screenplay. Mr. McDonald disagrees. This dispute is not for the Court
16 to resolve on summary judgment.

17       **A.    This Court may not resolve a battle of the experts on summary
18             judgment.**

19       The premise of Disney's motion is that this Court should accept its expert's
20 testimony and disregard the testimony from Alfred and Martinez's expert. But
21 elementary summary judgment principles reject this premise: "[T]he Court is
22 precluded from granting summary judgment in either side's favor" when the "case
23 boils down to a battle of the experts, and such a battle must be left for the jury's
24 resolution." *Lewert v. Boiron, Inc.*, 212 F. Supp. 3d 917, 937 (C.D. Cal. 2016),
25 *aff'd*, 742 F. App'x 282 (9th Cir. 2018) (collecting cases); *see also NetFuel, Inc. v.
26 Cisco Sys. Inc.*, 438 F. Supp. 3d 1031, 1038–39 (N.D. Cal. 2020) (finding "battle of
27 the experts" precludes summary judgment). The Ninth Circuit reversed summary
28 judgment in *Scharf v. U.S. Attorney General* because resolution of conflicting

expert testimony "is not the court's function on summary judgment." 597 F.2d 1240, 1243 (9th Cir. 1979). Indeed, this principle follows the general rule that juries—not judges—evaluate credibility and weigh conflicting evidence. *See, e.g.*, *Campbell v. PricewaterhouseCoopers, LLP,* 642 F.3d 820, 832 (9th Cir. 2011).

That Professor Román and Mr. McDonald disagree is no basis for summary judgment. For instance, they disagree over the themes of the works. (Stmt. F. 83.) Professor Román explained why the theme of both works is redemption, while Mr. McDonald characterized the *Pirates* film as one of liberation. (*Id.*) They disagree over plot structure. Mr. McDonald contends that every story must have a 3-act sequence, while Professor Román explains that is not true. (*Id.* F. 84.) And they disagree over the supernatural element in the *Pirates* screenplay. Mr. McDonald originally opined that the *Pirates* screenplay had none (but later admitted he was wrong), while Professor Román concluded the opposite. (*Id.* F. 85.) And, of course, the experts disagreed about the overall conclusion of substantial similarity. These disagreements carried over into methodologies each expert employed. Professor Román considered the selection and arrangement of elements across the respective works as a whole; Mr. McDonald did not. (*Id.* F. 86.) These disagreements, among *many* more, render summary judgment improper.

Professor Román and Mr. McDonald's disagreement also distinguishes Disney's "controlling" case law. Neither *Funky Films* nor *Benay* involved dueling experts. Indeed, neither Ninth Circuit decision mentions expert testimony at all. *See generally Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006); *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010). And unlike other instances when courts have decided substantial similarity without expert testimony, the Ninth Circuit invited expert testimony here after finding more than *de minimis* similarity across works. *Alfred*, 821 F. App'x at 729. In *Shaw*, expert testimony that "illustrat[ed] how the plots in both scripts share a common sequence and rhythm" was enough to overcome summary judgment. *See Shaw*, 919

F.2d at 1358; *see also id.* at 1359 ("It is not the district court's role, in ruling on a motion for a summary judgment, to limit the interpretative judgment of each work to that produced by its own experience."). So too here. Only a jury may now resolve the battle between Professor Román and Mr. McDonald.

**B.    The Court may not accept or credit Disney's expert testimony as true.**

Disney's reliance on McDonald for summary judgment is especially improper because he is neither reliable nor credible. Alfred and Martinez object to Mr. McDonald's testimony under Rule 702, as explained in their objections. Copyright law does not require novelty. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 358 (1991) ("[N]ovelty is not required."). Yet McDonald bases his opinions on a "novelty" analysis. (Stmt. F. 87.) Disney tasked McDonald with the wrong standard.

This Court may also not accept Mr. McDonald's opinions on summary judgment because his credibility is in dispute. Courts may not accept a moving party's expert opinions when the non-moving party has undermined that expert's credibility. *See, e.g.*, *Lobato v. Gomez*, No. 1:15-cv-00686-EPG, 2016 WL 6494713, at *6 (E.D. Cal. Nov. 1, 2016) (surveying extensive circuit and district court case law rejecting summary judgment where credibility of witness was challenged and finding credibility challenge more than "vague or uncertain"). Indeed, to accept Mr. McDonald's opinions would violate the "two things" forbidden at summary judgment: weighing evidence and making credibility determinations. *Liuget v. Danney*, No. SACV 18-01683 AG (DFMx), 2019 WL 7906432, at *4 (C.D. Cal. Dec. 6, 2019) (citing *Anderson*, 477 U.S. at 255).

Here, McDonald's credibility is in serious question. Mr. McDonald is a Disney *employee*. He has relied on Disney for most of his annual income as a W2 employee of Disney for over three decades. (Stmt. F. 88.) And outside his work for Disney, he has worked for "every major" entertainment studio. (*Id.* F. 89.) Based on his allegiance to Hollywood studios, Mr. McDonald has never found substantial

similarity or even anything protectible, in any of his past testifying experiences. (*Id.* F. 90.) In fact, he candidly conceded that he "wouldn't have done that." (*Id.*) Witness bias is a classic topic reserved for the jury. *See, e.g.*, *Burke v. City of Santa Monica*, No. CV 09-02259 MMM (PLAx), 2011 WL 13213593, at *13 (C.D. Cal. Jan. 10, 2011) ("An expert witness's bias goes to the weight . . . of the testimony, and should be brought out on cross-examination." (quoting *United States v. Kelley*, 6 F. Supp. 2d 1168, 1183 (D. Kan. 1998))).

