JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
ROBIN S. GRAY (State Bar No. 316544)
robin.gray@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:   (213) 687-3702

*Attorneys for Defendant Walt Disney Pictures*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-CV-08074-CBM-ASx |
| Plaintiffs, | **DEFENDANT WALT DISNEY PICTURES' REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT RE SUBSTANTIAL SIMILARITY** |
| v. | |
| WALT DISNEY PICTURES, | *[Filed concurrently with [2] Response to Plaintiffs' Objection to Evidence; [3] Request for Judicial Notice in Support of Reply; [4] Supplemental Declaration of Jordan D. Segall in Support of Reply; and [5] Response to Notice of Errata]* |
| Defendant, | |
| | Date:   October 19, 2021 |
| | Time:   10:00 a.m. |
| | Dep't:   Courtroom 8B |
| | Judge:   Hon. Consuelo B. Marshall |

1

## <u>TABLE OF CONTENTS</u>

2                                                                          <u>Page</u>

3   I.       INTRODUCTION ........................................................................... 1

4   II.      ARGUMENT ................................................................................. 4

5            A.    District Courts in the Ninth Circuit Routinely Resolve
                   Substantial Similarity on Summary Judgment, Even in the Face
6                  of Contradictory Expert Testimony ..................................... 4

7            B.    Of the Two Experts, Only McDonald's Opinions Assist the
                   Court........................................................................................ 5
8
             C.    No Genuine Dispute Exists on Substantial Similarity ........................ 6
9
                   1.    There Is No Striking Similarity in an Original Selection
10                       and Arrangement of Original Elements ....................................... 6

11                 2.    There Is No Substantial Similarity Between the Works
                         with Respect to the Relevant Protectable Elements .................... 9
12
             D.    Plaintiffs' Use of Disney's Ride Precludes their Claim ...................... 12
13
     III.    CONCLUSION ............................................................................ 15
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alfred v. Walt Disney Co.*,
  821 F. App'x 727 (9th Cir. 2020)..............................................................5

*Anderson v. Stallone*,
  1989 WL 206431 (C.D. Cal. Apr. 25, 1989)............................................2

*Benay v. Warner Bros. Ent.*,
  2008 WL 11336277 (C.D. Cal. Mar. 14, 2008) ...................................4, 5

*Benay v. Warner Bros. Entm't, Inc.*,
  607 F.3d 620 (9th Cir. 2010).......................................................3, 9, 10

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010)...............................................4, 5

*Brown Bag Software v. Symantec Corp.*,
  960 F.2d 1465 (9th Cir. 1992) ................................................................4

*Caldwell v. City of S.F.*,
  2020 WL 7643124 (N.D. Cal. Dec. 23, 2020) ......................................14

*DuMond v. Reilly*,
  2021 WL 733311 (C.D. Cal. Jan. 14, 2021).......................................7, 8

*Flynn v. Surnow*,
  2003 WL 23411877 (C.D. Cal. Dec. 9, 2003)........................................8

*Funky Films, Inc. v. Time Warner Entm't Co.*,
  462 F.3d 1072 (9th Cir. 2006) .................................................2, 6, 9, 13

*Gable v. Nat'l Broad. Co.*,
  727 F. Supp. 2d 815 (C.D. Cal. 2010)...................................3, 4, 5, 7, 8

*Hathaway v. Caputo*,
  2021 WL 1862248 (D. Ariz. May 10, 2021)...........................................8

*L.A. Printex Indus., Inc. v. Aeropostale, Inc.*,
  676 F.3d 841 (9th Cir. 2012) ..................................................................7

1
2

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

3
4

*Litchfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ....................................................................... 3

5
6

*McIntosh v. N. Cal. Universal Ents. Co.*,
   670 F. Supp. 2d 1069 (E.D. Cal. 2009) ................................................ 10, 15

7

*Mestre v. Vivendi Universal U.S. Holding Co.*,
   273 F. App'x 631 (9th Cir. 2008) ................................................................. 7

8
9

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) ..................................................................... 7

10
11

*Narell v. Freeman*,
   872 F.2d 907 (9th Cir. 1989) ..................................................................... 12

12
13

*Rentmeester v. Nike, Inc.*,
   883 F.3d 1111 (9th Cir. 2018) .................................................................. 3, 8

14
15

*Rice v. Fox Broad. Co.*,
   330 F.3d 1170 (9th Cir. 2003) ................................................................. 4, 13

16
17

*Shame on You Prods., Inc. v. Elizabeth Banks*,
   120 F. Supp. 3d 1123 (C.D. Cal. 2015) .................................................. 7, 12

18
19

*Silas v. HBO, Inc.*,
   201 F. Supp. 3d 1158 (C.D. Cal. 2016) ....................................................... 8

20

*Skidmore v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) ..................................................................... 8

21
22

*Sobhani v. @Radical.Media Inc.*,
   257 F. Supp. 2d 1234 (C.D. Cal. 2003) ..................................................... 13

23
24

*Zella v. Scripps Co.*,
   529 F. Supp. 2d 1124 (C.D. Cal. 2007) ....................................................... 7

