**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd., Suite 1038
Beverly Hills, California 90211

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (pro hac vice)
PArenz@RobinsKaplan.com
Brandon J. Pakkebier
(MN Bar No. 0400691) (pro hac vice)
BPakkebier@RobinsKaplan.com
800 LaSalle Avenue
Suite 2800
Minneapolis, Minnesota 55402
Telephone: 612 349 8500
Facsimile: 612 339 4181

*Attorneys for Plaintiffs*
*Alfred Lee Alfred, II, et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II, et al., | Case No. 2:18-CV-08074-CBM-ASx |
| Plaintiffs, | **DECLARATION OF ALEKSANDRA HILVERT IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL** |
| v. | |
| WALT DISNEY PICTURES, | |
| Defendant. | Judge: Hon. Alka Sagar |
| | Date: April 26, 2022 |
| | Time: 10:00 AM |
| | Location: Courtroom 540 |
| | Discovery Cutoff Date: June 15, 2022 |
| | Pretrial Conference Date: Jan. 9, 2023 |
| | Trial Date: Feb. 7, 2023 |

1

## DECLARATION OF ALEKSANDRA HILVERT ESQ.

I, ALEKSANDRA HILVERT, declare as follows:

1.      I am an attorney admitted to practice before all courts of the state of California.  I am senior counsel in the law firm of Lowe & Associates P.C. and am one of the attorneys representing Plaintiffs ARTHUR LEE ALFRED, II and EZEQUIEL MARTINEZ JR. ("Plaintiffs").  The facts stated below are true and of my own personal knowledge.  If called to testify, I could and would competently testify to these facts.   This declaration is based upon my own recollections, as well as the documents that have come into my possession, custody and control.

2.      Steven Lowe and I represented the Plaintiffs on the Ninth Circuit appeal associated with this case in 2019 following the dismissal of the case

3.      After the Ninth Circuit reversed and remanded the case back to the District Court on or about July 22, 2020, Disney filed a Petition for en banc Rehearing which was denied on August 31, 2020.

4.      Starting around September of 2020, our firm began conferring with counsel for Defendant Walt Disney Pictures ("Disney") about the case and how best to proceed in an efficient manner.  Based on my best recollection, during a conference call in late 2020, Counsel for Disney proposed that the parties agree to bifurcate discovery by subject matter. To that end, the parties began discussing a stipulation that would bifurcate the case into two phases – substantial similarity first and then all other remaining issues in the second phase ("Bifurcation Stipulation").  During this time, the specific individuals we spoke with on behalf of Disney were Melina LeMoine, Jordan Segall and Mark Yohalem.

5.      We spoke on the phone with Ms. LeMoine, Mr. Segall and Mr. Yohalem several times, specifically, but not limited to, November 18, 2020 and December 17, 2020.

6.      A true and accurate copy of an email and attached draft Bifurcation Stipulation I received from Mr. Segall dated December 24, 2020 is attached hereto as **Exhibit A**.  Counsel for Defendants provided this first draft Bifurcation Stipulation.   The first draft Bifurcation Stipulation provided:

a. "1.   The parties share a common interest in streamlining this action by reducing the number of named defendants and establishing certain mutually agreeable limits on discovery and motion practice."

b. "2.   The parties further recognize that the issue of the substantial similarity between the Plaintiffs' allegedly infringed *Pirates of the Caribbean* screenplay and the Defendants' allegedly infringing motion pictures in the *Pirates of the Caribbean* franchise is a threshold one whose early resolution could substantially promote the efficient resolution of this litigation."

c. "3.   Accordingly, the parties execute this Stipulation for the following purposes, upon order of this Court:  … (b)  limiting the initial discovery to permit the efficient resolution of the parties' core legal dispute on the substantial similarity of the Plaintiffs' screenplay and Defendants' motion pictures."

d. "10.  In order to promote the efficient resolution of the litigation, the parties agree to the following discovery limits:   (a)  Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity and all other discovery (including damages discovery) occurring, if necessary, in a second phase that will follow the Court's resolution of any motion from Defendant for summary judgment on substantial similarity."

A true and accurate copy of the first draft of the Bifurcation Stipulation, prepared by counsel for Disney, is attached hereto as **Exhibit B.**

7.     Over the course of the next few months, our office negotiated the language of the Stipulation with Disney's counsel via email and over the phone. During this phase, the parties negotiated the discovery that would be necessary in phase 1 – which was limited to the issue of substantial similarity.  Specifically, on or about December 28, 2020, I sent Disney's counsel an email which attached a revised version of the Bifurcation Stipulation; along with a cover email which stated: *"Given we are doing substantial similarity discovery in phase one we really just need expert depositions and there is no need for other discovery (ie RFPDs) at this stage."* A true and accurate copy of said email is attached hereto as **Exhibit C.**

8.     In response, on or about December 29, 2020, I received an email from Mr. Segall which provided a further revised Bifurcation Stipulation and also provided as follows:

        a.  "We agree with limiting discovery to initial disclosures and expert depositions in phase".

        b.  "As we agreed during the call, the purpose of bifurcating discovery is so that substantial similarity can be resolved before proceeding to discovery other issues. Accordingly, we've modified the stipulation to provide that phase 2 discovery will open after the Court rules on Disney's motion, if mediation should prove unsuccessful and Disney files a motion. We're assuming that your edit here was not meant to be a substantive change away from that approach, so hopefully our proposed revision will work for everyone."

A true and accurate copy of an email I received from Mr. Segall dated December 29, 2020 is attached hereto as **Exhibit D.**

9.     The final draft of the Bifurcation Stipulation, as filed with the Court, provides, among other things, as follows:

a. "1.    The parties share a common interest in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable limits on discovery, motion practice, and ADR."

b. "2.    The parties further agree that the issue of whether substantial similarity exists between the Plaintiffs' allegedly infringed *Pirates of the Caribbean* screenplay and the Defendants' allegedly infringing *Pirates of the Caribbean* motion pictures should be bifurcated from the other legal issues presented in this litigation.

c. "3.    Accordingly, the parties execute this Stipulation for the following purposes, upon order of this Court: (b) Limiting initial discovery to facilitate the efficient resolution of whether substantial similarity exists between the Plaintiffs' screenplay and the Defendants' motion pictures…"

d. "10.  In order to streamline the litigation, the parties agree to the following bifurcation of discovery:  (a) Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity; if other discovery is necessary, it will occur in a second phase that will follow the parties' mediation and the Court's resolution of Walt Disney Pictures' intended motion for summary judgment on substantial similarity, as set forth below. (b) More specifically, in the first discovery phase discovery shall be limited to: (i) initial disclosures under Federal Rule of Civil Procedure 26(a)(1), which shall be made by January 29, 2021; expert disclosures under Federal Rule of Civil Procedure 26(a)(2) relating to the issue of substantial similarity, which shall be made by March 30, 2021; and (iii) one deposition of each side's respective expert witnesses on substantial similarity."

A true and correct copy of said Stipulation is attached hereto as **Exhibit E.**

10.     The intent of the parties, from my understanding, and from reviewing the email correspondence between the parties on this issue, was to allow for limited discovery on substantial similarity and then reserve discovery on all other issues in Phase 2.   To the best of my recollection and upon reviewing the correspondence, at no point did Disney's counsel state or suggest that they wanted to conduct any further discovery on substantial similarity beyond what was negotiated for and stipulated to by the parties in Phase 1.  A major point of the stipulation was to bifurcate discovery by subject matter in order to litigate the case more efficiently. Mr. Lowe and I would not have agreed to Disney's bifurcation proposal, given it prolonged the Plaintiffs' time to trial, if the same issue in Phase 1 discovery (i.e. substantial similarity) was still be subject to discovery in Phase 2.

11.     The Court entered the parties' stipulation on or about January 19, 2021 (Dkt. 122).

12.     Plaintiffs submitted their expert report from Professor Román on or about November 30, 2020.

13.     Disney submitted their rebuttal report from one of its employees, James McDonald, who disagreed with Professor Román and concluded that the elements in the screenplay were not novel, on or about March 31, 2021. This report is attached as **Exhibit F**.

14.     Professor Román then served a rebuttal to Disney's report on or about May 7, 2021. This report is attached as **Exhibit G**.

15.     The parties deposed the experts extensively as follows:

    a.  Prof. Román deposition: May 27, 2021;

    b.  Mr. McDonald deposition:  June 16, 2021;

    c.  Prof. Román continued deposition: July 9, 2021;

    d.  Mr. McDonald continued deposition:  September 3, 2021.

16.     The depositions resulted in approximately 811 pages of testimony over the course of 4 days.

17.     After Hon. Marshall denied Disney's Motion for Summary Judgment, Disney moved to certify Judge Marshall's order to the Ninth Circuit. Judge Marshall denied this motion in early March. The Court's order is attached as **Exhibit H**.

18.     Defendant's Responses and Objections to Plaintiff's First Set of Interrogatories, dated February 4, 2022 is attached as **Exhibit I**. Exhibit I appends Exhibit A, the exhibit is designated Confidential Attorneys' Eyes Only and therefore is not included.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed March 28, 2022 in Los Angeles, California.

ALEKSANDRA HILVERT, ESQ.

# <u>EXHIBIT A</u>

 Aleksandra Hilvert <aleksandra@lowelaw.com>

## Alfred v. Disney - Stipulation re Dismissal, Discovery, and Scheduling

**Segall, Jordan** <Jordan.Segall@mto.com>                                     Thu, Dec 24, 2020 at 3:37 PM
To: Aleksandra Hilvert <aleksandra@lowelaw.com>
Cc: Steven Lowe <steven@lowelaw.com>, "Yohalem, Mark" <Mark.Yohalem@mto.com>

Aleks,


Attached is a proposed "phase 2" stipulation along the lines we've discussed. Please let us know if th is works for
plaintiffs and we can prepare a suitable proposed order.


Merry Christmas,


--Jordan


**Jordan D. Segall** | **Munger, Tolles & Olson LLP**
350 South Grand Avenue | 50th Floor | Los Angeles, CA 90071
Tel:  213.683.9208 | jordan.segall@mto.com | www.mto.com/lawyers/jordan-d-segall

***NOTICE***

*This message is confidential and may contain information that is privileged, attorney work product or otherwise exempt from*
*disclosure under applicable law.  It is not intended for transmission to, or receipt by, any unauthorized person.  If you have*
*received this message in error, do not read it.  Please delete it without copying it, and notify the sender by separate e-mail so*
*that our address record can be corrected.  Thank you.*


📄 **Alfred v. Disney - Stipulation re Dismissal, Discovery, and Scheduling(46406271.1).docx**
69K

# EXHIBIT B

Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
LOWE & ASSOCIATES, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

*Attorneys for Plaintiffs Arthur Lee Alfred II and
Ezequiel Martinez Jr.*

MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com

MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

*Attorneys for Defendants The Walt Disney
Company et al.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-cv-08074-CBM-AS |
| Plaintiffs, | **STIPULATION REGARDING [1] DISMISSAL OF DEFENDANTS; [2] LIMITATIONS ON DISCOVERY; [3] MOTION PRACTICE AND ADR** |
| vs. | |
| THE WALT DISNEY COMPANY et al., | Lodged Concurrently: [Proposed] Order |
| Defendants. | Judge:  Hon. Consuelo B. Marshall |

The parties to the above-entitled action, by and through their respective counsel of record, hereby stipulate as follows:

1.     The parties share a common interest in streamlining this action by reducing the number of named defendants and establishing certain mutually agreeable limits on discovery and motion practice.

2.     The parties further recognize that the issue of the substantial similarity between the Plaintiffs' allegedly infringed *Pirates of the Caribbean* screenplay and the Defendants' allegedly infringing motion pictures in the *Pirates of the Caribbean* franchise is a threshold one whose early resolution could substantially promote the efficient resolution of this litigation.

3.     Accordingly, the parties execute this Stipulation for the following purposes, upon order of this Court:

(a)     reducing the number of named defendants;

(b)     limiting the initial discovery to permit the efficient resolution of the parties' core legal dispute on the substantial similarity of the Plaintiffs' screenplay and Defendants' motion pictures; and

(c)     establishing an orderly stipulated procedure for motion practice and alternative dispute resolution.

4.     IT IS HEREBY STIPULATED between Plaintiffs and Defendants, by and through their undersigned attorneys, as follows:

**Stipulation Regarding Dismissal of Named Defendants**

5.     The parties stipulate and agree that Walt Disney Pictures, a subsidiary of The Walt Disney Company, is the only necessary Defendant in this matter.

6.     Upon execution of this stipulation by the parties, Plaintiffs shall file a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) dismissing without prejudice every defendant named in the First Amended Complaint (Dkt. 112) except for Walt Disney Pictures.

-1-

7.     Defendants agree that, in the event Plaintiffs obtain a judgment on their claims at trial, Walt Disney Pictures shall be responsible for damages for copyright infringement attributable to any subsidiary of The Walt Disney Company, and shall be solely responsible for satisfying any such judgment.

8.     Defendants further agree that, for purposes of fact discovery, documents in the possession of The Walt Disney Company or any of its subsidiaries shall be regarded as being within the "possession, custody, or control" of Walt Disney Pictures (as that phrase is used in Federal Rule of Civil Procedure 34(a)(1)), and Defendants will not refuse to produce relevant documents or other discoverable materials in the possession of The Walt Disney Company or one of its subsidiaries on the ground that the entity is not a named defendant.

9.     Defendants further agree that Walt Disney Pictures, as the remaining named defendant, shall be responsible for acts and omissions by Brigham Taylor within the scope of his employment and related to or arising from Plaintiffs' claims between 1999 and 2003, irrespective of which among the Walt Disney Company and its subsidiaries Mr. Taylor was performing work for and irrespective of his status as an employee or independent contractor during either the time of his conduct alleged in the First Amended Complaint or the time of his testimony, if any, in discovery or trial in this matter.

## **Stipulation Regarding Limitations on Discovery**

10.     In order to promote the efficient resolution of the litigation, the parties agree to the following discovery limits:

(a)     Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity and all other discovery (including damages discovery) occurring, if necessary, in a second phase that will follow the Court's resolution of any motion from Defendant for summary judgment on substantial similarity.

STIPULATION REGARDING DISMISSAL OF DEFENDANTS, LIMITATIONS ON DISCOVERY, AND MOTION PRACTICE AND ADR

(b)      In the first discovery phase, the parties shall be limited to three (3) fact depositions each and twenty (20) requests for production of documents. This stipulation is not intended to otherwise modify the applicable discovery limitations set forth in the Federal Rules of Civil Procedure or Local Rules of this Court.

(c)      Walt Disney Pictures shall prepare and serve an expert report limited to substantial similarity, and the parties' experts will prepare rebuttal reports and sit for expert depositions.

**Stipulation Regarding Motion Practice and Alternative Dispute Resolution**

11.    Walt Disney Pictures shall file an answer to the First Amended Complaint by the current deadline of January 29, 2021, without further motion practice under Federal Rule of Civil Procedure 12(b).

12.    Following the completion of phase-one fact and expert discovery (as described in paragraph 10 above), the parties agree to participate in a mediation before a mutually agreed-upon mediator and shall endeavor to conduct that mediation within 60 days of the completion of the first phase of discovery.

13.    In the event the parties are unable to resolve the case through mediation, Walt Disney Pictures shall file a motion for summary judgment raising the sole issue of substantial similarity within 60 days of any failure to resolve the case through mediation.

14.    This stipulation is made without intending to limit Defendants' right to file other dispositive motions as authorized by the Federal Rules of Civil Procedure and this Court's Local Rules.

15.    The parties shall meet and confer on a proposed case schedule reflecting the and submit it to the Court for approval.

STIPULATION REGARDING DISMISSAL OF DEFENDANTS, LIMITATIONS ON DISCOVERY, AND MOTION PRACTICE AND ADR

1   DATED:  December __, 2020          MUNGER, TOLLES & OLSON LLP

2

3                                      By: _____/s/ DRAFT_____

4                                          JORDAN D. SEGALL
                                           Attorneys for Defendants
5

6   DATED:  December __, 2020          LOWE & ASSOCIATES

7

8                                      By: _____/s/ DRAFT_____

9                                          STEVEN T. LOWE
                                           Attorneys for Plaintiffs
10

11          In accordance with Civil Local rule 5-4.3.4(a)(2)(i), the filer attests that each

12   of the above signatories has concurred in the filing of this document.

13   DATED:  December __, 2020

14

15                                     By: _____/s/ DRAFT_____

16                                         JORDAN D. SEGALL

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT C

 Gmail                                        Aleksandra Hilvert <aleksandra@lowelaw.com>

---

## Alfred v. Disney - Stipulation re Dismissal, Discovery, and Scheduling

---

**Aleksandra Hilvert** <aleksandra@lowelaw.com>                    Mon, Dec 28, 2020 at 8:25 PM
To: "Segall, Jordan" <Jordan.Segall@mto.com>
Cc: Steven Lowe <steven@lowelaw.com>, "Yohalem, Mark" <Mark.Yohalem@mto.com>

Counsel:

Attached please find a red-lined version of the draft stipulation.  Don't be alarmed but we did make several changes.
A few things to note:

1. We clarified that the three outlier defendants are parties to the stipulation as well; otherwise we need to serve them and dismiss them separately (per Jordan's email).  They are distributors of the franchise and therefore proper parties.  Let us know if you see another way of handling them but this seems the least complicated;
2. Given we are doing substantial similarity discovery in phase one we really just need expert depositions and there is no need for other discovery (ie RFPDs) at this stage.
3. We added some placeholders for dates (which we would like to nail down at this stage if possible) as well as an agreement that we will work together on deadlines for pleadings if mediation is unsuccessful.   Of course we can add a sentence that Plaintiffs will work with you on deadlines for any motions we file as well if you'd like.

The other changes are self-explanatory.  I hope I caught all of the revisions between the drafts you sent on Christmas Eve and today at 12:46pm (especially given the changes were not made using track changes). If not, please make them to this version using track changes.

Let us know if you'd like a call on this and hope your 2 year old is enjoying dunking on his new hoop!

Best,
Aleks

[Quoted text hidden]

---

📄 **Alfred v. Disney - Stipulation re Dismissal, Discovery, and Scheduling(46406271.1)_amh edit.docx**
77K

# EXHIBIT D



## Alfred v. Disney - Stipulation re Dismissal, Discovery, and Scheduling

**Segall, Jordan** <Jordan.Segall@mto.com>                    Tue, Dec 29, 2020 at 5:23 PM
To: Aleksandra Hilvert <aleksandra@lowelaw.com>
Cc: Steven Lowe <steven@lowelaw.com>, "Yohalem, Mark" <Mark.Yohalem@mto.com>

Hi Aleks,

Thanks for your edits to the stipulation. We've been working on another round of revisions, and I'm
attaching a revised draft both as a clean version and as a redline against your 12/28 8:25 pm draft.

Many of our changes should be self-explanatory, but I wanted to explain a few points:

·    First, with respect to the issue of "outlier" defendants: in this version of the stipulation, all
defendants named in the FAC other than Walt Disney Pictures, whether they've been served or not,
are defined as "Dismissed Defendants," and the key agreements apply to all the Dismissed
Defendants. The parties to the stipulation, per the first paragraph, are "The Plaintiffs and Defendants
to the above-entitled action," which also encompasses all of the parties named in the FAC. Nor is
there any reason why they need to be served before you dismiss them. Please let us know if these
edits address your concerns on this score.

·    We agree with limiting discovery to initial disclosures and expert depositions in phase 1. We
propose Disney's expert disclosure occurring by March 30, 2021—let us know if that proposal works.
We've included a blank space for a deadline for plaintiffs' expert rebuttal report; let us know how much
time you think you'd need. We have also proposed a mutual exchange of Rule 26(a)(1) initial
disclosures concurrent with the answer deadline (1/29/21).

·    We have made some changes to paragraph 8, on depositions. The version in the last draft would
have essentially waived Disney's ability to object to a requested deposition of any Disney-affiliated
individual—for instance, on the ground that it lacks control over a particular deponent (such as a
consultant or individual contractor) or seeks testimony from an apex executive. We realize that wasn't
your intent; you just wanted to make sure that dismissing the Dismissed Defendants leaves you no
worse off in terms of discovery. To achieve that, this draft agrees that Defendants will make witnesses
available for deposition without subpoenas to the same extent it would if the Dismissed Defendants
were still named parties to the action. Hopefully that does the trick.

·    We have also made some changes to paragraph 9, on Taylor. At this time, Disney has no intention
of arguing that any of his conduct was outside the scope of his employment. That said, Disney cannot

execute a blanket waiver of any such argument under any circumstances, as it does not have perfect information about the underlying facts. For example, if it came to light that Mr. Taylor was actively colluding with the plaintiffs on this lawsuit, Disney would of course need to remain free to disclaim that conduct. (That scenario is obviously just meant as an illustration.) In order to protect you in case Disney uncovered facts that led Disney to assert the defense, the dismissal of Mr. Taylor will be *without* prejudice. In the unlikely event that Disney ever did find itself in changed circumstances like those, the plaintiffs can bring Mr. Taylor back into the lawsuit at that time. All of this seems very unlikely, but the language we are proposing makes sure that neither party is prejudicing itself in the event of such an unlikely scenario.

·    Finally, your revision provided that phase 2 discovery opens following a failed mediation. As we agreed during the call, the purpose of bifurcating discovery is so that substantial similarity can be resolved before proceeding to discovery other issues. Accordingly, we've modified the stipulation to provide that phase 2 discovery will open after the Court rules on Disney's motion, if mediation should prove unsuccessful and Disney files a motion. We're assuming that your edit here was not meant to be a substantive change away from that approach, so hopefully our proposed revision will work for everyone.

If you have other questions about specific changes we've made or would like to discuss by phone, we are available tonight or tomorrow.

[Quoted text hidden]

**2 attachments**

 **Alfred - Disney Draft Stipulation (12-29 Disney Draft).docx**
71K

**Disney Redline versus Plaintiffs' 12-28 Draft.docx**
75K

# EXHIBIT E

1 | Steven T. Lowe, SBN 122208
2 | Aleksandra Hilvert, SBN 258463
LOWE & ASSOCIATES, a Professional Corporation
3 | 8383 Wilshire Blvd. Suite 1038
4 | Beverly Hills, California 90211
Telephone: (310) 477-5811
5 |
6 | *Attorneys for Plaintiffs Arthur Lee Alfred II and*
*Ezequiel Martinez Jr.*
7 |
8 | MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
9 | JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
10 | MUNGER, TOLLES & OLSON LLP
11 | 350 South Grand Avenue, Fiftieth Floor
12 | Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
13 | Facsimile:   (213) 687-3702
14 |
15 | *Attorneys for Defendants The Walt Disney*
*Company et al.*
16 |
17 | UNITED STATES DISTRICT COURT
18 | CENTRAL DISTRICT OF CALIFORNIA
19 |
20 | ARTHUR LEE ALFRED, II et al.,
21 |                  Plaintiffs,
22 |         vs.
23 | THE WALT DISNEY COMPANY et al.,
24 |
25 |                  Defendants.
26 |
27 |
28 |

Case No. 2:18-cv-08074-CBM-AS

**STIPULATION REGARDING
[1] DISMISSAL OF DEFENDANTS;
[2] BIFURCATION OF
DISCOVERY; [3] MOTION
PRACTICE AND ADR**

Lodged Concurrently: [Proposed] Order

Judge:  Hon. Consuelo B. Marshall

The Plaintiffs and Defendants to the above-entitled action, by and through their respective counsel of record, hereby stipulate as follows:

1.      The parties share a common interest in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable timeframes regarding discovery, motion practice, and ADR.

2.      The parties further agree that the issue of whether substantial similarity exists between the Plaintiffs' allegedly infringed *Pirates of the Caribbean* screenplay and the Defendants' allegedly infringing *Pirates of the Caribbean* motion pictures should be bifurcated from the other legal issues presented in this litigation.

3.      Accordingly, the parties execute this Stipulation for the following purposes, upon order of this Court:

(a)      Reducing the number of named defendants;

(b)      Limiting initial discovery to facilitate the efficient resolution of whether substantial similarity exists between the Plaintiffs' screenplay and the Defendants' motion pictures; and,

(c)      Establishing an orderly agreed-upon procedure for motion practice and alternative dispute resolution.

IT IS HEREBY STIPULATED between Plaintiffs and Defendants, by and through their undersigned attorneys, as follows:

**Stipulation Regarding Dismissal of Certain Defendants**

4.      The parties stipulate and agree that Walt Disney Pictures, a subsidiary of The Walt Disney Company (the "Defendant"), is the only necessary Defendant in this matter.

5.      Upon execution of this stipulation by the parties, Plaintiffs shall file: (1) an amended Exhibit 1 to the First Amended Complaint (the Copyright Certificate for Plaintiffs' screenplay); and (2) a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) dismissing without prejudice every defendant named

-1-

in the First Amended Complaint (Dkt. 112) except for Walt Disney Pictures, whether served or not served (the "Dismissed Defendants"). Such dismissals shall not mean or be taken to signify that the Dismissed Defendants were "prevailing parties" in the litigation for purposes of costs and fees pursuant to the Copyright Act.

6.      Defendants agree that, in the event Plaintiffs obtain a judgment on their claims, Walt Disney Pictures shall be responsible for damages for copyright infringement attributable to any subsidiary of The Walt Disney Company, including the Dismissed Defendants. Walt Disney Pictures will satisfy any such judgment. And, in the event Walt Disney Pictures cannot satisfy any such judgment, another subsidiary of The Walt Disney Company shall satisfy the judgment.

7.      Defendants agree that for purposes of fact discovery, documents in the possession of The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, shall be regarded as being within the "possession, custody, or control" of Walt Disney Pictures (as that phrase is used in Federal Rule of Civil Procedure 34(a)(1)), and Defendants will not refuse to produce discoverable documents or other materials in the possession of The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, on the grounds that the custodial entity is not a named defendant. Thus, no subpoena shall be required to be served on The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, in order to seek discovery from them.

