1  KELLY M. KLAUS (SBN 161091)
   kelly.klaus@mto.com
2  JORDAN D. SEGALL (State Bar No. 281102)
   jordan.segall@mto.com
3  ROSE L. EHLER (State Bar No. 296523)
   rose.ehler@mto.com
4  JULIANA M. YEE (State Bar No. 304564)
   juliana.yee@mto.com
5  ROBIN S. GRAY (State Bar No. 316544)
   robin.gray@mto.com
6  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue, 50th Floor
7  Los Angeles, California 90071-3426
   Telephone:  (213) 683-9100
8  Facsimile:   (213) 687-3702

9  *Attorneys for Defendant Walt Disney
   Pictures*

10

11                  **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT OF CALIFORNIA**

13

14  ARTHUR LEE ALFRED, II et al.,        | Case No. 2:18-CV-08074-CBM-ASx

15             Plaintiffs,               | **DISCOVERY MOTION**

16         v.                            | **DECLARATION OF JORDAN D. SEGALL IN SUPPORT OF JOINT STIPULATION REGARDING DEFENDANT'S MOTION TO COMPEL RESPONSES TO CONTENTION INTERROGATORIES**
17  WALT DISNEY PICTURES,
18             Defendant,
19

20                                       | Judge:  Hon. Alka Sagar

21                                       | Hearing Date:   April 26, 2022
22                                       | Time:            10:00 a.m.
                                         | Place:           Roybal Ctrm. 540
23
24                                       | Pretrial Conf.:   January 9, 2023
                                         | Trial Date:       February 7, 2023
25                                       | Discovery Cutoff: June 27, 2022
26

27

28

## <u>DECLARATION OF JORDAN D. SEGALL</u>

I, Jordan D. Segall, hereby declare:

1.      I am admitted to practice before all of the courts of the State of California and this Court.  I am an attorney at the law firm of Munger, Tolles & Olson LLP and counsel of record for Defendant Walt Disney Pictures in the above-captioned matter.  I have personal knowledge of the facts set forth in this declaration, and, if called as a witness, I could and would testify competently to the matters set forth herein

2.      Attached here as **Exhibit 1** is a correct copy of the Court's May 25, 2021 scheduling order (Dkt. 145).  The scheduling order has not been amended since it was entered.

3.      Attached here as **Exhibit 2** is a correct copy of Plaintiffs' Answers to Defendant's First Set of Interrogatories, which Plaintiffs served in this action on February 17, 2022.

4.      The district court dismissed Plaintiffs' original complaint with prejudice on the ground that the works at issue—Plaintiffs' Screenplay and WDP's motion picture *Pirates of the Caribbean: The Curse of the Black Pearl*—were not substantially similar as a matter of law.  The Ninth Circuit reversed the district court's judgment and remanded the case.  Following remand, WDP's counsel explained to Plaintiffs' counsel that WDP intended to renew via an early summary judgment motion its argument that the works are not substantially similar as a matter of law, once the parties had developed the expert evidence that the Ninth Circuit stated could help inform the district court's analysis of  substantial similarity.

5.      To avoid costly and burdensome fact discovery that was not necessary to the resolution of WDP's summary judgment motion on substantial similarity, WDP proposed that the parties stipulate to bifurcate discovery into two phases, with discovery in phase 1 limited to expert discovery on substantial similarity, and fact discovery on all issues taking place in phase 2 if the case proceeded beyond

-1-

summary judgment.  Plaintiffs agreed, and the parties drafted and filed a joint stipulation proposing that discovery be bifurcated.

6.     Attached here as **Exhibit 3** is a correct copy of the parties' joint Stipulation Regarding [1] Dismissal of Defendants; [2] Bifurcation of Discovery; [3] Motion Practice and ADR (Dkt. 121), which was filed in this action on January 14, 2021.

7.     Attached here as **Exhibit 4** is a correct copy of the Court's Order Granting Stipulation Regarding [1] Dismissal of Defendants; [2] Bifurcation of Discovery; [3] Motion Practice and ADR [121] (Dkt. 122), which the Court entered in this action on January 19, 2021.

8.     Attached here as **Exhibit 5** is a correct copy of Plaintiffs' original Complaint and Jury Demand (Dkt. 1), which Plaintiffs filed in the District of Colorado in this action on November 14, 2017.

9.     Attached here as **Exhibit 6** is a correct copy of Plaintiffs' *First Amended* Complaint for Damages for: 1. Copyright Infringement (Film & Derivative Works) (Dkt. 112), which Plaintiffs filed in this action on November 30, 2020.

10.    Following the entry of the Court's order bifurcating discovery, the parties exchanged expert reports on substantial similarity, and both sides took a deposition of the other side's expert witness.

11.    Attached here as **Exhibit 7** is a correct copy of the expert report of Plaintiffs' expert on substantial similarity, David Román (Dkt. 112-6), which Plaintiffs filed in this action on November 30, 2020.

12.    Attached here as **Exhibit 8** is a correct copy of the Court's Order Re: Defendants' Motion to Dismiss Plaintiffs' Complaint [JS-6] (Dkt. 93), dismissing the original complaint without leave to amend, which the Court entered in this action on May 13, 2019.

13.     Attached here as **Exhibit 9** is a correct copy of the Court's Order Re: Defendant's Motion for Summary Judgment Re Substantial Similarity [163] [193] (Dkt. 200), which the Court entered in this action on December 16, 2021.

14.     Attached here as **Exhibit 10** is a correct copy of Plaintiffs' Opposition to Defendant's Motion to [1] Certify the Court's Order Denying Summary Judgment on Substantial Similarity (Dkt. 200) for Interlocutory Appeal Pursuant to 28 U.S.C. § 1292 (b) and [2] Stay Pending Resolution of Interlocutory Appeal (Dkt. 206), which Plaintiffs filed in this action on January 25, 2022.

15.     Plaintiffs have noticed the deposition of four witnesses to date: Brigham Taylor (a producer on some of the *Pirates of the Caribbean* motion pictures); Nina Jacobson (a WDP executive at the time *Pirates of the Caribbean: The Curse of the Black Pearl* was developed and released); Stuart Beattie (one of the screenwriters on *The Curse of the Black Pearl*; and (4) Jerry Bruckheimer (an executive producer on *The Curse of the Black Pearl*.  Those depositions have been noticed to take place between March 24 and April 1, 2022.  Plaintiffs have also stated that they intend to depose Ted Elliott and Terry Rossio, two of the other screenwriters on the motion picture.

16.     Attached here as **Exhibit 11** is a correct copy of a meet-and-confer letter I sent to Plaintiffs' counsel Patrick Arenz on February 28, 2022.  Beginning on page 7 of my letter, I addressed Plaintiffs' failure to respond to Interrogatories 4, 5, 6, and 8.

17.     On March 9, 2022, I participated in a meet-and-confer call with Plaintiffs' counsel regarding, among other topics, Plaintiffs' responses to WDP's first set of interrogatories.  On the call, I reiterated that WDP believed Plaintiffs should fully and completely answer Interrogatories 4, 5, 6, and 8, and asked Plaintiffs either to do so or to confirm that the parties were at an impasse on that issue.  Plaintiffs' counsel responded that Plaintiffs believed they had no obligation to answer the interrogatories, but would consider WDP's position.

18.     Attached here as **Exhibit 12** is a correct copy of a meet-and-confer letter I sent to Plaintiffs' counsel Patrick Arenz on March 11, 2022.  On page 3 of my letter, I reiterated that WDP believed complete and verified answers to Interrogatories 4, 5, 6, and 8 were necessary, and asked Plaintiffs to commit to provide those answers no later than the end of the business day on March 11, 2022.

19.     Attached here as **Exhibit 13** is a correct copy of an email I received from Plaintiffs' counsel Patrick Arenz at 2:25 p.m. on March 11, 2022, regarding WDP's contention interrogatories.  Mr. Arenz's email stated that Plaintiffs intended to stand on their objections to Interrogatories 4, 5, 6, and 8.

20.     WDP has made five productions of documents, and has produced approximately 2,200 documents totaling nearly 65,000 pages.  WDP's document production is substantially complete at this time.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of March, 2022, at Pasadena,, California.

_____
Jordan D. Segall

# Exhibit 1

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | **CV 18-8074-CBM(ASx)** | | Date | MAY 25, 2021 |
|---|---|---|---|---|
| Title | Arthur Lee Alfred et al v. Walt Disney Company, The et al., | | | |

| Present: The Honorable | CONSUELO B. MARSHALL, UNITED STATES DISTRICT JUDGE |
|---|---|

| Yolanda Skipper | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant |
| Aleksandra M. Hilvert | Robin S. Gray |
| Steven T. Lowe | Jordan Dentler Segall |

**Proceedings:** TELEPHONIC HEARING RE SCHEDULING CONFERENCE AND STATUS CONFERENCE RE MANDATE APPEAL NO. 55669

The case is called and counsel state their appearance. The Court and counsel confer. Hearings held.

Following discussions with the parties, the Court will have the parties meet and confer re the 2nd phase. Court sets the following dates as stated on the record:

Motion for summary judgment hearing will be set for October 19, 2021 at 10:00 a.m.
ADR-1 Form shall be filed on or before June 1, 2021.

Expert discovery shall be completed on or before June 15, 2022.
Fact discovery shall be completed on or before June 27, 2022.
Rebuttal expert disclosure completion due no later than July 13, 2022.
Expert discovery shall be completed on or before August 15, 2022.

Settlement conference shall be held on or before September 13, 2022.

Motions shall be filed by no later than September 13, 2022 and set for oral argument on or before October 25, 2022 at 10:00 a.m..

Pre Trial Conference is set on January 9, 2023 at 2:30 p.m.

Jury Trial is set on February 7, 2023 at 10:00 a.m.(est. 4-5 days).

: **35**

Initials of Preparer     YS

# Exhibit 2

**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (*pro hac vice*)
parenz@robinskaplan.com
Brandon J. Pakkebier
(MN Bar No. 0400691) (*pro hac vice*)
bpakkebier@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota  55402

*Attorneys for Plaintiffs*
*Arthur Lee Alfred, II, et al.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II, et al., | Case No. 2:18-CV-08074-CBM-ASx |
| Plaintiffs, | **PLAINTIFFS' ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES** |
| v. | |
| WALT DISNEY PICTURES, | |
| Defendant. | |

REQUESTING PARTY: Defendant WALT DISNEY PICTURES

RESPONDING PARTY: Plaintiffs ARTHUR LEE ALFRED, II, et al.

SET NUMBER:              ONE

Plaintiffs provide the following responses to Disney's first set of interrogatories. No incidental or implied admissions are intended or made by the responses contained herein. Discovery is ongoing and Plaintiffs reserve the right to supplement these responses to the interrogatories as necessary and as set forth by Federal Rule of Civil Procedure 26(e).

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

1.      Plaintiffs object to the definition of "documents" to the extent that the definition is broader than the definition and requirements set forth in the Federal Rules of Civil Procedure.

2.      Plaintiffs object to the definition of "Your Screenplay" as overbroad in that it includes "other materials that include or relate to that screenplay." Plaintiffs will interpret this term to mean "drafts, revisions, and artwork" of the screenplay at issue in this litigation.

3.  Plaintiffs object to Disney's instruction to provide responsive information in Plaintiffs' "indirect" or "constructive" control as outside the scope of Plaintiffs' obligations under the Rules of Civil Procedure. Pursuant to the Federal Rules and Ninth Circuit precedent, a party must have a legal right to the information before it is considered in the party's possession, custody, or control. *See, e.g.*, *A. Farber & Partners, Inc. v. Garber*, 234 F.R.D. 186, 189 (C.D. Cal. 2006). Mere availability or access does not suffice. *Id.*

4.      Plaintiffs further object to each definition and instruction to the extent that it attempts to impose obligations inconsistent with or in addition to those required by the Federal Rules of Civil Procedure, the Local Rules or Orders of this Court, or any other applicable authority.

5.  Plaintiffs object to each and every Interrogatory, definition, and instruction to the extent that it seeks information or documents protected by the attorney-client privilege, work product doctrine, or any other applicable law,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 2 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

privilege, immunity, protection, or doctrine. Plaintiffs claim such privileges and protections to the extent implicated by each Interrogatory, and exclude privileged and protected information from their responses.

**INTERROGATORY NO. 1:**

Identify by name, contact information (and in the case of an individual, employer and title) all PERSONS YOU believe to have knowledge pertaining to any matter alleged in YOUR FAC, and separately for each such PERSON, the nature of such knowledge.

**ANSWER TO INTERROGATORY NO. 1:**

Plaintiffs object to this Interrogatory as categorically overbroad, unduly burdensome, and not proportional to the needs of the case in that it seeks the identity of any person Plaintiffs "believe" to have knowledge for "any matter," no matter the nature of that information. Such requests are improper. *Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case.").

On the basis of their objection, Plaintiffs will not respond to this Interrogatory.

**INTERROGATORY NO. 2:**

Identify all communications YOU have had with any PERSON (other than communications with YOUR counsel that YOU contend are privileged) regarding YOUR SCREENPLAY by setting forth (a) the name, contact information (and in the case of an individual, the employer and title) of each PERSON involved in the communication (including each employee or agent of an entity); (b) the date of the communication; (c) the means of the communication (e.g., telephone call, e-mail); and (d) the substance of the communication set forth in detail. This interrogatory

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

1  includes, among other things, communications regarding the conception or sources

2  of inspiration for YOUR SCREENPLAY and non-privileged communications

3  regarding this LITIGATION.

4  **ANSWER TO INTERROGATORY NO. 2:**

5      Plaintiffs object to this Interrogatory as categorically overbroad in that it

6  seeks the identity of any communication Plaintiffs have had with any person

7  regarding Plaintiffs Screenplay, no matter the nature of that communication,

8  especially with its requests for "all communications" that include "non-privileged

9  communications regarding this LITIGATION." Such a request is improper. *Philips*

10  *N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL

11  3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that

12  interrogatories demanding "all details, facts, and information . . . [are] facially

13  overbroad, unduly burdensome, and disproportionate to the needs of the case.").

14  Plaintiffs further object that this Interrogatory is facially unduly burdensome in that

15  it requires a response without any limitations on timing. And as Disney itself has

16  argued, a "Relevant Timeframe" is between October 1, 1999 and June 28, 2003.

17  Plaintiffs will construe the Request to be limited to that timeframe. *Id.* Plaintiffs

18  also object to the discrete subparts in the interrogatory as unduly burdensome.

19      On the basis of their objections, Plaintiffs state that they will identify

20  categories of communications between individuals between October 1, 1999 and

21  June 28, 2003 that concerned the Pirates SCREENPLAY. Within that timeframe,

22  Plaintiffs respond that they communicated with the following individuals:

23  - Tova Laiter. Plaintiffs communicated in-person, by telephone, and by

24  e-mail with Tova Laiter regarding the Screenplay multiple times

25  between 1999 and 2000 to discuss the Screenplay's contents, its

26  submission to various entertainment companies, and the status of the

27  Screenplay after submission to Disney. Ms. Laiter acted as Plaintiffs'

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

1    producing partner in submitting the Screenplay, and engaged in a

2    series of calls to discuss the submission status of the Screenplay.

3    • Brigham Taylor. Plaintiffs had or were involved in, though their

4    producing partner Tova Laiter, communications by telephone with

5    Brigham Taylor regarding the Screenplay multiple times in 2000 to

6    discuss the Screenplay's contents and Taylor's consideration of the

7    Screenplay, and whether Taylor would produce the Screenplay. For

8    instance, these communications included a telephone conversation

9    with Mr. Taylor in the fall of 2000, during which he explained that

10   their script had been sent to Ms. Nina Jacobson for her consideration.

11   A further telephone conversation with Mr. Taylor related that Ms.

12   Jacobson did not intend to pursue the *Pirates* Screenplay for

13   production because it involved children.

14   • Michael Haynes and Josh Harmon. Plaintiffs communicated in-person

15   with Mr. Haynes and Mr. Harmon in October of 2000 when they saw

16   their *Pirates of the Caribbean* script sitting on Mr. Taylor's desk at a

17   creative team meeting. After asking about the script, they were ushered

18   out of Mr. Taylor's office.

19   • Louis Spoto. Plaintiffs communicated with Mr. Spoto, Esq., an

20   attorney at Loeb and Loeb, regarding the Screenplay. The substance of

21   those communications is protected by the attorney-client privilege.

22   On the basis of their objections, Plaintiffs will not respond further to this

23   Interrogatory.

24   **INTERROGATORY NO. 3:**

25   Describe with particularity all preexisting sources of any kind or nature that

26   you consulted or relied upon, or that inspired in any way YOUR conception,

27   creation, authorship, or development of YOUR SCREENPLAY

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 5 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**ANSWER TO INTERROGATORY NO. 3:**

Plaintiffs object to the requirement that they identify "all" preexisting sources of any kind as categorically overbroad and unduly burdensome. Such requests are improper. *Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case."). Plaintiffs further object to the phrases "consulted or relied upon" and "inspired in any way" as vague and ambiguous because it is unclear what those terms mean, particularly in combination with other disjunctive portions of the interrogatory.

On the basis of their objections, Plaintiffs will not respond to this Interrogatory other than to state that Plaintiffs' Screenplay is an original expression created by the Plaintiffs.

**INTERROGATORY NO. 4:**

Identify and describe with particularity each element of YOUR SCREENPLAY that you contend DEFENDANT infringed.

**ANSWER TO INTERROGATORY NO. 4:**

Plaintiffs object to this Interrogatory as seeking discovery on questions of substantial similarity in violation of the parties' stipulation, which provides that discovery is bifurcated. *See* Dkt. No. 121. After the Ninth Circuit remanded this case, the parties stipulated to phased discovery—at Disney's suggestion—to best expedite the litigation. That agreement was predicated on a shared interest "in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable timeframes regarding discovery, motion practice, and ADR." *Id.* ¶ 1. To that end, the parties agreed to a "phased" approach to discovery, under which fact discovery would be bifurcated into two phases.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

1   "[D]iscovery in the first phase [was] limited to the issue of substantial similarity."

2   *Id.* ¶ 10. The Parties completed that phase, including through expert reports and

3   depositions. Disney then filed its summary judgment motion, which the Court

4   denied.

5         After the Court's denial of summary judgment, this case moved into the

6   "second phase" of discovery. That "second phase" encompasses "other discovery"

7   *not relating to* substantial similarity. *See id.* ¶ 10(a). Thus, pursuant to the Court's

8   adoption of the parties' stipulation, this "second phase" is limited to issues *other*

9   than substantial similarity.

10         On the basis of their objection, Plaintiffs will not respond to this

11   Interrogatory.

12   **INTERROGATORY NO. 5:**

13         Identify all facts that support or refute YOUR contention that each

14   component identified in response to Interrogatory 4 above contains original

15   expression that is subject to protection under copyright law.

16   **ANSWER TO INTERROGATORY NO. 5:**

17         Plaintiffs object to this Interrogatory as seeking discovery on questions of

18   substantial similarity in violation of the parties' stipulation, which provides that

19   discovery is bifurcated. *See* Dkt. No. 121. After the Ninth Circuit remanded this

20   case, the parties stipulated to phased discovery—at Disney's suggestion—to best

21   expedite the litigation. That agreement was predicated on a shared interest "in

22   streamlining this action by reducing the number of named defendants and

23   establishing certain mutually-agreeable timeframes regarding discovery, motion

24   practice, and ADR." *Id.* ¶ 1. To that end, the parties agreed to a "phased" approach

25   to discovery, under which fact discovery would be bifurcated into two phases.

26   "[D]iscovery in the first phase [was] limited to the issue of substantial similarity."

27   *Id.* ¶ 10. The Parties completed that phase, including through expert reports and

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 7 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

depositions. Disney then filed its summary judgment motion, which the Court denied.

After the Court's denial of summary judgment, this case moved into the "second phase" of discovery. That "second phase" encompasses "other discovery *not relating to* substantial similarity. *See id.* ¶ 10(a). Thus, pursuant to the Court's adoption of the parties' stipulation, this "second phase" is limited to issues *other* than substantial similarity.

Plaintiffs further object to the requirement to provide "all facts" as overbroad and unduly burdensome. *See Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case."). Plaintiffs further object to the interrogatory to the extent as not proportional to the needs of case as it calls for a legal conclusion on individual components and is inconsistent with the Ninth Circuit's direction to apply the original selection and arrangement of elements.

On the basis of their objections, Plaintiffs will not respond to this Interrogatory.

**INTERROGATORY NO. 6:**

Identify and describe with particularity each element of CURSE or any of the SEQUEL MOVIES that YOU contend infringed YOUR copyright in THE SCREENPLAY.

**ANSWER TO INTERROGATORY NO. 6:**

Plaintiffs  object to this Interrogatory as seeking information not relevant to any party's claims or defenses in that it requests information how "any of the SEQUEL MOVIES" infringe Plaintiffs' Screenplay, which is not a claim asserted in the First Amended Complaint (and as explained at the summary judgment

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 8 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

hearing). (For the avoidance of doubt, and as explained, Disney's profits from the Sequels are relevant to an award of damages for Disney's infringement of the Pirates Screenplay.)

Plaintiffs object to this Interrogatory as seeking discovery on questions of substantial similarity in violation of the parties' stipulation, which provides that discovery is bifurcated. *See* Dkt. No. 121. After the Ninth Circuit remanded this case, the parties stipulated to phased discovery—at Disney's suggestion—to best expedite the litigation. That agreement was predicated on a shared interest "in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable timeframes regarding discovery, motion practice, and ADR." *Id.* ¶ 1. To that end, the parties agreed to a "phased" approach to discovery, under which fact discovery would be bifurcated into two phases. "[D]iscovery in the first phase [was] limited to the issue of substantial similarity." *Id.* ¶ 10. The Parties completed that phase, including through expert reports and depositions. Disney then filed its summary judgment motion, which the Court denied.

After the Court's denial of summary judgment, this case moved into the "second phase" of discovery. That "second phase" encompasses "other discovery *not relating to* substantial similarity. *See id.* ¶ 10(a). Thus, pursuant to the Court's adoption of the parties' stipulation, this "second phase" is limited to issues *other* than substantial similarity.

On the basis of their objection, Plaintiffs will not respond to this Interrogatory.

## **INTERROGATORY NO. 7**:

Identify all facts that support YOUR contention that DISNEY had access to YOUR SCREENPLAY in the conception, creation, development, or production of CURSE or any of the SEQUEL MOVIES.

**ANSWER TO INTERROGATORY NO. 7:**

Plaintiffs object to this Interrogatory as overbroad and unduly burdensome in that it requests identification of "all facts." *See Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case."). Plaintiffs further object to this Interrogatory as seeking information within the possession, custody, or control of Disney.

On the basis of their objections, Plaintiffs state that at least from August, 2000 until November of 2002, Disney had access to Plaintiffs' Screenplay. The Plaintiffs first couriered their Screenplay to Disney in August 2000 for initial consideration, which was followed up with telephone calls to Brigham Taylor about the Screenplay. Mr. Taylor eventually relayed to Ms. Tova Laiter that he had passed the Screenplay along to Ms. Nina Jacobson for her consideration. In addition to calling Mr. Taylor, Plaintiffs also had ongoing meetings with him (and others at Disney) due to their involvement in the *Red Hood* project, in which they would physically meet at Disney's Burbank studios to discuss ideas and developments for the project. At one meeting in October of 2000, Plaintiffs saw a copy of their *Pirates of the Caribbean* Screenplay on Mr. Taylor's desk. After inquiring about the Screenplay, Plaintiffs were ushered out of Mr. Taylor's office. Several weeks later, Mr. Taylor called Ms. Laiter to inform of Disney's decision to "pass" on the Plaintiffs' Screenplay. Disney continued to possess the Screenplay, contrary to industry practices, until November of 2002, when Disney mailed it back to Mr. Martinez.  Plaintiffs also incorporate Disney's response to Plaintiffs' Interrogatory No. 1 as part of this response.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 10 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**INTERROGATORY NO. 8:**

Identify all facts that support YOUR contention that DISNEY copied YOUR SCREENPLAY in the conception, creation, development, or production of CURSE or any of the SEQUEL MOVIES.

**ANSWER TO INTERROGATORY NO. 8:**

Plaintiffs object to this Interrogatory as overbroad and unduly burdensome in that it requests identification of "all facts." *See Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case."). Plaintiffs object to this Interrogatory as seeking information not relevant to any party's claims or defenses in that it requests information how "any of the SEQUEL MOVIES" infringe Plaintiffs' Screenplay, which is not a claim asserted in the First Amended Complaint (and as explained at the summary judgment hearing). (For the avoidance of doubt, and as explained, Disney's profits from the Sequels are relevant to an award of damages for Disney's infringement of the Pirates movie.) Plaintiffs further object to this Interrogatory as seeking discovery on questions of substantial similarity in violation of the parties' stipulation, which provides that discovery is bifurcated. *See* Dkt. No. 121. After the Ninth Circuit remanded this case, the parties stipulated to phased discovery—at Disney's suggestion—to best expedite the litigation. That agreement was predicated on a shared interest "in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable timeframes regarding discovery, motion practice, and ADR." *Id.* ¶ 1. To that end, the parties agreed to a "phased" approach to discovery, under which fact discovery would be bifurcated into two phases. "[D]iscovery in the first phase [was] limited to the issue of substantial similarity." *Id.* ¶ 10. The Parties

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 11 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

completed that phase, including through expert reports and depositions. Disney then filed its summary judgment motion, which the Court denied.

After the Court's denial of summary judgment, this case moved into the "second phase" of discovery. That "second phase" encompasses "other discovery *not relating to* substantial similarity. *See id.* ¶ 10(a). Thus, pursuant to the Court's adoption of the parties' stipulation, this "second phase" is limited to issues *other* than substantial similarity.

On the basis of their objections, Plaintiffs will not respond to this Interrogatory.

**INTERROGATORY NO. 9:**

State the amount of damages and/or losses that YOU have allegedly suffered as a result of DISNEY's alleged infringement of YOUR copyright in YOUR SCREENPLAY, including a detailed calculation illustrating how YOU arrived at the amount, and the methodology used to calculate the amount.

**ANSWER TO INTERROGATORY NO. 9:**

Plaintiffs object to this Interrogatory as premature because it seeks information that is the subject of expert discovery, which has not yet commenced under the Court's scheduling order. Plaintiffs also object to this Interrogatory as premature because a complete response requires information uniquely in Disney's possession and which Disney has not provided in full in discovery to date.

On the basis of their objections, Plaintiffs respond at this time that they may seek actual damages and Disney's additional profits. *See* 17 U.S.C. § 504(a). Plaintiffs may seek damages based on Disney's profits on the *Pirates of the Caribbean* film and the *Pirates of the Caribbean* sequels as derivative works, including but not limited to in the form of a hypothetical license. Plaintiffs may also seek indirect profits from the *Pirates of the Caribbean* franchise for merchandise, artwork, and other sales generated from the success of the *Pirates of the Caribbean*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 12 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

film franchise. Plaintiffs may further seek damages for the loss of income attributable to, among other things, Plaintiffs' loss of writing credit and status within the Writers Guild of America ("WGA"), including WGA residuals. As discovery has just begun, Plaintiffs will supplement this response as discovery progresses and as set forth in the scheduling order.

**INTERROGATORY NO. 10:**

State the amount of any profit, revenue, compensation, or financial benefit that YOU contend DISNEY has received, or YOU anticipate DISNEY will receive in the future, attributable to any alleged infringement of YOUR copyright in YOUR SCREENPLAY, including a detailed calculation illustrating how YOU arrived at the amount, and the methodology used to calculate the amount.

**ANSWER TO INTERROGATORY NO. 10:**

Plaintiffs object to this Interrogatory as premature because it seeks information that is the subject of expert discovery, which has not yet commenced under the Court's scheduling order. Plaintiffs also object to this Interrogatory as premature because a complete response requires information uniquely in Disney's possession and which Disney has not provided in full in discovery to date.

On the basis of their objections, Plaintiffs respond at this time that based on the facts currently known to them, Disney made substantial profit on the *Pirates of the Caribbean* film through copying of Plaintiffs' original expression in their Pirates screenplay. Owing to the popularity of that infringement, Disney has profited—directly and indirectly—through the broadcast and distribution of the *Pirates of the Caribbean* sequels and from sales of merchandise, artwork, and other *Pirates of the Caribbean* branded items. As discovery has just begun, Plaintiffs will supplement this response as discovery progresses and under the Scheduling Order.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 13 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**INTERROGATORY NO. 11:**

Identify any agreement between YOU and any other PERSON regarding the division, distribution, or allocation of any revenues YOU may receive relating to YOUR SCREENPLAY, including any recovery from this LITIGATION through judgment or settlement, and describe in detail any such agreement, including (a) the counterparty; (b) the date of the agreement; and (c) the material terms of the agreement.

**ANSWER TO INTERROGATORY NO. 11:**

Plaintiffs object that that this Interrogatory does not seek relevant information that is proportional to the needs of the case to the extent it seeks information relating to agreements with legal counsel. Plaintiffs also object to the extent it seeks information protected by the attorney work-product doctrine and/or attorney-client privilege.

On the basis of their objection, Plaintiffs identify that Tova Laiter, Ezequiel Martinez Jr., and Arthur Lee Alfred II have agreed since 2000 to allocate any profits from the sale, monetization, or commercialization of their Screenplay equally among themselves, which reflects Ms. Laiter's contributions as Plaintiffs' prospective producer partner, and Plaintiffs' contributions as screenwriters and prospective assistant producers. These individuals have affirmed their understanding that this agreement applies to any recovery in this litigation resulting from Disney's infringement. Pursuant to Rule 33(d), Plaintiffs will produce a copy of the 2000 agreement and other documents that memorialize their agreements amongst themselves.

**INTERROGATORY NO. 12:**

If YOU contend that DISNEY's alleged infringement of YOUR copyright in YOUR SCREENPLAY was "willful," identify all facts supporting that contention.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**ANSWER TO INTERROGATORY NO. 12:**

Plaintiffs object to this Interrogatory as overbroad and unduly burdensome in that it requests identification of "all facts." *See Philips N. Am. LLC v. PKI Healthcare, Inc.*, No. SACV 19-01765-JVS (JDEx), 2020 WL 3031614, at *2-3 (C.D. Cal. Mar. 10, 2020) (collecting cases and noting that interrogatories demanding "all details, facts, and information . . . [are] facially overbroad, unduly burdensome, and disproportionate to the needs of the case."). Plaintiffs also object to this Interrogatory as premature because a complete response requires information uniquely in Disney's possession and which Disney has not provided in full in discovery to date. Plaintiffs also object to this interrogatory as calling for a legal conclusion.

On the basis of their objections and upon information currently known to Plaintiffs, Plaintiffs state that Disney's infringement was willful. After Plaintiffs submitted their script to Disney in August 2000, Disney proceeded to incorporate the original expression found within the Screenplay into their own *Pirates of the Caribbean* film, using the original selection and arrangement of elements from Plaintiffs' Screenplay. This infringement was willful because Disney knew that its copying infringed Plaintiffs' copyright and/or Disney recklessly disregarded Plaintiffs' copyright. Plaintiffs incorporate their response to Interrogatory 7. As explained in that response, the creative team members who accessed Plaintiffs' screenplay—Brigham Taylor, Josh Harmon, Michael Haynes, and Nina Jacobson— then were materially involved in the development of the infringing Pirates film. Thus, Disney knew or recklessly disregarded that its Pirates film infringed the Screenplay, which makes the infringement willful under the law.

**INTERROGATORY NO. 13:**

Identify and describe with particularity YOUR efforts to sell, license, exploit, or otherwise monetize YOUR SCREENPLAY, and the results of those efforts.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**ANSWER TO INTERROGATORY NO. 13:**

Plaintiffs object to this Interrogatory as overbroad because it places no temporal limitation on any response. As Disney itself has maintained, a "Relevant Timeframe" is between October 1, 1999 and June 28, 2003. Plaintiffs will construe the Request to be limited to that timeframe.