The jury should also have the chance to question his expertise. While Mr. McDonald is quick to contend that the *Pirates* screenplay is "generic," "uninventive," and scènes à faire, he reached these broad-brushed conclusions only by watching pirate movies for about 90 hours and googling questionable websites like pirateking.com and wikipedia.com. (Stmt. F. 91.)

Finally, the Court should not allow Mr. McDonald to evade cross-examination before a jury (if the Court allows him to testify at all). Cross-examination is "the greatest legal engine ever invented for the discovery of truth." *California v. Green,* 399 U.S. 149, 158 (1970) (quoting 5 Wigmore § 1367). Even in a pretrial deposition, McDonald retreated from his positions that the *Pirates* screenplay had no undead pirates, (Stmt. F. 92), or that Captain Nefarious was not evil, charismatic, and funny. (*Id.* F. 93.) If not excluded, Mr. McDonald should face Alfred and Martinez's complete cross-examination at trial.

### C.   The Court may not disregard Alfred and Martinez's expert at this stage.

Disney has no basis to ignore Professor Román's opinion. "[C]hallenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). Indeed, courts may not weigh "expert credibility" on summary judgment. *Baird v. BlackRock Institutional Trust Co., N.A.*, No. 17-cv-01892-HSG,

2021 WL 681468, at *1 (N.D. Cal. Jan. 28, 2021). Disney's attacks on the weight over Professor Román's opinions are improper on summary judgment as a result.

Those same attacks are also misleading and unwarranted. Consider Disney's glib representation that Professor Román "had never heard of, seen, or ridden the Ride." (Disney Br. at 21 n.8.) That statement is false—and Disney knows it. Professor Román's rebuttal expert report explained that he had watched a video of the ride and that the skeletons in the ride "are not 'undead' – they were just positioned in the way they died." (Stmt. F. 94.) At his deposition, he testified that "there was, literally, like no story there [in the ride]. It didn't – there was nothing really there. The ride had no narrative structure." (*Id.* F. 95.)

Disney also distorts Professor Román's testimony and analysis when it contends that he made "no effort whatsoever" to consider protectible versus unprotectible elements. (Disney Br. at 10.) For instance, Professor Román employed his "scholarly expertise to do a comparative study between a screenplay and a film and to see what the similarities were." (Stmt. F. 96.) The similarities he identified and explained were "qualitatively important" under this analysis. (*Id.* F. 97.) Indeed, he disregarded "banal" similarities. (*Id.* F. 98.) He also considered the overall selection and arrangement of these similarities as a whole, as the Ninth Circuit directed. (*Id.* F. 99.)

Next, Disney tries to belittle Professor Román through its misleading suggestion that he questioned "the pirate genre's very existence." (Disney Br. at 3.) Yet Professor Román explained that the pirate genre is a subgenre of the sailor-at-sea genre. (Stmt. F. 100.) Disney's expert even agrees in principle with this explanation: "pirates is probably a subgenre of the adventure genre if you're gonna be -- technical on the specifics." (*Id.* F. 101.) That *both* experts believe the pirate genre does not stand alone is no basis to ridicule Professor Román.

Finally, Disney critiques Professor Román for not watching enough pirate movies before his opening report. (*See* Disney Br. at 10.) To start, Disney

mischaracterizes the record on this point. Professor Román explained his rich familiarity with pirate literature and other pirate movies. (Stmt. F. 102.) Even so, individual prior works are irrelevant to whether the *Pirates* film is substantially similar to the Pirates *screenplay*. *Cf. Granite Music Corp. v. United Artists Corp.,* 532 F.2d 718, 722-25 (9th Cir. 1976) (noting that prior works may be relevant to the separate issue of independent creation); *Fleener v. Trinity Broad. Network*, 203 F. Supp. 2d 1142, 1150 (C.D. Cal. 2001) (denying summary judgment that elements linked to the particular genre were not standard or indispensable to the genre). The analysis for Professor Román was whether the *Pirates* film is substantially similar to the *Pirates* screenplay—not whether the *Pirates* screenplay is novel over prior works. And he considered other pirate movies and literature in rebuttal to Mr. McDonald's report. (Stmt. F. 103.) In total, even separate from his proficiency in the Early Modern Period, including many pirates works (both fiction and non-fiction), Professor Román considered *Treasure Island*, *Cutthroat Island*, *Robinson Crusoe*, *Peter Pan*, *Pirates of Penzance*, and *The Goonies*, along with the book *Pirates and Seafaring Swashbucklers on the Hollywood Screen*. (Stmt. F. 104.) None of Disney's arguments about Professor Román raise any proper issue for the Court to consider on summary judgment. At most, Disney's attacks on Professor Román go to the weight of his testimony.

## II.   This Court should deny Disney's motion because a genuine dispute exists over the substantial similarity between the *Pirates* screenplay and *Pirates* film.

Disney failed to meet its heavy burden to avoid trial. The Ninth Circuit has long held that summary judgment over substantial similarity "has traditionally been disfavored in copyright litigation." *See, e.g.*, *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 n.6 (9th Cir. 1983). The extrinsic test is the only relevant test on summary judgment. *Metcalf*, 294 F.3d at 1073. And Alfred and Martinez need only show "indicia of a sufficient disagreement concerning the substantial similarity of [the] two works" to overcome Disney's motion. *Swirsky v.*

*Carey,* 376 F.3d 841, 844 (9th Cir. 2004) (quoting *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1472 (9th Cir. 1992)). Expert testimony alone may show this sufficient disagreement. *See, e.g.*, *id.* at 846-47 (reversing summary judgment because district court erred by discounting copyright owner's expert).