25

**FEDERAL RULES**

26

Fed. R. Civ. P. 26(a)(1)(A)(i) .......................................................................... 14

27

Fed. R. Civ. P. 37(c)(1) .................................................................................... 14

28

# TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**OTHER AUTHORITIES**

"Secret of Monkey Island," Wikipedia,
https://en.wikipedia.org/wiki/The_Secret_of_Monkey_Island ............................. 8

Rafael Sabatini, *Captain Blood* (1922) ...................................................... 11

## I.    INTRODUCTION

Plaintiffs and WDP both adapted Disney's humorous, adventurous Pirates of the Caribbean attraction, and naturally both adaptations are humorous adventures about pirates in the Caribbean—replete with the stock elements and *scenes a faire* that follow from that premise.  But the two are fundamentally *dis*similar in plot, themes, dialogue, mood, pace, characters, and sequence of events.  Plaintiffs' Screenplay follows a group of ragtag kids, explicitly modeled on the protagonists of *The Goonies* and named "the Rascal Scoundrels" after a lyric in the Ride's "Yo Ho" song.  Fully *49%* of the 594 instances in which a character speaks in the Screenplay come from the Scoundrels.  Owing to these child characters' centrality, Plaintiffs rightly described their Screenplay as "Goonies' meets 'Pirates of the Caribbean.'"  (Dkt. 112-2 at 1.) Davey (a surrogate father), Jane (a surrogate mother), and Nefarious (a Captain Hook to their Peter Pan and the Lost Boys) have roles to play, but the Screenplay is largely a light-hearted picaresque about the Scoundrels: how they leave behind orphanhood and childish piracy to find parents and legitimacy as pirate-hunters.  For that reason, the Screenplay has no substantial similarity to the Motion Picture, which has no children at all, nor any similar plot.  The two works share only a superficial overlap owing to both works' incorporation of the Ride and the pirate genre's conventions: Caribbean ports, rum-loving pirates, skeletons, and caves full of glittering treasure.

Plaintiffs know that the centrality of the Rascal Scoundrels makes the Screenplay fundamentally different from the Motion Picture.  Thus, their 30-page Opposition writes the Rascal Scoundrels out of the Screenplay altogether.  Not once does the Opposition mention the "Rascal Scoundrels," let alone any of the individual child-protagonists.  The Rascals' leader Jimmy alone speaks twice as often (103 times) as Jane (44 times), more than Nefarious (83 times), and almost exactly as much as Davey (109 times).  Combined, Davey, Nefarious, and Jane—whom Plaintiffs *now* characterize as their "[S]creenplay's three main characters" (Dkt. 184 ("Opp.") 17)— speak 20% less often (237 times) than do the Rascals (293 times).  The Rascals, who

plainly are the main or at least co-equal characters, also engage in far more action. Yet they are utterly absent from the Opposition's description of Plaintiffs' Screenplay. Plaintiffs' embarrassed silence about the Rascal Scoundrels says it all.

Plaintiffs also know that their Screenplay looted Disney's Ride for its key material. The Screenplay's name, tagline, setting, genre, character names, locations, events, songs, and key dialogue are lifted—explicitly and verbatim—from Disney's Ride. Plaintiffs claim that they "do not assert references to the ride as part of their claim for copyright infringement." (Opp. 27.) That is simply not true. For instance, the "Jane" character, who Plaintiffs speciously claim is the same as the Motion Picture's Elizabeth Swann, appears in the Screenplay as "the Redhead," a character *explicitly* taken from the Ride. (DSUF 136.) Plaintiffs' central contention is that the Motion Picture took the idea of skeleton pirates from the Screenplay. The Screenplay's pirates are not actually skeletons, but setting that aside, there *are* skeleton pirates in the Ride. (DSUF 3, 4.) Plaintiffs now claim the Ride's skeletons "are not 'undead'" (Opp. 13), but Plaintiffs know that to be false. The Ride commences with a pirate skeleton whose moving skull speaks to the riders. (DSUF 3.) Plaintiffs used that undead pirate's skull as the cover image to their Screenplay and quoted his dialogue throughout their Screenplay. (Gray Decl. ¶ 3; DSUF 3, 119, 121.) Plaintiffs also took the iconic skeleton pirate helmsman from the Ride, used footage of him in their sizzle reel, and had him appear in the Screenplay (DSUF 99, 137), albeit as one of the face-painted crew who look like skeletons to frightened victims. Again, Plaintiffs' inability to grapple with indisputable facts speaks volumes. As far as Defendants are aware, no plaintiff has ever been allowed to "sue the party whose work he has infringed upon for infringement of his infringing derivative work." *Anderson v. Stallone*, 1989 WL 206431, at *9 (C.D. Cal. Apr. 25, 1989).