8.      Defendants agree that they will make employees of The Walt Disney Company and its subsidiaries, including the Dismissed Defendants, available for deposition without a subpoena to the same extent that they would if the Dismissed Defendants were named defendants. This includes designated corporate representatives under Federal Rule of Civil Procedure 30(b)(6).

9.      Defendants agree that they will make Dismissed Defendant Brigham Taylor ("Taylor") available for a deposition without a subpoena for personal

appearance.  Defendants further agree that Walt Disney Pictures, as the sole named defendant, shall be responsible for the acts or omissions by Taylor alleged in the First Amended Complaint, irrespective of which Disney entity Taylor was performing work for and irrespective of his status as an employee or independent contractor during the time of his conduct alleged in the First Amended Complaint. Walt Disney Pictures does not intend to argue that Taylor was acting outside the course or scope of his employment with respect to the allegations in the First Amended Complaint.  Within thirty (30) days of Taylor's deposition, Walt Disney Pictures shall make a final election whether to raise the defense that Taylor was acting outside the course or scope of his employment in any respect (the "Election"). Walt Disney Pictures hereby waives any argument that the present dismissal of Taylor or the passage of time between Taylor's dismissal and the Election are grounds for objecting to Plaintiffs' re-asserting claims against Taylor as a named defendant in the event Walt Disney Pictures elects to assert this defense.

### **Stipulation Regarding Limitations on Discovery**

10.    In order to streamline the litigation, the parties agree to the following bifurcation of discovery:

(a)    Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity; if other discovery is necessary, it will occur in a second phase that will follow the parties' mediation and the Court's resolution of Walt Disney Pictures' intended motion for summary judgment on substantial similarity, as set forth below.

(b)    More specifically, in the first discovery phase discovery shall be limited to: (i) initial disclosures under Federal Rule of Civil Procedure 26(a)(1), which shall be made by January 29, 2021; expert disclosures under Federal Rule of Civil Procedure 26(a)(2) relating to the issue of substantial similarity, which shall be made by March 30, 2021; and (iii) one deposition of each side's respective expert witnesses on substantial similarity.  This stipulation is not intended to otherwise

modify the applicable discovery limitations set forth in the Federal Rules of Civil Procedure or Local Rules of this Court.

11. By March 30, 2021, Walt Disney Pictures shall disclose an expert on substantial similarity pursuant to Federal Rule of Civil Procedure 26(a)(2), including a written report. Plaintiffs' expert may prepare a rebuttal report within thirty (30) days after Walt Disney Pictures' expert disclosure. Both experts shall sit for expert depositions, if so requested, as soon as practical after the production of expert and rebuttal reports, if any.

**Stipulation Regarding Motion Practice and Alternative Dispute Resolution**

12. Walt Disney Pictures shall file an answer to the First Amended Complaint by the current deadline of January 29, 2021, without further motion practice under Federal Rule of Civil Procedure 12(b).

13. Following the completion of the first phase of discovery (as described in paragraphs 10–11 above), the parties agree to participate in a mediation before a mutually agreed-upon mediator and shall endeavor to conduct that mediation within 60 days of the completion of the first phase of discovery.

14. In the event the parties are unable to resolve the case through mediation, Walt Disney Pictures may file a motion for summary judgment on *only* the issue of substantial similarity within 60 days of the failed mediation. The parties agree to meet and confer on a stipulated briefing schedule for that motion but in no event shall Walt Disney Pictures object to Plaintiffs seeking four (4) weeks to prepare and file their opposition. Nothing shall preclude the Plaintiffs from filing a cross motion for summary judgment on substantial similarity *only* adhering to the briefing schedule above.

15. Following the Court's ruling on Walt Disney Pictures' motion for summary judgment on substantial similarity, or if Walt Disney Pictures elects not to file such a motion, discovery shall commence on all issues with no limitations other than as provided herein or by law.

16.    This stipulation is made without intending to limit any party's right to file dispositive motions after phase two discovery or discovery motions at any point in the case as authorized by the Federal Rules of Civil Procedure and this Court's Local Rules.

17.    By January 29, 2021, the parties shall meet and confer on a proposed case schedule reflecting the stipulations herein and submit it to the Court for approval.

DATED:  January 14, 2021          MUNGER, TOLLES & OLSON LLP


                                  By:    _/s/ Jordan D. Segall_
                                      JORDAN D. SEGALL
                                      Attorneys for Defendants


DATED:  January 14, 2021          LOWE & ASSOCIATES


                                  By:    _/s/ Steven T. Lowe_
                                      STEVEN T. LOWE
                                      Attorneys for Plaintiffs


    In accordance with Civil Local rule 5-4.3.4(a)(2)(i), the filer attests that each of the above signatories has concurred in the filing of this document.

DATED:  January 14, 2021


                                  By:    _/s/ Jordan D. Segall_
                                      JORDAN D. SEGALL

# EXHIBIT F

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Arthur Lee Alfred, II and Ezequiel Martinez,
Jr.,

          Plaintiffs,

    v.

Walt Disney Pictures,

          Defendant.

Case No. 2:18-CV-08074-CBM-AS

**Expert Report of James McDonald**

**March 30, 2021**

## BACKGROUND AND QUALIFICATIONS

I am a Story Analyst and consultant on screenwriting and writer-credit issues for motion pictures.  I have a Bachelor of Arts in Communications from Stanford University and an M.F.A. in Directing for Film & TV from the UCLA Film School.

Over the last four decades, I have worked for every major studio and several other studios and production companies.  In that time, I have read and analyzed more than 10,000 submissions for feature film development.  I spent two years as vice president in charge of development for an independent production company.  As a producer, with partners, I put three feature film projects into development at studios and production companies.

Over the last three decades, I have reviewed and analyzed the development process of more than 90 films and TV series and made recommendations as to writing credits.

My current curriculum vitae is attached to the end of this report.

Within the last five years, I have testified as an expert at one arbitration, the 2016 arbitration case *The Writers Guild of America West, Inc. vs. Touchstone Television Pictures, LLC, ABC Studios and Film 49 Productions, Inc*., No. 15-CR-0040.

I have prepared and delivered this report in connection with the case *Arthur Lee Alfred, II, et al. v. The Walt Disney Company et al.*, No. CV 18-8074-CBM-ASx, currently pending in the United States District Court for the Central District of California.  I have been retained by defense counsel to analyze and testify about the similarities and differences between the Plaintiffs' screenplay *Pirates of the Caribbean* ("Plaintiffs' Screenplay") and the Defendant's feature film *Pirates of the Caribbean: The Curse of the Black Pearl* ("Disney Film" or "*Curse of the Black Pearl*").  I am being compensated for my time spent conducting this analysis at the rate of $200 per hour.  In the event that I testify, I will be compensated for my time at the rate of $400 per hour.

## ASSIGNMENT AND APPLICABLE STANDARDS

At defense counsel's request, I have analyzed Plaintiffs' Screenplay and the Disney Film under what I understand to be the standards applicable to the "extrinsic test" for substantial similarity under applicable copyright laws.  I have been asked to assume that the extrinsic test requires a comparison of the two works' setting, plot, characters, theme, mood, pace, dialogue, and sequence of events.  Further, I understand that I should "filter" out certain unprotectable elements that fall on the "idea" side of the "idea-expression" dichotomy.  Within the framework of the filtration standards I have been asked to assume and apply, I have brought to bear my knowledge and experience with respect to the creation and development of stories into motion pictures.

My analysis in this report assumes that the following principles guide the filtration analysis.

I understand that filtration is the process of identifying and discarding unprotectable elements before comparing two works to determine their substantial similarity.  As explained to

me, I understand that U.S. Supreme Court Judge Learned Hand described a test of "abstractions" to draw the line between protectable and non-protectable elements. I am informed that Judge Hand described this test as follows: "Upon any work and especially upon a play a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about and at times consist of only its title, but there is a point in this series of abstractions where they are no longer protected since otherwise the playwright could prevent the use of his ideas to which apart from their expression his property is never extended."

I have assumed that, at the extrinsic stage of analysis, unprotectable elements must be filtered out before a court compares the two works. I understand that these unprotectable elements include ideas, expression merged with ideas, *scenes a faire* (or stock scenes and features), features dictated by functional considerations, as well as features that are not original to the copyright plaintiff.

I understand that *scenes a faire* are defined as stock elements that flow from a basic idea. These stock elements may be patterns, motifs, situations, or scenes that are bound to occur given certain story parameters. I also understand that the merger doctrine is similar, but not identical, to the *scenes a faire* doctrine. I understand that the merger doctrine applies when there is a "merger" of idea and expression, such that a given idea is inseparably tied to a particular expression. I further understand that, where functional considerations in the subject matter or medium selected constrain the author's creative choices, the constrained elements must be filtered out.

## MATERIALS AND INFORMATION CONSIDERED

In conducting my analysis, I have reviewed and considered the following materials:

- Plaintiffs' screenplay *Pirates of the Caribbean*;

- Disney's motion picture *Pirates of the Caribbean: The Curse of the Black Pearl*;

- the Expert Report of David Román attached as Exhibit 6 to Plaintiffs' First Amended Complaint ("Román Expert Report");

- the Court's "Order Re: Defendants' Motion to Dismiss Plaintiffs' Complaint," dated May 13, 2019;

- Plaintiffs' original "Complaint & Jury Demand," including attachments, dated November 14, 2017;

- Plaintiffs' First Amended Complaint, dated November 30, 2020, including the "sizzle reel" included as an exhibit;

- footage of the Disneyland theme park ride "Pirates of the Caribbean" (the "Disneyland Ride"); and

- relevant works in the pirate genre, such as works cited in paragraph 8 of Plaintiffs' original Complaint: *A General History of the Pyrates*, *Robinson Crusoe*, *Treasure Island*, *Peter Pan*, *Captain Singleton*, *The Pirate*, *The Gold-Bug*, *The Coral Island*, and *The Red Rover*, and films cited in paragraph 10 of Plaintiffs' original complaint: *Treasure Island*,

*Peter Pan*, *Savage Island*, *The Buccaneer*, *The Pirate*, *The Island*, *Captain Blood*, *Blackbeard the Pirate*, and *Yellowbeard*. (Some of these works have appeared in multiple media, e.g., a novel, a play, a film.) I have also reviewed *The Goonies*, a pirate film referenced in Plaintiffs' pitch materials that were exhibits to Plaintiffs' original and amended complaints, and *Cutthroat Island*, a pirate film at least indirectly referenced in Plaintiffs' pitch materials.

## SUMMARY OF AFFIRMATIVE AND REBUTTAL OPINIONS

Based on the materials I have reviewed and the analysis that I describe below, I conclude that, especially after filtering out the unprotectable elements of Plaintiffs' Screenplay, there is no substantial similarity between Plaintiffs' Screenplay and the Disney Film at the level of expressive content. This conclusion holds along all of the pertinent dimensions of plot, characters, themes, mood, setting, pace, dialogue, and sequence of events.

I understand that David Román, the Plaintiffs' expert, has stated that his contentions regarding the protectable similarities of expression may be found in his expert report. I therefore have reviewed his report to consider whether the points he raises change my analysis. They do not. In fact, I believe Dr. Román's report reflects a lack of familiarity with the pirate genre in general and of the specific works Plaintiffs state are characteristic of the genre. The similarities and novelties that Dr. Román identifies either do not exist, are common to other pirate films and literature, or exist at such a high level of abstraction that they constitute unprotectable "ideas" instead of the protectable "expression" of those ideas.

## SIMILARITY ANALYSIS

## I. Plaintiffs' Screenplay Is a Generic Combination of Two Well-Known works, *The Goonies* and *Cutthroat Island*

Plaintiffs' Screenplay is about two pirates fighting over the pieces of a map to a lost treasure with the hero winning the battle and ending up with his real treasure, love and family. As Plaintiffs' cover letter describes, at its base, their Screenplay is "'Goonies' meets 'Pirates of the Caribbean.'" (First Amended Complaint, Exhibit 2.) In my opinion, that is in essence all Plaintiffs' Screenplay is.

**The Goonies**       **Plaintiffs' Concept Art**       **Cutthroat Island**

  

Plaintiffs' concept art (above, center), submitted with their pitch materials, further confirms that their Screenplay is merely a pastiche of existing ideas. Plaintiffs prepared and submitted a mock-up poster that literally overlays posters from two well-known pirate-related films—*The Goonies* (above, left) and *Cutthroat Island* (above, right)—adding a few minor elements taken from Disney's Pirates of the Caribbean amusement park attraction. At the center of the concept art is a group of children, huddled together in front of their parents and over a skull atop a pile of treasure—borrowed entirely from *The Goonies* movie poster. And nearer to the top, almost in the background, is the faded center image of the movie poster for *Cutthroat Island*, a film Plaintiffs relied on in creating the concept for their Screenplay.

*The Goonies*, released in 1985, is an iconic film about a group of young misfits who discover a treasure map that takes them on an adventure to find the long-lost treasure of a 17th-century pirate, One-Eyed Willy. In the end, the characters come together and discover the real treasure is love and family.

*Cutthroat Island*, released in 1995, is a pirate film about a female pirate and her con-man companion finding three pieces of a map in a quest to find a hidden island full of treasure (the eponymous "Cutthroat Island"). In the process, the female pirate and her companion find both moral redemption and love in one another.

Plaintiffs' Screenplay is a generic and uninventive combination of these two well-known works.

## II. Plaintiffs' Screenplay and the Disney Film Are Fundamentally Dissimilar in All Respects Relevant to the Extrinsic Test

Though both works under analysis are about pirates in the Caribbean, they tell two different stories with substantially different plots, characters, and relationship dynamics. Plaintiffs' Screenplay is about two pirates fighting over the pieces of a map to an immense

wealth of treasure, with the hero teaming up with a band of child misfits, winning the battle, and ending up with his real treasure, love and family. In the end, the pirate-hero abandons piracy for a respectable family life. Disney's *Curse of the Black Pearl* is about two adult heroes teaming up to rescue the governor's daughter and retake the first hero's ship from cursed, undead pirates intent on lifting the curse. In the end, the curse is lifted; the formerly cursed pirates die or are captured; the pirate-hero gets his ship back *and resumes a life of piracy*; and the non-pirate hero wins the governor's daughter, whom he has long adored.

While both works fall within the pirate genre (and thus feature characteristic scenes from that genre) and both draw upon the Disneyland Ride, they are substantially different. Plaintiffs' Screenplay is a pastiche of *The Goonies*, *Cutthroat Island*, and the Disneyland Ride—heavy on slapstick humor, focusing largely on a group of misfit kids, and ultimately about giving up piracy and treasure-hunting for family life. *Curse of the Black Pearl* is a clever, supernatural story about undead pirates who must break their curse and thus find life (and death) by recovering the last piece of a treasure they stole long ago. The Disney Film's protagonists are drawn *to* piracy, not away from it, and they are all adults. It is not a redemption story but a liberation story. While both works have humor, the humor in Plaintiffs' Screenplay is conventional slapstick humor imitative of *The Goonies*. The Disney Film has more sophisticated humor, embodied in the wry and ludicrous Jack Sparrow, a character unlike anyone in Plaintiffs' Screenplay. As explained more thoroughly below, similarities can be found between the works because they both fall in the pirate genre; but they are not substantially similar, especially once generic elements are filtered out.

I believe that the fundamental differences in the two works are reflected in each of the characteristics relevant to the extrinsic test.

### A.     Plot

If "story" is defined as what a narrative is about, then "plot" is how the elements and dynamics of the story are told—i.e., its narrative structure or story line.

Even though Plaintiffs' Screenplay and the Disney Film's stories are about pirates, the plot differences between the two works are substantial, while the similarities are superficial to the point that the works only share abstract and/or generic ideas. To clearly spell out their similarities and differences, one can apply the paradigmatic three-act plot structure and framework formula.[1] This structure consists of an "inciting incident," which sets up a "conflict" (act one), which is then "complicated" (act two) as it builds to a "climax," which ends with a "resolution" (act three).

#### 1.     *Inciting Incident.*

Both plots start at sea with ships, but the ships, the characters and the action are different. Plaintiffs' plot starts with a full-on battle between a pirate ship and a British privateer ship[2]—

---

[1] On the three-act structure, see Syd Field, *Screenplay* (1979).

[2] Privateers, unlike pirates, operated lawfully under the auspices of a government such as the British crown. Sir Francis Drake, for instance, was a privateer.

reminiscent of the opening of *The Black Swan* (1942)—and ends with the privateer captain, Nefarious, betraying and killing his crew then taking command of the pirate ship as part of his deal with the pirate captain, Davey Jones, with whom he shares a treasure map.

*Curse of the Black Pearl*'s plot starts with a British warship, escorting the new Governor and his daughter, Elizabeth Swan, age ten, to Port Royal, coming upon a burning ship and rescuing an unconscious boy, Will Turner, age ten or eleven, floating on debris in the sea. While watching over Will on deck, Elizabeth finds he's wearing a gold Aztec medallion and thinks the boy is a pirate. As she stands and pockets the medallion, she glimpses a ship with black sails disappearing into the ghostly fog covering the calm seas.

    2.    *Conflict.*

Plaintiffs' plot conflict is set up with Nefarious and Davey each holding half a treasure map and not trusting each other. The action in the prologue has Davey giving his half of the map to his lover, Jane; them getting into a confrontation with Nefarious, who grabs Jane and threatens to throw her overboard if Davey doesn't give him his half of the map; Davey hesitating then giving up the map; Nefarious tossing Jane overboard; a sea monster destroying the ship; and Davey escaping with his half of the map into the rough seas.

  Disney's plot conflict is set up at the beginning of Act I with the introduction of the second male hero, Captain Jack Sparrow, who wants to get his ship, the *Black Pearl*, back; the cursed *Black Pearl* pirates, led by Captain Barbossa, kidnapping Elizabeth, now age eighteen; and the revelation that the pirates need to return the gold medallion to break their curse.

    3.    *Complication.*

The most logical (and common) way to develop plot complications is to introduce obstacles for the characters to overcome. Plaintiffs' Screenplay's complications have Jane coming back into Davey's depressed, drunken life after ten years, betraying him to Nefarious then changing her mind, and helping him escape; the orphan Rascal Scoundrels having to survive a gauntlet of booby traps in a cave to retrieve Nefarious' half of the treasure map then getting caught by Nefarious; Nefarious holding Jane captive for betraying him; and Davey needing to rescue Jane and the Rascal Scoundrels then beat Nefarious and his pirates to the treasure.

*Curse of the Black Pearl*'s complications have Jack and Will escaping jail, stealing the British Navy Commodore Norrington's fastest ship, gathering their own pirate crew, and chasing down the *Black Pearl*; and Barbossa and his pirates discovering they need Will's blood along with the medallion to break the curse. After Jack, Will, and their crew lose a sea battle with the *Black Pearl*, Will gives himself up to Barbossa in return for Jack and Elizabeth's freedom. Barbossa holds the crew captive and maroons Jack and Elizabeth on an island. Jack and Elizabeth are rescued by the Norrington and his men; and Elizabeth promises to marry Norrington if he goes after the pirates and rescues Will.

    4.    *Climax.*

Though the climaxes of both works take place in and around an island cave filled with treasure and have plenty of swashbuckling action (in the grand pirate movie tradition), why the

characters are there and how the action elements and dynamics play out are significantly different.  In Plaintiffs' Screenplay, the major battle action takes place on the pirate ship and involves Davey heroically battling Nefarious and his pirates to free Jane and the Rascal Scoundrels.  The battle action that takes place in the treasure cave has Nefarious first attacking Jane then dueling Davey while the pirates pop jewels out of the cave wall, fend off the Rascal Scoundrels, and try to stop the water pouring through the holes they've created in the wall; and the climactic sequence ends with Davey defeating Nefarious by pinning him to the wall with a sword then escaping with Jane and the Rascal Scoundrels in a rowboat as the cave fills with water and a sea monster swallows Nefarious, followed by the entire island sinking into the sea.

*Curse of the Black Pearl*'s climactic sequences start with Norrington and his men in rowboats outside the treasure cave entrance waiting to ambush the pirates as they leave.  Jack rows into the cave and stops Barbossa from cutting Will's throat over the Aztec treasure chest by telling him that Norrington and his men are outside waiting for them.  As he palms a medallion from the chest, Jack talks Barbossa into waiting to lift the curse until after they've defeated Norrington and taken his flagship.  Jack then offers a deal where he gets the *Black Pearl* and will sail under Barbossa's flagship colors.  While Barbossa's cursed pirates walk across the bottom of the sea and ambush the crew of the flagship, Elizabeth slips away in a rowboat to the *Black Pearl* and frees Jack's captive pirate crew, but can't get them to help her rescue Will.  While the crew sail off in the *Black Pearl*, Norrington and his men get back to the ship and battle the cursed pirates, and Jack and Barbossa duel in the treasure cave.  As Elizabeth arrives and Will defeats the last remaining pirate in the cave, Jack puts his blood on the medallion and flips it to Will as Barbossa threatens to shoot Elizabeth.  Jack shoots Barbossa, who is then surprised to see Will lifting the curse by dropping both medallions with Jack's and his blood into the chest.  Back on the ship, the cursed pirates find they are mortal again and surrender.

     5.     *Resolution.*

Plaintiffs' Screenplay ends with the protagonists quitting piracy.  Davey, Jane, and the Rascal Scoundrels are rescued by a British privateer ship.  Davey and the Rascal Scoundrels leave piracy behind forever to be commissioned as privateers, and are given a ship as reward for ridding the Caribbean of Nefarious.  They all sail off with Jane—an ersatz nuclear family—for their next adventure.

*Curse of the Black Pearl* ends with the protagonist *returning* to piracy.  At the end of the Disney Film, Jack has been sentenced to hang.  Will helps Jack escape the noose with a little distraction from Elizabeth, and Will and Jack take out several soldiers before they are captured on the parapet.  Elizabeth then sides with Will and Jack, and the Governor orders his soldiers to lower their weapons.  Jack sees a parrot and escapes backwards over the wall into the sea, knowing his *Black Pearl* crew has come for him.  The Governor and Commodore accept Elizabeth's choice of life with Will.  Significantly, Jack ends the film as a pirate captain of a pirate ship—*not* a privateer—whistling the Ride's iconic "a pirate's life for me" song.

     6.     *Plaintiffs' Alleged Plot Similarities in the Complaint and Expert Report*

I noted that paragraphs 104 through 109 in the First Amended Complaint describe three alleged plot similarities between the two works.  None of the ideas reflected in the purported plot

8

similarities are novel. And, when one compares the specific expression of the plot elements in the context of their respective scenes, they are substantially different.

In paragraphs 105 and 106, Plaintiffs argue that the scenes in their Screenplay and the Disney Film of pirates heckling women as they are brought aboard are both unique and similar. Pirates heckling women, however, should be filtered out as generic. In fact, at that level of generality, the idea was already expressed in the Disneyland Ride, which depicted pirates having captured women or pursuing women. The idea of pirates threatening women with violence is expressed differently in the two works:

- In Plaintiff's Screenplay, Jane kicks Pirate #1 in the groin, which prompts his attack; and then, after Nefarious snaps a whip around Pirate #1's neck and orders him keel-hauled, Jane lunges at Nefarious with her dagger but has to stop when she feels Stitch's pistol in her side and his knife at her throat.

- In the Disney Film, Elizabeth is simply slapped by a pirate, whose arm is then grabbed by Barbossa.

To the extent the similarity Plaintiffs are drawing is a pirate captain restraining mistreatment of a female prisoner by pirates, such scenes are routine in the genre, included in works referenced by Plaintiffs, such as *Captain Blood* (1922 novel; 1935 film).

In paragraph 107, Plaintiffs allege that both works depict male pirates disguising themselves as women to deceive enemies during battle. The basic idea of pirates dressing up as women is a generic plot idea that should be filtered out. (This is explained further below in Section III C of this report.) And again, the specific expression of this idea in each work occur in different circumstances with different characters and different action. In Plaintiffs' Screenplay, Jane dresses Davey up to try and sneak him past Nefarious and his crew in the port town midway through the plot. In *Curse of the Black Pearl*, two minor characters, Pintell and Ragetti, are disguised as women in a rowboat to distract the British soldiers just before the climactic battle.

In paragraph 108, Plaintiffs allege that both works contain similar scenes in which the two protagonists take control of their rival's ships. The idea of taking over a ship is generic to the pirate genre (and indeed to virtually all adventure stories set at sea). The scenes are also strikingly dissimilar:

- In Plaintiffs' Screenplay, the Rascal Scoundrels are on the pirate ship looking for the map when the British privateers attack the port town. Davey escapes Nefarious and his men, and then swims to the pirate ship when he sees the boys there and his own ship blown up.

- In *Curse of the Black Pearl*, Elizabeth sneaks off Norrington's flagship as the climactic battle starts, rows to the *Black Pearl*, and frees Jack's pirate crew. Refusing to go with her to the treasure cave to rescue Will, Jack's pirate crew sails off in the *Black Pearl*. In the end, they return to collect Jack, who has just escaped the hangman's noose.

Dr. Román argues that the "most obvious" similarity between the works is "the fact that both scripts feature pirate ships with skeleton crews." (Román Expert Report, p. 11.) But he does not mention that skeleton or undead pirates are a generic element in pirate stories, including

in the Disneyland Ride that inspired both works. In fact, Plaintiffs' "sizzle reel" included footage of the Ride's skeleton pirates, and it appears that Plaintiffs' inclusion of pirates with painted skeleton faces was intended to superficially link their Screenplay to the Ride. Pirates who are skeletons, ghosts, or undead also appear in well-known works such as the opera *The Flying Dutchman*, the acclaimed comic *Watchmen*, the novel *On Stranger Tides*, the video game *Monkey Island*, and many pirate movies. (This is explained further below in Section III C of this report.)