On the basis of their objection, Plaintiffs identify that, between October 1, 1999 and June 28, 2003, Tova Laiter distributed their Screenplay to multiple movie studios, production companies, and/or agencies. Plaintiffs understand that Ms. Laiter distributed their Screenplay under her standard process for distributing screenplays by enclosing the Screenplay and a trailer teaser, and including a cover letter about the Screenplay in an envelope package. As part of this standard process, Ms. Laiter, couriered the envelope for consideration. Among the companies receiving submissions were Disney, Paramount Pictures (in the Buena Vista division), and Spyglass Pictures. Plaintiffs also state that it will produce documents pursuant to Rule 33(d) to the extent they exist and are located after a reasonable search.


Dated: February 17, 2022                    Respectfully submitted,

                                            By:  */s/ Patrick M. Arenz*
                                            **ROBINS KAPLAN LLP**
                                            Patrick M. Arenz (*pro hac vice*)
                                            Brandon J. Pakkebier (*pro hac vice*)

                                            **LOWE & ASSOCIATES, PC**
                                            Steven T. Lowe, Esq.
                                            Aleksandra Hilvert, Esq.
                                            *Attorneys for Plaintiffs*
                                            *Arthur Lee Alfred, II, et al.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
LOS ANGELES

- 16 -

PLAINTIFFS' ANSWERS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES
2:18-CV-08074-CBM-ASX

**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (*pro hac vice*)
parenz@robinskaplan.com
Brandon J. Pakkebier
(MN Bar No. 0400691) (*pro hac vice*)
bpakkebier@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota  55402

*Attorneys for Plaintiffs*
*Arthur Lee Alfred, II, et al.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PICTURES,<br><br>Defendant. | Case No. 2:18-CV-08074-CBM-ASx<br><br>**PLAINTIFFS ARTHUR LEE ALFRED, II AND EZEQUIEL MARTINEZ, JR.'S VERIFICATION OF PLAINTIFFS' ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**<br><br>Judge: Hon. Consuelo Marshall |

1

## **<u>VERIFICATION</u>**

2    I, Ezequiel Martinez, Jr., have read Plaintiffs' Answers to Defendant's First

3  Set of Interrogatories and believe the factual information in them to be true and

4  correct to the best of my knowledge, information, and belief. I make no

5  representation about responses or objections involving issues of law, legal

6  contentions, or legal conclusions.

7    I declare under penalty of perjury that the foregoing is true and correct.

8

9  Executed on February ___, 2022.

10                                                  Ezequiel Martinez, Jr.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **<u>VERIFICATION</u>**

I, Arthur Lee Alfred, II, have read Plaintiffs' Answers to Defendant's First Set of Interrogatories and believe the factual information in them to be true and correct to the best of my knowledge, information, and belief. I make no representation about responses or objections involving issues of law, legal contentions, or legal conclusions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February _17_ , 2022.

_Arthur L. Alfred_

Arthur Lee Alfred, II

# Exhibit 3

1   Steven T. Lowe, SBN 122208
2   Aleksandra Hilvert, SBN 258463
    LOWE & ASSOCIATES, a Professional Corporation
3   8383 Wilshire Blvd. Suite 1038
    Beverly Hills, California 90211
4   Telephone: (310) 477-5811
5
6   *Attorneys for Plaintiffs Arthur Lee Alfred II and
    Ezequiel Martinez Jr.*
7
8   MARK R. YOHALEM (State Bar No. 243596)
    mark.yohalem@mto.com
9   JORDAN D. SEGALL (State Bar No. 281102)
    jordan.segall@mto.com
10  MUNGER, TOLLES & OLSON LLP
11  350 South Grand Avenue, Fiftieth Floor
    Los Angeles, California 90071-3426
12  Telephone:  (213) 683-9100
    Facsimile:   (213) 687-3702
13
14  *Attorneys for Defendants The Walt Disney
15  Company et al.*

16                  UNITED STATES DISTRICT COURT

17                 CENTRAL DISTRICT OF CALIFORNIA

18

19  ARTHUR LEE ALFRED, II et al.,          Case No. 2:18-cv-08074-CBM-AS
20
21                  Plaintiffs,            **STIPULATION REGARDING
                                           [1] DISMISSAL OF DEFENDANTS;
22          vs.                            [2] BIFURCATION OF
                                           DISCOVERY; [3] MOTION
23  THE WALT DISNEY COMPANY et            PRACTICE AND ADR**
24  al.,
                                           Lodged Concurrently: [Proposed] Order
25                  Defendants.
                                           Judge:  Hon. Consuelo B. Marshall
26

27

28

---

The Plaintiffs and Defendants to the above-entitled action, by and through their respective counsel of record, hereby stipulate as follows:

1.      The parties share a common interest in streamlining this action by reducing the number of named defendants and establishing certain mutually-agreeable timeframes regarding discovery, motion practice, and ADR.

2.      The parties further agree that the issue of whether substantial similarity exists between the Plaintiffs' allegedly infringed *Pirates of the Caribbean* screenplay and the Defendants' allegedly infringing *Pirates of the Caribbean* motion pictures should be bifurcated from the other legal issues presented in this litigation.

3.      Accordingly, the parties execute this Stipulation for the following purposes, upon order of this Court:

         (a)      Reducing the number of named defendants;

         (b)      Limiting initial discovery to facilitate the efficient resolution of whether substantial similarity exists between the Plaintiffs' screenplay and the Defendants' motion pictures; and,

         (c)      Establishing an orderly agreed-upon procedure for motion practice and alternative dispute resolution.

IT IS HEREBY STIPULATED between Plaintiffs and Defendants, by and through their undersigned attorneys, as follows:

**<u>Stipulation Regarding Dismissal of Certain Defendants</u>**

4.      The parties stipulate and agree that Walt Disney Pictures, a subsidiary of The Walt Disney Company (the "Defendant"), is the only necessary Defendant in this matter.

5.      Upon execution of this stipulation by the parties, Plaintiffs shall file: (1) an amended Exhibit 1 to the First Amended Complaint (the Copyright Certificate for Plaintiffs' screenplay); and (2) a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) dismissing without prejudice every defendant named

-1-

in the First Amended Complaint (Dkt. 112) except for Walt Disney Pictures, whether served or not served (the "Dismissed Defendants"). Such dismissals shall not mean or be taken to signify that the Dismissed Defendants were "prevailing parties" in the litigation for purposes of costs and fees pursuant to the Copyright Act.

6.     Defendants agree that, in the event Plaintiffs obtain a judgment on their claims, Walt Disney Pictures shall be responsible for damages for copyright infringement attributable to any subsidiary of The Walt Disney Company, including the Dismissed Defendants. Walt Disney Pictures will satisfy any such judgment. And, in the event Walt Disney Pictures cannot satisfy any such judgment, another subsidiary of The Walt Disney Company shall satisfy the judgment.

7.     Defendants agree that for purposes of fact discovery, documents in the possession of The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, shall be regarded as being within the "possession, custody, or control" of Walt Disney Pictures (as that phrase is used in Federal Rule of Civil Procedure 34(a)(1)), and Defendants will not refuse to produce discoverable documents or other materials in the possession of The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, on the grounds that the custodial entity is not a named defendant. Thus, no subpoena shall be required to be served on The Walt Disney Company or its subsidiaries, including the Dismissed Defendants, in order to seek discovery from them.

8.     Defendants agree that they will make employees of The Walt Disney Company and its subsidiaries, including the Dismissed Defendants, available for deposition without a subpoena to the same extent that they would if the Dismissed Defendants were named defendants. This includes designated corporate representatives under Federal Rule of Civil Procedure 30(b)(6).

9.     Defendants agree that they will make Dismissed Defendant Brigham Taylor ("Taylor") available for a deposition without a subpoena for personal

appearance. Defendants further agree that Walt Disney Pictures, as the sole named defendant, shall be responsible for the acts or omissions by Taylor alleged in the First Amended Complaint, irrespective of which Disney entity Taylor was performing work for and irrespective of his status as an employee or independent contractor during the time of his conduct alleged in the First Amended Complaint. Walt Disney Pictures does not intend to argue that Taylor was acting outside the course or scope of his employment with respect to the allegations in the First Amended Complaint. Within thirty (30) days of Taylor's deposition, Walt Disney Pictures shall make a final election whether to raise the defense that Taylor was acting outside the course or scope of his employment in any respect (the "Election"). Walt Disney Pictures hereby waives any argument that the present dismissal of Taylor or the passage of time between Taylor's dismissal and the Election are grounds for objecting to Plaintiffs' re-asserting claims against Taylor as a named defendant in the event Walt Disney Pictures elects to assert this defense.

### Stipulation Regarding Limitations on Discovery

10.    In order to streamline the litigation, the parties agree to the following bifurcation of discovery:

(a)    Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity; if other discovery is necessary, it will occur in a second phase that will follow the parties' mediation and the Court's resolution of Walt Disney Pictures' intended motion for summary judgment on substantial similarity, as set forth below.

(b)    More specifically, in the first discovery phase discovery shall be limited to: (i) initial disclosures under Federal Rule of Civil Procedure 26(a)(1), which shall be made by January 29, 2021; expert disclosures under Federal Rule of Civil Procedure 26(a)(2) relating to the issue of substantial similarity, which shall be made by March 30, 2021; and (iii) one deposition of each side's respective expert witnesses on substantial similarity. This stipulation is not intended to otherwise

modify the applicable discovery limitations set forth in the Federal Rules of Civil Procedure or Local Rules of this Court.

11.     By March 30, 2021, Walt Disney Pictures shall disclose an expert on substantial similarity pursuant to Federal Rule of Civil Procedure 26(a)(2), including a written report.  Plaintiffs' expert may prepare a rebuttal report within thirty (30) days after Walt Disney Pictures' expert disclosure.  Both experts shall sit for expert depositions, if so requested, as soon as practical after the production of expert and rebuttal reports, if any.

**Stipulation Regarding Motion Practice and Alternative Dispute Resolution**

12.     Walt Disney Pictures shall file an answer to the First Amended Complaint by the current deadline of January 29, 2021, without further motion practice under Federal Rule of Civil Procedure 12(b).

13.     Following the completion of the first phase of discovery (as described in paragraphs 10–11 above), the parties agree to participate in a mediation before a mutually agreed-upon mediator and shall endeavor to conduct that mediation within 60 days of the completion of the first phase of discovery.

14.     In the event the parties are unable to resolve the case through mediation, Walt Disney Pictures may file a motion for summary judgment on *only* the issue of substantial similarity within 60 days of the failed mediation.  The parties agree to meet and confer on a stipulated briefing schedule for that motion but in no event shall Walt Disney Pictures object to Plaintiffs seeking four (4) weeks to prepare and file their opposition.  Nothing shall preclude the Plaintiffs from filing a cross motion for summary judgment on substantial similarity *only* adhering to the briefing schedule above.

15.     Following the Court's ruling on Walt Disney Pictures' motion for summary judgment on substantial similarity, or if Walt Disney Pictures elects not to file such a motion, discovery shall commence on all issues with no limitations other than as provided herein or by law.

16.    This stipulation is made without intending to limit any party's right to file dispositive motions after phase two discovery or discovery motions at any point in the case as authorized by the Federal Rules of Civil Procedure and this Court's Local Rules.

17.    By January 29, 2021, the parties shall meet and confer on a proposed case schedule reflecting the stipulations herein and submit it to the Court for approval.

DATED:  January 14, 2021          MUNGER, TOLLES & OLSON LLP


                                  By:  _____/s/ Jordan D. Segall_____
                                       JORDAN D. SEGALL
                                       Attorneys for Defendants


DATED:  January 14, 2021          LOWE & ASSOCIATES


                                  By:  _____/s/ Steven T. Lowe_____
                                       STEVEN T. LOWE
                                       Attorneys for Plaintiffs


       In accordance with Civil Local rule 5-4.3.4(a)(2)(i), the filer attests that each of the above signatories has concurred in the filing of this document.

DATED:  January 14, 2021


                                  By:  _____/s/ Jordan D. Segall_____
                                       JORDAN D. SEGALL

# Exhibit 4

Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
LOWE & ASSOCIATES, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

*Attorneys for Plaintiffs Arthur Lee Alfred II and*
*Ezequiel Martinez Jr.*

MARK R. YOHALEM (State Bar No. 243596)
mark.yohalem@mto.com
JORDAN D. SEGALL (State Bar No. 281102)
jordan.segall@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:  (213) 683-9100
Facsimile:   (213) 687-3702

*Attorneys for Defendants The Walt Disney*
*Company et al.*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARTHUR LEE ALFRED, II et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>THE WALT DISNEY COMPANY et al.,<br><br>Defendants. | Case No. 2:18-cv-08074-CBM-ASx<br><br>**ORDER GRANTING STIPULATION REGARDING [1] DISMISSAL OF DEFENDANTS; [2] BIFURCATION OF DISCOVERY; [3] MOTION PRACTICE AND ADR  [121]**<br><br>Judge:  Hon. Consuelo B. Marshall |

The Court, having reviewed the parties' stipulation filed concurrently with this Proposed Order and for good cause shown, hereby orders as follows:

1. Plaintiffs shall have leave to file an amended Exhibit 1 to the First Amended Complaint (Dkt. 112-1), consisting of the Copyright Certificate for Plaintiffs' screenplay on or before January 29, 2021.

2. Following entry of this Order, Plaintiffs shall file a notice of dismissal pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) dismissing without prejudice every defendant named in the First Amended Complaint except for Walt Disney Pictures, whether served or not served. Such dismissals shall not mean or signify that the dismissed defendants were "prevailing parties" in the litigation for purposes of costs and fees pursuant to the Copyright Act.

3. Walt Disney Pictures shall answer the First Amended Complaint by January 29, 2021, and shall not file any further motions under Federal Rule of Civil Procedure 12(b).

4. Discovery in this matter shall be bifurcated into two phases.

5. Discovery in the first phase shall be limited to the issue of substantial similarity between the parties' works, and shall be limited to: (i) initial disclosures under Federal Rule of Civil Procedure 26(a)(1), which shall be made by January 29, 2021; (ii) expert disclosures under Federal Rule of Civil Procedure 26(a)(2) relating to the issue of substantial similarity (including a report by Walt Disney Pictures' expert), which shall be made by March 30, 2021; (iii) a rebuttal report by Plaintiffs' expert, if Plaintiffs elect to prepare one, which shall be prepared within thirty (30) days after receipt of Walt Disney Pictures' expert report; and (iii) one deposition of each side's respective expert witnesses on substantial similarity.

6. The parties intend to participate in a mediation following the completion of the first phase of discovery. Within sixty (60) days after the completion of mediation, if it is unsuccessful, Walt Disney Pictures may file a motion for summary judgment limited to the issue of substantial similarity.

1  Plaintiffs shall be entitled to file a cross-motion for summary judgment, also solely

2  on the issue of substantial similarity.  In no event shall either party object to the

3  other party seeking four (4) weeks to prepare and file their opposition to any such

4  motion for summary judgment.

5       7.     Discovery in the second phase shall commence following the Court's

6  rulings on Walt Disney Pictures' motion for summary judgment, or immediately

7  after mediation if Walt Disney Pictures elects not to file a motion for summary

8  judgment.  The second phase of discovery shall encompass all issues, without

9  limitation other than as provided herein or by law.

10

11      IT IS SO ORDERED.

12

13 DATED:  JANUARY 19, 2020

14

15

                                          Hon. Consuelo B. Marshall
16                                        United States District Judge

17

18

19

20

21

22

23

24

25

26

27

28

ORDER GRANTING STIPULATION REGARDING [1] DISMISSAL OF DEFENDANTS; [2]
BIFURCATION OF DISCOVERY; [3] MOTION PRACTICE AND ADR

# Exhibit 5

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 1 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 40 of 182   Page ID
#:4944

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.   _____


ARTHUR LEE ALFRED II; EZEQUIEL MARTINEZ, JR.; and TOVA LAITER,


     Plaintiffs,


v.


    THE WALT DISNEY COMPNAY, a Delaware Corporation; DISNEY ENTERPRISES, INC., a Delaware Corporation; WALT DISNEY MOTION PICTURES GROUP, INC, a California Corporation; DISNEY CONSUMER PRODUCTIONS, INC., a California Corporation; DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., a California Corporation; DISNEY BOOK GROUP, LLC, a Delaware Limited Liability Company; DISNEY INTERACTIVE STUDIOS, INC., a California Corporation; DISNEY STORE USA, LLC, a Delaware Corporation; WALT DISNEY ATTRACTIONS TECHNOLOGY, LLC, a Delaware Limited Liability Company; WALT DISNEY THEATRICAL RECORDINGS, a California Corporation; WALT DISNEY PARKS AND RESORTS WORLDWIDE, a Florida Corporation; ABC, INC., a New York Corporation; BUENA VISTA HOME ENTERTAINMENT, INC., a California Corporation; BUENA VISTA MEDIA, a California Corporation; BUENA VISTA PRODUCTIONS; a California Corporation; BUENA VISTA THEATRES, INC.;  a California Corporation; BUENA VISTA THEATRICAL GROUP LTD., New York Corporation; BUENA VISTA VIDEO ON DEMAND, a California Corporation; BUENA VISTA BOOKS, INC., a California Corporation; BUENA VISTA CATALOGUE CO., a California Corporation; BUENA VISTA NON-THEATRICAL, INC., a California Corporation; JOHN and JANE DOES 1-10, inclusive.


    Defendants,


---

## COMPLAINT AND JURY DEMAND

---


    ARTHUR  LEE  ALFRED  II,  EZEQUIEL  MARTINEZ,  JR.,  and  TOVA  LAITER

("Plaintiffs"), by and through counsel, Maceau Law files this its Complaint against Defendants,

THE WALT DISNEY COMPANY, a Delaware Corporation; DISNEY ENTERPRISES, INC., a Delaware Corporation; WALT DISNEY MOTION PICTURES GROUP, INC, a California Corporation; DISNEY CONSUMER PRODUCTIONS, INC., a California Corporation; DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., a California Corporation; DISNEY BOOK GROUP, LLC, a Delaware Limited Liability Company; DISNEY INTERACTIVE STUDIOS, INC., a California Corporation; DISNEY STORE USA, LLC, a Delaware Corporation; WALT DISNEY ATTRACTIONS TECHNOLOGY, LLC, a Delaware Limited Liability Company; WALT DISNEY THEATRICAL RECORDINGS, a California Corporation; WALT DISNEY PARKS AND RESORTS WORLDWIDE, a Florida Corporation; ABC, INC., a New York Corporation; BUENA VISTA HOME ENTERTAINMENT, INC., a California Corporation; BUENA VISTA MEDIA, a California Corporation; BUENA VISTA PRODUCTIONS; a California Corporation; BUENA VISTA THEATRES, INC.;  a California Corporation; BUENA VISTA THEATRICAL GROUP LTD.,  New York Corporation; BUENA VISTA VIDEO ON DEMAND, a California Corporation;  BUENA VISTA BOOKS, INC., a California Corporation; BUENA VISTA CATALOGUE CO., a California Corporation; BUENA VISTA NON-THEATRICAL, INC., a California Corporation; JOHN and JANE DOES 1-10, inclusive. ("Defendants") and for its claims and causes of action states as follows:


**INTRODUCTION**


This case is about The Walt Disney Company's ("TWDC") willful infringement of Plaintiff's original copyrighted expression of themes, settings, dialogue, characters, plot, mood, sequence of events contained in an original spec screenplay entitled "*Pirates of the Caribbean*"

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 3 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 42 of 182   Page ID
#:4946

and The Walt Disney Company's creation of a "*Pirates of the Caribbean*" franchise to include films, video games, theme park attractions, merchandising, casino games, literature and other related items.

## JURISDICTION AND VENUE

1.     This Court has original subject matter jurisdiction over this action and the claims asserted herein, pursuant to 28. U.S.C. § 1331 ("federal question jurisdiction") and § 1338(a) (actions arising under any Act of Congress relating to copyright claims), in that this action arises under the laws of the United States and, more specifically, Acts of Congress relating to copyrights. The matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

2.     Defendants are subject to personal jurisdiction of the Court because they reside and/or conduct business in the State of Colorado.

3.     Venue is properly laid in this district pursuant to 28 U.S. C. 1400(a) and (b).   This Court is a proper venue for this copyright infringement case because (a) the agent for Plaintiff's may be found in the State of Colorado and/or (b) each Defendant does business in the State of Colorado, or has otherwise engaged in tortious conduct injuring the Plaintiff in the State of Colorado.

Case 1:17-cv-02729  Document 1  Filed 11/14/17  USDC Colorado  Page 4 of 25
Case 2:18-cv-08074-CBM-AS  Document 232-2  Filed 03/29/22  Page 43 of 182  Page ID
#:4947

## THE PARTIES

4.      This litigation arises from, inter alia, defendant's wrongful and unjustified theft of intellectual property, namely an original spec screenplay entitled: "*Pirates of the Caribbean*" (hereafter known as *"The Screenplay"*).

5.      Plaintiff A. Lee Alfred, II is a citizen of the United States and resides in California. Plaintiff Ezequiel Martinez, Jr. is a citizen of the United States and resides in California. Plaintiff Tova Laiter is a citizen of the United States and resides in California.

6.      On information and belief, defendant The Walt Disney Company (hereinafter known as "*Defendants"* or "*TWDC")* is incorporated in Delaware, with its principal place of business in California, and it is duly qualified to transact business in the state of Colorado.

7.      There are persons and/or entities who or which do or may have liability upon one or more of the claims asserted or to be asserted in this action and who or which are identified in this Complaint only as John and/or Jane Does and/or Doe Entities, whose true name is unknown. Either their identities are not yet known to Plaintiffs or the facts concerning their liability and/or their amenability or capacity to be joined as defendants in this case are not yet sufficiently known to Plaintiffs to allow their joinder in this pleading.  As additional facts concerning such matters are learned, Plaintiffs will move promptly to amend this Complaint accordingly.

## HISTORY AND LORE OF PIRATES IN
## MYTH, LITERATURE, FILM AND SONG

8.      Throughout history there has been the lore and myth of pirates that have pervaded literature, song and film.  With works like, "*A General History of the Pyrates*" (1724), by Captain

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 5 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 44 of 182   Page ID
#:4948

Charles Johnson.  Additionally, there is literature such as "*Robinson Crusoe*," "*Treasure Island*," "*Peter Pan*," "*Captain Singleton*," "*The Pirate*," "*The Gold-Bug*," "*The Coral Island*," "*The Red Rover*," among many others.

9.    These traditional expressions of pirates include looking for treasure, are feared by all and are not shown to be good men with a sense of humor.

10.    Films have covered swashbuckling pirates, many adaptations from literature, such as "*Treasure Island*," "*Peter Pan*," "*Savage Island*," "*The Buccaneer*," "*The Pirate*," "*The Island*," "*Captain Blood*," "*Blackbeard the Pirate*," and "*Yellowbeard*," among many others.  While the majority of these pirates films have a love story/triangle, the pirates themselves are brutal and not historically portrayed as humorous and good men.

11.    Pirates are traditionally (and historically) evil, loathsome, feared and enemies of mankind.  These works typically describe pirates as bearded, eye patched, peg legged with a hook in place of their hand.

12.    Pirates have not been expressed as "humorous" or "good men", but as fearsome men who terrorize all that are in their path of destruction.

**CAPTAIN JACK AS AN EXPRESSION OF A UNIQUELY NEW "PIRATE"**

13.    Pirates in film, while handsome or good looking, have not been depicted as having a sense of humor, until "Captain Jack Sparrow" in the *Pirates* franchise.  This "new" pirate, who is funny, not feared, and repeatedly referred to as a "good man" has not only created a new pirate character, but created a Pirates franchise that has been wholly centered on this new pirate character.  This "Captain Jack Sparrow" character is widely recognizable and consistently differs from the traditional character of pirates.  The "Captain Jack Sparrow" in character is substantially similar

Case 1:17-cv-02729 Document 1 Filed 11/14/17 USDC Colorado Page 6 of 25
Case 2:18-cv-08074-CBM-AS Document 232-2 Filed 03/29/22 Page 45 of 182 Page ID
#:4949

to the character "Davy Jones" in *"The Screenplay"*. (see *Exhibits 1 & 5*)

## FACTUAL BACKGROUND

14.     Every young screenwriter dreams of writing that fresh and creative script that can catch the attention of a major film studio. The opportunity to have a major film studio, such as Defendants, take a screenwriter's original spec screenplay and turn the work into a major motion picture is the ultimate dream.

15.     A. Lee Alfred, II and Ezequiel Martinez, Jr. almost realized that dream, but they this dream quickly turned into a nightmare, when their original work, *"The Screenplay"*, was intentionally copied and commercially exploited by Defendant's, creating a billion-dollar franchise, with no credit or compensation to Alfred or Martinez.

16.     A. Lee Alfred II and Ezequiel Martinez, Jr, through their Producer, Tova Laiter, submitted their original screen play *Pirates of the Caribbean* (*"The Screenplay"*) in August 2000 to Defendants. (see *Exhibit 2.*)

17.     Both Alfred and Martinez had previously submitted an original spec screenplay *"Red Hood"* to Defendants in October 1999, through their same producer Tova Laiter.

18.     Defendants elected to produce *"Red Hood"* and invited both Alfred and Martinez to work with Brigham Taylor, Josh Harmon, Michael Haynes, (et al) on the development of the *"Red Hood"* project.

19.     In fact, Defendants paid for Alfred and Martinez to join the Writers Guild, as is required for all screenwriters at *TWDC*.

20.     Alfred and Martinez began to make several trips monthly to *TWDC* to work on this

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 7 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 46 of 182   Page ID
#:4950

project, without a contract completed and without compensation.

21.    These young writers, fresh out of film school, were ecstatic to work with Defendants and felt as if their dreams were coming true.

22.    From October 1999 through October 2000, both Alfred and Martinez worked with the Defendant's creative team on "*Red Hood*."

23.    The contract for the purchase of this screenplay was being reviewed by attorneys and without compensation or a properly executed contract, they continued to "trust" that Defendants would compensate them for their original spec screenplay.

24.    While working on the creative team for "*Red Hood*", both Alfred and Martinez developed an idea for an original spec screenplay entitled "*Pirates of the Spanish Main."*

25.    Due to their relationship with Defendants at the time, Alfred and Martinez retitled the original spec screenplay "*Pirates of the Caribbean."*

26.    This name change was when both writers realized that the ride had "no story" and they began to envision their screenplay incorporating the basic elements of the *Pirates of the Caribbean* ride while creating a new story focused upon a supernatural element.

27.    Alfred and Martinez wrote *"The Screenplay"* and the final draft was completed on July 19th, 2000.  (see *Exhibit 2.)*

28.    Tova Laiter reviewed several drafts of *"The Screenplay"* and after July 19th, 2000, received the final draft entitled "*Pirates of the Caribbean*" and began to "shop" the original spec screenplay to several different producers, studios and directors.

29.    Laiter discussed *"The Screenplay"* with Brigham Taylor, at *TWDC*, and upon Taylor's encouragement and desire to consider *"The Screenplay"* submitted *"The Screenplay"* to Taylor on August 9th, 2000.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 8 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 47 of 182   Page ID
#:4951

30.     With the original spec screenplay, the writers also submitted a Sizzle Reel (created by Martinez) and original artwork (created for Alfred and Martinez.)

31.     Taylor suggested that the idea of a film based on the *Pirates of the Caribbean* ride had been suggested over the years and that the Defendants had considered making a film based on the *Pirates of the Caribbean* ride recently.

32.     However, Taylor, expressly stated to Laiter that the Defendants "had no treatment or script."  (see *Exhibit 3.)*

33.     After the submission of *"The Screenplay",* Sizzle Reel and original artwork, Laiter, Alfred and Martinez waited to hear from Taylor as to whether Defendants would be interested in producing *"The Screenplay".*

34.     They heard nothing from Taylor for many weeks.  (This was odd because it is the industry standard to pass on or accept a project within 1-2 weeks.)

35.     Laiter made numerous phone calls to follow up with Taylor.

36.     Alfred and Martinez also mentioned *"The Screenplay"* to Taylor and Harmon, when at *TWDC* to discuss "*Red Hood*."

37.     Specifically, Alfred and Martinez attended a meeting with Taylor and Harmon, where upon arriving early, they noticed their script and artwork on a coffee table in Taylor's office.

38.     After mentioning *"The Screenplay"* and asking whether they would be discussing this project, they were quickly ushered out of the office to wait for Taylor.

39.     When they returned to the office, a short time later, all materials that had been on the coffee table had been moved and the meeting ended abruptly.

40.     Within a week, both Alfred and Martinez had their contract and compensation for *"Red Hood"* and were not invited back to TWDC.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 9 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 48 of 182   Page ID
#:4952

41.     Shortly thereafter, Laiter was informed by Taylor that the Defendants were going to pass on the project due to children being in *"The Screenplay."*  Alfred and Martinez were both on the phone (listening on silent) when Laiter was informed that Defendants were passing on the original spec screenplay and passing on the project.

42.     At no point during the conversation did the Defendants state that they had another screenplay already and were moving forward with a *"Pirates of the Caribbean"* film project.

43.     Traditionally, in the film industry, when a studio passes on a project, the original works are returned immediately to the submitters.  This is an industry accepted standard designed to prevent the "unintentional" copying of any original spec screenplay submitted to the studios.

44.      At the time that Defendants passed on Alfred and Martinez's original spec screenplay, it was not returned.

45.     In fact, *"The Screenplay"* was never returned to Laiter or Alfred.

46.     Just over two years later, on November 26th, 2002, *"The Screenplay"* was returned to Martinez, via U.S.P.S. Priority Mail, with the return address of "B. Taylor" at TWDC. (see *Exhibit 4.)*

47.     It is highly unusual that Defendants returned the original spec screenplay to Martinez and not Laiter, who originally submitted the original spec screenplay as the Producer of the project.

48.      It is also highly unusual to return a script over two years later.  At the time, the original spec screenplay was returned to Martinez, Defendants were already in production on the first *"Pirates of the Caribbean"* film.

49.     The first *"Pirates of the Caribbean"* film, *"Pirates of the Caribbean: The Curse of the Black Pearl"* premiered just over seven months later, on July 9th, 2003.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 10 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 49 of 182   Page ID
#:4953

50.     It was upon viewing the first film that Alfred, Martinez and Laiter realized the many similarities between their original spec screenplay and *"Pirates of the Caribbean: The Curse of the Black Pearl"*.

51.     The similarities have continued throughout the entire *"Pirates of the Caribbean"* franchise.

52.     The Defendants intentionally, blatantly, and without authorization copied the work of Alfred and Martinez.   Themes, settings, plot, several characters, and dialogues from *"The Screenplay",* some practically verbatim, have been copied by the Defendants into *"Pirates of the Caribbean: The Curse of the Black Pearl",* and in every subsequent sequel, including the 2017 release of *"Pirates of the Caribbean: Dead Men Tell No Tales,"* (2017).

53.     Defendant's unauthorized copying and appropriation of *"The Screenplay"* is just another misappropriation of intellectual property of others in their longstanding history of copying other's original material.   From allegedly *Lion King* to *Toy Story, Monsters, Inc. to Up,* and in more recent years, *Frozen, Inside Out*, to *Zootopia* and many others*,* Defendants have a long history of disregarding Copyright law and making tremendous profit without compensating the very individuals that created these original expressions.

54.     Alfred, Martinez and Laiter seek to hold Defendants responsible for their theft of intellectual property and the unauthorized copying of their original spec screenplay.   They also seek to hold Defendants responsible for their future loss of reputation, income and the emotional and physical distress caused by their intentional acts.

Case 1:17-cv-02729  Document 1  Filed 11/14/17  USDC Colorado  Page 11 of 25
Case 2:18-cv-08074-CBM-AS  Document 232-2  Filed 03/29/22  Page 50 of 182  Page ID
#:4954

## COPYRIGHTABLE ELEMENTS

55.    Copyright law was enacted in 1790 under the United States Copyright Law Act (and further covering Motion Pictures in 1912) for the very purpose of protecting original works of authorship from any unauthorized copying by individuals or corporations.  The law itself was most certainly enacted to protect the inexperienced and naïve individuals from being taken advantage of by those who would benefit from the unauthorized copying of these individuals work.

56.    In *Litchfield v. Spielberg,* 736 F.2d 1352, 1356 (9th Cir. 1984); the Courts held: "To prove copyright infringement, the Plaintiff must show (1) ownership of the copyright, (2) access to the copyrighted work, and (3) substantial similarity between the copyrighted work and the defendant's work."