Indeed, "[d]eterminations of substantial similarity of expression are subtle and complex." *Baxter v. MCA, Inc.*, 812 F.2d 421, 424 (9th Cir. 1987). The extrinsic test requires a "factbound" determination as a result. In *Williams v. Gaye*, for instance, the Ninth Circuit rejected the defendant's argument that the court could review the denial of summary judgment as a "purely legal issue[]." 895 F.3d 1106, 1122 (9th Cir. 2018). Rather, the district court's "factbound inquiry" under the extrinsic test required the court to review the full record at trial on appeal. *Id.*; *see also Three Boys Music Corp. v. Bolton,* 212 F.3d 477, 485 (9th Cir. 2000) (reviewing "factual determinations regarding extrinsic test"). Courts routinely deny summary judgment on a disputed record as a result. *See, e.g.*, *Shaw*, 919 F.2d at 1355 (reversing summary judgment over substantially similarity between script and television show); *Metcalf*, 294 F.3d at 1074 (reversing summary judgment over substantially similarity between script and television show).[2] The unique procedural history here cries out for a similar conclusion. Unlike those limited cases finding no similarity on summary judgment, the Ninth Circuit has already found "the similarities between [the works] is more than de minimis." *Alfred*, 821 F. App'x at 729. That Alfred and Martinez have come forward with expert evidence supporting this conclusion confirms that Disney's motion must fail.

---

[2] *See also Baxter*, 812 F.2d at 425 (reversing summary judgment over substantial similarity); *Twentieth Century-Fox Film*, 715 F.2d at 1330 (same); *Wilson v. Walt Disney Co.*, 123 F. Supp. 3d 1172, 1173 (N.D. Cal. 2015) (denying summary judgment over substantial similarity); *Morgan Creek Prods., Inc. v. Capital Cities/ABC Inc.*, 22 U.S.P.Q.2d 1881 (C.D. Cal. 1991) (same); *Walt Disney Prods. v. Filmation Assocs.*, 628 F. Supp. 871, 878 (C.D. Cal. 1986) (same); *Barris/ Fraser Enters. v. Goodson-Todman Enters.*, 5 U.S.P.Q.2d (BNA) 1887 (S.D.N.Y. 1988) (same).

**A.    The original selection and arrangement of elements in the *Pirates* screenplay is a question of fact for the jury.**

Disney's motion (and expert) ignore the originality standard. Yet "[t]he *sine qua non* of copyright is originality." *Feist*, 499 U.S. at 345; *see also id.* at 346-47 (explaining that originality "remains the touchstone of copyright protection today"). It is also a low standard: "the requisite level of creativity is extremely low; even a slight amount will suffice." *Id.* at 345. The Ninth Circuit has held that "originality is broad, and originality means 'little more than a prohibition of actual copying [a previous work].'" *Swirsky,* 376 F.3d at 851 (citation omitted).

The originality standard controls any dispute over protectibility in a copyrighted work. Indeed, courts use "original" and "protected" interchangeably. *See, e.g.*, *id.* at 844. And a work may include protectible elements in isolation, or the work may include a protectible selection and arrangement of unprotectible elements. *See, e.g.*, *Metcalf*, 294 F.3d at 1074. Either way, disputes over originality or protectibility present classic fact issues. *See, e.g.*, *Divine Dharma Meditation Int'l Inc. v. Inst. of Latent Energy Stud.*, No. SACV 16-226-JLS (JCGx), 2016 WL 7486286, at *5 (C.D. Cal. May 25, 2016) (explaining "question of originality in copyright law 'is one of fact, not law'" (quoting *Dezendorf v. Twentieth Century-Fox Film Corp.*, 99 F.2d 850, 851 (9th Cir. 1938))).

The original selection and arrangement of unprotectible elements is one of those fact questions. Copyright law recognizes that "[o]riginal selection, coordination, and arrangement of unprotectible elements may constitute protectible expression." *L.A. Printex Indus., Inc. v. Aeropostale, Inc.,* 676 F.3d 841, 849 (9th Cir. 2012) (citing *Feist*, 499 U.S. at 362). And while Disney tries to cabin this test only to "some cases," the Court need not speculate over its application *in this case* because the Ninth Circuit has held that it applies: "the district court erred by failing to compare the original selection and arrangement of the unprotectible elements between the two works." *Alfred*, 821 F. App'x at 729. The law of the case requires

its application here. *See, e.g., Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007).