Plaintiffs' Opposition plays as fast and loose with the Ninth Circuit's precedent as it does with Plaintiffs' Screenplay and Disney's Ride. Plaintiffs obviously lose under *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072 (9th Cir. 2006),

and *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010). The works in those cases were far more similar than are the works here, and yet in both cases, summary judgment was granted against the Plaintiffs' claims for lack of substantial similarity. Plaintiffs urge this Court to distinguish those cases on the ground that "[n]either *Funky Films* nor *Benay* involved dueling experts." (Opp. 10.) But that is untrue. *Both* cases involved dueling experts, which did not stop the district courts from granting summary judgment or the Ninth Circuit from affirming. *See infra* at 4–5. As those cases show, Plaintiffs are wrong to claim that district courts do not decide substantial similarity on summary judgment in the face of a "battle of the experts." (Opp. 1.) To the contrary, "[n]umerous cases have found in favor of defendants on the issue of substantial similarity despite the existence of expert testimony offered by plaintiffs." *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815, 837 (C.D. Cal. 2010).

Finally, Plaintiffs propose simply disregarding most of the Ninth Circuit's substantial similarity precedent and permitting their claim to proceed on the theory that even if the Screenplay is nothing but stolen material, genre tropes, and *scenes a faire*, Plaintiffs' "selection and arrangement" of their plunder is entitled to copyright protection. As explained below, no law supports this contention, and what Plaintiffs are labeling a "selection and arrangement" analysis is really just the kind of list of "random similarities scattered throughout the parties' works" that this Court (Dkt. 93 at 18) and the Ninth Circuit, *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984), have deemed inadequate to make out an infringement claim. Further, the Ninth Circuit has made clear that Plaintiffs cannot make out a selection and arrangement claim by pointing to "similarities in general ideas or concepts." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1122–23 (9th Cir. 2018). "Permitting [Plaintiffs] to claim such a right would withdraw those ideas or concepts from the 'stock of materials' available to other artists." *Id.* at 1123. However framed, Plaintiffs' claim fails.

The Court should grant summary judgment.

## II.     ARGUMENT

### A.     District Courts in the Ninth Circuit Routinely Resolve Substantial Similarity on Summary Judgment, Even in the Face of Contradictory Expert Testimony

Plaintiffs argue that the Court is precluded from granting summary judgment because "both parties have offered expert testimony to support their positions." (Opp. 9.) On Plaintiffs' view, the mere fact that they have submitted *any* expert testimony, no matter how unhelpful, is sufficient to get to trial. Plaintiffs are wrong: in cases involving substantial similarity, "the mere existence of dueling expert reports does not necessarily create a triable issue of fact." *Gable*, 727 F. Supp. 2d at 836–37. District courts routinely grant summary judgment for defendants on substantial similarity even when plaintiffs proffer expert testimony. *See, e.g.*, *id.* at 836 (plaintiff's expert report did not "alter[] the substantial similarity analysis," which was "largely based on the Court's own extensive review of the works"); *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1062 (C.D. Cal. 2010) ("[S]ummary judgment on the issue of substantial similarity is appropriate where, even considering the experts' testimony, no reasonable jury could conclude that the objective components of the works are substantially similar."). The Ninth Circuit has repeatedly affirmed such judgments. *E.g.*, *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1180 (9th Cir. 2003); *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465 (9th Cir. 1992).

The two cases that most closely control the outcome here, *Benay* and *Funky Films*, further refute Plaintiffs' contention that expert testimony precludes summary judgment. Plaintiffs claim that neither case "involved dueling experts." (Opp. 10.) But *both* cases did. In *Benay*, the plaintiffs "provided a document entitled 'Material Review Addendum' by expert Lew Hunter, who identifies the purportedly 'identical premise a.k.a. concept' between the Plaintiffs' Screenplay and *The Last Samurai*." *Benay v. Warner Bros. Entm't*, 2008 WL 11336277, at *9 (C.D. Cal. Mar. 14, 2008). In granting summary judgment, the Court explained that this expert failed to account for the fact that the similarities he identified were unoriginal and therefore

unprotectable: "even if the Court were to accord Hunter's statement weight, Defendants have presented evidence that the idea of a war officer from the West training the Imperial Army in Japan is based on historical events, and thus is not novel." *Id.* at *10.  So too with *Funky Films*.  The plaintiffs there "submitted an expert report prepared by screenwriting lecturer Robert McKee[.]"  (Reply RJN Ex. A at 5.)  He concluded the works were "strikingly similar" because of "the frequency and quality of marked parallels." (*Id.*)  The defendants submitted two expert reports "independently analyzing and applying the extrinsic test."  (*Id.*)  The court considered all three, but "[found] it unnecessary to rely on any of them and instead base[d] its decision on its own independent review and careful evaluation" of the works.  (*Id.*)

Despite the battle of the experts in *Funky Films* and *Benay*, the Ninth Circuit affirmed in both cases.  Those cases defeat Plaintiffs' contention that "[o]nly a jury may … resolve the battle between Professor Román and Mr. McDonald."  (Opp. 11.)