Also, Dr. Román's description of the works is inaccurate in key respects. For example, in *Curse of the Black Pearl*, Barbossa and his crew *actually are* undead skeletons. The undead pirates appear to be human (and pass themselves off as such), but when struck by moonlight are revealed as skeletons. Being dead already, they cannot be killed until the curse is lifted. In Plaintiffs' Screenplay, by contrast, there are no *actual* skeleton pirates—there are merely pirates who are "ghostly *looking*" with "their faces *painted* into TRIBAL SKULLS," referred to as "skull-faced pirates." In other words, the pirates in Plaintiffs' Screenplay are ordinary humans decorated as skeletons, not vice-versa, and their appearance does not magically change. (The Rascal Scoundrels find skeletons on Nefarious' ship, but they are ordinary inanimate skeletons, not undead pirates.)

## B. Characters

Along with their physical appearance, age, personality, occupation, and/or social status, characters are defined by their emotional and psychological wants and needs, goals, motivations, beliefs, inner conflicts, talents and shortcomings, and relationships—all of which should change and/or grow through the course of the story.

The few similarities there are between Plaintiffs' Screenplay and the Disney Film's characters and relationships are superficial and generic. None of the characters from Plaintiff's work exist in the Disney Film. And even at the highest level of generality (e.g., "pirate protagonist" or "heroine love interest"), there are characters that do not have a conceivable counterpart in each work. For example, the key characters of the Rascal Scoundrels in Plaintiffs' Screenplay (the *Goonies* half of Plaintiffs' pitch to Disney) lack any counterparts in *Curse of the Black Pearl*; and Governor Swan, Will Turner, and Commodore Norrington in *Curse of the Black Pearl* have no counterparts in Plaintiffs' Screenplay. Also, Plaintiffs' Screenplay's pirate crew is significantly different from both of the pirate crews in *Curse of the Black Pearl*—as noted, Plaintiffs' villainous pirates are ordinary pirates motivated by greed who wear makeup to appear scary, while the *Black Pearl*'s crew are cursed, undead skeletons who are motivated by their desire to lift the curse. The crew assembled by Jack and Will in the Disney Film are not villains at all, but protagonists.

### 1. *Plaintiffs' Alleged Character Similarities*

Plaintiffs draw comparisons between (1) Davey Jones (Plaintiffs' Screenplay) and Captain Jack Sparrow (Disney Film); (2) Jack Nefarious (Plaintiffs' Screenplay) and Hector Barbossa (Disney Film); (3) the Rascal Scoundrels (Plaintiffs' Screenplay) and Jack Sparrow's "crew" (Disney Film); and (4) Jane (Plaintiffs' Screenplay) and Elizabeth Swan (Disney Film). As explained below, these comparisons are superficial and inaccurate.

(a)    The Protagonists: Davey Jones v. Captain Jack Sparrow

Plaintiffs' Screenplay's **Davey Jones** is an archetypal pirate hero in the tradition of *Captain Blood* (1922 novel; 1935 film), *The Sea Hawk* (1940), and *Against All Flags* (1952). He is introduced in the Prologue as a cocky "dashing young rogue whose talents in piracy are unsurpassed" then, after losing the love of his life (Jane), becomes a self-pitying, lost drunk until she re-enters his life ten years later. Jane gives Davey Jones the chance to redeem himself by heroically fighting for what he really wants and needs—Jane and the orphans, not gold. He has a conscience and a moral compass. In the end, he renounces piracy and becomes a privateer. The character arc is very similar to that of Captain Blood, a dashing young rogue who becomes a pirate, falls into drink and despair when he believes he has lost his chance at the love of his life, recovers in order to redeem himself in her eyes, becomes a privateer, and wins her love. Plaintiffs acknowledged the influence of *Captain Blood* (1922 novel; 1935 film) in their original complaint.

*Curse of the Black Pearl*'s **Jack Sparrow** is a non-traditional hero. He has no morals and not much of a conscience as he schemes and fights to get his ship back. Like Davey—and most pirates—he is drunk a lot. The difference is that Jack drinks for pleasure (a happy drunk) while Davey drinks to forget (a sad, pathetic drunk). Unlike Davey, Jack has no romantic relationship, and isn't seeking one—he makes crude passes at Elizabeth Swan, but does not seek (or win) her love in *Curse of the Black Pearl*. In the end, he is still a pirate, which is what he wants to be. Unlike Davey Jones, he does not become law-abiding, romantically attached, or a father figure to anyone. Jack's arc is not from pirate to family man, but from ousted pirate captain *back to pirate captain*. In short, Jack and Davey's wants, needs and motivations are completely different, as are their relationships with the other characters in their stories.

Plaintiffs' claim that Davey Jones and Jack Sparrow are similar focuses on generic personal characteristics: Plaintiffs allege that both men are "cocky," "dashing," "morally ambiguous," "opportunistic," and fond of rum. (First Amended Complaint, paragraphs 83–84.) These character traits are too generic to be protectable under the applicable rules and should be filtered out. Moreover, they largely merge with the idea of a pirate captain.

Dr. Román also opines that the two characters are similar, but his analysis of them is factually inaccurate. Davey Jones is not introduced as a "disillusioned pirate with a drinking problem." (Román Expert Report, p. 7.) In fact, when he is first introduced in the prologue, he is described as a dashing young rogue, "clean-shaven, hair pinned back in a tail," with "unsurpassed" talents. It isn't until Nefarious betrays him and he loses Jane that he is seen (ten years later) as disillusioned and drunk. Nor is Davey ever depicted as "morally suspect." He is introduced as a classic hero, whose disillusionment is easy to understand and empathize with because he blames himself for losing the love of his life, Jane, in the Prologue. He is clearly the hero, and Plaintiffs' Screenplay encourages the audience to identify with him and root for his redemption.

Jack Sparrow, by contrast, is not young or dashing in an archetypal way (he was portrayed by an actor nearly 40 years of age). His morality isn't merely "questionable"—he clearly has no morals, as he tells Will at the end of their swordfight. Jack drinks because he likes

it; not out of self-pity like Davey. In key respects, he is an anti-hero. Davey and Jack are substantially different in their appearance, attitudes, interests, motivations, and relationships.

      (b)      The Villains: Captain Jack Nefarious v. Captain Hector Barbossa

Plaintiffs' Screenplay's **Jack Nefarious** is an archetypal pirate villain, much like Dawg Brown in *Cutthroat Island* (1995). Like Dawg's character, he is relentlessly focused on getting a map to lost treasure. He's introduced as a "distinguished naval officer and pirate hunter with a savage instinct and sinister nature" then quickly becomes a ruthless killer, who blows up his privateer crew and ship and takes command of Davey's pirate ship and crew. He has no loyalty to anyone or any moral code, as he readily betrays his partnership in the map with Davey. When he re-enters the story as "Phantom Jack," his "ghostly persona" is clad in the classic baroque style of several real pirate captains of the late 1600s. Like the real Blackbeard, he has fuses in his hair and beard, which he uses against privateers who try to capture him. Though he and his crew have been posing as ghosts, they are not actually dead or cursed.

*Curse of the Black Pearl*'s **Hector Barbossa** is defined by two qualities that Jack Nefarious lacks: he is cursed, and he has honor. Barbossa and his crew are cursed to live halfway between life and death, unable to die until the curse is lifted. He can't taste or smell food, and yearns to. In the moonlight, he is revealed to be a skeleton. He and his crew are not motivated by greed, but by a desire to lift the curse and become human again: in an inversion of the classic pirate trope, he and his crew are hunting for treasure not to become wealthy, like a typical pirate (and like Jack Nefarious), but to lift the curse they are under.

Barbossa's second defining characteristic is his honor. He has always been a pirate who lives by the Pirate Code. Unlike Nefarious, his word is his bond when he gives it, and he keeps it. He is loyal to his crew and cooperates with them to lift the curse. Barbossa's relationship with Jack Sparrow is a rivalry over captaining the *Black Pearl*.

Plaintiffs claim that the two villains are "sinister, morally ambiguous and opportunistic." (First Amended Complaint, paragraph 86.) Not only is this stating obvious, generic, functional characteristics of almost any pirate story's antagonist, but the two characters are not actually similar. An examination of Nefarious' actions and dialogue reveals there is nothing "ambiguous" about his morality; he is a vicious pirate with no morals whatsoever. Barbossa, on the other hand, has enough morality to live by the "Pirate Code" and be loyal to his crew.

Plaintiffs also mischaracterize the relationship between Nefarious and Barbossa, whom they claim "were originally Davey Jones'/Jack Sparrow's first mates." (First Amended Complaint, paragraph 86.) That is inaccurate: Barbossa was Jack's first mate, but Nefarious was *not* Davey's—Plaintiffs have flipped the relationship of their characters, as Davey was *Nefarious's* first mate.

Plaintiffs also argue the characters are similar because both "shoot their own crew members to further their own objectives." (First Amended Complaint, paragraph 86.) Pirate captains killing their crew members is a trope as old as the genre (and no doubt true to life, given the brutal means by which authority was maintained in such criminal enterprises). In any case, the specific expressive details of these scenes—i.e., the settings, the context of the scenes, the reason for the shooting, and the outcome—are completely different. In the prologue of

Plaintiffs' Screenplay, Nefarious shoots and kills his privateer first mate to blow up his ship and take over Davey's pirate ship. In *Curse of the Black Pearl*, Barbossa shoots a crewman in the treasure cave to test whether the curse has been lifted, but the crewman doesn't die.

Dr. Román's comparison of the characters also rests on generic character traits—he argues that both characters are cunning, sinister, and charismatic. These traits are too generic to be relevant to the extrinsic test. Dr. Román also claims that, while both villains are "motivated by greed at all costs," they are "also immensely entertaining and likable," which he claims "deviates from the treacherous pirate characterization of the standard pirate narrative." (Román Expert Report, p. 8.) This characterization is confusing as well as highly abstract. Nefarious is not depicted as "immensely entertaining and likable"; Plaintiffs' Screenplay characterizes him as a dark, mysterious, and violent villain.

Even if taken at face value, Dr. Román's description seems to describe many famous pirate villains who are both evil and entertaining, such as Long John Silver in *Treasure Island* (1950) or Captain Hook in *Peter Pan* (1953). It is unclear what is meant by the "standard treacherous pirate characterization," how these two specifically deviate from it, and how that makes them "less menacing." In fact, Barbossa is not "motivated by greed at all costs"; his motivation in the Disney Film is not greed but a desire to break the curse at all costs. Nefarious, on the other hand, is "motivated by greed at all costs," like generic villains in pirate movies where finding a hidden treasure is the main goal that drives the plot action.

(c)     Rascal Scoundrels v. Jack Sparrow's Crew

The Rascal Scoundrels are a group of six orphan children, ages seven to fifteen, who, as Plaintiffs describe in their original submission letter to Disney, mirror the ragtag group in *The Goonies* (1985). Each character is specifically introduced to the audience. Jimmy, age fifteen, is the oldest and usual leader of the group. Catfish, age thirteen, wears oversized clothes. Clumsy, age twelve, has a stutter and is, as the name suggests, clumsy. Stink, age eleven, is overweight and constantly eating. Snooze, age ten, again as the name suggests, is always tired. And Littles, age seven, is the youngest of the group. These characters are stock figures in film. While Plaintiffs identified *The Goonies* as the specific source of their copying, it is clear that the Rascal Scoundrels also owe much to the Little Rascals—who went on a pirate adventure seeking treasure in a cave in *Mama's Little Pirates* (1934). Similar ensembles appear in numerous movies such as *The Sandlot* (1993), *The Bad News Bears* (1976), and *Stand By Me* (1986).

The Rascal Scoundrels are nothing more than a generic trope of a group of children dropped into a pirate tale and should be filtered out as generic. Further, despite Plaintiffs' attempt to cast them as "supporting characters," the Rascal Scoundrels are their Screenplay's *central* characters, with their Screenplay's plot focusing on the Rascal Scoundrels' actions, interactions, and what happens to them in the end. Indeed, the fact that, in their cover letter, Plaintiffs describe their Screenplay as "'Goonies' meets 'Pirates of the Caribbean'" further emphasizes Plaintiffs' concept of the Rascal Scoundrels as their Screenplay's central characters. In *The Goonies* (1985), the main group of children is the center of the story and the namesake of the film.

The Rascal Scoundrels have *no analogue* in *Curse of the Black Pearl*.  Jack Sparrow's crew, whom Plaintiffs' complaint compares to the Rascal Scoundrels, actually *are* supporting characters: they have few or no lines of dialogue, they have no character development, and neither the plot arc nor the resolution of *Curse of the Black Pearl* concern them.  Showing how implausible this comparison is, Dr. Román abandons it: his expert report compares the Rascal Scoundrels to Will Turner, not to Jack Sparrow's crew.  (Román Expert Report, p. 12–13.)

Both claims of similarity are forced at best.  The group of orphans in Plaintiffs' Screenplay could not be more different from Sparrow's crew of adult pirates.  The Rascal Scoundrels are a group of children, interested in being pirates, who loyally serve as the crew for an adult pirate.  Jack Sparrow is a lone wolf for many points in his pirate career, has no one singular crew, associates only with grown men, and has betrayed or been betrayed by many of them.  Plaintiffs claim that the two crews share immaturity and violent tendencies, but that does not make them similar.  Humor and violence are common in many pirate crews depicted in pirate stories.  See above at Section III A.  The only concrete comparison Plaintiffs draw between the groups of characters is between Stink in their Screenplay and Gibbs in the Disney Film, on the ground that both are "smelly."  (First Amended Complaint, paragraph 89.)  But Gibbs' sleeping with the pigs is an explicit reference to the Disneyland Ride, and in any event most pirates would likely have had poor hygiene.

(d)     Jane v. Elizabeth

Plaintiffs' Jane character, an adult pirate, is a "savvy wench" stock heroine, in the tradition of Captain Rouge in *The Golden Hawk* (1952), Captain Anne Providence in *Anne of the Indies* (1951), Prudence 'Spitfire' Stevens in *Against All Flags* (1952), and Morgan Adams in *Cutthroat Island* (1995), the latter of whom Plaintiffs explicitly incorporated into their concept art as the model for Jane.  She is out for herself in the beginning and throughout much of the story.  When she first appears in the Prologue, she is dressed as a pirate and indicates she and Davey have had a long history together.  They're like a married couple in conflict trying to sort out their relationship.  When she reappears, she is hustling and pickpocketing pirates in a bar and working with Nefarious against Davey.  She then saves him from Nefarious when Davey tells her he still loves her.  In the end, she too realizes love and family are more important than gold.

The Disney Film's Elizabeth Swan is a fundamentally different character type: she is an archetypal "kidnapped aristocratic heroine" and love interest found in many pirate works—often, as with Elizabeth, the daughter or niece of an island governor.  Like Will, her character arc is a "coming of age" journey—from being a sheltered, unsure-of-herself girl confined by the conventions of her station (literally stifled by a corset) to a self-confident woman willing to stand up for herself and choose her own life and love.  She and Will are archetypal "young lovers."  Other than being a female captive of the villain, she has nothing in common with Jane.

Plaintiffs' and Dr. Román's abstract comparisons lack specific expressive detail within the context of each story line—e.g., Dr. Román opines, "[b]oth female leads also help rescue their love interest from the trappings set by the rival ship captains."  (Román Expert Report, p. 11.)  Aside from being a vague statement without detailed support, female leads helping rescue their love interest is a common genre trope.  Also, several of their statements are inaccurate.  For example, Dr. Román claims that "[n]either Jane nor Elizabeth is the standard 'Damsel in

14

Distress' in need of rescue." (Román Expert Report, p. 10). But early in the Disney Film the Elizabeth character is a classic "damsel in distress" in need of rescue, before the film complicates that trope later. Plaintiffs' Jane character, by contrast, is *never* portrayed as a damsel in distress and isn't taken hostage by Nefarious and his crew until more than halfway through Plaintiffs' Screenplay.

There are other inaccuracies in Dr. Román's comparisons of Elizabeth and Jane. First, Dr. Román opines that the two women "share the same physical characteristics, age, and temperament and function." (Román Expert Report, p. 10.) In Plaintiffs' Screenplay Prologue, Jane is introduced as a full-grown, red-haired woman in "buccaneer clothes," probably at least twenty or twenty-one, who has had a romantic and working pirate relationship with Davey for some time. Ten years later, Jane is a tavern wench hustling drunken pirates for money and in cahoots with Nefarious to get Davey's map. When the Disney Film's Elizabeth character is introduced on a British warship in the film's prologue, she is a child around ten, and the Governor's daughter. Eight years later, she is a proper, aristocratic, brown-haired young lady, attired in a corset and fancy dress, living in the Port Royal Governor's mansion and about to be proposed to by a Commodore in the British Navy. Among many other differences, the women don't share the same age, physical characteristics, or social rank and status.

Second, Dr. Román opines that "the women are thrown overboard and into the sea by the main villain pirate while the male romantic lead begs him to 'let her go!'" This idea is both generic and inaccurate. In the Plaintiffs' Screenplay's prologue, Nefarious throws Jane overboard in response to Davey (their Screenplay's male romantic lead) begging him to "let her go." In *Curse of the Black Pearl*, however, Barbossa and his pirates make Elizabeth walk the plank after they discover she's not the daughter of Bootstrap Bill Turner and of no use to them. Jack Sparrow, who is *not* "the male romantic lead" in the Disney Film, goes overboard after her, and the two of them are marooned on an island. Elizabeth's romantic interest, Will Turner, isn't even on the pirate ship when she walks the plank. So, considering the action in the context of each story line, both women go overboard in different ways, for different reasons, and at different places in the story.

Third, Dr. Román offers that both Jane and Elizabeth "engage the pirates on nearly equal terms in matters of skill, wit, and athletics." (Román Expert Report, p. 10.) This opinion appears to be little more than the claim that both works feature strong female protagonists, which is obviously a generic idea. Again, the expression is utterly different: Jane is a savvy pirate, living by her wits by hustling and pickpocketing other pirates. Elizabeth is the Governor's sheltered daughter trying to survive her kidnapping by pirates.

## C.     Themes

The definition of "theme" in art and literature is "a unifying motif" or "recurrent or central idea" that resonates through the development of the characters and plot from beginning to end. It is what the story is about on a philosophical, emotional or psychological level—e.g., Coming of Age, Courage and Perseverance, Revenge, Redemption, Friendship, Family and Love. Themes can be "the moral of the story." Often themes are presented as a dichotomy—e.g., good vs. evil, love vs. hate, rich vs. poor and appearance vs. reality—and used as a filter in developing the arcs of the characters and relationships. Stories often have multiple themes, but

there is typically a major theme that is the most significant theme of the story, and the overriding drive of the whole story—e.g., loyalty to family is the major theme of *The Godfather* book and films; and, true love means being selfless enough to sacrifice one's happiness, or even life, for another is a common theme of works like *Casablanca* (1942), *A Tale of Two Cities* (1935), and *Titanic* (1997), among many others.

The major theme of Plaintiffs' Screenplay's story is that "life's real treasure is love and family, not gold and jewels." The thematic conflict set up in the Prologue is "treasure vs. love"—Davey has to choose between giving Nefarious his half of the map to save Jane. It is repeated midway through the plot when Jane betrays Davey to Nefarious then has a change of heart, and then in the end, when Davey and Jane choose saving each other and the orphans over the treasure. There is also a "redemption" theme in Davey's character arc.

As previously stated, *Curse of the Black Pearl* is a liberation story, "freedom vs. captivity." Historically, liberation (e.g. freedom from oppression, poverty, slavery, indentured servitude, captivity, etc.) was often what drove people into piracy, which was one of the few "democratic" societies of the time. The thematic dynamic of "liberation" drives each of the main characters to free (liberate) someone or something they love and/or themselves from the social, magical or actual physical restraints or constraints that shackle them:

- Barbossa (and his crew) are driven to liberate themselves from the Aztec curse, which holds them captive between life and death.

- Jack Sparrow is driven by the desire to liberate his beloved ship from the mutinous Barbossa and crew that marooned him on an island. Jack also is constantly fighting and scheming to avoid or escape captivity throughout the Disney Film—from being chased by the Port Royal soldiers, his swordfight with Will, and his imprisonment in the fort jail cells in Act I; through being captured by Barbarossa and marooned a second time then captured by Norrington in Act II; to the hangman's noose at the end of Act III.

- Will trains with his sword every day as part of his internal drive to liberate himself from the constraints of his social status as an orphan and apprentice to a drunken sword maker. When Elizabeth is kidnapped, Will is driven to rescue (liberate) her from her captors, even to the point of taking her place as Barbossa's captive.

- Elizabeth's internal struggle with the restraints and constraints of her social status as the Governor's daughter is initially illustrated by her battle with a tight-fitting corset as she is being dressed for her meeting with her Father and Norrington. When kidnapped, she argues, negotiates, and battles for her freedom; and then, once freed by Will's sacrifice, she argues, negotiates, and battles to free him from captivity.

- Will and Elizabeth are also lovers overcoming the obstacles and outside forces thwarting their relationship and the development of their romance. They are brought together by the cursed medallion as kids then separated by it in their late teens, whereupon they choose not to "suffer the slings and arrows of outrageous fortune" but "take up arms against a sea of troubles, and, by opposing, end them." The romance between lower-class Will and upper-class Elizabeth is a further instance of these characters being liberated from their respective social classes (e.g., working-class apprentice, upper-class marital token).

16

In the end, the main characters in the Disney Film are all liberated from their social, magical, and physical shackles and free to live the lives they choose: Jack gets his ship back and is free to sail the seas as a pirate; Elizabeth and Will are freed from their social constraints and obligations so they can love and build their life together; and, Barbossa and his crew are freed from the curse.

          1.    *Plaintiffs' Alleged Thematic Similarities*

In paragraphs 110 and 111 of the First Amended Complaint, Plaintiffs argue the two works share a common theme of a "pirate ghost story." Not only does this ignore the generic elements that should be filtered out, as explained above, there are no "undead pirates" in Plaintiffs' Screenplay; they are only talked about by Davey and the Rascal Scoundrels, and faked by Nefarious and his crew. "Undead pirates" do exist as a central plot element in *Curse of the Black Pearl*; so the specific expression of this "theme" in each work is significantly different. In keeping with the childish tone of Plaintiffs' Screenplay, the "undead pirates" are more like the masked ghost pirates of *Scooby Doo* than the actual skeletons of the Disney Film.

In paragraph 112, Plaintiffs argue whether the characters are trying to find treasure (their Screenplay) or return it (*Curse of the Black Pearl*) is a distinction without a difference. This is not so. In the Disney Film, the characters are hunting down one medallion to return it to a treasure that is not lost to break the curse they are under, which is distinctly different from fighting over a map to find a "lost treasure." In any case, there are few plot elements more universal in pirate stories than a hunt for treasure.

As to the theme of "redemption," which Plaintiffs argue in paragraph 113 is characteristic of both works, it applies to their Screenplay's story but not the Disney Film's story. The Merriam-Webster definition of redemption is "the act, process, or an instance of redeeming," where redeeming is defined as "serving to offset or compensate for a defect." In Plaintiffs' Screenplay, Davey spends ten years wallowing in self-pity and self-blame for almost choosing the treasure map over Jane and losing her, then climbs out of the bottle to redeem himself by saving her and the Rascal Scoundrels from Nefarious and his crew. Jack Sparrow in the Disney Film, however, is not a "shell of (his) former self" at the beginning; he's simply without his ship. He's the pirate he always was and doesn't change character through the Disney Film, but he does get his ship back in the end.

Dr. Román's expert report also includes inaccurate statements: Davey is not "a younger pirate" when he "finds redemption through romance." (Román Expert Report, p. 12.) Will is not a pirate at the start of *Curse of the Black Pearl*, and never becomes one—the closest is a jest from Elizabeth at the very end. And Will's romance with Elizabeth has nothing to do with "redemption": neither Will nor Elizabeth does anything wrong for which they need to be redeemed.

**D.**    **Setting**

Both stories are set in the Caribbean, which, as described above, is the ultimate generic setting for a pirate story and should be filtered out. The same is true for particular scenes, such as a British colonial port town with a governor's mansion and fort, or a pirate-controlled port. The specific instances of these in the *Curse of the Black Pearl* (Port Royal and Tortuga) appear

in numerous pirate works, including *Captain Blood* (1922 novel; 1935 film). These elements are so generic because they are historically accurate. As described above, deserted islands, sea caves, pirate ships, and the Caribbean Sea are common to both of these stories, and to many pirate stories in movies, literature, and history. Plaintiffs' Screenplay's treasure and the cave settings—including the waterfall entrance—are generic as well, with examples given above. Moreover, these various scenes appear in the Disneyland Ride, and they are acknowledged as such in the scene's action descriptions (e.g., Plaintiffs' Screenplay, p. 91, "The boat continues sailing through the cavern like the *DISNEYLAND RIDE, 'PIRATES OF THE CARIBBEAN'*.").

       1.    *Plaintiffs' Claims.*

No specific setting or scenes are described—and no comparative and analytic detail has been made—by Plaintiffs or Dr. Román. Plaintiffs suggest that the ghost ship, port town, and cove with hidden treasure are all similar, but this is not so. First, Nefarious's "ghost ship" isn't a "ghost ship at all." It's just a pirate ship, described as having "a gothic interior (that) would be perfect for Dracula." The Rascal Scoundrels find a lot of skeletons on the ship and a revolving trick bed. Second, Plaintiffs' Screenplay scenes in the port town are: an auction of wenches on an outdoor stage (taken directly from the Disneyland Ride); a clothing store where the Rascal Scoundrels try to buy pirate clothes; an alleyway; Davey's docked privateer ship; the tavern where Davey is first reunited with Jane; and Jane's room. None of these specific settings have any similarity to the specific Port Royal settings in *Curse of the Black Pearl*—e.g., the fort, the Governor's mansion, the blacksmith shop, or the jail. Third and finally, as to the cove where the treasure is hidden, Plaintiffs' Screenplay describes a waterfall entrance in the dark, which is nothing like the sea cave entrance in the Disney Film, and is an explicit reference to the Disneyland Ride. In short, when you compare the specific details, even the generic Caribbean-pirate-story settings in both works are expressed very differently.