*57.*    Ownership of *"The Screenplay"* vested on July 19th, 2000, when the Plaintiffs affixed their original expression in a tangible medium.  17 U.S.C. § 102(a).  (see *Exhibit 3.*)

58.    Defendants had access to the copyrighted work on August 9th, 2000, when Tova Laiter sent *"The Screenplay",* original artwork and Sizzle Reel, to Brigham Taylor. (see *Exhibit 2.*)

59.    Defendants returned a copy of *"The Screenplay",* via U.S.P.S. Priority Mail, to the Plaintiff, Ezequiel Martinez, Jr. on November 26th, 2002, therefore; Defendants had access to *"The Screenplay",* at the very minimum, for the period of August 9th, 2000 until November 26th, 2002. (see *Exhibits 3&4.*)

60.    "To prove infringement, a Plaintiff must show that the works are substantially similar in both *ideas* and *expression." Sid & Marty Krofft*, 562 F.2d at 1164 (9th Cir. 1977). Similarity of ideas may be shown by an extrinsic test which focuses on alleged similarities in the

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 12 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 51 of 182   Page ID
#:4955

objective details of the works. *Id.* The extrinsic test requires a comparison of plot, theme, dialogue, mood, setting, pace and sequence. *Jason v. Fonda*, 698 F.2d 966 (9th Cir. 1982), *incorporating by reference*, 526 F. Supp. 774, 777 (C.D.Cal.1981)."

## DEFINTIONS OF ELEMENTS IN EXTRINSIC TEST

61.    Plot: refers to a series of dramatic events or actions that make up a film's narrative. A plot point is a key turning point or moment in a film's story that significantly advances the action. Plot points either set the story further into motion, or disrupt and complicate the plot; also known as beat or A story; contrast to a subplot (aka B story or C story) - a secondary plot in a film; a plot plant is the technique of 'planting' an apparently trivial piece of information early in a story - that becomes more important later on;

62.    Theme:  the central characteristic, idea, concern or motif in a film;

63.    Dialogue: any spoken lines in a film by an actor/actress. It may be considered overlapping if two or more characters speak simultaneously. In film-making, it is recording dialogue to match lip movements on previously-recorded film.

64.    Mood:  emotional tone; atmosphere or pervading tone;

65.    Setting:  the time (time period) and place in which the film's story occurs, including all of the other additional factors, including climate (season), landscape, people, social structures and economic factors, customs, moral attitudes, and codes of behavior, also known as locale;

66.    Pace:  the speed/tempo of the dramatic action, which is usually enhanced by the soundtrack and the speed of the dialogue, the type of editing, etc.;

67.    Sequence:  a scene, or connected series of related scenes that are edited together and comprise a single, unified event, setting, or story within a film's narrative; it also refers to

scenes that structurally fit together in the plots; sequence usually refers to a longer segment of film than a scene and sequences are often grouped into acts (like a three-act play). A sequence shot refers to a long, normally complicated shot with complex camera movements and actions;

68.    "To constitute infringement of expression, the total concept and feel of the works must be substantially similar. *Sid & Marty Krofft*, 562 F.2d at 1164."

69.    *"The Screenplay"* is substantially similar in total concept and feel of the works of the *Pirates* franchise through the plot, theme, dialogue, mood, setting, pace, sequence.  (*Exhibit 5.)*

## CHARACTER

70.    "Characters that have received copyright protection have displayed consistent, widely identifiable traits."  *Rice v. Fox Broadcasting Company*, 330 F.3d 1170, 1175 (9th Cir. 2003).   To show that characters are eligible for copyright protection Plaintiffs must show that character is sufficiently delineated through showing consistent and widely identifiable traits.

71.    The overall character of *"The Screenplay"* and the key characters in "The Screenplay" are delineated and consistent, widely identifiable with several of the character and characters of the *Pirates* franchise.  (*Exhibit 5.)*

### FIRST CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
### (REPRODUCTION OF COPYRIGHTED WORK)

72.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

73.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

74.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] reproduc[tion] the copyrighted work in copies or phonorecords." 17 U.S.C. § 106(1).

75.    Plaintiffs' exclusive rights to *"The Screenplay"*, Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay"*, Sizzle Reel, and original artwork.

76.    Plaintiffs, have the right and standing to enforce their exclusive rights to *"The Screenplay"*, Sizzle Reel, and original artwork and its copyrightable elements.

47.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

48.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

49.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', reproduced the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay"*, Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

50.    Specifically, Defendants prepared reproductions of the Plaintiffs' original works of

authorship, with the following works: "The Pirates of the Caribbean: The Curse of the Black
Pearl" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "Pirates of the Caribbean:
*At World's End*" (2007); "Pirates of the Caribbean: On Stranger Tides" (2011); and "Pirates of
the Caribbean: Dead Men Tell No Tales" (2017).

51.    "Anyone who violates any of the exclusive rights of the copyright owner . . . is an
infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

52.    Defendants' infringement was and continues to be intentional, deliberate, willful,
malicious, and in blatant disregard of Plaintiff's exclusive rights. Defendants are currently
preparing reproductions of Plaintiffs' original works of authorship. Defendants never obtained a
license from Plaintiffs to prepare reproductions of Plaintiffs' original works of authorship.
Defendants are violating Plaintiffs' exclusive rights to reproduce Plaintiffs' original works of
authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b),
Plaintiffs are instituting an action for willful infringement by Defendants.

53.    Defendants' infringing conduct has caused Plaintiff to suffer damages and harm,
including but not limited to, lost derivative market exploitation opportunity, lost revenues and
profits, loss of creative attribution, loss of integrity, lost market share and other damages. The
exact nature and extent of said damages will be proven at trial and exceeds the minimum
jurisdictional requirements of this Court.

54.    Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery
of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. §
504.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 16 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 55 of 182   Page ID
#:4959

## SECOND CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
## (PREPARATION OF DERIVATIVE WORKS)

55.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

56.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

57.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] prepar[ation] of derivative works based upon the copyrighted work." 17 U.S.C. § 106(2).

58.    Plaintiffs' exclusive rights to "The Screenplay", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

59.    Plaintiffs, have the right and standing to enforce their exclusive rights to "The Screenplay", Sizzle Reel, and original artwork and its copyrightable elements.

60.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

61.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

62.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', prepared derivative works based on the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 17 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 56 of 182   Page ID
#:4960

63.     Specifically, Defendants prepared the following derivative works of the Plaintiffs' original works of authorship: "The Pirates of the Caribbean: The Curse of the Black Pearl" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "Pirates of the Caribbean: On Stranger Tides" (2011); and "Pirates of the Caribbean: Dead Men Tell No Tales" (2017).

64.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

65.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently preparing derivative works based on Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs' to prepare reproductions of Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to prepare derivative works based on Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs' are instituting an action for willful infringement by Defendants.

66.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

67.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 18 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 57 of 182   Page ID
#:4961

### THIRD CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
### (DISTRIBUTION OF COPYRIGHTED WORK)

69.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

70.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

71.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the] distribut[ion] copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 106(3).

72.    Plaintiffs' exclusive rights to "The Screenplay", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

73.    Plaintiffs, have the right and standing to enforce their exclusive rights to "The Screenplay", Sizzle Reel, and original artwork and its copyrightable elements.

74.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

75.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

76.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', distributed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates franchise.

77.    Specifically, Defendants distributed the Plaintiffs' original works of authorship,

with the following works: "The Pirates of the Caribbean: The Curse of the Black Pearl" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "*Pirates of the Caribbean: At World's End*" (2007); "Pirates of the Caribbean: On Stranger Tides" (2011); and "Pirates of the Caribbean: Dead Men Tell No Tales" (2017).

78.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

79.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently distributing Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to distribute Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to distribute Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

80.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

81.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 20 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 59 of 182   Page ID
#:4963

## FOURTH CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT
### (PUBLIC PERFORMANCE OF COPYRIGHTED WORK)

83.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

84.    *"The Screenplay"*, Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

85.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, t[he] perform[ance of] the copyrighted work publicly." 17 U.S.C. § 106(4).

86.    Plaintiffs' exclusive rights to "The Screenplay", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in *"The Screenplay",* Sizzle Reel, and original artwork.

87.    Plaintiffs, have the right and standing to enforce their exclusive rights to "The Screenplay", Sizzle Reel, and original artwork and its copyrightable elements.

88.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

89.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

90.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', publicly performed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "The Screenplay", Sizzle Reel, and original artwork by producing and distributing the various works that comprise the Pirates of the Caribbean

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 21 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 60 of 182   Page ID
#:4964

franchise.

91.     Specifically, Defendants publicly performed the Plaintiffs' original works of authorship, with the following works: "The Pirates of the Caribbean: The Curse of the Black Pearl" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "Pirates of the Caribbean: *At World's End*" (2007); "Pirates of the Caribbean: On Stranger Tides" (2011); and "Pirates of the Caribbean: Dead Men Tell No Tales" (2017).

92.     "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

93.     Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiffs' exclusive rights. Defendants are currently publicly performing Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to publicly perform Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights publicly perform Plaintiffs' original works of authorship and are willfully infringing on Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

94.     Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

95.     Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. § 504.

Case 1:17-cv-02729   Document 1   Filed 11/14/17   USDC Colorado   Page 22 of 25
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 61 of 182   Page ID
#:4965

**FIFTH CLAIM FOR RELIEF FOR INFRINGEMENT OF COPYRIGHT**
**(PUBLIC DISPLAY OF COPYRIGHTED WORK)**

97.    "Copyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a).

98.    "The Screenplay", Sizzle Reel, and original artwork, are original works of authorship by the Plaintiffs fixed in a tangible medium of expression on July 19th, 2000.

99.    "[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly." 17 U.S.C. § 106(5).

100.    Plaintiffs' exclusive rights to "The Screenplay", Sizzle Reel, and original artwork extend to the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "The Screenplay", Sizzle Reel, and original artwork.

101.    Plaintiffs, have the right and standing to enforce their exclusive rights to "The Screenplay", Sizzle Reel, and original artwork and its copyrightable elements.

102.    Plaintiffs have duly complied with all the provisions of the copyright laws of the United States related to their original works of authorship. The Plaintiffs registered their original works of authorship with the U.S. Copyright Office on October 3rd, 2017.

103.    Defendants had access to "The Screenplay", Sizzle Reel, and original artwork.

104.    Defendants have willfully, for commercial exploitation, and without permission of the Plaintiffs', publicly displayed works containing the themes, settings, dialogue, characters, plot, pace, sequence of events, and mood expressed in "*The Screenplay",* Sizzle Reel, and original

artwork by producing and distributing the various works that comprise the Pirates of the Caribbean franchise.

105.   Specifically, Defendants publicly displayed the Plaintiffs' original works of authorship, with the following works: "The Pirates of the Caribbean: The Curse of the Black Pearl" (2003); "*Pirates of the Caribbean: Dead Man's Chest*" (2006); "Pirates of the Caribbean: *At World's End*" (2007); "Pirates of the Caribbean: On Stranger Tides" (2011); and "Pirates of the Caribbean: Dead Men Tell No Tales" (2017).

106.   "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author, as the case may be." 17 U.S.C. § 501(a).

107.   Defendants' infringement was and continues to be intentional, deliberate, willful, malicious, and in blatant disregard of Plaintiff's exclusive rights. Defendants are currently publicly displaying Plaintiffs' original works of authorship. Defendants never obtained a license from Plaintiffs to publicly display Plaintiffs' original works of authorship. Defendants are violating Plaintiffs' exclusive rights to publicly perform Plaintiffs' original works of authorship and are willfully infringing on the Plaintiffs' copyright. Pursuant to 17 U.S.C. § 501(b), Plaintiffs are instituting an action for willful infringement by Defendants.

108.   Defendants' infringing conduct has caused Plaintiffs to suffer damages and harm, including but not limited to, lost derivative market exploitation opportunity, lost revenues and profits, loss of creative attribution, loss of integrity, lost market share and other damages. The exact nature and extent of said damages will be proven at trial and exceeds the minimum jurisdictional requirements of this Court.

109.   Accordingly, Plaintiffs are entitled to an award against Defendants for the recovery of Defendants' profits, Plaintiffs' actual damages and punitive damages, pursuant to 17 U.S.C. §

504.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, respectfully prays for judgment against each and all of the Defendants upon each and all of the claims for relief asserted herein above, including and without limitation:

(1)    on the FIRST FIVE Claims for relief, the copyright owners' actual damages and any additional profits of the infringer as provided by 17 U.S.C. § 504(b).

(2)    on the FIRST FIVE Claims for relief, temporary and final injunctive relief "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright" as provided by 17 U.S.C. § 502(a) to restrain any further acts of infringement.

(3)    prejudgment or moratory interest in accordance with law; and

(4)    such other and further relief as the Court deems just and proper under the circumstances.

**PLAINTIFFS REQUESTS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

Dated this 14th day of November, 2017.

**MACEAU LAW:**

_/S/ Elizabeth M. Thomas_

Elizabeth M. Thomas
Ryan C. Gillman
Gregory A. Maceau
1465 North Union Blvd., Suite #100
Colorado Springs, CO 80909
Telephone: 719-633-2222
Email: elizabeth@maceaulaw.com

# Exhibit 6

Steven T. Lowe, SBN 122208
Aleksandra Hilvert, SBN 258463
**LOWE & ASSOCIATES**, a Professional Corporation
8383 Wilshire Blvd. Suite 1038
Beverly Hills, California 90211
Telephone: (310) 477-5811

Attorneys for Plaintiffs,
Arthur Lee Alfred II and
Ezequiel Martinez Jr.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ARTHUR LEE ALFRED, II**, an individual; AND **EZEQUIEL MARTINEZ, JR.**, an individual, <br><br> Plaintiffs, <br> v. <br><br> **THE WALT DISNEY COMPANY**, a Delaware corporation; **BRIGHAM TAYLOR**, an individual; **DISNEY ENTERPRISES INC**., a Delaware Corporation; **WALT DISNEY PICTURES**, a California company; **WALT DISNEY MOTION PICTURES GROUP, INC**., a California corporation; **THE DISNEY STORE INC.**, a California corporation; **WALT DISNEY PARKS AND RESORTS**, a Florida company; **DISNEY+** a California company; **DISNEY CONSUMER PRODUCTIONS, INC.,** a California Corporation; **DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC**., a California corporation; **DISNEY BOOK GROUP, LLC.,** a Delaware Limited | CASE NO. 2:18-CV-08074-CBM-AS <br><br> Assigned to Hon. Consuelo Marshall <br><br> PLAINTIFFS' *FIRST AMENDED* COMPLAINT FOR DAMAGES FOR: <br><br> 1. COPYRIGHT INFRINGEMENT (FILM & DERIVATIVE WORKS) <br><br> **DEMAND FOR JURY TRIAL** <br><br> Complaint Filed: Nov. 14, 2017 (Colorado District Court 1:17-CV-02729) <br> Trial: TBD |

Liability Company; **DISNEY INTERACTIVE STUDIOS, INC**., a California corporation; **WALT DISNEY ATTRACTIONS TECHNOLOGY LLC**, a Delaware Limited Liability Company; **WALT DISNEY THEATRICAL RECORDINGS**, a California Corporation; **DISNEY MEDIA DISTRIBUTION**, a California company; **BUENA VISTA PICTURES DISTRIBUTION, INC.**, a California Company; **AMERICAN BROADCASTING COMPANY,** a New York Company; **BUENA VISTA MEDIA**, a California corporation; **BUENA VISTA HOME ENTERTAINMENT**, **INC**. a California Company; **BUENA VISTA THEATRICAL GROUP LTD**., a New York Corporation; **BUENA VISTA CATALOGUE CO.,** a California Company**; BUENA VISTA NON-THEATRICAL, INC.,** a California Corporation; **BUENA VISTA PRODUCTIONS,** a California corporation, **BUENA VISTA THEATERS, INC.,** a California corporation; **BUENA VISTA VIDEO ON DEMAND,** a California corporation; **BUENA VISTA BOOKS, INC.,** a California corporation; and DOES 1-50, inclusive,

Defendants.

PLAINTIFFS' FIRST AMENDED COMPLAINT

PLAINTIFFS Arthur Lee Alfred, II, and Ezequiel Martinez ("Plaintiffs") hereby allege as follows:

**PARTIES**

1.     At all times mentioned herein, Plaintiff ARTHUR LEE ALFRED, II ("Alfred") is an individual residing in the State of California.

2.     At all times mentioned herein, Plaintiff EZEQUIEL MARTINEZ JR. ("Martinez") is an individual residing in the State of California.

3.     Alfred and Martinez shall be collectively referred to as "Plaintiffs."

4.     Upon information and belief, Defendant THE WALT DISNEY COMPANY ("Defendant TWDC") is incorporated in Delaware, with its principal place of business in Burbank, California.

5.     Upon information and belief, Defendant DISNEY ENTERPRISES, INC. ("Defendant DEI") is incorporated in Delaware, with its principal place of business in Burbank, California.

6.     Upon information and belief, Defendant WALT DISNEY PICTURES ("Defendant Disney Pictures") is incorporated in California, with its principal place of business in Burbank, California. Defendant Disney Studios is a division of Defendant TWDC and is a film production studio arm of Walt Disney Studios.

7.     Upon information and belief, Defendant WALT DISNEY MOTION PICTURES GROUP, INC. ("Defendant Disney Motion Pictures") is incorporated in California, with its principal place of business in Burbank, California.

8.     Upon information and belief, Defendant THE DISNEY STORE INC. ("Defendant Disney Store") is incorporated in California, with its principal place of business in Burbank, California.

9. Upon information and belief, Defendant DISNEY CONSUMER PRODUCTIONS, INC. ("Disney Consumer") is a California corporation with its principal place of business in Burbank, California.

10. Upon information and belief, Defendant DISNEY CONSUMER PRODUCTIONS AND INTERACTIVE MEDIA, INC., ("Disney Media") is a California corporation with its principal place of business in Burbank, California.

11. Upon information and belief, Defendant DISNEY BOOK GROUP, LLC., ("Disney Book") is a Delaware Limited Liability Company.

12. Upon information and belief, Defendant DISNEY INTERACTIVE STUDIOS, INC. ("Disney Interactive") is a California corporation with its principal place of business in Burbank, California.

13. Upon information and belief, Defendant WALT DISNEY ATTRACTIONS TECHNOLOGY LLC ("Disney Attractions") is a Delaware Limited Liability Company.

14. Upon information and belief, Defendant WALT DISNEY THEATRICAL RECORDINGS ("Disney Recordings") is a California Corporation with its principal place of business in Burbank, California.

15. Upon information and belief, Defendant WALT DISNEY PARKS AND RESORTS U.S., Inc. ("Defendant Disney Parks") is incorporated in Florida, with its principal place of business in Orlando, Florida.

16. Upon information and belief, Defendant DISNEY+ ("Defendant Disney+") is owned and operated by DISNEY MEDIA DISTRIBUTION.

17. Defendant DISNEY MEDIA DISTRIBUTION ("Defendant Disney Distribution") is incorporated in California, with its principal place of business in Burbank, California.

18. Upon information and belief, Defendant BUENA VISTA PICTURES DISTRIBUTION ("Defendant Buena Vista") is owned and operated

3

by Defendant AMERICAN BROADCASTING COMPANY. Defendant Buena Vista, among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

19. Upon information and belief, Defendant BUENA VISTA HOME ENTERTAINMENT ("Defendant Buena Vista Ent.") is incorporated in California, with its principal place of business in Burbank, California. Defendant Buena Vista Ent., among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

20. Upon information and belief, Defendant BUENA VISTA MEDIA ("Defendant Buena Vista Media") is incorporated in California, with its principal place of business in Burbank, California.

21. Upon information and belief, Defendant BUENA VISTA PRODUCTIONS ("Defendant Buena Vista Productions") is incorporated in California, with its principal place of business in Burbank, California.

22. Upon information and belief, Defendant BUENA VISTA THEATERS, INC ("Defendant Buena Vista Theaters") is incorporated in California, with its principal place of business in Burbank, California.

23. Upon information and belief, Defendant BUENA VISTA THEATRICAL GROUP LTD. ("Defendant Buena Vista Theatrical") is incorporated in New York, with its principal place of business in New York, New York.

24. Upon information and belief, Defendant BUENA VISTA VIDEO ON DEMAND ("Defendant Buena Vista VOD") is incorporated in California, with its principal place of business in Burbank, California.

25. Upon information and belief, Defendant BUENA VISTA BOOKS ("Defendant Buena Vista Books") is incorporated in California, with its principal place of business in Burbank, California.

4

26.    Upon information and belief, Defendant BUENA VISTA NON THEATRICAL, INC. ("Defendant Buena Vista Non-Theatrical") is incorporated in California, with its principal place of business in Burbank, California.

27.    Upon information and belief, Defendant AMERICAN BROADCASTING COMPANY ("Defendant ABC") is incorporated in New York, with its principal place of business in New York, New York. Defendant ABC, among others, is a distributor of the *Pirates of the Caribbean* franchise of films.

28.    The foregoing entities shall hereinafter be collectively referred to as "Disney".

29.    For the purposes of this pleading, the Pirates of the Caribbean franchise currently consists of the original film "Pirates of the Caribbean: Curse of the Black Pearl" (the "Film") released to the public on June 28, 2003; "Pirates of the Caribbean: Dead Man's Chest" ("POTC 2") released to the public on June 24, 2006; "Pirates of the Caribbean: At World's End" ("POTC 3") released to the public on May 25, 2007; "Pirates of the Caribbean: On Stranger Tides" ("POTC 4") released to the public on May 7, 2011; "Pirates of the Caribbean: Dead Men Tell No Tales" ("POTC 5") released to the public May 26, 2017 and any other films not yet released but which are ultimately released and are derivative of the Film.  The Film, POTC 2, POTC 3, POTC 4, and POTC 5 shall be collectively herein referred to as the "Film Franchise."

30.    At all times mentioned herein, Disney and Taylor shall be jointly referred to as "Defendants".

31.    Plaintiff is unaware of the true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, and for that reason, sues such Defendants under such fictitious names. Plaintiff is informed and believes and on that basis alleges that such fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that

5

Plaintiff's damages as herein alleged were proximately caused by the conduct of said Defendants. Plaintiff will seek to amend the complaint when the names and capacities of such fictitiously named Defendants are ascertained. As alleged herein, "Defendants" shall mean all named Defendants and all fictitiously named Defendants.

32.     Plaintiffs are informed and believe and on that basis alleges that Defendants at all times relative to this action, were agents, servants, partners, joint venturers, and employees of each of the other Defendants and in doing the acts alleged herein were acting with the knowledge and consent of each of the other Defendants in this action. Alternatively, at all times mentioned herein, each of the Defendants conspired with each other to commit the wrongful acts complained of herein. Although not all of the Defendants committed all of the acts of the conspiracy or were members of the conspiracy at all times during its existence, each Defendant knowingly performed one or more acts in direct furtherance of the objectives of the conspiracy. Therefore, each Defendant is liable for the acts of all of the other conspirators.

## JURISDICTION AND VENUE

33.     This action arises under the Copyright Laws of the United States (Title 17, U.S.C. § 101 *et seq.*) and the common law of the State of California.

34.     This court has exclusive jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338 in that this action involves claims arising under the Copyright Laws of the United States. To the extent that this action is based on related state claims, the Court has supplemental jurisdiction thereto under 28 U.S.C. § 1367.

35.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400 in that Defendants transact business in the county of Los Angeles, California.

PLAINTIFFS' FIRST AMENDED COMPLAINT

## **PRELIMINARY STATEMENT**

36.     Every young screenwriter dreams of writing that commercial screenplay that can catch the attention of a major film studio. The opportunity to have a major film studio, such as the defendants to this case, take a screenwriter's original spec screenplay and turn the work into a major motion picture is the ultimate dream.

37.     The screenwriter Plaintiffs almost realized that dream, but this dream quickly turned into a nightmare, when their original screenplay entitled "Pirates of the Caribbean" was intentionally copied and commercially exploited by Defendants, with no credit or compensation to either of the Plaintiffs.

38.     Plaintiff Alfred is a 1998 graduate of California State University in San Bernardino.  Coming from a small African American family, he was the first in his family to graduate college; in fact, Plaintiff Alfred grated at the top of his class with a degree in Communications and Television.  Also, he, along with Plaintiff Martinez, were the first to produce independent films at the university. After graduating, Plaintiff Alfred worked as an intern at MTV Films while simultaneously perfecting his craft of screenwriting.  Thereafter, beginning in 2001, Plaintiff Alfred began working as a producer in the entertainment industry whereby he produced a number of music videos, commercials, infomercials and corporate videos. In 2010, Plaintiff Alfred began working for famous award winning actor/producer/director Forest Whitaker as a Creative Executive. He and Mr. Whitaker worked together for three (3) years.   As Whitaker's Creative Manager, Plaintiff Lee helped develop Juntobox Films, a social media platform for independent filmmakers to create and collaborate on independent films.

39.     Plaintiff Martinez attended California State University in San Bernardino where he studied Film and Television.  Upon information and belief, he produced the first student feature film in the history of any California State University student.   While in school, he was awarded top film student in

7

Southern California by his professors. Thereafter, he joined Paramount Pictures as an intern working on the film VARSITY BLUES. Plaintiff Martinez has made a living as a screenwriter for over twenty-two (22) years, having worked for several years with Madonna's production company Maverick (from 2003 to 2006). At Maverick, he worked with every major studio setting up film and television projects in the entertainment industry.

### PLAINTIFFS SOLD DISNEY THEIR ORIGINAL SCREENPLAY CALLED "RED HOOD" BEFORE SUBMITTING THE PIRATES SCREENPLAY

40. In or about early 1999, Plaintiffs jointly wrote an original "spec" screenplay entitled RED HOOD ("*Red Hood*"). *Red Hood* was an updated version of the folklore tale of *Little Red Riding Hood*. Plaintiffs were able to use their collective experiences as minorities growing up in Los Angeles in the 1980s and 1990s to infuse their writing with an edgy, commercial appealability to a diverse audience. To date, Plaintiffs have jointly written three (3) screenplays together.

41. Plaintiffs, through their producer, Tova Laiter ("Laiter") submitted *"Red Hood"* to various producers and production companies, including Disney, in or about 1999.

42. Defendants, including Taylor, favorably received the *Red Hood* screenplay and elected to option *Red Hood*.

43. Thereafter, Taylor/ Disney, made an offer to Plaintiffs to work with Taylor (and other Disney executives) to develop *Red Hood*. In or about this time, Disney paid for Plaintiffs to join the Writers Guild of America, as was required for all screenwriters who work with Disney.

44. In or about fall of 1999, Defendants, specifically, Taylor, who was at that time employed by Disney as a creative executive, invited Plaintiffs to work with himself, Josh Harmon ("Harmon"), Michael Haynes ("Haynes") and

PLAINTIFFS' FIRST AMENDED COMPLAINT

others on the "development" of the *Red Hood* Project. Upon information and belief, Harmon and Haynes worked in the same department at Disney (along with Taylor); upon information and belief, that department was the motion pictures group department.

45. Thereafter, beginning in approximately the fall of 1999, Plaintiffs began attending multiple meetings in person at the Disney lot in Burbank, California (and telephonically) with Taylor, Harmon and Haynes, for the purpose of developing *Red Hood*.

46. In or about January of 2000, Plaintiffs optioned *Red Hood* to Disney for $15,000. *Red Hood* was never produced by Disney.

47. For approximately one year, from October 1999 through October 2000, Plaintiffs working with Taylor, along with other members of Defendant Disney's creative team, on *Red Hood*, primarily at the Disney lot in Burbank, California.

## PLAINTIFFS WRITE AN ORIGINAL SCREENPLAY ENTITLED "PIRATES OF THE CARIBBEAN"

48. In or about March of 2000, Plaintiffs developed an idea for an original spec screenplay originally entitled *Pirates of the Spanish Main* and began writing the same.

49. On or about July 19, 2000, Plaintiffs finalized the first draft of *The Pirates of the Spanish Main* (which they later retitled *Pirates of the Caribbean* to make it more marketable to Disney) (the "Screenplay"). Given their existing relationship with Disney, Plaintiffs retitled the Screenplay and added some relatively minimal characteristics from the Disney theme park ride of the same name (the "Ride") for the purposes of submitting the Screenplay to Disney.

50. Plaintiffs registered the Screenplay with the United States Copyright Office (a true and accurate copy of a printout from the US Copyright Office database is attached hereto as **Exhibit 1**) registration no. Pau-003855850.

PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs have requested an official copy of the registration itself from the US Copyright Office (which has been delayed due to Covid-19) and will seek to substitute it as Exhibit 1 once received.

51.     Plaintiffs are the owners of all copyright rights in and to the original creative work, the Screenplay in all of its original, unique and protected permutations, and has never assigned, licensed or otherwise transferred its copyright protection to any of the Defendants, nor to any other third party.

52.     On or about August 2, 2000, Laiter had a conversation with Taylor by telephone wherein she described the Screenplay to Taylor.  During that conference, Taylor stated that Disney wanted to make a film related to the Ride and were discussing the foregoing internally.

53.     At that time, Taylor solicited a submission of Plaintiffs' Screenplay. Taylor sounded highly interested during the call – which is to be expected since Taylor already knew that Plaintiffs were capable of writing marketable screenplays.

54.     On or about August 7, 2000, Laiter had a second call with Taylor advising him that she would send the Screenplay to Taylor on August 9, 2000.

55.     Upon Taylor's request, Laiter submitted the Screenplay to Taylor on August 9, 2000.  A true and accurate copy of Laiter's cover letter and the Screenplay itself is attached hereto as **Exhibit 2.**

56.     At the end of the submission letter, Laiter included the following: "Please let me know as soon as possible as I have a draft that does not have the Disney song or the Ride references that I plan to take to other studios."  In other words, the Screenplay stands on its own two feet as a self-contained original creative work, without any dependence upon the Ride.  The Ride references were ancillary, and extraneous added solely to make the Screenplay more marketable to Disney.

PLAINTIFFS' FIRST AMENDED COMPLAINT

57.     Thereafter, Plaintiffs hand delivered a sizzle reel about their project (i.e. a one-minute trailer) and original artwork in order to fully present their concepts to Disney.  The Screenplay, a sizzle reel and original artwork is collectively referred to as the "Materials".  A true and accurate copy of the artwork is attached hereto as **Exhibit 3**; and the sizzle is being lodged herewith as **Exhibit 4**.

58.     Plaintiffs waited to hear from Taylor as to whether Defendants would be interested in producing the Screenplay.  Much to Plaintiffs' dismay, they heard nothing from Taylor for a few months.  This was especially surprising since Laiter's letter included a request for Taylor's prompt response.

59.     Approximately two (2) months later, in early October 2000, Plaintiffs attended a meeting with Taylor and Harmon at the Disney lot to work on *Red Hood*.   Plaintiffs arrived early for the meeting and were brought into Taylor's office to wait for him.

60.     It was at that time that they specifically witnessed their Materials - the Screenplay and artwork on a coffee table in Taylor's office.

61.     Pleasantly surprised, Plaintiffs mentioned the Screenplay to Harmon and asked whether they would be discussing the Screenplay.  Almost immediately thereafter, Plaintiffs were quickly ushered out of Taylor's office.

62.      When the *Red Hood* meeting officially commenced in Taylor's office a short time later, all Materials including the Screenplay were removed and the meeting ended abruptly.  Plaintiffs' invitation to the Disney lot was unceremoniously revoked immediately thereafter.

63.     Thereafter, Plaintiffs were not invited back to meet with either Taylor or other executives at Defendant Disney regarding *Red Hood* or any other project.

64.     Shortly thereafter, Laiter was informed by Taylor via telephone that the Defendants were going to pass on the project due to the presence of children

PLAINTIFFS' FIRST AMENDED COMPLAINT

in the Screenplay.   This seemed to be a strange reason to pass given children are in most of Disney's films and television shows.

## PLAINTIFF'S ORIGINAL SCREENPLAY WAS NOT RETURNED
## UNTIL THE FILM WAS IN PRODUCTION

65.    It is custom and practice in the film industry for original works to be returned immediately to the agent or individual who submitted the work when a studio passes on a project. This is an industry accepted standard designed to prevent the "unintentional" copying of original spec screenplays.