The Ninth Circuit's decision in *Metcalf* shows the degree of expression necessary to overcome summary judgment. [3] The Ninth Circuit observed that the setting was "set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs" and "deal[t] with issues of poverty, race relationships and urban blight." *Id.* at 1073. The main character is a "young, good-looking, muscular" surgeon who grew up in the hospital's neighborhood, and struggles "to choose between the financial benefits of private practice and the emotional rewards of working in the inner city." *Id.* This character also develops a strong attraction to a hospital administrator who is in her thirties, divorced, and devoted to the hospital. *Id.* As to plot, the court recounted that "the hospital's bid for reaccreditation is vehemently opposed by a Hispanic politician." *Id.* at 1074. This selection and arrangement of elements—and no more—was sufficiently original (and thus protectible) to survive summary judgment. *Id.*

Alfred and Martinez's original selection and arrangement of elements in their *Pirates* screenplay surpasses what sufficed in *Metcalf*. This selection and arrangement includes the *Pirates* screenplay's three main characters: Davey Jones, Captain Nefarious, and Jane; the plot focused on a supernatural conflict with a ghost ship with a ghost captain and skeleton crews; a fast-paced sequence of events that starts with a prologue, resumes a decade later with fast-paced episodes, like Captain Nefarious' attack on the shipping port town when he takes Jane captive, and ending with a final battle on an ominous island, Calavera Island with skeleton-faced pirates in a cavernous cove accessible only by boat; an overall theme about redemption; the settings on a ghost ship, the port town, and the ominous cove; and a

---

[3] Disney conceded on appeal that *Metcalf* remains "an instructive example of what is required for the selection and arrangement of generic elements in a narrative work to establish substantial similarity." (Answering Brief at 40, *Alfred v. Walt Disney Co.*, No. 19-55669 (9th Cir. Dec. 20, 2019) (Dkt. 28).)

hybrid tone and mood that is both suspenseful and adventurous, as well as playful, humorous (slapstick, satire, and irony) and witty. (Stmt. F. 105.) Disney even concedes that this combination of elements is original and does not contest it. (Lowe Decl. ¶ 4 & Ex. O at 78:14-20.)

Whether any one of these elements is individually protectible is irrelevant. As explained in *Metcalf*, "one cannot copyright the idea of an idealistic young professional choosing between financial and emotional reward, or of love triangles among young professionals that eventually become strained, or of political forces interfering with private action." 294 F.3d at 1074. But the combination of even generic elements "can itself be a protectable element" sufficient to overcome summary judgment. *Id.* And the combination of elements in the *Pirates* screenplay is more detailed and unique than the combination in *Metcalf*.

Indeed, this combination is qualitatively significant because it defies the archetypical pirate story. The "standard pirate story," for instance, "typically depicts power differences and the tensions resulting from those conflicts; male bonding and the shipmen as kin motif; maritime culture including work life and quotidian experience; storms at sea or other unforeseen challenges from nature; the necessity of recruiting a future captain to replace an aging or retiring captain; and the overarching threat of mutiny." (Stmt. F. 106.) That Alfred and Martinez reinvented this traditional pirate storyline underscores the originality of their screenplay.

Nor is Disney correct that *Funky Films* and *Benay* controls. To the contrary, neither decision applied the original selection and arrangement test to the copyrighted works. *See generally Funky Films*, 462 F.3d at 1076-82; *Benay*, 607 F.3d at 624-29. That Disney wants this Court only to apply the filtration test invites the same error it invited at the motion to dismiss stage. *See Alfred*, 821 F. App'x at 729 ("The district court erred by failing to compare the original selection and arrangement of the unprotectible elements between the two works.").

Finally, Disney's "novelty" attack fails. As discussed above, novelty is irrelevant in a copyright dispute. *See, e.g.*, *Feist*, 499 U.S. at 358. But even if novelty were relevant, Disney has offered no evidence that any pirate work before the Pirates screenplay included the combination of elements above. *Three Boys,* 212 F.3d at 485 (affirming finding of substantial similarity where the defense expert conceded that "the combination of unprotectible elements" in the infringing song was not "anywhere in the prior art"). Indeed, Disney has not even identified a *single* pirate story that is both supernatural and humorous; suspenseful and playful; and featured a morally ambiguous disillusioned and drunken—and yet charismatic— pirate that seeks redemption against his former first-mate nemesis who has held a strong female character hostage. (Stmt. F. 107.) Nor has Disney identified a *single* pirate story that arranged the very similarities that the Ninth Circuit found significant. *See Alfred*, 821 Fed. Appx. at 729. Any dispute over the originality (and thus protectibility) of Alfred and Martinez's combination of these elements is for the jury to decide at trial, not for the Court on summary judgment.

**B.     The similarities between the *Pirates* screenplay and *Pirates* film are likewise a question for the jury.**

The Ninth Circuit looks at eight factors for the extrinsic test for literary works: "plot, theme, dialogue, mood, setting, pace, characters, and sequence of events." *Metcalf*, 294 F.3d at 1073. (Disney calls these factors the "*Funky Films* factors" to try to elevate that 2006 case, even though these factors have existed for four decades*. See, e.g.*, *Jason v. Fonda,* 526 F. Supp. 774, 777 (C.D. Cal. 1981), *aff'd,* 698 F.2d 966 (9th Cir. 1982).) Courts consider these factors holistically and do not require an author to prove similarity across each. *See, e.g.*, *Metcalf*, 294 F.3d at 1073-74 (finding triable issue based on similarities across setting, characters, and plot); *Shaw*, 919 F.2d at 1364 (finding triable issue even though mood, setting, and pace "do not weigh heavily in our decision").

Alfred and Martinez will prove at trial that Disney's *Pirates* film is substantially similar to their *Pirates* screenplay. These similarities include the elements that the Ninth Circuit found "more than de minimis":

> both begin with a prologue that takes place ten years prior to the main story; introduce the main characters during a battle, at gunpoint; involve treasure stories that place on islands and in jewel-filled caves; include past stories of betrayal by a former first mate; contain fearful moments driven by skeleton crews; focus on the redemption of a young, rogue pirate; and share some similarities in dialogue and tone.