## B.     Of the Two Experts, Only McDonald's Opinions Assist the Court

The Ninth Circuit did not remand for an expert to tell this Court how to *perform* the substantial similarity analysis, but instead to provide "[a]dditional evidence" that might "*inform* the question of substantial similarity."  *Alfred v. Walt Disney Co.*, 821 F. App'x 727, 729 (9th Cir. 2020) (emphasis added).  Experts could provide evidence on whether "the elements the two works share in common are unprotected generic, pirate-movie tropes," something that the Ninth Circuit found "difficult to know" at the pleading stage.  *Id.*  McDonald's report provided that evidence.  Román's did not and could not because Plaintiffs kept evidence about the Ride and genre from him to "keep [his] eyes on the prize": when he prepared his report, he was unaware "there was a theme park" ride and was unfamiliar with the pirate genre; Plaintiffs told him *not* to educate himself.  (Supp'l Segall Decl. Ex. A at 147:16–149:12; DSUF 148, 167.)

Expert testimony will "seldom be necessary" to analyze substantial similarity in cases, like this one, that involve works "targeted at a general audience" that "deal with subject matter readily understandable by any ordinary person, including the Court."

*Bernal*, 788 F. Supp. 2d at 1062.  It is, at most, "marginally helpful" in such cases. *Gable*, 727 F. Supp. 2d at 836.  Román does not discuss a technical topic like musical composition.  He compares narrative elements familiar to lay audiences: a prologue; a romantic subplot; a "final epic showdown"; and so forth.  (*See* Román Report at 9–10, 13–14, 17–18.)  All Román really did was "read and analyze[]" Plaintiffs' Ninth Circuit brief and "verif[y] the accuracy of said similarities" therein.  (*Id.* at 4–5.)

Unlike Román, McDonald provided the *evidence* that the Ninth Circuit solicited—an expert's review of the voluminous pirate genre, identifying its tropes and *scenes a faire* as embodied in many famous works.  This helps *inform* the substantial similarity analysis that the Court must *perform*.  Plaintiffs' attacks on McDonald's credibility are unfounded.  (Opp. 11–12.)  They cannot dispute the accuracy of his description of the pirate genre, which is the primary benefit of expert testimony here.  Their claim that he "retreated" from positions about their Screenplay is untrue[1] and irrelevant.  The Court can read the works and verify for itself, say, whether living pirates whose "faces are painted into TRIBAL SKULLS" are ghosts.

## C. No Genuine Dispute Exists on Substantial Similarity

### 1. There Is No Striking Similarity in an Original Selection and Arrangement of Original Elements

Given how generic their Screenplay is, Plaintiffs argue that *unprotectable* elements can establish substantial similarity.  Their contentions are unavailing.

---

[1] McDonald never said the Screenplay had undead pirates, as Plaintiffs claim.  (Opp. 12.)  He acknowledged that one of the verses of "Yo Ho" sung by those pirates included the phrase "a phantom's life indeed."  (Lowe Decl. Ex. O at 153.)  He then said, "[T]hey're playing at the life of being a ghost, not necessarily being a ghost."  (*Id.*)  As he explained, if the Screenplay had intended for the pirates to be ghosts, it would have said so.  (*Id.* at 152.)  Instead, the Screenplay's pirates "get shot and killed, or stabbed, or something like that, which indicates to me that they're not dead.  They're just painting themselves up to be ghost-like to scare people."  (*Id.* at 151.)  McDonald noted that their "skull face[s]" were explicitly "described as being painted on" in the Screenplay.  (*Id.*)  "[T]here's a difference between, you know, promoting yourself as being a ghost or a phantom … and actually being a ghost or a phantom."  (*Id.* at 149.)  Nor did McDonald "retreat[]" from an opinion that Nefarious was not "funny."  (Opp. 12.)  He acknowledged that there was one "light-hearted, humorous moment" involving Nefarious—"one line, one small scene.  Most of the humor in this scene comes from the kids, not him."  (Lowe Decl. Ex. O at 144.)

*First*, Plaintiffs argue WDP "ignore[s] the originality standard."  (Opp. 16.)
Originality is *necessary* for a work to be protectable, but it is not sufficient to establish
the work's protectability, let alone the protectability of the "constituent elements" that
a plaintiff claims are substantially similar.  *E.g.*, *Funky Films*, 462 F.3d at 1076–77.

*Second*, Plaintiffs argue that the "selection and arrangement of unprotectible
elements" can constitute protectable expression in applying the extrinsic test.  (Opp.
16.)  They rely on *L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 849
(9th Cir. 2012), an inapt case involving textile patterns, and *Metcalf v. Bochco*, 294
F.3d 1069, 1074 (9th Cir. 2002), the only Ninth Circuit case to hold that the selection
and arrangement of unprotectable elements in a *narrative* work sufficed to create a
question of fact on the extrinsic test.  But *Metcalf* did not involve genre works with
vague overlap; it involved works with a unique premise and "striking" similarities.  *Id.*
at 1073–74.  There were "voluminous, nearly identical" elements that "occurred in the
same pattern."  *Gable*, 727 F. Supp. 2d at 843–44.