**E.    Mood**

For the most part, the overall tone of Plaintiffs' Screenplay's action and interaction is light-hearted mishmash of juvenile slapstick comedy with the Rascal Scoundrels, romantic melodrama with Davey and Jane, and swashbuckling action. Plaintiffs were candid in their pitch materials that this is simply a synthesis of *The Goonies* (1985), *Cutthroat Island* (1995), and the Disneyland Ride. The overall tone of the Disney Film, on the other hand, artfully weaves together several elements: satirical comedy, with Jack Sparrow's antics and reactions; romantic adventure, with Will's heroics in rescuing Elizabeth; and horror, with Barbossa and his cursed pirate crew. Comedy, adventure, romance, drama, suspense, melodrama, and horror are common tonal elements found in many pirate movies, plays and literature. Comparing Plaintiffs' Screenplay and the Disney Film, the former is less sophisticated and pitched at a younger audience.

       1.    *Plaintiffs' Claims.*

Dr. Román opines that the two works evoke similar moods by using slapstick humor, emotions invoked by supernatural presences, and the presence of a black ship. (Expert Report, p. 24–25.) First, as explained further below in Section III A of this report, humor, irony, and wit, along with physical, gag, and situational comedy are generic terms that can be applied to many pirate movies. *Curse of the Black Pearl*'s comedy is more gag comedy than slapstick (e.g.,

Pintell's eye keeps popping out).  Second, as to the "eerie mood" evoked when the "true nature of the supernatural pirates" is revealed, that may refer to particular *moments* in each work but says little about how the moods of the two works compare overall.  Also, the "true nature" of Plaintiffs' Screenplay's pirates is that they are live humans made up to look like ghosts, while the "true nature" of the cursed pirates in *Curse of the Black Pearl* is that they're somewhere between life and death and cannot die.  Third, and as explained below, a black ship with black sails and a pirate flag sailing out of the fog is a common pirate film trope.  And that description of a pirate ship is generic.  Indeed, it is a featured element of the acclaimed song "Pirate Jenny" in Berthold Brecht's *Threepenny Opera* (1928): "And the ship / The Black Freighter / Runs a skull up its masthead / And a cheer rings the air / By noontime the dock / Is a-swarmin' with men / Comin' out of the ghostly freighter / They're moving in the shadows / Where no one can see / And they're chainin' up people / And they're bring' em to me."  The fact that a pirate ship creates a "sinister and foreboding mood" is its very functional intent—considering that pirate ships literally fly a flag with a skull and crossbones on it.

### F.    Pace and Sequence of Events

If pace is defined as how dynamically the plot moves forward, then the pace of Plaintiffs' Screenplay is actually quite slow or, at best inconsistent.  Most of the set pieces (sequence of events) in the first half of the story—e.g., from the Prologue to the port town scenes to the Rascal Scoundrels on Nefarious ship—are over-written and don't move the plot forward very fast.  For example, the Prologue is 11 pages long, with the initial battle action taking up the first page and the sea monster attack taking up the last page-and-a-half; the eight-and-a-half pages in between are exposition-heavy in introducing Nefarious, Davey, Jane, and their relationships.  If you use a page a minute as a rule of thumb, the Prologue takes at least 12 minutes.  Immediately following this, pages 12 to 30 are spent with the Rascal Scoundrels somewhat aimlessly running around town before the arrival of Nefarious and his pirate crew in the port and before Davey and Jane are reunited.  Nefarious doesn't appear until page 47, then confronts Davey about the map on page 52 and takes Jane hostage on page 54.  By this point, we're halfway through the script and the plot hasn't moved very far from where it started, with Nefarious confronting Davey and demanding his half of the map.

In comparison, the Disney Film's Prologue takes 4 minutes and 52 seconds.  In the next 35 minutes, Jack Sparrow is introduced; he tries to steal a ship; he rescues Elizabeth from drowning; he escapes his initial capture; he duels with Will, is captured and jailed; and the cursed pirates attack the port and kidnap Elizabeth.  By this point, we're a third of the way through the Disney Film, and all the character, relationship, and plot elements have been set up and are moving forward full steam.

The bottom line is that the neither the pace nor the sequence of events in the two works is similar.

### 1.    *Plaintiffs' Claims.*

As to Plaintiffs' claims, once one looks beyond their very general, macro view to the specific expressive details of the "events" summarized, the inaccuracies and the substantial differences of expression become clear.

In paragraph 92 of the First Amended Complaint, and in Dr. Román's expert report, Plaintiffs claim the prologues in the two works are similar. As explained below, the idea of a story with a prologue is generic and should be filtered out. Nor are the two prologues in fact similar. Each prologue has different characters in different situations, with different actions and results:

- In Plaintiffs' Screenplay, a full-on battle between a pirate ship and a British privateer ship—reminiscent of the opening of *The Black Swan* (1942)—ends with the privateer captain, Nefarious, betraying and killing his crew then taking command of the pirate ship as part of his deal with the pirate captain, Davey Jones. The plot is set up with Nefarious and Davey each holding half a treasure map and not trusting each other. The action has Davey giving his half of the map to his lover, Jane; them getting into a confrontation with Nefarious, who grabs Jane and threatens to throw her overboard if Davey doesn't give him his half of the map; Davey hesitating then giving up the map; Nefarious tossing Jane overboard; a sea monster destroying the ship; and Davey escaping with his half of the map into the rough seas.

- In *Curse of the Black Pearl*, a British warship, escorting the new Governor and his daughter, Elizabeth, age ten, to Port Royal, comes upon a burning ship and rescues an unconscious boy, Will, floating on debris in the sea. While watching over Will on deck, Elizabeth finds he's wearing a gold Aztec medallion and thinks the boy is a pirate. As she stands and pockets the medallion, she glimpses a ship with black sails disappearing into the ghostly fog covering the calm seas.

Other differences abound. In *Curse of the Black Pearl*, the gold medallion is only introduced—not explained—in the prologue. The audience does not learn of its significance or back-story until eight years later (after the prologue) when the pirates aboard the *Black Pearl* attack the city and kidnap Elizabeth. Also, the Disney Film's lead character—Jack Sparrow—and his "motivation" aren't introduced or established in the prologue. Hence, neither the Disney Film's lead character nor the key plot dynamic—i.e., that returning the coin will break the curse—are introduced in the Film's prologue. In Plaintiffs' Screenplay, by contrast, the key character, key relationships, and key plot point (that obtaining both halves of the map will lead to the treasure) are all fully established. In short, other than taking place on a ship at sea and the image of another ship burning, the specific expression of story elements and their dynamics in the two prologues—i.e., "the foundation for the plot," "the motivation for the main characters," and "conflict on the ship that throws the viewer into the pirate story"—are completely different.

In paragraph 93 of the First Amended Complaint, Plaintiffs describe that the characters are "engaged in a series of battles," following the prologue, which is highly generic in pirate stories.

In paragraph 94, Plaintiffs argue the introduction of Davey Jones and Jack Sparrow are similar in the two works. This is not remotely true. In Plaintiffs' Screenplay, Davey is first seen on his pirate ship surrounded by privateers with guns pointed at him after the sea battle, while in *Curse of the Black Pearl* Jack Sparrow is first seen atop the mast of a ship as it slowly sinks sailing into a Port Royal dock. Sparrow's history with Barbossa is not depicted, only recounted, while Nefarious' betrayal of Davey plays out in Plaintiffs' Prologue. Also, Nefarious' betrayal of Davey isn't a mutiny since Nefarious is already in command of the pirate ship when it

happens; whereas, Barbossa led a mutiny of the Black Pearl crew to supplant Jack as its captain. All mutinies are a form of betrayal, but not all betrayals are mutinous.

In paragraph 95, Plaintiffs argue the attacks on the port towns are similar. Not so:

- Nefarious and his crew sail into the port town after getting a message from Jane via a peg-leg parrot to find Davey and get his half of the map. The pirates don't attack the town. Nefarious marches them into town; questions pirates in the tavern; and lets Jane lead Davey to him and his men. Three British privateers attack the town and blow up Davey's ship. The pirates attack and take over one of the British ships after Davey escapes and makes off with the pirate ship.

- By contrast, in the Disney Film the *Black Pearl* and her cursed pirate crew have a pitched gun battle with the Port Royal fort guns; land and attack the town and fort; and hunt down and kidnap Elizabeth from the Governor's mansion. Plaintiffs' Davey character escapes Nefarious and his men with Jane's help, for which she is taken prisoner, while Disney's Jack character is in jail throughout the battle and doesn't get out until Will springs him from his cell the next morning, long after the battle.

Other than both being examples of the generic pirate-work scene of an amphibious attack on a port town, the scenes share no similarities.

In paragraph 96, Plaintiffs assert that two island scenes are similar. As an initial matter, islands with skulls or references to the dead are generic and should be filtered out.[3] Scenes on islands are one of the most fundamental *scenes a faire* in the pirate genre. Moreover, in Plaintiffs' Screenplay, the action on Calavera Island has the Rascal Scoundrels following the map they have through a jungle, across a gorge to a cave in the shape of Skull & Crossbones, where they retrieve another treasure map from a skeleton pirate sitting on a throne then have to escape (Indiana Jones-style) from the booby-trapped cave just before it closes. They are immediately captured by Nefarious' pirates and taken to the pirate ship. In the Disney Film, the cursed pirates take the treasure cave on Isla de Muerta and discover her blood on the Aztec medallion doesn't lift the curse; Will sneaks her and the medallion out of the cave and back to the ship he and Jack stole from Norrington; the cursed pirates find Jack Sparrow while searching for Elizabeth; and Jack makes a deal with Barbossa to keep from being killed.

Plaintiffs allege in paragraph 97 that both works feature a ship battle. But again, naval battles are *scenes a faire* in pirate works—one even appears in the Disneyland Ride. In any case, the two ship-battle scenes are expressed very differently. In Plaintiffs' Screenplay, Nefarious and his pirates retake the pirate ship; find that Davey is not there; and prepare to kill the Rascal Scoundrels as they sail to a cove. Davey appears—looking and sounding like the "dashing and brave" "young rogue" he was ten years ago. While Davey battles Nefarious and his men and rescues Jane, the Rascal Scoundrels escape in a rowboat. The gun and cannon battle between Davey and the pirates leads to the ship blowing up. Nefarious and his men escape to a rowboat,

---

[3] To name a few, *Treasure Island* (1883) features "Skeleton Island"; *Cutthroat Island* (1995) has the eponymous "Cutthroat Island"; *Peter Pan* (1953) has "Skull Rock"; and *Curse of Monkey Island* (1997) has "Skull Island." *The Goonies* (1985) has a skull-shaped cave with a pirate ship in it for its climax.

while it appears Davey and Jane have perished in the blast. The tide takes the Rascal Scoundrels' boat into a thick fog in the cove then over a waterfall into the cavern, reminiscent of the Disneyland Ride. Nefarious and his men follow in their boat.

In *Curse of the Black Pearl*, however, the Black Pearl overtakes the ship with Elizabeth, Will, and Jack's crew. After a pitched battle between the ships and crews, during which Barbossa's monkey retrieves the medallion for him, Will threatens to kill himself if Elizabeth isn't set free and his crew isn't left unharmed. Agreeing to Will's terms, Barbossa maroons Elizabeth and Jack on the same island he marooned Jack before then heads back to Isla Muerta with Will and Jack's crew in chains. Jack and Elizabeth are rescued from the island by Commodore Norrington in his flagship. Elizabeth agrees to marry Norrington if he'll save Will. Jack leads Norrington to Isla de Muerta then slips ashore while Norrington and his men wait in boats outside the treasure cave entrance.

In paragraph 98, Plaintiffs' state the scenes in the caverns are similar. As detailed above under "Plot," in Plaintiffs' Screenplay, the battle action that takes place in treasure cave has Nefarious first attacking Jane then dueling Davey while the pirates pop jewels out of the cave wall, fend off the Rascal Scoundrels, and try to stop the water pouring through the holes they've created in the wall. The climactic sequence ends with Davey defeating Nefarious by pinning him to the wall with a sword then escaping with Jane and the Rascal Scoundrels in a rowboat as the cave fills with water and a sea monster swallows Nefarious, followed by the entire island sinking into the sea. Davey, Jane, and the Rascal Scoundrels are rescued by a British privateer ship. Davey and the Rascal Scoundrels are commissioned as privateers and given a ship as reward for ridding the Caribbean of Nefarious; and they all sail off with Jane for their next adventure.

The Disney Film's climactic sequences start with Norrington and his men in rowboats outside the treasure cave entrance waiting to ambush the pirates as they leave. Jack rows into the cave and stops Barbossa from cutting Will's throat over the Aztec treasure chest by telling him that Norrington and his men are outside waiting for them. As he palms a medallion from the chest, Jack talks Barbossa into waiting to lift the curse until after they've defeated Norrington and taken his flagship. Jack then offers a deal where he gets the Black Pearl and will sail under Barbossa's flagship colors. While Barbossa's cursed pirates walk across the bottom of the sea and ambush the crew of the flagship, Elizabeth slips away in a rowboat to the Black Pearl and frees Jack's captive pirate crew, but can't get them to help her rescue Will. While the crew sail off in the Black Pearl, Norrington and his men get back to the ship and battle the cursed pirates, and Jack and Barbossa duel in the treasure cave. As Elizabeth arrives and Will defeats the last remaining pirate in the cave, Jack puts his blood on the medallion and flips it to Will while Barbossa threatens to shoot Elizabeth. Jack shoots Barbossa, who is then surprised to see Will lifting the curse by dropping both medallions with Jack's and his blood into the chest.

Back on the ship, the cursed pirates find they are mortal again and surrender. Jack is arrested and sentenced to hang. Will helps Jack escape the noose with a little distraction from Elizabeth. Will and Jack take out several soldiers before being captured on the parapet. Elizabeth sides with Will and Jack. The Governor orders the soldiers to lower their weapons. Seeing the parrot, Jack falls back over the wall into the sea, knowing his *Black Pearl* crew has come for him. The Governor and Commodore accept Elizabeth's choice of life with Will, and give Jack a day's head start.

### G.      Dialogue

I found no lines in the Disney Film identical to lines in Plaintiffs' Screenplay.  Though there might be a few lines in Plaintiffs' Screenplay vaguely similar to ones in the Film, they are said in different situations within the context of each story and by or to different characters for different reasons.  In some instances, Plaintiffs' Screenplay has taken lines from the Disneyland Ride that are also referenced in the Disney Film.

#### 1.      *Plaintiffs' Claims.*

Plaintiffs lists several lines of dialogue taken out of the specific context of the scenes they are found in and calls them "instances of similarity."  The dialogue compared in paragraphs 100 through 103 of the First Amended Complaint may be vaguely similar, but the lines are said in different contextual circumstances by and/or to different people for different reasons.  The statements in paragraphs 100, 101, and 102 are nothing more than generic statements about cursed pirates or ships with black sails which, as described above, harken back to the legend of *The Flying Dutchman*.  The statements in paragraph 103 about characters being slapped by women are simply, and literally, slapstick humor in pirate films, which are similarly generic.  In fact, women taunting pirates was featured in the Disneyland Ride by a scene of a woman chasing a pirate and a scene of a wife shouting at her husband being held over a well, "Don't be chicken!"

Dr. Román's expert report makes no specific references to any dialogue.  Instead, he insists that the two works share "multiple original patterns of similarities," which is a vague and abstract conclusion.  "Patterns" are not specific detailed expressions of settings, plot, characters, relationships, action, theme, pacing, or sequence of events and demonstrate nothing specifically similar.

## NOVELTY ANALYSIS

## III.    None of the Elements Dr. Román Relies Upon are Original to Plaintiffs' Screenplay

Every element of Plaintiffs' Screenplay identified as inventive or original in the expert report of Dr. Román is borrowed from classic works in the pirate genre, in most instances from works referenced in Plaintiffs' original complaint as establishing the central tropes of the genre.

### A.      Tone and Mood

Dr. Román posits that Plaintiffs' introduction of irony and wit to a pirate story was an original contribution of Plaintiffs'.  This is incorrect.

While real pirates were fearsome criminals, savage murderers, and brutal robbers, and expressed as such in historical non-fiction and fictional accounts, over the last 300 years, many fictional pirates have been romanticized in literature, poetry, song, plays, and films as tragic figures, romantic heroes, and/or glamorous, witty, rogues.  Indeed, comedy in pirate stories dates back to at least Gilbert and Sullivan's 1879 operetta, *The Pirates of Penzance*, which satirized the pirate melodramas of the period.

Humor, irony, and wit are generic terms that can be applied to many pirate movies, especially in the films of the last 100 years.  In fact, most of the pirate moves of the 1940s and 1950s were replete with humorous, ironic and witty actions, interactions, characters, and dialogue—e.g., *The Crimson Pirate* (1952), *The Pirate* (1948), *The Black Swan* (1942), *Raiders of the Seven Seas* (1953), and *The Princess and the Pirate* (1944).  Humor and comedy were a main selling point of the pirate adventure.  Even the Disneyland Ride—which Plaintiffs explicitly borrowed from in their Screenplay—played up this "humorous tone" with scenes of women chasing pirates, drunk pirates laying with the pigs, imprisoned pirates trying to lure a dog with a skeleton's bone, and the like.

For example, *Yellowbeard* (1983)—a film cited by Plaintiffs in their original complaint as being a centerpiece work in the genre—was a fast-paced, action-adventure comedy that self-promoted as "the comedy of the century—the seventeenth century" and included humorous dialogue (e.g., Dan, Yellowbeard's son: "I can't kill him, he brought me up, just like a father." Yellowbeard: "Oh—you mean he beat you and kicked you and smashed you in the teeth?"  Dan: "No, he's been kind and gentle."  Yellowbeard: "What kind of father is that?!  Kill him!") and wit (e.g., Yellowbeard: "What, you again?"  Yellowbeard's wife: "Again?!  I haven't seen you for fifteen years!"  Yellowbeard, exasperated: "What is it this time?").

Similarly, *The Goonies* (1985), to which Plaintiffs compared their Screenplay, was a comedy adventure film that fully captured a humorous tone, "diluting the impeding sense of danger."  (Román Expert Report, p. 6.)

In *Under the Black Flag: The Romance and the Reality of Life Among the Pirates* (1995), David Cordingly explains that along with Blackbeard, Captain Hook, and Byron's Corsair, Long John Silver's tall, powerful, wily character, "which alternates between jovial good humor and utter ruthlessness in the pursuit of gold," has come to represent many people's image of a pirate.

**B.      Characters**

Dr. Román opines that various character types are unique to Plaintiffs' Screenplay, when in fact each character is a generic archetype common throughout the pirate genre.

***Pirate with a drinking problem.***  Dr. Román argues that Plaintiffs' inclusion of a disillusioned pirate with a drinking problem is a unique element.  A drunken pirate is a common genre trope, and part of the Disneyland Ride.  Even handsome roguish, heroic protagonists in pirate movies drink a lot—e.g., *The Black Swan* (1942).  *Captain Blood* (1922 novel; 1935 film), cited by Plaintiffs' as being central to the genre, similarly features Dr. Peter Blood, the lead pirate, who is also admittedly a disillusioned drunk (e.g., at one point he says, "Such a partnership requires sober thought.  My poor head has been dancing with rum this whole week past.").  A critical plot arc of *Captain Blood* is the pirate captain's descent into despair and drink, and his ultimate rehabilitation for the sake of a woman he hopes to impress and win.  *The Sea Hawk* (1940) featured rum-soaked pirates in an attempt to save England.  And *Treasure Island* (1883), similarly cited by Plaintiffs as being central to the genre, introduced "Dead Man's Chest," a famous and fictional sea song flattering the drunk pirate life, featuring the iconic line "drink and the devil had done for the rest—yo-ho-ho, and a bottle of rum!"

24

**Cunning but likeable second lead character.**  Similarly, Plaintiffs' claim to a second male lead who is cunning and sinister but also charismatic and likeable is not a novel concept. Indeed, many pirate tales focus on a lead pirate with a right hand man or sidekick fitting this exact description.  For example, in *Cutthroat Island* (1995), Morgan Adams, the lead captain of her father's, is accompanied by William Shaw, a crafty and charming secondary lead—his introductory scene portrays the doctor-turned-thief working an elegant dancing ball, charming and stealing from the female guests.  Similarly in *Savage Islands* (1983; also known as *Nate and Hayes*), another work cited by Plaintiffs in their original complaint as a centerpiece for the pirate genre, lead character Nate Williamson teams up with an unsuspecting ally, the roguish yet charming William Hayes (e.g., Hayes: "You sound like a very sad and bitter old lady, Ben."). As to Dr. Román's claim that this type of character uniquely made Plaintiffs' Screenplay "highly engaging and entertaining" and "more friendly to a mass audience," most of the pirate movies of the 1940s and 1950s were about being lighthearted, engaging, and entertaining—e.g. *The Black Swan* (1942), *The Princess and the Pirate* (1944), *Raiders of the Seven Seas* (1953), and *The Crimson Pirate* (1952).

**"Swashbuckling" pirates.**  Although Dr. Román thinks that "combining elements of the swashbuckler and the pirate appears to be an original innovation specific to [Plaintiffs'] Screenplay," it is anything but.  As an initial matter, the distinction between swashbuckler and pirate is artificial at best.  "Swashbuckling pirates" has itself been a trite expression and common in much of pirate lore.  For instance, in the trailer for *Captain Blood* (1935), cited by Plaintiffs as being central to the genre, the lead pirate, Peter Blood, is described as a "swashbuckling leader." Even a cursory search on Google Books for the phrase "swashbuckling pirate" confirms that this concept has been commonplace for decades if not centuries.  For instance, the search turns up *The Real Story of the Pirate* (1923) ("But once again Mary proved only a woman with a romantic soul and a tender heart, though she was a swashbuckling pirate with pistols and cutlass in her belt and murder on her soul.").  It turns up *Pirates and Seafaring Swashbucklers on the Hollywood Screen: Plots, Critiques, Casts and Credits for 137 Theatrical and Made-for-Television Releases* (1995).  And it turns up *Postcolonial Piracy* (2014), which states that the "[t]he swashbuckling pirate-figure has a pop-cultural history" dating to *A General History of Pyrates* (1724)—one of the works cited in Plaintiffs' original complaint.  Similarly, searching for "pirate swashbuckler" in Google Books turns up instances such as *Burt Lancaster: Hollywood's Magic People* (1971) (describing *The Crimson Pirate* (1952) as "the pirate swashbuckler to end all swashbucklers").

Further, swashbuckling "with flamboyance and swagger" and pirates being swashbucklers have been common in pirate movies since Douglas Fairbanks Sr. in *The Black Pirate* (1926).  Flamboyance and swagger are, literally, included in the definition of swashbuckling.  The dictionary definition of swashbuckler is "a skilled swordsman, soldier, adventurer, or daredevil."  The idea of the hero and villain being skilled swordsmen is ubiquitous in pirate movies—think of *Peter Pan*—and various other adventure movies.

As explained above, while real, live, historical pirates were not "good men" but common criminals, often savage murderers and brutal robbers, fictional pirates in books, plays, and films have often been portrayed as heroes—swashbuckling "good men" who defeat the corrupt villain and win the heroine's heart.

Men of upright stature turned pirates is likewise a genre trope. For example, *Captain Blood* (1922 novel; 1935 film), a work cited by Plaintiffs as central to the genre, tells the story of Peter Blood, an honorable physician and former soldier and sailor who is driven to piracy after being unjustly deemed a part of the Monmouth rebellion. In *Treasure Island* (1883), also cited by Plaintiffs as being a centerpiece in the genre, the lead character is an innkeeper's son turned pirate. *Captain Singleton* (1720), yet another work cited by Plaintiffs as central to the genre, features the lead character as a child from a well-to-do family who was kidnapped and eventually turned to a life as a pirate. Somewhat similarly, in *The Buccaneer* (1938), yet another work Plaintiffs agree is central to the genre, the lead pirate Laffite demonstrates a sense of loyalty and decorum towards the Louisiana government. The Pirate King of *The Pirates of Penzance* (1879 opera; 1981 Broadway production) is similarly held out as highly noble.

***Lead women.*** The "lively adventurous young women who dream of a life beyond the constraints of the port town where they've been raised" is similarly not novel. For instance, *Blackbeard the Pirate* (1952), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, a privateer turned pirate falls in love with a pirate's daughter onboard who set sail with her father. Even the notion that these young women "engage the pirates on nearly equal terms in matters of skill, wit, and athletics" is not novel. *Cutthroat Island* (1995), which Plaintiffs' own artwork indicates as a key source of their Screenplay's material, tells the story of female pirate Morgan Adams on a quest for treasure. Similarly, Captain Rouge in *The Golden Hawk* (1952), Captain Anne Providence in *Anne of the Indies* (1951), and Prudence 'Spitfire' Stevens in *Against All Flags* (1952) are female pirate leads who hold their own against their male counterparts. Further, notorious, real-life female pirates have inspired pirate lore: real-life female pirate Mary Read inspired *Queen of the Seas* (1961) and Grace O'Malley inspired *Grania: She-King of the Irish Seas* (1986). Certainly the portrayal of strong female leads in pirate lore is not an invention of Plaintiffs' Screenplay.

Pirates and privateers wooing the daughter of a local official or gentry is also an extremely common genre trope. For instance, it provides the central narrative impetus of *Captain Blood* (1922 novel; 1935 film), where the eponymous pirate Peter Blood tries to prove himself worthy of the governor's niece, Arabella. He goes so far as to kill his villainous partner, Levasseur, in a duel to save her from him. Indeed, one of the short stories that Rafael Sabatini ultimately wove into *Captain Blood* was simply titled "The Governor's Daughter." The trope was so well established that winning the hand of a governor's daughter is a victory condition in a popular series of computer games entitled *Sid Meier's Pirates!*, first released in 1987.

### C. Theme, Plot, and Sequence of Events

The theme, plot, and sequence of events of Plaintiffs' Screenplay are also not inventive.