66.    However, at the time that Defendants passed on Plaintiffs' original spec screenplay, it was not returned to Laiter.

67.    Instead, just over two years later, on November 26th, 2002, the Screenplay was returned to _Plaintiff Martinez_, via U.S.P.S. Priority Mail, with the return address of Taylor ("B. Taylor") at Disney.   A true and accurate copy of the return envelope is attached hereto as **Exhibit 5.**

68.    Upon information and belief, in or about September of 2002, Defendants already drafted the final version of the "Shooting Script" (which is the final version of a screenplay used in filming) and production began on the Film on October 9, 2002. Therefore, by the time the original spec screenplay was returned to Plaintiff Martinez, Defendants were already in production on the Film which incorporated significant, striking and substantial elements from Plaintiffs' Screenplay. Defendants had over two (2) years to pour over the contents of the Screenplay, and pirate it as they so desired.

69.    Upon information and belief, in or about May of 2001, Taylor was promoted from Director of Production to Vice President of Production at Disney.

## DISNEY RELEASES PIRATES OF THE CARIBBEAN IN 2003

70.    The first "_Pirates of the Caribbean_" film, "_Pirates of the Caribbean: The Curse of the Black Pearl_" (the "Film") premiered just over

12

seven months later, on June 28, 2003. This was the first installment in what turned out to be an incredibly successful franchise for Disney.

71.     Thereafter, on June 24, 2006, Defendants released *Pirates of the Caribbean: Dead Man's Chest* ("POTC 2") in theaters nationwide. POTC 2 is a direct sequel to the Film and a derivative work thereof. POTC 2 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof. POTC 2 is therefore a separate infringement of Plaintiff's Screenplay.

72.     On May 25, 2007, Defendants released *Pirates of the Caribbean: At World's End* ("POTC 3") in theaters nationwide. POTC 3 is a direct sequel to the Film and a derivative work thereof. POTC 3 utilizes the same basic core expression of the Screenplay, as well containing other similarities according to proof. POTC 3 is therefore a separate infringement of Plaintiff's Screenplay.

73.     On May 7, 2011, Defendants released *Pirates of the Caribbean: On Stranger Tides* ("POTC 4") in theaters nationwide. POTC 4 is a direct sequel to the Film and a derivative work thereof. POTC 4 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof. POTC 4 is therefore a separate infringement of Plaintiff's Screenplay.

74.     On May 26, 2017, Defendants released *Pirates of the Caribbean: Dead Men Tell No Tales* ("POTC 5") in theaters nationwide. POTC 5 is a direct sequel to the Film and a derivative work thereof. POTC 5 utilizes the same basic core expression of the Screenplay as well containing other similarities according to proof. POTC 5 is therefore a separate infringement of Plaintiff's Screenplay.

75.     Many of the similarities identified hereinbelow carried over throughout the entire *Pirates of the Caribbean* franchise.

76.     In 2020, Disney announced that a sixth installment in the Film franchise is being planned for release.

PLAINTIFFS' FIRST AMENDED COMPLAINT

77.     Upon information and belief, the entire POTC Franchise has earned Disney approximately $40,000,000,000 which figure is growing by the second given the vast amount of ticket sales, DVD/Blu-ray and downloaded content, television and streamed content, merchandise, and books and video games.

78.     Inexplicably, in or about 2011 or 2012, Taylor sent Plaintiff Martinez several movie posters for the Film.

## THE SCREENPLAY AND DISNEY'S FILM ARE SUBSTANTIALLY SIMILAR

79.     The Defendants intentionally, blatantly, and without authorization copied the Plaintiffs' Screenplay.  Themes, settings, pace, plot, sequence of events, mood, several characters, and dialogues from the Screenplay, some practically verbatim, have been copied by the Defendants.

80.     David Román, a Professor in the Department of English at the University of Southern California, performed an in depth review and analysis of the Screenplay and the Film and has determined that "there are enough important similarities between the two works to merit a conclusion that one is substantially similar to the other" and otherwise as set forth in his report attached hereto.  Report, pg. 1.

81.     Professor Román holds a PhD and an Master of Arts in Comparative Literature from the University of Wisconsin at Madison and is the author of several award-winning books on twentieth and twenty-first century American literature and culture.   Before teaching at USC, Professor Román taught at the University of Washington and Yale University.    A true and accurate copy of Professor Román's expert report along with his *curriculum vitae* is attached hereto as **Exhibit 6.**

82.     Furthermore, Professor Román has acknowledged, verified and confirmed each of the additional similarities, which were specifically identified

in Plaintiffs' Corrected Opening Brief filed with the Ninth Circuit Court of Appeals on October 8, 2019 as follows:

**Characters**

    a. <u>Main Character: Captain Davey Jones v. Captain Jack Sparrow</u>

83.    In the Screenplay, Davey Jones is described as a cocky, dashing young rogue who is a talented pirate. Similarly, in the Film, Jack Sparrow is a dashing young rogue character that is cocky, and a highly adept pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:08:52; 00:09:43; 00:09:58). For example, in the Film, Jack Sparrow struts down the plank of a boardwalk to steal a ship, taunts British guards by saying "but you have heard of me" and flashes a coy smile at the guards while stealing their ship (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:11:40; 00:18:20; 00:46:50).

84.    Both Jack Sparrow and Davey Jones are also morally ambiguous, opportunistic and more concerned with rum than piracy. The character of Captain Jack Sparrow is introduced as a morally ambiguous, opportunistic pirate who is more concerned with his ship, the Black Pearl, rum and women, than being a pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:10:29; 00:10:41; 00:12:10; 00:44:13; 01:36:00-01:39:00; 01:40:20-40). It is said of Jack Sparrow early in the Film: "That is without a doubt the worst pirate I have ever seen." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:17-20; 00:46:40). Similarly, in the Screenplay the Rascal Scoundrels question Davey Jones' reputation saying: "the great Davey Jones, huh? That's some legend you've got there".

85.    Davey Jones has a significant alcohol problem and is disillusioned with piracy. Similarly, Jack Sparrow has a significant alcohol problem and is also disillusioned with piracy (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:53:58; 01:35:40-01:36:40; 01:41:01). Both Jones and Sparrow want to be known as great pirates, and are even encouraged at some point to be the

PLAINTIFFS' FIRST AMENDED COMPLAINT

pirates they once were, or that legend claims them to be (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:18:20; 01:37:17); however, they routinely fail at doing so. The Rascal Scoundrels are disappointed in Davey Jones, who is always drunk, just as others are disappointed in Jack Sparrow who is always drunk (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:53:58; 01:35:40; 01:39:00).

> b. Main Character: Captain Jack Nefarious v. Captain Barbossa

86.    In the Screenplay, Captain Jack Nefarious is sinister, morally ambiguous and opportunistic. Nefarious is a pirate that is more concerned with finding treasure by any means necessary, including forcing Davey Jones overboard while taking his ship.  Similarly, in the Film, Captain Barbossa is seen as sinister, morally ambiguous and opportunistic. For example, Barbossa betrays Sparrow, maroons him on an island and hijacks the Black Pearl. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:25). Nefarious/Barbossa were originally Davey Jones'/Jack Sparrow's first mates and the pairs quickly become arch-rivals in both the Screenplay and the Film (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:29:45; 00:53:12; 01:07:00; 01:52:25). In yet another parallel, Nefarious and Barbossa both even shoot their own crew member to further their own objectives (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:13:03). However, both characters somehow remain infinitely likable and charming in their own way. *See generally,* Screenplay and Film.

> c) Supporting Characters: Rascal Scoundrels v. Jack Sparrow's Crew

87.    In the Screenplay, the Rascal Scoundrels are introduced as a ragtag crew of orphans, fiercely loyal to Davey Jones. The Rascal Scoundrels are immature, as demonstrated by their slapstick humor, yet they have violent tendencies. Appellants' Screenplay depicts this crew of Rascal Scoundrels led by

PLAINTIFFS' FIRST AMENDED COMPLAINT

a dissolute, charismatic pirate captain – Davey Jones. The Scoundrels, as orphaned children, are fascinated with the pirate life.

88.     In the Film, (as in the Screenplay,) Jack Sparrow's crew is introduced in a shipping port town: they are all simple-minded and childlike (engaging in juvenile slapstick humor,) yet have violent and opportunistic tendencies. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:50:43; 1:01:06). While Jack Sparrow's crew may not be children, they are very childlike in behavior. Furthermore, Pintel and Ragetti (albeit members of Barbossa's crew) provide comic relief throughout the Film, such as when they dress up as women to confuse British soldiers, but are also shown as having violent tendencies, similar to the Rascal Scoundrels in the Screenplay (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:30:51; 01:49:07-24).

89.     In yet another purported coincidence, the character Stink in the Screenplay is described as round and plump, with a funny pudgy face, gulping down the last piece of whatever he was eating. Stink is vile and smelly. In the Film, the character Gibbs, who is round and plump with a pudgy face, is known to sleep with pigs and is also described as smelly (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:31; 00:52:11).

### d) Supporting Character: Jane v. Elizabeth

90.     In the Screenplay, the character of Jane, is a young woman who lives in the shipping port town, and longs for adventure on the high seas. Similarly, in the Film, Elizabeth is a young woman who lives in the shipping port town and dreams of pirates and adventure on the high seas. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:32-00:00:52; 00:01:55). In fact, she says "I think it'd be rather exciting to meet a pirate" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:25). Both Jane/Elizabeth rise to the occasion to become fierce warriors and competent pirates, far from being the stereotypical "damsel in distress." (01:59:53). In addition, both

PLAINTIFFS' FIRST AMENDED COMPLAINT

Jane/Elizabeth are sly and cunning, tricking Nefarious/Barbossa to prevent them from finding the final treasure (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:39:45).

### Pace and Sequence of Events

91. The pace and sequence of events in the Screenplay is mirrored in the Film. The Screenplay is fun and fast-paced. The Film is also fun and fast-paced. The sizzle reel prepared by the Plaintiffs that accompanied their Screenplay envisions a fast paced, feature-length film. The following is a synopsis of the sequence of events of the Screenplay and the Film:

92. The Screenplay and Film both uniquely begin with a prologue set around ten years earlier that introduces the characters and love interests before the story begins (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:01:27). In the Screenplay, a privateer ship and a pirate ship exchange cannon fire while Jane and Davey Jones first appear. The opening of *The Curse of the Black Pearl* shows the aftermath of a privateer ship torn apart by cannon fire after being attacked by pirates where Elizabeth first meets Will (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:02:26-00:02:54). Thereafter, in the Screenplay, Davey Jones is engaged in a series of battles with his arch rival and former first mate, Captain Jack Nefarious.

93. Similarly, in the Film, Jack Sparrow and his crew are thereafter engaged in a series of battles with his former first mate, Captain Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:06:10; 01:25:11-02:01:36).

94. In both the Screenplay and the Film, the Davey Jones and Jack Sparrow characters are formally introduced at gunpoint (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:17:40). The backstory to Captain Barbossa in the Film is that Barbossa initiated a mutiny where Jack Sparrow was kicked off the Black Pearl so that Barbossa could commandeer the ship to seek

18

treasure. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:06:25).
Similarly, in the Screenplay, Captain Nefarious' rivalrous history with Davey
Jones begins when Nefarious betrays Davey Jones, taking his ship and treasure
map.

95.    Both works continue when Nefarious/Barbossa attack the shipping
port town in the present looking for key items they need to get to the treasure
(*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:08-00:37:10).
In both battles, the supernatural pirates are first revealed (*Pirates of the
Caribbean: The Curse of the Black Pearl*, at 00:37:10). During the course of the
battle, both Davey Jones/Jack Sparrow manage to escape unscathed (*Pirates of
the Caribbean: The Curse of the Black Pearl*, at 00:44:28). However, in both,
Nefarious/Barbossa also manage to take Jane/Elizabeth captive, imprisoning
them on their ships (*Pirates of the Caribbean: The Curse of the Black Pearl*, at
38:00).

96.    Next, Davey Jones/Jack Sparrow and their crews make their way to
an ominous island (*Pirates of the Caribbean: The Curse of the Black Pearl*,
1:05:08). In the Screenplay this occurs on "Calavera Island,"; in the Film, it
occurs on "Isla de Muerta," (*Pirates of the Caribbean: The Curse of the Black
Pearl*, 01:05:08).[1]   Both islands hold the promise of the final treasure, but leave
the characters disappointed by the actual outcome (*Pirates of the Caribbean:
The Curse of the Black Pearl*, at 01:12:33).

97.    After leaving the island, Davey Jones/Jack Sparrow endure a series
of conflicts with Nefarious/Barbossa that culminate in a fierce ship battle as the
characters reach the cavern containing the final treasure. (*Pirates of the*

---

[1] Translating the names of both islands from Spanish reveals that even the
names are similar. "Calavera Island" means "Skull Island," while "Isla de Muerta"
translates to "Island of the Dead." Both islands also have physical attributes that
include half-submerged skulls (*Pirates of the Caribbean: The Curse of the Black
Pearl*, 01:05:08).

PLAINTIFFS' FIRST AMENDED COMPLAINT

*Caribbean: The Curse of the Black Pearl*, at 01:50:45) During both battles, the characters escape the ships by rowboat to enter the treasure cavern (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:50:38).

98.     Once the characters enter the cavern in the climax of both the Screenplay and the Film, Davey Jones/Jack Sparrow fight Nefarious/Barbossa and their supernatural crews over the sought after treasure (*Pirates of the Caribbean: The Curse of the Black Pearl*, 01:52:25-02:00:00). Both battles show swords sticking through the rib cages of skeletons, (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:55:48) and during this swordfight, Barbossa/Nefarious say to their adversary that they "can't die"/"can't [be] beat" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 1:55:16-18). However, Davey Jones/Jack Sparrow find a way to defeat their adversaries and flee the cavern by rowboat with Jane/Elizabeth (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). Despite both caves being filled with gold and jewels, Davey Jones/Jack Sparrow only end up being able to take a small fraction of the treasure with them while escaping the cavern (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:20). As they emerge from the treasure caverns Davey Jones/Jack sparrow are finally rescued, not by their crews, but by privateer ships (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:04:37). Both works conclude in the bay of the port town, with Davey Jones/Jack Sparrow aboard their respective ships, and returned to their former positions as prestigious captains (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 2:12:00).

99.     Neither the Film nor Screenplay is a love story; they are both action films with supernatural elements. However, both make reference to the importance of romantic relationships – in the Film, Jack Sparrow says that "not all treasure is silver and gold" in reference to Will Turner's relationship with Elizabeth Swan, and in the Screenplay Davey Jones pronounces to his love

PLAINTIFFS' FIRST AMENDED COMPLAINT

interest, Jane, that what "we have is far greater than any treasure!" (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:09:55).

**Dialogue**

100.    The Screenplay and the Film have several instances of similarity of dialogue. In the Film, the Black Pearl is described as "A ship with black sails, that's crewed by the damned" (*Pirates of the Caribbean: The Curse of the Black Pearl*, 00:12:54-55) and in the Screenplay "His ghost sails the seas in his ghost ship". While a black ship with black sails may be common in pirate lore or pirate stories, the use of the description and visual imagery of this ship is strikingly similar; moreover, as discussed *infra,* purported "scenes a faire" are **included** in the analysis. Also, the Black Pearl is "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:54-00:13:00). The Screenplay similarly has the dialogue "Legend says that a big sea monster ate him and spat him out".[2]

101.    A quote from the Screenplay states of Nefarious that "[f]or ten years the Phantom has stopped at nothing... and he'll CRUSH anyone...who gets in his way". In *The Curse of the Black Pearl*, the characters state of Barbossa and his ship that "She's been praying on ships and settlements for near ten years. [And] never leaves survivors." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:29:52).

102.    In the Film, Elizabeth tells Captain Barbossa, "I hardly believe in ghost stories anymore." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:56:44). Similarly, the Screenplay has the Rascal Scoundrels discussing that the tale of "undead Jack" is an old seaman's tale and not real. Further, the existence of cursed pirates is touched on throughout the Film. (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:00:59; 00:37:14; 00:56:30;

---

[2] A sea monster is also prominent in Sequel #1.

PLAINTIFFS' FIRST AMENDED COMPLAINT

00:57:31). Later in the Screenplay two pirates also say "perhaps he be a Ghost! Maybe he thinks he be Phantom Jack" referring to "undead Jack" Nefarious. Nefarious and Barbossa's dialogue are mirrored in the works as well. While being attacked both pirate villains state that they "can't die." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:31:32).

103.   In the Screenplay, Davey Jones tries to convince a woman in the tavern that he was once a dashing, swashbuckling pirate. In the Film, Jack Sparrow constantly tries to convince everyone of his lore as a great pirate (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:20). Furthermore, both Davey Jones and Jack Sparrow are slapped by women in comedic scenes. In the Screenplay the woman states, "You had that coming, Davey Jones!". In the Film, Jack Sparrow says, "Not sure I deserved that," followed by "I may have deserved that." (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:51:20-30). While the latter may be funnier than the former, they convey the same message.

**Plot**

104.   In addition to the similarities in plots/sequence of events between the Screenplay and the Film identified herein above, both also contain scenes that are so unique they cannot be considered *scènes à faire.  See*, "Sequence of Events" *supra;* "Theme" *infra.*

105.   For example, when Jane/Elizabeth are first taken hostage by Nefarious/Barbossa, they are both brought aboard ship where they are taken past crew members before meeting with Nefarious/Barbossa directly.  (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:15). In the Screenplay, Jane is heckled by crew members while being escorted across the deck.

106.   After being insulted, one crew member tries to attack Jane before Nefarious intervenes. Nefarious, in response, reprimands the crew member as a warning to the rest of the crew not to harm Jane. *Id.* In the Film, Elizabeth is

similarly heckled by crew members on the deck of the ship before meeting face to face with Barbossa (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:09). As she attempts to respond, she is slapped by one of the crew members (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:13). Just as Elizabeth is struck, Barbossa appears, grabs the crew member's arm and threateningly warns that no one is to lay a hand on her. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 00:38:18).

107.   In another uniquely similar scene, male pirates in the Screenplay and Film poorly disguise themselves as women to deceive enemies during battle (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). In the Screenplay, Davey Jones dresses as a "wench" before revealing himself and attacking the invading pirates. The scene is comedic, with one of the pirates attempting to kiss Davey Jones before he says "Love hurts" and strikes the pirate. *Id.* In the Film, two members of Barbossa's crew dress up as young maidens to create a distraction and mount a surprise attack (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:50:18). The otherwise rugged pirates fan each other, even complimenting each other's outfits before viciously engaging in sword fights with enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46).

108.   In yet another remarkable similarity, Davey Jones/Jack Sparrow both take control of their rivals' ghost ships in the Screenplay and Film in almost the exact same manner. In the Screenplay, while Davey Jones is busy fighting Nefarious and his supernatural pirates, Davey Jones' crew is able to climb aboard the unoccupied Phantom Ship. The crew takes control of the ship without Davy Jones, bringing him aboard only at the last minute during a hot pursuit. In the Film, Jack Sparrow's crew also takes the Black Pearl while Barbossa and his crew are fighting Jack and other enemies (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 01:58:46). After regaining control of the empty Black

PLAINTIFFS' FIRST AMENDED COMPLAINT

Pearl without Jack, they likewise welcome him aboard at the conclusion of a hot pursuit. (*Pirates of the Caribbean: The Curse of the Black Pearl,* at 02:09:53).

109.   The three comparisons are a non-exhaustive list of scenes from the Screenplay and Film with stark parallels. They are far from similarities of generic pirate elements; they evidence substantial copying.

**Theme**

110.   Supernatural elements and undead pirates are one of the main recurring themes of the Screenplay, as it is in the Films. Captain Barbossa says to Elizabeth "You better start believing in ghost stories Ms. Turner, you're in one." (*Pirates of  the Caribbean: The Curse of the Black Pearl*, at 1:00:25). The "hook" of the Screenplay and the Film that made it new, different, and exciting was the supernatural theme: supernatural undead/ghost pirates (ER 249; 259; 265; 267-68; 277) (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:09; 00:58:54; 01:00:45).

111.   Similarly, the theme of the Screenplay centers on a pirate ghost story. In the Screenplay, Davey Jones discusses ghost stories with the Rascal Scoundrels telling them that "There is no Phantom Jack. It's an old seaman's tale" and that Jack's "ghost ship" is not real. But in fact they are. In the Screenplay, Stink says that "a big sea monster ate [Jack Nefarious] and then spit him out". In the Film, Captain Barbossa's ship is described as "A black ship with black sails, crewed by the damned" and "captained by a man so evil that hell itself spat him back out." (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55; 00:13:00).

112.   Indeed, while Captain Barbossa and his crew are not trying to find lost treasure, but rather trying to return it, as argued by Appellees, it is a distinction without a difference: Barbossa and his crew are *seeking* treasure (including the gold medallion worn by Elizabeth), which will break the curse

PLAINTIFFS' FIRST AMENDED COMPLAINT

that made them undead. This search for treasure advances the main theme and plot of the Screenplay and Film.

113.    Another common theme in both the Screenplay and Film are Davey Jones/Jack Sparrow's redemption. In both works, Davey Jones/Jack Sparrow are first depicted as shells of their former selves (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:18:17-20. However, throughout both works they demonstrate their true character, defeating the rivals that have haunted them and returning to their former glory (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 02:12:00).

**Mood**

114.    There is slapstick humor in both films. In the Film, the monkey provides slapstick humor throughout, as do the characters of Pintel and Ragetti (members of Barbossa's crew), much like the Rascal Scoundrels do in the Screenplay.

115.    In the Screenplay, the emotion that is invoked when the true nature of the supernatural pirates is revealed is substantially similar to the emotion invoked during the same events in the Film: an eerie mood (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:37:07).

116.    The presence of a black ship, black sails, fog indicating the arrival of the ship, as well as other "common" pirate symbols are used in substantially the same selection and arrangement in both the Screenplay and the Film, to create a similar sinister and foreboding mood (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:04:45; 00:16:52; 00:29:08; 01:21:43).

**Setting**

117.    The Screenplay and the Film share specific settings of specific scenes. The ghost ship (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 00:12:55); the port town (*Pirates of the Caribbean: The Curse of the Black*

PLAINTIFFS' FIRST AMENDED COMPLAINT

*Pearl,* at 00:29:45); and the cove where the treasure is hidden (*Pirates of the Caribbean: The Curse of the Black Pearl*, at 01:08:08).

118.   The foregoing is by no means an exhaustive recitation of similarities, and are anything but random; they are tied together by theme, sequence of events, and major characters.

## FIRST CLAIM FOR RELIEF
### (COPYRIGHT INFRINGEMENT REGARDING THE PIRATES OF THE CARIBBEAN FILM FRANCHISE)
### (Against All Defendants)

119.   Plaintiff repeats, alleges and incorporates by reference the paragraphs hereinabove as though fully set forth herein.

120.   In or about June of 2003, Defendants the Film to the public.

121.   Interestingly, Taylor was not credited on the first film although he has stated in interviews and books published later that he created the story with Harmon and Haines.  It was not until the second film, *"Pirates of the Caribbean: Dead Man's Chest"*, released in 2006, that Taylor was credited as a production executive.   Indeed, Taylor, the suspected architect of the scheme to steal and copy from Plaintiffs' work, was credited as producer on each of the films except the first one.

122.   As alleged hereinabove, the named Defendants have infringed upon Plaintiff's copyright by copying wholly original elements from Plaintiff's Screenplay, without any permission, in the Film and the subsequent derivative works released by Defendants.

123.   Upon information and belief, the named Defendants intentionally broadcast, distributed, published, sold, conveyed, and otherwise exploited the Screenplay without authorization, in violation of Plaintiffs' rights.

124.   Upon information and belief, the named Defendants have intentionally violated the Federal Copyright Act, Title 17 U.S.C. § 101 *et seq.*, entitling Plaintiff to all damages and remedies provided by the Act.

26

125.   Upon information and belief, the named Defendants continue to infringe upon Plaintiff's copyrights, causing Plaintiff irreparable injury and damage, including through cinematic sequels (such as *Dead Man's Chest*, *At World's End*, *On Stranger Tides*, *Dead Men Tell No Tales*, and the recently announced sixth installment) and other related media. Said infringement entitles Plaintiff to actual and statutory damages, injunctive and other relief provided by the Copyright Act.

WHEREFORE Plaintiff prays,

## **ON ALL CAUSES OF ACTION:**

1.   For a preliminary and permanent injunction enjoining Defendants from infringing the copyright of Plaintiffs in any manner;

2.   For actual damages and profits according to proof;

3.   That Defendants be required to pay to Plaintiffs such damages as Plaintiff has sustained in consequence of Defendants' infringements of Plaintiffs' copyright and to account for:

    a.   All gains, profits and advantages derived by Defendants by their infringement of Plaintiffs' copyright or such damages as the court shall deem proper within the provisions of the copyright statute, but no less than $100,000,000;

    b.   That Defendants deliver up to be impounded during the pendency of this action all copies of said infringing work as in its possession or under its control and deliver up for destruction all infringing copies or other materials used to make infringing copies;

4.   For statutory damages, costs, and attorney fees with respect to *Pirates of the Caribbean: The Curse of the Black Pearl* and any other derivative works;

5.   For an accounting;

6.   For cost of suits and interest; and,

27

PLAINTIFFS' FIRST AMENDED COMPLAINT

7.    For such relief as is just and proper.

Dated: November 30, 2020

LOWE & ASSOCIATES

/s/ *Steven Lowe*

STEVEN T. LOWE, ESQ.
ALEKSANDRA HILVERT, ESQ.
Attorney for
PLAINTIFFS ARTHUR LEE ALFRED,
II, EZEQUIEL MARTINEZ JR.

PLAINTIFFS' FIRST AMENDED COMPLAINT

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: November 30, 2020

LOWE & ASSOCIATES

/s/ *Steven Lowe*

STEVEN T. LOWE, ESQ.
ALEKSANDRA HILVERT, ESQ.
Attorney for
PLAINTIFFS ARTHUR LEE ALFRED, II,
EZEQUIEL MARTINEZ JR.

29

# Exhibit 7

Report of David Román

Dated November 29, 2020


I am a Professor in the Department of English at the University of Southern California, a position I have held since 1995 (in both the undergraduate and graduate programs). I am the author of several award-winning books on twentieth and twenty-first century American literature and culture, which are listed on my CV attached hereto as Exhibit A. I've published on a wide-range of topics from the early modern period to our contemporary moment, and on a wide-range of texts including plays, novels, and films. My most recent publication is a coedited volume of critical essays on the works of Tarell Alvin McCraney, who won an Academy Award for best-adapted screenplay for *Moonlight*, the film that won Best Picture at the 2017 Academy Awards. I have lectured at colleges and universities throughout the United States, including keynote lectures and visiting appointments at the University of Pennsylvania, Princeton University, Dartmouth College, Harvard University, Yale University, Brown University, Columbia University, Stanford University, and Cornell University. I also have taught and lectured throughout the world. Since 2018, I have held an academic affiliation with the University of London's Royal Central School of Speech

1

and Drama.   I've also worked as a senior editor for various academic journals and university presses including those published by Johns Hopkins University Press, the University of Michigan Press, and The University of Chicago Press.   I hold a PhD in Comparative Literature from the University of Wisconsin at Madison.   Before USC, I taught at the University of Washington and Yale University.

My training in Comparative Literature has equipped me to compare and contrast different types of literary works in close detail.   Comparative Literature is also an interdisciplinary practice that encompasses the full range of the literary, performing, and visual arts, including film.   These critical skills are especially relevant to legal cases involving copyright infringement and issues of plagiarism.  That is because Comparative Literature scholars are trained to identify the structures and patterns of stories, including, among other things, the following: themes, plots, characters, the sequence of events, tonalities and moods, and dialogue.   We observe patterns across genres, especially the manner by which writers select and arrange the elements that compose the literary work.

I was asked by Aleksandra M. Hilvert of Lowe & Associates, Attorneys at Law, to examine certain materials in the case of Arthur Lee Alfred, II and Ezequiel Martinez versus The Walt Disney Company for copyright infringement of their original screenplay entitled *Pirates of the Caribbean* (Lee v. Disney et.al. U.S.D.C. Central District of California, Case no. 2:18-cv08074). I was asked to read the plaintiff's original screenplay, which was provided to me by the firm, and compare it to the Disney film entitled *Pirates of the Caribbean: Curse of the Black Pearl* (2003), which I screened on *Netflix*, and then assess the patterns of similarities, if any, between them. After several readings and screenings of the material, I am confident that I can offer a fair and unbiased opinion on the matter.

I believe that there are enough important patterns of similarities between the two works to merit a conclusion that one is substantially similar to the other, notwithstanding the existence of some differences. Once I communicated my preliminary views to the lawyers, they provided me with secondary materials related to the case, which I also reviewed. In particular, I read and analyzed the Appellants' Corrected Opening Brief Filed with the 9th Circuit, focusing on pages 8-25 (a true and correct excerpt of which is attached hereto as Exhibit B) and I verified the accuracy of said similarities set forth

3

therein. I adopt Exhibit B as an addendum to my report. Finally, I was asked to write up a report addressing the patterns of similarities between the original Screenplay and Disney's *Pirates of the Caribbean: Curse of the Black Pearl*, which I submit here.

**PRELIMINARY STATEMENT**

Disney's film version of *Pirates of the Caribbean: Curse of the Black Pearl,* which I will refer to herein as the Disney Film, has many qualitatively significant similarities to the Screenplay. I considered the following aspects of the Screenplay and the Disney Film to arrive at my position: plot, themes, dialogue, mood, setting, pace, characters and the sequence of events. While there are various differences between the two works that one could readily identify, I found substantial qualitatively important similarities across the categories of mood, tone, pace, sequence of events, themes, plot, character, and setting, which when viewed in combination, form an overarching pattern of creative elements which demonstrate creativity and originality, and which are repeated in the Film. Some of these similarities, which I will articulate more fully below, are so nuanced and sophisticated, that they might not be apparent on first viewing. Other similarities are immediately apparent.

4

## SIMILARITIES IN BOTH WORKS IN TONE and MOOD

Both works draw from the archetypical pirate narrative, but the Screenplay provides an original contribution to the standard pirate story. One way it does this is by introducing irony and wit, which are interspersed throughout the work.  Let me explain by providing you the context for one the Screenplay's innovations to the standard pirate story.  Ships-at-sea stories typically include the depiction of power differences and the tensions resulting from those conflicts; male bonding and the shipmen as kin motif; maritime culture including work life and quotidian experience; storms at sea or other unforeseen challenges from nature; the necessity of recruiting a future captain to replace an aging or retiring captain; and the overarching threat of mutiny.

Pirate stories, as a subgenre of the sailor at sea stories, share some of these characteristics but generally follow a different pattern focusing on an individual pirate, who looms large and wields great power among his crew. There is usually the threat of mutiny. In these archetypes, the pirate is presented as dangerous and threatening.  Ship stories--and typical pirate stories, especially--share a distinct narrative tone that's based on suspense.

5

They entertain primarily through adventure, and a sequence of thrilling narrative events that are based on an imminent sense of danger.

While the Screenplay and the *Pirates of the Caribbean: Curse of the Black Pearl* can readily be seen as sharing several of these themes, characters, and plot devices (albeit selected and arranged in substantially similar ways as more fully explained below and in Exhibit B), they differ dramatically in tone from typical "pirate" and "sailors-at-sea" stories. And what is this difference? Humor, irony, and wit.

The Screenplay brings something entirely original to this traditional narrative by incorporating a humorous tone to the story. The Screenplay is playful, ironic, and funny. It also goes further by diluting the impeding sense of danger that characterizes pirate stories. While the aspect of suspense remains, the threat of the actual danger is diminished by the Screenplay's playfully entertaining tone and mood. Even the moments suggesting the danger of mutiny are rendered non-threatening in the Screenplay. While there is suspense, there is no fear. The Screenplay presents an original, atypical "spin" on the standard pirate story to appeal to a wider demographic. It maintains much of the suspense and sense of adventure

6

anticipated in a pirate story, but it does so in what are in my opinion, original ways.  By lightening the tone and mood of the story to include humor, irony, and even satire, the Screenplay deviates from the conventional narrative without completely undermining its effect.  It's still a pirate story—but with a twist.