*Alfred*, 821 F. App'x at 729.

However articulated, a classic fact dispute exists over the substantial similarity across the *Pirates* screenplay and *Pirates* film. The Ninth Circuit's factors, analyzed below, confirm it.

**Characters.** Davey Jones (screenplay) and Jack Sparrow (film) are substantially similar. Both characters are one of the core main characters. Each is a cocky, dashing, and charismatic young rogue pirate with a drinking problem. (Stmt. F. 108.) He is morally ambiguous, opportunistic, and a disillusioned swashbuckling pirate who self-promotes. Sparrow/Jones wants to be a great pirate, yet routinely fails. Sparrow/Jones is a humorous character. (*Id.*)

Captain Nefarious (screenplay) and Captain Barbossa (film) are substantially similar. Nefarious/Barbossa is a sinister—and yet funny and charismatic—pirate focused on finding treasure at all costs. (*Id.* F. 109.) Nefarious/Barbossa is the former first mate to Jones/Sparrow who ousted him after a mutiny. (*Id.*) The likeability—and less menacing nature—of these villains makes both works friendlier to a mass audience too. (*Id.* F. 110.)

Jane (screenplay) and Elizabeth (film) are substantially similar. Jane/Elizabeth is a young woman who lives in the shipping port town and dreams of pirates and adventure on the high seas. (*Id.* F. 111.) After Barbossa/Nefarious kidnaps her, she belies the damsel-in-distress stereotype, and reveals herself as a fully dimensional character who later tricks Barbossa/Nefarious to prevent him

from finding the final treasure. (*Id.* F. 112.) Elizabeth/Jane is both feminine and tough. (*Id.*) She is also the love interest who sustains the Romántic story line. (*Id.* F. 113.)[4]

To be sure, these expressive character elements—and specifically, the combination of these three characters—are more expressive than what the Ninth Circuit found sufficient to overcome summary judgment in *Shaw*, 919 F.2d at 1363 (finding main characters substantially similar that were "well dressed, wealthy and have expensive tastes. The most striking similarity is their self-assuredness, and unshakeable faith in the satisfactory outcome of any difficult situation."), and *Metcalf*, 294 F.3d at 1073 (focusing on "young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located").

**Plot, Sequence of Events, and Pace.** The plot, sequence of events, and pace in the *Pirates* screenplay and *Pirates* film are substantially similar. The overall plot in both works focuses on a supernatural conflict between Jones/Sparrow and Nefarious/Barbossa, who leads a ghost ship with skeleton-pirate crews with a curse or haunted legend underlying it. (Stmt. F. 114.) In both works, as Professor Román explained, "these skeleton crews mainly surface at night during scenes of epic battle and provide a sensational thrill-driven aura to the story. Both works also rely on a curse or a haunted legend that the characters in each story set out to rectify or undue a quest that involves in both cases the search for lost or stolen treasures on remote islands." (*Id.* F. 115.)

Both works start with a prologue about ten years earlier. (*Id.* F. 116.) The prologue in both works (1) sets the tone and mood of the story; (2) introduces unfinished business that will be revisited about a decade later; (3) introduces some of the major characters, including Jane/Elizabeth; (4) takes place on a ship in rough seas under threatening skies; and (5) introduces a conflict on the ship that throws the viewer into a pirate story. (*Id.* F. 117.)

---

[4] Jones/Sparrow's crew members are also substantially similar. (Roman Decl. Ex. J at 12-13.)

In both works, the lead pirate characters (Jones/Sparrow and Nefarious/Barbossa) are introduced formally at gunpoint, and Nefarious/Barbossa takes the ship from Jones/Sparrow. (*Id.* F. 118.) A series of fast-paced episodes years later follow. For instance, in both works, the characters next cross paths during Barbossa/Nefarious's attack on the shipping port to search for key items to locate the treasure. (*Id.* F. 119.) While Sparrow/Jones escapes unharmed, Nefarious/Barbossa takes Jane/Elizabeth captive. (*Id.*) The competing ships make their way to an ominous island, Calavera Island (meaning Skull Island)/Isla de Muerta (meaning Island of the Dead), for the final battle scene with Nefarious/Barbossa's skeleton pirates in a cavernous cove accessible only by small boats. (*Id.* F. 120.) After defeating Nefarious/Barbossa and his crew, Jones/Sparrow and Jane/Elizabethreturn to the port town. (*Id.* F. 121.) The story ends with Jones/Sparrow's redemption by captaining his ship. (*Id.* F. 122.)

The *Pirates* film also includes many other similarities with the *Pirates* screenplay that shows a repeating pattern. For example, when Jane/Elizabeth are first taken hostage by Nefarious/Barbossa, they are both brought aboard ship where they are taken past crew members before meeting with Nefarious/Barbossa directly. (*Id.* F. 123.) In the *Pirates* screenplay, the crew members heckle Jane while she is escorted across the deck. (*Id.* F. 124.) After being insulted, one crew member tries to attack Jane before Nefarious intervenes. (*Id.* F. 125.) Nefarious, in response, reprimands the crew member as a warning to the rest of the crew not to harm Jane. (*Id.* F. 126.) In the *Pirates* film, Elizabeth is similarly heckled by crew members on the deck of the ship before meeting face to face with Barbossa. (*Id.* F. 127.) As she tries to respond, she is slapped by one of the crew members. (*Id.* F. 128.) Just as Elizabeth is struck, Barbossa appears, grabs the crew member's arm and threateningly warns that no one is to lay a hand on her. (*Id.* F. 129.)