Later panels have "limit[ed] *Metcalf* to its facts," *Mestre v. Vivendi Universal
U.S. Holding Co.*, 273 F. App'x 631, 632 (9th Cir. 2008),[2] and district courts have
declined to extend the selection and arrangement analysis of narrative works "beyond
the clear-cut case presented in *Metcalf*," *Zella v. Scripps Co.*, 529 F. Supp. 2d 1124,
1138 (C.D. Cal. 2007); *see Shame on You Prods., Inc. v. Elizabeth Banks*, 120 F.
Supp. 3d 1123, 1170–71 (C.D. Cal. 2015), *aff'd*, 690 F. App'x 519 (9th Cir. 2017)
(collecting cases).  With such extreme facts, *Metcalf* has "strikingly limited" utility.
*DuMond v. Reilly*, 2021 WL 733311, at *9 (C.D. Cal. Jan. 14, 2021).  It presents a
*higher* standard than *Benay* and *Funky Films*, not a lower one.

Plaintiffs do not come close to meeting that standard.  Plaintiffs' argument that
the similarity here "surpasses what sufficed in *Metcalf*" is preposterous.  *Metcalf*'s
"striking" and "voluminous" similarities included "nearly identical" premises, themes,

---

[2] Appellants in both *Funky Films* and *Benay* made selection and arrangement arguments
based on *Metcalf*, with no success.  (*See* Reply RJN Ex. B at 32; Ex. C at 46–50.)

characters, and plot arcs.  There is nothing comparable here.  *Metcalf* does not apply where the selected elements are the established tropes of a genre, and their arrangement is conventional (e.g., a prologue at the start and a "final epic showdown" at the end, setting pirates on ships in the Caribbean, or positing a conflict between a captain and first mate).  *Cf. Rentmeester*, 883 F.3d at 1122–23.  Further, a *Metcalf* argument fails where, as here, there are "significant differences throughout the works" and many of the most significant elements in the plaintiff's work have no correlates in the defendant's.  *Silas v. HBO, Inc.*, 201 F. Supp. 3d 1158, 1184 (C.D. Cal. 2016).

Plaintiffs "offer [no] explanation as to how [their] 'combination of unprotectable elements' was 'particularly selected and arranged.'"  *DuMond*, 2021 WL 733311, at *23.  They just point to "random similarities scattered throughout the works"—"a ghost ship with a ghost captain"; a "fast-paced sequence of events that starts with a prologue"; an "overall theme about redemption" (Opp. 17)—which is not sufficient to establish substantial similarity via selection and arrangement.  *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1075 (9th Cir. 2020).  "Presenting a 'combination of unprotectable elements' without explaining how these elements are particularly selected and arranged amounts to nothing more than trying to copyright commonplace elements."  *Id.*; *Flynn v. Surnow*, 2003 WL 23411877, *9 (C.D. Cal. Dec. 9, 2003).

Finally, Plaintiffs argue that summary judgment is appropriate only if WDP can identify a prior pirate work that includes *all* of the generic elements that are similar between the works at issue here.  (Opp. 19.)  That is not the law.  The question is not whether Plaintiffs' cherry-picked collection of generic similarities have all appeared in a prior work,[3] but rather whether there is a "common pattern of unprotected elements in [the Screenplay] that also appears in [the Motion Picture] in the sort of magnitude contemplated by *Metcalf*."  *Gable*, 727 F. Supp. 2d at 844; *see also Hathaway v.*

---

[3] Regardless, an acclaimed 1990 videogame discussed in McDonald's report, *Secret of Monkey Island* (itself inspired by the Ride), features a prologue, a romance, a curse, ghost pirates, a charismatic and humorous pirate villain, a mutiny, and a mix of supernatural horror and humor.  *See* https://en.wikipedia.org/wiki/The_Secret_of_Monkey_Island.

1   *Caputo*, 2021 WL 1862248, at *7 (D. Ariz. May 10, 2021).  The answer is no.

2   ### 2.   There Is No Substantial Similarity Between the Works with Respect to the Relevant Protectable Elements

3   When Plaintiffs finally arrive at applying the extrinsic test, their argument is

4   rife with errors, makes no effort to distinguish unprotectable elements, and ignores the

5   radical differences between the two works.  Even works that at first blush appear very

6   similar are not substantially similar when "a closer inspection reveals that they tell

7   very different stories." *Benay*, 607 F.3d at 625; *Funky Films*, 462 F.3d at 1077–78.

8   The works here are not similar at first blush, much less on closer inspection.

9   ***Plot and Sequence of Events.***  Plaintiffs distort the Screenplay, by for example

10   claiming it "focuses on a supernatural conflict" between Jones and Nefarious, who

11   "leads a ghost ship with skeleton-pirate crews with a curse … underlying it." (Opp.

12   21.)  In fact, it is about six orphaned children who want to be pirates, and their

13   drunken caretaker who redeems himself by helping them find the lost half of a map

14   leading to a booby-trapped sunken city.  The Motion Picture has none of that.  As a

15   matter of law, "the plot and sequence of events in Plaintiffs' Screenplay and

16   Defendants' films are not substantially similar," as this Court has explained and as

17   expert testimony confirms.  (Dkt. 93 at 8–9 (detailing the marked differences).)