***Skeleton crews.*** "Pirate ships with skeleton crews," cursed pirates, lost or stolen treasure, etc. are all stock elements in film and literature. For instance, *The Flying Dutchman* is an ancient myth, dating back to the 17th century, of a ghost ship that was said to be cursed to sail the oceans forever; *The Flying Dutchman* was also popularized by films like *Pandora and the Flying Dutchman* (1951), poems like *The Rime of the Ancient Mariner* (1797), and novels like *The Phantom Ship* (1839). The acclaimed comic miniseries *Watchmen* (1986-1987) features as a story-within-story "Tales of the Black Freighter," which depicts a phantom pirate ship crewed by

26

the damned undead. Similarly, *On Stranger Tides* (1987)—nominated for the World Fantasy Award for Best Novel—features a pirate ghost ship, undead pirate crews, attempts to undo curses, and quests that take the characters to various islands. The *Monkey Island* video game series (1990-2009), is set on fictional Caribbean islands around the 17th century featuring a main character pirate, Guybrush Threepwood, who woos the adventurous female Governor Marley while facing off against the villainous zombie-ghost pirate LeChuck and his skeletal crew. Skeletal crews and the ghost ship are also featured in the Disneyland Ride—indeed, Plaintiffs' sizzle reel incorporated that footage from the Ride. Numerous films, such as *The Ghost Pirates* (1909), *James and the Giant Peach* (1996), *Dead Men Tell* (1941), *Ghost in the Noonday Sun* (1973), *Matusalem* (1993), and *Peter Pan and the Pirates: Ghost Ship* (1992), all also feature pirates with skeleton crews, cursed pirates, and lost or stolen treasure. The children's television show *Scooby Doo* has also featured multiple episodes with ghost pirates.

**Dressing up as women.** Plaintiffs' complaint argues that dressing up like women is a unique, similar element in the works. But it is not at all unique. Men dressing up as women is common in many comedic movies—including pirate movies. For instance, *The Crimson Pirate* (1952) featured the hero pirate, Captain Vallo, and two others dressed up as women to deceive the villainous governor and his soldiers. In *A High Wind in Jamaica* (1929 novel, 1965 film), pirates, some disguised as women, capture a ship and take the children aboard prisoner; the children wind up serving aboard the ship. In the 1925 Basil Lubbock painting "Pirates Decoying an American Ship," the pirates are disguised as women. Thus, employing the commonplace comedic trope of a male character disguising himself as a woman is neither unique in film nor even unique in the pirate genre.

**Romance.** Dr. Román posits that "the element of romance [was] … one of [Plaintiffs' Screenplay's] major innovations to the typical pirate story." This statement is wholly inaccurate. In most, if not all, the pirate movies of the 1920s, 1930s, 1940s, and 1950s, a romance between the protagonist pirate and the female lead was "central" to the story, including many of the films cited by Plaintiffs in their original complaint as central to the pirate genre: *Captain Blood* (1935), *The Buccaneer* (1938), *The Pirate* (1948), *Blackbeard the Pirate* (1952), and *Peter Pan* (1953). Redemption through romance, the moral that there is more to life than greed, and community support for the romantic relationship are also all commonplace in the pirate genre. For example, in *Yellowbeard* (1983), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, Yellowbeard not only reunites with his estranged son and finds redemption, but his son also finds love in the daughter of one of the film's villains; the entire crew is supportive of the new unions. In *Captain Blood* (1922 novel; 1935 film), romance is a centerpiece of the story, and Blood's romantic pursuit of the governor's niece, Arabella, both leads him away from piracy and redeems his pirate crew. *The Pirate* (1948), another work Plaintiffs cited as being at the center of the pirate genre in their original complaint, similarly features a redemption story through love, the moral that there is more to pirate life than greed, and an ultimate romantic union that is supported by the community.

Romance in pirate genre is also explained historically. In *Under the Black Flag: The Romance and the Reality of Life Among the Pirates* (1995), David Cordingly calls the Golden Age of Piracy the beginning of the change in public perception about pirates. By the early 1700s, the threat of piracy and attacks on merchant shipping in the Caribbean and along the American seaboard was receding due to stepped-up naval patrols. Historical facts were blended

with fiction, and the common murderers and robbers that pirates were (and are) in reality began to take on the status of romantic outlaws in ballads, plays, poems, and novels.

For example, in 1713, *The Successful Pyrate* play was based loosely on the real life of Captain Henry Avery and portrayed him as a brave outlaw. The play also features a love story between an Indian princess and a young man. It became the first in a long line of melodramas with pirate themes that entertained London theatergoers over the next 150 years, with most featuring love stories. Similarly, in 1720, novelist Daniel Defoe published *Captain Singleton*, a work cited by Plaintiffs as being central to the genre, which is a fictional pirate's autobiography where the pirate finds love. The romantic pirate outlaw and his exotic adventures also gained popularity from *The Corsair*, an 1813 epic poem by Lord Byron, and Walter Scott's 1822 novel, *The Pirate*; both are about tragic figures attractive to women and admired by their crews.

***Orphans.*** Orphaned characters in pirate stories are also not novel. In *Captain Blood* (1922 novel; 1935 film), a work cited by Plaintiffs as being central to the genre, the main character, Peter Blood, lost his mother in childhood and his father at age 20. *The Coral Island* (1857), another work Plaintiffs cited as being at the center of the pirate genre, tells the story of three boys marooned on an island who become a family of their own and seek mentorship in the pirate crew who shows up on the island. *Captain Singleton* (1720), another work Plaintiffs cited as being at the center of the pirate genre, tells the story of Daniel Defoe, a child from a well-to-do family who was stolen, raised by gypsies, and eventually becomes a pirate. Maybe the ultimate orphan story in the pirate genre, *Peter Pan* (1904 play; 1911 novel; 1953 Walt Disney Productions film), not only centers on an orphaned boy with no parents looking to make a family but also includes the Lost Boys, a group of orphans whom Peter raises on the island, forming bonds among themselves, and ultimately finding a sense of family. *Pirates of Penzance* (1879 opera; 1981 Broadway production), similarly tells the story of a pirate crew composed of orphans who bond among themselves, forming an orphan pirate family, and even spare any lives along the way if they too are orphans; the main character Frederic even invites them to give up piracy and go with him but later Frederic joins the pirates aboard their ship as one of the crew.

***Prologue.*** Prologues are common in movies and literature, and Dr. Román even acknowledges this is a common plot device in literature and drama. As to there being "no precedent in the genre of the pirate story to encourage such a prologue," that is plainly untrue. Prologues are commonplace in the pirate genre, and regularly introduce the major characters and include a conflict that throws the audience into the pirate story. For instance, in *Yellowbeard* (1983), a film Plaintiffs cited as being at the center of the pirate genre in their original complaint, the film starts with a prologue set in the 1600s on a ship 20 years before the main plot and features an act of betrayal and stolen treasure. *Captain Blood* (1935), another work cited by Plaintiffs as being central to the genre, similarly features a prologue set in the 1600s where the main character is convicted of being a traitor and exiled to the British Colonies of the Caribbean. *Raiders of the Seven Seas* (1953) also has a prologue set in the 16th century in which the heroic pirate Barbarossa escapes a Spanish prison in Morocco and steals a Spanish galleon before jumping ahead in time to action in the Caribbean. *The Princess and the Pirate* (1944) also has a prologue featuring the Pirate Captain burying his treasure on an island then killing the map maker and men who buried the treasure. Even the Disneyland Ride arguably has a prologue, introducing riders to the port town and time period before riders are swept away into the action.

*Climatic ending.* Dr. Román again suggests a romantic ending is unique in the pirate genre, but, as explained above, this is not the case. The other element Dr. Román suggests is novel is a final battle in a cave. Caves are common place in the pirate genre and a centerpiece of the Disneyland Ride *Pirates of the Caribbean*. As Plaintiffs advertised in their cover letter, their Screenplay was in fact based on the Disneyland Ride. Just like in the Ride, in Plaintiffs' Screenplay the cave is accessed by riding a boat over a waterfall. Further, Plaintiffs' Screenplay even explains that the "boat continues sailing through the cavern like the DISNEYLAND RIDE, *'PIRATES OF THE CARIBBEAN'*" and that the cave is decorated with skeletons of pirates impaled by swords and treasure off to the side of the boat, like in the Ride. (Plaintiffs' Screenplay, p. 98.) The Disneyland Ride also ends with an epic shootout in a cave. A cave is also the resting place of the treasure in *Treasure Island* (1883 novel; 1950 Walt Disney Productions film), a work Plaintiffs claimed in their original complaint was central to the pirate genre. Skull Rock in *Peter Pan* (1904 play; 1911 novel; 1953 Walt Disney Productions film) is also a cave. And in *The Goonies* (1985), which Plaintiffs admitted in their cover letter inspired their Screenplay, the final showdown also happens in a cave. *Cutthroat Island* (1995) likewise features climactic battle scenes in a treasure-filled cave on the titular Cutthroat Island.

### D. Pace, Setting, and Dialogue

*Pace.* Dr. Román suggests that the fact that both works share a fast-paced and adventurous nature is notable. Far from being notable, however, nearly all works in the pirate genre, and particularly nearly all films in the pirate genre, share an adventurous and fast-paced momentum.

*Setting.* Dr. Román also emphasizes that both works take palce in the Caribbean seas, on boats, and in an island cave. Again, nearly all pirate works occur in part on the high seas, on boats, and on islands. This is also the exact setting of the Disneyland Ride and it is not surprising that it would be used in the Disney Film. The Caribbean as a setting for a pirate story is not only literally in the name of the Disneyland Ride, it is far and away the most common setting for the genre, and is the setting of numerous works cited by Plaintiffs as central to the genre, e.g., *A General History of the Pyrates* (1724), *The Pirate* (1948), *The Red Rover* (1827), *Captain Blood* (1922 novel; 1935 film).

*Dialogue.* Finally, Dr. Román argues that the dialogue is echoed between the works—albeit without highlighting any examples himself. The examples identified in the First Amended Complaint, however, are of little note, and only highlight: (1) comments about a ghost ship, which as explained above is not novel and featured in the Disneyland Ride; (2) pirates being ruthless, which is similarly an extremely common trope in the genre and featured in the Ride; (3) references to cursed pirates, which is also explained above as not being novel and again featured in the Ride; and (4) comedic scenes with women, which is again not only featured in the Disneyland Ride by women chasing pirates or the scene of a woman telling her husband being held over a well "don't be chicken" but also common place in the pirate genre generally. Certain lines, such as the "yo ho, yo ho, a pirate's life for me" song, are common in the works because they are iconic elements of the Disneyland Ride that Plaintiffs admit they appropriated into their Screenplay.

which as explained above is not novel and featured in the Disneyland Ride; (2) pirates being ruthless, which is similarly an extremely common trope in the genre and featured in the Ride; (3) references to cursed pirates, which is also explained above as not being novel and again featured in the Ride; and (4) comedic scenes with women, which is again not only featured in the Disneyland Ride by women chasing pirates or the scene of a woman telling her husband being held over a well "don't be chicken" but also common place in the pirate genre generally. Certain lines, such as the "yo ho, yo ho, a pirate's life for me" song, are common in the works because they are iconic elements of the Disneyland Ride that Plaintiffs admit they appropriated into their Screenplay.

## CONCLUSION

Based on my knowledge and experience with respect to the creation and development of stories into motion pictures, and the foregoing filtration analysis, I conclude that there is no substantial similarity of protectable expression between Plaintiffs' Screenplay and the Disney *Pirates of the Caribbean* Film. The similarities that do exist between the two works exist at such a high level of abstraction as to constitute similarities between abstract ideas rather than similarities of actual, concrete expression.

Respectfully submitted,

Dated March 30, 2021

James McDonald

30

**JAMES McDONALD**

1818 Colby Ave., #302
Los Angeles, CA 90025
310/473-1818 – Home
310/804-2039 – Cell
jmmcdonald@earthlink.net

# CAREER HISTORY

## 1990 to Present

**PRODUCER**
Feature/TV Films
- Development deals with Walt Disney Pictures, Polygram Entertainment, Propaganda Films, and Image Organization.
- Partnerships with The Avnet/Kerner Co., Allagash Films, and Partisan U.S.A.

Music
- Managing Partner of the My Songs Company (1993-Present).

**STORY CONSULTANT, EXPERT WITNESS and ANALYST**
Walt Disney Corporation
- Disney and Pixar Animation Business Affairs Depts.: Forensic analyst for writer credit determinations (1992-Present).
- Feature Film Dept.: Development consultant and Story Analyst (1990-2008).
- Litigation Dept.: Story consultant/expert witness on several copyright cases (1997-Present).

Barnes & Thornburg Law Firm
- Litigation Dept.: Expert Witness on one credit arbitration case (2016)

Munger, Toles & Olsen Law Firm
- Litigation Dept.: Expert witness on two copyright cases (2015 & 2021).

Akin Gump Law Firm
- Litigation Dept.: Expert witness on one credit arbitration case (2010).

Butzel Long Law Firm
- Litigation Dept.: Expert witness on one copyright case (2007).

Paul, Hastings, Jovanovich Law Firm
- Litigation Dept.: Expert witness on two copyright cases (1997 & 1999).

Warner Bros., HBO, 20th Century Fox, MGM, Miramax, Lionsgate and Walden Media Inc.
- Story consultant and/or analyst for writer credit determinations & issues.

## 1977 to 1990

**DEVELOPMENT EXECUTIVE**
Freddie Fields Productions – V.P., Production. Handled development of the movie GLORY.
20th Century Fox – Director of Acquisitions & Story Editor/Analyst for John Davis (studio owner at the time).

**STORY ANALYST**
20th Century Fox, Paramount, Orion, Lorimar, Columbia, Universal, Disney and MGM.

### EDUCATION

U.C.L.A. – M.F.A. in Directing, Film & Television Dept.
Stanford University – B.A., Communications

# EXHIBIT G

Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
LOWE & ASSOCIATES, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

*Attorneys for Plaintiffs Arthur Lee Alfred II and
Ezequiel Martinez Jr.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al., | Case No. 2:18-cv-08074-CBM-AS |
| Plaintiffs, | **PLAINTIFFS' EXPERT WITNESS REBUTTAL REPORT REGARDING SUBSTANTIAL SIMILARITY** |
| vs. | |
| THE WALT DISNEY COMPANY et al., | |
| Defendants. | Judge: Hon. Consuelo B. Marshall |

Pursuant to Federal Rule of Civil Procedure 26(a)(2) and the stipulation of the parties (Dkt. 121), Plaintiffs Arthur Lee Alfred, II and Ezequiel Martinez, Jr. ("Plaintiffs") hereby disclose the Rebuttal Report of Professor David Román on the issue of substantial similarity. Professor Román, who is serving as Plaintiffs' expert witness on the issue of substantial similarity, may present evidence at trial. Professor Román's rebuttal report is attached hereto as **Exhibit A**.

The following is provided without prejudice to Plaintiffs' right to supplement this disclosure in later stages of discovery or to designate additional experts, including rebuttal experts, at the appropriate time and consistent with the parties' agreement, the Federal Rules of Civil Procedure, and this Court's Local Rules.

Respectfully submitted,

DATED:  May 7, 2021                    LOWE & ASSOCIATES

                                       By:    _/s/ steven lowe_
                                              STEVEN T. LOWE
                                              Attorneys for Plaintiffs

# EXHIBIT "A"

## **PLAINTIFFS' REBUTTAL**

Notwithstanding the highly biased testimony of Disney's expert, Mr. James McDonald, [1] there are significant and substantial similarities between Plaintiff's Screenplay *Pirates of the Caribbean* ("Screenplay") and Disney's *Pirates of the Caribbean* ("Disney's Movie"), with respect to plot, theme, dialogue, mood, setting, characters, pace and sequence of events.   As I concluded in my initial expert report, "While there are various differences between the two works that one could readily identify, I found substantial qualitatively important similarities across the categories of mood, tone, pace, sequence of events, themes, plot, character, and setting which when viewed in combination, form an overarching pattern of creative elements which demonstrate creativity and originality, and which are repeated in the Film."

Disney's expert report drafted by Mr. McDonald ("Disney's Report") fails to address several key similarities (which supports a concession of such similarities), intentionally and consistently distorts the works in a self-serving, conclusory manner, and focuses heavily on dissimilarities that I am informed should be disregarded.

### **Disney's Report Focuses on Movie Tropes In the Pirate Genre, Which I am Informed Are Largely Irrelevant Under the Appropriate Analysis**

A large portion of Disney's Report focuses on generic, *scenes a faire* and the Disney ride (the "Ride") laden with references to old pirate literature and films, stock characters and even an opera from the 1800s.[2]  I am informed that this is the wrong focus since other pirate movies are irrelevant to this case unless Disney is challenging the originality of Plaintiffs' Screenplay work (which it is not the case).  However, it is my opinion that the Screenplay has much more than

---

[1] Mr. McDonald is a longstanding loyal Disney employee.  Mr. McDonald has worked for Disney since 1990 (and in the litigation department since 1997); and has also worked for 20th Century Fox (owned by Disney) from 1977 to 1990.  This speaks volumes about his impartiality; he is <u>not</u> a truly unbiased expert witness. Rep. pg. 32.

[2] As revealed by his C.V., Mr. McDonald does not have experience or education in the history of film.  Even his filmography career is devoid of any reference to pirate films yet Disney's Report mentions a total of <u>*sixty (60)*</u> different pirate books, films or other works. I, on the other hand, have an extensive background in literary history and incorporate film and film theory in my humanities classes at USC.

1

sufficient originality and creativity to constitute an original work, within what I am informed is
the requirement of the Copyright Act of a "modicum" of creativity. Also, I am informed that
*scenes a faire* are, in fact, considered in a "selection and arrangement" analysis. Instead, I am
informed that the focus should be on the core characters in both works, dialogue comparisons,
which coalesce in a new take on the pirate genre (and the pirate captain) and the key sequence of
events in both works. Those latter elements are at the core of proving the works are, in fact,
substantially similar.

Disney's Report, at its core, claims that Plaintiffs' Screenplay is "uninventive" and
dismisses any similarities as merely generic. Rep., *passim*. Specifically, it states that, "the
similarities and novelties that Dr. Román identifies either do not exist, are common to other
pirate films and literature, or exist at such a high level of abstraction that they constitute
unprotectable "ideas" instead of the protectable "expression" of those ideas." Rep. pg. 4. I am
also informed that Mr. McDonald's unilateral decision to filter out all generic elements is further
flawed given such elements are included under the "selection and arrangement" analysis. In fact,
Disney's Report uses the term "generic" over 30 times; "genre" over 50 times and "trope" a total
of 13 times. I also note that most of the "generic" references are to obscure works which are not
widely known [e.g. *The Red Rover* (1827), *The Black Pirate* (1926)] and therefore, I am
informed that Disney has not met its burden to provide sufficient evidence that a particular
element is, in fact, *scenes a faire*. One can be certain that if Paramount or MGM released a film
with the same core elements featured in Disney's Movie, Disney would undoubtedly sue them
for copyright infringement. As the 9th Circuit pointed out in reversing the dismissal of this case
in 2020, it is also unclear whether these pirate tropes are true tropes or whether they became
tropes due to the success of the POTC franchise - in existence since 2003:

> "As Plaintiffs note, expert testimony would aid in determining
> whether the similarities Plaintiffs identify are qualitatively
> significant. *See* <u>Newton v. Diamond</u>, 388 F.3d 1189, 1196 (9th Cir.
> 2004). This would be particularly useful in this circumstance,
> where the works in question are almost twenty years old and the
> blockbuster *Pirates of the Caribbean* film franchise may itself
> have shaped what are now considered pirate-movie tropes."

2

_Alfred v. Disney et al_. 9th Cir. 19-55669 07/22/2020; Ninth Cir.
(Hon Paez, Hon. Bade and Hon. Melgren)

     Without addressing each element which Disney's Report contends is a _scenes a faire_ (i.e. virtually everything), my opinion is that he has been overly liberal in his conclusions, has relied upon insufficient "evidence", thereof, and has neglected to apply the appropriate analysis, which includes said _scenes a faire_. To summarize, focusing on the generic elements has very limited relevance where there is no possible contention that the Plaintiffs' work is not sufficiently original. In fact, as I opined in my original report, the way Plaintiffs combined elements is actually a new twist on pirate genre movies including, but not limited to, "lightening the tone and mood of the story to include humor, irony, and even satire." Pl. Rep. pg. 7. I further opined that "the Screenplay deviates from the conventional narrative without completely undermining its effect. It's still a pirate story—but with a twist." Pl. Rep. pg. 7. McDonald's refusal to see the innovation and reduce the Screenplay dismissively as simply "a generic and uninventive combination of two well-known works ("_Goonies_" and "_Cutthroat Island_") is wrong in my opinion.. [3] This depiction blatantly disregards Plaintiffs' innovations in their Screenplay, to a much more contemporary version of the antiquated pirate story (which, of course, Disney borrowed from Plaintiffs). [4]

     Furthermore, Disney's Report's side-by-side comparison of _The Goonies_, _Treasure Island_ and the artwork which was submitted by Plaintiffs to Disney does not mean that the Screenplay is lacking sufficient originality. Pitches often connect an original screenplay in conversation with already familiar works to help make the sale (e.g. as one of many examples, it is commonly known that "Stranger Things" is a cross between "E.T." and Stephen King's "IT").

---

[3] Of importance, in stark contrast to Mr. McDonald's assertion on page 3 of Disney's Report, Goonies is _not_ a pirate movie – it is a comedy/adventure about kids who are trying to avoid losing their house by searching for treasure in a small Oregon town.

[4] I am informed that, as alleged in Plaintiffs' First Amended Complaint, Disney's Executive Brigham Taylor ("Taylor") solicited, read, and spent significant time (2 months) considering Plaintiffs' Screenplay; Taylor also sent it to then-Disney's studio head Nina Jacobson. Therefore, Plaintiffs' Screenplay must have been innovative and commercially-viable to be worthy of such extensive studio consideration.

3

It is also widely recognized that combining pre-existing images with a pitch is standard operating procedure in Hollywood.

Also, Disney's Report uses a definition of literary aspects such as plot, character, *etc*. which are grossly antiquated and arbitrary. For example, the term "plot" is not determined by a 3-act structure exclusively (according to a source cited from 1979). Rep., Pg. 6. The 1979 definition used by Mr. McDonald is helpful in the structuring an argument, but it assumes the screenwriters were using this model. It also assumes that this 3-act model is the only model available to structure a plot, something that isn't actually true. Therefore, I have not adhered to these definitions and have used what I understand to be currently accepted definitions thereof.

Disney's Report also ignores one of the key findings in my initial report regarding the Screenplay - that Plaintiffs' Screenplay incorporates "humor, irony and wit" and even romance which was a major departure from the typical "tyranny at sea" pirate story. Pl. Rep. *passim*. While Plaintiffs' Screenplay might include humorous films and pop culture references that Disney's Report cites, both works' use of humor, irony, wit, and romance is one of the ways that the Plaintiffs' Screenplay was able to make the pirate genre commercially appealing to a contemporary audience. Some of these other stories that the Disney report cites [Gilbert and Sullivan's *Pirates of Penzance* (1879); *Yellowbeard* (1983)] are exclusively comedies, unlike the Screenplay and Movie, which are mixed genres. The Screenplay is not merely a comedy with pirates, as the Disney Report suggests. The Screenplay is a far more sophisticated hybrid genre. As previously pointed out, while there is nothing new under the sun (when each element is broken off and inspected separately), the Plaintiffs' Screenplay is a new twist on an old genre. Pl. Rep., pg. 5-7.

In a similar vein, Disney's Report attempts to refute my opinion to the effect that the likeable protagonist pirate found in both works is "more friendly [and appeals] to a mass audience" by citing a number of popular films of the 1940s and 1950s which feature likeable pirates. Pg. 25. However, this misses my point: Plaintiffs' Screenplay combines numerous elements in a creative way. Isolating the nuanced use of likeable pirates in earlier works does not debunk that the two works overlap consistently and substantially. Furthermore, under the

4

selection and arrangement test (which, I am informed, is the law as dictated by the Ninth Circuit) these similarities are considered when looking for similar patterns between the two works.

Even if an element can be traced back to prior existing works that play a prominent role in shaping the genre, this does not automatically mean that the element is a standard or indispensable part of the genre. With this in mind, it is my understanding that even if separate elements resemble those featured in prior works, such similarities are only consequential to the effect that they may establish a particular element is a "*scenes a faire*" (which are nevertheless included in the analysis.

**Disney's Report Fails to Address Key Similarities**

It is my opinion that another major flaw with Disney's Report is not what it states - *but what it fails to state*. Disney's Report ignores numerous detailed comparisons identified in my initial report and instead resorts to putting forth conclusory "differences" which I am informed are not even supposed to be considered under well-established case law.

Defendants cannot escape the truth that the pace and sequence of events in the Screenplay is mirrored in Disney's Movie which include: 1) a unique prologue around 10 years earlier (whereby both main protagonists are introduced at gunpoint); 2) villains attacking a shipping port town looking for key items; 3) protagonist pirate losing his prized ship; 4) the protagonists and their crews making their way to an ominous island; 5) followed by a series of conflicts with the antagonists; 6) concluding with a climactic scene inside a cavern, among numerous other similarities in the sequence of events in both works. Pl. Rep. 16-17. The characters are also virtual mirror images of each other in both works. Pl. Rep. pg. 7-11. Disney's Movie could have been about a pirate's quest to steal a ship or a lifetime supply of rum; or about taking over a port town. The main protagonist could have been a privateer saving the town from the evil pirates. However, it was not.