The Disney Film adapts this ironic and humorous tone from the Screenplay and exploits it throughout the entire film. The Screenplay sets out to entertain a wide and diverse demographic including the coveted family audience.  The lighthearted mood of the Film makes it enjoyable and immensely entertaining.  In my opinion, the Disney Film is a much more enjoyable experience than other films in this genre, and as a result, more commercially viable in part because of the mood and tone.

## SIMILARITIES IN ORIGINAL PATTERNS IN BOTH WORKS IN CHARACTERS

There are also substantial similarities in the patterns of the main characters. In the Screenplay, the character Davey Jones is introduced as a disillusioned pirate with a drinking problem.  He's also morally suspect, which is to say, it's unclear initially if we are able to identify with him or not.    In the

7

Disney Film, the character Jack Sparrow (played by Johnny Depp) is also a drunkard of equally questionable morality. Despite their reputations as pirates, others who encounter Davey Jones and Jack Sparrow doubt the legendary status that both these leading characters self-promote.

The second set of analogous male leads, itself an unusual similarity between the Screenplay and the Disney Film, are Captain Jack Nefarious and Captain Hector Barbossa (played by Geoffrey Rush). Both of these men are cunning and sinister figures who despite their off-putting behavior retain a high level of individual charisma. While both Captain Jack Nefarious and Captain Hector Barbosa are motivated by greed at all costs, they are also immensely entertaining and likeable. This likeability deviates from the treacherous pirate characterization of the standard pirate narrative and makes these two figures much less menacing. Both works share the lack of a menacing antagonist and offer instead a highly engaging and entertaining character, thereby making the Screenplay and the Disney Film much more friendly to a mass audience. In my opinion, these are important similarities to the mass appeal of the Film.

Further, both the Screenplay and the Disney Film also include a set of central male characters who excel at the skills of a swashbuckler yet maintain the outsider edginess necessary of a pirate.  In the Screenplay, Davey Jones best embodies these elements, but they are also evident in Captain Jack Nefarious.  In the Disney Film, each of the male leads exhibit aspects of this innovative hybrid persona including the "villain" Captain Hector Barbossa.   Captain Jack Sparrow and William Turner, however, are the best example of this new character type, which helps explain their connection throughout the Disney Film.  Typically the archetypal swashbuckler, who performs with swagger and flamboyance in stories of adventure, maintains a level of chivalric decorum even as he fights off the villain.  The pirate, while equally skilled, is often the swashbuckler's nemesis and generally resides on the fringes of society.  The Screenplay ingeniously blurs these two stock characters to create a new type of protagonist with the qualities of both character types.  This hybrid character type combining elements of the swashbuckler and the pirate appears to be an original innovation specific to the Screenplay.   While this manipulation of the standard pirate depiction is at the core of both works, its origins are located in the Screenplay.

Finally, in addition to the similar original patterns of the male leads, we add to that pattern the similarity of the lead women in both works. Both of the lead women in the Screenplay (Jane) and the Disney Film (Elizabeth) are lively, adventurous young women who dream of a life beyond the constraints of the port town where they've been raised. Both of these spirited women engage the pirates on nearly equal terms in matters of skill, wit, and athletics. Neither Jane nor Elizabeth is the standard "Damsel in Distress" in need of rescue. In both works, the women are thrown overboard and into the sea by the main villain pirate while the male romantic lead begs him to "let her go!" Also, Jane and Elizabeth share a sense of resilience even as they are used as bargaining chips between the competing male pirates. They are more than merely love interests; they are full dimensional romantic matches. Both the Screenplay and the Disney Film feature this strong female heroine who share the same physical characteristics, age, and temperament and function the same in both works. And both the Screenplay and the Disney Film share dialogue claiming that it's bad luck to have a woman on a ship, a line that foreshadows the power each of these women will later display.

Both female leads also help rescue their love interest from the trappings set by the rival ship captains in the Screenplay and the Film. Again, I find it striking that the Disney Film's depiction of Elizabeth functions so similarly as the Screenplay's Jane, especially given the similarities of the Davey Jones/Jack Sparrow and Jack Nefarious/Hector Barbossa characters. These women characters are important qualitatively in both works. Their incorporation into the story introduces the element of romance, which becomes increasingly significant to the plot as the story develops. This aspect of romance also contributes to the commercial viability of both works. The love story enabled by the presence of a strong and attractive woman character expands the typical demographic of the pirate film to appeal to women and young girls, two overlapping groups who generally are not the genre's targeted audience.

**SIMILARITIES IN ORIGINAL PATTERNS IN BOTH WORKS IN THEME, PLOT, and SEQUENCE OF EVENTS**

There are many other elements in *Pirates of the Caribbean: Curse of the Black Pearl* that overlap with the Screenplay and therefore merit attention. The most obvious similarities have to do with the fact that both scripts feature pirate ships with skeleton crews. In both works, these skeleton crews

11

mainly surface at night during scenes of epic battle and provide a sensational thrill-driven aura to the story.  Both works also rely on a curse or a haunted legend that the characters in each story set out to rectify or undue, a quest that involves in both cases the search for lost or stolen treasures on remote islands.

In each story, a younger pirate finds redemption through romance.  Thus, both share, as one of their common themes, the moral that there is more to life than greed and the search for wealth.  The entire community of the original Screenplay, including the set of comic young rascal scoundrels, endorses and supports this romantic ending, and everyone benefits from the union of the couple.   In the Disney Film, the younger pirate similarly wins the approval from the other men who hold power in the British Empire, and who initially rejected him as a suitor to the main female lead.

The Screenplay and the Disney Film also share a common theme of mentorship of male orphans. In the Screenplay, this is most evident in the presentation of the rascal scoundrels, who are orphan boys.  While the boys form a caring bond among themselves, they are also drawn to Davey Jones as a mentor figure.  They believe that Jones can help them become better

12

pirates. By the end of the Screenplay, Jones appreciates the orphans for more than just their bravery and success at sea. He chooses to build a family with Jane and the orphans, and decides to raise the young boys as his own.

Similarly, in the Disney Film, a young William Turner (Orlando Bloom) is orphaned in the opening prologue of the film. While the Disney Film's Will Turner has some aspects of the personality of the Screenplay's Davey Jones, as outlined above, he also shares some similarities with the Screenplay's orphans. Like the young rascal scoundrels in the Screenplay, young Will Turner seeks out mentors, beginning with the drunken blacksmith who trains him in his trade, and including Jack Sparrow, with whom he learns about the pirate culture and his father's history. Similarly, like the young rascal scoundrels from the Screenplay, Will is a capable and ingenious fighter whose participation in the pirate battles lead to the defeat of the main antagonist villain.

With respect to the sequence of events, the Disney Film begins with a prologue that introduces some of the main characters and sets up some of the plot points that will be explored throughout the story. The action of the Film's prologue takes place entirely on a ship at sea. This prologue is set

eight years before the actual story begins and the story resumes eight years

later and stays consistently in that time frame until its conclusion.   There is

no precedent in the genre of the pirate story to encourage such a prologue; in

fact, it's highly atypical in my opinion.


Similarly, the Screenplay begins with a prologue set in 1602 where the main

plot device of retrieving the missing map is introduced in a showdown

between the two leads, Davey Jones and Captain Jack Nefarious.   The

prologue begins with a conflict on the ship that throws us immediately into

the pirate story.  In a quick sequence of events, we meet the major players,

including Jane, the female love interest, who will later be revealed to have a

more significant role.  The struggle between Davey Jones and Jack

Nefarious takes place at sea during a storm and involves a series of reveals

and betrayals.   The prologue concludes with a sea monster attacking the

ship and leaving everything in chaos.  The story then resumes ten years later,

in 1612, and stays consistently in that time frame until its conclusion.  While

the plot points in the two prologues may differ somewhat, the prologue itself

functions in the same way in both works.

 In the Screenplay and the Disney Film, the prologue functions as a framing device.   In both works, it provides a backstory for some of the lead characters that feature prominently in the main story and offers a historical context for the central themes and concerns of the primary story.  In both works, the prologue sets the foundation for the plot and introduces the motivation for the main characters.  In both works, it also sets the tone and mood of the story, which in this case, can be categorized as adventurous, suspenseful, and entertaining.  In both works, there is unfinished business introduced in the prologue that will be revisited approximately a decade later in both stories.  In both works, we meet some of the major players in the prologue, including the female lead. In both works, the action takes place on a ship in rough seas under threatening skies. In both works, there is a conflict on the ship that throws the viewer into the pirate story.  The prologue is a device borrowed from classical and medieval literature, mainly drama, and its incorporation in the Screenplay, and the way it is utilized, is sufficiently creative and original in my opinion.

I was surprised to see that the Disney Film also begins with a prologue set nearly a decade before the actual main story.   And while the time period (the early 18th century rather than the early 17th century) and while the

15

duration between the prologue and the rest of the story, differs ever so slightly, the function of the prologue in the Disney Film is identical to that of the Screenplay. It too begins at sea and introduces key themes, characters, and symbols that will permeate the rest of the Film.

Furthermore, both prologues leave us wondering who survived the conflicts at sea, something that both the Screenplay and the Disney Film address in the later sequences. These later sequences in both the Screenplay and the Disney Film underscore the impact of betrayals set up in the backstory of the prologue between the two male protagonists, who were once allies. This is the same in both works. In the Screenplay's prologue, Davey Jones and Captain Jack Nefarious are at opposite ends in a "merciless battle" pitting pirates against privateers. Captain Jack Nefarious, in a double-betrayal, turns first against his crew of pirate hunters, and then against Davey Jones for complete control of the map leading to the location of the treasures. Similarly, in the Disney Film, after the prologue, we learn of the mutiny of the Black Pearl ship by Hector Barbossa who betrayed Captain Jack Sparrow, a fellow pirate who previously was his friend, advisor, and ally.

16

The Disney Film also resembles the Screenplay in its climatic ending in two qualitatively important respects.   First, the Screenplay ends with a love resolution, nearly as if in a Shakespearean comedy, where the figures blocking the romance between the leading male and female (Davey and Jane) are removed.  Further, the couple gains the support of their community, thus insuring a happy ending.   The Disney Film borrows this structure with Will Turner and Elizabeth Swann's romance, which like in the Screenplay, must endure a sequence of nail-biting episodic events that they maneuver through and survive in order to solidify their bond.  By the end of the Film, Norrington (Elizabeth's initial suitor) and Govenor Swann (Elizabeth's father) endorse the young lovers' relationship having at first vehemently disapproved.  The element of romance that was so central to the Screenplay, and also one of its major innovations to the typical pirate story, also appears in the Disney Film.  This plot device, where the success of the lovers is central to the story's climax, appears in both works.

Furthermore, the Disney Film, like the original Screenplay, sets out to resolve the dilemma of the lovers as much as that of the pirates.  The narrative momentum in each work invests equally in bringing the lovers together, a somewhat unusual overlap between the two works given the

genre. Davey learns that the treasure he was seeking was always right there in front of him: love and family.   The Film similarly ends on the note that love wins, as the community bonds to celebrate the hard fought union of Will Turner and Elizabeth Swann.   Both the Screenplay and the Disney Film focus on the heterosexual romance between the male and female leads as much as they do the antagonistic duals between the two male pirate leads.

There is also a second significant plot point in the sequence of events where the endings substantially overlap. Both the Screenplay and the Film locate their final epic showdown in a remote and ominous cave that is inaccessible except by small boats. This final battle in the Screenplay takes place in the "Lost City in the Caribbean Coves," which is inhabited by the skull-faced pirates who emerge to attempt to fend off Davey Jones, Jane, and the young rascal scoundrels.  Similarly, in the Disney Film, the final showdown between Jack Sparrow (joined by Will Turner and Elizabeth Swann) and Hector Barbossa occurs in a cavernous location equally distant and inaccessible to the other seamen except through smaller boats.   This final scene also summons the phantom skeleton crew pirates to engage in battle. This similarity is a significant one in and of itself.  The climactic endings of the Screenplay and the Disney Film are strikingly similar in form and

18

content. This combination of multiple elements, including a pattern of main characters, similar themes, and sequence of events, mood, tone, and pace are original in the Screenplay; a similar pattern of elements emerges in the Disney Film.   There are more similarities regarding sequence of events identified in the Opening Brief (Ex. B).

**SIMILARITIES In BOTH WORKS IN PACE, SETTING, and DIALOGUE**

The two works also share the same pacing.  The Screenplay is composed of a sequence of fast-paced episodes that maintain the story's narrative momentum.   This adventurous pacing delivers and sustains the story's excitement and suspense.  The Screenplay's setting is primarily located on the Caribbean seas where much of the action unfolds.   But the Screenplay's setting can also be placed on the ship itself, which becomes the site where the interpersonal dynamics of the main characters plays out, and in the cave where the climatic battle ensues.  The Film's pace and setting are virtually identical to the Screenplay; in each work the pace and the setting contribute to the overall appeal of the story, albeit not atypical for the pace and setting to be similar in this genre (which is why I have addressed this last.) As for the dialogue:  there are also moments when characters in the Disney Film

19

echo the words written in the Screenplay.    The Appellants' Opening Brief identifies many of these overlaps, and I have mentioned one or two above. I concur with the findings in the Brief and would add that although the similarities in the Dialogue, Setting, and Pace between the two works are among the most obvious points, there are substantial and more sophisticated similarities less immediately apparent to be made here, all of which are outlined above (or in Exhibit B).

## CONCLUSIONS:

The overlap of character, plot devices, tone and mood, sequence of events, and major themes between the Screenplay and the *Pirates of the Caribbean: Curse of the Black Pearl* is significant and substantial.   While there are several tropes typical of pirate stories in both works, the manner in which these tropes are selected and arranged within the Disney Film suggests a prior familiarity with the Screenplay in that they are very similar.   The ten-year prologue, which introduces the story, and the happy romantic ending following a battle in a cave, which concludes it, are nearly identical in both works.  The narrative content that appears within this framing device, largely set forth in Exhibit B, has enough similarity to support my opinion that there are substantially similar qualitatively important patterns that appear in both

20

works.   The Screenplay sets into motion a sequence of adventurous events that build great suspense and provide highly entertaining, often amusing, results.    The Disney Film shares this ironic tonality and a similar fast-paced and suspenseful narrative momentum.

In conclusion, I believe that the Screenplay and *Pirates of the Caribbean: The Curse of the Black Pearl* share multiple original patterns of similarities. In other words, in my opinion the patterns that appear in the Screenplay are original, displaying a great deal of creativity; those same original patterns and combinations of literary elements reappear in the Disney Film. Furthermore, although some of the similarities are more nuanced, the selection and arrangement of these elements point to a pattern of resemblances first found in the Screenplay.  In my opinion, the Screenplay is a first-rate piece of original writing, showcasing a brilliant and highly innovative retelling of the standard pirate narrative.  Some of the Screenplay's creative innovations, which I have outlined above, constitute sufficiently original, atypical contributions to the pirate storyline not evident before in the literature that I am familiar with.

Based on my thorough analysis, I believe that the Disney Film *Pirates of the Caribbean: The Curse of the Black Pearl* borrows heavily from the Screenplay, and does so in a very sophisticated manner that obscures the plagiarism at first glance. A thorough analysis, however, reveals that the Disney Film substantially relies on the major original innovations of the Screenplay for its success. The Disney Film becomes a better more dynamic and entertaining film, and subsequently a more commercially successful one, based on what it mimics from the Screenplay. The Screenplay's originality, which I have outlined above, appeals to a much broader audience than the standard pirate narrative. Disney's film *Pirates of the Caribbean: The Curse of the Black Pearl* effectively loots the innovative treasures originally found in the Screenplay.

Respectfully submitted,

_____

David Román

Professor, Department of English, University of Southern California

22

# Exhibit 8

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

11
12
13
14
15
16

ARTHUR LEE ALFRED II *et al.*,

     Plaintiff,

v.

THE WALT DISNEY COMPANY, *et al.*,

     Defendants.

Case No.:  CV 18-8074-CBM-ASx

**ORDER RE: DEFENDANTS'
MOTION TO DISMISS
PLAINTIFFS' COMPLAINT
[JS-6]**

17
18

    The matter before the Court is Defendants' Motion To Dismiss Plaintiffs'

Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 78.)

19

**I.    BACKGROUND**

20
21
22
23
24
25
26
27
28

    This is a copyright infringement action wherein Plaintiffs assert five

"claims" for copyright infringement under the federal Copyright Law Act:  (1)

"Infringement of Copyright (Reproduction of Copyrighted Work)"; (2)

"Infringement of Copyright (Preparation of Derivative Works)"; (3) "Infringement

of Copyright (Distribution of Copyrighted Work)"; (4) "Infringement of

Copyright (Public Performance of Copyrighted Work)"; and (5) "Infringement of

Copyright (Public Display of Copyrighted Work)."  Plaintiffs allege Defendants'

five feature films (i.e., (1) *Pirates of the Caribbean: The Curse of the Black Pearl*;

(2) Pirates *of the Caribbean: Dead Man's Chest*; (3) *Pirates of the Caribbean: At*

1

*World's End*; (4) *Pirates of the Caribbean: On Stranger Tides*; and (5) *Pirates of the Caribbean: Dead Men Tell No Tales*) infringe Plaintiffs' screenplay entitled *Pirates of the Caribbean* (the "Screenplay").

## II.    STATEMENT OF THE LAW

### A.    Fed. R. Civ. Proc. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." Dismissal of a complaint can be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  On a motion to dismiss for failure to state a claim, courts accept as true all well-pleaded allegations of material fact and construes them in a light most favorable to the non-moving party.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031-32 (9th Cir. 2008).  A court may consider the allegations contained in the pleadings, exhibits attached to or referenced in the complaint, matters properly subject to judicial notice, and materials whose contents are alleged in the complaint, in ruling on a motion to dismiss.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Thomas v. Walt Disney Co.*, 337 Fed. App'x. 694, 694-95 (9th Cir. 2009); *In re Stac Elec. Sec. Litig.,* 89 F.3d 1399, 1405 n.4 (9th Cir. 1996).[1]  To survive a motion to dismiss, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 663, (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  If a complaint cannot be cured by additional factual allegations, dismissal without leave to amend is proper. *Twombly*, 550 U.S. at 555.

---

[1] Plaintiffs' Screenplay was attached as an exhibit to the Complaint (Dkt. No. 1-1), and therefore the Court has considered the Screenplay for purposes of the instant Motion.

## B.   Copyright Infringement

"To state a claim for copyright infringement, [Plaintiffs] must plausibly allege two things: (1) that [they] owns a valid copyright in [the work], and (2) that [Defendants] copied protected aspects of [Plaintiffs' work]." *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1116–17 (9th Cir. 2018) (citations omitted).  The second element has two distinct components: "copying" and "unlawful appropriation." *Id.* "When the plaintiff lacks direct evidence of copying, he can attempt to prove it circumstantially by showing that the defendant had access to the plaintiff's work and that the two works share similarities probative of copying." *Id.* at 1117.  "Such proof creates a presumption of copying, which the defendant can then attempt to rebut by proving independent creation." *Id.*

"To prove unlawful appropriation, . . . the similarities between the two works must be substantial and they must involve protected elements of the plaintiff's work." *Id.*  "[W]hether works are substantially similar involves a two-part analysis consisting of the extrinsic test and the intrinsic test." *Id.* at 1118 (internal  quotations and citations omitted).  A plaintiff must satisfy both components, and therefore a lack of extrinsic similarity is fatal to a plaintiff's copyright case as a matter of law. *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 476-77 (9th Cir. 2014) (citing *Funky Films, Inc.,* 462 F.3d at 1081).[2]

The extrinsic test "is objective in nature.  '[I]t depends not on the responses of the trier of fact, but on specific criteria which can be listed and analyzed.'  The extrinsic test focuses on 'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works.  In applying the extrinsic test, this court 'compares, not the basic plot ideas

---

[2] The court may determine that the works are not substantially similar as a matter of law by on a motion to dismiss by applying the objective extrinsic test.  *See White*, 572 F. App'x at 476-77; *Thomas*, 337 F. App'x. at 694-95; *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1150-71 (C.D. Cal. 2015), *aff'd sub nom. Shame on You Prods., Inc., v. Banks*, 690 F. App'x 519 (9th Cir. 2017).

for stories, but the actual concrete elements that make up the total sequence of events and the relationships between the major characters.'" *Funky Films,* 462 F.3d at 1081 (citations omitted). "Familiar stock scenes and themes that are staples of literature are not protected." *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002). In addition, "[s]cenes-à-faire, or situations and incidents that flow necessarily or naturally from a basic plot premise, cannot sustain a finding of infringement." *Id.* "Therefore, when applying the extrinsic test, a court must filter out and disregard the non-protectable elements in making its substantial similarity determination." *Id.* at 822-23.[3] The Court need not explain in its analysis every alleged similarity in a copyright infringement case and may properly disregard alleged similarities that are not protectable. *White*, 572 F. App'x at 477 (citing *Funky Films*, 462 F.3d at 1077 ("[W]e filter out and disregard the non-protectable elements in making [our] substantial similarity determination.")).[4]

## III.   DISCUSSION

**A.   Judicial Notice**

Defendants request that the Court take judicial notice of the following:

> 1.   The motion picture *Pirates of the Caribbean: The Curse of the Black Pearl* (Rosen Decl. Ex. 1);

---

[3] *See also Shaw v. Lindheim,* 919 F.2d 1353, 1361 (9th Cir. 1990) (applying the extrinsic test to determine "whether there is substantial similarity between the *protected* expression of ideas in two literary works"); *Berkic*, 761 F.2d at 1293-94 (rejecting consideration of general ideas as well as scènes-à-faire in determining substantial similarity under the extrinsic test).

[4] The intrinsic test is a subjective comparison that focuses on "whether the ordinary, reasonable audience would find the works substantially similar in the "total concept and feel of the works." *Cavalier*, 297 F.3d at 822 (internal quotations and citations omitted). "[T]he intrinsic test for expression is uniquely suited for determination by the trier of fact." *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1166 (9th Cir. 1977). Accordingly, where the plaintiff satisfies the extrinsic test, "the intrinsic test's subjective inquiry must be left to the jury and [any dispositive motion] must be denied." *Smith v. Jackson*, 84 F.3d 1213, 1218 (9th Cir. 1996).

2.    The motion picture *Pirates of the Caribbean: Dead Man's Chest* (*id.*, Ex. 2);

3.    The motion picture *Pirates of the Caribbean: At World's End* (*id.*, Ex., Ex. 3);

4.    The motion picture *Pirates of the Caribbean: On Stranger Tides* (*id.*, Ex., Ex. 4);

5.    The motion picture *Pirates of the Caribbean: Dead Men Tell No Tales* (*id.*, Ex., Ex. 5); and

6.    Excerpts from the book *Pirates of the Caribbean:  From the Magic Kingdom to the Movies* (2005) by Jason Surrell (*id.*, Ex. 6); and

7.    two DVDs containing audio and video footage of Disney's Pirates of the Caribbean theme park rides at Walt Disney World as it existed in July and August 2005 (Parras Decl. ¶¶ 3-6, Exs. 1 & 2).

(Dkt. No. 79 ("RJN").)  Plaintiffs did not file an objection to Defendants' request for judicial notice.

The Court **GRANTS** Defendants' RJN as to the motion pictures and DVDs which include audio and/or visuals of the Disneyland and Disney World Pirates of the Caribbean theme park rides because they are incorporated by reference into the Complaint.  (*See* Compl. ¶¶ 51, 52.)[5]  The Court **DENIES** Defendants' RJN as to the book *Pirates of the Caribbean:  From the Magic Kingdom to the Movies* (2005) by Jason Surrell (Ex. 6) because neither the book nor its contents are

---

[5] *See U.S. v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim."); *Thomas*, 337 F. App'x at 695 ("the district court properly considered materials whose contents [plaintiff] alleged in her complaint" (i.e., *Finding Nemo* movie) in finding as a matter of law that plaintiff's literary work was not "substantially similar" to defendants' animated movie and granting defendant's motion to dismiss plaintiff's copyright infringement action); *Gilbert v. New Line Prods., Inc.*, 2010 WL 891333 (C.D. Cal. Feb. 17, 2010), *aff'd* 490 F. App'x 34 (9th Cir. 2012) (taking judicial notice of the screenplays plaintiff alleged were infringed, as well as defendants' allegedly infringing movie, where there were "no disputes as to the authenticity of the works").

5

alleged or referenced in the Complaint.

**B.     Copyright Infringement**

Defendants move to dismiss Plaintiffs' copyright infringement claims solely on the ground the parties' works are not substantially similar as a matter of law.[6]

**(1)     Inverse Ratio Rule**

Plaintiffs contend the Court must apply the inverse ratio rule in analyzing whether the works are substantially similar because Defendants have admitted access to the Screenplay.  Under the "inverse ratio rule," "a lower standard of proof of substantial similarity is required when a high degree of access is shown." *Skidmore for Randy Craig Wolfe Tr. v. Led Zeppelin*, 905 F.3d 1116, 1130 (9th Cir. 2018) (internal quotations and citation omitted).  However, the rule "assists only in proving copying, not in proving unlawful appropriation," and "[t]he showing of substantial similarity necessary to prove unlawful appropriation does not vary with the degree of access the plaintiff has shown." *Id.*  Therefore, "[t]he inverse ratio rule has no bearing" in analyzing whether the works are substantially similar for purposes of determining unlawful appropriation.  *Rentmeester*, 883 F.3d at 1125.  Accordingly, the inverse ratio rule is irrelevant here in determining whether the parties' works are substantially similar under the extrinsic test.

**(2)     Substantial Similarity**

To determine whether there is substantial similarity among the parties' works, the Court must apply an extrinsic analysis of "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events" in the works.  *Funky Films*, 462 F.3d at 1081.  The Court's objective comparison of the parties' works under the extrinsic test is set forth below.

**a.     Plot and Sequence of Events**

The Complaint alleges a single purported similarity as to the plot of the

---

[6] Defendants do not dispute Plaintiffs sufficiently allege ownership of the Screenplay and access for purposes of the instant Motion.

6

works:  "Supernatural 'cursed' pirates or 'skull faced' pirates."  (Compl. Ex. 5.)
The idea of cursed pirates is scenes-a-faire and unprotectable.  Even if such an
idea could be protectable, the Complaint alleges that the Screenplay incorporated
"the basic elements of the *Pirates of the Caribbean* ride."  (Compl. ¶ 26.)  The
Disney theme park rides on which the Screenplay is based feature skeletal pirates
who speak, steer ships, and find treasure.  (*See* RJN Ex. 6.)  Moreover, in
Defendants' first film *Pirates of the Caribbean – Curse of the Black Pearl*,
Barbossa and his crew's bodies are skeleton when they appear in moonlight—
whereas Jack Nefarious and his crew have skull faces all the time regardless of
whether they are in moonlight.  Therefore, Plaintiffs' infringement claims cannot
be based on the fact that the works include pirates who are skull-faced or skeletal.[7]

Plaintiffs also allege the works are similar because they include treasure
maps, ghost pirates, the "undead," the supernatural, ships flying black sails,
skeletons, privateers, naval attacks, dark fog, the "pirate code," ghosts, and sea
monsters.[8]  These alleged similarities, however, are "unprotectable elements"
because they are "familiar stock scenes, and characteristics that flow naturally
from the works' shared basic plot premise" regarding pirates.[9]

---

[7] *See Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 913 (9th Cir. 2010)
("[S]cenes a faire (standard features) and unoriginal components aren't
protectable."); *id.* at 917 (noting that the fact that works both included "stuffed,
cuddly dinosaurs" is "not the sort of similarity we look for in copyright law"
because "[s]ubstantial similarity for copyright infringement requires a similarity of
expression, not ideas," and finding defendant's Bratz dolls "can't be considered
substantially similar to Bryant's preliminary sketches simply because the dolls and
sketches depict young, stylish girls with big heads and an attitude").

[8] While the Complaint alleges these purported similarities, the Complaint does not
specifically allege that these purported similarities are similarities in plot.

[9] *See Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 625 (9th Cir. 2010)
(finding the screenplay and film were not substantially similar under the extrinsic
test despite the fact that both were premised on an American war veteran going to
Japan to help the Imperial Army by training it in the methods of modern Western
warfare for its fight against a samurai uprising; both had protagonists who are
authors of non-fiction studies on war and who have flashbacks to battles in
America; both included meetings with the Emperor and numerous battle scenes;
both were reverential toward Japanese culture; both featured the leader of the
samurai rebellion as an important foil to the protagonist; and in both works the
American protagonist is spiritually transformed by his experience in Japan); *see*

7

Moreover, an objective analysis of the works demonstrates the plot and sequence of events in Plaintiffs' Screenplay and Defendants' films are not substantially similar. Plaintiffs' Screenplay is based on Davey Jones, a group of orphans named the Rascal Scoundrels, and Davey Jones' love interest Jane, who are in pursuit of a map leading to treasure. After battling with Jack Nefarious who has one half of the treasure map, Jones ultimately gives up the treasure for Jane and the orphans, whom Jones and Jane then raise as their own children.

Defendants' Films do not focus on a search for treasure. The plot of Defendants' first film, *Pirates of the Caribbean – The Curse of the Black Pearl*, is about returning treasure Captain Barbossa and his crew found to end a curse they were put under when they stole the treasure. (*See also* Plaintiffs' Opposition at 17 (acknowledging that "Barbossa and his crew are not trying to *find* lost treasure, like Nefarious and the Rascals, but trying to *return* it").[10] Defendants' second film, *Pirates of the Caribbean – Dead Man's Chest*, focuses on characters trying to break curses and pay debts owed – Jack Sparrow and Bill Turner's debts owed to Davey Jones—and Barbossa's attempt to seek revenge on Davey Jones who took the Black Pearl from him. Defendants' third film, *Pirates of the Caribbean – At Worlds' End*, focuses on saving Jack Sparrow, the characters' attempt to defeat

---

*also Funky Films*, 462 F.3d at 1077-78 (finding the works were not substantially similar in plot despite the fact that the works both included an older brother who moved home from a distant city, was creative in contrast to his conservative younger brother, and initially had no interest in becoming involved in the family business; both works included a business was financially fragile; both included a rival funeral home which attempted to take over the home but failed; and both included a younger brother who changed his church affiliation in order to increase their client base, reasoning a closer examination of the works revealed one to be essentially a murder mystery and the other to be a study of "the way the characters struggle with life in the wake of the cataclysmic death of [their] father").

[10] Plaintiffs argue the plot of parties' works both feature a search for treasure because Plaintiffs' Screenplay depicts Nefarious, Davey Jones, and the Rascal Scoundrels are searching for treasure to keep it, and Defendants' first film depicts Barbossa and his crew searching for treasure in order to return it. Pirates searching for treasure, however, is unoriginal and generic, and therefore unprotectable. *See Mattel*, 616 F.3d at 913 ("[S]cenes a faire (standard features) and unoriginal components aren't protectable.").

Davey Jones, and Will Turner's attempt to free his father from the curse tying him
to the Flying Dutchman.  Defendants' fourth film, *Pirates of the Caribbean - On
Stranger Tides*, focuses on the characters' race to find the Fountain of Youth.
Defendants' fifth film, *Pirates of the Caribbean – Dead Men Tell No Tales*, again
focuses on attempts to break the curses at sea.

Accordingly, the parties' works are not substantially similar as to plot or
sequence of events under the extrinsic test because "a closer inspection reveals
that they tell very different stories."  *Benay*, 607 F.3d at 625.[11]

### b.    Characters

The Complaint alleges the key characters in the Screenplay are delineated
and consistent, widely identifiable with several of the character and characters of
[Defendants'] *Pirates* franchise."  (Compl. ¶ 71, Ex. 5.)