In another uniquely similar scene, male pirates in the screenplay and film poorly disguise themselves as women to deceive enemies during battle. (*Id.* F. 130.)

In the screenplay, Jones dresses as a "wench" before revealing himself and attacking the invading pirates. (*Id.*) The scene is comedic, with one of the pirates seeking to kiss Jones before he says "Love hurts" and strikes the pirate. (*Id.*) In the film, two members of Barbossa's crew dress up as young maidens to create a distraction and mount a surprise attack. (*Id.* F. 131.) The otherwise rugged pirates fan each other, even complimenting each other's outfits before viciously engaging in sword fights with enemies. (*Id.* F. 132.)

In yet another example, Jones/Sparrow both take control of their rivals' ghost ships in almost the same manner. In the Screenplay, while Jones is busy fighting Nefarious and his supernatural pirates, Jones' crew is able to climb aboard the unoccupied Phantom Ship. (*Id.* F. 133.) The crew takes control of the ship without Jones, bringing him aboard only at the last minute during a hot pursuit. (*Id.* F. 134.) In the film, Sparrow's crew also takes the ghost ship while Barbossa and his crew are fighting Sparrow and other enemies. (*Id.* F. 135.) After regaining control of the empty ship without Sparrow, they likewise welcome him aboard at the end of a hot pursuit. (*Id.* F. 136.)

The Ninth Circuit's decision in *Shaw* has special relevance here. There, the court reversed summary judgment on substantial similarity because "the sequence of events by which the author expresses the theme or idea" constituted an original selection and arrangement through "a pattern which is sufficiently concrete as to warrant a finding of substantial similarity if it is common to both the Plaintiff's and Defendant's works." *Shaw*, 919 F.2d at 1360. Here too, the consistent similarity across the sequence of events in both works establishes the same "pattern" sufficient in *Shaw*. (*See, e.g.*, Lowe Decl. Ex. J at 21 (opining on "same original patterns and combinations" across both works).)

**Themes.** The main theme in both works is about redemption. While Jones/Sparrow starts the story in despair as a failed pirate, he redeems himself after defeating his rival Nefarious/Barbossa and returns to glory. (Stmt. F. 137.)

**Setting.** The *Pirates* film and screenplay take place on a ghost ship, the port town, and the cove where the treasure is hidden ("Calavera Island"/"Isla de Muerta"). (*Id.* F. 138.)

**Tone and Mood.** The tone and mood of the story is both suspenseful and adventurous, as well as playful, humorous (slapstick, satire, and irony), and witty. This hybridity adds a "spin" on the standard pirate story. (*Id.* F. 139.)

**Dialogue.** The *Pirates* screenplay and the *Pirates* film have several instances of similarity of dialogue. *See Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947) ("Copying and infringement may exist, although the work of the pirate is so cleverly done that no identity of language can be found in the two works."). Each respective ship is a supernatural ship captained by an evil man. (*Compare id.* F. 140 ("a ship with black sails, that's crewed by the damned and captained by a man so evil that hell himself spat him back out") *with id.* F. 141 ("Legend says that a big sea monster ate him and spat him out" and now "His ghost sails the seas in his ghost ship.").) Just as the screenplay provides, "[f]or ten years the Phantom has stopped at nothing… and he'll CRUSH anyone…who gets in his way," (*id.* F. 142), so too does the film provide Barbossa has "been praying on ships and settlements for near ten years. [And] never leaves survivors." (*Id.* F. 143.)

And there is more. In the film, Elizabeth tells Barbossa, "I hardly believe in ghost stories anymore." (*Id.* F. 144.) The screenplay also has the Jones' crew discussing that the tale of "undead Jack" is an old seaman's tale and not real. (*Id.* F. 145.) Later in the screenplay, two pirates also say, "perhaps he be a Ghost! Maybe he thinks he be Phantom Jack" referring to "undead Jack" Nefarious. (*Id.* F. 147.) The existence of cursed pirates is also touched on throughout the *Pirates* film. Nefarious and Barbossa's dialogue are mirrored in the works as well. While being attacked by pirate (Nefarious/Barbossa) villains state that they "can't die." (*Id.* F. 148.)

In the screenplay, Jones tries to convince a woman in the tavern that he was once a dashing, swashbuckling pirate. (*Id.* F. 149.) In the film, Sparrow tries to convince others of his lore as a great pirate. (*Id.* F. 150.) And women slap both Jones/Sparrow in comedic scenes. In the screenplay the woman states, "You had that coming, Davey Jones!" (*Id.* F. 151.) In the film, Jack Sparrow says, "Not sure I deserved that," followed by "I may have deserved that." (*Id.* F. 152.) Both lines convey substantially similar messages.

\* \* \*

The combination of these expressive elements are qualitatively significant too. Even Disney has observed that the archetypical pirate story was "the most failed movie genre of the modern era." (*Id.* F. 153.) Yet after Disney incorporated the elements from the screenplay above—which diverged from that archetypical story through its original twist—Disney claims to have "re-invented the pirate film." (*Id.* F. 154.) That the *Pirates* screenplay and film diverge from the standard pirate storyline in the same manner controverts any suggestion that the similarities are merely "random." At minimum, a fact dispute exists over these substantial similarities. "[T]he totality of the similarities . . . goes beyond the necessities of the . . . theme and belies any claim of literary accident. The cumulative weight of these similarities allows [Alfred and Martinez] to survive summary judgment." *Metcalf*, 294 F.3d at 1074 (quoting *Shaw*, 919, F.2d at 1363).