18   This Court's earlier ruling and expert testimony reject Plaintiffs' claim that the

19   plots are similar because they "focus[] on a supernatural conflict" involving a "curse";

20   "[t]he idea of cursed pirates is scenes-a-faire and unprotectable," and taken from the

21   Ride.  (Dkt. 93 at 7; McDonald Report at 26–27.)  Regardless, Plaintiffs' comparison

22   is false.  The Motion Picture concerns skeleton pirates who cannot die, who seek to

23   break the ancient Aztec curse keeping them alive.  The Screenplay's pirates are not

24   skeletons—their human faces are *painted* like skulls and they are easily killed.  And,

25   the "curse" appears at the end of the Screenplay, when a dying Nefarious declares "I

26   curse this treasure of Davey Jones!" to no apparent effect (Screenplay at 104)—

27   apparently a reference to the Ride's cursed treasure.  (*See* Gray Decl. Ex. D ¶ 46.)

28   Plaintiffs note that both works have a prologue set in the past.  (Opp. 21.)

"Prologues are common in movies and literature," especially in the pirate genre. (McDonald Report at 28.)  Plaintiffs claim the prologues are similar because they "set the tone and mood of the story" and introduce plot elements and major characters. (Opp. 21.)  That is what all prologues do.  That both prologues "take place on a ship" (*id.*) flows from the Ride itself and the pirate genre.  The Court need only compare what actually *happens* in the prologues to see they are different in every expression.

Plaintiffs claim that "the lead pirate characters (Jones/Sparrow and Nefarious/Barbossa) are introduced formally at gunpoint, and Nefarious/Barbossa takes the ship from Jones/Sparrow." (Opp. 22.)  Not so.  In the Screenplay's prologue, Jones is introduced at gunpoint and then *gives* his ship to Nefarious as his commanding officer.  (Screenplay at 12 ("[T]he ship is yours to command.").)  In the Motion Picture, Barbossa's mutiny against Sparrow occurs before the prologue and is not depicted.  Sparrow is introduced after the prologue, comically riding a sinking ship into port, and when he is later held at gunpoint, it is not "during a battle" (Opp. 1), nor is Barbossa anywhere nearby.  Barbossa later introduces himself, *not* at gunpoint.

Other scenes Plaintiffs discuss—a pirate captain kidnapping the heroine, pirates cross-dressing to fool their enemies, and protagonists taking control of pirate ships—are *scenes a faire* common in pirate stories.  (McDonald Report at 14, 27, 9.)  At the level of concrete expression, the scenes exhibit little similarity.  (*See id.* at 8–10.)

**Characters**.  There are a "number of important characters" in the two works with "no obvious parallel," *Benay*, 607 F.3d at 627, most notably the Screenplay's Rascal Scoundrels and the Motion Picture's Will Turner.  The Opposition mentions neither, even though these are major characters.  The closest Plaintiffs get to acknowledging the Scoundrels is an absurd[4] footnote claiming that "Jones/Sparrow's crew members are also substantially similar." (Opp. 21, n. 4.)

---

[4] Sparrow's bit-part crew are adult, grizzled pirates recruited midway through the Motion Picture.  The main-character Rascals are children with stock traits (one farts, one is stupid, one stutters, etc.) *pretending* to be pirates.  There are also no parallels for the Screenplay's effete clothier "El Capitan" or the Motion Picture's Governor Swann and Norrington.

Plaintiffs' comparisons of other characters are unpersuasive at best.

*Davey and Jack*. This Court and expert testimony agree that "cockiness, bravery, and drunkenness are generic, non-distinct characteristics which are not protectable." (Dkt. 93 at 9; McDonald Report at 24–26.) Those traits are all Davey and Jack share. They have different appearances, values, and arcs. (Dkt. 93 at 10.)

*Nefarious and Barbossa*. "[P]irate villains who are both evil and entertaining" are a commonplace in pirate stories at least as far back as *Treasure Island* and must be filtered out. (*See* McDonald Report at 13.) The Court has explained how different the characters are. (Dkt. 93 at 10–12.) Finally Nefarious is *not* "the former first mate to Jones" (Opp. 20); Plaintiffs have that backward. (*See* Dkt. 93 at 11; Screenplay at 11.)

*Jane and Elizabeth*. As the Court previously held, and as expert testimony confirms, the Motion Picture has "no equivalent to Plaintiffs' Jane character." (Dkt. 93 at 12; McDonald Report at 14–15.) Plaintiffs compare Jane to the Motion Picture's Elizabeth, but they are completely different. Jane is a red-haired buccaneer "harlot" who works at a tavern and schemes after a treasure map; she is Davey's old flame from pirate adventures a decade earlier. She earns respectability and returns to Davey. Elizabeth is a young, brown-haired Governor's daughter of uptight class—literally corseted, initially—who wants to avoid a high-status marriage; she is *Will*'s romantic interest (not Jack's). She breaks free from upper class norms (the Motion Picture ends with her pointing out that she is now "wearing trousers"). Being strong women in romantic subplots is not substantial similarity. (McDonald Report at 14–15, 26.)

*Themes*. Plaintiffs claim the works share a "redemption" theme. (Opp. 24.) Redemption is a universal theme in literature, and the pirate genre in particular. *See, e.g.*, Rafael Sabatini, *Captain Blood* (1922). But Plaintiffs are wrong that the works have a common theme; in fact, their themes are diametrically opposed. (Mot. 23.) The Screenplay is a conventional redemption story in which a drunk, a "harlot," and child-orphans—all pirates—abandon piracy, become law-enforcement officers, and form a nuclear family. The Motion Picture is a liberation story in which respectable,

law-abiding characters (Will, Elizabeth, her father, and Norrington) end the film *less* conventional and *more open* to piracy.  Sparrow never renounces piracy; the last shot shows him aboard a pirate ship with a pirate crew, whistling "a pirate's life for me."