At some key points, Disney's Report even admits similarities do exist – but qualifies the same by saying they "exist at such a high level of abstraction that they constitute unprotectable *'ideas'* instead of the protectable *'expression'* of these ideas." Rep., Pg. 4. However, first of all,

5

exactly when an element transforms from an idea to the expression of an idea is difficult to determine. I am informed that some writers have opined that once an idea is expressed, that constitutes the expression of an idea. Moreover, I am informed that ideas, and other unprotectable elements, are still considered when looking for similar patterns in both works under the selection and arrangement test. Furthermore, as my earlier report points out, the two works "share multiple original patterns of similarities…the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film." Pl. Rep. pg. 21. Nevertheless, a non-exhaustive list of similarities which Disney's Report failed to refute is as follows:

1.      Disney's Report does not dispute that the function of the prologue in both the Screenplay and the POTC is similar. While the Disney Report points out differences in the actual details of each respective prologue (i.e. the female lead is a child in one and a young lady in the other), *it cannot challenge the importance and function of the prologue to the overall narrative.* Of course there are stories with prologues, and maybe even some pirate stories have prologues, but Disney's Report recognizes that the prologues at issue herein do much more than what prologues generally do. Every prologue is different and serves a specific function to its story. And even here, while some details in plot vary, the sequence of them remains similar. Finally, despite Disney's allegation that the Disney Movie's prologue does not create a conflict, it is my opinion that said prologue was rife with conflict (e.g. whether the boy lost at sea was a pirate, whether pirates exist, whether they will attack the governor's ship, etc.)

2.      Disney's Report does not dispute that Plaintiffs' Screenplay's choice to highlight the heterosexual love plot was innovative, apparently it was innovative enough to use in Disney's Movie. Pl. Rep., pg. 18-19. The Disney Report attempts to undermine this claim by (again) citing examples of romance in other pirate stories. However, it is the similarity of this pattern whereby the Screenplay successfully maintains both major plot lines (the pirate adventure, and the heterosexual romance) to the end, that makes this similarity an important one. The success of both works finale is in the satisfaction from watching the resolution of both the pirate antagonist conflict and the romantic conflict.

6

3.      Disney's Report also attempts to create distinctions in connection with various scenes which truly parallel each other; only by ignoring the glaring similarities and hyper-focusing on the minor differences.  For example, consider the two scenes with pirates heckling women.  Disney's Report ignores that the entire scene has many similarities including: 1) the capture of the female lead; 2) the heckling by a pirate; 3) a slap by the head pirate toward the heckling pirate; and, 4) reprimand/embarrassment.  Just because the men are slapped or kicked in different parts of the body ignores the glaring similarities.  Another example is the scene in _both_ works wherein male pirates are disguised as women "to deceive enemies during battle".  Rep., pg. 9.  Once again, Disney's Report focuses on the minor differences in these scenes (one is trying to evade while and the other is trying to distract) but they are basically identical - and both undoubtedly provide the comedic relief that they are intended to provide.  Disney's Movie could have featured a man dressing up as a farm animal, or an elderly person, or snuck in by a cart or wagon.  Indeed, both works utilize the same vehicle to serve the same purpose.  Finally, Disney's Report attempts to split hairs over the scene in which the protagonists take control of rival ships.  By hyper-focusing on the granular detail, Disney's Report inadvertently highlights the similarity between the scenes.  Both scenes involve the protagonist's crew gaining control over the rival ship where their leader comes on board at the last possible second. Pl. Rep. pg. 22. These scenes are effectively identical in my opinion.

4.      Disney's Report attempts to refute my expert opinion that neither female lead is the standard "damsel in distress" (Pl. Rep. pg. 10) by saying that Elizabeth _begins_ the story as a classic "damsel in distress" yet she evolves into a stronger female lead. However, in doing so, Disney actually _admits_ that Elizabeth was actually not a standard damsel in distress - thereby making my point.  Rep. pg. 15.  My initial report emphasized that Elizabeth (like Jane in the original screenplay) is a much more nuanced character and plays a much more advanced role in the plot than simply a stock female role in a typical pirate adventure.

7

5.      There are over twenty (20) other similarities in my initial report which Disney's Report fails to refute. [5]   For the sake of brevity, instead of analyzing each one in the context of the analysis above, a non-exhaustive list is provided below:

a)      My initial report opines that characters who meet the main characters in both works – Davey Jones (Screenplay) and Jack Sparrow (Disney Movie) – "doubt the legendary status that both these leading characters self-promote" despite their reputations. Pl. Rep. pg. 8. Disney does not refute this.

b)      My initial report opines that Captain Jack Nefarious (Screenplay) and Captain Hector Barbossa (Disney Movie) are both "cunning and sinister figures who despite their off-putting behavior retain a high level of individual charisma." Pl. Rep. pg. 8. Disney does not refute this.

c)      My initial report opines that the characters of Captain Jack Nefarious (Screenplay) and Captain Hector Barbossa (Disney Movie) make their respective works friendlier to a mass audience. Pl. Rep. pg. 8. Disney does not refute this.

d)      My initial report opines that the characters of Davey Jones (Screenplay), Captain Jack Nefarious (Screenplay), Captain Hector Barbossa (Disney Movie), Captain Jack Sparrow (Disney Movie), and William Turner (Disney Movie) each embody the "innovative hybrid persona" where they "excel at the skills of a swashbuckler yet maintain the outsider edginess of a pirate." Pl. Rep. pg. 9. Disney does not refute this.

e)      My initial report opines that the female characters in both works – Jane (Screenplay) and Elizabeth (Disney Movie) – "share a sense of resilience even

---

[5] The foregoing list does not include the numerous detailed similarities I concurred with which were delineated in Plaintiffs' Corrected Appellant Brief (and which were not addressed in Disney's Report).

8

as they are used as bargaining chips between the competing male pirates." Pl. Rep. pg. 10. Disney does not refute this.

f)   My initial report opines that Jane and Elizabeth serve as "more than merely love interests; they are full dimensional romantic matches." Pl. Rep. pg. 10. Disney does not refute this.

g)   My initial report opines that "both the Screenplay and the Disney Film share dialogue claiming that it's bad luck to have a woman on a ship, a line that foreshadows the power of these women…" Pl. Rep. pg. 10. Disney does not refute this.

h)   My initial report opines that the female characters in both works – Jane (Screenplay) and Elizabeth (Disney Movie) – are important qualitatively in both works and that "their incorporation into the story introduces the element of romance, which becomes increasingly significant as the story develops." Pl. Rep. pg. 11. Disney does not refute this.

i)   My initial report opines that the romance introduced by the two female characters in both works "expands the typical demographic of the pirate film to appeal to women and young girls, two overlapping groups who generally are not the genre's targeted audience." Pl. Rep. pg. 11. Disney does not refute this.

j)   My initial report opines that both works share "the moral that there is more to life than greed and the search for wealth." Pl. Rep. pg. 12. Disney does not refute this.

k)   My initial report opines that the skeleton crews in both works mainly surface at night during scenes of epic battle.  Pl. Rep. pg. 12. Disney does not refute this.

9

l)  My initial report opines that the skeleton crews "provide a sensational thrill-driven aura to the story." Pl. Rep. pg. 12. Disney does not refute this.

m)  My initial report opines that William Turner from the Disney Movie shares similarities to the Screenplay's orphans, known as the young rascal scoundrels, specifically the idea that both Turner and the scoundrels seek out mentors. Pl. Rep. pg. 13. Disney does not refute this.

n)  My initial report opines that both William Turner and the young rascal scoundrels participate in the pirate battles that lead to the defeat of the main antagonist villain in their respective works. Pl. Rep. pg. 13. Disney does not refute this.

o)  My initial report opines that the prologue in both works: (1) "sets the tone and mood of the story;" (2) introduces unfinished business "that will be revisited approximately a decade later;" (3) introduces "some of the major players, including the female lead;" (4) "takes place on a ship in rough seas under threatening skies;" and (5) introduces a "conflict on the ship that throws the viewer into the pirate story." Pl. Rep. pg. 15. Disney does not directly refute any of this.

p)  My initial report opines that the prologues of both works "leave us wondering who survived the conflicts at sea," which is something that both works address in later sequences. Pl. Rep. pg. 16. Disney does not refute this.

q)  My initial report opines that both works end on a note that love wins. Pl. Rep. pg. 18. Disney does not refute this.

r)  My initial report opines that the climatic endings of both works "substantially overlap" as they both "locate their final epic showdown in a remote and

ominous cave that is inaccessible except by small boats." Pl. Rep. pg. 18. Disney does not refute this.

s)   My initial report opines that the final scenes of both works revive "the skull-faced pirates who emerge to attempt to fend off Davey Jones, Jane, and the young rascal scoundrels" (Screenplay) and "the phantom skeleton crew pirates to engage in battle" (Disney Movie). Pl. Rep. pg. 18. Disney does not refute this.

t)   My initial report opines that the climatic endings of both works are similar in form and content by combining "multiple elements, including a pattern of main characters, similar themes, and sequence of events, mood, tone, and pace." Pl. Rep. pg. 18-19. Disney does not refute this.

u)   My initial report opines that the setting of both works is virtually identical. Pl. Rep. pg. 19. Disney does not refute this.

## Disney's Expert Report Inappropriately Highlights Dissimilarities Between the Works – and in Doing So, Materially *Mischaracterizes* the Works.

Despite what can only be characterized as a tremendous amount of similarity, Disney's Report also attempts to focus on a set of red-herring arguments highlighting dissimilarities. However, I am informed that "dissimilarities" are generally not to be considered because a plagiarist cannot excuse copying by showing how much work he did not appropriate. It is my opinion that the Disney Report "muddies the waters" with alleged dissimilarities. Because they do not actually negate the similarities, I am informed that they should not be given any consideration. Also, Disney's Report includes self-serving descriptions of the differences, which are largely based on a flawed review of the works at issue. A few such examples are as follows:

1.   Disney's Report repeatedly advances the idea that Plaintiffs' Screenplay is a redemption story and the Disney Movie is a liberation story. See, e.g., Rep., pg. 6, 11, 16-17. However, this is not correct in my opinion. Disney's Movie is actually a redemption

11

story of Jack Sparrow.  Sparrow begins the Movie as a type of loser figure (in fact, a failed pirate) - but by the end of the Movie, he "redeems" his reputation as a potent pirate capable of much mischief.  His "redemption" as a pirate in the initial film becomes the basis for the entire franchise.  Also, Plaintiffs' Screenplay also can be described as a "liberation" story, given that the path to redemption for Davey, for Jane, and for the Rascal Scoundrels, is to *liberate* themselves from previous held positions, beliefs, and values.   The report sets up a false dichotomy between "redemption" and "liberation" creating a distinction where one does not exist. They both incorporate both themes.

2.      Disney's Report tries to posit that the Movie's Barbossa is not motivated by greed at all costs. Rep. pg. 12-13.  This is not accurate; while Barbossa is motivated in part to lift the curse on him and his crew, he is *also* motivated by *greed* and a desire to resume his piracy to pillage and plunder uninterrupted or encumbered by the curse.   Lifting the curse is a means to an end.  Also, Barbossa's entire back story is fueled by greed.  His reasoning for marooning Jack Sparrow was for the sake of a greedy desire to take the treasure and the Black Pearl.  His core greediness motivates much of his behavior in the Movie.

3.      Disney's Report opines that Plaintiffs' Screenplay did not incorporate an element of a "curse". Rep., pg. 17.  This is also incorrect.  Plaintiffs' Screenplay referenced Phantom Jack's curse numerous times.  For example, Plaintiffs' Screenplay includes dialogue from one of the Rascal Scoundrels saying, "Legend says that a big sea monster ate [Jack Nefarious] and then spit him out… Now his ghost sails the seas in his Ghost ship.  Searching and sailing. Sailing and searching". Screenplay, pg. 27.  A reasonable interpretation thereof is that Jack Nefarious did not die; but he is eternally cursed.  In addition, the characters in Plaintiffs' Screenplay reference Captain Jack as a "ghost" who sails. Screenplay pgs. 27, 31, 34.  That is exactly what the curse of Barbossa is based upon – a perpetual search for something that may last for an eternity.  In Disney's Movie, Barbossa tells Elizabeth "you best start believing in ghost stories, you're in one" – clearly Disney's Movie was also envisioned as a ghost story.  Yet again it appears, in my opinion, that Disney adopted Plaintiffs' unique thematic elements.

12

4.      Disney's Report also insists that Barbossa "has enough morality to live by the pirate code" (Rep. pg. 12) but this is also a mischaracterization.  My view is that Barbossa manipulates the pirate code to serve his own interests and not to uphold some sense of loyalty to a code of honor.   He tricks Elizabeth by invoking the pirate code only to then deceive her, and he does this publicly to show his crew how clever and sinister he is; in fact, Barbossa even tells Elizabeth, "the code is more what you call guidelines, than actual rules" meaning he has no honor and lies and deceives as needed.

5.      Disney's Report disregards the "Rascal Scoundrels" as "generic": simply are a "generic trope of children dropped into a pirate tale".  However, children in a pirate story who happen to have similar traits as the crew members in the Movie cannot possibly be considered *scenes a faire*.   Rep. pg. 13.  Furthermore, the viewer does not know exactly what will happen to these boys when they are first introduced in the Screenplay, and there is considerable suspense surrounding their actions.  In other words, they are more than merely predictable stock characters.  The Disney Report also suggests that the Rascal Scoundrels are not supporting characters because of the "concept" of *Goonies* in the Plaintiff's complaint.   The issue here is not whether the Screenplay differs or departs from *Goonies*; it's whether the Disney Movie differs or departs from the Screenplay.  The case is not whether Plaintiffs' Screenplay is a rip-off of *The Goonies,* which it is not in my opinion.

6.      Disney's Report's also unduly dissects the female leads; opining that Plaintiff's comparison of Jane and Elizabeth is simply that both are "strong female protagonists" (and calling that a "generic idea").  Rep., pg. 15.  Yet this disregards my opinion that the two women are "lively, adventurous young women who dream of a life beyond the constrains of the port town where they've been raised…[and] both of these spirited women engage the pirates on nearly equal terms in matter of skill, wit, and athletics" who are drawn to the pirate life and are not scared or intimidated by pirates Pl. Rep. pg. 10.   My opinion on the similarities between Jane and Elizabeth is that they are similar in virtually every detail.

13

7. Disney's Report also seeks to conflate ghost pirates, undead pirates, cursed pirates, and living pirates. Rep., *passim*. The distinction between the foregoing, while nuanced, is important in this case. In fact, both works involve cursed, skeleton pirates. Disney's Movie could have featured vampire pirates, witch pirates, werewolf pirates - or any other feared, supernatural being. But both works use of ghostly skeleton pirates is an important similar feature – no matter the granular detail used by Disney to distinguish them. I am informed that, in literary work cases, minor deviations do not negate similarities.

8. Furthermore, Plaintiffs' Screenplay revolves around a myth of ghosts with skull faces who are feared because of this myth (and given it is unclear to the reader/viewer if they are dead or alive – this would ultimately be up to the filmmaker to decide how to portray this visually). This is very similar to that in Disney's Movie. While a pirate trope may be the fear of a black flag with crossbones, Plaintiffs' Screenplay created a new fear - a fear based upon supernatural mythology so terrifying that even those pirates who fly a black flag fear the legend of the ghost pirates. This is an element that was prominent in the Screenplay and reappears in the Disney Movie, to set up their blockbuster franchise.

9. With respect to the setting, even if the Caribbean is standard in many pirate stories, that doesn't mean that Plaintiffs' Screenplay doesn't tweak this element in new and original ways. See, Pl. Rep. Ex. B.

10. Disney's Report next claims Plaintiffs' Screenplay was geared to a younger audience often describing it as a "slapstick comedy" - which is simply not true. Rep., pg. 6, 18. This opinion ignores the fact that Plaintiffs' Screenplay contains ominous elements that Plaintiffs showcased not only in the Screenplay itself but also via their sizzle/trailer. See, Pl. Rep. Ex. B ("In the Screenplay, the emotion that is invoked when the true nature of the supernatural pirates is revealed is substantially similar to the emotion invoked during the same events in the Film: an eerie mood"). The trailer, submitted along with Plaintiffs' Screenplay, was certainly not childish, and cartoonish.

14

And Disney's Report fails to rebut my position that both works took a somewhat dramatic departure from typical "pirate" and "sailors-at-sea" stories by emphasizing humor, irony, and wit to a far greater extent than is typical in this genre. Rep., pg. 6. Disney's Report also ignores my opinion that the Screenplay appeals to a wide range of viewers interested in adventure, romance, and family entertainment. Rep., pg. 18. The Disney Movie repeats this mood and the aforementioned tone for their wildly successful franchise. Disney's Movie is no less juvenile than Plaintiffs' Screenplay. Both utilize suspenseful humor. Also, Disney's Movie actually incorporates slapstick comedy elements – as evidenced by characters Rigetti and Pintel who dress up like women, and continuously bicker providing quirky humor throughout Disney's Movie. These unusual and peculiar characters are also similar to some of the Rascal Scoundrels in Plaintiffs' Screenplay. Pl. Rep., pg. 12, 24.

11.     In describing Plaintiffs' Screenplay, Disney's Report conveniently omits who Plaintiffs' "band of child misfits" win a battle against (saying instead that the hero teams up with a "band of child misfits, winning the battle, and ending up with real treasure…" Rep., pg. 6). That's because this omission is another key similarity – in both works the protagonists battle "cursed, undead pirates" – not just how the Disney Movie as their report would like us to believe. Rep. pg. 6.

12.     Similarly, in describing Plaintiffs' Screenplay's Nefarious and Davey, the Disney Report goes to great lengths to omit the fact that they are enemies at their core – just like in Disney's Movie. Rep., pg. 7.

13.     Disney's Report also conclusively (and falsely) states that "Dave and the Rascal Scoundrels leave piracy behind forever". Rep. pg. 8. This was an assumption made by Disney's Expert; and in fact, there is no dialogue or narration that says they have given up piracy forever. This is mere conjecture; and therefore, not accurate.

14.     Disney's Report also claims that skeletal or "undead" pirates are featured in the Disney's "Pirates of the Caribbean" Ride.[6]  However, "undead" pirates were not found in the Ride – the Ride originally featured immobile skeleton remains.  These are not "undead" –  they were just positioned in the way they died.  The skeletons on the Ride were not living/dead pirates.

15.     There are other flawed representations about the Ride found in Disney's Report. For example, Disney's Report claims that "Skeletal crews and the ghost ship are also featured in the Disneyland ride—indeed, Plaintiffs' sizzle reel incorporated that footage from the Ride". Rep. pg. 27.  This is false.  There was no "ghost ship" anywhere in the Ride to my understanding – and it's not even clear from Disney's Report exactly what he is referring to in making that conclusory statement. The only image I saw were skeletal remains frozen in time and various scenes or vignettes.  Disney's Report also claims that the Ride ends "with an epic shootout in a cave".  Rep., pg. 29.  Not so.   From my review of the videos, the only shootout is between a ship and a port in the first half of the Ride; and the Ride ends with drunk, half cross-eyed pirates who are smirking, laughing and shooting guns aimlessly while drinking rum.   It is more reminiscent of a celebration after looting a town or ship than a "shootout". Finally, this "scene" in the Ride takes place in an armory full of gunpowder barrels that will blow if any stray bullet strikes them – not a cave.

16.     Also, the Ride provides no backstory that discloses whether any pirates were cursed; and there is no inference from the ride that the skeletons would rise from the dead.  This is in stark contrast to Disney's Report that posits that the Ride featured "references to cursed pirates".  Rep., pg. 29.  Finally, in Jason Surrell's *Pirates of the Caribbean* book, Brigham Taylor says that he and Disney screenwriter Jay Wolpert did not get a narrative from the Ride during their walk-through.  ("We went to Walt Disney Imagineering and they arranged a walk-through of the attraction with Tony Baxter and X Atencio…They walked Jay and me through the show before it was open.  We didn't get a narrative from the ride, but we did get a backdrop, a milieu, from the ride.") Pg. 115.

---

[6]  In response to Disney's Report that focused on the Ride, I then proceeded to watch video footage available on the internet of the Pirates of the Caribbean Ride in order to respond to the opinions about the Ride.

17.     Disney's Report contradicts itself with respect to describing the generic "pirate captain". First, on page 11 of their Report, Disney claims that generic pirate captains are "cocky", "dashing" and "fond of rum". This is contradicted by their subsequent statement that pirate captains are generally "tall, powerful, wily" characters, who alternate between "jovial good humor and utter ruthlessness in the pursuit of gold" – what, in fact, is a generic pirate captain? It is my opinion that the pirate captain in the Screenplay and the Movie is not a "generic" pirate captain at all. Rep. pg. 24.

18.     On page 11 of Disney's Report, Disney asserts that "Davey is never depicted as morally suspect". This is incorrect. Davey is depicted as morally suspect from the very beginning of the Screenplay. As just one example, he takes advantage of the Rascal Scoundrels. When the Rascal Scoundrels catch on to this, they abandon. Pl. Screenplay, Pg. 26-30. Also, Davey Jones is called out for his womanizing, lying and deceit when Jane slaps him in the tavern. Screenplay, Pg. 35.

19.     Disney's Report also claims that Jack Sparrow does not drink "out of self-pity." Pg. 11-12. Another incorrect statement. In fact, every time Sparrow is doomed or starting to give up, he starts drinking. When he and Elizabeth are marooned on the island, he starts drinking to drown out his sorrow. Sparrow's whole existence is largely one of self-pity (e.g., he was marooned by Barbossa's crew and lost the Black Pearl).

20.     Disney's Report attempts to make a big deal out of the character flip between pirate captain and first mate which is a distinction without a difference. Rep., pg. 12 ("Barbossa was Jack's first mate, but Nefarious was *not* Davey's—Plaintiffs have flipped the relationship of their characters, as Davey was *Nefarious's* first mate). The fact remains that these main characters, the protagonist and the villain still share a very important backstory – they were once pirates on the same ship with a head pirate and subordinate pirate relationship.

17

21.     Disney's Report states that Sparrow's crew is not part of the plot or resolution – which is yet another false generalization. Rep., pg. 14. The crew is vital to the climactic battle scene. The Movie ends with Jack Sparrow now having recovered the Black Pearl and having a full crew. They are not only prominently featured at the end – but they are Sparrow's crew going forward.  Rep. pg. 14.

22.     Disney's Report also claims that "Sparrow's history with Barbosa is not depicted, only recounted, while Nefarious' betrayal of Davey plays out in Plaintiff's prologue".  This is yet another distinction without a difference.  Rep. pg. 20.  Both had similar betrayals at sea with the antagonist.

23.     Disney's Report relies heavily on the opinion that the Disney Movie is about a treasure that needs to be _returned_ – not a search for treasure. Rep., pg. 17. As exhaustively briefed for the court and the Ninth Circuit, that truly is a distinction without a difference. First, the mission to return the treasure only commences half way through the Movie after the last piece of gold is found.  The first half of Disney's Movie is about a _search_ for treasure - searching for the last piece to lift the curse (just like Plaintiffs' Screenplay).  Furthermore, the search for treasure advances the main theme and plot of both the Screenplay and Movie.

24.     Finally, Disney's Report completely ignores the laundry list of similarities found in Plaintiffs'/Appellants' Corrected Opening Brief submitted to the Ninth Circuit on the issue of substantial similarity which was attached to my initial report as Exhibit B.  I had verified the accuracy of said similarities and adopted those similarities as an addendum to the Plaintiff's Report.   Those similarities, along with the ones I have addressed in my Report and this Rebuttal, all provide for striking similarity between Plaintiffs' Screenplay and Disney's Movie.

## **CONCLUSION**

To summarize, Disney's Report does not fundamentally refute my opinions and conclusions that the two works are substantially similar, including the following:

"…in my opinion the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film. Furthermore, although some of the similarities are more nuanced, the selection and arrangement of these elements point to a pattern of resemblances first found in the Screenplay. In my opinion, the Screenplay is a first-rate piece of original writing, showcasing a brilliant and highly innovative retelling of the standard pirate narrative. Some of the Screenplay's creative innovations, which I have outlined above, constitute sufficiently original, atypical contributions to the pirate storyline not evident before in the literature that I am familiar with." Pl. Rep. pg. 21.

Respectfully Submitted,

_____

Prof. David Román

# EXHIBIT H

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**CENTRAL DISTRICT OF CALIFORNIA**

10
11

ARTHUR LEE ALFRED II *et al.*,

Case No.:  CV 18-8074-CBM(ASx)

12

    Plaintiff,

**ORDER RE: DEFENDANT'S MOTION TO [1] CERTIFY THE COURT'S ORDER DENYING SUMMARY JUDGMENT ON SUBSTANTIAL SIMILARITY (DKT. 200) FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1282(B) AND [2] STAY PENDING RESOLUTION OF INTERLOCUTORY APPEAL.**

13

v.

14

THE WALT DISNEY PICTURES,

15

    Defendant.

16
17
18
19

    The matter before the Court is Defendant's Motion to [1] Certify the

20

Court's Order Denying Summary Judgment on Substantial Similarity (Dkt. 200)

21

for Interlocutory Appeal Pursuant to 28 U.S.C. § 1282(b) and [2] Stay Pending

22

Resolution of Interlocutory Appeal.  (Dkt. No. 205.)  The matter is fully briefed.

23

**I.    BACKGROUND**

24

    This is a copyright infringement action arising from Defendant's alleged

25

infringement of Plaintiffs' Screenplay entitled *Pirates of the Caribbean* (the

26

"Screenplay").  On May 13, 2019, the Court granted Defendant's motion to

27

dismiss upon finding the parties' works were not substantially similar as a matter

28

of law.  (Dkt. No. 93.)  On May 14, 2019, judgment was entered in favor of

Defendants.  (Dkt. No. 94.)  Plaintiffs appealed.

On July 22, 2020, the Ninth Circuit issued a memorandum disposition finding Plaintiffs' Screenplay "shares sufficient similarities with the film to survive a motion to dismiss," reasoning while the district court noted that the elements the two works share in common are unprotected generic, pirate-movie tropes, the Ninth Circuit found "at this stage of the litigation, it is difficult to know whether these elements are indeed unprotectible material.  (Dkt. No. 103.)  The Ninth Circuit concluded "[a]dditional evidence would help inform the question of substantial similarity" and "expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant," and therefore reversed the district court's dismissal and remanded the action.  (*Id.*)  On September 8, 2020, the Ninth Circuit issued its Mandate.  (Dkt. No. 104.)