### 1.  Defendants' Jack Sparrow / Plaintiffs' Davey Jones

The Complaint alleges Defendants' Captain Jack Sparrow character is
"substantially similar" to the character Davey Jones in Plaintiffs' Screenplay
because Jack Sparrow is repeatedly portrayed in Defendants' Films as "funny, not
feared," "repeatedly referred to as a 'good man,'" cocky but with a "heart of
gold," and a drunk who loves rum, and Plaintiffs' Davey Jones is a dashing young
rogue," clean-shaven, hair pinned back in a tail," with "unsurpassed" talents in
piracy who is cocky and brave, and a drunk.  (Compl. ¶ 13, Ex. 5; Screenplay at 2,
29, 79.)  However, cockiness, bravery, and drunkenness are generic, non-distinct
characteristics which are not protectable.[12]

---

[11] *See also Wild v. NBC Universal*, 513 F. App'x 640, 642 (9th Cir. 2013)
("[R]andom similarities scattered throughout the works . . . are insufficient to
support a claim of substantial similarity."); *Gable v. Nat'l Broad. Co.*, 727 F.
Supp. 2d 815, 844 (C.D. Cal. 2010), *aff'd sub nom., Gable v. Nat'l Broad. Co.*,
438 F. App'x 587 (9th Cir. 2011) (finding no substantial similarity in plot where
many of the elements pointed out by plaintiff were not similar when viewed in
context, and those that did "bear some commonality—e.g., lottery winnings,
prison time, paying off debts—[did] not occur in the same sequence").

[12] *See DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015) ("[C]opyright
protection is available only for characters that are especially distinctive.  To meet

Moreover, Plaintiffs' Davey Jones character and Defendants' Jack Sparrow character are not substantially similar based on an objective analysis of the works. As to their appearance, Plaintiffs' Davey Jones is described as a "dashing young rogue," clean-shaven, hair pinned back in a tail (Screenplay 79), whereas Defendants' Jack Sparrow is never clean shaven, has facial hair, is dirty, has his hair in dreadlocks and wears a black hat, and his hair is never pinned back. Plaintiffs' Davey Jones character ultimately gives up the treasure he has been pursuing for love, to raise orphan children, and to return to life as a privateer with his newfound family at his side. Defendants' Jack Sparrow never renounces his piracy, does not have an equivalent love interest, does not care for children, is willing to sacrifice everything to be captain of his beloved Black Pearl ship, and continues to live the life of a pirate.

2. Plaintiffs' Jack Nefarious / Defendants' Captain Barbossa

The Complaint alleges Defendants' Captain Barbossa character is substantially similar to Plaintiffs' Jack Nefarious character because Barbossa is introduced in Defendants' first film *The Curse of the Black Pearl* in a black outfit with a black hat, a twisting mustache and goatee, with sunken eyes, and left eye twitching. (Compl. Ex. 5.) In objectively comparing the works, however, Barbossa is introduced in the film dressed in dark pirates clothing with a white collar and a dark feathery hat with a pet monkey on his shoulder, he has a scraggly

---

this standard, a character must be sufficiently delineated and display consistent, widely identifiable traits.") (internal quotations and citations omitted); *Mattel*, 616 F.3d at 917 (noting that the fact that works both included "stuffed, cuddly dinosaurs" is "not the sort of similarity we look for in copyright law," and finding defendant's dolls "can't be considered substantially similar to Bryant's preliminary sketches simply because the dolls and sketches depict young, stylish girls with big heads and an attitude"); *see also Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010) ("[T]he characters generically labeled in the Complaint only as a 'cocky kid' and an 'older mentor' are not protected by copyright law. Moreover, the Court does not find anything outside of the two characters' generic cocky attitude to be similar."); *Esplanade Prods., Inc. v. Walt Disney Co.*, 2017 WL 5635027, at *10 (C.D. Cal. Nov. 8, 2017) (the fact that both works had characters "acting bravely and determinedly to help others in trouble" was unprotectable).

mustache and beard, and yellowish eyes, but his left eye does not twitch.
Plaintiffs' character Jack Nefarious, on the other hand, is introduced in the
Screenplay as "[a] distinguished naval officer and pirate hunter with a savage
instinct and sinister nature.  You'd hesitate to call him the good guy," and his "left
eye twitches."  (Screenplay at 1-2.)  Later in the Screenplay, Nefarious is
described as "[p]ale," "[e]yes sunken in like a century old dead man," with a
"dark, twisting mustache with a curving goatee, makes him look more like a
devil," "clad in a black baroque pirate suit, he is charismatic in an evil way."
(Screenplay at 47.)  Moreover, any similarities between the characters based on
wearing dark pirate clothing and having facial hair are generic and unprotectable.

Plaintiffs also allege Barbossa and Nefarious are substantially similar
because Barbossa is "not a bargainer."  (Compl. Ex. 5.)  This characterization of
Barbossa is inaccurate because Barbossa bargains numerous times throughout
Defendants' Films, including for his own life and the life of his crew.

Plaintiffs also allege Barbossa and Nefarious are substantially similar
because Barbossa was Jack Sparrow's first mate and betrayed him.  (Compl. Ex.
5.)  Although Barbossa was Jack Sparrow's first mate, Barbossa led a mutiny to
overtake the Black Pearl (Jack Sparrow's ship) and marooned Jack Sparrow on an
island alone.  Barbossa and Jack Sparrow continually fight over being captain of
the Black Pearl, and Barbossa ultimately sacrifices himself, with the help of Jack
Sparrow who gives him a sword, to save his daughter Carina from Captain
Salazar.  In Plaintiffs' Screenplay, Jack Nefarious is captain of a privateer ship
which takes control of Davey Jones' pirate ship, but Nefarious shoots his own first
mate, turns on his crew, and shoots his own privateer ship which causes it to
explode and sink in the ocean because Nefarious and Davey Jones have a deal
regarding finding treasure.  It is revealed that Davey Jones was Nefarious's first
mate, and Davey allows Nefarious to take command of the ship because Nefarious
has the other half of the treasure map.  Davey Jones does not maroon Nefarious on

an island; instead Nefarious tries to take Jones' half of the map but is pulled into
the ocean by the tentacle of a sea monster.  Nefarious later returns as "Phantom
Jack" in search of Davey Jones's half of the map and the treasure.  When they find
the treasure, the cavern floods with water, Phantom Jack is swallowed by a sea
monster, and Davey, Jane, and the orphans escape.

Accordingly, Plaintiffs' Jack Nefarious character and Defendants' Barbossa
character are not substantially similar under the extrinsic test.

### 3.  Plaintiffs' Rascal Scoundrels and Jane

Six orphan children named the Rascal Scoundrels are main characters in
Plaintiffs' Screenplay.  Moreover, the female lead in Plaintiffs' Screenplay is Jane,
Jones' love interest, who is depicted as a young, beautiful woman with long red
hair, whose background is not revealed in the Screenplay.  (Screenplay at 8.)
Davey Jones ultimately gives up all the treasure for a future with Jane raising the
Rascal Scoundrels.  Defendants' Films, however, do not include a group of orphan
children and have no equivalent to Plaintiffs' Jane character.

Accordingly, there is no substantial similarity as to the characters of the
parties' works under the extrinsic test.[13]

### c.  Themes

The Complaint alleges the works are similar in theme because "10 years" is
mentioned in Defendants' first film *Pirates of the Caribbean – The Curse of the
Black Pearl*, and "is a continuing theme of time in the films," and the time period
of ten years also appears three times in the Screenplay.  (Compl. Ex. 5.)   In
Defendants' Films, the captain of the Flying Dutchman is cursed and can only go

---

[13] *See, e.g.*, *Benay*, 607 F.3d at 627 (finding no similarity among characters where
there were "a number of important characters in the Film and the Screenplay who
have no obvious parallel in the other work"); *Funky Films*, 462 F.3d at 1078-79
(finding no similarity in characters where several central characters in defendants'
work were "[c]ompletely missing" from or had "no counterpart" in plaintiff's
work); *Bernal*, 788 F. Supp. 2d at 1070 (finding no substantial similarity in
characters where one is clearly the main character and the other is "one of four
main characters that are central to the progression of the series").

on land once every 10 years.  In the Screenplay, 10 years pass between the first
scene and the second scene when the Rascal Scoundrels are introduced, Jane says,
"ten years later you show up only to say you still love me," and Jack tells the
Rascal Scoundrels that "[f]or ten years the Phantom [Jack] has stopped at nothing
to get that treasure."  Accordingly, any theme regarding "10 years" as depicted in
the parties' works is not substantially similar, and the concept of 10 years is
generic and not protectable.

The Complaint also alleges the parties' works are similar as to theme
because they both include betrayal.  (Compl. Ex. 5.)  Mutiny and betrayal,
however, are generic stock themes and flow naturally from the premise of pirates
and ships, and therefore unprotectable.[14]  Moreover, while Plaintiffs' Screenplay
portrays Davey Jones as Jack Nefarious's first mate, Davey Jones does not lead a
mutiny against Nefarious.  In contrast, in Defendants' Films, Captain Barbossa
was Jack Sparrow's first mate, but led a mutiny to overtake Jack's ship and
marooned Jack on an island.  Accordingly, the idea of "betrayal" in the parties'
works is not depicted in a substantially similar manner.[15]

The Complaint also alleges the works are similar in theme because the main
character in the parties' works "will be free, a privateer in the employ of
England."  (Compl. Ex. 5.)  Defendants' Jack Sparrow character, however, never
becomes a privateer in Defendants' Films and continues living the life of the
pirate, whereas Plaintiffs' Davey Jones character gives up treasure and piracy to
become a privateer and raise orphans with his love interest Jane.

Based on an objective analysis of the works under the extrinsic test, the

---

[14] *See Benay*, 607 F.3d at 627 (noting that although both works "explore general
themes of the embittered war veteran, the 'fish-out-of water,' and the clash
between modernization and traditions, . . . those themes arise naturally from the
premise of an American war veteran who travels to Japan to fight the samurai"
and were therefore unprotectable).

[15] *See, e.g., Gable*, 727 F. Supp. 2d at 844 (finding no substantial similarity where
many of the elements pointed out by plaintiff were not similar when viewed in
context).

13

Court finds the themes of the works are not substantially similar.  The main theme of Plaintiffs' Screenplay is the cost of treasure and piracy,[16] and the realization that love and family are worth more than treasure.[17]  Defendants' Films include themes regarding the costs of love,[18] and Defendants' main character Jack Sparrow never gives up piracy for love, children, or family.  Moreover, not all pirates are evil in Defendants' Films (e.g., Will becomes a pirate but is not portrayed as evil) and some of the privateers/non-pirates featured in Defendants' works are evil or morally corrupt (e.g., privateers for the East India Trading Company and Lord Becket, Captain Salazar).  Furthermore, unlike in Plaintiffs' Screenplay where the privateers prevail, in Defendants' film *Pirates of the Caribbean:  At World's End,* Lord Becket and the privateers aboard his ship are killed by pirates.

Accordingly, the themes of the parties' works are not substantially similar under the extrinsic test.

### d.    Dialogue

Plaintiffs fail to demonstrate "extended similarity in dialogue" in the works as required for the works to be substantially similar.  *Shame on You Prods.*, 120 F. Supp. 3d at 1156.[19]  Plaintiffs' Screenplay does not include dialogue similar to the

---

[16] I.e., Nefarious dies because he orders his men to collect the jewels in the cavern, which causes the cavern to flood; the Rascal Scoundrels believe everything bad happened because they wanted to be pirates; Jane feels betrayed by Davey Jones because he hesitates when Captain Nefarious tells him to choose between Jane or the treasure map.

[17] I.e., Davey Jones gives up gold, diamonds and jewels, and the life of the pirate, in exchange for a future as a family with Jane and the orphans, and returns to life as a privateer.

[18] I.e., Davey Jones cuts his heart out because he cannot endure the pain of loving Calypso; Bill Turner foolishly wages his soul for an eternity of servitude aboard the Flying Dutchman to try to save his son Will from losing to Davey Jones in a dice game only to realize that Will was playing the game to find where Davey Jones carried the key to the chest holding his heart which would free Bill Turner; Jack seduced Angelica just before she was going to take a vow to become a nun, Angelica professes her love for Jack but he strands her on an island because he is afraid she will seek revenge for her father Blackbeard's life.

[19] *See also Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1450 (9th Cir. 1988)

dialogue from Defendants' Films referenced in the Complaint.[20]  While the Court

notes a few instances of similar dialogue based on its objective review of the

works, such dialogue appears in different contexts, are made by different

characters, and/or are unoriginal because they are identical or substantially similar

to portions of the theme song from Disney's Pirates of the Caribbean theme park

ride.[21]  Therefore, the parties' works are not substantially similar in dialogue under

the extrinsic test.[22]

### e.    Mood

While the parties' works include dark scenes involving pirate battles and

sea monsters, the mood flowing from these scenes is unprotectable because it

flows "naturally from unprotectable basic plot premises" involving pirates.[23]

Moreover, although Plaintiffs' Screenplay includes skull-faced pirates and a

Phantom Captain Jack, sword fights, and violence, the mood of the Screenplay is

more lighthearted, some of the Rascal Scoundrels repeatedly provide comedic

relief in the form of slapstick comedy,[24] and the Screenplay ends with Davey

---

(finding no "extended similarity of dialogue [as] needed to support a claim of
substantial similarity"); *Gable*, 727 F. Supp. 2d at 847-48 (noting that "plaintiff
must demonstrate 'extended similarity of dialogue'" to support a claim of
substantial similarity based on dialogue, and finding that no reasonable jury could
conclude that works are substantially similar where, *inter alia*, there was no
similar dialogue between works).

[20] The Complaint also cites to numerous purported similarities in dialogue among
the works which are not actually dialogue.  (*See* Compl. Ex. 5.)

[21] Plaintiffs state in their opposition that "some (or perhaps many) of the elements
that are present in both the Screenplay and the Disney films are generic and
contain what could be considered historical elements in all stories about pirates or
incorporate popular visual elements from the *Pirates of the Caribbean* theme park
ride."

[22] *See Cavalier*, 297 F.3d at 824-25 (finding no triable issue of fact on the issue of
whether parties' works were substantially similar under the extrinsic test where,
*inter alia*, the works differed "markedly" in dialogue).

[23] *See Shame on You Prods.*, 120 F. Supp. 3d at 1158 ("Thus, Shame on You
cannot demonstrate there is substantial similarity in mood by arguing that both
works are light-hearted comedies that involve a walk of shame" because such a
"general mood . . . flows naturally from unprotectable basic plot premises" and is
not entitled to protection).

[24] E.g., Clumsy who constantly knocks things over, falls, breaks things; Stink who

15

Jones and Jane kissing with the orphans proudly alongside them.  The mood of
Defendants' Films is much darker, and Defendants' Films include more violence
such as execution scenes.  Accordingly, the mood of the parties' works is not
substantially similar under the extrinsic test.[25]

### f.      Setting

Plaintiffs argue the setting of the parties' works is substantially similar
because the works take place primarily aboard ships in the Caribbean, and are set
in a "ghost ship" and cavern.  The Complaint, however, alleges Plaintiffs'
Screenplay incorporated "the basic elements of the *Pirates of the Caribbean*

---

emits an odor, passes gas, and is constantly made fun of because of his stench; and
Snooze who falls asleep anywhere.

[25] *See, e.g., Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1180–81 (C.D.
Cal. 2016) (finding plaintiffs' screenplay is a dark drama, set primarily at night,
replete with examples of unredeemed moral corruption and no humorous
moments, whereas defendant's television series is a comedic drama, set primarily
during the daytime, which focuses on how players spend their time during the off
season and the relationships they have with their agents, teammates, and friends),
*aff'd*, 713 F. App'x 626 (9th Cir. 2018); *Bissoon-Dath v. Sony Computer Entm't
Am., Inc.*, 694 F. Supp. 2d 1071, 1083 (N.D. Cal. 2010), *aff'd sub nom., Dath v.
Sony Computer Entm't Am., Inc.*, 653 F.3d 898 (9th Cir. 2011) (finding no
substantial similarity in themes between the works upon noting that although
"violence is not absent from plaintiffs' works, it lacks the thematic centrality and
intensity seen in [defendant's work]"); *Marcus v. ABC Signature Studios, Inc.*,
279 F. Supp. 3d 1056, 1071 (C.D. Cal. 2017) (finding the moods of the two works
were not substantially similar, reasoning "[w]hile both works are billed as
comedies, *Across the Tracks* takes on a more serious mood with the overt racism
and clear movement towards a message of family strength and emphasis on
religion as the Johnson family deals with the inappropriate behavior of their
neighbors," whereas "*Black-ish* is much more light-hearted, even ending the
episode with the family dancing at Andre Jr.'s "bro mitzvah"); *Bernal v.
Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1070 (C.D. Cal. 2010)
(finding the moods of the two works were not substantially similar, reasoning that
although both works "deal with dark subject matter, *Homeless* is a drama, while
*Desperate Housewives* is a comedy,"  and noting that "Plaintiff's work has few
humorous elements" whereas "[b]y comparison, Defendant's work is consistently
funny throughout the entire show"); *Kouf v. Walt Disney Pictures & Television*, 16
F.3d 1042, 1046 (9th Cir. 1994) (holding the mood of the works "differ
dramatically" and were not substantially similar under the extrinsic test because
one work was "a light-hearted, family adventure story" whereas the other work
was "a darker adventure that spans a series of days and depicts many locations and
a shoot-out"); *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1114 (N.D.
Cal. 2010) (finding the moods of two works not substantially similar where one
contained scenes involving drug dealers and the hero chopping off his own finger
while the other had "'happy upbeat overtones'").

16

ride."[26]  (Compl. ¶¶ 25, 26.)  Therefore, the settings of the parties' works aboard ships in the Caribbean and in a cavern are unprotectable because they flow from the natural premise of a story based on Disney's Pirates of the Caribbean theme park ride.[27]  Moreover, the fact that the parties' works are primarily set aboard ships, in port towns, and in the Caribbean,[28] does not weigh heavily on the issue of substantial similarity.[29]

Having reviewed the works under the extrinsic test, the Court finds the works are not substantially similar based on any similarities in setting.

### g.    Pace

Plaintiffs' work is a 111-page screenplay which depicts a fight between Davey Jones and Captain Nefarious over a treasure map, and then flashes forward 10 years to telling the story of six orphans living aboard Davey Jones' ship looking for the map and treasure, the battle between Nefarious and Jones over the map and the treasure, and concludes with Nefarious's death and Davey Jones's sacrifice of treasure in exchange for Jane and the orphans.  Defendants' works include five feature films which are each over two hours long and together total more than 12 hours.  Defendants' Films span over the course of many years and portray the various adventures of numerous characters including Jack Sparrow,

---

[26] Disney's Pirates of the Caribbean theme park ride features pirates finding treasure in a cavern, a skeleton pirate steering a ship, and other skeleton pirates. (RJN #7, Parras Decl. Exs. 1, 2.)

[27] *See, e.g., Shame on You Prods., Inc.*, 120 F. Supp. 3d at 1159 ("[T]he use of city streets is generic and flows from the unprotectable concept of setting a work in a city); *Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002) (night sky setting was unprotectable *scene a faire* where it "naturally and necessarily flows from the basic plot premise").

[28] Plaintiffs acknowledge in their opposition "it is historically accurate that a majority of pirate stories take place in the Caribbean, and therefore not copyrightable."  (Opposition at 20.)

[29] *See Shaw v. Lindheim*, 919 F.2d 1353, 1363 (9th Cir. 1990) (the fact that the works were both "set in large cities . . . do[es] not weigh heavily in our decision" on the issue of substantial similarity); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) (any similarities in setting, such as being filmed in a secret location without any audience, was "generic and inconsequential" and therefore was not substantially similar).

1    Captain Barbosa, Will and Henry Turner, Elizabeth Swan, and Carina Smith.[30]

2    Accordingly, the parties' works are not substantially similar in pace based on the

3    Court's objective review of the works under the extrinsic test.[31]

4                            \*      \*      \*

5        At most, Plaintiffs have demonstrated random similarities scattered

6    throughout the parties' works.  Analyzing the plot, themes, dialogue, mood,

7    setting, pace, characters, and sequence of events as discussed above, the Court

8    finds the parties' works are not substantially similar as a matter of law under the

9    extrinsic test.[32]

10    **C.     Leave to Amend**

11        Plaintiffs request that the Court "allow the Plaintiffs to amend their

12    complaints after having the opportunity to view the original scripts used by the

13    Defendants for the Disney films."  The Complaint, however, alleges Defendants'

14    Films (not the scripts for the films) infringe Plaintiffs' Screenplay.  (*See* Compl.

15    ¶¶ 50, 63, 77, 91, 105.)  Therefore, the scripts used for Defendants' Films are

16    irrelevant in determining whether Defendants' allegedly infringing works (i.e.,

17    Defendants' five feature films) infringe Plaintiffs' Screenplay.[33]  Moreover,

18

19    [30] *See The Curse of the Black Pearl* (143 minutes); *Dead Man's Chest* (150 minutes); *On Stranger Tides* (136 minutes); *At World's End* (169 minutes); and *Dead Men Tell No Tales* (129 Minutes).

20

21    [31] *See, e.g., Weygand v. CBS Inc.*, 1997 WL 377980, at \*8 (C.D. Cal. May 21, 1997) (pace not substantially similar where one work took place within approximately one year whereas the other work spanned over approximately

22    twenty years).

23    [32] *See Rappoport v. Ovitz*, 242 F.3d 383 (9th Cir. 2000) ("Because Rappoport demonstrated only random similarities, there is no substantial similarity between the works."); *Kouf*, 16 F.3d at 1045 ("[W]e are equally unimpressed by Kouf's

24    compilation of random similarities scattered throughout the works.") (internal quotations omitted); *Zella*, 529 F. Supp. 2d at 1137 (granting summary judgment

25    for defendants where plaintiff "cobbled together" a list of generic elements that did not form a specific pattern); *Flynn v. Surnow*, 2003 WL 23411877, \*9 (C.D.

26    Cal. Dec. 9, 2003) (similarities cited by Plaintiff were "randomly scattered throughout the works and ha[d] no concrete pattern . . . in common").

27    [33] *See Briggs v. Blomkamp*, 70 F. Supp. 3d 1155, 1168 n.2 (N.D. Cal. 2014) (the

28    proper comparison was plaintiff's copyrighted screenplay and the final version of the film, not the film's screenplay), *aff'd sub nom. Briggs v. Sony Pictures Entm't,*

Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 03/29/22   Page 137 of 182   Page ID
#:5041
Case 2:18-cv-08074-CBM-AS   Document 232-2   Filed 05/13/19   Page 19 of 19   Page ID #:5750

amendment would be futile since the parties' works are not substantially similar under the extrinsic test as a matter of law.[34]

## IV.   CONCLUSION

Accordingly, the Court **GRANTS** Defendants' Motion to Dismiss Plaintiff's Complaint without leave to amend, and **DISMISSES** Plaintiffs' copyright infringement claims **WITH PREJUDICE**.


**IT IS SO ORDERED.**


DATED:  May 13, 2019.                     _____
                                           CONSUELO B. MARSHALL
                                           UNITED STATES DISTRICT JUDGE

---

*Inc.*, 714 F. App'x 712 (9th Cir. 2018); *Quirk v. Sony Pictures Entm't Inc.*, 2013 WL 1345075, at *6 (N.D. Cal. Apr. 2, 2013) (finding draft scripts for defendant's film were irrelevant in copyright action alleging infringement based on defendant's film where the plaintiff did not plead that the scripts constituted infringing works, and concluding "the only relevant question at this juncture is whether the final movie as filmed, edited, and released contains matter substantially similar to protectable elements of Quirk's novel").

[34] *See Rentmeester*, 883 F.3d at 1123 ("Nothing disclosed during discovery could alter the fact that the allegedly infringing works are as a matter of law not substantially similar [to Plaintiff's work]."); *Shame on You Prods.*, 120 F. Supp. 3d at 1150-71 (dismissing copyright infringement claim with prejudice upon finding that the works were not substantially similar for purposes of a motion to dismiss).

# Exhibit 9

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ARTHUR LEE ALFRED II *et al.*,<br><br>    Plaintiff,<br><br>v.<br><br>THE WALT DISNEY PICTURES,<br><br>    Defendant. | Case No.:  CV 18-8074-CBM-ASx<br><br>**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT RE SUBSTANTIAL SIMILARITY [163][193]** |

The matter before the Court is Defendant Walt Disney Picture's ("Defendant's") Motion For Summary Judgment re Substantial Similarity.  (Dkt. No. 163.)  The matter is fully briefed.[1]

## I.    BACKGROUND

This is a copyright infringement action brought by Plaintiffs Arthur Lee Alfred II and Ezequiel Martinez (collectively, "Plaintiffs") arising from Defendant's alleged infringement of Plaintiffs' Screenplay entitled *Pirates of the Caribbean* (the "Screenplay").  The Complaint asserted the following five

---

[1] The parties appeared at the hearing on the Motion and were provided an opportunity to raise any issues regarding the Motion at the hearing.  Accordingly, Plaintiffs' ex parte application to file a surreply (Dkt. No. 193) is denied.

"claims":  (1) "Infringement of Copyright (Reproduction of Copyrighted Work)"; (2) "Infringement of Copyright (Preparation of Derivative Works)"; (3) "Infringement of Copyright (Distribution of Copyrighted Work)"; (4) "Infringement of Copyright (Public Performance of Copyrighted Work"); and (5) "Infringement of Copyright (Public Display of Copyrighted Work)."  The Complaint alleged that Defendant's five feature films (i.e., (1) *Pirates of the Caribbean: The Curse of the Black Pearl*; (2) Pirates *of the Caribbean: Dead Man's Chest*; (3) *Pirates of the Caribbean: At World's End*; (4) *Pirates of the Caribbean: On Stranger Tides*; and (5) *Pirates of the Caribbean: Dead Men Tell No Tales*) infringed Plaintiffs' Screenplay.

On May 13, 2019, the Court granted Defendant's motion to dismiss upon finding the parties' works were not substantially similar as a matter of law.  (Dkt. No. 93.)  On May 14, 2019, judgment was entered in favor of Defendants.  (Dkt. No. 94.)  Plaintiffs appealed.  On July 22, 2020, the Ninth Circuit issued a memorandum disposition finding Plaintiffs' Screenplay "shares sufficient similarities with the film to survive a motion to dismiss," reasoning while the district court noted that the elements the two works share in common are unprotected generic, pirate-movie tropes, the Ninth Circuit found "at this stage of the litigation, it is difficult to know whether these elements are indeed unprotectible material.  (Dkt. No. 103.)  The Ninth Circuit concluded "[a]dditional evidence would help inform the question of substantial similarity" and "expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant," and therefore reversed the district court's dismissal and remanded the action.  (*Id*.)  On September 8, 2020, the Ninth Circuit issued its Mandate.  (Dkt. No. 104.)

Following remand, the parties stipulated to Plaintiffs filing a First Amended Complaint ("FAC"), which was approved by the Court.  (Dkt. No. 111.)  On November 30, 2020, Plaintiffs filed the FAC which asserts a single cause of action

1  for "Copyright Infringement Regarding the Pirates of the Caribbean Film

2  Franchise." (Dkt. No. 112.)  Defendant now moves for summary judgment on the

3  issue of substantial similarity.

4                    ## II.   STATEMENT OF THE LAW

5       On a motion for summary judgment, the Court must determine whether,

6  viewing the evidence in the light most favorable to the nonmoving party, there are

7  any genuine issues of material fact.  *Simo v. Union of Needletrades, Indus. &*

8  *Textile Employees*, 322 F.3d 602, 609-10 (9th Cir. 2003); Fed. R. Civ. P. 56.

9  Summary judgment against a party is appropriate when the pleadings, depositions,

10  answers to interrogatories, and admissions on file, together with the affidavits, if

11  any, show that there is no genuine issue as to any material fact and that the

12  moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  A

13  factual dispute is "material" only if it might affect the outcome of the suit under

14  governing law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  An

15  issue is "genuine" only if there is a sufficient evidentiary basis on which a

16  reasonable jury could find for the non-moving party.  *Id*. at 249.  The evidence

17  presented by the parties must be admissible.  Fed. R. Civ. P. 56(e).  In judging

18  evidence at the summary judgment stage, the Court does not make credibility

19  determinations or weigh conflicting evidence.  *T.W. Elec. Serv., Inc. v. Pac. Elec.*

20  *Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  Rather, "[t]he evidence of

21  the nonmovant is to be believed, and all justifiable inferences are to be drawn in

22  [the nonmovant's] favor."  *Anderson*, 477 U.S. at 255.  But the non-moving party

23  must come forward with more than "the mere existence of a scintilla of evidence."

24  *Id*. at 252.

25                        ## III.   DISCUSSION

26       Defendant moves for summary judgment on the ground the works are not

27  substantially similar as a matter of law.

28

**A.** **Plaintiffs' Screenplay and Defendant's Motion Picture** *Pirates of the Caribbean:  The Curse of the Black Pearl*

Defendant contends Plaintiffs' 2000 Screenplay and Defendant's 2003 motion picture *Pirates of the Caribbean:  The Curse of the Black Pearl* are both based on Disney's Pirates of the Caribbean theme park ride, and "[a]fter filtering out generic, unprotectable elements and elements that are stock features or *scenes a faire* of the pirate genre, no reasonable factfinder could conclude that the works are substantially similar."

The parties submit dueling expert reports on the issue of substantial similarity.  Defendant argues Plaintiffs' expert testimony does not preclude granting summary judgment in Defendant's favor because Plaintiffs' expert testified at his deposition that 1) he formed his expert opinion without reviewing any works in the pirate genre because Plaintiffs' counsel asked him not to and informed him that other pirate movies are irrelevant to this case, and only reviewed two pirate works (the *Goonies* and *Cutthroat Island*) after he formed his expert opinion (Defendant's Statement of Facts ("SUF")[2] Nos. 148, 167, 169); 2) he has never been on or heard of Disney's Pirates of the Caribbean ride, and did not review an footage of the ride in connection with forming his expert opinion (Defendant's SUF Nos. 171, 177-78); and 3) he only has "passing familiarity" with the pirate genre, he questions whether the pirate genre exists, and his background with pirate works is extremely limited[3] (Defendant's SUF Nos. 155, 156, 157, 170).  Defendant thus contends Plaintiffs' expert disregarded the Ninth Circuit's "directive" "that expert testimony should help distinguish tropes of the pirate genre from original elements in the works" in in its opinion remanding the action.

---

[2] References to SUF as used herein, refer to the evidence cited in support of the fact.

[3] However, Plaintiffs' expert testified at his deposition:  "I consider myself having familiarity with pirate literature."  (Roman Depo. 18:16-20.)

In its opinion remaining this matter, the Ninth Circuit stated:

> The district court noted some of these similarities but dismissed the action largely because it concluded that many of the elements the two works share in common are unprotected generic, pirate-movie tropes. But, at this stage of the litigation, it is difficult to know whether such elements are indeed unprotectible material. Additional evidence would help inform the question of substantial similarity. *Cf. Rentmeester*, 883 F.3d at 1123 ("This is not a case in which discovery could shed light on any issues that actually matter to the outcome."). As Plaintiffs note, expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant. *See Newton v. Diamond*, 388 F.3d 1189, 1196 (9th Cir. 2004). This would be particularly useful in this circumstance, where the works in question are almost twenty years old and the blockbuster *Pirates of the Caribbean* film franchise may itself have shaped what are now considered pirate-movie tropes.

(Dkt. No. 103.) While the Ninth Circuit noted it was difficult at the pleading stage to determine whether elements of the works were unprotectible, generic pirate-movie tropes, the Ninth Circuit's discussion with respect to experts was not limited to the subject of pirate-movie tropes. Rather, the Ninth Circuit stated, "[a]dditional evidence would help inform the question of substantial similarity" and expert testimony would assist in determining whether similarities identified by Plaintiffs were "significant." (*Id*.) Thus, Plaintiffs' expert was not limited to opining on pirate-movie tropes and is not precluded by the Ninth Circuit's opinion from offering expert testimony comparing the parties' works.