**C.    The differences Disney point to do not eliminate the fact dispute over the substantial similarity to the screenplay's original expression.**

The focus on summary judgment is the similarity across the two works. Copyright law provides "broad" protection to literary works, like the screenplay here. *Alfred*, 821 F. App'x at 730. "To illustrate, there are myriad of ways to make an 'aliens-attack movie,' but 'there are only so many ways to paint a red bouncy ball on blank canvas. Whereas the former deserves broad copyright protection, the

latter merits only thin copyright protection." *Williams*, 895 F.3d at 1120. Thus, the standard is "substantial similarity" and not "virtually identical" as Disney has tried to do. *See, e.g.*, *Mattel Inc. v. MGA Ent. Inc.,* 616 F.3d 904, 913-14 (9th Cir. 2010).

The Ninth Circuit's substantial similarity standard recognizes no copyright owner has to prove the infringer copied the entire work. "[A] copyright defendant need not copy a plaintiff's work in its entirety to infringe the work. It is enough that the defendant appropriated *a substantial portion* of the plaintiff's work." *L.A. Printex*, 676 F.3d at 852 (emphasis added). Indeed, the court has embraced Judge Hand's famous maxim that "it is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Id.* (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 56 (2d Cir. 1936)). For this reason, courts have found infringement on only a six-note sequence in an entire song, or just 20-percent of an entire film. *See, e.g.*, *Baxter v. MCA, Inc.,* 812 F.2d 421, 425 (9th Cir. 1987); Nimmer on Copyright § 13.03 [A][1][E] (citing *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947)). And courts deny summary judgment when concrete similarities—along with substantial differences—exist: "Although Disney is correct that differences exist between the works (particularly with respect to pace and mood), their plot and sequence of events have too much in common for a court to conclude that 'no reasonable juror could find substantial similarity of ideas and expression.'" *Wilson v. Walt Disney Co.*, No. 14-cv-01441-VC, 2014 WL 4477391 at *1 (N.D. Cal. July 30, 2015). The Ninth Circuit held the same in *Shaw*, 919 F.2d at 1358 (reversing summary judgment "[d]espite these dissimilarities"). The Court should reach the same conclusion here.

**III.    Disney's ride is irrelevant to the question of substantial similarity.**

  **A.    Disney's ride is "not material" to this motion.**

   Disney's heavy reliance on its "ride" is a sharp detour from what it told the Ninth Circuit. On appeal, Disney informed the Ninth Circuit that its ride was "not material" to decide substantial similarity as a matter of law. (Answering Brief at 5, *Alfred v. Walt Disney Co.*, No. 19-55669 (9th Cir. Dec. 20, 2019) (Dkt. 28).) That conclusion remains the same now since Disney asks this Court to decide substantial similarity as a matter of law. Disney's reversal is no more than a sucker-punch tactic—and a weak one at that.

   Indeed, Plaintiffs do not assert references to the ride as part of their claim for copyright infringement. Nor is any evidence about the ride even properly before the Court. "Rule 26 requires witnesses to be identified by name, address and telephone number." *Gold Value Int'l Textile, Inc. v. Charlotte Russe, Inc.*, No. CV 2:16-cv-294-CBM-PLA, 2017 WL 8237898, at *2 n.4 (C.D. Cal. Oct. 27, 2017); *see also Ovieda v. Sodexo Operations, LLC*, No. CV 12-1750-GHK (SSx), 2013 WL 12122413, at *6 (C.D. Cal. Oct. 9, 2013). Broad references to "employees, agents, or independent contractors" on a topic are insufficient. *Id.* This Court struck witness declarations for individuals who the offering party did not previously disclose in this way. *Id.* This Court should reach the same conclusion here. Contrary to Rule 26's requirements, Disney not identify any of those fact witnesses in its disclosures. (Lowe Decl. Ex. W.) The Court should thus strike Disney's declarations for Diego Parras, Rebecca Cline, and David Jensen and corresponding exhibits.

   But even if the Court considers the ride, Disney's arguments still fail. To start, the ride is just that—*a ride*. It has no story or narrative. Even Disney's expert concedes as much. (*Id.* F. 155.) And by definition, the ride cannot have a "prologue"—as Disney now contends without support—with no story or narrative.

   Other material fact disputes exist over the ride too. At the motion to dismiss stage, Disney offered the Court a video of the ride in 2005. Yet Disney did not

inform the Court that Disney undertook a "stem-to-stern enhancement" of the ride that included "new special effects and illusions" upon the release of the *Pirates* sequel in 2006. (*Id.* F. 156.) Further, between 1968 and 2005 (thus prior to 2006) Disney  made other changes, including making a skeleton "undead." (*Id* .F. 157.) For instance, Disney's previously undisclosed video of the ride from 1968 shows a skeleton fixed to a ship's wheel, which reflects "the skeletal remains of pirates who fell short in search for buried treasure." (*Id.* F. 158 (explaining that skeletons in the ride "are not 'undead' – they were just positioned in the way they died.").) Yet at some later-but-undisclosed time, Disney updated that same skeleton to make it a living skeleton actively steering the ship wheel. (*Id.* F. 159.) At best, this dispute is a fact issue for the jury to decide. At worst, it shows that Disney cannot establish that the 2005 video was representative of the ride before the *Pirates* screenplay—it was not. (*See* Dkt. No. 79 Ex. I (submitting same 2005 version to the Court).)[5]

Even so, Disney's counsel focuses on a series of references that Alfred and Martinez added to pique Disney's (their then-business partner) interest. (Stmt. F. 160.) That Laiter mentioned that she would send a copy without those references to other studios reflects only the inference that these references would have no effect on a different company. None of these ride references had significance to the original story. Indeed, Disney's expert conceded that the screenplay is original. (*Id.* F. 161.) The references are de minimis. (Martinez Decl. ¶ 14.)