*Dialogue.*  Plaintiffs fail to show "extended similarity of dialogue."  *Shame on You Prods.*, 120 F. Supp. 3d at 1156.  They muster three similar snippets of pirate-trope dialogue comprising 19 words from a 143-minute feature film (e.g., Barbossa "never leaves survivors") (Opp. 24–25), but "[p]hrases and expressions conveying an idea typically expressed in a limited number of stereotyped fashions are not subject to copyright protection."  *Narell v. Freeman*, 872 F.2d 907, 911 (9th Cir. 1989).  They claim a few *distinct* lines in the two works "convey substantially similar messages." (Opp. 25.)  That is not enough.  *See Shame on You Prods.*, 120 F. Supp. 3d at 1156 (no infringement where thematically similar dialogue had "virtually no overlap").

*Mood.*  Plaintiffs' scattershot use of *eight* divergent descriptors of the works' mood proves there is no substantial similarity.  (Opp. 24.)  As the Court and expert testimony readily recognized, the Screenplay is a "lighthearted" work for and about children, while the Motion Picture is "much darker."  (Dkt. 93 at 15, 16; McDonald Report at 18.)  Both have humor and adventure because both meet the "expectations families associate with the Disney ride."  (Dkt. 112-2 at 1.)

*Setting.*  Plaintiffs do not dispute that the common settings—"a ghost ship, the port town, and the cove where the treasure is hidden"—are both *scenes a faire* in pirate works generally and drawn from the Ride specifically.  (*See* Dkt. 93 at 17.)

*Pace.*  Plaintiffs fail to address the differences in pace set forth in the Motion (Mot. 24), and the Court's prior order (Dkt. 93 at 17–18).

## D.     Plaintiffs' Use of Disney's Ride Precludes their Claim

No case has been located in which a plaintiff's adaption of the defendant's intellectual property somehow limits the ways in which the defendant can adapt that property.  Yet that is exactly what happened here.  Plaintiffs *knew* WDP was adapting the Ride as a film.  So they prepared a spec screenplay that incorporated everything

there was to copy from the Ride (its name, its tagline, its genre, its setting, its mix of humor and adventure, its theme song, its dialogue, its locations, its characters, its scenes, its props)—in Plaintiffs' own words, everything necessary to appropriate "the image and expectations families associate with the Disney ride." (Dkt. 112-2 at 1.) None of this is disputed. Plaintiffs only quibble at the margins, and generally in a fashion that does not pass the straight-face test.[5] Plaintiffs have little room to prevaricate when their Screenplay features the Ride's name and iconic talking pirate skeleton beneath the slogan "IT ISN'T JUST A RIDE ANY MORE." (Dkt. 1-1 at 3.)

Plaintiffs' use of Disney's Ride requires, *at minimum*, filtering out all in the Screenplay that is in the Ride or derives from the Ride, and ought to result in filtering out the Screenplay's entire contents. This Court must "filter out and disregard the non-protectable elements in making [its] substantial similarity determination." *Funky Films*, 462 F.3d at 1077. "[N]o protection may adhere in facts, ideas, scenes, characters, themes, or other elements borrowed from another author." *Rice*, 148 F. Supp. 2d at 1052. Beyond that, courts hold that an author cannot claim protection of "any portion of an unauthorized derivative work," particularly when "the pre-existing work tends to pervade the entire derivative work." *Sobhani v. @Radical.Media Inc.*, 257 F. Supp. 2d 1234, 1240 (C.D. Cal. 2003). Since the Screenplay includes substantially all of what is in the Ride, the use of the preexisting work is pervasive.

Plaintiffs' grounds for asking the Court to ignore the Ride are all baseless:

1. *WDP did not say the Ride was "not material" to the substantial similarity analysis.* (Opp. 27.) WDP told the Circuit that this Court's judicial notice of the Ride's elements was not an abuse of discretion, and that even if it was, any error was harmless because "the evidence considered about the ride was unnecessary to the Court's ruling." (Answering Br. 20, 52–58.) The Ride is immaterial in the sense that

---

[5] *E.g.*, Plaintiffs deny the verbatim Ride dialogue "Strike yer colors, ya brazen wench!" in their Screenplay came from copying. (*Compare* Gray Decl. Ex. D ¶ 34, *with* Alfred Decl. ¶ 15.) Plaintiffs claim to have coincidentally "created the lyrics on those two pages by ourselves" (Alfred Decl. ¶ 17), even though those lyrics are clearly patterned on "Yo Ho."

1   the Court *could* grant WDP's motion without considering the Ride, but it should not.