Following remand, the parties stipulated to Plaintiffs filing a First Amended Complaint ("FAC"), which was approved by the Court.  (Dkt. No. 111.)  On November 30, 2020, Plaintiffs filed the FAC which asserts a single cause of action for "Copyright Infringement Regarding the Pirates of the Caribbean Film Franchise."  (Dkt. No. 112.)  On December 16, 2021, the Court denied Defendant's Motion for Summary Judgment re Substantial Similarity upon finding the parties' expert opinions created a genuine issue of disputed fact regarding whether the works are substantially similar.  (Dkt. No. 200 (the "MSJ Order").)

## II.   STATEMENT OF THE LAW

28 U.S.C. § 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court

2

unless the district judge or the Court of Appeals or a judge thereof shall so order.

## III.    DISCUSSION

### A.    Interlocutory Appeal

Defendant requests that the Court certify the MSJ Order for interlocutory appeal with respect to the following question:

> Does the presence of "dueling experts" automatically preclude summary judgment on substantial similarity, or must a court apply the objective criteria of the extrinsic test, evaluating the expert opinions on each element to determine if there are genuine disputes of material fact regarding whether the allegedly similar elements are protectable?

### 1.    Controlling Question of Law

For certification for interlocutory appeal under Section 1292(b), Defendant must first demonstrate the appeal involves a controlling question of law.  28 U.S.C. § 1292(b).  "[A]ll that must be shown in order for a question to be 'controlling' is that resolution of the issue on appeal could materially affect the outcome of litigation in the district court."  *In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981).  Here, Defendant argues the Court's ruling in the MSJ Order that dueling expert opinions created a genuine issue of material fact was a legal conclusion that determined Defendant's summary judgment motion, and therefore the MSJ Order presents a controlling question of law that the Ninth Circuit should answer before the parties proceed to prepare for trial.

In the MSJ Order, the Court found:

> Plaintiffs' expert opines that the parties' works are substantially similar and have original elements in common, whereas Defendant's expert opines that the parties' works are not substantially similar and common elements in the parties' works are common in the pirate genre generally.  The opinions from the parties' experts thus creates a genuine issue of material fact in dispute regarding whether the works are substantially similar.

(MSJ Order at 6.)  The Court finds the question presented by Defendant is a legal question regarding whether contrary expert testimony regarding substantial similarity precludes summary judgment.  Therefore, Defendant identifies a

controlling question of law.

2.    **Substantial Ground for Difference of Opinion**

Section 1292(b) also requires that a substantial ground for difference of opinion exists on the controlling issue of law.  28 U.S.C. § 1292(b).  "To determine if a 'substantial ground for difference of opinion' exists under § 1292(b), courts must examine to what extent the controlling law is unclear." *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). "[I]dentification of a sufficient number of conflicting and contradictory opinions would provide substantial ground for disagreement." *Id.* at 633–34 (quoting *Union Cnty. v. Piper Jaffray & Co.*, 525 F.3d 643, 647 (8th Cir. 2008)); *see also Reese*, 643 F.3d at 688 (certification for interlocutory appeal under Section 1292(b) is appropriate if the "'appeal involves an issue over which reasonable judges might differ' and such 'uncertainty provides a credible basis for a difference of opinion'") (citation omitted)).  "Courts traditionally will find that a substantial ground for difference of opinion exists where [1] the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, [2] if complicated questions arise under foreign law, or [3] if novel and difficult questions of first impression are presented."  *Couch*, 611 F.3d at 633.

Defendant contends substantial grounds exist for differences in opinion on this "controlling question" because numerous courts have granted summary judgment in analogous circumstances notwithstanding competing expert reports. Defendant cites to the following cases wherein Defendant contends the district court applied the extrinsic test and granted summary judgment on the ground of no substantial similarity notwithstanding the submission of expert testimony by the plaintiffs:  *Johannsongs-Pub. Ltd. v. Lovland*, 2020 WL 2315805 (C.D. Cal. Apr. 3, 2020), *aff'd*, 2021 WL 5564626 (9th Cir. Nov. 29, 2021); *8th Wonder Entertainment, LLC v. Viacom Int'l, Inc.*, 2016 WL 6882832 (C.D. Cal. Nov. 22, 2016); *Counts v. Meriwether*, 2015 WL 9594469 (C.D. Cal. Dec. 30, 2015);

*Stabile v. Paul Smith Ltd.*, 137 F. Supp. 3d 1173 (C.D. Cal. 2015); *Pringle v. Adams*, 2012 WL 1103939 (C.D. Cal. Mar. 30, 2012), *aff'd*, 556 F. App'x 586 (9th Cir. 2014); *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043 (C.D. Cal. 2010).  However, these cases cited by Defendant either did not discuss contrary expert opinions, or included a finding that one party's expert testimony was inadmissible,[1] or a finding that expert testimony was unnecessary or unhelpful.  Therefore, the cases cited by Defendant are distinguishable from the instant case wherein the Ninth Circuit remanded the action and found this Court had erred by independently comparing the works at the motion to dismiss stage without the benefit of expert testimony, and wherein Defendant did not object to Plaintiff's expert's testimony as inadmissible.

Plaintiffs, on the other hand, cite to a recent copyright case wherein the district court denied summary judgment on the issue of substantial similarity where there were contrary expert testimony on the issue.  *See Hall v. Swift*, 2021 WL 6104160, at *5 (C.D. Cal. Dec. 9, 2021) (finding genuine issues of triable facts existed as to substantial similarity between the works and that "it is not proper for this Court to resolve on summary judgment what is essentially simply a battle of the experts").  Therefore, Defendant fails to identify "a sufficient number of conflicting and contradictory opinions" which "would provide substantial ground for disagreement."  *Couch*, 611 F.3d at 633–34.

### 3. Material Advancement of the Ultimate Termination of the Litigation

"[T]here are no set criteria a court is required to consider when evaluating whether an interlocutory appeal will materially advance the litigation."  *Beeman v.*

---

[1] Defendant acknowledges two of the cases it previously relied on in its summary judgment motion—*Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620 (9th Cir. 2010), and *Gable v. Nat'l Broad. Co.*, 727 F. Supp. 2d 815 (C.D. Cal. 2010))—were distinguished by this Court on the ground the courts in those cases had excluded the expert's testimony.

*Anthem Prescription Mgmt., Inc.*, 2007 WL 8433884, at *2 (C.D. Cal. Aug. 2, 2007). However, interlocutory appeals pursuant to Section 1292(b) is "to be used only in exceptional situations in which allowing an interlocutory appeal would avoid protracted and expensive litigation." *In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d 1020, 1026 (9th Cir. 1981), *aff'd sub nom. Arizona v. Ash Grove Cement Co.*, 459 U.S. 1190 (1983). The Court finds this factor does not favor certification of the matter for interlocutory appeal because this case is not in its early stages, an interlocutory appeal would take time to complete which would further delay this case which has already been pending since 2018, and it is unclear whether the interlocutory appeal would be concluded prior to the currently scheduled February 7, 2023 trial date. *See United States v. Woodbury*, 263 F.2d 784, 787 (9th Cir. 1959) ("Section 1292(b) was intended primarily as a means of expediting litigation by permitting appellate consideration during the early stages of litigation of legal questions which, if decided in favor of the appellant, would end the lawsuit" such as questions "relating to jurisdiction or a statute of limitations.").

\*    \*    \*

Therefore, considering the factors above, while Defendant identifies a controlling issue of law, Defendant does not demonstrate there is substantial difference of opinion on the issue or that the interlocutory appeal will materially advance the termination of the litigation. Defendant thus fails to show this is an "exceptional situation" warranting an interlocutory appeal. *In re Cement Antitrust Litig. (MDL No. 296)*, 673 F.2d at 1026.

**B.     Stay of Proceedings Pending the Appeal**

Defendant's request to stay is denied as moot in light of the Court's denial of the Motion to certify the matter for interlocutory appeal.

## IV.     CONCLUSION

Accordingly, the Court **<u>DENIES</u>** Defendant's Motion to [1] Certify the

1  Court's Order Denying Summary Judgment on Substantial Similarity (Dkt. 200)

2  for Interlocutory Appeal Pursuant to 28 U.S.C. § 1282(b) and [2] Stay Pending

3  Resolution of Interlocutory Appeal.

4

5      **IT IS SO ORDERED.**

6

7  DATED: March 2 2022.

8                                      CONSUELO B. MARSHALL
                                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT I

KELLY M. KLAUS (SBN 161091)
kelly.klaus@mto.com
JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
ROSE L. EHLER (State Bar No. 296523)
rose.ehler@mto.com
JULIANA M. YEE (State Bar No. 304564)
juliana.yee@mto.com
ROBIN S. GRAY (State Bar No. 316544)
robin.gray@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:   (213) 683-9100
Facsimile:    (213) 687-3702

*Attorneys for Defendant Walt Disney Pictures*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PICTURES,<br><br>Defendant, | Case No. 2:18-CV-08074-CBM-ASx<br><br>**DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**<br><br>Judge:   Hon. Consuelo Marshall<br><br>Complaint Filed: Nov. 14, 2017<br>(D.C. Colo. No. 1:17-CV-02729)<br><br>Pretrial Conference:  Jan. 9, 2023<br>Trial Date:  Feb. 7, 2023 |

PROPOUNDING PARTY:        PLAINTIFFS

RESPONDING PARTY:        WALT DISNEY PICTURES

SET NO.:                ONE

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Walt
Disney Pictures ("WDP"[1]) responds and objects as follows to the First Set of
Interrogatories propounded by Plaintiffs Arthur Lee Alfred, II and Ezequiel
Martinez, Jr. ("Plaintiffs").

## PREFATORY STATEMENT

1.      By responding to Plaintiffs' First Set of Interrogatories, WDP does not
waive any privilege or objection that may be applicable to: (a) the use, for any
purpose, by Plaintiffs of any information or documents sought by Plaintiffs or
provided in response to an Interrogatory; (b) the admissibility, relevance, or
materiality of any of the information or documents to any issue in this case; or
(c) any demand for further responses involving or relating to the subject matter of
any of the Interrogatories.

2.      WDP's responses are based on information reasonably available to
WDP as of the date of these responses.  WDP's investigation is continuing and
ongoing.  Subject to and without waiving any of its objections set forth herein, WDP
reserves the right to alter or to supplement these responses as additional information
becomes known to it, but undertakes no obligation to do so beyond the obligations
imposed by the Federal Rules of Civil Procedure, the Local Rules, and Orders of
this Court.

## GENERAL OBJECTIONS

The following General Objections apply to and are incorporated into each and
every response to each and every specific Interrogatory, whether or not such
General Objections are expressly incorporated by reference in such response.

1.      WDP objects to each and every Interrogatory, definition, and

---

[1] Per the parties' January 14, 2021 Stipulation, for the purpose of these discovery
responses, the term "WDP" includes The Walt Disney Company and its
subsidiaries.  Dkt. No. 121, ¶ 7.

instruction to the extent that it attempts to impose obligations inconsistent with or in addition to those required by the Federal Rules of Civil Procedure, the Local Rules or Orders of this Court, or any other applicable authority.

2.      WDP objects to each and every Interrogatory, definition, and instruction as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it is not reasonably limited in scope, or seeks information neither relevant to any issue in this case nor reasonably calculated to lead to the discovery of admissible evidence, particularly to the extent that compliance would force WDP to incur a substantial expense that outweighs any likely benefit of the discovery.

3.      WDP objects to each and every Interrogatory, definition, and instruction to the extent that it lacks any reasonable time limitation, including but not limited to, because it poses an undue burden on WDP.  To the extent WDP agrees to produce information in response to a specific Interrogatory, it will do so on a timeframe that is reasonable, taking into account the nature and scope of the individual Interrogatory and what is proportional to the needs of this case.  Unless otherwise specified—as WDP has, for example, with respect to Interrogatories seeking financial information—WDP limits its responses to the timeframe of October 1, 1999 to June 28, 2003 (the "Relevant Timeframe").

4.      WDP objects to each and every Interrogatory, definition, and instruction to the extent that it seeks information or documents protected by the attorney-client privilege, work product doctrine, or any other applicable law, privilege, immunity, protection, or doctrine.  WDP claims such privileges and protections to the extent implicated by each Interrogatory, and excludes privileged and protected information from its responses.  The production of any privileged information or document by WDP is unintentional, and any such inadvertent production shall not be construed as a waiver of any applicable objection or privilege.

5.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it calls for a legal conclusion.  Any response by WDP shall not be construed as providing a legal conclusion regarding the meaning or application of any terms or phrases used in Plaintiffs' Interrogatories, definitions, or instructions.

6.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it seeks information or documents already in the possession of or more readily available to Plaintiffs, that are equally available to Plaintiffs as they are to WDP, or that could be derived or ascertained by Plaintiffs with substantially the same effort that would be required of WDP.

7.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it seeks information or documents not within WDP's possession, custody, or control.

8.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it is unreasonably cumulative or duplicative.

9.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it seeks any confidential, proprietary, competitively sensitive, trade secret information, financial information, or any other information or documents that WDP is not permitted to disclose pursuant to confidentiality or other legal obligations to third parties.

10.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it contains subparts or a compound, conjunctive, or disjunctive request.

11.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it calls for WDP to form and then render an expert opinion.

12.     WDP objects to each and every Interrogatory, definition, and instruction to the extent that it is argumentative.

13.    WDP objects to each and every Interrogatory, definition, and instruction to the extent that it is speculative, lacks foundation, or contains characterizations, definitions, or assumptions.  Nothing contained in or absent from WDP's responses, objections, or production shall constitute, or be deemed as, an admission, concession, or agreement that Plaintiffs' characterizations, definitions, or assumptions are correct or accurate.

14.    WDP objects to each and every Interrogatory, definition, and instruction to the extent that it purports to require WDP to compile information in a manner that is not maintained in the ordinary course of business, or to create documents, including but not limited to charts, tables, reviews, proposals, methodologies, and/or breakdowns, that do not already exist.

15.    WDP objects to each and every Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent that it calls for the production of "all" documents and/or communications concerning a subject matter, without regard to whether the documents are likely to be privileged, duplicative, and/or have any (or minimal) connection to the claims or defenses at issue in this case.

16.    WDP objects to each and every Interrogatory to the extent it seeks discovery of documents or electronically stored information from sources that are not reasonably accessible in light of the burdens or costs required to locate, restore, review and produce whatever responsive information may be found.  To the extent that any Interrogatory requires the identification or production of email currently in electronic form, or any other electronic communications or electronically stored information, and WDP agrees to conduct a search of media reasonably likely to contain the same, WDP will search readily accessible email or other electronic media in relation to individual custodians or other sources likely to have responsive documents.  WDP will not search emails that are inaccessible or that are overly burdensome to restore and/or search (e.g., disaster recovery tapes), or other media

1    containing electronically stored information that are inaccessible or unduly

2    burdensome to search.

3    **OBJECTIONS TO PLAINTIFFS' DEFINITIONS AND INSTRUCTIONS**

4          1.     WDP's responses, regardless of whether they include a specific

5    objection, do not constitute an adoption or acceptance of the definitions and

6    instructions that Plaintiffs seeks to impose.

7          2.     For clarity, WDP shall refer to "Pirates of the Caribbean film" *Pirates*

8    *of the Caribbean: The Curse of the Black Pearl* (2003), as Film or *The Curse*;

9    Plaintiffs' "Pirates of the Caribbean screenplay" as Screenplay; and the "Pirates of

10   the Caribbean ride" as the Ride.

11         3.     According to Plaintiffs' definition, the term "Pirates of the Caribbean

12   franchise" would encompass any "work, product, film, book, or similar" and any

13   "sales, licensing, or royalties related thereto" created by anyone after 2003, whether

14   or not related in any way to the Film or WDP.  WDP objects to the defined term

15   "Pirates of the Caribbean franchise" and to each and every Interrogatory containing

16   that term, on the ground that it is vague and ambiguous to the extent it purports to

17   include any work, product, film, book, sales, licensing, royalties, or other elements

18   besides *The Curse* and the four films: *Pirates of the Caribbean: Dead Man's Chest*,

19   *Pirates of the Caribbean: At World's End*, *Pirates of the Caribbean: On Stranger*

20   *Tides*, and *Pirates of the Caribbean: Dead Men Tell No Tales* (together, herein, the

21   "Four Film Sequels").  Thus, to the extent WDP's responses and objections use the

22   term "Pirates of the Caribbean franchise," that term shall only refer to *Pirates of the*

23   *Caribbean: The Curse of the Black Pearl*; *Pirates of the Caribbean: Dead Man's*

24   *Chest*, *Pirates of the Caribbean: At World's End*, *Pirates of the Caribbean: On*

25   *Stranger Tides*, and *Pirates of the Caribbean: Dead Men Tell No Tales*.

26         4.     WDP objects to the defined terms "document" and "documents" and to

27   each and every Interrogatory containing those terms, to the extent the definition

28   seeks to impose an obligation beyond Federal Rule of Civil Procedure 34(a).  WDP

1  will construe these terms in accordance with the Federal Rules of Civil Procedure,

2  the Local Rules, and Orders of this Court.

3       5.     WDP objects to the defined terms "communication" and

4  "communications" and to each and every Interrogatory containing those terms, on

5  the ground that they are vague, ambiguous, overly broad, unduly burdensome, and

6  not proportional to the needs of this case to the extent that these terms purport to

7  impose an obligation beyond Federal Rule of Civil Procedure 34(a) and to the extent

8  these terms are duplicative and cumulative of the defined terms "document" and

9  "documents."  WDP will construe these terms in accordance with the Federal Rules

10  of Civil Procedure, the Local Rules, and Orders of this Court.

11       6.     WDP objects to the defined term "relating to" and to each and every

12  Interrogatory containing that term, on the ground that it is vague, ambiguous, overly

13  broad, and unduly burdensome, and to the extent it requires WDP to speculate as to

14  whether documents "relate" the topic specified.  WDP will construe this term in

15  accordance with its plain English meaning.

16       7.     WDP objects to the defined terms "person" and "persons" and to each

17  and every Interrogatory containing those terms, on the ground that they are vague,

18  ambiguous, overly broad, unduly burdensome, and not proportional to the needs of

19  this case.  WDP will construe these terms in accordance with their plain English

20  meaning.

21       8.     WDP objects to Instruction 14 to the extent it is overly burdensome and

22  imposes obligations beyond those imposed by the Federal Rules of Civil Procedure.

23  WDP will not provide a privilege log in response to these interrogatories to the

24  extent that privileged documents involve litigation related to the Film.  WDP is

25  willing to meet and confer regarding a proportional privilege log.

26       9.     WDP objects to Instruction 15 to the extent it is overly burdensome and

27  imposes obligations beyond those required by Rule 26(e).  WDP will supplement

28  responses as indicated herein, but will not undertake to supplement such responses

1   after the close of discovery.

2   **SPECIFIC OBJECTIONS AND RESPONSES TO INTERROGATORIES**

3   **INTERROGATORY NO. 1:**

4   Identify each individual at or affiliated with Disney who had access to or

5   reviewed Plaintiffs' Pirates of the Caribbean screenplay before the release of the

6   Pirates of the Caribbean film.

7   **RESPONSE TO INTERROGATORY NO. 1:**

8   WDP incorporates its Prefatory Statement, General Objections, and

9   Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

10  Interrogatory insofar as the term "access" is vague and ambiguous and calls for a

11  legal conclusion.  WDP construes "access" to the Screenplay in this Interrogatory to

12  mean receipt of the Screenplay.

13  Subject to and without waiving the foregoing objections, WDP responds as

14  follows:  Brigham Taylor had access to the Screenplay, as did his assistant.  Further,

15  some within WDP's Development department at the time of submission had access

16  to and/or reviewed the Screenplay for the purpose of script coverage of the

17  Screenplay.

18  WDP's investigation is ongoing, and it reserves the right to supplement this

19  response.

20  **INTERROGATORY NO. 2:**

21  Identify by bates number each document that pre-dates the release of the

22  Pirates of the Caribbean film that relates to (1) the Plaintiffs or Tova Laiter, and (2)

23  Pirates of the Caribbean or Plaintiffs' screenplay entitled Red Hood.

24  **RESPONSE TO INTERROGATORY NO. 2:**

25  WDP incorporates its Prefatory Statement, General Objections, and

26  Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

27  Interrogatory as overly broad, unduly burdensome, and not proportional to the needs

28  of this case to the extent it seeks information that is not related to the Screenplay or

1  the screenplay entitled Red Hood, and/or is equally ascertainable to Plaintiffs

2  through reasonable search of the documents that WDP will produce and/or that are

3  in Plaintiffs' possession.  WDP further objects that the phrase "Pirates of the

4  Caribbean" is vague and ambiguous as to whether it refers to the Screenplay, the

5  Film, or something else entirely.  WDP interprets the phrase to mean Plaintiffs'

6  Screenplay.  WDP further objects to this Interrogatory on the ground that the request

7  to identify by bates number is unduly burdensome and seeks to impose obligations

8  on WDP that are in excess of those imposed by the Federal Rules of Civil

9  Procedure, the Local Rules, and Orders of this Court.

10      Subject to and without waiving the foregoing objections, WDP responds as

11 follows: WDP directs Plaintiffs to its forthcoming document production, which will

12 include non-privileged documents, if any, that are located after a reasonably diligent

13 search and responsive to Plaintiffs' Request for Production of Documents in the

14 same categories as set forth in this Interrogatory.

15      WDP's investigation is ongoing, and it reserves the right to supplement this

16 response.

17 **INTERROGATORY NO. 3:**

18      Identify each draft script, storyboard, outline, and treatment relating to

19 Disney's conception and development of the Pirates of the Caribbean film, including

20 the author(s), date, and bates numbers for each respective script, storyboard, outline,

21 and treatment.

22 **RESPONSE TO INTERROGATORY NO. 3:**

23      WDP incorporates its Prefatory Statement, General Objections, and

24 Objections to Plaintiffs' Definitions and Instructions.  WDP further objects that the

25 terms "draft," "script," "storyboard," "outline," and "treatment" are vague and

26 ambiguous, in part because the terms mean different things to different people, even

27 within the motion picture industry.  WDP construes the term "treatment" to refer to

28 a written description of a story idea that is not in screenplay or similar form.  WDP

construes the term "script" to refer to the written text of a screenplay.  WDP further objects that the terms "draft," "script," "storyboard," "outline," and "treatment" are vague and ambiguous because no clear line differentiates when changes, edits, or revisions to a script, storyboard, outline, or treatment constitutes a new "draft." WDP further objects to this Interrogatory as overly broad, unduly burdensome, and not proportional to the needs of this case to the extent it seeks information that is equally ascertainable to Plaintiffs through reasonable search of the documents that WDP will produce.

Subject to and without waiving the foregoing objections, WDP responds as follows: WDP identifies the following treatments and draft scripts:

- Brigham Taylor, Michael Haines, and Josh Harmon treatment, 7/8/2000
- Jay Wolpert draft script, 5/1/2001
- Jay Wolpert draft script, 7/20/2001
- Jay Wolpert draft script, 8/28/2001
- Treatment, 9/28/2001
- Stuart Beattie draft script, 11/2/2001
- Stuart Beattie draft script, 11/9/2001
- Stuart Beattie draft script, 2/22/2002
- Stuart Beattie draft script, 4/5/2002
- Terry Rossio and Ted Elliot treatment, 5/16/2002
- Terry Rossio and Ted Elliot draft script, 5/24/2002
- Terry Rossio and Ted Elliot draft script, 7/3/2002
- Terry Rossio and Ted Elliot draft script, 8/14/2002
- Terry Rossio and Ted Elliot draft script, 9/1/2002
- Terry Rossio and Ted Elliot script, 3/3/2003

For associated Bates numbers, WDP directs Plaintiffs to its forthcoming document production.

1    WDP's investigation is ongoing, and WDP reserves the right to supplement

2    this response.

3    **INTERROGATORY NO. 4:**

4    Describe in detail each independent conception, consideration, or analysis at

5    Disney of any idea for a potential film relating to the Pirates of the Caribbean ride

6    before the release of the Pirates of the Caribbean film, including the individuals

7    involved, the date(s), and a summary of the idea.

8    **RESPONSE TO INTERROGATORY NO. 4:**

9    WDP incorporates its Prefatory Statement, General Objections, and

10   Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

11   Interrogatory insofar as describing WDP's "independent conception, consideration,

12   or analysis" is vague, ambiguous, and calls for a legal conclusion.  WDP further

13   objects to the extent this Interrogatory is overly broad, unduly burdensome, and not

14   proportional to the needs of this case insofar as it seeks "any" idea for a potential

15   film "relating to" the Ride, and will respond with descriptions of ideas for potential

16   films relating to the Ride that it identified after a reasonably diligent inquiry.  WDP

17   further objects to the phrase "summary of the idea," as it is subject to multiple

18   interpretations.

19   Subject to and without waiving the foregoing objections, WDP responds as

20   follows: In the mid-1990s, WDP considered a direct-to-video children's project

21   titled *Pirates of the Caribbean* based on the Ride.  In the same time period, WDP

22   considered an animated children's television series based on the Ride.

23   In 1992, Terry Rossio and Ted Elliott developed and pitched to WDP an idea

24   for a *Pirates of the Caribbean* movie that included elements drawn from the Ride.

25   In 2000, Brigham Taylor, vice president of production; Michael Haines, a

26   creative executive; and Josh Harmon, a veteran story department employee, held

27   regular story sessions during which they would meet to discuss feature length

28   movies they would like to see developed.  During these sessions, Taylor, Haines,

1  and Harmon discussed the idea of a pirate feature length movie titled *Pirates of the*
2  *Caribbean*, based on the Ride.  The three individuals worked to develop the first
3  draft of the treatment of the film that became *The Curse*.

4      WDP also directs Plaintiffs to its forthcoming document production, which
5  will include non-privileged documents, if any, that are located after a reasonably
6  diligent search and responsive to Plaintiffs' Request for Production of Documents in
7  the same categories as set forth in this Interrogatory.

8      WDP's investigation is ongoing, and WDP reserves the right to supplement
9  this response.

10 **INTERROGATORY NO. 5:**

11     Identify who at, and on what date, Disney conceived of the concept for the
12 Pirates of the Caribbean film and identify by bates numbers documents which
13 corroborate that conception.