Defendant also contends Plaintiffs' expert testimony does not preclude summary judgment on the issue of substantial similarity because he testified at his deposition that he had never heard of the extrinsic test for substantial similarity, the "methodology" he applied was impressionistic, the law "didn't seem relevant to what [he] was tasked to do," and he could not recall his counsel telling him anything about the legal standards he should apply in reaching his opinions other than that he should disregard dissimilarities between the works. (Defendant's SUF Nos. 164-66.) However, these arguments go to the weight of Plaintiffs' expert report, and the Court cannot weigh evidence on summary judgment. *See*

1   *Morrill v. Stefani*, 338 F. Supp. 3d 1051, 1056 (C.D. Cal. 2018); *Iguaçu, Inc. v.*
2   *Cabrera*, 2013 WL 12173236, at *5 (N.D. Cal. Feb. 21, 2013), *aff'd sub nom.*
3   *Igua%26cu, Inc. v. Filho*, 637 F. App'x 407 (9th Cir. 2016) (citing *U.S. v. Union*
4   *Pacific R. Co.*, 565 F.Supp.2d 1136, 1150 n. 22 (E.D. Cal. 2008)).

5         Plaintiffs' expert opines that the parties' works are substantially similar and
6   have original elements in common, whereas Defendant's expert opines that the
7   parties' works are not substantially similar and common elements in the parties'
8   works are common in the pirate genre generally.  The opinions from the parties'
9   experts thus creates a genuine issue of material fact in dispute regarding whether
10  the works are substantially similar.  *See Lewert v. Boiron, Inc.*, 212 F. Supp. 3d
11  917, 937 (C.D. Cal. 2016) ("[T]he Court is precluded from granting summary
12  judgment in either side's favor. This case boils down to a battle of the experts, and
13  such a battle must be left for the jury's resolution."), *aff'd*, 742 F. App'x 282 (9th
14  Cir. 2018).[4]

15        Defendant argues district courts have granted summary judgment on the
16  issue of substantial similarity despite the existence of dueling experts, citing
17  *Funky Films, Inc. et al. v. Time Warner Ent. Co., L.P., et al.*, No. 8:03-cv-0964-
18  CJC-PLAx (C.D. Cal. Feb. 19, 2004) (Dkt. No. 83), *aff'd*, *Funky Films, Inc. v.*
19  *Time Warner Entm't, Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006), *overruled by*
20  *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th
21  Cir. 2020); *Benay v. Warner Bros. Ent.*, 2008 WL 11336277 (C.D. Cal. Mar. 14,
22  2008), *aff'd in part, rev'd in part and remanded sub nom. Benay v. Warner Bros.*
23  *Ent.*, 607 F.3d 620 (9th Cir. 2010), *overruled by Skidmore as Tr. for Randy Craig*
24  *Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); and *Gable v. Nat'l*
25  *Broad. Co.*, 727 F. Supp. 2d 815 (C.D. Cal. 2010).  Unlike in *Benay* and *Gable*,
26

27  [4] *See also Optivus Tech., Inc. v. Ion Beam Applications S.A.,* 2005 WL 6070811,
    at *31 (C.D. Cal. Mar. 14, 2005), *aff'd*, 469 F.3d 978 (Fed. Cir. 2006); *Avery*
28  *Dennison Corp. v. Acco Brands, Inc.*, 2000 WL 986995, at *12 (C.D. Cal. 2000).

where the plaintiff's expert's statements were found to be inadmissible, here
Defendant does not object to the admissibility of Plaintiffs' experts' reports.
Moreover, unlike the expert in *Gable* who lacked literary expertise, here
Plaintiffs' expert submits a copy of his curriculum vitae which demonstrates he is
a professor in the English Department at the University of Southern California and
has been a professor/assistant professor/instructor in the English Department at
various universities and colleges since 1989, he has a bachelor's degree, Master of
Arts, and Ph.D. in Comparative Literature. (Dkt. No. 177-5.) Furthermore, *Funky
Films*, *Benay*, and *Gable* do not have a similar procedure posture to this case in
which the Ninth Circuit found on appeal of this matter that "[a]dditional evidence
would help inform the question of substantial similarity" and "expert testimony
would aid in determining whether the similarities Plaintiffs identify are
qualitatively significant" in this action. (Dkt. No. 103.)

Defendant also argues expert testimony "will 'seldom be necessary' to
analyze substantial similarity in cases, like this one, that involve works 'targeted at
a general audience' that 'deal with subject matter readily understandable by any
ordinary person, including the Court." (Reply at 5.) However, this Court
previously conducted its own review of the works without expert testimony at the
motion to dismiss stage and granted Defendant's motion to dismiss upon finding
the parties' works were not substantially similar as a matter of law, but the Ninth
Circuit reversed and remanded upon finding expert testimony "would aid" in
determining whether the works are substantially similar. (Dkt. No. 103.)

Accordingly, because the parties' expert opinions create a genuine issue of
disputed fact regarding whether the works are substantially similar, the Court
denies Defendant's Motion for Summary Judgment on the issue of substantial
similarity.

**B.    Derivative Work**

Defendant also contends Plaintiffs' Screenplay is an unauthorized

derivative work based on Disney's Pirates of the Caribbean theme park ride (the

"Ride").  The parties disagree regarding whether this issue is within the scope of

the parties' stipulation regarding Defendant's summary judgment motion.

In the parties' stipulation which was approved by the Court, the parties

stipulated as follows:

> (a) Fact discovery shall be bifurcated, with discovery in the first phase limited to the issue of substantial similarity; if other discovery is necessary, it will occur in a second phase that will follow the parties' mediation and the Court's resolution of Walt Disney Pictures' intended motion for summary judgment on substantial similarity, as set forth below.

> (b) More specifically, in the first discovery phase discovery shall be limited to: (i) initial disclosures under Federal Rule of Civil Procedure 26(a)(1), which shall be made by January 29, 2021; expert disclosures under Federal Rule of Civil Procedure 26(a)(2) relating to the issue of substantial similarity, which shall be made by March 30, 2021; and (iii) one deposition of each side's respective expert witnesses on substantial similarity. . . .

> Following the completion of the first phase of discovery . . ., the parties agree to participate in a mediation . . ..  In the event the parties are unable to resolve the case through mediation, Walt Disney Pictures may file a motion for summary judgment on *only* the issue of substantial similarity within 60 days of the failed mediation.

(Dkt. Nos. 121, 122.)  Under the Copyright Act, a work is not a "derivative work"

unless it is "based upon one or more preexisting works" and, in order to qualify as

a "preexisting work," the underlying work must be copyrightable.  *Ets-Hokin v.

Skyy Spirits, Inc.*, 225 F.3d 1068, 1078 (9th Cir. 2000).  Therefore, the Court finds

the issue of whether Plaintiffs' Screenplay is a derivative work of Disney's Ride is

outside the scope of the parties' stipulation because it would require the Court to

examine whether Plaintiffs' Screenplay is based on Disney's Ride and whether

Disney's Ride is copyrightable, rather than compare whether Plaintiffs'

Screenplay is substantially similar to Defendant's Film.

Plaintiffs argue even if the issue of whether Plaintiffs' Screenplay is a

derivative work could be a proper subject of Defendant's instant summary

judgment motion, Defendant fails to demonstrate Plaintiffs' Screenplay is a

1  derivative work because Defendant does not offer evidence showing Disney's
2  Ride is copyrightable, citing *Espanade Prods. Inc. v. Walt Disney Co.,* 768 Fed.
3  App'x 732, 733 (9th Cir. 2019) ("a title is unprotected as a matter of federal law").
4      Defendant contends Plaintiffs' Screenplay quotes the song "Yo-Ho (A
5  Pirate's Life for Me)." Defendant states in its reply that the "Yo Ho" song heard
6  in the Ride is "subject to a registered copyright" (Reply at 20), but Defendant cites
7  to no evidence in support of this contention. Moreover, Defendant cites to the
8  following portions of Plaintiffs' Screenplay in support of its contention that
9  Plaintiffs' Screenplay quotes the "Yo Ho" song from the Disney Ride. (*See* Dkt.
10 No. 1-1, Plaintiffs' Screenplay at 39 ("Yo ho, yo ho, a phantom's life indeed"); *id.*
11 at 40 ("Yo ho, yo ho, a pirate's life for (hiccup!) me!"); *id.* at 52 ("We hack and
12 raze, behead and set blaze, avast ye scurvys yo ho! We murder with greed, do
13 treacherous deeds, Avast ye scurvy's yo ho! In search of the MAP you'll fall in
14 our trap, Avast ye scurvy's yo ho! The Phantom is near, his evil strikes fear, avast-
15 ye-scurvys-yo HOOOO!!!"); *id.* at 74 ("We kidnap and ravage and don't give a
16 hoot, drink up me'earties yo-ho! We're RASCAL SCOUNDRELS villains and
17 knaves, drink up me'earties, yo-ho!"); *id.* at 109 ("Yo ho, yo ho, a PARROTS life
18 for me.").)[5]
19      However, Plaintiff Martinez declares:
20          I have reviewed Exhibit D to Gray's declaration which alleges that
21          page 32 and 45 of the Screenplay contain references to the ride
            because the songs use the phrase "Yo-Ho". However, Alfred and I
22          created the lyrics on those two pages by ourselves. In particular, the

---

23 [5] Defendant fails to cite to any other evidence demonstrating the "elements" of the
   Disney Ride purportedly copied by Plaintiffs in their Screenplay are copyrighted
24 or copyrightable in order to demonstrate Plaintiffs' Screenplay is an unprotectable
   derivative work. *See Orr v. Bank of America,* 285 F.3d 764, 775 (9th Cir. 2002)
25 (the failure to provide citations to exhibits warranted exclusion of evidence
   offered in opposition to motion); *Cortes v. Mkt. Connect Grp., Inc.,* 2015 WL
26 5772857, at *4 (S.D. Cal. Sept. 30, 2015) ("To the extent the parties failed to cite
   evidence, the Court is not required to search it out for them."); *Zackaria v. Wal-*
27 *Mart Stores, Inc.,* 2014 WL 11398759, at *2 (C.D. Cal. Feb. 21, 2014) ("[I]t is not
   the court's duty to scour [through the record] in search of evidence supporting
28 plaintiff's factual statement.").

song lyrics that we created at page 32 are: "Yo ho, yo ho, a phantom life indeed. We bury, abduct, we sin and slay, avast ya scurvys yo ho! We're banshees of fright and phantoms of night, avast ye scurvy yo ho...." The song we created at page 45 are: "We hack and raze, behead and set blaze, avast ya scurvys yo ho! w murder with greed, do treacherous deeds, Avast ye scurvy' a yo ho! In search of the map you'll fall in our trap, Avast y scurvy' yo ho! The Phantom is near, his evil strikes fear, avast-ya-scurvys-yo HOOOOO!!!" Only the words "yo ho" have any similarity with the song in the ride and our songs have no melodies. To the best of my knowledge, the phrase "Yo-Ho" has long been associated with pirates and is not something that Disney created for the ride.

(Martinez Decl. ¶ 16.) Plaintiff Alfred also declares:

I have reviewed Exhibit D to Gray's declaration, which alleges that page 32 and 45 of the Screenplay contain references to the ride because the songs use the phrase "Yo-Ho". However, Martinez and I created the lyrics on those two pages by ourselves. In particular, the song lyrics that we created at page 32 are: "Yo ho, yo ho, a phantom life indeed. We bury, abduct, we sin and slay, avast ya scurvys yo ho! We're banshees of fright and phantoms of night, avast ye scurvy yo ho...." The song we created at page 45 are: "We hack and raze, behead and set blaze, avast ya scurvys yo ho! w murder with greed, do treacherous deeds, Avast ye scurvy• a yo ho! In search of the map you'll fall in our trap, Avast y scurvy• yo ho! The Phantom is near, his evil strikes fear, avast-ya-scurvys-yo HOOOOO!!!" Only the words "yo ho" have any similarity with the song in the ride and our songs have no melodies. To the best of my knowledge, the phrase "Yo-Ho" has long been associated with pirates and is not something that Disney created for the ride.

(Alfred Decl. ¶ 17.) Accordingly, even if the issue of whether Plaintiff's Screenplay is an unprotectable derivative work is a proper basis for Defendant's Motion for Summary Judgment as stipulated by the parties, there is a genuine issue of disputed fact regarding whether Plaintiffs' Screenplay copied the "Yo Ho" song from the Disney Ride, which precludes summary judgment on the issue of whether Plaintiffs' Screenplay is an unprotectable derivative work.[6]

---

[6] Plaintiffs also argue Defendant offers no evidence demonstrating Plaintiffs' Screenplay was unauthorized by Disney. The parties disagree regarding the effect of Disney's acceptance of Plaintiffs' Screenplay which was retitled "Pirates of the Caribbean" instead of "Pirates of the Spanish Main" (see FAC ¶ 49). Plaintiffs also argue Defendant conceded on appeal that the Ride is "not material" for purposes of determining whether the parties' works are substantially similar, and Defendant's evidence with respect to the Ride is improper because Defendant did not disclose any of the fact witnesses in its Rule 26 disclosures whom it now relies on with respect to the Ride—both contentions of which are disputed by Defendant. However, the Court does not reach these issues raised by Plaintiff

# IV.   CONCLUSION

Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment re substantial similarity.

**IT IS SO ORDERED.**

DATED:  December 16, 2021.

_____
CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE

---

because Defendant does not cite to any evidence or authority demonstrating Disney's Ride is copyrighted or copyrightable as required to find Plaintiffs' Screenplay is an unprotectable derivative work.

# Exhibit 10

**LOWE & ASSOCIATES, PC**
Steven T. Lowe (SBN 122208)
steven@lowelaw.com
Aleksandra Hilvert (SBN 258463)
aleksandra@lowelaw.com
8383 Wilshire Blvd, Suite 1038
Beverly Hills, California 90211

**ROBINS KAPLAN LLP**
Patrick M. Arenz
(MN Bar No. 0386537) (pro hac vice)
parenz@robinskaplan.com
Brandon J. Pakkebier
(MN Bar No. 0400691) (pro hac vice)
bpakkebier@robinskaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402

*Attorneys for Plaintiffs*
*Arthur Lee Alfred, II, et al.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| ARTHUR LEE ALFRED, II, et al., | Case No. 2:18-CV-08074-CBM-ASx |
|---|---|
| Plaintiff, | **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO [1] CERTIFY THE COURT'S ORDER DENYING SUMMARY JUDGMENT ON SUBSTANTIAL SIMILARITY (Dkt. 200) FOR INTERLOCUTORY APPEAL PURSUANT TO 28 U.S.C. § 1292 (b) AND [2] STAY PENDING RESOLUTION OF INTERLOCUTORY APPEAL** |
| v. | |
| WALT DISNEY PICTURES, | |
| Defendant. | |

*[Filed concurrently with Proposed Order]*
Judge: Hon. Consuelo B. Marshall
Hearing Date: February 15, 2022
Time: 10:00 a.m.
Place: Courtroom 8B

# **TABLE OF CONTENTS**

**Page**

Introduction .................................................................................................. - 1 -

Factual Background ...................................................................................... - 1 -

    I.    The Screenwriters have pursued their claim against Disney since 2017. ............................................................................................... - 1 -

    II.   This Court applied routine legal principles when it denied Disney's motion for summary judgment. ......................................... - 2 -

    III.  This case is on track to resolve on the merits within one year. ........ - 2 -

Argument ..................................................................................................... - 3 -

    I.    The Court should not certify this case for a second appeal to the Ninth Circuit. ..................................................................................... - 3 -

        A.   Disney failed to establish a controlling question of law. ....... - 3 -

        B.   Disney has not proven a substantial ground for difference of opinion. .................................................................................. - 6 -

        C.   Disney did not establish that certification will materially advance the ultimate termination of the litigation. ................. - 7 -

    II.   The Court should not delay trial to stay this case for a second appeal. ....................................................................................... - 9 -

Conclusion ................................................................................................ - 11 -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred v. Disney*,
821 F. App'x 727 (9th Cir. 2020) ................................................................. 1

*Association of Irritated Residents v. Fred Schakel Dairy*,
634 F. Supp. 2d 1081 (E.D. Cal. 2008) ...................................................... 10

*Baker v. Wehinger*,
2021 WL 3519918 (C.D. Cal. Apr. 27, 2021) ............................................. 5

*In re Cement Antitrust Litig.*,
673 F.2d 1020 (9th Cir. 1981) .................................................................... 3

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978) .................................................................................... 3

*Couch v. Telescope, Inc.*,
611 F.3d 629 (9th Cir. 2010) ............................................................... 3, 6, 7

*Danjaq LLC v. Sony Corp.*,
263 F.3d 942 (9th Cir. 2001) ...................................................................... 9

*Dezendorf v. Twentieth Century-Fox Film Corp.*,
99 F.2d 850 (9th Cir. 1938) ........................................................................ 4

*Env't World Watch, Inc. v. Walt Disney Co.*,
2014 WL 10979864 (C.D. Cal. Apr. 2, 2014) ............................................. 4

*Feltner v. Columbia Pictures Television, Inc.*,
523 U.S. 340 (1998) .................................................................................... 9

*Hall v. Swift*,
2021 WL 6104160 (C.D. Cal. Dec. 9, 2021) ............................................... 7

*AE* ex rel. *Hernandez v. Cty. of Tulare*,
666 F.3d 631 (9th Cir. 2012) ...................................................................... 9

*United States* ex rel. *Integra Med Analytics LLC v. Providence Health & Servs.*,
2019 WL 6973547 (C.D. Cal. Oct. 8, 2019) ............................................... 9

*James v. Price Stern Sloan, Inc.*,
    283 F.3d 1064 (9th Cir. 2002) ........................................................................ 7

*Lyon v. W.W. Grainger Inc.*,
    2010 WL 2485944 (N.D. Cal. June 15, 2010) ................................................. 8

*McCollough v. Johnson, Rodenburg & Lauinger, LLC*,
    637 F.3d 939 (9th Cir. 2011) ......................................................................... 3

*Monster Energy Co. v. Integrated Supply Network, LLC*,
    2018 WL 6136144 (C.D. Cal. Sept. 21, 2018) ................................................ 7

*Orgain, Inc. v. Northern Innovations Holding Corp.*,
    No. 8:18-cv-01253-JLS-ADS, 2021 WL 6103528 (C.D. Cal. Sept.
    29, 2021) ....................................................................................................... 8

*Patel v. City of Long Beach*,
    2014 WL 12850522 (C.D. Cal. Dec. 3, 2014) ............................................... 10

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    460 F.3d 1217 (9th Cir. 2006) ...................................................................... 10

*Sateriale v. RJ Reynolds Tobacco, Co.*,
    2015 WL 3767424 (C.D. Cal. June 17, 2015) ................................................ 4

*Shurance v. Planning Control Int'l, Inc.*,
    839 F.2d 1347 (9th Cir. 1988) .................................................................... 7, 8

*Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*,
    2016 WL 10637079 (C.D. Cal. Dec. 28, 2016) .............................................. 4

*Swirsky v. Carey*,
    376 F.3d 841 (9th Cir. 2004) ......................................................................... 4

*T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*,
    809 F.2d 626 (9th Cir. 1987) ......................................................................... 6

*Turo Inc. v. City of L.A.*,
    2020 WL 4287583 (C.D. Cal. July 27, 2020) ................................................. 4

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
    715 F.2d 1327 (9th Cir. 1983) ....................................................................... 4

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

iii

PLAINTIFFS' OPP. TO CERT. MOT.
2:18-CV-08074-CBM-ASX

*U.S. Rubber Co. v. Wright,*
   359 F.2d 784 (9th Cir. 1966) ................................................................ 3

*United States v. INSYS Therapeutics, Inc.,*
   2021 WL 4307404 (C.D. Cal. Apr. 14, 2021) ................................... 8, 9

*United States v. Woodbury,*
   263 F.2d 784 (9th Cir. 1959) ........................................................ 4, 6, 7

*Williams v. Gaye,*
   895 F.3d 1106 (9th Cir. 2018) ............................................................... 4

*Youssofi v. Credit One Financial,*
   2016 WL 6395086 .................................................................................. 8

**Introduction**

Nothing about this Court's decision on a routine summary judgment motion warrants an interlocutory appeal. Disney's motion to certify is only more stunning because the Ninth Circuit has already considered the issue of substantial similarity once. And when it considered that issue, the Ninth Circuit invited expert testimony after it found that the works at issue included "more than de minimis" similarities. That this Court applied established summary judgment principles upon its review of competing expert opinions is no "exceptional" basis to delay this case for a second appeal before trial. The Court should deny Disney's motion.

**Factual Background**

**I.     The Screenwriters have pursued their claim against Disney since 2017.**

The Plaintiff Screenwriters—Alfred and Martinez—sued Disney for copyright infringement in 2017. They alleged that Disney copied their highly original "spin" on a pirate story through the *Pirates of the Caribbean* film. In May 2019, this Court granted Disney's motion to dismiss because it found the two works were not substantially similar as a matter of law. Dkt. No. 93.

Over a year later, the Ninth Circuit reversed and remanded in July 2020. The Ninth Circuit found error in "failing to compare the original selection and arrangement of the unprotectible elements between the two works." *Alfred v. Disney*, 821 F. App'x 727, 729 (9th Cir. 2020). And based on its own review, the Ninth Circuit found that "the selection and arrangement of the similarities between [the two works] is more than de minimis." *Id.* The court also invited expert testimony about whether these similarities were "qualitatively significant." *Id.*

On remand, the parties stipulated—at Disney's request—to phase the litigation. Dkt. No. 112. The stipulation limited the first phase to the issue of substantial similarity. *Id.* ¶ 2. Both parties exchanged expert reports. *See* Dkt. Nos. 133, 139, 146. Disney relied on one of its employees who has a long history as a defense witness. Dkt. 184 at 8. The Screenwriters, on the other hand, relied on an

PLAINTIFFS' OPP. TO CERT. MOT.
2:18-CV-08074-CBM-ASX

independent expert—Professor Román—who has a Ph.D in comparative literature. *Id.* at 7. Professor Román detailed his opinion that Disney's *Pirates* Film shared "substantial qualitatively important similarities" as the *Pirates* Screenplay across all elements in the extrinsic test. *Id.*

## II.    This Court applied routine legal principles when it denied Disney's motion for summary judgment.

Disney moved for summary judgment in September. The Court heard oral argument for over an hour in October. In December, this Court denied Disney's summary judgment motion. Dkt. 200. In that denial, the Court rejected Disney's critiques of Professor Román because they went to the weight of his testimony, not admissibility. *Id.* at 5-6. Indeed, Disney never even challenged the admissibility of Professor Román's opinions. *Id.* at 7. Even so, the Court recognized Professor Román's distinguished qualifications in comparative literature. *Id.* The Court also distinguished Disney's case law based on the Ninth Circuit's decision in this matter. *Id.* Thus, through application of routine summary judgment principles, the Court considered and credited—as required under Rule 56—Professor Román's opinions that "the works are substantially similar and have original elements in common." *Id.* at 6. As a result, "the parties' expert opinions create a genuine issue of disputed fact regarding whether the works are substantially similar, [so] the Court denies Defendant's Motion for Summary Judgment on the issue of substantial similarity." *Id.* at 7.

## III.    This case is on track to resolve on the merits within one year.

After the Court denied summary judgment, the parties entered the second phase of this Court's scheduling order. The second phase addresses all remaining issues, like damages and Disney's independent creation defense. *Id.* ¶ 14. Both parties have served discovery on these issues. *See* Dkt. No. 205 Ex. 1 ¶¶ 2, 5 (referencing the Screenwriters' and Disney's discovery requests). Fact discovery for this second phase ends later this year in June. Dkt. 145. The Court scheduled a

one-week trial for February 7, 2023. *Id.* Thus, for a case that the parties have litigated for over four years already, a jury will finally resolve it on the merits in less than one year from the hearing date on Disney's motion.

**Argument**

## I. The Court should not certify this case for a second appeal to the Ninth Circuit.

Disney has proved no "exceptional circumstances" warrant a second appeal over the fact-intensive issue about substantial similarity. *See In re Cement Antitrust Litig.*, 673 F.2d 1020, 1026 (9th Cir. 1981) (requiring "exceptional circumstances" for a § 1292(b) appeal). Indeed, courts overwhelmingly limit appellate review until after final judgment. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978). And appellate courts do not even review orders denying summary judgment on appeal. *McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 955 n.4 (9th Cir. 2011). "[O]nly in extraordinary cases" will district courts certify novel legal issues to a circuit court for interlocutory review. *U.S. Rubber Co. v. Wright*, 359 F.2d 784, 785 (9th Cir. 1966). This Court's denial of Disney's mundane summary judgment motion is not such an extraordinary case.

For this Court to certify appellate review now, Disney bears the burden to prove all three factors under § 1292(b). *Couch v. Telescope, Inc.*, 611 F.3d 629, 633 (9th Cir. 2010). Those three conjunctive factors are (1) a controlling question of law; (2) a substantial ground for difference of opinion; and (3) that certification will materially advance the ultimate termination of the litigation. *Id.* Disney has failed to meet this heavy burden on every factor.

### A. Disney failed to establish a controlling question of law.

Section 1292(b) was not intended for appellate review of standard summary judgment decisions. Rather, it was intended to permit review of pure issues of law on questions like "those relating to jurisdiction or a statute of limitations which the district court has decided in a manner which keeps the litigation alive but which, if

answered differently on appeal, would terminate the case." *United States v. Woodbury*, 263 F.2d 784, 787 (9th Cir. 1959). Nothing in Disney's motion about this Court's denial of its motion for summary judgment presents a comparable legal issue here.

Indeed, Disney's own case law confirms that § 1292(b) only applies to pure questions of law. *See Env't World Watch, Inc. v. Walt Disney Co.*, 2014 WL 10979864, at *4 (C.D. Cal. Apr. 2, 2014). "The question must be of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than . . . whether the party opposing summary judgment had raised a genuine issue of material fact." *Sateriale v. RJ Reynolds Tobacco Co.*, 2015 WL 3767424, at *2 (C.D. Cal. June 17, 2015) (internal quotations omitted; ellipsis in original). In fact, disputes over a genuine issue of fact are the "antithesis of a proper § 1292(b) appeal." *Turo Inc. v. City of L.A.*, 2020 WL 4287583, at *5 (C.D. Cal. July 27, 2020). "[R]eexamination of the facts or application of the law to the case" is improper for interlocutory appeal. *Surf City Steel, Inc. v. Int'l Longshore & Warehouse Union*, 2016 WL 10637079, at *7 (C.D. Cal. Dec. 28, 2016).

Disney's motion for the Ninth Circuit to review this Court's denial of summary judgment fails this standard. The extrinsic test on substantial similarity is a "factbound" determination and not a purely legal issue. *See Williams v. Gaye*, 895 F.3d 1106, 1122 (9th Cir. 2018). Whether elements of a copyrighted work are original or protectible is a classic question of fact. *See, e.g.*, *Dezendorf v. Twentieth Century-Fox Film Corp.*, 99 F.2d 850, 851 (9th Cir. 1938) (holding that originality is question "of fact, not of law" and "may not be summarily disposed of" but instead "must be established by proof"). As such, summary judgment "has traditionally been disfavored in copyright litigation." *See, e.g.*, *Twentieth Century-Fox Film Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 n.6 (9th Cir. 1983). And the Ninth Circuit has already held that expert testimony alone may overcome summary judgment in copyright cases. *See, e.g.*, *Swirsky v. Carey*, 376 F.3d 841, 844 (9th

Cir. 2004). Nothing about the Court's consideration and analysis of Professor Román's detailed expert opinions raises a pure legal issue for the Ninth Circuit to review now.

Disney's effort to manufacture a subsidiary legal issue also fails to meet the standard for § 1292(b) review. The introduction for Disney's motion speculates about various "if" scenarios about how Ninth Circuit review could theoretically affect this case. Dkt. No. 205, Disney Br. at 2. These scenarios range from remand to the Court for additional review; an independent analysis of substantial similarity by the Ninth Circuit; and resolution of "some of the proffered similarities" to limit trial. *Id.* At the same time, Disney of course also ignores the more likely scenarios that the Ninth Circuit would reject interlocutory appeal or simply affirm the Court's well-reasoned decision. Even so, this spectrum of fact-based possibilities confirms that no binary and controlling legal issue exists.

Nothing about Disney's motion to certify somehow converts the fact-intensive question over substantial similarity into a purely legal one. Instead, "Defendants disagree with how the Court *applied* the law . . . to the specific facts of this case. No number of factual assumptions or qualifiers can transform Defendants' fact-intensive argument into a purely legal question." *Baker v. Wehinger*, 2021 WL 3519918, at *2 (C.D. Cal. Apr. 27, 2021) (emphasis added). Even worse for Disney, Disney's motion seeks to undermine and distort the Court's decision. The predicate for Disney's motion is that the Court did not "examin[e] the substance of the two experts' analyses." Disney Br. at 6. But Disney's motion acknowledges that "a court may find genuine issues of material fact on the basis of expert opinions that have sufficient support." Disney Br. at 13. The Court here already did precisely that when it found that Disney did not even challenge the admissibility of Professor Román's opinions, and thus Disney's arguments against him all went to the question of weight and not admissibility. Dkt. No. 200 at 4-7. Indeed, together with this overall opinion about the qualitative importance over the

similarities identified by the Ninth Circuit, Professor Román's opinion detailed scores more similarities across all factors in the extrinsic test. A longer order that memorializes his opinion on the selection-and-arrangement of original elements across both works and on each element of the extrinsic test would not lead to a different outcome. Nor would it convert this fact-intensive question into a "controlling" legal issue. Contrary to Disney's insistence, courts may not weigh conflicting evidence on summary judgment. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

### B. Disney has not proven a substantial ground for difference of opinion.

Disney ignores the directive from the Ninth Circuit on this element: "Courts traditionally will find that a substantial ground for difference of opinion exists where [1] the circuits are in dispute on the question and the court of appeals of the circuit has not spoken on the point, [2] if complicated questions arise under foreign law, or [3] if novel and difficult questions of first impression are presented." *Couch*, 611 F.3d at 633; *see also Woodbury*, 263 F.2d at 787 (finding certification "improvidently granted" because case was "unexceptional"). Yet Disney shows no circuit split. This case does not involve foreign law. And nothing about this Court's application of routine summary judgment principles raises a novel issue of first impression.

None of Disney's cases—most of which made no appearance in its summary judgment motion[1]—prove a substantial difference of opinion on any legal issue. "[J]ust because counsel contends that one precedent rather than another is controlling does not mean there is such a substantial difference of opinion as will support an interlocutory appeal." *Couch*, 611 F.3d at 633. At most, Disney's cases reflect the fact-intensive nature of these motions. Even then, they ultimately reflect

---

[1] Disney relies on over a dozen more cases for this motion to certify than its entire summary judgment motion.

that the Court's decision involves routine summary judgment principles. Disney's "strong disagreement with the Court's ruling is not sufficient for there to be a 'substantial ground for difference of opinion.'" *Couch*, 611 F.3d at 633. This conclusion is especially strong here because the Ninth Circuit requested expert testimony in this case. And so too when Judge Fitzpatrick reached a similar conclusion within weeks of this Court's decision. *See Hall v. Swift*, 2021 WL 6104160, at *5 (C.D. Cal. Dec. 9, 2021) ("[I]t is not proper for this Court to resolve on summary judgment what is essentially simply a battle of the experts.").

### C. Disney did not establish that certification will materially advance the ultimate termination of the litigation.

Disney glosses over this dispositive element as well. "Section 1292(b) was intended primarily as a means of expediting litigation by permitting appellate consideration *during the early stages* of litigation." *Woodbury*, 263 F.2d at 787 (emphasis added); *see also James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1068 n.6 (9th Cir. 2002) (construing § 1292(b) narrowly). Only at the infancy of a case can immediate appellate review possibly "avoid protracted and expensive litigation." *Id.* This case has been pending for over four years already, and the parties completed the first of two bifurcated phases in the pretrial order. No straight-faced analysis of this consideration warrants certification under these circumstances.

The Court's trial date has special importance. In *Shurance v. Planning Control Int'l, Inc.*, the Ninth Circuit denied review because "an interlocutory appeal might well have the effect of delaying the resolution of this litigation, for an appeal probably could not be completed before [the date] when trial is currently scheduled." 839 F.2d 1347, 1348 (9th Cir. 1988). This Court likewise denied review in *Monster Energy Co. v. Integrated Supply Network, LLC* because the appeal would not conclude before the trial date. 2018 WL 6136144, at *4 (C.D. Cal. Sept. 21, 2018). That same analysis holds true here. A one-week trial is set to take

place one year from now on February 7, 2023. Neither the parties nor the Court need speculate about the timing for an appeal versus trial. The first appeal took thirteen months from notice of appeal to disposition. And Disney's motion to certify would require additional briefing seeking interlocutory appeal before the merits briefing. The Court's trial is thus certain to resolve this case on the merits before the Ninth Circuit could complete its second review of this matter.