Finally, Disney errs when it relies heavily on the original complaint. "[I]t is hornbook law that an amended pleading supersedes the original, the latter being treated thereafter as non-existent." *Bullen v. De Bretteville*, 239 F.2d 824, 833 (9th Cir. 1956). Disney's reliance on this "non-existent" pleading is thus irrelevant. Even then, Disney omits relevant context for various allegations, like that the ride

---

[5] Disney's reliance on Exhibit D from its attorney declaration is also an improper attempt to circumvent the Court's page limits, as explained in Alfred and Martinez's corresponding objection.

had "no story" and that Alfred and Martinez created "a new story focused upon a supernatural element." (Dkt. 1 ¶ 26.) Disney's reliance on out-of-context excerpts of a non-existent pleading is improper and irrelevant to Disney's motion.

**B.    Disney's unauthorized derivative work argument is outside the scope for this motion and lacks merit.**

Disney's unauthorized derivative argument fails for four reasons. First, Disney's affirmative defense to infringement is beyond the scope of this motion. In the parties' stipulation over phased discovery, the parties agreed that "Walt Disney Pictures may file a motion for summary judgment on *only* the issue of substantial similarity" during this first phase. (Dkt. 121 ¶14.) On its face, Disney's new contention that the *Pirates* screenplay is an unauthorized derivative work of the ride falls outside this limited scope. That Disney pled this as its twelfth affirmative defense only confirms this conclusion too. (Dkt. 124 at 20.)

Second, the *Pirates* screenplay is not a derivative work of the ride. A derivative work is one that *infringes* the original work. *See, e.g.*, *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984). To start, Disney makes no showing that an amusement park ride is even copyrightable subject matter. *Cf.* 17 U.S. Code § 102 (listing "works of authorship"). The law is unambiguous that the core similarity—the title—is *not* protected by copyright. *See, e.g.*, *Espanade Prods. Inc. v. Walt Disney Co.,* 768 Fed. App'x 732, 733 (9th Cir. 2019) ("a title is unprotected as a matter of federal law"). And Disney made no meaningful effort to articulate how the 104-page *Pirates* screenplay infringes Disney's 15-minute ride across the eight-factors of the extrinsic test. Disney's expert provided no such analysis or opinion. Nor could he, as the ride references consist only of 2 pages across the 104-page screenplay. (Stmt. F. 162.)

Nor is the unpublished decision in *Anderson v. Stallone* relevant. To prove this unauthorized derivation, the district court observed that it would "be required to undertake the extensive comparisons under the *Krofft* substantial similarity test to

determine whether Anderson's work is a derivative work." No. 87-0592, 1989 WL 206431, at *8 (C.D. Cal. Apr. 25, 1989). Yet the court avoided that analysis because it viewed the defendant's copyrighted work as not a script or story, but separately copyrighted characters. *Id.* And it was "uncontroverted" that the plaintiff's work appropriated the *same* copyrighted Rocky characters, so there was no question the plaintiff's characters were "derivative." *Id.* (referring to "bodily appropriation" of characters). Here, in contrast, Disney has made no argument that the ride features *any* characters, let alone any that are independently copyrighted or unlawfully included in the *Pirates* screenplay.

Next, Disney offers no evidence that the screenplay was "unauthorized." Consistent with the limited scope of phase I and Disney's anemic Rule 26 disclosures, Disney offered no evidence on this element. In fact, the record shows that Disney authorized the screenplay's playful references to the ride when it accepted the script with knowledge that it was titled "Pirates of the Caribbean.". And authorized derivative works allow the author to retain his copyright in new contributions that are more than "trivial." *See, e.g.*, *Abs. Ent. v. CBS Corp.,* 908 F.3d 405, 414 (9th Cir. 2018). At minimum, a fact dispute would exist over the scant references across the 104-page screenplay that Disney concedes is original.

Finally, this entire sideshow about the ride reveals Disney's overarching hubris and hypocrisy. Disney and its expert contend that everything that Disney stole from Alfred and Martinez's *Pirates* screenplay is "generic" and "uninventive," while they simultaneously maintain that Disney "owns" the trivialities and tropes in the ride. (Stmt. F. 163.) This inconsistency is for the jury to resolve.

### Conclusion

The Ninth Circuit found similarity across the *Pirates* screenplay and film. Alfred and Martinez's expert confirmed and expanded on these important similarities. Only a jury may now decide this hotly contested dispute. Alfred and Martinez ask the Court to deny Disney's motion in full.

1

2    Dated:      October 4, 2021              **LOWE & ASSOCIATES, PC**

3
                                             By: */s/ Steven T. Lowe, Esq.*
4                                            Steven T. Lowe, Esq.
                                             Aleksandra Hilvert, Esq.
5
                                             **ROBINS KAPLAN LLP**
6                                            Patrick M. Arenz (pro hac vice pending)

7                                            *Attorneys for Plaintiffs*
                                             *Arthur Lee Alfred, II, et al.*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28