2       2. *There is no Rule 26 violation.*  As explained in WDP's response to Plaintiffs'

3   evidentiary objections, the declarants who authenticated WDP's documents are not

4   fact witnesses with "discoverable information."  Fed. R. Civ. P. 26(a)(1)(A)(i); *see*

5   *also Caldwell v. City of S.F.*, 2020 WL 7643124, at *7 (N.D. Cal. Dec. 23, 2020).

6   Even if Rule 26 applied, which it does not, any error was harmless.  Fed. R. Civ. P.

7   37(c)(1).  The parties stipulated they would not depose fact witnesses before this

8   motion, and Plaintiffs do not dispute that what WDP submitted is authentic.

9       3. *The footage shows the Ride Plaintiffs copied.*  Plaintiffs originally argued

10  that the 2005 footage submitted by WDP was part of an effort to mislead the Court

11  because "Disney undertook a 'stern[*sic*]-to-stern enhancement' of the ride that

12  included 'new special effects and illusions' upon the release of the [first] Pirates film

13  in 2003."  (Original Opp. 28.)  As Plaintiffs' Errata (Dkt. 183) confirms, the source

14  cited by their original Opposition contradicted this assertion: the "stem-to-stern

15  enhancement … premiered at Disneyland on June 24, right along with the *second* film

16  in the series."  (Lowe Decl. Ex. U at 147 (emphasis added).)  The *second* film was

17  released in 2006, *after* the 2005 footage was taken.  In any event, even if Plaintiffs

18  could somehow quarrel with the 2005 footage, they have no quarrel with the 1968

19  footage, which depicts that same skeleton (Jessen Decl. Ex. A at 21:45), along with

20  the other elements stolen by Plaintiffs (*see generally* Gray Decl. Ex. D).[6]

21      4. *The need to filter the Ride is not an "affirmative defense outside the scope of*

22  *this motion*."  (Opp. 29.)  As explained above, the extrinsic test requires the Court to

23  filter all unprotectable elements from the Screenplay.  Plaintiffs cannot claim

24  protection for what they took from the Ride—certainly not against Disney.  Plaintiffs

25

26  [6] Plaintiffs' Errata should end their contention that the Ride had no living skeleton pirates.
    They concede the 2005 footage shows "a living skeleton actively steering the ship wheel"
27  (Opp. 28), offer no evidence that this skeleton was different when they wrote the Screenplay
    (*see* Errata Resp. 1), and concede they put this skeleton into their Screenplay (Alfred Decl.
28  ¶ 15(e); DSUF 16).  The Motion Picture's living skeleton pirates came from the Ride, and so
    did the Screenplay's only arguable skeleton pirate (as opposed to pirate in skull face-paint).

claim, without legal citation, that "Disney authorized the screenplay's playful references to the ride when it accepted the script with knowledge that it was titled 'Pirates of the Caribbean.'" (Opp. 30.)  This is impossible, since Plaintiffs wrote the Screenplay before Disney received it.  And it is legally wrong, since accepting the Screenplay is nowhere near the conduct needed to imply such a license.  *See McIntosh v. N. Cal. Universal Enters. Co.*, 670 F. Supp. 2d 1069, 1089–91 (E.D. Cal. 2009).  It is also contrary to Plaintiffs' acknowledgment that they could not distribute the Screenplay as it stood because it incorporated Disney's material.  (Dkt. 112-2 at 1.)

Plaintiffs get things backwards when they claim WDP is showing "hubris and hypocrisy" by arguing that Plaintiffs cannot base a substantial similarity claim on genre tropes, while "simultaneously maintain[ing] that Disney 'owns' the trivialities and tropes in the ride." (Opp. 30.)  Plaintiffs stole much more from the Ride than generic material like its Caribbean setting, drunk pirates, nautical battles, treasure-filled caverns, and the like.  They stole its famous name, "Yo Ho" song (subject to a registered copyright), and verbatim dialogue.  They made a sizzle reel with Ride footage and audio, and used the Ride's logo and tagline.  The Screenplay explicitly directed that scenes should copy the Ride, and called for props taken from the Ride.  Beyond that, WDP's point was that "[i]f the Court accepts Plaintiffs' view that [generic] elements can be protected, then Plaintiffs' infringement of the Ride is much more extensive than what Plaintiffs confessed." (Mot. 14–15.)

It is Plaintiffs who can prevail only by having it both ways.  If generic elements like a pirate "setting … primarily located on the Caribbean seas" (Román Report at 19) are not protectable, they must be filtered from the Screenplay.  If they are protectable, the Ride's use of them is protected, so they still must be filtered from the Screenplay.  Either way, Plaintiffs cannot claim the Motion Picture infringed their adaptation of the Ride by including generic elements present in the Ride itself.

## III.   CONCLUSION

The Court should grant summary judgment.

1  DATED: October 5, 2021                    MUNGER, TOLLES & OLSON LLP
2                                                JORDAN D. SEGALL
                                                 MARK R. YOHALEM
3                                                ROBIN S. GRAY
4
5                                            By:  _____/s/ Jordan D. Segall_____
6                                                 JORDAN D. SEGALL
                                             *Attorneys for Defendant Walt Disney Pictures*
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEFENDANT WALT DISNEY PICTURES' REPLY ISO MOTION FOR SUMMARY JUDGMENT