14 **RESPONSE TO INTERROGATORY NO. 5:**

15     WDP incorporates its Prefatory Statement, General Objections, and
16 Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this
17 Interrogatory as vague and ambiguous insofar as it seeks the identity of individuals
18 who "conceived of the concept" of the Film.  The Film is based on innumerable
19 "concepts," some of which include stock elements of the pirate genre going back
20 decades or longer, and some of which related to the creation of the Ride in the
21 1960s.  WDP further objects to this Interrogatory on the ground that the request to
22 identify corroborating documents by bates number is unduly burdensome and seeks
23 to impose obligations on WDP that are in excess of those imposed by the Federal
24 Rules of Civil Procedure, the Local Rules, and Orders of this Court.

25     Subject to and without waiving the foregoing objections, WDP responds as
26 follows: In approximately early-to-mid 2000, Brigham Taylor, Michael Haines, and
27 Josh Harmon worked to develop a written treatment for a feature *Pirates of the*
28 *Caribbean* motion picture.  On July 8, 2000, Taylor, Haines, and Harmon sent that

1  treatment to Nina Jacobson. That treatment led to the development of scripts

2  identified in WDP's response to Interrogatory No. 3, which relate to *The Curse*.

3       WDP directs Plaintiffs to its forthcoming document production, which will

4  include non-privileged documents, if any, that are located after a reasonably diligent

5  search and responsive to Plaintiffs' Request for Production of Documents in the

6  same categories as set forth in this Interrogatory.

7       WDP's investigation is ongoing, and WDP reserves the right to supplement

8  this response.

9  **INTERROGATORY NO. 6:**

10       Identify each person with whom you or your representatives shared the first

11  draft treatment, outline, or script of the Pirates of the Caribbean film.

12  **RESPONSE TO INTERROGATORY NO. 6:**

13       WDP incorporates its Prefatory Statement, General Objections, and

14  Objections to Plaintiffs' Definitions and Instructions. WDP further objects that the

15  phrase "first draft treatment, outline, or script" is vague and ambiguous, in part

16  because the terms "treatment," "outline," or "script" mean different things to

17  different people, even within the motion picture industry. WDP construes the term

18  "treatment" to refer to a description of a story idea that is not in screenplay or other

19  form. WDP further objects that this Interrogatory is compound, as the first person

20  with whom WDP shared the "first draft treatment" may be different from the first

21  person with whom WDP shared the first "script," and will depend on how those

22  terms are defined. WDP construes this Interrogatory to seek identification of the

23  persons with whom WDP shared the first treatment, outline, or script—whichever

24  existed first—of the Film.

25       Subject to and without waiving the foregoing objections, WDP responds as

26  follows: Brigham Taylor, Michael Haines, and Josh Harmon prepared the first draft

27  treatment of a feature length motion picture that would become *The Curse.* They

28  shared the draft treatment with Nina Jacobson, then President of Buena Vista

1  Motion Pictures Group, on July 8, 2000.  On approximately July 10, 2000, Jacobson
2  authorized Taylor, Haines, and Harmon to identify a screenwriter to develop the
3  treatment into a full screenplay.  Taylor, Haines, and Harmon selected Jay Wolpert
4  to prepare the full screenplay, and also shared the treatment with Wolpert.

5       WDP's investigation is ongoing, and WDP reserves the right to supplement
6  this response.

7  **INTERROGATORY NO. 7:**

8       Identify all documents or information provided to Jerry Bruckheimer (or his
9  executive team), and all communications about, his (or his team's) consideration of
10  a potential film about the Pirates of the Caribbean, as referenced for example on
11  pages 116 and 118 of Surrell's book.

12  **RESPONSE TO INTERROGATORY NO. 7:**

13       WDP incorporates its Prefatory Statement, General Objections, and
14  Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to the
15  extent this Request seeks information not in WDP's possession, custody, or control.
16  WDP further objects to this Interrogatory as overly broad, unduly burdensome, not
17  proportional to the needs of this case to the extent it seeks information that is
18  equally ascertainable to Plaintiffs through a reasonable search of the records
19  produced by WDP.  WDP further objects that the term "consideration of" is vague
20  and ambiguous, as the term is susceptible to multiple interpretations.  WDP further
21  objects to this Interrogatory as not relevant to any party's claims or defenses.

22       Subject to and without waiving the foregoing objections, WDP responds as
23  follows: WDP directs Plaintiffs to its forthcoming document production, which will
24  include non-privileged documents, if any, that are located after a reasonably diligent
25  search and responsive to Plaintiffs' Request for Production of Documents in the
26  same categories as set forth in this Interrogatory.  On the basis of its objections,
27  WDP will not otherwise respond to this Interrogatory.

28

1    WDP's investigation is ongoing, and WDP reserves the right to supplement

2    this response.

3    **INTERROGATORY NO. 8:**

4    Identify each pirate film, book, or work that Disney was aware of before 2000

5    that featured both humorous and supernatural elements in the respective film, book,

6    or work.

7    **RESPONSE TO INTERROGATORY NO. 8:**

8    WDP incorporates its Prefatory Statement, General Objections, and

9    Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to the

10   phrase "Disney was aware of" as vague and ambiguous in reference to a non-human

11   entity.  WDP further objects to this Interrogatory as overly broad, unduly

12   burdensome, not proportional to the needs of this case, and not relevant to any

13   party's claims or defenses insofar as it seeks identification of each "pirate film,

14   book, or work" that "Disney was aware of" before 2000, as pirate works have been

15   ubiquitous for decades, and indeed WDP produced pirate works itself before 2000,

16   including but not limited to the Ride and at least two motion pictures.  It is also

17   irrelevant to the merits of any party's claims or defenses, insofar as the

18   determination of what elements of a pirate story are generic is the subject of expert

19   evidence, some of which already has been provided by WDP.  WDP further objects

20   to the terms "humorous" and "supernatural" as vague and ambiguous.  WDP further

21   objects to this Interrogatory to the extent it seeks information that is voluminous and

22   occurred over many years.  WDP further objects to this Interrogatory to the extent it

23   calls for a legal conclusion.

24   Subject to and without waiving the foregoing objections, WDP responds as

25   follows: In preparing the treatment for the feature length film that ultimately became

26   *The Curse*, Brigham Taylor, Michael Haines, and Josh Harmon surveyed prior films

27   and literature in the pirate genre, including prior works with humorous and/or

28   supernatural elements.  Terry Rossio and Ted Elliott reviewed a large body of works

in the pirate genre both in preparing to pitch their *Pirates of the Caribbean* project in the 1990s and in revising the screenplay for *The Curse*, including works with humorous and/or supernatural elements.  Additionally, over the years, The Walt Disney Company and its affiliates have produced a variety of foundational pirate works, including works that inspired both the Screenplay and *The Curse,* and works that share common genre tropes with those works and/or humorous or supernatural elements, such as *Treasure Island* (1950) and *Peter Pan* (1953).

WDP also directs Plaintiffs to its forthcoming document production, which will include non-privileged documents, if any, that are located after a reasonably diligent search and responsive to Plaintiffs' Request for Production of Documents in the same categories as set forth in this Interrogatory.

WDP's investigation is ongoing, and WDP reserves the right to supplement this response.

**INTERROGATORY NO. 9:**

Describe in detail Brigham Taylor's role and involvement in the conception, development, and release of the Pirates of the Caribbean film.

**RESPONSE TO INTERROGATORY NO. 9:**

WDP incorporates its Prefatory Statement, General Objections, and Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this Interrogatory as premature as discovery is ongoing and Plaintiffs have requested Brigham Taylor's deposition.  WDP further objects to this Interrogatory insofar as the phrases "role and involvement" and "conception, development, and release" are vague and ambiguous.  WDP is willing to meet and confer regarding the information requested in this Interrogatory.

Subject to and without waiving the foregoing objections, WDP responds as follows: During his regular story sessions with Haines and Harmon in 2000, Brigham Taylor discussed the idea of creating a pirate feature length movie called *Pirates of the Caribbean.*  He, Haines, and Harmon continued developing the idea

1 inside and outside their regular story sessions over the course of several months.

2 Taylor worked closely with Haines and Harmon to develop a draft treatment, which

3 they shared with Nina Jacobson on July 8, 2000.

4 After Jacobson greenlit the project for further development, Taylor was

5 assigned to be the lead creative executive for the project.  In that role, Taylor

6 oversaw the project and acted as the liaison between the production team and the

7 studio.  Taylor was involved, for example, with hiring and casting decisions,

8 reviewing and providing feedback on draft scripts, visiting the set during

9 production, and supervising post-production.  Consistent with company practices of

10 not crediting the lead creative executive on its motion pictures, Taylor did not

11 receive a credit on *The Curse*.

12 WDP's investigation is ongoing, and WDP reserves the right to supplement

13 this response.

14 **INTERROGATORY NO. 10:**

15 Describe in detail Disney's knowledge and understanding in 2000 of the

16 material elements of a conventional or standard pirate story, including a list of films,

17 books, or works that Disney was aware of in 2000 that incorporated those elements.

18 **RESPONSE TO INTERROGATORY NO. 10:**

19 WDP incorporates its Prefatory Statement, General Objections, and

20 Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to the

21 phrase "material elements of a conventional or standard pirate story" as vague and

22 ambiguous, as the phrase is subject to multiple interpretations.  WDP further objects

23 to this Interrogatory to the extent it calls for a legal conclusion.  WDP further

24 objects to the phrase "knowledge and understanding" as vague and ambiguous in

25 reference to a non-human entity.  WDP further objects to this Interrogatory as overly

26 broad, unduly burdensome, not proportional to the needs of this case, and not

27 relevant to any party's claims or defenses insofar as it seeks a detailed description of

28 "*Disney's knowledge and understanding* in 2000 of the material elements of a

-17-

1 conventional or standard pirate story." It is also irrelevant to the merits of any

2 party's claims or defenses, insofar as the determination of what is a "material

3 element" of a "conventional or standard pirate story" is an objective determination.

4       Subject to and without waiving the foregoing objections, WDP responds as

5 follows: In preparing the treatment for the feature length film that ultimately became

6 *The Curse*, Brigham Taylor, Michael Haines, and Josh Harmon surveyed prior films

7 and literature in the pirate genre. Terry Rossio and Ted Elliott reviewed a large

8 body of works in the pirate genre both in preparing to pitch their *Pirates of the*

9 *Caribbean* project in the 1990s and in revising the screenplay for *The Curse*.

10 Additionally, The Walt Disney Company and its affiliates have produced a variety

11 of foundational pirate works, including works that inspired both the Screenplay and

12 *The Curse* and share common genre tropes with those works, such as *Treasure*

13 *Island* (1950) and *Peter Pan* (1953).

14       WDP also directs Plaintiffs to its forthcoming document production, which

15 will include non-privileged documents, if any, that are located after a reasonably

16 diligent search and responsive to Plaintiffs' Request for Production of Documents in

17 the same categories as set forth in this Interrogatory.

18       WDP's investigation is ongoing, and WDP reserves the right to supplement

19 this response.

20 **INTERROGATORY NO. 11:**

21       State Disney's gross revenue on an annual basis for the Pirates of the

22 Caribbean film.

23 **RESPONSE TO INTERROGATORY NO. 11:**

24       WDP incorporates its Prefatory Statement, General Objections, and

25 Objections to Plaintiffs' Definitions and Instructions. WDP further objects to this

26 Interrogatory as seeking highly-sensitive confidential business information. WDP

27 further objects to this Interrogatory as overly broad, unduly burdensome, not

28 proportional to the needs of this case, and not relevant to any party's claims or

defenses to the extent it seeks information regarding gross revenue pre-dating November 14, 2014.  WDP further objects to this Interrogatory insofar as the phrase "gross revenue . . . for the Pirates of the Caribbean film" is vague and ambiguous as to the revenue streams sought.  WDP construes this term to include *The Curse* revenues derived from domestic and international theatrical, physical retail, electronic home video ("EHV"), transactional video on demand ("TVOD"), pay TV, free/basic TV distribution, and other non-theatrical distribution.  WDP further objects that this Interrogatory calls for a legal conclusion, is premature, and the subject of expert testimony.

Subject to and without waiving the foregoing objections, WDP responds as follows: WDP directs Plaintiffs to the attached CONFIDENTIAL-ATTORNEYS EYES ONLY Exhibit A, which shows WDP's revenues for *The Curse* domestic and international theatrical, physical retail, electronic home video ("EHV"), transactional video on demand ("TVOD"), pay TV, and free/basic TV distribution as well as other non-theatrical distribution on an annual basis from October 2014 through the end of 2021.[2]

WDP's investigation is ongoing, and WDP reserves the right to supplement this response.

**INTERROGATORY NO. 12:**

State Disney's gross revenue on an annual basis for the Pirates of the Caribbean franchise.

**RESPONSE TO INTERROGATORY NO. 12:**

WDP incorporates its Prefatory Statement, General Objections, and Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

---

[2] By producing financial information from the fourth quarter of 2014, WDP expressly preserves and does not waive its objection that revenue information pre-dating November 14, 2014 is overly broad, unduly burdensome, not proportional to the needs of the case, and outside the relevant damages limitation period.

Interrogatory as seeking highly-sensitive confidential business information for tactical advantage, rather that evidentiary value.  WDP objects to the term "Pirates of the Caribbean franchise" on the ground that the term is vague and ambiguous to the extent it purports to include any work, product, film, book, sales, licensing, or royalties besides *The Curse* and Four Film Sequels.  As defined, the term would encompass any "work, product, film, book, or similar" and any "sales, licensing, or royalties related thereto" created by anyone after 2003, whether or not related in any way to *The Curse* or WDP.  WDP further objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of this case, and not relevant to any party's claims or defenses to the extent it seeks information regarding gross revenue derived from any works besides *The Curse*.  Plaintiffs have not provided any facts to support any basis for claiming infringement for the Four Film Sequels or damages contentions sufficient to show the relevance of this Interrogatory.  In response to WDP counsel's January 25, 2022 email request for information regarding the relevance of this and similar requests, Plaintiffs' counsel stated vaguely that these requests "relate to damages for Disney's infringement" and "relate[] to Disney's indirect profits."  WDP further objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of this case, and not relevant to any party's claims or defenses to the extent it seeks information regarding gross revenue pre-dating November 14, 2014.  WDP further objects to this Interrogatory insofar as "gross revenue . . . for the Pirates of the Caribbean franchise" is vague and ambiguous as to the revenue streams sought.  WDP further objects that this Interrogatory calls for a legal conclusion, is premature, and the subject of expert testimony.

Subject to and without waiving the foregoing objections, WDP responds as follows: WDP refers Plaintiffs to its response to Interrogatory No. 11 regarding gross revenues for *The Curse*.  With respect to gross revenue information for any of the Four Film Sequels or any other works sought by this request, WDP will not

DEF.'S RESPONSES AND OBJECTIONS TO FIRST SET OF INTERROGATORIES

1  respond on the basis of its objections.  WDP is willing to meet and confer with

2  Plaintiffs regarding this Interrogatory.

3  **INTERROGATORY NO. 13:**

4       State Disney's costs and expenses on an annual basis for the Pirates of the

5  Caribbean film.

6  **RESPONSE TO INTERROGATORY NO. 13:**

7       WDP incorporates its Prefatory Statement, General Objections, and

8  Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

9  Interrogatory as seeking highly-sensitive confidential business information.  WDP

10  further objects to this Interrogatory as overly broad, unduly burdensome, not

11  proportional to the needs of this case, and not relevant to any party's claims or

12  defenses to the extent it seeks information regarding costs and expenses pre-dating

13  November 14, 2014.  WDP further objects to this Interrogatory insofar as the phrase

14  "costs and expenses . . . for the Pirates of the Caribbean film" is vague and

15  ambiguous as to the categories of costs and expenses sought.  WDP construes this

16  term to include *The Curse* costs and expenses incurred from domestic and

17  international theatrical, physical retail, electronic home video ("EHV"),

18  transactional video on demand ("TVOD"), pay TV, and free/basic TV distribution;

19  other non-theatrical revenues; distribution overhead; residuals; participation; and

20  production costs.  WDP further objects that this Interrogatory calls for a legal

21  conclusion, is premature, and the subject of expert testimony.

22       Subject to and without waiving the foregoing objections, WDP responds as

23  follows: WDP directs Plaintiffs to the attached CONFIDENTIAL-ATTORNEYS

24  EYES ONLY Exhibit A, which shows WDP's costs and expenses incurred from *The*

25  *Curse* domestic and international theatrical, physical retail, electronic home video

26  ("EHV"), transactional video on demand ("TVOD"), pay TV, and free/basic TV

27  distribution; other non-theatrical distribution; distribution overhead; residuals;

28  participation; and production costs on an annual basis from October 2014 through

1   the end of 2021.[3]  WDP's investigation is ongoing, and WDP reserves the right to

2   supplement this response.

3   **INTERROGATORY NO. 14:**

4       State Disney's costs and expenses on an annual basis for the Pirates of the

5   Caribbean franchise.

6   **RESPONSE TO INTERROGATORY NO. 14:**

7       WDP incorporates its Prefatory Statement, General Objections, and

8   Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

9   Interrogatory as seeking highly-sensitive confidential business information for

10  tactical advantage, rather that evidentiary value.  WDP objects to the term "Pirates

11  of the Caribbean franchise" on the ground that the term is vague and ambiguous to

12  the extent it purports to include any work, product, film, book, sales, licensing, or

13  royalties besides *The Curse* and Four Film Sequels.  As defined, the term would

14  encompass any "work, product, film, book, or similar" and any "sales, licensing, or

15  royalties related thereto" created by anyone after 2003, whether or not related in any

16  way to *The Curse* or WDP.  WDP further objects to this Interrogatory as overly

17  broad, unduly burdensome, not proportional to the needs of this case, and not

18  relevant to any party's claims or defenses to the extent it seeks information

19  regarding costs and expenses related to any works besides *The Curse*.  Plaintiffs

20  have not provided any facts to support any basis for claiming infringement for the

21  Four Film Sequels or damages contentions sufficient to show the relevance of this

22  Interrogatory.  In response to WDP counsel's January 25, 2022 email request for

23  information regarding the relevance of this and similar requests, Plaintiffs' counsel

24

25  _____

    [3] By producing financial information from the fourth quarter of 2014, WDP
26  expressly preserves and does not waive its objection that costs and expenses
    information pre-dating November 14, 2014 is overly broad, unduly burdensome, not
27  proportional to the needs of the case, and outside the relevant damages limitation
    period.

28

stated vaguely that these requests "relate to damages for Disney's infringement" and "relate[] to Disney's indirect profits."  WDP further objects to this Interrogatory as overly broad, unduly burdensome, not proportional to the needs of this case, and not relevant to any party's claims or defenses to the extent it seeks information regarding costs and expenses pre-dating November 14, 2014.  WDP further objects to this Interrogatory insofar as "costs and expenses . . . for the Pirates of the Caribbean franchise" is vague and ambiguous as to the categories of costs and expenses sought.  WDP further objects that this Interrogatory calls for a legal conclusion, is premature, and the subject of expert testimony.

Subject to and without waiving the foregoing objections, WDP responds as follows: WDP refers Plaintiffs to its response to Interrogatory No. 13 regarding costs and expenses for *The Curse.*  With respect to costs and expenses information for any of the Four Film Sequels or any other works sought by this Interrogatory, WDP will not respond on the basis of its objections.  WDP is willing to meet and confer with Plaintiffs regarding this Interrogatory.

**INTERROGATORY NO. 15:**

State Disney's contention as to any apportioned values of the Pirates of the Caribbean film, including a description of Disney's method for apportionment and an identification of any documents relating to that contention.

**RESPONSE TO INTERROGATORY NO. 15:**

WDP incorporates its Prefatory Statement, General Objections, and Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this Interrogatory as seeking highly-sensitive confidential business information.  WDP objects to the extent this request seeks any documents or information protected by the attorney-client privilege, the work-product doctrine, or any analogous privilege or protection from discovery.  WDP further objects to this Interrogatory insofar as the phrases "any apportioned values of the Pirates of the Caribbean film" and "method for apportionment" are vague and ambiguous.  WDP does not understand

1  what is meant by these phrases.  To the extent this Interrogatory asks WDP to state

2  its position regarding the amount of any profits that should be apportioned to

3  allegedly infringing or non-infringing aspects of the Film, then WDP objects that

4  this Interrogatory calls for a legal conclusion, is premature, and the subject of expert

5  testimony.  *Polar Bear Prods, Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir.

6  2004).  WDP further objects to this Interrogatory as overly broad, unduly

7  burdensome, not proportional to the needs of this case, and not relevant to any

8  party's claims or defenses to the extent it seeks information regarding "any

9  apportioned values" of any profits pre-dating November 14, 2014.

10      On the basis of its objections, WDP will not respond to this Interrogatory.

11  WDP is willing to meet and confer with Plaintiffs regarding this Interrogatory.

12  **INTERROGATORY NO. 16:**

13      Describe in detail all sources of revenue that are based upon the Pirates of the

14  Caribbean film, including, without limitation, royalties, license fees, or sales derived

15  from merchandise or other products.

16  **RESPONSE TO INTERROGATORY NO. 16:**

17      WDP incorporates its Prefatory Statement, General Objections, and

18  Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this

19  Interrogatory as overly broad, unduly burdensome, not proportional to the needs of

20  this case, and not relevant to any party's claims or defenses to the extent it seeks

21  information relating to sources of revenue pre-dating November 14, 2014.  WDP

22  further objects to this Interrogatory as overly broad, unduly burdensome, not

23  proportional to the needs of this case, and not relevant to any party's claims or

24  defenses insofar as it seeks information regarding sources of revenue from "sales

25  derived from merchandise or other products."  Plaintiffs have not provided

26  information regarding their damages contentions sufficient to show the relevance of

27  information regarding such revenue.  WDP further objects that the phrase "all

28  sources of revenue that are *based upon* the Pirates of the Caribbean film" is vague

1  and ambiguous, as the phrase is subject to multiple interpretations. WDP construes

2  this phrase to refer to the revenues derived from *The Curse* domestic and

3  international theatrical, physical retail, electronic home video ("EHV"),

4  transactional video on demand ("TVOD"), pay TV, free/basic TV distribution, and

5  other non-theatrical distribution. WDP further objects to the terms "royalties,"

6  "license fees," or "sales derived from merchandise or other products" as vague and

7  ambiguous. WDP further objects that this Interrogatory calls for a legal conclusion,

8  is premature, and the subject of expert testimony.

9        Subject to and without waiving the foregoing objections, WDP responds as

10  follows: WDP directs Plaintiffs to the attached CONFIDENTIAL-ATTORNEYS

11  EYES ONLY Exhibit A, which shows WDP's revenues for *The Curse* domestic and

12  international theatrical, physical retail, electronic home video ("EHV"),

13  transactional video on demand ("TVOD"), pay TV, and free/basic TV distribution

14  as well as other non-theatrical distribution. WDP's investigation is ongoing, and

15  WDP reserves the right to supplement this response.

16  **INTERROGATORY NO. 17:**

17        Describe each material change to the Pirates of the Caribbean ride after its

18  inception and before the release of the Pirates of the Caribbean film.

19  **RESPONSE TO INTERROGATORY NO. 17:**

20        WDP incorporates its Prefatory Statement, General Objections, and

21  Objections to Plaintiffs' Definitions and Instructions. WDP further objects to this

22  Interrogatory as overly broad, unduly burdensome, not proportional to the needs of

23  this case, and not relevant to any party's claims or defenses to the extent it seeks

24  information that involved at least dozens of individuals and took place over an

25  extended period of time of more than 35 years. WDP further objects to this Request

26  to the extent the time period and scope of this Request are not relevant to any party's

27  claims or defenses. WDP further objects to this Interrogatory on the ground that the

28  phrase "material change" is vague and ambiguous. WDP interprets the phrase

"material change" to refer to a change to the Ride that implicates those elements of the Ride that also appear in either the Screenplay or *The Curse*.

Subject to and without waiving the foregoing objections, WDP responds as follows: WDP is not currently aware of any "material change" to the Ride from the date of its inception to the date of the release of *The Curse*.

WDP's investigation is ongoing, and WDP reserves the right to supplement this response.

**INTERROGATORY NO. 18:**

State the basis for Disney's contention that Plaintiffs acted with unclean hands.

**RESPONSE TO INTERROGATORY NO. 18:**

WDP incorporates its Prefatory Statement, General Objections, and Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this Interrogatory as premature as discovery is ongoing.  WDP further objects to this Interrogatory on the ground that it calls for a legal conclusion, expert testimony, or information that may be developed through expert discovery.

Subject to and without waiving the foregoing objections, WDP responds as follows: Plaintiffs, without authorization, created a derivative work and therefore misappropriated WDP's intellectual property, including but not limited to elements of the Ride, in the alleged creation of Plaintiffs' Screenplay.

WDP's investigation is ongoing, and WDP reserves the right to supplement this response.

**INTERROGATORY NO. 19:**

State the basis for Disney's contention that Plaintiffs are equitably estopped.

**RESPONSE TO INTERROGATORY NO. 19:**

WDP incorporates its Prefatory Statement, General Objections, and Objections to Plaintiffs' Definitions and Instructions.  WDP further objects to this Interrogatory as premature as discovery is ongoing.  WDP further objects to this

Interrogatory on the ground that it calls for a legal conclusion, expert testimony, or information that may be developed through expert discovery.

Subject to and without waiving the foregoing objections, WDP responds as follows: After an extensive marketing campaign, *The Curse* premiered in June 2003. It was widely distributed in theaters across the United States and worldwide and watched by millions of viewers.  Nevertheless, Plaintiffs waited over 11 years before filing suit on November 14, 2014.  Plaintiffs, without authorization, created a derivative work and therefore misappropriated WDP's intellectual property, including but not limited to elements of the Ride, in the alleged creation of Plaintiffs' Screenplay.

WDP's investigation is ongoing, and WDP reserves the right to supplement this response.

DATED:  February 4, 2022          MUNGER, TOLLES & OLSON LLP


By: _____
      JULIANA M. YEE
Attorneys for Defendant Walt Disney Pictures