Disney's reliance on the unpublished decision from another district in *Youssofi v. Credit One Financial* is immaterial. There, the district court certified its threshold decision to compel arbitration. 2016 WL 6395086, at \*1. But that district court recognized the vitality of *Shurance*. *Id.* at n.6. The district court distinguished *Shurance* because the arbitrability question was jurisdictional. *Id.* No similar threshold issue over jurisdiction exists here.

Disney's argument that an appeal would conserve resources rings hollow as well. Disney's brief envisions trial on the merits even after its proposed second appeal. *See, e.g.*, Disney Br. at 2, 7, 14. But to get there, "the parties will need to submit a revised 26(f) report and the Court will need to issue an amended Scheduling Order to govern the case, taking up additional judicial resources and attorney time, and leading to further delay in prosecution of this action." *United States v. INSYS Therapeutics, Inc.*, 2021 WL 4307404, at \*1 (C.D. Cal. Apr. 14, 2021). And then fact and expert discovery will need to occur, followed by trial. Even then, a potential for a third appeal would exist depending on the verdict. Disney's proposed approach is the antithesis of judicial economy. The clearest path toward ultimate termination of this litigation is trial as scheduled.

\*\*\*

On top of Disney's failure to meet its burden on each of three considerations, "district court judges [also] have unfettered discretion to deny certification." *Orgain, Inc. v. Northern Innovations Holding Corp.*, 2021 WL 6103528, at \*2 (C.D. Cal. Sept. 29, 2021); *Lyon v. W.W. Grainger Inc.*, 2010 WL 2485944, at \*2

(N.D. Cal. June 15, 2010). And that discretion should stop Disney's serial motion practice from denying and delaying the Screenwriters their scheduled jury trial.

## II.   The Court should not delay trial to stay this case for a second appeal.

Disney also failed to meet its burden for a stay. Disney bears the burden to meet a four-factor test to obtain a stay pending interlocutory appeal. *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 6973547, at *6 (C.D. Cal. Oct. 8, 2019). Those four factors are: "(1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured in the absence of a stay; (3) whether issuance of the stay will substantially injure the non-moving party; and (4) whether the stay is in the public interest." *Id.* Disney addressed none of these factors, and thus waived any right to a stay. *See, e.g.*, *AE* ex rel. *Hernandez v. Cty. of Tulare*, 666 F.3d 631, 638 (9th Cir. 2012) (finding failure to "specifically and distinctly" argue issue in opening brief forfeits argument).

Nor could Disney prevail under the required analysis. As explained above, and as dictated by the Court's decision on summary judgment, Disney has no likelihood of success. And that Disney will have to proceed with routine discovery in a civil case is not any conceivable form of irreparable injury. That Disney waited one month to file its motion to certify confirms the same. But continued delay of trial will prejudice the Screenwriters, who lack the resources of Disney and who have already pursued this case for years. Nor does delay enhance judicial economy, as the parties will need to update scheduling orders and proceed with discovery, "taking up additional judicial resources and attorney time, and leading to further delay in prosecution of this action." *INSYS Therapeutics*, 2021 WL 4307404 at *1. Here, that means trial will not occur until sometime in 2024 or 2025. No plaintiff should wait six-to-seven years to obtain their constitutional right to trial by jury. *See, e.g.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 348-49 (1998) (finding Seventh Amendment right in copyright actions); *Danjaq LLC v.*

1    *Sony Corp.*, 263 F.3d 942, 962 (9th Cir. 2001) (finding copyright owner "has a

2    constitutional right to a jury trial on [its] copyright infringement claims.").[2] The

3    public's interest is not served in such a scenario either. *See, e.g.*, *In re*

4    *Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1226-27 (9th Cir.

5    2006) (noting that public has interest in "expeditious resolution of litigation");

6    *Patel v. City of Long Beach*, 2014 WL 12850522, at *2 (C.D. Cal. Dec. 3, 2014)

7    ("the public interest . . . favors a prompt and final resolution of the instant lawsuit"

8    (internal quotations omitted)).

9        Finally, Disney's complaints about proceeding with discovery lack merit.

10   The parties agreed, when they bifurcated discovery at Disney's request, that

11   discovery would proceed after Disney's motion for summary judgment. Both

12   parties have since served discovery, as anticipated by their earlier stipulation and

13   the Court's scheduling order. And Disney has pled an independent creation defense

14   and argued about pirate tropes, so Disney has no basis to resist document

15   production about the creation of the *Pirates* Film or depositions of the witnesses

16   who were involved in that creation. Disney has no basis to stall discovery now.

17       Even so, counsel for the Screenwriters have offered several times to confer

18   about any concerns over discovery burden or scope. And counsel for the

19   Screenwriters asked for deposition dates for material witnesses to avoid last-minute

20   scheduling issues, especially because some witnesses do not work for Disney. *See*

21   Dkt. No. 205 Ex. B. Thus, as a professional courtesy, counsel for the Screenwriters

22   provided a list over three weeks ago, so Disney could contact them first to

23   determine whether its counsel will represent those witnesses. *Id.* Disney has

24   provided no response on a single witness's availability yet. It has only mentioned

25   that one witness passed away earlier this month. This unfortunate news also

26

27   [2] Disney's reliance on *Association of Irritated Residents v. Fred Schakel Dairy* is
     immaterial because it involved multiple claims that were not at issue in the certified
28   appeal and the court anticipated a potential amended complaint following appeal.
     634 F. Supp. 2d 1081, 1094 (E.D. Cal. 2008).

undercuts Disney's argument that the parties can delay further without prejudice to the Screenwriters.

### Conclusion

The Ninth Circuit found more than *de minimis* similarities across the two works and invited expert testimony on whether these similarities were qualitatively important. Professor Román detailed his opinions on exactly these issues, which Disney never challenged. Nothing about the Court's decision denying summary judgment warrants a second appeal to the Ninth Circuit under these circumstances. To the contrary, every consideration in Rule 1 strongly favors that the Court resolve this case on the merits at trial next year. The ordinary Rules of Civil Procedure will then allow Disney to pursue any alleged legal errors on appeal. The Screenwriters should not have to wait any longer for their jury trial in this case.

Dated: January 25, 2022                    Respectfully submitted,


                                           By:  */s/ Patrick M. Arenz*
                                           **ROBINS KAPLAN LLP**
                                           Patrick M. Arenz (pro hac vice)
                                           Brandon J. Pakkebier (pro hac vice)

                                           **LOWE & ASSOCIATES, PC**
                                           Steven T. Lowe, Esq.
                                           Aleksandra Hilvert, Esq.
                                           *Attorneys for Plaintiffs*
                                           *Arthur Lee Alfred, II, et al.*

# Exhibit 11

MUNGER, TOLLES & OLSON LLP

350 SOUTH GRAND AVENUE 50TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

February 28, 2022

Writer's Direct Contact
(213) 683-9208
(213) 683-5108 FAX
Jordan.Segall@mto.com

**VIA E-MAIL**

Patrick M. Arenz
Brandon Pakkebier
Robins Kaplan LLP
800 LaSalle Ave., Suite 2800
Minneapolis, MN 55402

Re:  *Alfred v. Walt Disney Pictures*, C.D. Cal. Case No. 2:18-cv-08074-CBM-AS
     Plaintiffs' Responses to WDP's First Sets of RFPs and Interrogatories

Dear Patrick:

We write regarding Plaintiffs' February 17, 2022 responses to WDP's first set of requests for production and first set of interrogatories.

As an initial matter, we note the disparity between the obligations that Plaintiffs seek to impose on WDP and Plaintiffs' apparent understanding of their own discovery obligations.  You sent multiple emails asking that WDP raise issues with Plaintiffs' discovery requests in advance of the response deadline.  WDP did so.  WDP also timely served its written discovery responses, has already made two productions of documents, and is in the process of reviewing thousands more documents.

By contrast, when Plaintiffs finally served responses and objections, they improperly objected to numerous requests in their entirety, imposed inappropriate limitations even when they did respond substantively, and refused to answer basic questions regarding the scope of Plaintiffs' claims.  Plaintiffs have made a single production of documents, consisting of just 210 documents, and have not indicated whether they have completed their production of documents they intend to produce in response to requests served to date.

Discovery obligations go both ways—particularly here, where Plaintiffs have brought paper-thin claims of copyright infringement 14 years after the release of the allegedly infringing work and are seeking wide-ranging discovery from WDP, even on immaterial topics like revenues outside the limitations period, press coverage of *Curse of the Black Pearl* ("*Curse*"), and information about profit participants, among others.

Below, we describe the deficiencies in Plaintiffs' written discovery responses.  We request that Plaintiffs meet and confer with us this week.

**1.     "Relevant Timeframe"**

A number of Plaintiffs' responses purport to apply a time limitation of October 1, 1999 to June 28, 2003, apparently because WDP applied this timeframe to its responses to Plaintiffs'

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 2

RFPs.  As we discuss in our meet-and-confer letter regarding Plaintiffs' discovery requests, the parties are not similarly situated with respect to this issue.  All of the conduct *by WDP* alleged in the FAC took place between 1999 and 2003, when *Curse* was released.  Setting aside discovery requests dealing with damages (where Plaintiffs' claims are limited to November 14, 2014 forward), all of WDP's relevant conduct could only have occurred through the date the movie was publicly released.

The same is not true with regarding Plaintiffs' conduct.  For example, the original Complaint contended that "Alfred, Martinez and Laiter realized the many similarities between their original spec screenplay and [*Curse*]" only "upon viewing the first film," Dkt. 1 ¶ 50, something that necessarily took place on or after June 28, 2003.  To the extent Plaintiffs discussed the film, their Screenplay, or the alleged infringement in any respect from the time they first viewed *Curse*, those communications are relevant and discoverable.

To take another example, Plaintiffs' efforts to market their Screenplay to other studios is relevant to multiple issues in the case, including the claimed originality and quality of Plaintiffs' work and the veracity of Plaintiffs' allegation that "the Screenplay stands on its own two feet as a self-contained original creative work, without any dependence upon the Ride."  FAC (Dkt. 112) ¶ 56.  Plaintiffs' communications with Tova Laiter about the Screenplay or the litigation (RFP 15), for example, are relevant *regardless* of when they occurred.

Furthermore, a key question in this litigation is why Plaintiffs waited 14 years after the release of *Curse* to assert for the first time that WDP allegedly infringed their Screenplay.  *Any* documents or communications in Plaintiffs' possession regarding the Screenplay, any of the *Pirates of the Caribbean* films, or Plaintiffs' infringement claims from the date the Plaintiffs began writing the Screenplay forward are potentially relevant to a variety of issues, including damages and Plaintiffs' credibility.

These are just some examples of why *Plaintiffs'* documents and communications after June 28, 2003 are potentially relevant and must be searched for and produced.  Plaintiffs' repeated form objections that requests lacking temporal limitations are "overbroad" are not well-taken in light of Plaintiffs' own conduct.  Plaintiffs are obligated to search for documents over a long period of time because, among other reasons, Plaintiffs elected to wait more than a decade after the release of *Curse* before filing suit.  Plaintiffs' burden claims are particularly baseless given that they seek at least $100 million in damages (FAC at 27) and have to search for documents and communications from only two individual custodians or sources within their possession, custody, or control.

Please (1) confirm that you will produce all responsive documents from October 1, 1999 forward; and (2) confirm that you will serve supplemental interrogatory responses that provide all relevant information from the same timeframe.

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 3

**2.      Deficiencies with Plaintiffs' Responses to WDP's First Set of Requests for Production**

  **A.      RFPs 1, 2, and 4 (documents regarding the claims and factual allegations in the FAC)**

RFPs 1 and 2 seek all documents that relate to Plaintiffs' allegations in the FAC, as well as all communications concerning the matters alleged in the FAC.  Similarly, RFP 4 asks for all documents on which Plaintiffs rely to support their claims and factual allegations.  Plaintiffs refuse to produce any responsive documents in response to these requests and instead incorporate their initial disclosures.

Plaintiffs' refusal to answer these foundational discovery requests is unacceptable. Plaintiffs brought this lawsuit—seeking a nine-figure damages award—and therefore must produce all documents that relate to their claims and allegations.  The allegations are not complicated: they relate to Plaintiffs' authorship of and attempt to sell the *Red Hood* and *Pirates of the Caribbean* screenplays to WPD and other studios, WPD's production of the *Pirates of the Caribbean* films, and WPD's alleged infringement of the Screenplay in *Curse*.  WDP is entitled to discovery all documents and communications in Plaintiffs' possession, custody, or control regarding these issues.

In addition, we request that Plaintiffs confirm they will run the following searches on Plaintiffs' ESI, from 1999 forward, and produce responsive, non-privileged documents that "hit" on these terms:

- Pirate!

- POTC

- Curse

- Black Pearl

- "Spanish Main"

- "Red Hood"

- Tova OR Laiter

- Brigham OR Taylor

- Josh OR Harmon

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 4

- Michael OR Haynes

- Disney

- Depp

- Infring! OR copyright OR lawsuit

- Copy! w/3 (script OR screenplay)

- "Dead Man's Chest" OR "At World's End" OR On Stranger Tides" OR "Dead Men Tell No Tales"

**B.      RFPs 8 & 9 (communications and employment with Disney):**

RFPs 8 and 9 ask for communications with Disney or its former employees (e.g., Brigham Taylor), as well as documents related to employment applications Plaintiffs have submitted to Disney.

In response to RFP 8, Plaintiffs refuse to produce responsive documents *after* the 2003 release of *Curse*, unless the documents reference *Curse* or Plaintiffs' Screenplay.  These limitations are inappropriate.  Plaintiffs have accused WDP of willful copyright infringement.  If Plaintiffs were corresponding with Disney *after* the alleged infringement, such communications are obviously relevant to Plaintiffs' credibility and their allegations that they believed Disney to have committed willful infringement, regardless of the subject of those communications.  Moreover, conducting searches for such communications will not be burdensome.

In response to RFP 9, Plaintiffs limit their "understanding" of the term "employment applications" to "formal application[s] to become a salaried or hourly employee at Disney."  This request encompass submissions made to Disney in an effort to sell any screenplay to Disney or to become a screenwriter on any Disney project.[1]

Please confirm that Plaintiffs will withdraw their limitations on their responses to RFPs 8 and 9 and will produce all responsive documents.

**C.      RFP 11**

RFP 11 seeks all documents relating to the Screenplay.  Plaintiffs respond that they will produce all responsive documents that pre-date the release of *Curse*, but for documents that post-

---

[1] Notably, the FAC alleges that "Plaintiff Martinez has made a living as a screenwriter for over twenty-two (22) years."  FAC ¶ 39.

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 5

date the release of *Curse*, they will only produce documents "between Plaintiffs and Disney" that reference *Pirates of the Caribbean*.

This limitation is unacceptable.  As we have explained, all documents and communications relating to the Screenplay—regardless of whom they were with or when they were created—are relevant to this litigation.  To take just one example, a key issue in this case is the extent to which Plaintiffs' Screenplay incorporates "supernatural" elements.  If Plaintiffs ever discussed or characterized the supernatural elements in their Screenplay in correspondence with each other or with third parties, those documents would obviously be relevant.

Please confirm that you will produce all non-privileged documents that relate in any respect to the Screenplay, without limitation.

**D.     RFPs 12 & 14**

RFPs 12 and 14 seek documents reflecting materials or documents that Plaintiffs considered in writing the Screenplay.  Plaintiffs refuse to produce documents responsive to these requests, asserting a variety of boilerplate objections and contending that the requests are insufficiently particularized.

Plaintiffs' objections to these requests are not well-taken.  Plaintiffs, as the authors of the Screenplay, presumably know what books, films, documents, or other materials they consulted in writing the Screenplay.  If those materials are still in Plaintiffs' possession, custody, or control, Plaintiffs must produce them.  Similarly, if there are documents, such as drafts or notes, that constitute, reflect or relate to documents that Plaintiffs (or anyone else) reviewed or considered in the development of the Screenplay, those documents must be produced as well.

Please confirm that you will produce all documents responsive to RFPs 12 and 14.

**E.     RFP 15**

RFP 15 seeks agreements or contracts among Plaintiffs and Tova Laiter.  Plaintiffs respond that they will only produce such documents to the extent they relate to *Red Hood* or *Pirates of the Caribbean*.

This limitation is not appropriate.  WDP is entitled to fully investigate the relationship between Plaintiffs and Ms. Laiter, who was formerly a plaintiff and who Plaintiffs identify as a fact witness they will use to support their claims and defenses at trial.  All agreements or contracts between Plaintiffs and Ms. Laiter are potentially relevant to credibility and bias, among other issues.

Please confirm that you will produce all agreements and contracts responsive to RFP 15.

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 6

3.    **Deficiencies with Plaintiffs' Responses to WDP's First Set of Interrogatories**

A.    **Interrogatory 1 (persons with knowledge of Plaintiffs' claims)**

Interrogatory 1 seeks identification of all known individuals with knowledge of the allegations in the FAC.  Plaintiffs refuse to answer on the ground that the interrogatory is "categorically overbroad, unduly burdensome, and not proportional to the needs of the case in that it seeks the identity of any person Plaintiffs 'believe' to have knowledge for 'any matter.'"[2]

The overbreadth/burden objections to this interrogatory is baseless.  Interrogatories are routinely used to identify individuals with knowledge material to a lawsuit.  If Plaintiffs are aware of any individual with knowledge of the allegations or claims in the FAC, they should be identified.

Please confirm that Plaintiffs will serve a supplemental response fully answering Interrogatory 1.

B.    **Interrogatory 3 (preexisting sources Plaintiffs consulted or relied upon in writing the Screenplay, or that inspired the Screenplay)**

Interrogatory 3 asks Plaintiffs to state the preexisting sources that Plaintiffs consulted or relied upon in drafting the Screenplay, or that inspired the Screenplay.  Plaintiffs refuse to respond, reasserting their breadth and burden objections.

Again, Plaintiffs' boilerplate objections are not well-taken.  Plaintiffs are allegedly the sole authors of the Screenplay they allege was infringed.  They are therefore personally aware of what preexisting sources they relied upon or were inspired by in writing the Screenplay.  It is highly doubtful there is any burden entailed in compiling a list of such sources.  Equally

---

[2] We note that your citation of *Philips North America LLC v. PKI Healthcare, Inc.*, 2020 WL 3031614, at *2–3 (C.D. Cal. Mar. 10, 2020)—repeated in response to Interrogatory 1 and six separate contention interrogatories—is inapposite.  *Philips* did not hold, as you suggest, that any interrogatory seeking a statement of "all facts" supporting a particular contention is improper.  Rather, it held that an interrogatory was improper that demanded a party "state all details, facts, and information that supports all claims by the party that it acted lawfully or with authorization regarding allegations contained in 238 paragraphs and 11 separate causes of action, most if not all of which alleging the party acted unlawfully and without authorization." *Id.* at *3.  WDP's request for a list of individuals with knowledge is far narrower than the request at issue in *Philips*.  Interrogatory 1 seeks the names of individuals, not "all details, facts, and information" supporting all of Plaintiffs' claims.  WDP's contention interrogatories relate to particular legal contentions in the FAC.  Contention interrogatories seeking all facts supporting particular legal contentions or allegations in a pleading are routinely approved by district courts in the Ninth Circuit.  *See, e.g.*, *Tennison v. City & Cty. of S.F.*, 226 F.R.D. 615, 618-19 (N.D. Cal. 2005).

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 7

unavailing is Plaintiffs' contention that the phrases "consulted or relied upon" and "inspired in any way" are "vague and ambiguous." If Plaintiffs reviewed a particular source (whether a theme park ride, film, book, or document) in connection with writing the Screenplay, it should be listed in Plaintiffs' response. If a particular source influenced the Screenplay, it too should be listed.

Please confirm that Plaintiffs will serve a supplemental response fully answering the interrogatory.

**C.     Interrogatory Nos. 4-6, 8 (infringement contentions and supporting facts):**

Interrogatories 4–6 and 8 ask Plaintiffs to state key facts supporting Plaintiffs' contentions:

- Interrogatory 4: What specific elements of Plaintiffs' Screenplay does Plaintiff allege WDP infringed?

- Interrogatory 5: What facts establish the elements in Interrogatory 4 are protectable, original expression?

- Interrogatory 6: What elements of *Curse* or its sequels infringe Plaintiffs' Screenplay?

- Interrogatory 8: What facts support Plaintiffs' contention that WDP copied the Screenplay in conception, creation, development, production of the Film or any Sequels?

Plaintiffs simply refuse to answer these interrogatories, contending that the parties' prior stipulation regarding bifurcated discovery *prohibits* WDP from taking any further discovery on the core issue of substantial similarity.[3] This contention is baseless. As Plaintiffs know, the stipulation was to streamline discovery by providing for early *expert discovery* on the issue of substantial similarity; the stipulation postponed all fact discovery and all expert discovery on other topics until the second phase, which the litigation has now entered. Dkt. 121 ¶ 10. The stipulation specifically set forth the limited initial disclosures and expert discovery that would occur in the first phase (*see id.* ¶ 10(b)), and provided that, in the second phase, "discovery shall commence on *all issues with no limitations* other than as provided herein or by law." (*Id.* ¶ 15

---

[3] We note that even if your objection regarding the bifurcation stipulation had merit—which it does not—that objection would not apply to Interrogatory 8, which does not seek information about substantial similarity. Rather, it asks Plaintiffs to identify all facts that support the contention that WDP copied the Screenplay.

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 8

(emphasis added).)  The stipulation did not remotely suggest that non-expert discovery on substantial similarity would be prohibited in the second phase.

It is clear from Plaintiffs' own discovery requests that Plaintiffs themselves do not believe the interpretation of the stipulation Plaintiffs have advanced in their responses to WDP's interrogatories.  Plaintiffs' written discovery requests seek extensive information relating to the issue of substantial similarity.  To take just one example, Plaintiffs' Interrogatory 8 asked WDP to identify "each pirate film, book, or work that Disney was aware of before 2000 that featured both humorous and supernatural elements in the respective film, book, or work"—information that is only relevant, if at all, to the substantial similarity *vel non* between the Screenplay and *Curse* and the filtration of unoriginal elements.

To date, Plaintiffs' specific contentions regarding (1) the common elements shared by the Screenplay and the *Pirates of the Caribbean* films and (2) the originality of those elements has been all over the map.  Plaintiffs have taken inconsistent and sometimes contradictory positions in their two complaints, in their motion to dismiss, appellate, and summary judgment briefing, and in their submission of Prof. Román's expert report.  Similarly, Plaintiffs have repeatedly invoked the "selection and arrangement test" without ever clarifying which of the alleged similarities between the Screenplay and *Curse* they contend constitute protectable expression and which they contend constitute non-protectable expression that is protectable under a selection-and-arrangement theory.

Plaintiffs have had ample opportunity to finalize their contentions regarding these issues.  WDP is entitled to a straightforward statement of Plaintiffs' contentions on these critical questions, verified under oath.

Please confirm that Plaintiffs will withdraw their meritless objection and provide complete responses to Interrogatories 4, 5, 6, and 8.

Additionally, Plaintiffs conceded on the parties' February 16, 2022 meet-and-confer call that they are not contending that the *Curse* sequels copied the Screenplay.  Please state as much in your responses to Interrogatories 6 and 8.

### D.  Interrogatory 9 (Plaintiffs' actual damages):

Interrogatory 9 asks Plaintiffs to state and provide a detailed calculation regarding their damages and/or losses, i.e., actual damages.  WDP is entitled to know what Plaintiffs' claim *they* lost in terms of revenue.

Plaintiffs' answer is non-responsive, focusing on WDP's alleged profits rather than Plaintiffs' losses.  Plaintiffs need to provide their contention of their actual damages, whether that is lost income or otherwise.  This is not information in WDP's control.

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
February 28, 2022
Page 9

Please confirm that Plaintiffs will supplement their interrogatory responses with a complete response.

### E.      Interrogatory 13 (efforts to sell Screenplay):

WDP's Interrogatory 13 asks Plaintiffs to explain their efforts to sell, license, or otherwise exploit the Screenplay and the results of those efforts.

As noted above, we expect you to provide an amended response that does not impose an inappropriate timeframe limitation.   Beyond that, however, Plaintiffs' response appears to be incomplete.  It provides an apparently non-exhaustive list of the entities to whom Tova Laiter distribute the Screenplay, stating: "*Among the companies* receiving submissions were Disney, Paramount Pictures (in the Buena Vista division), and Spyglass Pictures." (Emphasis added.) WDP is entitled to a complete list of the "movie studios, production companies, and/or agencies" to whom Ms. Laiter or Plaintiffs distributed the Screenplay.

Please confirm that Plaintiffs will serve a supplemental response fully answering Interrogatory 13.

### 4.      Preservation of Documents

Plaintiffs' response to Interrogatory 2 states that they consulted with an attorney, Mr. Louis Spoto, regarding the Screenplay prior to June 28, 2003.  If Plaintiffs consulted with Mr. Spoto because they reasonably anticipated the possibility of litigation based on their belief *Curse* infringed the Screenplay, then Plaintiffs were under a duty to preserve all potentially relevant documents since the time of that consultation.  Please tell us the date on which Plaintiffs began preserving documents in anticipation of this litigation.

\* \* \*

We look forward to your response and quick resolution of these issues.  We would like to meet and confer this week on the issues raised in our letter.  Please let us know if you are available for a call on Wednesday, March 2 or Thursday, March 3.

Very truly yours,

*/s/ Jordan D. Segall*

Jordan D. Segall

# Exhibit 12

MUNGER, TOLLES & OLSON LLP

350 SOUTH GRAND AVENUE 50TH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

March 11, 2022

Writer's Direct Contact
(213) 683-9208
(213) 683-5108 FAX
Jordan.Segall@mto.com

**VIA E-MAIL**

Patrick M. Arenz
Brandon Pakkebier
Robins Kaplan LLP
800 LaSalle Ave., Suite 2800
Minneapolis, MN 55402

Re:  *Alfred v. Walt Disney Pictures*, C.D. Cal. Case No. 2:18-cv-08074-CBM-AS
Plaintiffs' Responses to WDP's First Sets of RFPs and Interrogatories

Dear Patrick:

We write following our meet-and-confer call on March 9, 2022 and following our letter dated February 28 regarding Plaintiffs' responses to WDP's first set of requests for production and first set of interrogatories.

**1.      Relevant Timeframe for Document Production**

You stated on the call that Plaintiffs would be willing to compromise on the timeframe for which they would search for and produce documents.  You asked that we propose specific timeframes for Plaintiffs' document searches and production with respect to particular RFPs. We do so below.

Given that Plaintiffs (1) conceived of and drafted their Screenplay sometime in the 1999–2000; (2) submitted their Screenplay to WDP in August 2000; (3) allege that they formed a belief that WDP had infringed their Screenplay upon seeing *Curse of the Black Pearl* after its public release in mid-2003; and (4) filed suit asserting copyright claims with respect to every motion picture in the *Pirates of the Caribbean* franchise in 2017, we believe that the relevant timeframe applicable to most of WDP's requests for production should be 1999 to November 14, 2017, when the original complaint was filed.  Plaintiffs have already agreed to search for documents from 1999 to June 2003 in many cases.  We ask that Plaintiffs either supplement or apply this time frame as follows:

**RFPs 1, 2, 3 (documents/communications re: allegations in the FAC):** produce responsive documents from 1999–2017

**RFP 8 (documents/communications or Submissions to Disney):** supplement with documents from 2003–2017 with subject matter limitation

**RFP 11 (documents/communications re: the Screenplay):**  supplement with documents from 2003–2017 with subject matter limitation

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
March 11, 2022
Page 2

**RFP 18 (documents/communications re: the Ride):** supplement with documents from 2003–2017 with subject matter limitation

**RFP 19 (documents/communications re: *Curse*):** supplement with documents from 2003–2017 with subject matter limitation

Similar timeframes should apply to the following interrogatories:

**ROG 1 (persons with information re: Plaintiffs' claims):** 1999–2017

**ROG 2 (communications re: Screenplay):** supplement with response covering 2004–2017 with subject matter limitation

**ROG 13 (efforts to sell, market, etc. Screenplay):** supplement with response covering 2004–2017 with subject matter limitation

As we noted on the call and in our prior letter, we believe the most efficient way to identify responsive documents is to use search terms to identify potentially responsive ESI. This is the approach that WDP has taken in responding to Plaintiffs' discovery responses. WDP collected hundreds of thousands of documents stored electronically and ran searches designed to identify potentially responsive documents. Particularly given the minimal reciprocal burden entailed in searching for responsive documents from what appears to be only *two* custodians, there is no basis for Plaintiffs to refuse to do the same. The following terms are the ones WDP proposes; documents that hit on these terms are highly likely to be responsive to numerous requests.

- Pirate!

- POTC

- Curse

- Black Pearl

- "Spanish Main"

- "Red Hood"

- Tova OR Laiter

- Brigham OR Taylor

- Josh OR Harmon

MUNGER, TOLLES & OLSON LLP

Patrick M. Arenz
March 11, 2022
Page 3

- Michael OR Haynes

- Disney

- Depp

- Infring! OR copyright OR lawsuit

- Copy! w/3 (script OR screenplay)

- "Dead Man's Chest" OR "At World's End" OR On Stranger Tides" OR "Dead Men Tell No Tales"

Please confirm that you will collect the two named Plaintiffs' ESI, including email, and run the proposed search terms to identify potentially responsive documents throughout the time period January 1, 1999 through November 14, 2017.  To the extent Plaintiffs refuse to include any of the foregoing search terms, please provide your specific grounds for objection regarding each such term and state precisely what search terms, if any, Plaintiffs will commit to apply in their place.

**2.      Contention Interrogatories**

On our call, we discussed WDP's contention interrogatories related to the particular elements of the Screenplay that Plaintiffs allege were infringed: Interrogatories 4, 5, 6, and 8.  The purpose of such contention interrogatories is to narrow the issues for trial, so the Court and parties can efficiently prepare.  Complete and verified answers to these interrogatories are critical to Defendants' ability to discover the bases for Plaintiffs' claims, to conduct discovery from relevant witnesses (including Plaintiffs and Ms. Laiter), and to prepare for trial.  We asked you for a firm answer by the close of business today, Friday, March 11, 2022, regarding whether you will provide full and complete responses to these interrogatories on or before March 18.  If we do not receive assurances by the close of business today that plaintiffs will provide full and complete responses by next Friday, we will proceed to seek relief from the Court.

Very truly yours,

*/s/ Jordan D. Segall*

Jordan D. Segall

# Exhibit 13

| | |
|---|---|
| **From:** | Arenz, Patrick M. <PArenz@RobinsKaplan.com> |
| **Sent:** | Friday, March 11, 2022 2:25 PM |
| **To:** | Segall, Jordan; Pakkebier, Brandon J. |
| **Cc:** | Aleksandra Hilvert; Steven Lowe; Klaus, Kelly; Ehler, Rose; Yee, Juliana; Gray, Robin |
| **Subject:** | RE: [EXTERNAL] Re: Alfred v. WDP | Meet and confer letters re: written discovery disputes |

Dear Jordan and Rose:

As a follow up to our discussion on Wednesday about Disney's interrogatories on infringement, we will stand on our objection that the current phase of discovery excludes the issue of substantial similarity. The purpose of the stipulation was that substantial similarity would be resolved in Phase 1. The stipulation makes this conclusion clear. More generally, this case needs efficiency to streamline it toward resolution at trial. Discovery that seeks to re-litigate the issue of substantial similarity—a topic that the Court has addressed many times already—does not advance this objective either.

Please let me know if it would help to discuss this topic further. I will respond in writing to the remainder of your letter early next week.

Thanks,

Patrick

Patrick M. Arenz
Robins Kaplan LLP | 800 LaSalle Avenue | Suite 2800 | Minneapolis, MN  55402
p 612 349 8591 | PArenz@RobinsKaplan.com| RobinsKaplan.com
Bio: http://robinskaplan.com/lawyers/patrick-arenz